## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case Nos. 25-11853(KBO)<br><br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br><br>　　　　　　　　Defendant. | Adv. Proc. No. 25-_____ |

## COMPLAINT

Debtors and plaintiffs Hudson 1701/1706, LLC and Hudson 1702, LLC (together "Plaintiffs") allege as follows:

## INTRODUCTION

1.    This action involves a Purported Ground Lease, as defined and described below, entered into between Plaintiffs and Defendant on May 4, 2022, together with the amendments

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

thereto in connection with the financing of Plaintiffs' planned redevelopment of the former Hudson Hotel in New York, New York (the "Hudson")[2] within the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street, New York, New York (the "Property").

2.      This Complaint seeks recharacterization of the Purported Ground Lease, which, while disguised as a "lease," does not resemble a ground lease, and certainly not the economic realities of a true lease by any definition of that term. Rather, the sum and substance of the Purported Ground Lease is that of a financing arrangement. This action follows the Plaintiffs' review of the Purported Ground Lease, as well as the facts and circumstances that led to the execution of the Purported Ground Lease, all of which overwhelmingly indicate that the Purported Ground Lease is a disguised financial product. Plaintiffs initially sought to recalibrate the Purported Ground Lease to reflect the true value of the use of the Hudson directly with the Defendant. This effort took place through reasonable, good-faith discussions, but Defendant rejected every single attempt. Plaintiffs have been left with little choice but to seek to redefine the Purported Ground Lease to reflect its actual substance and purpose and avoid Defendant's attempt to take advantage of the favorable treatment of "leases" under the Bankruptcy Code to the detriment of the Plaintiffs' and their other creditors.

3.      As detailed herein, the Purported Ground Lease embodies many of the hallmarks of a disguised financing agreement, including, *inter alia*, that; (a) the "rent" payments were calculated to ensure Defendant saw a return on its investment and were not related to the market value of the tenancy; (b) it required an upfront payment (so-called "prepaid rent") in excess of $36

---

[2] As used herein, the term "Hudson" refers, collectively, to Condominium Units 1701, 1702, and 1706 in the Property as further detailed below and the Unit numbers for the Condominium Units refer to the Lot numbers on the tax maps of The City of New York..

million, essentially equivalent to an 18% down payment or an equity contribution; (c) it requires a "Right-Size Payment" equivalent to an equity cure provision in a loan; (d) Defendant purchased the Hudson specifically as part of an arrangement to finance Plaintiffs' acquisition and redevelopment of the Hudson; and (e) it burdens Plaintiffs with all of the obligations typically associated with outright ownership. Taken together, it is clear that the Parties did not intend to enter a true lease and that Defendant was instead financing the purchase of the Hudson as part of Plaintiffs' redevelopment plan. Indeed, Defendants themselves touted their purported ground leases as a "financing product" in their contemporaneous communications and advertisements concerning the Purported Ground Lease.

4.      Accordingly, Plaintiffs seek a declaratory judgment that the Purported Ground Lease is not a "lease," but rather is a disguised financing arrangement. Thus, the interests created by the Purported Ground Lease are properly excluded from application of Bankruptcy Code sections 365 and 1123. Rather, the Purported Ground Lease transaction is subject to Section 506 of the Bankruptcy Code.

5.      In addition, Plaintiffs assert that the Fourth Amendment to the Purported Ground Lease was entered at a time when Plaintiffs were insolvent or rendered Plaintiffs insolvent and for less than reasonably equivalent consideration received by Plaintiffs in exchange and is avoidable under Bankruptcy Code sections 548 and 544 and applicable non-bankruptcy law and recoverable under section 550 of the Bankruptcy Code.

## PARTIES

6.      Plaintiff Hudson 1701/1706, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with offices at 1166 Avenue of the Americas, 15th Floor, New York, NY 10036. Plaintiff Hudson 1701/1706, LLC is a debtor in the above-

captioned cases having filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code on October 22, 2025 (the "Petition Date").

7.      Plaintiff Hudson 1702, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with offices at 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.  Plaintiff Hudson 1702, LLC is a debtor in the above-captioned cases having filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code on the Petition Date.

8.      Nonparty PV Hudson, LLC ("PV Hudson") is a limited liability company organized and existing under the laws of the State of Delaware and is the current holder of 100% of the limited liability company membership interests in each of the Plaintiffs.

9.      Nonparty CSC Hudson, LLC ("CSC") is a limited liability company organized and existing under the laws of the State of Delaware and is the former holder of 100% of the limited liability company membership interests in each of the Plaintiffs.

10.     Upon information and belief, nonparty MSP Capital Management, L.L.C., d/b/a Montgomery Street Partners ("MSP"), is a limited liability company organized and existing under the laws of the State of Texas with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201.

11.     Upon information and belief, nonparty The Ground Lease REIT, Inc. ("GLR") is a real estate investment trust with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201. Upon information and belief, GLR was formed by and is a subsidiary of MSP.

12.     Upon information and belief, Defendant 356W58 Ground Lessor LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201.  Upon information and belief,

Defendant 356W58 Ground Lessor LLC was formed by GLR as a special purpose entity for the purposes of entering the Purported Ground Lease with Plaintiffs.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, sections 105, 363, 364 and 365, 506, 548, 550, and 502(d) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7001(a), 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedure in order to determine the respective rights of Plaintiffs and Defendant concerning the Purported Ground Lease described herein, which in turn relates to real property of Plaintiffs.

14.     This Court has jurisdiction over the above-captioned bankruptcy cases, Debtors, property of Debtors' estates, and Defendants and this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a).

15.     This is a core proceeding under 28 U.S.C. § 157(b)(2).

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

17.     Pursuant to Fed. R. Bankr. P. 7008(a) and Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), Plaintiffs consent to the Court's entry of a final judgment or order with respect to this adversary proceeding if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### A.     Background of Transaction

18.     Plaintiffs were formed in March 2022 to redevelop and operate certain condominium units within the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street, New York, New York.

19.    The building was first constructed in 1929 as the American Women's Association clubhouse and residence for young women. It contained 1,250 rooms, along with a swimming pool, restaurant, and gymnasium.  Following the American Women's Association's bankruptcy in 1941, the building was converted into the Henry Hudson Hotel.

20.    On or around April 11, 1985, and pursuant to a declaration under Article 9-B of the Real Property Law of the State of New York, the real property located at 353 West-361 West 57th Street was declared a condominium known as 353 West 57th Street Condominium (the "Condominium").   The plan for the Condominium was subsequently amended on several occasions (as amended, the "Condominium Declaration").   The Condominium Declaration establishes a Condominium Association and Common Elements, including the land, and each of the Condominium Unit owners has a specified undivided interest in such Common Elements.

21.    The Condominium consists of six units numbered Unit 1701 through Unit 1706; however, only Units 1701, 1702 and 1706 are subject to the Purported Ground Lease (as defined herein).   Unit 1701 (the "EBC Unit") comprises 203,585 square feet of the Property, including portions of the cellar, sub-cellar first floor and floor 26, the entire first mezzanine and floors numbered 2 through 9, and 25, as well as certain elevators, entranceways, windows and other mechanical areas as more particularly described in the Condominium Declaration.  Unit 1702 (the "Hotel Unit") comprises 216,937 square feet of the Property, including portions of the cellar, sub-cellar, first floor and floors 23, 24 and 26, and the entire floors 11 through 22, as well as certain elevators, entranceways and windows and other mechanical areas as more particularly described in the Condominium Declaration.  Unit 1706 comprises 17,981 square feet in the Condominium

and consists of the 10th floor of the Property.[3]  The "Hudson" refers, collectively, to Condominium Units 1701, 1702 and 1706 in the Property.

22.     In 1997, the building was purchased by the Morgans Hotel Group. Following a three-year, $125 million renovation, certain condominium units were converted to hotel use by renowned hotelier Ian Schrager and renamed "The Hudson."

23.     Plaintiffs planned to redevelop the Hudson as a multifamily residential property originally anticipated to include 440 market-rate rental units complete with commercial space and a penthouse.

24.     CSC originally entered into a Purchase and Sale Agreement dated February 3, 2022 to purchase Unit 1701 and Unit 1702 and lease Unit 1706, with an option to later purchase Unit 1706 from a subsidiary of Cain International, a real estate investment management company, for $207.5 million.

25.     Upon information and belief, CSC sought out alternative, additional financing for its redevelopment plans and entered into discussions with GLR, a real estate investment trust formed by MSP, a commercial real estate investment firm. Upon information and belief, CSC was attracted to GLR and MSP's "ground lease" scheme, which was explicitly advertised as a "financing product" as described by MSP and GLR directly below.[4]

**THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION**

| Transaction Size | Property Types | NOI Coverage | Rate | Geography | Risk Profile |
|---|---|---|---|---|---|
| $10M - $500M+ | Mixed Use, Multifamily, Student & Senior Housing, Office, Industrial, Hospitality | 4.0x – 7.0x | 3.5% - 5.0%+ | Top 50 MSA's | Core, Value Add, Ground Up Development |

The **GLR Ground Lease** is an interest only, 99-year financing product intended to maximize sponsor's returns and seeks to address funding gaps due to cost overruns, vacancy, or lack of lender liquidity.

---

[3] For completeness, Unit 1703 is a supermarket unit on the first floor of the Property that comprises 18,236 square feet, Unit 1704 is a store unit on the first floor of the Property that comprises 1,598 square feet, and Unit 1705 comprises 3,821 square feet in the Property; it is the penthouse unit on portions of the 23rd and 24th floors of the Property, including the 24th floor roof.

[4] *See THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION* (publicly available at https://glreit.com/wp-content/uploads/2023/04/GLR_Flyer.pdf) (last accessed December 17, 2025).

26.     CSC then assigned the Purchase and Sale Agreement to Defendant, a special purpose entity formed by GLR.

27.     On May 4, 2022, Defendant acquired Unit 1701 and Unit 1702, along with a lease and purchase option for Unit 1706, and simultaneously entered into the purported "Ground Lease" dated May 4, 2022 with Plaintiffs (as amended, the "Purported Ground Lease"), pursuant to which Plaintiffs occupy the Hudson.  A true and correct copy of the Purported Ground Lease is attached hereto as **Exhibit A**.  On or around January 3, 2023, Defendant acquired Unit 1706.

28.     Furthermore, and pursuant to a Closing Agreement between CSC, Defendant, and Plaintiffs, CSC—not Defendant—was required to pay all the costs ancillary to Defendant's purchase of the property, including (i) all taxes; (ii) title insurance premiums; (iii) escrow fees; (iv) recording fees; (v) other costs or expenses incurred by Defendant in connection with the closing ("including, without limitation third party due diligence costs and construction consultant fees incurred by [Defendant]") up to $350,000; and (vi) $595,000 "in consideration for advisory and management services" to GLR.

29.     Pursuant to the Purported Ground Lease, Plaintiffs were required to make an upfront payment to Defendant of $36,850,000 "in connection with [Plaintiffs'] acquisition of the Personal Property and [Defendant's] acquisition of the Leased Premises." *See* Ex. A, § 4 (i).  It is not clear what "Personal Property" was actually acquired in this transaction given the Hudson's status as an abandoned hotel property.

30.      Plaintiffs also received an aggregate $207 million in development and construction financing (the "Loan") from nonparty Parkview Financial REIT LP ("Prepetition Lender") to fund the redevelopment of the project.

31.      MSP touted the transaction in a press release stating that Plaintiffs "utilized our ground lease capital and paired it with leasehold financing to gain control of the asset and reposition it" and that Defendant's "ground lease paired with leasehold financing provides our tenant [Plaintiffs] with a compelling execution at a lower blended cost of capital."[5]

32.      The Purported Ground Lease bears the words "Ground Lease" but it lacks the indicia of a ground lease.  The term "ground lease" typically describes a lease of unimproved land on which improvements are to be built by the tenant or a lease of improved real estate that covers the land but not the improvements, which are owned by the tenant.  The Purported Ground Lease, however, refers to leases for two Condominium units—Units 1701 and 1702—and a sublease for a third unit, Unit 1706, which was subsequently acquired by Defendant and made part of the Purported Ground Lease.

33.      As MSP celebrates in its press release, the true essence of the Purported Ground Lease structure was a disguised financing to fund Plaintiffs' acquisition and construction.

34.      Likewise, GLR touts its ground lease schemes to its investors and potential borrowers as "A COMPELLING **FINANCING** SOLUTION" that is a "return-enhancing alternative to conventional financing" offering "a highly competitive cost of capital."[6] It further

---

[5] MSP July 31, 2022 Press Release, *Montgomery Street Partners Utilizes 99-Year Ground Lease Structure to Acquire, Facilitate Planned Residential Conversion of the Hudson Hotel in Columbus Circle, Manhattan* (publicly available at https://montgomerystreetpartners.com/news/montgomery-street-partners-utilizes-99-year-ground-lease-structure-to-acquire-facilitate-planned-residential-conversion-of-the-hudson-hotel-in-columbus-circle-manhattan/) (last accessed December 17, 2025).

[6] *See THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION* (publicly available at https://glreit.com/wp-content/uploads/2023/04/GLR_Flyer.pdf) (last accessed December 17, 2025).

explains that the ground lease structure is "an interest only, 99 year financing product intended to maximize Sponsor returns and address capital requirements for core to opportunistic real estate investments."[7] In short, GLR's marketing makes clear that its ground lease product is nothing more than an alternative financing solution for real estate developers.

B.    **The Purported Ground Lease**

35.    Under the Purported Ground Lease, Plaintiffs hold an undivided interest in the Hudson, which includes Units 1701, 1702, and 1706 of the Condominium. As noted, the Purported Ground Lease does not cover Condominium Unit 1703, Unit 1704, and Unit 1705 on the Property.

36.    Upon execution of the Purported Ground Lease, Plaintiffs were required to make an upfront payment to Defendant of $36,850,000 or 18% of the purchase price "in connection with [Plaintiffs'] acquisition of the Personal Property and [Defendant's] acquisition of the Leased Premises." *See* Ex. A, § 4 (i).  This upfront payment was identified as "Prepaid Rent." However, Plaintiffs did not receive any credit for future rent payments owed by Plaintiffs. *See id.*

37.    Furthermore, and upon information and belief, the $36.85M purchase price for this "Personal Property" was an inflated amount that bore no relationship to the value of the "Personal Property" acquired from the Hudson, a former hotel occupied by, among others, SRO tenants. Accordingly, the $36.85M in consideration for "Personal Property" or "Prepaid Rent" is more accurately viewed as a financial down payment or equity contribution from Plaintiffs to Defendant for the Hudson.[8]

---

[7] *See id. supra* fn. 6.

[8] Under Section 5(b), the upfront payment of "Prepaid Rent" is treated as a loan from Plaintiffs to Defendant for tax purposes—a tax advantage benefitting Defendant.

38.     Upon information and belief, Defendant denoted the transaction as a "ground lease" to, in part, secure certain state and federal tax advantages for Defendant.

39.     The annual Base Rent for the first five years of the Purported Ground Lease term was $6,000,000 (approximately 3% of the purchase price) payable in $500,000 monthly installments. *See* Ex. A, § 4(a). The Base Rent is set to increase by 10% in the sixth and eleventh lease years and by at least 2% for the proceeding 88 lease years. *See id.*, § 4(b)-(d).  The Base Rent increased to $6,400,000 upon Defendant's purchase of the Tenth Floor Unit (i.e., Condominium Unit 1706) on January 3, 2023.[9]   A conservative estimate of Defendant's return on investment over the full term of the Purported Ground Lease exceeds approximately 63%.

40.     If Plaintiffs elect to pursue a Fallback Project (as that term is defined in the Purported Ground Lease)[10] to amend the original redevelopment plans, Defendant is entitled to a "Right-Size Payment," or equity cure, to maintain a satisfactory loan-to-value ratio ("<u>LTV</u>") and ensure it recoups its investment by no later than the end of the fifth lease year, May 3, 2027. *See* Ex. A, § 60(a).[11]

41.     The amount of the Right-Size Payment is a function of the 12-month trailing net operating income earned by Plaintiffs from the Hudson.  *See id.*, at 26.  Notably, the Right-Size

---

[9] As discussed below, the Base Rent was increased in connection with the Fourth Amendment to the Purported Ground Lease.

[10] Under the Purported Ground Lease, the "Fallback Project" is an alternative plan for a "fallback use of the Improvements approved by [Defendant]" in connection with the submission of a proposed "Fallback Business Plan" to Defendant outlining proposed modifications to the project, schedule, financing, etc.  *See* Ex. A at 9-10.  The triggering event requiring the submission of the Fallback Business Plan is discussed *infra* at Section C.

[11] As discussed below, these dates were adjusted in connection with the Fourth Amendment to the Purported Ground Lease.

Payment is *inversely* related to Plaintiffs' net operating income.  *See id.*  As income goes down, the Right-Size Payment goes up. [12]

42.     The Right-Size Payment is similar to the industry-typical equity cure provision in financing agreements which allows a borrower to inject additional capital by way of equity or subordinated debt when the LTV increases beyond a certain threshold to avoid breach of an LTV covenant.  The Right-Size Payment is nothing more than a disguised equity cure payment that would be found in a typical real estate financing arrangement. Instead of the threat of an LTV covenant breach, the Purported Ground Lease simply *requires* Plaintiffs to pay the Right-Size Payment to keep the Purported Ground Lease at an LTV acceptable to Defendant.

43.     The Purported Ground Lease is also "triple net," meaning that the Purported Ground Lease also obligates Plaintiffs to (1) pay all real estate taxes (*see* Ex. A, § 7(a)), (2) obtain insurance at levels demanded by Defendant and naming Defendant as an additional insured (*see* § 15 and (3) keep and maintain the Hudson in good condition, repair, and appearance (*see* § 9(a)). The Purported Ground Lease also obligates Plaintiffs to obtain all permits and licenses (*see* § 7(c)), keep the Hudson free and clear of liens (*see* § 10), and pay all utilities (*see* § 9(f)).

44.     In connection with the Purported Ground Lease, Alberto Smeke Saba and Salomon Smeke Saba (the "Smekes"), the principals of CSC and former principals of Plaintiffs, entered into a "Carry Guaranty" with Defendant guaranteeing the payment of "rent" owed to Defendant, plus interest, taxes, insurance premiums and all operating expenses.  The Carry Guaranty is attached hereto as **Exhibit B**. The Smekes also entered into Completion Guarantees with both Defendant and Prepetition Lender guaranteeing the completion of construction. The Completion Guarantees

---

[12] As discussed below, the potential Right-Size Payment amount was increased as part of the Fourth Amendment to the Purported Ground Lease.

are attached hereto as **Exhibits C and D**. Notably, these guarantees provide additional security typical of what a lender would require.

45.     The Purported Ground Lease and purported rent payments are unsubordinated to the Loan and other debts. *See* Ex. A., § 18(a).   This has made it more difficult for Plaintiffs to obtain additional financing because any such lender would need to be subordinated to Defendant's interest in the Purported Ground Lease and rental payments.

### C.     Construction Delays and Amendment to Purported Ground Lease

46.     Plaintiffs began construction on or around June 2022 to convert the Hudson to a multifamily residential property originally anticipated to include approximately 440 market-rate rental units together with commercial and amenity space and a penthouse.

47.     The Purported Ground Lease required substantial completion of the construction project by May 4, 2024.

48.     When Plaintiffs commenced development and then construction, the Hudson contained 39 single room occupancy ("SRO") units and now contains 32 SRO units, many of which continue to be occupied by the SRO Tenants, who are beneficiaries of rent-stabilization under New York City law.  Because the Hudson is also located within the Clinton Special District, New York City zoning regulations require that the New York City Department of Housing and Preservation Development ("HPD") issue a Certificate of No Harassment ("CONH") following an investigation and survey of tenants residing at the Hudson.  Plaintiffs therefore required a CONH from the Department of Buildings before making alterations to the Hudson.  The CONH certifies that a building owner is not harassing tenants by, among other things, offering money, threatening the use of force, disrupting essential services such as heat and water, or negligently creating an unsafe living environment.

49.     The Purported Ground Lease required Plaintiffs to obtain the CONH by July 8, 2024 (the "CONH Requirement Outside Date").  *See* Ex. A, at 5.

50.     On December 2, 2022, HPD sent a letter to the SRO Tenants seeking information in connection with Hudson's CONH application.  On September 7, 2023, the SRO Tenants presented to Manhattan Community Board Four alleged incidents of harassment including: (i) inadequate notice of water and electricity shutdowns, (ii) inadequate pest control, (iii) positive testing for lead, and (iv) exposed wiring and cables.

51.     The HPD made an initial determination finding that there was reasonable cause to believe that harassment occurred and on September 25, 2023, issued a notice of hearing and petition for Debtors to be heard before the Office of Administrative Trials and Hearings ("OATH").  The HPD also recommended that OATH deny the Plaintiffs' application for a CONH.

52.     When the HPD issued the initial determination, Plaintiffs were still controlled by the Smekes and, rather than contesting the HPD's determination of harassment, the Smekes caused Plaintiffs to opt to pursue an application for a cure agreement with HPD to clear the record and allow redevelopment and construction to continue.  To qualify for a cure agreement, an applicant must provide permanent affordable housing amounting to 28% of the total residential floor area of the building overseen by the HPD Inclusionary Housing Unit.  Accordingly, the decision to seek a cure agreement affected the earning potential of the Plaintiffs—if a cure agreement is obtained, the Plaintiffs may only obtain market rate rentals for approximately 300 of the approximately 440 units anticipated in the Hudson following redevelopment.

53.     It quickly became clear that Plaintiffs were not going to meet the CONH Requirement Outside Date. In the event that Plaintiffs did not meet the CONH Requirement Outside Date, the Purported Ground Lease provided for delivery to Defendant of an alternative

"Fallback Business Plan" for a "Fallback Project," subject to Defendant's approval. *See* Ex. A, § 48(c).

54.　　Plaintiffs originally delivered two alternative Fallback Business Plans to Defendant on December 22, 2023 and January 11, 2024.

55.　　In response, Defendant conditioned their *preliminary* acceptance of either Fallback Business Plan on Plaintiffs entering into an "interim amendment" to the Purported Ground Lease. The purpose of this interim amendment was simple: raise the rent to make sure Defendant has its loan repaid in a timely manner, notwithstanding that the economics of the development materially changed to the detriment of Plaintiffs. Indeed, in Defendant's response to the submitted Fallback Business Plan, it refers to the "exceptionally low cost of capital provided to" Plaintiffs and explains that Defendant's "investors are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics" to the Purported Ground Lease.

56.　　Plaintiffs agreed to enter into a fourth amendment to the Purported Ground Lease on March 29, 2024 (the "Fourth Amendment"). A true and correct copy of the Fourth Amendment is attached hereto as **Exhibit E** Pursuant to the Fourth Amendment, the going-forward annual Base Rent was increased to $8,750,000—an increase of approximately 36%—payable in $729,166.67 monthly installments. The Fourth Amendment allowed for a credit of $2,350,000 to be applied to the monthly rent payments in twelve monthly installments ending on March 29, 2025. *See* Ex. E, § 5(b). As of the Petition Date, the contractual purported monthly rental obligation was still $729,166.67, assuming section 365 of the Bankruptcy Code applies.

57.　　The Fourth Amendment also allowed for more frequent adjustments to the Base Rent to account for inflation, from adjustments every 10 years to adjustments every 5 years. *See id.*, § 5(d). It also ensures that the increase is no less than 2% regardless of inflation. *See id.*

58.     The Fourth Amendment *further* changes the inputs for the calculation of the Right-Size Payment to be more favorable to Defendant, ballooning the potential payment up to a cap of $65,000,000.  *See id.* at 5.

59.     In exchange for incurring these increased payment obligations to Defendant, Plaintiffs received (1) a change in the date of the Right-Size Payment, which was pushed back from the end of the fifth lease year to the end of the tenth lease year; and (2) the ability to make a Buyback Option payment to Defendant to decrease going-forward "rent" payments upon completion of construction in accordance with a not-yet-agreed-to Fallback Business Plan, but no later than May 4, 2027.  *See id.*, § 7(a). In effect, the Debtors received an option to repay the loan early in exchange for the Fourth Amendment, which materially increased the Debtors' costs under the Ground Lease.

### D.     UCC Foreclosure Sale of Equity Interests

60.     As security for Plaintiffs' Loan Obligations to Prepetition Lender in addition to collateral granted by Plaintiffs to Prepetition Lender, CSC, as pledgor and the then-sole member of the Plaintiffs, entered into a pledge and security agreement (the "Pledge Agreement") with Prepetition Lender.  Under the Pledge Agreement, as collateral CSC pledged 100% of the equity interests in the Plaintiffs along with certain other rights and interest, and as specifically defined in the Pledge Agreement (the "Pledged Collateral") for the Loan Obligations to Prepetition Lender. Upon an event of default, the Prepetition Lender had the right to conduct a UCC sale of the Pledged Collateral.

61.     As noted, the Fourth Amendment increased the payments from $6,400,000 to $8,750,000 million per annum. These increased payments remained owing during construction and did not fluctuate with the stop work order in place as a result of the HPD's determination of

harassment and further aggravated already-present liquidity constraints resulting from continued rent payments during the delays in construction.

62.     The Loan from the Prepetition Lender matured on November 1, 2024.  Plaintiffs were unable to make payment by that time, and the Prepetition Lender subsequently agreed to forebear from exercising any remedies on two occasions through November 22, 2024. Ultimately, on November 23, 2024, the Prepetition Lender sent Plaintiffs a notice of default under the Loan and forbearance agreements.

63.     On or around November 25, 2024, the Prepetition Lender served upon CSC, Plaintiffs, and the Smekes a notice of public disposition of collateral, scheduling a UCC foreclosure sale of the Pledged Collateral scheduled for March 24, 2025 (the "UCC Sale"). On February 11, 2025, the Prepetition Lender served a second notice of disposition and publicized the adjusted date of the UCC Sale of April 10, 2025.

64.     Prepetition Lender and the Smekes were involved in negotiations to resolve issues arising from the Smekes' management of the project in order to allow the redevelopment and construction to continue at the Hudson.  Those efforts were at least partially successful, and, on April 10, 2025—the date scheduled for the UCC Sale—the Prepetition Lender and the Smekes, as guarantors of the Loan, entered into an agreement which among other things, adjourned the UCC Sale.

65.     Following intervening litigation and stalled negotiations, the UCC Sale of the Pledged Collateral was ultimately conducted on July 25, 2025. Prepetition Lender obtained the equity interests in Plaintiffs in exchange for a credit bid in the amount of $80,000,000 of existing indebtedness. The Prepetition Lender then assigned the interests it acquired to its wholly owned subsidiary, PV Hudson. PV Hudson is currently the sole member of the Plaintiffs.

66.     Plaintiffs, now under PV Hudson's ownership, attempted to negotiate with Defendant reasonable stand-still agreements and a modification of the Purported Ground Lease to reflect changes in the economic realities of the project and the actual fair-market value of Plaintiffs' use of the Hudson, but were rejected.

67.     On November 20, 2025, Plaintiffs, as Debtors, sought authority in the Bankruptcy Case to extend the time to perform any obligations under the Purported Ground Lease for a period of 60 days from the Petition Date, through and including December 21, 2025 [D.I. 94].  The Bankruptcy Court entered an order granting this relief on December 12, 2025, and the Plaintiffs agreed to pay any rents that were then-due on December 22, 2025, while reserving "all rights with respect to any claims either party may assert against the other with respect to the Ground Lease" [D.I. 160].

**E.     The Purported Ground Lease – Disguised Financing Arrangement**

68.     The Purported Ground Lease embodies characteristics of a disguised financing agreement or joint venture agreement and is not a true lease.

**1.     Payments Under the Ground Lease Bore No Relation to Use of the Hudson, But Rather Were Calculated to Ensure Return on Investment.**

69.     Although the Purported Ground Lease recites that it is a lease and not a financing arrangement, courts look beyond such labels to the economic realities of the transaction. Here, the economic substance is that of a financing. The purported "rent" payments were not calculated to compensate Defendant for the use of the Hudson or by reference to the market value of the occupancy rights for the Condominium units (Units 1701, 1702 and 1706). Rather, the "rent" payments were designed and structured to ensure that Defendant would receive specific returns on its investment as one would expect with interest and fees on a loan.

70.     For one, Plaintiffs paid a $36,850,000 upfront payment upon execution of the Purported Ground Lease. This payment was designated as for the acquisition of "Personal Property," for the prepayment of rent, or both.  But Plaintiffs received no rent credit, and whatever "Personal Property" existing in the Hudson—a former hotel occupied by SRO Tenants—is, upon information and belief, worth considerably less than $36.85 million.  The descriptions are not credible; rather, Plaintiffs effectively made an 18% down payment or an equity contribution to Defendant. Indeed, upon information and belief, the Hudson was largely gutted of any personal property (i.e., furniture) prior to Defendant's acquisition of the Property.

71.     Similarly, the Right-Size Payment was calculated to ensure that Defendant saw a specific return on its investment in case of the need to switch to a Fallback Project—a reduction in potential cash flow, resulting in a reduction in value necessitating the need to "right-size" the LTV ratio. That is, the requirement that Plaintiffs make a Right-Size Payment was triggered by the change in redevelopment plans, and to compensate Defendant's investors as a consequence of these changes—again bearing no relation to the value of the occupancy rights for the Hudson.

72.     The Right-Size Payment *increases* even when the income Plaintiffs generate from the Hudson *decreases*. The Right-Size Payment is *inversely* associated with the current market value of the use of the Hudson and capped at the sum of $65 million—approximately 38.2% of the original purchase price paid by Defendant—which, when added to the initial downpayment of $36.85 million represents 50% of the initial purchase price. The Right Size Payment is nothing more than an equity cure provision to "right size" the extent of the LTV ratio.

73.     The "rent" payments themselves are equally unmoored from the market value of the use of the Hudson, ballooning 10% in the sixth and eleventh years of the Purported Ground Lease and at least 2% thereafter with *no adjustment* based on the fair market value of the use of

the Hudson anytime during the 99-year term.[13] The "rent" payments ensure that Defendant receives a fixed return that never gets adjusted for the fair market value. As noted earlier, a conservative estimate of Defendant's return on investment over the full term of the Purported Ground Lease exceeds approximately 63%. Defendant is acting as a lender ensuring a return based on the amount of capital Defendant extended to Plaintiffs.

74.      The payment increases in the Fourth Amendment drive this point home. Indeed, Defendant admitted that it required Plaintiffs to execute the Fourth Amendment because Defendant was worried about the returns it had promised to its investors in reliance on Plaintiffs' completion of the redevelopment project. Defendant explained in response to Plaintiffs' Fallback Business Plan submitted in December 2023 that its "investors require that ground lease proceeds advanced and ground rent rates and increases be tied to specific thresholds, yields, and coverage ratios based on the asset's as-stabilized market value and project net operating income" and that its "investors are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics to the [Purported] Ground Lease."

75.      Moreover, as a condition to entering the Purported Ground Lease, Defendant required not only a guaranty of rent payments, but also a guaranty that construction would be completed.  The guaranty gives Defendant additional credit support beyond the value of the Hudson and external to the Purported Ground Lease and is consistent with support that a lender would receive in a conventional financing.

76.      The Purported Ground Lease did not provide for a "pre-term" or "holding-period" rent period prior to receiving development permits or a "construction period" rent that would apply

---

[13] The Parties demonstrated elsewhere in the Purported Ground Lease that they could calculate the fair market value of the purported "Leasehold Estate" for other non-"rent" purposes.  *See*, *e.g.*, Ex. A, § 14.

while improvements were in process. Here, the rent payments—in effect, interest—started in full force without abatement despite the construction delays.  Indeed, Plaintiffs will have to pay *more* in connection with the Right-Size Payment on account of construction delays than if the construction of the project was finished and Plaintiff were collecting rent. These provisions demonstrate that the payment obligations under the Purported Ground Lease were in no way related to the market value of the use of the Hudson.

77.    In its own marketing materials, Defendant describes their "ground lease" scheme as an "interest only, 99-year financing product intended to maximize Sponsor returns and address capital requirements for core to opportunistic real estate investments."[14]  Defendant is not in the business of collecting passive rental income like a typical landlord. In other words, Defendant earns "interest" on its investment capital. The Purported Ground Lease is simply an investment and financing vehicle.

## 2.    Hudson Was Acquired By Defendant Specifically For Plaintiffs' Use.

78.    Defendant received assignment of the Purchase and Sale Agreement from Plaintiffs, then paid for and acquired Hudson with the sole purpose of turning it around and "leasing" it to Plaintiffs. The purpose of this scheme is to have Defendant acquire the Condo Units by way of a disguised "interest only financing product," in order to allow Plaintiffs to obtain typical debt for the redevelopment portion of the project.

79.    Defendant acquired Hudson after Plaintiffs had *already* contracted to purchase Hudson. After direct assignment of the Purchase and Sale Agreement, Defendant acquired Hudson and simultaneously entered into the Purported Ground Lease with Plaintiffs. Moreover, CSC—which owned all of the equity interests in Plaintiffs—was required to pay all of the costs ancillary

---

[14] *See GLR Ground Lease*, *supra* fn. 6.

to the transaction, including Defendant's diligence costs and a $595,000 payment to GLR for "advisory and consulting services."  It is very unusual for a landlord to require its tenant to pay such a fee for leasing space; however, it is typical for a lender to require payments for such financing fees, as Defendant required the Plaintiffs to do here.

80.     In the Purported Ground Lease itself, Defendant notes that the up-front payment of $36.85 million was "in connection with . . . [Defendant's] *acquisition* of the Leased Premises" (resulting in an LTV ratio of approximately 82%), not some sort of security deposit or genuine prepaid rent that would be credited to future rent payments. *See* Ex. A, § 4(i) (emphasis added).

81.     Defendant also announced to the world that the Purported Ground Lease was used to "acquire" the Hudson and "facilitate" the redevelopment by providing Plaintiffs "a lower blended cost of capital."

### 3.     The Transaction Was Denoted as a Purported Ground Lease for Tax Purposes.

82.     Upon information and belief, Defendant structured the Ground Lease to protect its investors from tax consequences and/or to secure certain tax advantages.

83.     Upon information and belief, Defendant enjoys tax advantages by reclassifying payments under the Purported Ground Lease as "Prepaid Rent," including the upfront payment and the Right-Size Payment that can be treated as a loan for tax purposes permitting Defendant to spread out its realization of such income over time pursuant to 28 U.S.C. § 467. Such payments would be subject to less advantageous tax treatment in the typical financing context when classified as a financing fee or equity cure payment.

### 4.     Plaintiffs Assumed All of the Obligations Typical of Ownership.

84.     As noted above, Plaintiffs assumed virtually all of the obligations that would be expected by an owner of the fee interest in the real estate.

85.     Plaintiffs are required under the Purported Ground Lease to, among other things, (i) obtain insurance at amounts set by Defendant and name Defendant as an additional insured, (ii) pay utilities, (iii) pay real estate taxes, (iv) obtain all necessary licenses and permits with government regulators, and (v) keep the Hudson clear of liens.

86.     Moreover, the Purported Ground Lease provides for a waterfall of any award in the event of condemnation where a portion of such proceeds go to Plaintiffs in proportion with the fair market value of the purported "Leasehold Estate." *See* Ex. A, § 14.

87.     While these terms may be understood to apply in commercial real estate ground leases, they should be viewed here in conjunction with the other indicia of a disguised financing arrangement, all meant to benefit Defendant.  In other words, a true ground lease might contain these terms, but it would not *also* require tens of millions of dollars in upfront and balloon payments without any adjustment of the rent based on the fair market value of the Hudson.

**5.     The Parties Intended To Enter Into a Financing Arrangement.**

88.     By entering into the Purported Ground Lease, the Parties actually intended to enter into a financial arrangement.

89.     This is made clear by MSP and GLR's own public statements describing their ground lease schemes as utilizing "ground lease capital," as a "financing product," and as a "compelling financing solution."

90.     Moreover, the "Project Budget" agreed to by Defendant lists the Purported Ground Lease as a source of capital for financing the purchase and redevelopment of Hudson along with the Loan and Plaintiffs' equity. *See* Project Budget, Schedule 1 to Purported Ground Lease, Ex. A at 156.

91.     Indeed, the unique nature of the Purported Ground Lease instructs that it is not a "ground lease" at all.  The term "ground lease" typically describes a lease of unimproved land on

which improvements are to be built by the tenant or a lease of improved real estate that covers the land but not the improvements, which are owned by the tenant.  The Purported Ground Lease is neither of those things.  Here, the Property is split into various Condominium units, of which only three are encompassed by the Purported Ground Lease. The Condominium Declaration establishes the Common Elements, including the land, and each of the six Condominium Unit owners has a specified undivided interest in such Common Elements—not Defendant   Instead, the Purported Ground Lease is a financing arrangement.

## <u>COUNT I</u>
### Declaration that Purported Ground Lease is Not a True Lease

92.     Plaintiffs restate and incorporate by reference the above paragraphs 1 through 91 as if set forth fully herein.

93.     Plaintiffs respectfully request that this Court invoke its equitable powers to look through the form of the Purported Ground Lease to its substance. Specifically, Plaintiffs request that the Court find and declare that the Purported Ground Lease is a disguised financing arrangement and not a true lease.  Plaintiffs request that the Court order that the interests created by the Purported Ground Lease are properly excluded from application of any Bankruptcy Code section is pertinent to leases, including but not limited to Bankruptcy Code sections 365 and 1123.

94.     Plaintiffs anticipate that Defendant will attempt to seek relief pursuant to Bankruptcy Code sections 365(d)(3) and (d)(4) in its ostensible role as "lessor" under the Purported Ground Lease or seek to terminate the Purported Ground Lease.  Therefore, an actual case or controversy exists between Plaintiffs and Defendant.[15]

---

[15] Plaintiffs reserve all rights to argue in the alternative that Bankruptcy Code sections 365(d)(3) and (d)(4) do not apply to the Purported Ground Lease on any other grounds.

95.     The controversy is genuine and definite. Whether the Purported Ground Lease is a true lease, or instead a disguised financing vehicle will materially impact Plaintiffs' rights in its chapter 11 proceedings, including any future chapter 11 plans.

96.     Pursuant to Bankruptcy Code section 105 and 28 U.S.C. §§ 2201 & 2202, Plaintiffs seek a declaratory judgement that the Purported Ground Lease is not an enforceable true lease and is instead a disguised financing agreement.

97.     In the event that this Court finds that Bankruptcy Code section 365 is applicable to the Purported Ground Lease as a true lease, Plaintiffs alternatively request leave to seek this Court's approval to assume the Purported Ground Lease pursuant to Bankruptcy Code section 365(a) and Rule 6006 of the Federal Rules of Bankruptcy Procedure.

<u>**COUNT II**</u>
**Avoidance of Fraudulent Transfer – Fourth Amendment**
**Pursuant to 11 U.S.C. §548(1)(B) – Constructive Fraud**

98.     Plaintiffs restate and incorporate by reference the above paragraphs 1 through 97 as if set forth fully herein.

99.     Plaintiffs request that the Court find that that the Fourth Amendment, any transfer thereunder or in connection with, and any obligations incurred thereby are avoidable as a constructive fraudulent transfer or obligation under 11 U.S.C. § 548(a)(1)(B).

100.    In connection with the Fourth Amendment, Plaintiffs incurred obligations to pay to Defendant approximately 36% in increased "rent" payments and an increased Right-Size Payment as compared to the original Purported Ground Lease.

101.    In exchange, Plaintiffs received a Buyback Option and are not required to pay the (increased) Right-Size Payment until the tenth lease year as compared to the fifth lease year under the original Purported Ground Lease.  This consideration received by Plaintiffs was far less than

the reasonably equivalent value of the 36%-increased "rent" payments and Right-Size Payment to be received by Defendant under the Fourth Amendment.

102.    Plaintiffs were insolvent (or were rendered insolvent) at the time the Parties entered into the Fourth Amendment. At that time, Plaintiffs' monetary obligations, including monthly "rent" payments under the Purported Ground Lease, and obligations owing to the Prepetition Lender and construction of the redevelopment project was (and remains) stalled indefinitely due to the HPD's finding of harassment of the SRO Tenants.

103.    At a minimum, Plaintiffs increased payment obligations to Defendant under the Fourth Amendment left them with an ever-shrinking unreasonably small amount of capital to adequately fund the construction of the redevelopment project.

104.    Plaintiffs also incurred the increased payment obligations to Defendant under the Fourth Amendment despite the fact that construction was stalled and that Plaintiffs believed they would be unable to pay the increased "rent" payments and Right-Size Payment when those debts matured—let alone the outstanding balance of the Loan quickly approaching the maturity date.

105.    Accordingly, Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations, and each of the Plaintiffs: (a) was insolvent on the date that each transfer and obligation was made; (b) became insolvent as a result of these transfers and obligations; (c) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (d) intended to incur, believed that they would incur, or reasonably should have believed that they would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.

106.    Plaintiffs entered into the Fourth Amendment under threat of termination of the Purported Ground Lease by Defendant.

107.    Accordingly, the transfer and obligations incurred under the Fourth Amendment are avoidable transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

**COUNT III**
**Avoidance of Fraudulent Transfer – Fourth Amendment**
**Pursuant to 11 U.S.C. §544(b)(1) – New York Uniform Voidable Transactions Act**

108.    Plaintiffs restate and incorporate by reference the above paragraphs 1 through 107 as if set forth fully herein.

109.    Section 544 of the Bankruptcy Code provides that the trustee "may avoid any transfer of an interest in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1).

110.    The Fourth Amendment, any transfer thereunder or in connection therewith, and any obligations incurred thereby are avoidable transfers under the New York Uniform Voidable Transactions Act, N.Y. Debt. and Cred. Law Art. § 270(a)(2).

111.    Each of these transfers and obligations is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers were made and obligations incurred.

112.    Plaintiffs request that the Court find that the Fourth Amendment any transfer thereunder or in connection therewith, and any obligations incurred thereby are avoidable transfers pursuant to 11 U.S.C. § 544(b) and the New York Uniform Voidable Transactions Act, N.Y. Debt. and Cred. Law Art. § 270(a)(2).

113.    Plaintiffs request that the Court find that that the Fourth Amendment, any transfer thereunder or in connection therewith, and any obligations incurred thereby are avoidable as a constructive fraudulent transfer or obligation under 11 U.S.C. § 544(b)(1).

## COUNT IV
### Recovery of Fraudulent Transfer Pursuant to 11 U.S.C. § 550

114.    Plaintiffs restate and incorporate by reference the above paragraphs 1 through 113 as if set forth fully herein.

115.    Section 550 of the Bankruptcy Code provides that if a transfer is avoided under section 548 of the Bankruptcy Code, Plaintiffs may recover the property transferred from Plaintiff to Defendant.

116.    Under the Fourth Amendment, Defendant has received monthly "rent" payments and continues to receive monthly "rent" payments of $729,166.67—$195,833.34 per month above-and-beyond what it would have received under the original Purported Ground Lease.

117.    Those payments were avoidable transfers under sections 544 and/or 548 of the Bankruptcy Code and are recoverable by the Plaintiffs' bankruptcy estates under section 550 of the Bankruptcy Code.

## COUNT V
### Disallowance of Defendant's Claims Pursuant to 11 U.S.C. § 502(d)

118.    Plaintiffs restate and incorporate by reference the above paragraphs 1 through 117 as if set forth fully herein.

119.    The increased "rent" payments under the Fourth Amendment are recoverable transfers under Section 550 of the Bankruptcy Code and those transfers and/or obligations of the Fourth Amendment are avoidable under sections 544 and/or 548 of the Bankruptcy Code.

120.     Defendant has not paid the amounts transferred for which Defendant is liable under Section 550 of the Bankruptcy Code.

121.     Accordingly, under Section 502(d) of the Bankruptcy Code any filed or scheduled claims held by Defendant are disallowed until Defendant pays in full for which it is liable under section 550 of the Bankruptcy Code.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendant as follows:**

A.     Entering a Declaration that the Purported Ground Lease is not a true lease;

B.     Entering a Declaration the Bankruptcy Code sections 365 and, in particular, sections 365(d)(3) and (4) are not applicable to the Purported Ground Lease;

C.     Determining that the Fourth Amendment is avoidable as a constructive fraudulent transfer under 11 U.S.C. 548(a)(1)(B);

D.     Ordering Defendants to repay the additional amounts paid under the Fourth Amendment above-and-beyond what they would have received under the original Purported Ground Lease in an amount to be determined at trial, plus pre- and post-judgment interest;

E.     Determining that the Purported Ground Lease is a disguised financing;

F.     Determining that the value of the property securing the disguised financing at an amount to be determined at trial;

G.     Declaring the terms of the financing based on a principal balance due as of the Petition Date in an amount to be determined at trial;

H.     Disallowing any claims of Defendant until the excess payments under the Fourth Amendment are repaid to Plaintiffs under 11 U.S.C. § 502(d); and

I.     Granting such other relief as it deems necessary and proper.

Dated: December 22, 2025
Wilmington, Delaware

**DLA Piper LLP (US)**


 _/s/ Stuart M. Brown_

Stuart M. Brown (DE No. 4050)
DLA Piper LLP (US)
1201 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com

-    and -

Neal Kronley (*pro hac vice* application pending)
David M. Riley (*pro hac vice* application pending)
Caleb B. Roche (*pro hac vice* application pending)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: neal.kronley@us.dlapiper.com
        david.riley@us.dlapiper.com
        caleb.roche@us.dlapiper.com

*Proposed Special Counsel to the Debtors*