# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>    Hudson 1701/1706 LLC,<br>            Debtors.[1] | Chapter 11<br><br>Case No. 25-11853 (KBO) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br>            Plaintiffs,<br>        v.<br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br>            Defendant. | (Jointly Administered)<br><br><br><br>Adv. Proc. No. 25-52471 (KBO) |

## 356W58 GROUND LESSOR LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

Dated: February 4, 2026
      Wilmington, Delaware

<div style="display:flex">

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      dute@lrclaw.com
      venkateswaran@lrclaw.com

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
      poconnor@adstach.com

</div>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 3

    A.    Origin of the Ground Lease. ................................................................................... 3

    B.    The Lease ................................................................................................................ 3

    C.    The Construction Loan .......................................................................................... 5

    D.    First Amendment to Ground Lease ........................................................................ 7

    E.    Parkview Assigns a Controlling Position of the Construction Loan to
        Northwind ............................................................................................................... 7

    F.    Northwind Assigns the Construction Loan Back to Parkview ................................ 8

    G.    Parkview, Landlord, and Debtors Execute the Fourth Amendment ........................ 9

    H.    Debtors Default on Construction Loan .................................................................. 11

    I.    Parkview and Debtors Enter into a Settlement Agreement, but Debtors
        Defaulted, and Parkview Foreclosed ...................................................................... 12

    J.    Bankruptcy Case Procedural History ...................................................................... 13

STANDARD OF REVIEW ...................................................................................................... 14

ARGUMENT ........................................................................................................................... 16

    I.   DEBTORS' CLAIM THAT THE LEASE IS NOT A TRUE LEASE IS
        IMPLAUSIBLE, AND THIS COURT SHOULD THUS DISMISS COUNT I ............. 16

    II.   DEBTORS' CLAIMS TO AVOID THE FOURTH AMENDMENT ARE
        IMPLAUSIBLE, AND THIS COURT SHOULD DISMISS COUNTS II AND III........ 20

    III.   DEBTORS' CLAIMS TO RECOVER AS AVOIDED TRANSFER (COUNTS IV
        AND V) SHOULD ALSO BE DISMISSED ................................................................. 22

CONCLUSION......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*631 N. Broad St., LP v. Commonwealth Land Title Ins. Co.*, No. CV 17-02805, 2018 WL 4051798 (E.D. Pa. Aug. 23, 2018)..................................................................... 17, 20

*Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 259099 (D. Del. Jan. 18, 2019)..... 17, 20

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................... 14

*In re Barney's, Inc.*, 206 B.R. 328 (Bankr. S.D.N.Y. 1997)........................................ 17

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ...................... 15, 16, 17

*In re Montgomery Ward, L.L.C.*, 469 B.R. 522 (Bankr. D. Del. 2012) ......................................... 5

*In re Robb*, 23 F.3d 895 (4th Cir. 1994) .................................................................. 18

*In re WorldCom, Inc.*, 339 B.R. 56 (Bankr. S.D.N.Y. 2006)......................................... 17

*In re Zohar III, Corp.*, 639 B.R. 73 (Bankr. D. Del. 2022) ...................................... 15, 16, 20, 21

*L A Apparel, Inc. v. Straight A Co., LP*, No. MC 3:21-285, 2022 WL 17417173 (M.D. Pa. Dec. 5, 2022) ............................................................................................. 17

*Matter of Davidson*, 947 F.2d 1294 (5th Cir. 1991) .................................................. 18

**Statutes**

Fed. R. Bankr. P. 7012(b) ................................................................................ 1

Fed. R. Civ. P. 12(b)(6)................................................................................... 1

**Other Authorities**

S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978) ........................................................ 5

356W58 Ground Lessor LLC ("Landlord"), through its undersigned counsel, respectfully submits this memorandum of law, together with the Declaration of Matthew B. McGuire, dated February 4, 2026 ("McGuire Declaration"), with exhibits annexed thereto, in support of its motion to dismiss the Complaint filed by Debtors Hudson 1701/1706, LLC and Hudson 1702, LLC (together, the "Debtors" or "Plaintiffs") [D.I. 1][2] with prejudice pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT[3]

The Complaint is nothing more than a naked attempt to gain unjustified leverage to renegotiate the terms of the Ground Lease (the "Lease"). As this Court is aware, Parkview Financial REIT, LP ("Parkview") was the construction lender to Debtors and held a leasehold mortgage and a pledge of the membership interests in Debtors. After Parkview foreclosed on those membership interests, Parkview became both the sole equity owner (and control party) of the Debtors, as well as Debtors' lender. Two months after Parkview engineered the Debtors' bankruptcy filing, and after failing to "recalibrate" the Lease, Parkview directed the Debtors to file this adversary proceeding – even though the substance of each claim is utterly inconsistent with every prepetition action and position taken by the Debtors and Parkview.

The claim seeking recharacterization (Count I) is belied by overwhelming evidence in the form of numerous, repeated, and authoritative documents confirming that all parties intended for the Lease to be a lease. These intentions have been asserted not just by the Debtors and their prior owners, but also by Parkview as their "leasehold" lender (and successor owner). The multiple

---

[2] Unless otherwise stated, all docket references are to the Adversary Proceeding number 25-52471.

[3] Terms utilized but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the body of this Memorandum of Law or in the Lease (McGuire Declaration Ex. C).

characterizations of the Lease as a true lease have also been made by the Debtors and Parkview both privately and publicly by various means – including in the Lease and leasehold financing documents themselves, as well as in the recorded documents evidencing the property sale to Landlord, the recorded memorandum of the Lease, the recorded leasehold mortgage, and in the public advertisements of the UCC foreclosure sale.

While the Complaint labels aspects of the Lease as indicative of a disguised financing, it ignores the fundamental notion that the written documents repeatedly confirm that all relevant parties – Debtors and Parkview included – understood that the Lease must be treated as a lease. To be sure, an examination of the recharacterization factors would amply demonstrate that the Lease is a true lease in substance (not just form). For example, the most significant factor in any recharacterization analysis fully supports the Lease is a true lease, as Landlord has the full reversionary interest in the property, and there is no purchase option for the Debtors whatsoever. Nevertheless, a searching analysis of factors should be unnecessary here because the operative documents and public statements by Debtors and Parkview so clearly evidence the parties' intentions and render the recharacterization claim wholly implausible.

The Debtors' claims to avoid the Fourth Amendment to the Lease (Counts II and III) are equally implausible. In seeking to avoid the Fourth Amendment, the Debtors allege that the give-and-take of the Fourth Amendment did not represent reasonably equivalent value from their perspective. But this position makes no sense in context, as the Fourth Amendment was requested by the Debtors to address their defaults, and the Fourth Amendment was specifically approved by the Debtors' leasehold lender, Parkview.

Because the substance of the Complaint is wholly contradicted by the actions of both the Debtors and their leasehold lender, Parkview, it fails to meet the plausibility standard required of litigants in this Court and should be dismissed forthwith.

## **BACKGROUND**

### A.  **Origin of the Ground Lease**

On February 3, 2022, CSC Hudson, LLC entered into a Purchase and Sale Agreement (the "PSA") to acquire certain condominium units (Units 1701, 1702, and 1706) comprising the majority of the building that formerly housed the Hudson Hotel, located at 353-361 West 57th Street, New York, New York (the "Premises") from an entity affiliated with Cain International US Services, LP ("Cain"). CSC Hudson, LLC and other entities bearing the CSC name are controlled by Alberto Smeke Saba and Saloman Smeke Saba.

On May 3, 2022, Landlord assumed all of the rights, title and interest of CSC Hudson, LLC in the PSA pursuant to an Assignment, Assumption and Modification of Purchase and Sale Agreement.

The next day, Cain sold the Premises to Landlord for a purchase price of $207,500,000, and deeds evidencing the transfer of ownership were recorded. *See* McGuire Declaration, Ex. A and B.

### B.  **The Lease**

Simultaneous with the purchase and sale of the Premises on May 4, 2022, the Debtors, as tenants, and Landlord, as landlord, entered into a ground lease for the Premises for a period of 99 years. *See* McGuire Declaration, as Ex. C.

Under the Lease, the Debtors were obligated to construct and complete an agreed upon project at the premises (the "Construction Project"). The Construction Project as initially

conceived was the conversion of the Leased Premises from a hotel into approximately 400 residential units to be rented at market rates. *See id*. at 18 (definition of "Multifamily Project"). The Debtors were required to substantially complete the initial project on or before May 4, 2024. *See id*. at 86 (§ 21(d)), 149 (definition of "Required Substantial Completion Date"), 152 (§ 6(b)), 153 (§ 10(a)).

The Lease obligates Debtors to pay Base Rent in equal monthly installments at a fixed amount beginning on May 4, 2022 through the fifth Lease Year. *See id*. at 34 (§ 4(a)). The parties agreed that Base Rent would increase at a particular rate between the sixth and eleventh Lease years (*id*. at § 4(b)), and at another rate beginning with the twelfth Lease Year. *See id*. at § 4(c). Commencing on the first day of the twenty-first Lease Year and every ten years thereafter, the Lease obligates Debtors to pay Base Rent according to a calculation outlined in Section 4 of the Lease. *See id*. at § 4(d).

In addition to Base Rent, Section 4 of the Lease obligates Debtors to pay Additional Rent, including property taxes, insurance, and maintenance costs, as is typical in "triple net leases." *See id*. at 35-36 (§ 4(h)).

The Lease prepared for the possibility that Debtors would not be able to complete the Construction Project on or before the May 4, 2024 deadline. In that event, Section 48 of the Lease obligated Debtors to formulate and submit a Fallback Business Plan and pursue a Fallback Project. *See id*. at 121-123 (§ 48). Landlord could approve or deny any Fallback Business Plan in its sole and absolute discretion. *See id*. at 9 (definition of "Fallback Business Plan").

Under the Lease, Debtors' delivery of a Fallback Business Plan would trigger Debtors' obligation to pay a Right-Size Payment pursuant to Section 60 of the Lease. *See id*. at 142-143.

At the end of the Lease term, Debtors are required to surrender the Premises to Landlord, and all of Debtors' right, title and interest in and to the Leased Premises shall automatically revert to and become the sole property of Landlord. *See id.* at 95-96 (§ 25(a)); *see also id.* at 34 (§ 3). Debtors do not have any right or ability to acquire the Premises. They must surrender the Premises at the end of the term.[4]

The Lease makes repeated and consistent statements reflecting the parties' agreement that the Lease is what it purports to be: a true lease. For example, Section 5(b) of the Lease states: "Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement, including for U.S. federal, state and local tax purposes. Landlord holds fee title in and to the Fee Estate, and such title was not acquired or intended to be held as any type of mortgage or security interest. Tenant shall be deemed the owner of the Leasehold Estate." *Id*. at 37 (§ 5(b)).

The Memorandum of Lease was recorded so that third parties would have notice of the existence of the Lease. *See* McGuire Declaration, Ex. D at 3. ("Landlord and Tenant have executed a certain Lease, dated as of the date hereof (the 'Lease'), under which Landlord leases to Tenant that certain real property described in Exhibit A attached hereto (the 'Leased Premises')").

**C.  The Construction Loan**

Concurrently with the execution of the Lease, Debtors obtained a Construction Loan from Parkview pursuant to that certain Building Loan Agreement dated May 4, 2022 (attached to the McGuire Declaration as Ex. E), and that certain Project Loan Agreement dated May 4, 2022

---

[4] The ***primary indicator*** concerning whether a lease is a true lease is how ownership is allocated at the end of the lease term. *In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 530 (Bankr. D. Del. 2012). In true leases, the property reverts back to the lessor. *See id.*; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978) ("The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or a lease intended as security.").

(attached to the McGuire Declaration as Ex. F), in an aggregate amount of up to $207,000,000. The purpose of the Construction Loan was to finance the Construction Project. Both the Building Loan Agreement and the Project Loan Agreement[5] make repeated references to the Lease, including that Debtors are the owners of leasehold estates in the Premises pursuant to the Lease, and that Debtors have "good, marketable and indefeasible title to its leasehold and/or subleasehold interests in the Property." *See* McGuire Declaration, Ex. E at 23 (§ 6.12); McGuire Declaration, Ex. F at 17 (§ 6.12). The Building Loan Agreement and the Project Loan Agreement specifically require Debtors to obtain Parkview's prior written consent before amending the Lease. *See* McGuire Declaration, Ex. G at 16-17 (§ 2.17); McGuire Declaration, Ex. H at 16-17 (§ 2.17).

Parkview secured its Construction Loan by executing that certain Building Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 4, 2022 ("Building Leasehold Mortgage") (attached to the McGuire Declaration as Ex. G), and that certain Project Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 4, 2022 ("Project Leasehold Mortgage") (attached to the McGuire Declaration as Ex. H), through which Debtors mortgaged their interests in the Premises, Improvements, the Lease, and the leasehold estate created pursuant to the Lease. The Project Leasehold Mortgage and Building Leasehold Mortgage each specifically reference and rely upon the Lease. *See* Exs. G at 2 and H at 2 ("Mortgagor is the owner of the leasehold estate in that certain piece or parcel of land located at and known as Units 1, 2 and 6 in the 353 West 57th Street Condominium, … which leasehold estate was demised pursuant to the Ground Lease described in Exhibit B attached hereto").

---

[5] The Building Loan Agreement and Project Loan Agreement may be referred to collectively as the "Loan Agreement."

Parkview, Landlord, and Debtors executed that certain Leasehold Financing Agreement dated May 4, 2022 that – in accord with its title – specifically referenced and relied upon the existence of the Lease and recognized Parkview as the "Leasehold Mortgagee." *See* McGuire Declaration, Ex. I at 2 (§ 1). That document further states in part, "Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease..." *See id*. at 1.

### D.  First Amendment to Ground Lease

Pursuant to Section 47 of the Lease, Landlord held an option to purchase a space on the tenth floor of the building known as the "Tenth Floor Unit" from an unaffiliated third party. Landlord exercised that option effective on January 3, 2023, and in connection with bringing the Tenth Floor Unit into the Leased Premises, Debtors and Landlord amended the Lease by executing that certain First Amendment to Ground Lease dated January 3, 2023 (attached to the McGuire Declaration as Ex. J).

Debtors were required to obtain, and did obtain, Parkview's prior written consent before executing this amendment. *See* McGuire Declaration, Ex. G at 16-17 (§ 2.17); McGuire Declaration, Ex. H at 16-17 (§ 2.17).

### E.  Parkview Assigns a Controlling Position of the Construction Loan to Northwind

By March 2023, Parkview had failed to make certain advances of the Construction Loan as a result of liquidity problems across its debt platform, which Parkview itself acknowledged. *See* McGuire Declaration, Ex. K. Without an ability to replace Parkview, Debtors struggled for months to pay various expenses and contractors, which allowed liens to accrue.

Thus, on May 1, 2023, the Construction Loan was modified and a portion of it was assigned to NW Hudson Lender LLC, an entity affiliated with Northwind Group. Modifications to the Construction Loan required Landlord's approval. As such, NW Hudson Lender LLC, Landlord,

and Debtors entered into the certain Leasehold Financing Agreement dated May 1, 2023 (attached to the McGuire Declaration as Ex. L), which among other things, contained repeated references to the Lease, including that Debtors are the owners of leasehold estates in the Premises pursuant to the Lease.

This Leasehold Financing Agreement, like the initial Leasehold Financing Agreement that Parkview executed in 2022, specifically referenced and relied upon the existence of the Lease and recognized NW Hudson Lender LLC as the "Leasehold Mortgagee." *See* McGuire Declaration, Ex. L at 2 (§ 1). It further states in part, "Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease..." *Id*. at 1.

Landlord granted its approval of the Construction Loan modification by executing that certain Second Amendment to Ground Lease with Debtors on May 1, 2023. *See* McGuire Declaration, Ex. M. Debtors were required to obtain and did obtain Parkview's prior written consent before executing this amendment. *See* McGuire Declaration, Ex. G at 16-17 (§ 2.17); McGuire Declaration, Ex. H at 16-17 (§ 2.17).

### F. Northwind Assigns the Construction Loan Back to Parkview

Parkview re-acquired a controlling position of the Construction Loan on December 1, 2023. That same day, Landlord and Debtors executed that certain Third Amendment to Ground Lease (attached to the McGuire Declaration as Ex. N) which, among other things, made repeated references to the Lease and recognized Parkview as a Leasehold Mortgagee under the Lease. *See* McGuire Declaration, Ex. N at 1.

Critically, Parkview (along with Landlord and Debtors) executed the Third Amendment, and specifically confirmed that "each of the representations and warranties made on behalf of Parkview set forth in Section 3 of this Third Amendment are true, correct and complete and (ii)

Parkview has executed and delivered the Parkview Estoppel." *See id*. at 5. Among other things, Parkview represented and warranted in Section 3 of the Third Amendment that "Parkview is hereby an assignee of Northwind under the [May 1, 2023] Leasehold Financing Agreement and, as assigned, such Leasehold Financing Agreement is in full force and effect[.]" *See id*. at 2 (§ 3).

The Parkview Estoppel (that certain document labeled "Certificate" and executed by Parkview on December 1, 2023) (attached to the McGuire Declaration as Ex. O) repeatedly references and relies upon the Lease, including Parkview's request "to be recognized under the Lease as a Leasehold Mortgagee." *See* McGuire Declaration, Ex. O at 1.

### G. Parkview, Landlord, and Debtors Execute the Fourth Amendment

Before commencing certain work comprising the Construction Project, Debtors were required by law to obtain a Certificate of No Harassment from the New York City Department of Housing Preservation and Development ("HPD") verifying that no tenant harassment occurred at the subject property during a prescribed look-back period—or an exemption therefrom (the "CONH Requirement").[6] Following receipt of certain HPD notices dated July 1, 2022 and September 25, 2023, it became apparent that Debtors could not satisfy the CONH Requirement, effectively nullifying their ability to legally pursue the initial Construction Project. *See* Ex. C at 86 (§ 21(d)). As a result, pursuant to the terms of the Lease, Debtors proposed two Fallback Business Plans on January 11, 2024, which Landlord could approve or deny in its sole and absolute discretion. Each proposed Fallback Business Plan was significantly deficient and thus rejected by Landlord in that certain Response Letter, dated January 26, 2024 (attached to the McGuire Declaration as Ex. P). The Response Letter laid out certain "Required Conditions," including

---

[6] "[I]n order for Tenant to achieve Substantial Completion of the [initial Construction Project] in accordance with Legal Requirements, Tenant must (i) satisfy the CONH Requirement with respect to the entire Leased Premises[.]" *See* McGuire Declaration, Ex. C at § 49.

detailed changes to the Lease required by the Landlord as a condition to approving either Fallback Business Plan. *See* McGuire Declaration, Ex. P at 10-12 (§ D).

Landlord and Debtors thus executed that certain Fourth Amendment to Ground Lease dated March 29, 2024. *See* McGuire Declaration, Ex. Q.

Under the Fourth Amendment, Debtors received numerous concessions in order to obtain certainty and time to (i) pursue a cure of HPD's adverse findings (*id*. at 2 (§ 2(c))), (ii) fix the deficiencies identified by Landlord in Debtors' Fallback Business Plan proposals (*id*.), (iii) determine in more detail any potential requirements of the Hotel Union (*id*. at 2-3 (§ 2(g))), should Debtor elect and receive Landlord's approval to pursue the Fallback Business Plan that proposed to use a portion of the Premises as an extended-stay hotel, (iv) pursue a renegotiation of the Construction Loan with Parkview (the Construction Loan was due to mature on November 1, 2024) to ensure that any Fallback Business Plan was adequately capitalized (*id*. at 2 (§ 2(c))), (v) give the Debtors more time to cure the existing liens at (*id*. at 3 (§ 2(h))), and (vi) provide more certainty to Debtors of their long-term financial obligations under the Lease, which would make potential sales of its leasehold interest more attractive to future tenants and leasehold lenders.

In exchange, Debtors agreed to pay increased Base Rent to be more reflective of market value of the Premises given that any Fallback Project would necessarily alter the use of the Premises and reduce its marketability. *Id*. at 3 (§ 3). Debtors were granted a twelve-month partial abatement of Base Rent (*i.e.*, until March 29, 2025) in order to ease pressure on the construction budget and push out Base Rent increases until after the anticipated Fallback Project completion and repayment of the Construction Loan. *Id*. at 15. Landlord agreed to this concession even though the Base Rent in the Required Conditions of Landlord's January 26, 2024 Response Letter called for a significantly higher amount of Base Rent with no abatement.

And Landlord agreed to extend Debtors' time to pay the Right-Size Payment, extending from the last day of the fifth Lease Year to the last day of the tenth Lease Year in order to further relieve pressure on the construction budget and Parkview. *Id*.

Like the Third Amendment, Parkview "acknowledged and agreed" to the Fourth Amendment and executed it on March 29, 2024. *Id*. at 13. The Fourth Amendment again made repeated references to and relied upon the Lease and Debtors' leasehold interest. *Id*.

### H. Debtors Default on Construction Loan

On October 11, 2024, Parkview sent that certain Notice of Events of Default Under Loan Agreement to Debtors to advise that Events of Default had occurred pursuant to the Building Loan Agreement as a result of (i) Debtors' default under the Lease after Debtors failed to share communications from the New York City Department of Buildings with Landlord, (ii) Debtors' failure to maintain adequate insurance coverage, and (iii) Debtors' apparent inability to pay the outstanding principal balance and all accrued and unpaid interest of the Construction Loan on or before the maturity date (November 1, 2024). *See* McGuire Declaration, Ex. R.

That Notice of Events of Default Under Loan Agreement made numerous and repeated references to the Lease and to Parkview's Leasehold Mortgage, including all four of the Lease Amendments (the Third and Fourth of which Parkview itself acknowledged and executed). *See id*. at 3. In addition, one of the Events of Default noticed by Parkview was the product of an Event of Default under the Lease, underscoring not only Parkview's recognition and acceptance of the Lease, but Parkview's reliance upon and confidence in the Lease. *See id*. at 4 ("Ground Lease Default").

Debtors' responded to this Notice with their own letter dated October 18, 2024 in which they, too, made repeated references to the Lease. *See* McGuire Declaration, Ex. S.

In February 2025, Parkview published Uniform Commercial Code notices in various periodicals (a sample of which is attached to the McGuire Declaration as Ex. T) advertising the public auction of collateral as part of its foreclosure proceedings against Debtors. The notices stated that the Debtors "own a leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium[.]" *See* McGuire Declaration as Ex. T. The notices further state: "The sale of the Collateral involves the sale of the equity interests of the Company and does not involve the direct sale of the leasehold estate described above." *Id*. And the notices direct interested parties to contact Parkview's counsel at DLA Piper. *Id*.

## I.   Parkview and Debtors Enter into a Settlement Agreement, but Debtors Defaulted, and Parkview Foreclosed

Parkview and Debtors entered into that certain Agreement dated April 10, 2025 (the "Settlement Agreement") (attached to the McGuire Declaration as Ex. U) in order to, among other things, incentivize Debtors to meet certain construction and regulatory approval milestones (including a May 30, 2025 deadline by which Debtors agreed to submit materials to HPD to cure the CONH) and memorialize Parkview's forbearance of its remedies under the Construction Loan Agreement and related Guaranties.

That Agreement made repeated references to the Lease, including:

- "Borrower is the owner of a ground leasehold estate in the premises described in Exhibit 'A' attached hereto (the 'Property') demised pursuant to the ground lease described in Exhibit 'B' attached hereto (the 'Ground Lease')." McGuire Declaration at Ex. U at 1 (§ A).

- "It is the intention of the Borrower, as mortgagor, and the Guarantor, as guarantor, and Administrative Agent, on behalf of the Lenders, as mortgagee, that there not be a merger of the leasehold estate in the Property demised pursuant to the Ground Lease with Administrative Agent's existing rights and lien rights under the Loan Documents and this Agreement, which lien rights as against the leasehold estate in the Property are specifically intended by the parties to survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby." *Id*. at 3 (§ R).

- "Nothing set forth in this Agreement shall be deemed to modify, amend, vitiate or otherwise reduce any of Borrower's or Guarantor's obligations or liabilities under the Ground Lease, the Project Guaranties (as defined in the Ground Lease) or any other documents, instruments or agreements executed or delivered by Borrower or Guarantor in connection with the Ground Lease." *Id*. at 12 (§ 6.6).

- The Agreement also included a brief description of the Lease in Exhibit B, which references all four Amendments to the Lease. *Id*. at Exhibit B.

Debtors failed to meet its May 30, 2025 deadline to submit materials to HPD, and Parkview subsequently issued that certain Notice of Default Under Financial Agreement dated June 5, 2025 (attached to the McGuire Declaration as Ex. V) in which it demanded that Debtors "provide Administrative Agent and Ground Lessor drafts of the Applicable HPD Materials for its review and approval pursuant to Section 3.3(e) no later than June 9, 2025." *See* McGuire Declaration, Ex. V at 2. That notice also made other references to the Lease. *Id*. at 1, n.2.

Parkview then pursued a foreclosure of its collateral and published Uniform Commercial Code notices in June 2025 in various periodicals advertising the public auction (a sample of which is attached to the McGuire Declaration as Ex. W). These notices contained language identical to the February notices, including that the Debtors "own a leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium" and "The sale of the Collateral involves the sale of the equity interests of the Company and does not involve the direct sale of the leasehold estate described above." *See* McGuire Declaration as Ex. W.  And the notices again direct interested parties to contact Parkview's counsel at DLA Piper. *Id*.

### J.  Bankruptcy Case Procedural History

On October 22, 2025 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are authorized to

operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 25, 2025, the Office of the United States Trustee for the District of Delaware appointed the Committee of Unsecured Creditors (the "Committee") in these chapter 11 cases. The Committee is comprised of three members, including Landlord.[7]

On December 22, 2025 – two months after filing the bankruptcy petition –  Debtors filed the Complaint seeking (i) a declaration that the Lease is not a true lease, (ii) avoidance of any transfer and obligations under the Fourth Amendment to Ground Lease under 11 U.S.C. § 548(1)(B), (iii) avoidance of any transfer and obligations under the Fourth Amendment to Ground Lease under 11 U.S.C. § 544(b)(1), recovery of fraudulent transfer under 11 U.S.C. § 550, and disallowance of the rent payments that the Debtors agreed to pay pursuant to the Fourth Amendment to Ground Lease under 11 U.S.C. § 502(d).

## STANDARD OF REVIEW

The Supreme Court requires that claimants plead facts sufficient to make out a plausible claim for relief. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotations and citations omitted).

---

[7] For the avoidance of doubt, the instant Motion is brought on behalf of Landlord in its individual capacity, not in its capacity as a Committee member.

In *In re Zohar III, Corp.*, this Court further delineated this standard of review on a motion to dismiss, holding that a plaintiff must allege facts that are plausible, and that courts may use judicial experience and common sense to discount pleadings that are contradicted by documents relied upon in a complaint:

> [T]he alleged facts must nudge the claims "across the line from conceivable to plausible." [citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)]. The United States Court of Appeals for the Third Circuit has prescribed a three-step process for courts to determine the sufficiency of a complaint - note the elements of the claim; identify the allegations that are conclusory and not entitled to an assumption of truth; assume the veracity of well-pleaded factual allegations and determine the plausibility of the plaintiff's entitlement to relief. [citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)]. Instead of being a mini trial for parties to put forth their whole case and competing viewpoints of what the ultimate outcome should be, a dismissal motion focuses on the narrow and fundamental question of whether, if everything the plaintiff alleges is true, the plaintiff can prevail. [citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)]. In answering that question, a court may draw from "judicial experience and common sense" [citing *Iqbal*, 556 U.S. at 679], but it must only consider alleged facts that are within the scope of the court's review. [citing *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)]. The scope of what is reviewable includes the complaint, public record, and documents that are "integral to or explicitly relied upon" by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based. [citing *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018)]. "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." [citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)].

*In re Zohar III, Corp.*, 639 B.R. 73, 89–90 (Bankr. D. Del. 2022) (Owens, J.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022).

Courts are not limited to claimants' version of evidence as presented in a complaint when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Courts may review documents not attached to a plaintiff's complaint "where plaintiff has actual notice ... and has relied upon these documents in framing the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citing *Watterson v. Page,* 987 F.2d 1, 3–4 (3d Cir. 1993). "Plaintiffs

cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

This rule seeks to prevent a plaintiff from maintaining a cause of action when a review of the underlying documentary evidence would reveal that the claim is implausible. *See id.* ("What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."); *see also In re Zohar III, Corp.*, 639 B.R. at 107 ("Like the challenged actions of the other Defendants, the plausibility of most of the supposed inequities committed by MBIA is undermined by governing documents and past litigation results.").

"[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited." *In re Burlington Coat Factory*, 114 F.3d at 1426.

## **ARGUMENT**

**I.    Debtors' Claim that the Lease is not a True Lease is Implausible, and this Court Should thus Dismiss Count I**

Each party involved in this litigation and in the underlying transaction – including Parkview – has not only recognized the validity of the Lease, but has relied upon its very legitimacy in entering into and amending the various and several agreements in the Lease's orbit. Indeed, the Lease's status as a true lease is central to every agreement executed in conjunction with it, including Parkview's Loan Agreement, each agreement and amendment that followed, and all public filings. If any party ever sincerely suspected that the Lease was not a true lease in the three years following its execution, it would have raised such an objection – especially when negotiating and executing the numerous agreements that rely upon the Lease.

An agreement labeled a "lease" creates a rebuttable presumption that the agreement is what is purports to be (a true lease) and the burden of demonstrating that it is a disguised financing rests with the party challenging it. *See In re Montgomery Ward*, 469 B.R. at 528; *accord In re WorldCom, Inc.*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006) (the burden of proof rests with the party seeking to characterize an agreement as something "other than what it purports to be."). "The quantum of evidence necessary to satisfy that burden is 'substantial.'" *In re Barney's, Inc.*, 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997).

This rule exists for good reason. Without it, landlords would exist under constant threat that unhappy or cash-strapped tenants could simply seek to undo contracts that were always treated as valid by all involved.

Courts in this circuit refuse to countenance that type of contradictory behavior under the doctrine of quasi-estoppel, which "operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *631 N. Broad St., LP v. Commonwealth Land Title Ins. Co.*, No. CV 17-02805, 2018 WL 4051798, at *8 (E.D. Pa. Aug. 23, 2018), *aff'd*, 778 F. App'x 164 (3d Cir. 2019); *see also Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 259099, at *4 (D. Del. Jan. 18, 2019) ("Quasi-estoppel is a similar doctrine recognizing the 'duty of consistency.' *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301-02 (Fed. Cir. 2000). Similar to judicial estoppel, it prevents a litigant 'from shifting to a contrary position touching on the same facts or transaction' and 'the earlier position was then to the advantage of the [litigant] but that it is now to the [litigant's] advantage to shift his position.' *Id.* at 1301 (quoting *Union Carbide Corp. v. United States*, 612 F.2d 558, 566 (Ct. Cl. 1979))."); *L A Apparel, Inc. v. Straight A Co., LP*, No. MC 3:21-285, 2022 WL 17417173, at *7 (M.D. Pa. Dec. 5, 2022) ("Under Delaware law, the doctrine of quasi-estoppel applies when it would be

unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.").

Courts in other circuits are similarly intolerant. *See In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994) ("[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."); *Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) ("[Q]uasi estoppel[] forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects.").

Here, Debtors' plausibility burden is insurmountable. The documents that Debtors' themselves attached to and cited in the Complaint – and other documents upon which their claims are based – clearly show that the Lease is what it purports to be, and that all relevant parties treated it as such. These documents are undisputedly authentic.

Debtors and Parkview acknowledged and relied upon the Lease in countless communications, and in at least the following agreements and notices:

    a.  The Lease (Ex. C) (executed by Debtors);

    b.  The Memorandum of Lease (Ex. D) (executed by Debtors and recorded);

    c.  The Building Loan Agreement (Ex. E) (executed by Debtors and Parkview);

    d.  The Building Leasehold Mortgage (Ex. G) (executed by Debtors and Parkview and recorded);

    e.  The Project Loan Agreement (Ex. F) (executed by Debtors and Parkview);

    f.  The Project Leasehold Mortgage (Ex. H) (executed by Debtors and Parkview and recorded);

    g.  The initial Leasehold Financing Agreement dated May 4, 2022 (Ex. I) (executed by Debtors and Parkview);

    h.  The First Amendment to Ground Lease (Ex. J) (executed by Debtors and approved by Parkview);

    i.   The Leasehold Financing Agreement dated May 1, 2023 (Ex. L) (executed by Debtors);

    j.   The Second Amendment to Ground Lease (Ex. M) (executed by Debtors and approved by Parkview);

    k.   The Third Amendment to Ground Lease (Ex. N) (executed by Debtors and Parkview);

    l.   The Parkview Estoppel (Ex. O) (executed by Parkview);

    m. The Fourth Amendment to Ground Lease (Ex. Q) (executed by Debtors and Parkview);

    n.   Notice of Events of Default Under Loan Agreement dated October 11, 2024 (Ex. R) (executed by Parkview);

    o.   Debtors' Letter in response to Notice of Events of Default Under Loan Agreement dated October 18, 2024 (Ex. S);

    p.   February 2025 UCC Notice of Public Sale (Ex. T) (published by Parkview);

    q.   The Settlement Agreement dated April 10, 2025 (Ex. U) (executed by Debtors and Parkview);

    r.   Notice of Default Under Financial Agreement dated June 5, 2025 (Ex. V) (executed by Parkview);

    s.   June 2025 UCC Notice of Public Sale (Ex. W) (published by Parkview).

Alone, the sheer *number* of agreements and other documents executed by Parkview and Debtors is enough to demonstrate that the Complaint is implausible. But the ***significance*** of these agreements and other documents is even more compelling. These agreements and documents are not mere communications between the parties or non-binding statements of intent (though Parkview and Debtors sent countless communications that are not attached here demonstrating their reliance on the Lease). Rather, these agreements and documents formed the bases of the parties' obligations to one another. In addition, every document that was recorded, and the February 2025 and June 2025 UCC Notices of Public Sale, conveyed to the world that Parkview understood that the Lease is exactly what it purports to be. *See* Exs. T and W (Debtors "own a

leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium.").[8] In short, all relevant parties at all times treated the Lease as a true lease because that is what it is.

And given that Parkview and Debtors accepted the benefits of the Lease, they are estopped from now taking an inconsistent position with the Lease and the numerous agreements based upon the Lease's validity to avoid the obligations or effects under the Lease. *631 N. Broad St*, 2018 WL 4051798, at *8; *Amgen Inc.*, 2019 WL 259099, at *4.

This Court need not abandon its "judicial experience and common sense" in the face of a claim that is so overwhelmingly contrary to integral and undisputedly authentic documents. *In re Zohar III, Corp.*, 639 B.R. at 89–90. It "make[s] no sense,… [and is] contradicted… by documents upon which [Debtors'] pleadings rely, or by facts of which the court may take judicial notice." *Id*.

Accordingly, Debtors' claim that the Lease is not a true lease is not plausible, and this Court should dismiss Count I in the Complaint.

## II.    Debtors' Claims to Avoid the Fourth Amendment are Implausible, and this Court Should Dismiss Counts II and III

Parkview as Construction Lender executed the Fourth Amendment to the Lease. Now, Parkview (acting through Debtors) asks this Court to ignore that fact and find that Debtors did not receive reasonably equivalent value under the Fourth Amendment. These claims are implausible.

Debtors themselves proposed negotiating and entering into the Fourth Amendment following their failure to obtain the CONH Requirement. That failure effectively nullified their ability to legally pursue the initial Construction Project and remain current under the Loan Agreement. Debtors received numerous concessions under the Fourth Amendment in order to

---

[8] Debtors' claim is further undermined by the fact that Parkview's collateral (*i.e.*, the Debtors' leasehold interest) would not exist if not for the Lease.

obtain certainty and time to (i) pursue a cure of HPD's adverse findings, (ii) fix the deficiencies identified by Landlord in Debtors' Fallback Business Plan proposals, (iii) determine in more detail any potential requirements of the Hotel Union, should Debtor elect and receive Landlord's approval to pursue the Fallback Business Plan that proposed to use a portion of the Premises as an extended-stay hotel, (iv) pursue a renegotiation of the Construction Loan with Parkview (the Construction Loan was due to mature on November 1, 2024) to ensure that any Fallback Business Plan was adequately capitalized, (v) give the Debtors more time to cure the existing liens, and (vi) provide more certainty to Debtors of their long-term financial obligations under the Lease, which would make potential sales of its leasehold interest more attractive to future tenants and leasehold lenders.

And Debtors were granted a twelve-month partial abatement of Base Rent (*i.e.*, until March 29, 2025) in order to ease pressure on the construction budget and push out Base Rent increases until after the anticipated repayment of the Construction Loan. Landlord agreed to this concession even though the Base Rent in the Required Conditions of Landlord's January 26, 2024 Response Letter called for a significantly higher amount of Base Rent with no abatement.

Parkview "acknowledged and agreed" to the Fourth Amendment and executed it on March 29, 2024.

Setting aside the reasonably equivalent value received by Debtors under the Fourth Amendment, it is not plausible that an amendment requested by Debtors and approved by Parkview as Debtors' lender is sufficiently unfair to be avoided. Such an argument "make[s] no sense,… [and is] contradicted… by documents upon which [Debtors'] pleadings rely, or by facts of which the court may take judicial notice." *In re Zohar III, Corp.*, 639 B.R. at 89–90.

Accordingly, Debtors' claims seeking to avoid the Fourth Amendment are not plausible, and this Court should dismiss Counts II and III in the Complaint.

## III. Debtors' Claims to Recover as Avoided Transfer (Counts IV and V) should also be Dismissed

Debtors' claims for recovery and disallowance (Counts IV and V) are predicated upon avoidance of the Fourth Amendment and should thus be dismissed along with Counts II and III.

## <u>CONCLUSION</u>

For the foregoing reasons, Landlord respectfully requests that this Court dismiss each of Debtors' claims with prejudice, and for such other and further relief that the Court deems just and proper.

Dated: February 4, 2026
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450
Email: landis@lrclaw.com
      mcguire@lrclaw.com
      dute@lrclaw.com
      venkateswaran@lrclaw.com

– and –

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
      poconnor@adstach.com

*Counsel to 356W58 Ground Lessor LLC*