# EXHIBIT C

**GROUND LEASE**

between

**HUDSON 1701/1706, LLC** and **HUDSON 1702, LLC**

collectively, as Tenant

and

**356W58 GROUND LESSOR LLC**

as Landlord

Dated: May 4, 2022

**<u>PROPERTY</u>**

353 West 57th Street Condominium
Condominium Units No. 1 and 2
353-361 West 57th Street
a/k/a 356 West 58th Street
New York, New York
Block: 1048, Lots: 1701 and 1702

4863-0344-5267, v. 18

**Table of Contents**

Page

1.   Certain Definitions ........................................................................................ 1
2.   Demise of Premises ...................................................................................... 33
3.   Term .............................................................................................................. 34
4.   Rent ............................................................................................................... 34
5.   Net Lease; True Lease ................................................................................. 36
6.   Title and Condition ..................................................................................... 38
7.   Taxes; Insurance and Legal Requirements ............................................... 39
8.   Use. ............................................................................................................... 42
9.   Maintenance and Repair ............................................................................ 44
10.  Mechanic's Liens ........................................................................................ 46
11.  Landlord's Right to Mortgage; Landlord's Right to Transfer ............... 47
12.  Tenant's Right to Mortgage ....................................................................... 51
13.  Alterations ................................................................................................... 59
14.  Condemnation ............................................................................................. 66
15.  Insurance ..................................................................................................... 68
16.  Casualty ....................................................................................................... 73
17.  Restoration .................................................................................................. 76
18.  Subordination to Financing ....................................................................... 77
19.  Assignment; Subleasing .............................................................................. 78
20.  Permitted Contests ..................................................................................... 85
21.  Events of Default ......................................................................................... 86
22.  Landlord's Remedies .................................................................................. 88
23.  Notices .......................................................................................................... 93
24.  Memorandum of Lease; Estoppel Certificates ......................................... 94
25.  Surrender; End of Term ............................................................................. 95
26.  No Merger of Title ...................................................................................... 97
27.  Exculpation .................................................................................................. 97
28.  Hazardous Substances ................................................................................ 97
29.  Representations and Warranties of Tenant ............................................. 102
30.  Representations and Warranties of Landlord ......................................... 105
31.  Entry by Landlord and Lender ................................................................ 106
32.  Financial Reporting ................................................................................... 106
33.  No Usury ..................................................................................................... 111
34.  Broker ......................................................................................................... 111
35.  Bankruptcy ................................................................................................. 111
36.  No Waiver ................................................................................................... 112
37.  Separability ................................................................................................ 113
38.  Indemnification .......................................................................................... 113
39.  Permitted Encumbrances .......................................................................... 116
40.  Headings ..................................................................................................... 116
41.  Modifications .............................................................................................. 116

42. Successors and Assigns..................................................................................... 116
43. Counterparts .................................................................................................. 117
44. Time of the Essence ...................................................................................... 117
45. Governing Law .............................................................................................. 117
46. Third Party Beneficiary.................................................................................. 117
47. Tenth Floor Purchase Option ........................................................................ 117
48. New Construction; Fallback Business Plan. .................................................. 121
49. Certificate of No Harassment; Tenant Protection Plan.................................. 123
50. Arbitration..................................................................................................... 129
51. Right to Perform. .......................................................................................... 130
52. Entire Agreement. ......................................................................................... 131
53. Waiver of Trial by Jury.................................................................................. 131
54. Exhibits. ........................................................................................................ 131
55. Prevailing Party Attorneys' Fees. ................................................................. 132
56. Penthouse Unit, Supermarket Unit and Store Unit. ...................................... 132
57. Union Matters. .............................................................................................. 136
58. Condominium Provisions............................................................................... 138
59. Hotel Provisions............................................................................................ 140
60. Right Size Event. .......................................................................................... 142
61. Joint and Several. ......................................................................................... 143

EXHIBITS:

Exhibit A – Legal Description of the Land

Exhibit B – Form of Owner's Recognition and Non-Disturbance Agreement

Exhibit C – Work Letter

Exhibit D – Form of Environmental Indemnity

Exhibit E – Form of Completion Guaranty

Exhibit F – Form of Carry Guaranty

Exhibit G – Form of Indemnity Agreement

Exhibit H – Example Calculations of Base Rent

Exhibit I – Form of Memorandum of Lease

Exhibit J – Permitted Encumbrances

Exhibit K – SRO Tenants

4863-0344-5267, v. 18

Exhibit L – Form of Condominium Board Resignation

Exhibit M – Example Calculations of Minimum Payment and Right-Size Payment

## BASIC GROUND LEASE INFORMATION

### Ground Lease dated as of May 4, 2022
(Capitalized terms used herein shall have the meanings set forth in the Lease)

*PARTIES*

 Landlord:  **356W58 GROUND LESSOR LLC**, a Delaware limited liability company, together with any successor or assign

 Tenant:  **HUDSON 1701/1706, LLC** and **HUDSON 1702, LLC**, each a Delaware limited liability company, individually and collectively, as the context may require, jointly and severally, and together with their respective successors or assignees permitted by this Lease

*DATES*

 Effective Date:   May 4, 2022

 Expiration Date:  May 31, 2121

*FIXED RENT*

Subject to Section 60, from and after the Effective Date and continuing through the end of the fifth (5th) Lease Year, the annual Base Rent for the EBC Unit and the Modified Hotel Unit shall be $6,000,000.00 (payable in accordance with Section 4(f) below at a rate of $500,000.00 per month) and, from and after the Tenth Floor Purchase Option Closing Date, the Base Rent for the Tenth Floor Unit shall be $400,000.00 per year (payable in accordance with Section 4(f) below at a rate of $33,333.33 per month). Commencing on the first day of the twenty-first (21st) Lease Year and on every subsequent CPI Adjustment Year, Base Rent shall increase to the greater of (x) the Base Rent in effect during the immediately preceding Lease Year, increased by the Rent Escalation or (y) the Base Rent for the immediately preceding Lease Year, *multiplied by* (B) the then-applicable CPI Increase Percentage (examples of which are further illustrated on Exhibit H attached hereto).

*PURPOSE OF LEASE*

It is the intention of Tenant that the primary purpose of this Lease is the conversion of the Leased Premises into the Multifamily Project in accordance with and subject to the terms and conditions of this Lease (the "Conversion"). Upon the Conversion, Tenant shall sublease at least 75% of the rentable floor space of the Leased Premises pursuant to the Residential Subleases for subtenants to use for residential purposes. It is Tenant's further intention to qualify this Lease for the New York City commercial rent exemption pursuant to New York City Administrative Code Section 11-704(d) (the "CRT Exemption").

*LANDLORD PAYMENT ADDRESS*

i

4863-0344-5267, v. 18

<u>Landlord Address for Payment by wire transfer to</u>:

Bank Name: NexBank
ABA No.: 311973208
Acct. No.: 1633502
Account Name: 356W58 Ground Lessor LLC
Address: 2515 McKinney Ave
Suite 1100
Dallas, TX 75201

Landlord may, by at least ten (10) Business Days' advance Notice pursuant to <u>Section 23</u> hereof, designate a different address or account for payment at any time during the Term of this Lease.

*[End of Basic Ground Lease Information]*

4863-0344-5267, v. 18

**THIS GROUND LEASE** is made as of May 4, 2022 (the "Effective Date") by and between **356W58 GROUND LESSOR LLC**, a Delaware limited liability company, having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219 (together with its successors or assignees, "Landlord"), and **HUDSON 1701/1706, LLC** ("Tenant 1") and **HUDSON 1702, LLC** ("Tenant 2"; together with Tenant 1, individually and collectively, as the context may require, jointly and severally, and together with their respective successors or assignees permitted by this Lease, "Tenant"), each a Delaware limited liability company having an address of c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013.

1.      **Certain Definitions**.   Capitalized terms used herein shall have the following meanings for all purposes of this Lease and shall be equally applicable to both the singular and plural forms of the terms herein defined.

"30 Year Treasury" means the annual yield to maturity of the actively traded non-callable non-inflation-indexed United States Treasury fixed interest rate security at a 30-year constant maturity (other than any such security which can be surrendered at the option of the holder at face value in payment of federal estate tax or which was issued at a substantial discount), as reported in *The Wall Street Journal* or other authoritative publication or news retrieval service on the fifth (5th) Business Day preceding the Right-Size Event Date. If *The Wall Street Journal* ceases to publish the "U.S. 30 Year Treasury Bond Yield," Landlord shall select an equivalent publication that publishes such "U.S. 30 Year Treasury Bond Yield," and if such "U.S. 30 Year Treasury Bond Yield" is no longer generally published or is limited, regulated or administered by a Governmental Authority, then Landlord shall select a comparable interest rate index in its sole discretion.

"32BJ" means the Local 32BJ SEIU union, and any successor union.

"32BJ Agreement" means the Apartment Building Agreement between the Realty Advisor Board on Labor Relations Incorporated and Service Employees International Union, Local 32BJ, in effect as of the Effective Date, as the same may be amended, restated and/or supplemented from time to time.

"AAA" has the meaning set forth in Section 50(a).

"Additional Rent" means all amounts, monetary liabilities and monetary obligations other than Base Rent which Tenant assumes or agrees to pay under this Lease to Landlord or others, whether or not such amounts, liabilities and obligations are designated as Additional Rent hereunder.

"Adjustment Date" has the meaning set forth in Section 4(c).

"Administrative Review" has the meaning set forth in Section 49(a).

"Advisory Fee" means a fee in the amount of 0.35% of the Tenth Floor Buyout Amount advanced by Landlord pursuant to Section 47, which fee shall be paid directly to GLR REIT Advisors, LLC, as consideration for the advisory and management

services rendered to Tenant and its Affiliates in connection with the transactions contemplated by this Lease and the other Lease Documents.

"Affiliate" means, as to any Person, any other Person that (i) directly or indirectly owns twenty-five percent (25%) or more of all equity interests in such Person and/or (ii) directly or indirectly Controls, is Controlled by or is under common Control with, such Person.

"Alteration" or "Alterations" means any or all demolitions, constructions, changes, additions, expansions, improvements, alterations, reconstructions, repairs or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary, whether voluntary or in connection with any restoration, repair, replacement or rebuilding, including any Material Alterations, other than the Construction Project.

"Applicable Standard" means the standard of operation generally and customarily maintained from time to time during the Term to buildings utilized for the Permitted Use located in the Relevant Area that are (a) owned and managed by institutional landlords; and (b) of an age, size and quality comparable to the age, size and quality of the Improvements existing at the time this standard is being applied.

"Approved Accountant" has the meaning set forth in Section 32(e)(i).

"Approved Bank" means a bank or other financial institution which has the Required Rating.

"Available Project Proceeds" means, as of the time of calculation, the sum of (A) the unadvanced balance of the Construction Loan yet to be advanced by Construction Lender pursuant to the Construction Loan Documents, to the extent such amounts are permitted to be advanced pursuant to the Construction Loan Documents for the applicable Project costs, *plus* (B) without duplication of clause (A) of this definition, the amount of any portion of the proceeds of the Construction Loan then held by the Construction Lender in any reserve or other account and which proceeds are permitted to be disbursed pursuant to the Construction Loan Documents for the applicable Project costs (including, without limitation, any deficiency collateral or balancing deposits required pursuant to the terms of the Construction Loan Documents).

"Bankruptcy Action" has the meaning set forth in Section 21(e).

"Bankruptcy Code" has the meaning set forth in Section 35.

"Base Rent" has the meaning set forth in Section 4.

"Base Rent Payment Date" has the meaning set forth in Section 4(f).

"Business Day" means any day other than a Saturday, Sunday or any other day on which commercial banks in the State of New York and/or the State of Texas are not open for business.

4863-0344-5267, v. 18

"Carry Guaranty" means that certain Carry Guaranty dated as of the Effective Date, by Guarantor in favor of Landlord, in the form attached hereto as Exhibit F.

"Casualty" has the meaning set forth in Section 16(a).

"Casualty Repair Guarantor" has the meaning set forth in Section 16(c).

"Casualty Repair Guaranty" has the meaning set forth in Section 16(c).

"City" means the City of New York.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commercial Subleases" means one or more retail or other commercial Subleases, at market rates, each on a form reasonably approved by Landlord and otherwise on arm's length terms and consistent with the Permitted Use; provided, however, in no event shall Tenant enter into any Commercial Sublease that would allow the subtenant thereunder to use the applicable portion of the Leased Premises in any way which would be reasonably likely to trigger the Snap Back Provision of the Union MOA without Landlord's prior written consent (to be given or withheld in Landlord's sole and absolute discretion).

"Completion of the Project" and "Complete" has the meaning set forth in the Work Letter.

"Completion Guaranty" means that certain Completion Guaranty dated as of the Effective Date, by Guarantor in favor of Landlord, in the form attached hereto as Exhibit E.

"Condemnation" means any permanent condemnation or confiscation of all or any portion of the Leased Premises for any public or quasi-public purpose by any Governmental Authority, civil or military, whether pursuant to eminent domain proceedings pursuant to Legal Requirements, an agreement with such Governmental Authority in settlement of or under threat of any such taking, condemnation or confiscation, or otherwise.  Such term shall also be deemed to include, to the extent not otherwise defined herein, a temporary taking of the Leased Premises or any part thereof or the Improvements thereon for a period of two (2) years or more, and the taking of the Leasehold Estate created herein.

"Condemnation Award" means the entire amount of any award paid or payable to Landlord and/or Tenant after the Effective Date on account of any Condemnation (as compensation for such Condemnation), including, without limitation: (1) any interest payable on account of such award; (2) any award made on account of any Improvements that are the subject of a Condemnation, whether or not the value of such Improvements is the subject of a separate award or otherwise separately determined by the applicable Governmental Authority; (3) the full amount paid or payable by such

Governmental Authority on account of the estate that is the subject of the Condemnation, as determined pursuant to the applicable Condemnation proceeding; and (4) any other sums payable on account of such Condemnation.

"Condemnation Fair Market Value" means, as of any date, the cash price that the applicable estate (i.e., the Fee Estate or the Leasehold Estate, as the case may be) will command, if unencumbered by (x) the Fee Mortgage (in the case of the Fee Estate) (but encumbered by this Lease, in the case of the Fee Estate)  and (y) any Leasehold Mortgage or other financing of the Leased Premises or any interest therein (in the case of the Leasehold Estate), in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and without coercion or duress, and assuming: (i) the price is not affected by undue stimulus and takes into account matters pertinent to and indicative of value, as applicable, including, without limitation, location, trends, market data, highest and best use, return on investment and other elements of value, (ii) buyer and seller are typically motivated and working in their own best interest, (iii) both parties are well informed or well advised, (iv) a reasonable time is allowed for exposure in the open market, and (v) the price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

"Condemnation Percentage" means, as to any Condemnation affecting any portion of the Improvements, a fraction, expressed as a percentage, the numerator of which is the rentable square footage of the portion of the Improvements taken or condemned as a result of the applicable Condemnation, and the denominator of which is the rentable square footage of the Improvements immediately prior to the date of such Condemnation.

"Condemnation Reduction" shall have the meaning set forth in Section 14(d).

"Conversion" has the meaning set forth in the "Basic Ground Lease Information" section of this Lease.

"CONH" means a Certification of No Harassment issued by HPD in accordance with the CONH Regulations.

"CONH Application" means the application for a CONH to be filed with HPD in order to satisfy the CONH Requirement.

"CONH Application Denial" has the meaning set forth in Section 49(b)(iv).

"CONH Exemption" means an exemption from the CONH Requirement, which may be available if the subject building falls into an exemption category as defined by Section 28-107.2 of the New York Administrative Code, as determined by HPD.

"CONH Exemption Application" means the application for an exemption from the CONH Requirement to be filed with HPD in order to obtain a CONH Exemption.

4

4863-0344-5267, v. 18

"CONH Exemption Approval" has the meaning set forth in Section 49(b)(ii).

"CONH Exemption Denial" has the meaning set forth in Section 49(b)(iii).

"CONH Re-Application Decision Notice" has the meaning set forth in Section 49(b)(d)((iv)).

"CONH Re-Application Notice" has the meaning set forth in Section 49(b)(d)((iv)).

"CONH Regulations" means, collectively, any and all Legal Requirements governing the CONH Requirement with respect to buildings located in New York City, including, without limitation, the Multiple Dwelling Law, the New York Administrative Code, and HPD internal procedures, as the same may be modified from time to time.

"CONH Requirement" means the requirement of HPD that an applicant must obtain either a CONH or CONH Exemption with respect to the subject building prior to commencing certain categories of work at a building if such building is (i) an SRO or contains SRO units, (ii) located in one of the specified geographic anti-harassment areas identified by HPD (including, without limitation, due to the building's location within a Special Clinton District), or (iii) on HPD's Pilot Program List. Landlord acknowledges that, as of the Effective Date, in order for Tenant to be able to obtain a permit from DOB for certain covered categories of work to Complete the Multifamily Project, Tenant must satisfy the CONH Requirement due to the configuration of the Leased Premises as an SRO and its location within a Special Clinton District.

"CONH Requirement Outside Date" means July 8, 2024.

"CONH Withdrawal Notice" has the meaning set forth in Section 49(b)(d).

"Condominium" means the 353 West 57th Street Condominium established pursuant to the Condominium Declaration. As of the Effective Date, the Condominium consists of six (6) Units, the EBC Unit, the Modified Hotel Unit, the Supermarket Unit, the Store Unit, the Penthouse Unit, and the Tenth Floor Unit. As of the Effective Date, Landlord (i) is the owner of each of the EBC Unit and the Modified Hotel Unit and (ii) holds a leasehold interest in the Tenth Floor Unit, pursuant to the Tenth Floor Lease.

"Condominium Act" means Article 9-B of the New York Real Property Law, as same may be amended, restated and/or replaced from time to time.

"Condominium Board of Managers" means the Persons that govern the affairs of the Condominium as provided in the Condominium By-Laws. As of the Effective Date, the Condominium Board of Managers consists of Alberto Smeke Saba, Freda Melissa Smeke, Salomon Smeke Saba and Marcelle Smeke.

"Condominium By-Laws" means those certain By-Laws of 353 West 57th Street Condominium, dated as of February 12, 1999, as the same maybe amended, restated, and/or supplemented from time to time in accordance with this Lease.

"Condominium Declaration" means that certain Amended and Restated Declaration pursuant to Article 9-B of the Real Property Law of the State of New York, dated February 12, 1999, and recorded on July 16, 1999, in Reel 2913 Page 1753, as amended by that certain Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999, in Reel 2979 Page 2159, as the same may be amended, restated, and/or supplemented by from time to time in accordance with this Lease.

"Condominium Documents" means, collectively, the Condominium Declaration, the Condominium By-Laws, and the Condominium Rules and Regulations, together with any other documents, instruments or agreements governing the Condominium from time to time, as each may be amended, restated, and/or supplemented from time to time in accordance with this Lease and the Condominium Act.

"Condominium Rules and Regulations" means the "Rules and Regulations" as defined in the Condominium Declaration, as the same may be amended, restated, and/or modified from time to time in accordance with this Lease.

"Construction Lender" means Parkview Financial, LP, a Delaware limited partnership.

"Construction Loan" means that certain construction loan made by Construction Lender to Tenant concurrently with the Effective Date, pursuant to the Construction Loan Agreement, in an aggregate maximum amount of up to $207,000,000.00 Dollars, secured by the Construction Loan Mortgage, which is a Leasehold Mortgage and evidenced and governed by the Construction Loan Documents.

"Construction Loan Agreement" means, collectively, (i) that certain Building Loan Agreement, dated as of the Effective Date, by and between Tenant, as borrower, and Construction Lender, as administrative agent and (ii) that certain Project Loan Agreement, dated as of the Effective Date, by and between Tenant, as borrower, and Construction Lender, as administrative agent.

"Construction Loan Documents" means all documents, agreements and instruments related to the Construction Loan, including, without limitation the Construction Loan Agreement and the Construction Loan Mortgage, each as the same may be amended, restated, and/or supplemented from time to time in accordance with this Lease.

"Construction Loan Mortgage" means, collectively, (i) that certain Building Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the Effective Date, by and between Tenant, as mortgagor, and Construction Lender, as mortgagee and (ii) that certain Project Loan Leasehold Mortgage,

6

Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the Effective Date, by and between Tenant, as mortgagor, and Construction Lender, as mortgagee.

"Construction Project" means the construction and completion of the Project in accordance with the Work Letter.

"Control" means, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through voting securities, contract or otherwise. "Controlled", "Controlling" and "under common Control with" shall have correlative meanings.

"CPI Adjustment Year" shall have the meaning set forth in Section 4(d).

"CPI Escalation" shall have the meaning set forth in Section 4(d).

"CPI Increase Percentage" shall mean the increase in (A) the Index for the last full calendar month preceding the applicable Adjustment Date, *over and above* (B) the corresponding Index for the calendar month in which the preceding Adjustment Date occurred, expressed as a percentage rounded to two (2) decimals.  Notwithstanding the foregoing, the CPI Increase Percentage shall in no event exceed (i) for the first CPI Adjustment Year, 180.60% (3% annual cap) or (ii) for any subsequent CPI Adjustment Year, 137.70% (3.25% annual cap).

"CRT Exemption" has the meaning set forth in the "Basic Ground lease Information" section of this Lease.

"Default" means any condition or event that constitutes a breach by Tenant of its obligations under this Lease or any event or circumstance (not constituting a breach of Tenant's obligations under this Lease) that, with the passage of time or the giving of Notice, or both, would constitute an Event of Default.

"Default Rate" means an annual interest rate equal to the lesser of (i) Prime Rate plus five percent (5%) and (ii) the maximum interest rate permitted by Legal Requirements.

"DOB" means the New York City Department of Buildings, or any successor agency thereof.

"DHCR" means the New York State Department of Housing Community and Renewal, or any successor agency thereof.

"Discussion Period" shall have the meaning set forth in Section 49(b)(d).

"Dispute" shall have the meaning set forth in Section 50(a).

"DOF" shall have the meaning set forth in Section 32(i).

"EBC Unit" shall have the meaning set forth in the Condominium Declaration.

"Effective Date" has the meaning given to such term in the Preamble to this Lease.

"Eligible Account" means an identifiable account which is separate from all other funds held by the holding institution that is (a) an account or accounts maintained with the corporate trust department of a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution, (b) a segregated account or accounts maintained with an Eligible Institution, (c) a segregated trust account or accounts maintained with the corporate trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal and state authority or (d) reasonably acceptable to Landlord.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other similar instrument.

"Eligible Institution" means any federal or state chartered bank or other depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-2 by S&P, P-2 by Moody's and F-2 by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days (including accounts in which the proceeds of any Letter of Credit are held if any such Letter of Credit is drawn upon in accordance with the terms of this Lease), the long term unsecured debt obligations of which are rated at least "A-" by Fitch and S&P and "A3" by Moody's.  At any time when there is a Leasehold Mortgagee, the institution serving as the Eligible Institution (at which the Eligible Account is held) shall be either (as elected by such Leasehold Mortgagee in its sole discretion) (x) an institution satisfying the standards set forth in the first sentence of this definition that is selected by such Leasehold Mortgagee or (y) such Leasehold Mortgagee itself (but only if such Leasehold Mortgagee satisfies the standards set forth in the first sentence of this definition.

"Enhanced Severance" has the meaning set forth in the Union MOA.

"Enhanced Severance Escrow Account" means the escrow account held by First American Title Insurance Company, pursuant to the Enhanced Severance Escrow Agreement, which account contains $34,228,632.15, representing the maximum amount of Enhanced Severance that may become be due under the Union MOA.

"Enhanced Severance Escrow Agreement" means that certain Enhanced Severance Escrow Agreement, dated as of the Effective Date, by and among Tenant, Landlord, Construction Lender and First American Title Insurance Company, as acknowledged by Jackson Lewis, P.C. and Newmark Knight Frank.

8

"Enhanced Severance Obligations" means Tenant's obligations under Paragraph 1 of the Union MOA to pay Enhanced Severance  (as that term is defined in the Union MOA) to the Hotel Employees who have elected to execute a general release in accordance with the Union MOA.

"Environmental Claim" has the meaning set forth in Section 28(a).

"Environmental Indemnity" means that certain Environmental Indemnity Agreement dated as of the Effective Date, by Tenant and Guarantor in favor of Landlord, in the form attached hereto as Exhibit D.

"Environmental Laws" has the meaning set forth in Section 28(a).

"Environmental Report" has the meaning set forth in Section 28(a).

 "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (a) described in Section 414(b) or (c) of the Code, of which Tenant is a member, and (b) solely for purposes of potential liability or any lien arising under Section 302 of ERISA and Section 412 of the Code, described in Section 414(m) or (o) of the Code, of which Tenant is a member.

"Event of Default" has the meaning set forth in Section 21.

"Existing Improvements" means the Improvements located on the Land as of the Effective Date.

"Expiration Date" has the meaning set forth in Section 3.

"Fallback Business Plan" means the fallback business plan prepared by Tenant and approved by Landlord (in its sole and absolute discretion) with respect to the construction of the Fallback Project. The Fallback Business Plan shall include (i) any proposed modifications to the Project Plans and Specifications, Project Budget and Construction Schedule, (ii) a list of and, if applicable, drafts of any additional construction contracts to be entered into in connection with implementing the Fallback Business Plan, (iii) an updated sources and uses, including any additional financing sources needed to Complete the Fallback Project, (iv) an updated memorandum or legal opinion reasonably acceptable to Landlord, prepared by Tenant's Architect or zoning counsel reasonably approved by Landlord, which memorandum or opinion shall set forth updated zoning calculations, relevant authority from Legal Requirements and such other information as is reasonably necessary to determine that the Fallback Business Plan can be achieved by the Required Substantial Completion Date under Legal Requirements, (v) if such Fallback Project is a Hotel Project, a proposed Hotel Flag and Hotel Operator, together with a draft Hotel Management Agreement, proposed room rates (and such other details pertaining to the proposed management and branding of the Hotel as Landlord shall reasonably request),

4863-0344-5267, v. 18

(vi) any proposed revisions to the applicable Tenant Protection Plan needed to complete the work for the Fallback Project (if applicable), (vii) a memorandum or legal opinion reasonably acceptable to Landlord, prepared by Tenant's labor and employment counsel (which counsel shall be reasonably acceptable to Landlord, it being agreed that Jackson Lewis P.C. is acceptable to Landlord), which memorandum or opinion shall provide a summary and analysis of any obligations of Tenant (and potential liability to Landlord reasonably ascertainable under the circumstances) under the IWA, 32BJ Agreement, L94 Agreement and Union MOA, together with an estimate of labor costs prepared by Tenant that may be incurred by Tenant during the construction of the Fallback Project and following Substantial Completion of the Fallback Project, and (viii) such other information as Landlord may reasonably request with respect to the Fallback Project.

"Fallback Business Plan Delivery Date" has the meaning set forth in Section 48(c).

"Fallback Business Plan Notice" has the meaning set forth in Section 48(c).

"Fallback Project" means a fallback use for the Improvements approved by Landlord in connection with the Fallback Business Plan, which may be the Hotel Project or any other Permitted Use, provided such Permitted Use does not require (i) any discretionary zoning, land use or other approvals from any Governmental Authority with jurisdiction over the Leased Premises that could be reasonably likely to delay Substantial Completion of the Fallback Project by the Required Substantial Completion Date, (ii) satisfaction of the CONH Requirement or (iii) the performance of any other obligation by Tenant or obtaining of any approval, consent or Permit that would be reasonably likely to delay Substantial Completion of the Fallback Project by the Required Substantial Completion Date.

"Fee Estate" means Landlord's fee interest in the Land and the Improvements.

"Fee Mortgage" has the meaning set forth in Section 11(c).

"Fee Mortgagee" has the meaning set forth in Section 11(c).

"Finding of Harassment" means, as to any CONH Application or CONH Exemption Application, Tenant receives notice or communication from HPD indicating (or suggesting) that there has been an initial determination by HPD that there is reasonable cause to believe that harassment occurred during the inquiry period at the Leased Premises.

"Financial Information" has the meaning set forth in Section 29(g).

"First Party" shall have the meaning set forth in Section 50(a).

"Fitch" means Fitch, Inc.

"Force Majeure" shall mean accidents, fire or other casualty, earthquakes, floods, hurricanes, other severe weather events, Acts of God, natural disasters, strikes, lockouts, labor disputes, civil commotion, explosion, sabotage, riot, inability to secure a proper supply of fuel, gas, steam, water, electricity, labor, or supplies, governmental regulations, laws or restrictions, war, state of emergency, local, national or global public health emergency or pandemic (including, without limitation, COVID-19) and any delays, backlogs, or slowdowns associated with or caused by same, government mandated quarantine, travel bans, or "stay-at-home" orders, the unanticipated closure of government buildings, airports, harbors, railroads, pipelines, or other infrastructure, or any other event or cause whatsoever beyond the reasonable control of Landlord or Tenant, whether or not similar to the foregoing.  Notwithstanding the foregoing, (a) Force Majeure shall not include (i) any inability or delay resulting from deterioration of general economic conditions, such party's insolvency or financial condition, or insufficient funds or any illiquidity or disruption affecting capital markets or other general economic conditions, nor shall any Force Majeure excuse or delay payment obligations under this Lease, (ii) any stop work order issued by DOB or HPD resulting (directly or indirectly) from Tenant's failure to comply with the Tenant Protection Plan during the construction of the Project, (iii) any labor strike resulting directly from Tenant's failure to comply with the Union MOA or any other Union Agreement to which Tenant is bound with respect to the Project, and (iv) any event that is the result of the gross negligence, illegal acts or willful misconduct of any party claiming Force Majeure, (b) Tenant shall not have the right to contend that Force Majeure has occurred under this Lease unless Tenant notifies Landlord thereof, (c) if Tenant notifies Landlord that Force Majeure has occurred within ten (10) Business Days after the date that Tenant actually becomes aware of the event or circumstance causing such Force Majeure, then Force Majeure shall be deemed to have occurred for purposes of this Lease commencing as of the date that such Force Majeure began, and (d) if Tenant does not notify Landlord that Force Majeure has occurred within ten (10) Business Days after the date that Tenant actually becomes aware of the event or circumstance causing Force Majeure, then such Force Majeure shall be deemed to have occurred for purposes of this Lease only from and after the date Tenant notifies Landlord thereof.

"Force Majeure Cap" means, (i) with respect to any delays in the achievement of Substantial Completion or Completion of the Project caused by Force Majeure, such delays shall not, in the aggregate, exceed twelve (12) months, (ii) with respect to any delays in the performance of any obligations under this Lease pertaining to satisfaction of the CONH Requirement, such delays shall not, in the aggregate, exceed ninety (90) days, and (iii) with respect to any delays in the performance of any other obligations under this Lease, such delays shall not, in the aggregate, exceed one hundred eighty (180) days.

"Foreclosure Event" means a foreclosure, trustee's sale, deed, transfer, assignment or other conveyance in lieu of foreclosure, or other similar exercise of rights or remedies under any Leasehold Mortgage, including the occurrence of any transfer of title to the mortgaged estate by operation of or pursuant to any Bankruptcy Proceeding, in each case whether the transferee is a Leasehold Mortgagee, a party claiming through a

11

Leasehold Mortgagee, or a holder of title to the mortgaged estate who acquired such interests through such Foreclosure Event.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Construction Manager" has the meaning set forth in the Work Letter.

"Governmental Authority" means any governmental or semi-governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority having jurisdiction or regulatory authority over the Leased Premises, Tenant or any Affiliate of Tenant, as applicable.

"Guarantor" means, individually and collectively as the context may require, Alberto Smeke Saba and Saloman Smeke Saba, each an individual, together with any other party reasonably approved by Landlord as a guarantor in accordance with this Lease from time to time and who has executed a guaranty to Landlord with respect to this Lease.

"Hazardous Materials" has the meaning set forth in Section 28(a).

"Healthcare Contribution Obligations" means Tenant's obligations (arising pursuant to paragraph 1 of the Union MOA) to make contributions to the Hotel Union Health Benefits Fund.

"Hotel Union Health Benefits Fund" means the New York Hotel Trades Council and Hotel Association of New York City, Inc., Health Benefits Fund.

"Hotel Employees" means, as of the Effective Date, the employees of the Hudson Hotel as described on Attachment A of the Union MOA.

"Hotel Flag" means a hotel brand under which the Hotel Project is operated as a full service hotel in accordance with the Fallback Business Plan, which Hotel Flag has been reasonably approved by Landlord.

"Hotel Franchisor" means any franchisor with respect to the Hotel Project approved by Landlord from time to time.

"Hotel Franchise Agreement" means a hotel franchise agreement for management and operation of the Hotel Project entered into between Tenant or Hotel Operator and Hotel Franchisor, which Hotel Franchise Agreement is consistent with the Fallback Business Plan and has been reasonably approved by Landlord.

"Hotel Management Agreement" means a hotel management agreement for management and operation of the Hotel Project entered into between Tenant and the Hotel Operator, which Hotel Management Agreement is consistent with the Fallback Business Plan and has been reasonably approved by Landlord.

4863-0344-5267, v. 18

"Hotel Operator" means the operator of the Hotel in accordance with the Hotel Flag pursuant to the Hotel Management Agreement.

"Hotel Project" means a hotel operated at the Leased Premises under the Hotel Flag, in accordance with the Fallback Business Plan approved by Landlord in accordance with this Lease.

"Hotel Union" means the New York Hotel and Motel Trades Council, AFL-CIO, and any successor union.

"Hotel Union Pension Fund" means the New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund as described in the Union MOA.

"Hotel Union Pension Fund Obligations" means Tenant's obligations (pursuant to Paragraph 2 of the Union MOA) to pay in a lump sum, no later than the Hotel Union Pension Fund Obligations Date, withdrawal liability in an amount assessed by the Hotel Union Pension Fund.

"Hotel Union Pension Fund Obligations Date" means the date that is sixty (60) days following the date of receipt of the notice and demand for payment of withdrawal liability from the Hotel Union Pension Fund in accordance with the Union MOA.

"HPD" means the New York City Department of Housing Preservation and Development.

"Improvements" shall mean, collectively, the Existing Improvements (so long as existing), the redevelopment of the Leased Premises in accordance with the Construction Project (including any item of property now or hereafter located or installed in or on the Leased Premises that is an integral part of the Improvements, including, without limiting the generality of the foregoing, heating, ventilating, and air-conditioning plants and systems, electrical and plumbing fixtures and systems and other like equipment and fixtures, if any (including, without limitation, all machinery, engines, dynamos, boilers, elevators, elevator shafts, radiators, air-conditioning compressors, sprinkler equipment, electrical equipment, ducts, fire protection equipment, pipes, conduits and fittings and any other systems servicing or furnishing utilities to the Leased Premises at any time now or hereafter erected, constructed, affixed or attached to or placed in or placed upon the Leased Premises), together with the other structures, fixtures and other improvements constructed and to be constructed on the Leased Premises in accordance with the Work Letter (or otherwise in accordance with this Lease from time to time), together with all Alterations, additions, and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease, excepting therefrom the Personal Property.

"Indemnified Parties" means (i) Landlord, The Ground Lease REIT, LP, a Delaware limited partnership, and GLP REIT Advisors, LLC, a Delaware limited liability company and (ii) each of their respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, lenders, Affiliates, subsidiaries,

13

4863-0344-5267, v. 18

participants, managers, successors and assigns of any and all of the foregoing, including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of Landlord's (or any Affiliate of Landlord's) assets and business.

"Indemnity Agreement" means that certain Indemnity Agreement dated as of the Effective Date, by Guarantor in favor of Landlord, in the form attached hereto as Exhibit G.

"Index" means United States Department of Labor, Bureau of Labor Statistics, Consumer Price Index for all Urban Consumers (CPI-U) U.S. City Average All Items (1982-84 = 100), not seasonally adjusted; provided, however, if (a) such Index is discontinued or is no longer available, such calculation shall be made by use of another reputable index selected by Landlord and approved by Tenant (such approval not to be unreasonably withheld, conditioned or delayed), (b) if the base period for the Index (currently 1982-84 = 100) is modified after the Effective Date, the base period used in making the foregoing calculation shall be appropriately adjusted by Landlord, as approved by Tenant (not to be unreasonably withheld, conditioned or delayed) to reflect such modification, and (c) if the Index is published in such a manner that an Index figure is not available for a particular month (the "Relevant Month") (such as, by way of illustration only and not by way of limitation, if the Index were only published every other month), then the Index figure published for the most recent month preceding such Relevant Month shall be used.

"Initial Environmental Report" has the meaning set forth in Section 28(a).

"Insurance Requirements" means the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy to maintain such policy in full force and effect.

"IWA" means The Industry Wide Agreement between the Hotel Union and the Hotel Association of New York City, Inc., in effect as of the Effective Date, as the same may be amended, restated, and/or supplemented from time to time.

"IWA Termination Date" has the meaning set forth in Section 32(c).

"L94" means Local 94-94A-94B International Union of Operating Engineers, AFL-CIO, and any successor union.

"L94 Agreement" means the Residential Building Agreement between the Realty Advisory Board on Labor Relations Incorporated and L94, in effect as of the Effective Date, as amended, restated, and or supplemented from time to time.

"Land" means the real property upon which the EBC Unit and Modified Hotel Unit sits, together with Landlord's right, title and interest in and to (a) any land lying in the bed of any existing dedicated street, road or alley adjoining thereto, all strips and gores adjoining thereto, (b) rights, ways, easements, privileges and appurtenances thereunto belonging, and (c) all other property rights, tangible or otherwise, arising out of

14

or connected with Landlord's ownership thereof. From and after the Tenth Floor Purchase Option Closing Date, clause (a) of this definition shall also be deemed to include the real property upon which the Tenth Floor Unit sits.

"Landlord" has the meaning given to such term in the Preamble to this Lease.

"Late Charge" means a late charge of ten percent (10%) of the delinquent amount of Base Rent or Additional Rent then due and payable to Landlord.

"Lease" means this Ground Lease, together with all exhibits, schedules and addenda attached hereto, including the Work Letter, as each may be amended, restated or otherwise supplemented from time to time after the Effective Date.

"Lease Year" means (a) with respect to the first Lease Year, the period commencing on the Effective Date and ending on (i) if the Effective Date is the first calendar day of a calendar month, the last calendar day of the calendar month immediately preceding the calendar month in which occurs the first (1st) anniversary of the Effective Date, or (ii) if the Effective Date is not the first calendar day of a calendar month, the last calendar day of the calendar month in which occurs the first (1st) anniversary of the Effective Date, and (b) with respect to each succeeding Lease Year through the expiration of the Term, the twelve (12) month period commencing on the first calendar day of the calendar month immediately following the expiration of the immediately preceding Lease Year.

"Leased Premises" means, collectively, the EBC Unit and the Modified Hotel Unit. From and after the Tenth Floor Purchase Option Closing Date, the Leased Premises shall also be deemed to include the Tenth Floor Unit.

"Leasehold Estate" means the leasehold interest of Tenant in the Land and the Improvements pursuant to this Lease.

"Leasehold Mortgage" means (i) any Mortgage that encumbers any portion of the Leasehold Estate made and entered into in compliance with this Lease or (ii) any pledge of equity interests in Tenant or any direct or indirect owner of Tenant by a direct or indirect owner of Tenant, in each case, that (A) is held by a Person that is a Qualified Institutional Lender, (B) does not secure (and is also not cross-defaulted with) any indebtedness that is secured by any real estate or leasehold interests other than the Leasehold Estate and (C) provides that all casualty and condemnation proceeds, and all security and/or collateral for any and all Alterations received, shall be held in accordance with the applicable terms of the Lease (unless Tenant has posted the security required by this Lease).

"Leasehold Mortgagee" means any holder of a Leasehold Mortgage of which Landlord has received Notice thereof (including the holder's address for receiving Notices), so long as such Leasehold Mortgagee is a Qualified Institutional Lender.

15

4863-0344-5267, v. 18

"Legal Requirements" means any one or more of all then-current laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted Governmental Authority or agency, and all then-existing covenants, restrictions and conditions of record, that are applicable to Tenant or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the Americans with Disabilities Act or compliance with any Environmental Laws), (ii) results in interference with the use or enjoyment of any of the Leased Premises or (iii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

"Letter of Credit" means an irrevocable, auto-renewing (if and to the extent commercially reasonably obtainable without material additional cost, but subject to the last two sentences of this definition), unconditional, transferable, clean sight draft standby letter of credit having an initial term of not less than one (1) year and with automatic renewals for one (1) year periods (unless the obligation being secured by, or otherwise requiring the delivery of, such letter of credit is required to be performed at least thirty (30) days prior to the initial expiry date of such letter of credit), in favor of Landlord (and/or a Fee Mortgagee) and entitling Landlord (and/or a Fee Mortgagee) to draw thereon in New York, New York, based solely on a statement that Landlord (and/or a Fee Mortgagee) has the right to draw thereon executed by an officer or authorized signatory of Landlord (and/or a Fee Mortgagee). A Letter of Credit must be issued by an Approved Bank. If at any time (a) the institution issuing any such Letter of Credit shall cease to be an Approved Bank or (b) if the Letter of Credit is due to expire prior to the termination of the event or events which gave rise to the requirement that Tenant deliver the Letter of Credit to Landlord, Landlord shall have the right to draw down the same in full and hold the proceeds thereof, unless Tenant shall deliver a replacement Letter of Credit from an Approved Bank within (i) as to (a) above, twenty (20) days after Landlord delivers written notice to Tenant that the institution issuing the Letter of Credit has ceased to be an Approved Bank or (ii) as to (b) above, within ten (10) days prior to the expiration date of said Letter of Credit. If an auto-renewing Letter of Credit is not commercially reasonably available without material additional cost, then not later than the date that is thirty (30) days prior to the stated expiration date of any non-auto-renewing Letter of Credit, Tenant shall either (i) cause the extension of such Letter of Credit or (ii) replace such Letter of Credit with a new Letter of Credit, failing which, Landlord shall, as its sole and exclusive remedy in respect of such failure, have the right to draw down on such Letter of Credit and hold the same on account of Tenant pursuant to this Lease. If Landlord has drawn down on such Letter of Credit pursuant to the immediately preceding sentence, Tenant shall use commercially reasonable efforts to replace the cash collateral resulting from such drawdown with a Letter of Credit.

"Liability Period" has the meaning set forth in Section 22(b).

"Liquidity" means, as of any date of determination and with respect to any Person, the value of (i) all cash and cash equivalents (including municipal bonds,

16

4863-0344-5267, v. 18

investment grade corporate bonds and U.S. Treasuries) owned by such Person on such determination date and held by such Person in unrestricted and unencumbered domestic accounts and over which such Person has sole control, plus (ii) the market value on such determination date of the unrestricted and unencumbered marketable securities actively traded on a U.S. stock exchange owned by such Person.

"Liquidity and Net Worth Threshold" means, as to the Guarantors party to the Project Guaranties, on an aggregate basis, a minimum Liquidity of $10,000,000.00 and a minimum Net Worth of $150,000,000.00.

"Losses" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, taxes, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, reasonable attorneys' fees, court costs and other costs of defense).

"Market Sublease Letter" has the meaning set forth in Section 19(m).

"Material Alteration" means any Alteration (including any Restoration) (1) that would result in (A) a material diminution of the market value of the Leased Premises based upon then prevailing market conditions, (B) a material reduction in the rentable square feet of the Improvements, or (C) a material change in use from the then existing use of the Leased Premises as of date of such proposed Alteration, (2) which would be reasonably expected to cost in excess of Five Million and No/100 Dollars ($5,000,000.00) adjusted for any increase in the Index every five (5) Lease Years, (3) which would alter the zoning compliance of the Leased Premises and land use entitlements applicable to the Leased Premises that would cause the Leased Premises to not be in compliance with any Legal Requirements or that would require any discretionary approval from a Governmental Authority to cure such noncompliance (excluding any non-complying status existing as of the commencement of performance of the work associated with the applicable Material Alteration), (4) which would adversely impact or modify the structural integrity or building systems of the Improvements (including, without limitation, any roofs, load-bearing walls, structural beams, columns, supports, or foundations), or (5) the Fallback Project.

"Material Alteration Security" has the meaning set forth in Section 13(c).

"Memorandum of Lease" means the Memorandum of Lease, in the form attached hereto as Exhibit I, dated as of the Effective Date, as executed by Landlord and Tenant with respect to this Lease.

"Minor Alteration" has the meaning set forth in Section 13(n).

"Minimum Payment" means, as of the Right-Size Event Date, an amount equal to the quotient obtained by dividing (x) (i) the then-applicable annual installment of Base Rent due from Tenant, *minus* (ii) the Right-Size Base Rent, *by* (y) the Right-Size Yield. Example calculations of the Minimum Payment are set forth on Exhibit M.

17

"Modified Hotel Unit" has the meaning set forth in the Condominium Declaration.

"Moody's" means Moody's Investor Service, Inc.

"Mortgage" means a mortgage, deed of trust, security deed, deed to secure debt, or similar security instrument now or hereafter executed constituting a lien or encumbering the Leasehold Estate or the Fee Estate, as amended, modified, renewed, consolidated, increased, decreased, assigned or restated from time to time.

"Mortgagee Protections" means, as to any Leasehold Mortgagee, all rights, protections, and privileges of such Person as expressly provided for under this Lease, including, without limitation, the following:  (1) any right to receive Notices and/or to cure defaults; (2) any requirement for Leasehold Mortgagee's consent to any matter; (3) in the case of a Leasehold Mortgagee, all provisions of this Lease relating to any New Lease and all rights of any new Tenant; and (4) all other rights, protections, and privileges of such Leasehold Mortgagee under this Lease.

"Multifamily Project" means an approximately 399-unit (exclusive of the 39 SRO units) market rate multifamily building with approximately 54,590 square feet of commercial space and a 3,500 square foot penthouse unit.

"Multiple Dwelling Law" means the New York State Multiple Dwelling Law, as amended, restated, and/or supplemented from time to time.

"National or Regional Credit Tenant" has the meaning set forth in Section 19(n).

"Net Award" means the entire award payable to Landlord by reason of a Condemnation (exclusive of any award payable with respect to the Personal Property or otherwise payable to Tenant), less any actual and reasonable costs and expenses incurred by Landlord or Tenant in collecting such award.

"Net Proceeds" means the entire proceeds of any property casualty insurance required under Section 15(a) attributable to restoration of the Improvements, less any actual and reasonable costs and expenses incurred by Landlord or Tenant in collecting such proceeds.

"Net Worth" shall mean, with respect to any Person, as of a given date, (i) the fair market value of the total assets of such Person (excluding goodwill, patents, trademarks, trade names, organization expense, unamortized debt discount and expense, deferred research and development costs, deferred marketing expenses, and other like intangibles) determined in accordance with GAAP, *minus* (ii) the total liabilities of such Person (including, without limitation, such Person's contingent liabilities that have accrued under GAAP, accrued and deferred income taxes, and any reserves against assets) determined in accordance with GAAP; provided, however, in no event shall Net Worth be calculated to include the value of the Leased Premises.

18

"New Lease" has the meaning set forth in Section 12(h).

"New Lease Option Period" has the meaning set forth in Section 12(h).

"Notices" has the meaning set forth in Section 23.

"OFAC Laws and Regulations" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

"Operating Expenses" means, for any period, without duplication, all expenses actually paid or payable by Tenant during such period in connection with the operation, management, maintenance, repair and use of the Leased Property, determined on an accrual basis, and, except to the extent otherwise provided in this definition, in accordance with GAAP. Operating Expenses specifically shall include (i) all expenses incurred in the immediately preceding twelve (12) month period, (ii) all payments required to be made pursuant to any covenants, restrictions, easements, declarations or agreements of record relating to the construction, maintenance, operations or use of the Leased Premises, (iii) property management fees in an amount equal to the management fees actually paid, (iv) administrative, payroll, security and general expenses for the Leased Premises, (v) the cost of utilities, inventories and fixed asset supplies consumed in the operation of the Leased Premises, (vi) a reasonable reserve for uncollectible accounts, (vii) costs and fees of independent, third-party professionals (including, without limitation, legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services required or permitted hereunder, (viii) cost of attendance by employees at training and manpower development programs, (ix) association dues (if any), (x) computer processing charges, (xi) advertising expenses, (xii) operational equipment and other equipment lease payments, (xiii) Taxes and insurance premiums and (xiv) customary capital and/or maintenance reserves. Notwithstanding the foregoing, Operating Expenses shall not include (1) depreciation or amortization, (2) income taxes due from Tenant or any Affiliate of Tenant, (3) capital expenditures, and (4) debt service with respect to any Leasehold Mortgage or other financing of Tenant or any Affiliate of Tenant with respect to the Leased Premises.

19

"Penthouse Unit" has the meaning set forth in the Condominium Declaration.

"Permits" means any and all licenses, permits (including building, demolition, alteration, use, and special permits), approvals, consents, certificates (including certificate(s) of occupancy), rulings, variances, authorizations, or amendments to any of the foregoing now or hereafter required pursuant to Legal Requirements or by Governmental Authorities or otherwise necessary for the performance and completion of the Construction Project or any Alteration.

"Permitted Encumbrances" means those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of the Effective Date, which are set forth on Exhibit J attached hereto.

"Permitted Use" means the use of the Leased Premises for any use in compliance with all Legal Requirements, subject to all applicable zoning ordinances, the Insurance Requirements, any and all conditions, restrictions and other encumbrances, if any, pursuant to the Permitted Encumbrances, and for no other purpose other than those consented to by Landlord in writing pursuant to Section 8 hereof; provided in no event shall the Leased Premises be used for a Prohibited Use.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust (including a business trust), non-incorporated organization or government or any agency or political subdivision thereof or any other entity.

"Personal Default" means any non-monetary Default of Tenant that is not reasonably susceptible of cure by a Leasehold Mortgagee (whether or not such Leasehold Mortgagee has possession of the Leased Premises), including, without limitation (to the extent, if any, that any of the following may actually constitute a Default under this Lease) a Bankruptcy Action affecting Tenant or any other Person; a prohibited transfer; failure to deliver financial information within Tenant's or Guarantor's control; and any other non-monetary Default that by its nature relates only to, or can reasonably be performed only by, Tenant or its Affiliates.

"Personal Property" means any and all any movable furniture, equipment, trade fixtures, office machines or other personal property (excluding the Improvements) located at the Leased Premises or used in connection therewith (it being understood that fixtures installed in the Improvements (other than trade fixtures) which cannot be removed without damaging or impairing the Improvements do not constitute Personal Property).

"Plan Asset Regulations" means the regulations issued by the Department of Labor at Section 2510.3-101 of Part 2510 of Chapter XXV, Title 29 of the Code of Federal Regulations, as modified by Section 3(42) of ERISA, as the same may be amended.

"Prepaid Rent" has the meaning set forth in Section 4(i).

20

4863-0344-5267, v. 18

"Prime Rate" means the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate."  If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest 1/100th of one percent (0.01%).  If The Wall Street Journal ceases to publish the "Prime Rate," Landlord shall select an equivalent publication (used by other commercial landlords or commercial real estate lenders in New York City with similarly positioned assets) that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Landlord shall select a comparable interest rate index used by other commercial landlords or commercial real estate lenders in New York City with similarly positioned assets.  Notwithstanding the foregoing or anything herein to the contrary, in no event shall the Prime Rate, for purposes of this Lease, be less than zero percent (0%) per annum.

"Proceeds Trustee" means the holder of the Net Proceeds to the extent same are to be held by the Proceeds Trustee in accordance with Articles 14 or 16 of this Lease, as the case may be, which holder shall be (i) the Leasehold Mortgagee, if any, (ii) if there is no Leasehold Mortgagee, the Fee Mortgagee (provided same is not an Affiliate of Landlord), if any, or (iii) if there is no Fee Mortgagee which is not an Affiliate of Landlord and no Leasehold Mortgagee, an Eligible Institution (which is not an Affiliate of Landlord) selected by Landlord (and reasonably approved by Tenant).

"Prohibited Person" means a Person that (i) has been convicted in a criminal proceeding of a felony or any crime involving moral turpitude, (ii) is an organized crime figure or is reputed to have substantial business or other affiliations with an organized crime figure, (iii) is directly or indirectly Controlled by or under common Control with a Person described in clauses (i) or (ii) of this definition, (iv) has been identified on any list of specially designated nationals and blocked persons subject to financial sanctions that is maintained by the U.S.  Treasury Department, Office of Foreign Assets Control and any other similar list maintained by the U.S.  Treasury Department, Office of Foreign Assets Control pursuant to OFAC Laws and Regulations, (v) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, including, without limitation, any Anti-Terrorism Laws, or (vi) would, by virtue of such Person's relationship with Landlord or any affiliate of Landlord, cause all or any portion of the Rent paid hereunder to be other than rents from real property pursuant to Section 856(d) of the Code, as determined in Landlord's sole discretion.

"Prohibited Use" means each of the following uses: (A) any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any building on any adjacent parcel; (B) prisons, jails or other detention or correctional facilities; (C) a refining or smelting operation; (D) any mobile home park, trailer court, labor camp, junkyard, or stockyard; (E) any sanitary landfill or dumping, disposing, incineration or waste disposal plant; provided, however, this prohibition shall not be applicable to any garbage compactors serving the Improvements to the extent permitted by

21

applicable Legal Requirements; (F) any used automobile, truck, trailer, or recreational vehicle business whose primary business is a body shop repair operation or any commercial truck, trailer, or similar equipment business whose primary business is a body shop repair operation; (G) sexually-oriented business such as, but not limited to, x-rated movie or video sales, theater or rental facility, lounge or club featuring nude or semi-nude entertainers or escort service; (H) slaughterhouse or facility for the rendering of animal substances or for the skinning or tanning of animal hides; or (I) the extraction or refining of minerals or hydrocarbons.

"Project" means the renovation and Conversion of the Leased Premises into the Multifamily Project with the intent that at least 75% or more of the rentable floor space of the Leased Premises shall be subleased pursuant to the Residential Subleases; provided, however, in the event that Tenant is unable to obtain necessary approvals or Permits to effectuate the Conversion (including, without limitation, by satisfying the CONH Requirement by the CONH Requirement Outside Date), the term "Project" shall mean the Fallback Project, if approved by Landlord in writing or otherwise required by Landlord in accordance with Section 48.

"Project Budget" has the meaning set forth in the Work Letter.

"Project Plans and Specifications" has the meaning set forth in the Work Letter.

"Project Guaranties" means, collectively, the Completion Guaranty, the Carry Guaranty, the Indemnity Agreement and the Environmental Indemnity, and such other guaranties required to be delivered by Guarantor to Landlord in connection with the construction and completion of the Project in accordance with this Lease.

"Qualified Institutional Lender" means one or more of the following (whether acting in its own capacity or as a fiduciary or representative):

(i)     a REIT (defined below) or other real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan;

(ii)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, which regularly engages in the business of making loans secured by or owning investments of types similar to the Leased Premises;

(iii)   a trustee or servicer in connection with a securitization of a loan (or any portion of a loan) secured directly or indirectly by the Leased

4863-0344-5267, v. 18

Premises (either in a single-asset securitization or together with other loans in a securitized pool);

(iv)    an institution substantially similar to any of the foregoing entities described in clauses (i) or (ii) above, that is regularly engaged in the business of making or owning commercial real estate loans or operating commercial properties; or

(v)    an investment fund, limited liability company, limited partnership or general partnership (or other entity) where such Person is not a Prohibited Person and a Person that is otherwise a Qualified Institutional Lender under clauses (i), (ii), or (iv) of this definition is the parent entity of such Person, or otherwise acts as the general partner, managing member or fund manager of such Person,

so long as in all cases under the foregoing clauses (i), (ii), (iii), (iv) and (v) above:

(A) such Person is not an Affiliate of Tenant and neither Tenant nor any Affiliate of Tenant is an administrative or other agent for such Person, is a holder of a note or other evidence of indebtedness evidencing such Person's loan secured by the Leasehold Mortgage or is a participant in or pledgee of any interest in such Person's loan secured by the Leasehold Mortgage;

(B) either (I) such Person on the date when its Leasehold Mortgage is executed and delivered, or on the date of such Leasehold Mortgagee's acquisition of its Leasehold Mortgage by assignment from the previous Leasehold Mortgagee, has total assets of not less than the Qualified Institutional Lender Asset Threshold Amount calculated without regard to the value or cost of the Leased Premises, or (II) such Person has engaged a nationally or regionally recognized commercial servicer to administer and service the Leasehold Mortgage;

(C) such Person is (I) subject to the jurisdiction of the federal courts of the United States of America and the courts of the State of New York and (II) not entitled, directly or indirectly, to diplomatic or sovereign immunity; and

(D) such Person is not a Prohibited Person.

In addition, the Construction Lender shall also be deemed to be a Qualified Institutional Lender with respect to the financing of the Construction of the Project and to the extent that Construction Lender provides permanent or other financing to Tenant with respect to the Leased Premises.

23

"Qualified Institutional Lender Asset Threshold Amount" means an amount equal to One Billion Dollars ($1,000,000,000), as adjusted for any increase in the Index every five (5) Lease Years.

"Qualified Replacement Guarantor" means shall mean a Person acceptable to Landlord, in its sole but reasonable discretion, that (A) has sufficient financial capacity to fulfill the obligations of the applicable guaranties and indemnities to Landlord (as evidenced by credit and background checks performed by Landlord, and such other financial statements and information reasonably requested by Landlord), which, for purposes of any Qualified Replacement Guarantor on the Project Guaranties shall meet the required Liquidity and Net Worth Threshold, (B) executes applicable guaranties (including the Environmental Indemnity and the Indemnity Agreement) in the form attached to this Lease (or otherwise provided to Landlord during the Term), in each case, in its capacity as guarantor or indemnitor thereunder, (C) has not, at any time in the immediately preceding ten (10) years prior to becoming a guarantor hereunder, been the subject of any bankruptcy, reorganization, insolvency, debtor-creditor or other similar proceeding, or made an assignment for the benefit of creditors, (D) is not a Prohibited Person, and (E) has a direct or indirect ownership interest in the Qualified Transferee proposed as a replacement Tenant hereunder.

"Qualified Transferee" means a Person (i) that has (or whose direct or indirect owners in such Person have, in the aggregate) a net worth (determined in accordance with GAAP consistently applied or other industry standard methods of accounting reasonable acceptable to Landlord) of not less than Forty Million Dollars ($40,000,000), as adjusted for any increase in the Index every five (5) Lease Years, (ii) has the financial capacity to satisfy all of its obligations under the Lease, taking into consideration the monthly rent to be collected from Subleases in effect as of the date that Tenant provides notice to Landlord of the proposed Qualified Transferee, (iii) (A) if the Leased Premises is then being used for the rental of market rate and/or luxury apartment units, such Person (together with its Affiliates, in the aggregate) owns or operates not less than 500 individual market rate and/or luxury apartment units in New York City during the 60-month period preceding any applicable assignment of the Lease to such Person or (B) if the Leased Premises is used for any other Permitted Use, is reputable and it (together with its Affiliates, in the aggregate) has significant experience owning and operating projects similar to the Leased Premises in New York City, as reasonably determined by Landlord, (iii) is not a Prohibited Person, and (iv) is not directly or indirectly Controlled by or under common Control with any Prohibited Person. A Person who is not otherwise a Qualified Transferee due solely to the failure to satisfy clauses (i) and/or (ii) of this definition shall nonetheless be deemed to be a Qualified Transferee if, as of the date of assignment of this Lease to such Person, (x) such Person has retained an asset manager for the Leased Premises and such asset manager is a Person that satisfies the applicable condition(s) in foregoing clauses (i) and/or (ii) of this definition, as the case may be and (y) each of such Person and the asset manager retained by such Person for the Leased Premises satisfies the foregoing clauses (iii) and (iv) of this definition.

"REIT" means a real estate investment trust within the meaning of Section

24

856 of the Code and the regulations promulgated thereunder.

"Relevant Area" means, collectively, (i) the Columbus Circle area of Manhattan, New York (as is generally bounded as of the Effective Date) and (ii) the Lincoln Square area of Manhattan, New York (as is generally bounded as of the Effective Date).

"Relevant Month" has the meaning set forth in the definition of "Index".

"REMIC Requirements" means any Legal Requirements applicable to any REMIC Trust (including, without limitation, any constraints, rules and/or other regulations and/or requirements relating to the servicing, modification and/or other similar matters with respect to the loan secured by a Fee Mortgage (or any portion thereof and/or interest therein)).

"REMIC Test" means, in the case of Alterations involving any demolition or removal of the Improvements at the Leased Premises (or any other release of the real property interests comprising the Leased Premises), evidence reasonably satisfactory to any Fee Mortgagee whose Fee Mortgage is subject to the REMIC Requirements that, upon (a) completion of such Alteration or (b) the release of such real property interests comprising the Leased Premises, as applicable, the aggregate value of the Land, Landlord's reversionary interest in the Improvements and Landlord's interest under this Lease shall be equal to an amount that is not less than eighty-percent (80%) of the outstanding principal balance of the loan secured by such Fee Mortgage at the time of commencement of such Alteration and shall otherwise satisfy the REMIC Requirements.

"REMIC Trust" means a "real-estate-mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Fee Mortgage.

"Rent" means all Base Rent, Additional Rent and other sums due and payable by Tenant under this Lease.

"Rent Escalation" has the meaning set forth in Section 4(c).

"Rent Regulation Program" has the meaning set forth in Section 7(d).

"Required Substantial Completion Date" has the meaning set forth in the Work Letter.

"Required Rating" means a rating of not less than "A-1" (or its equivalent) from each of S&P and Moody's (or, if no longer issuing ratings, a reasonable replacement selected by Landlord) if the term of such Letter of Credit is no longer than three (3) months or if the term of such Letter of Credit is in excess of three (3) months, a rating of not less than "A" (or its equivalent) from each of S&P and Moody's (or, if no longer issuing ratings, a reasonable replacement selected by Landlord).

25

"Residential Subleases" means Subleases of individual units in the Leased Premises at market rates, on a form reasonably approved by Landlord and otherwise on arm's length terms and consistent with the Permitted Use.

"Restoration" (in verb form, "Restore") means the repair, replacement, restoration and rebuilding of the Leased Premises after any Condemnation or Casualty as nearly as possible to their value, condition and character existing immediately prior to such Condemnation or Casualty, including, without limitation, any required demolition, planning, and permitting required to complete such Restoration; provided, however, if any Legal Requirements have changed since the date immediately prior to the applicable Condemnation or Casualty or applicable Legal Requirements otherwise do not permit the Leased Premises to be restored to substantially its prior value, condition or character immediately prior to such Condemnation or Casualty, the scope and character of the Restoration shall be subject to Landlord's prior written approval in accordance with Section 13 in connection with a Material Alteration.

"Restoration Fund" has the meaning set forth in Section 14(c).

"RGB" means the New York City Rent Guidelines Board, or any successor agency.

"Right-Size Base Rent" means, as of the Right-Size Event Date, the quotient obtained by *dividing* (x) the quotient obtained by dividing the Trailing 12-Month NOI by 3.65 *by* (y) 110%.

"Right-Size Event" has the meaning set forth in Section 60(a).

"Right-Size Event Date" has the meaning set forth in Section 60(a).

"Right-Size Payment" means shall mean, as of the Right-Size Event Date, (A) if the Trailing 12-Month NOI *divided by* the then-scheduled unabated annual installment of Base Rent due in the sixth (6th) Lease Year is less than 3.65, an amount equal to the lesser of (x) the Minimum Payment and (y) the quotient obtained by dividing $2,000,000 by the Right-Size Yield; or (B) if the Trailing 12-Month NOI divided by the then-scheduled unabated annual installment of Base Rent due in the sixth (6th) Lease Year is equal to or greater than 3.65, an amount equal to $0. For the avoidance of doubt, Exhibit M shall include example calculations of each of the amounts described in clauses (A) and (B) of this definition, in addition to the calculation of the Minimum Payment.

"Right-Size Reduction" has the meaning set forth in Section 60(a).

"Right-Size Yield" means the lesser of (A) 30 Year Treasury plus seventy-five (75) basis points and (B) 3.53%.

"RPIE" shall have the meaning set forth in Section 32(i).

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"Second Party" has the meaning set forth in Section 50(a).

"Seller" means EC 58th Street LLC, a Delaware limited liability company.

"Significant Commercial Sublease" has the meaning set forth in Section 19(m).

"Snap Back Provision" means the provision in Paragraph 4 of the Union MOA, which provides that if the building containing the Leased Premises operates a hotel, or private membership club, or food and beverage operation at the Leased Premises, or if the Multifamily Project offers leases of less than one (1) year, the former Hotel Employees shall be recalled and the Leased Premises shall be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA, including the right to daily room clean.

"Special Clinton District Regulations" means the regulations governed by New York City Zoning Resolution Article IX, Chapter 6, in effect on the Effective Date, as the same may be amended, restated and/or supplemented from time to time.

"Special Clinton District" means the geographical location of the Clinton community as set forth in New York City Zoning Resolution Article IX, Chapter 6, as of the Effective Date.

"Special Clinton District Lookback Period" means the statutory lookback period to September 5, 1973, which may be limited by HPD to fifteen (15) years prior to the date of the CONH Application for the Special Clinton District, as required pursuant to the CONH Regulations.

"SRO" means a Single Room Occupancy multiple dwelling, as defined in the New York Multiple Dwelling Law.

"SRO Lookback Period" means the statutory three (3) year period prior to the date of the CONH Application for the SRO, as required pursuant to the CONH Regulations.

"SRO Regulations" means those rules and regulations pertaining to SRO units as provided by the New York State Administrative Code, Multiple Dwelling Law, and Rent Stabilization Code, as the same may be amended, restated and/or supplemented from time to time.

"SRO Tenant" means any tenant occupying an SRO on the Leased Premises. As of the Effective Date, a complete list of all SRO Tenants occupying SROs at the Leased Premises is attached hereto as Exhibit K.

"State" means the State of New York.

"Store Unit" has the meaning set forth in the Condominium Declaration.

"Store Unit Lease" means that certain Standard Form of Store Lease, dated January 1, 1999, by and between Store Unit Owner and Seller (as assignee of Henry Hudson Holdings LLC ("Henry Hudson Holdings"), and recorded on October 27, 1999, in Reel 2979 Page 2172, as amended by that certain unrecorded Amendment to Lease, dated September 30, 1999, as amended by that certain unrecorded Amendment of Lease, dated August 13, 2004, as amended by that certain Assignment and Assumption of Ground Lease in Lieu of Foreclosure, dated November 24, 2020, by and between Henry Hudson Holdings and Seller, and recorded December 4, 2020 as CRFN 2020000344629, as assigned to Store Unit Tenant pursuant to the Store Unit Lease Assignment.

"Store Unit Lease Assignment" means that certain Assignment and Assumption of Lease, dated as of the Effective Date, by and between Seller, as assignor, and Store Unit Tenant, as assignee.

"Store Unit Owner" means A & C West 57 LLC, a New York limited liability company (as successor to Adrienne Schatz (a/k/a Adrienne Wechsler) and Cheryl Hirsch).

"Store Unit Tenant" means 353W57 1704, LLC, in its capacity as the tenant under the Store Unit Lease, together with its successors and assigns.

"Subleases" means all subleases and lettings, written and oral, licenses, concessions, easements, occupancies or any other agreement for use or hire of all or any portion of the Leased Premises, including, without limitation, any Commercial Sublease or Residential Sublease.

"Substantial Completion" has the meaning set forth in the Work Letter.

"Successor Landlord" has the meaning given to such term in Section 11(a)

"Successor Tenant" means: (1) any purchaser, transferee, or assignee of the Leasehold Estate pursuant to a foreclosure or assignment in lieu thereof of any Leasehold Mortgage, including Leasehold Mortgagee or its successor, assignee, designee, or nominee (if applicable); and (2) such purchaser's, transferee's, or assignee's, direct and indirect successors and assigns.  Each Successor Tenant must be a Qualified Transferee and, if so, any such Successor Tenant shall also have all rights of Tenant hereunder.

"Supermarket Unit" has the meaning set forth in the Condominium Declaration.

"Taxes" means any and all (a) real estate taxes and assessments (including, without limitation, all business improvement district charges, if any) that are levied or assessed upon or charged with respect to the Leased Premises or any part thereof; (b) personal

28

property taxes on the Personal Property (it being understood that Tenant shall pay personal property taxes on Personal Property whether or not properly allocable to the Term); (c) rent and occupancy taxes, and any other occupancy and rent taxes, imposed on this Lease or the Rent payable by Tenant hereunder; (d) mortgage recording tax imposed on any Leasehold Mortgage; (e) water, water meter and sewer rents, rates, taxes and charges; (f) transit taxes and vault taxes levied or assessed upon or charged with respect to the Leased Premises; (g) sales taxes, excises and levies; (h) inspection, license and permit fees; (i) charges with respect to police protection, fire protection and street, bridge and highway construction, maintenance and lighting and sanitation supply, if any, levied or assessed upon the Leased Premises; (j) charges for public and private utilities and services (including, without limitation, gas, electricity, steam, light, heat, air-conditioning, power, cable, telephone and other communication, fire alarm and security services) levied or assessed upon the Leased Premises; (k) transfer taxes and recording taxes imposed in respect of the Leasehold Estate (including with respect to the creation of the Leasehold Estate or on any assignment or sublease of this Lease by Tenant); (l) charges and taxes for any easement or agreement maintained for the benefit of any of the Leased Premises; (m) other governmental levies, fees, rents, assessments or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, that are assessed, levied, confirmed, imposed upon, or would grow or become due and payable out of or in respect of, or charged with respect to, or are encumbrances or liens upon (I) the Leased Premises or any part thereof, (II) any appurtenances of the Leased Premises, (III) any personal property, equipment or other facility used in the operation of the Leased Premises, (IV) the Rent payable by Tenant hereunder, (V) this Lease or the Leasehold Estate, (VI) any document to which Tenant is a party transferring an interest or estate in the Leased Premises or any part thereof, or (VII) the possession, use, occupancy or operation of the Leased Premises or any part thereof by Tenant; (n) any costs (including reasonable attorneys' fees and expenses) incurred by Landlord in connection with any dispute with any taxing authority related to any of the foregoing and (m) interest, costs, fines, penalties and other similar or like governmental charges applicable to any of the foregoing (in each instance, whether foreseen, unforeseen or extraordinary, imposed upon or assessed, prior to or during the Term, against Landlord, Tenant or the Leased Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Base Rent or Additional Rent, including without limitation, any sales tax, use tax, franchise tax, margin tax, or occupancy tax or excise levied by any governmental body on or with respect to such Base Rent or Additional Rent).

"Tenant" has the meaning given to such term in the Preamble to this Lease.

"Tenant 1" has the meaning given to such term in the Preamble to this Lease.

"Tenant 2" has the meaning given to such term in the Preamble to this Lease.

29

4863-0344-5267, v. 18

"Tenant's Architect" has the meaning set forth in the Work Letter.

"Tenant's Equity Contribution" means a $22,148,097.00 of cash equity contributed to Tenant by its Affiliates and/or other investors in Tenant acceptable to Landlord.  For the avoidance of doubt, Landlord acknowledges that Tenant's Equity Contribution has been satisfied as of the Effective Date.

"Tenant Key Person(s)" means individually and collectively, as the context may require, Alberto Smeke Saba and Salomon Smeke Saba.

"Tenant Key Person Event" means, at any time during the period beginning on the Effective Date and ending on the achievement of Substantial Completion of the Project, the failure for any reason of at least one (1) of the Tenant Key Persons to (i) Control Tenant, and/or (ii) own at least fifty percent (50%) of the direct and/or indirect interest in Tenant; unless such failure is due to the death or disability of a Tenant Key Person and within sixty (60) days after such death or disability Tenant has provided a permanent replacement Tenant Key Person approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed if such proposed replacement Tenant Key Person (A) has substantial experience in the development, ownership, operation and leasing of properties similar to the Leased Premises that are used for the Permitted Use in accordance with the Applicable Standard and (B) after giving effect to such replacement, Tenant would continue to qualify as a Qualified Transferee (to the extent that immediately prior to such death or disability Tenant was otherwise a Qualified Transferee).

"Tenant Protection Plan" means a plan prepared by Tenant's Architect and/or Construction Manager in compliance with the Tenant Protection Plan guidelines governed by New York City Local Law 106 of 2019 and New York City Local Law 154 of 2017, as the same may be amended from time to time.

"Tenth Floor Buyout Amount" means (i) if the Tenth Floor Purchase Price is less than $8,000,000.00, the Tenth Floor Purchase Price, (ii) if the Tenth Floor Purchase Price is less than or equal to $16,000,000.00 (but greater than $8,000,000.00), an amount equal to $8,000,000.00, and (iii) the Tenth Floor Purchase Price is greater than $16,000,000.00, an amount equal to the sum of (x) $8,000,000.00, *plus* (y) fifty percent (50%) of the amount of the Tenth Floor Purchase Price that is in excess of $16,000,000.00; provided, however, if the Tenth Floor Purchase Option is exercised by Tenant in accordance with Section 47(b), the Tenth Floor Buyout Amount shall not exceed $10,500,000.00 in the aggregate.

"Tenth Floor Escrow Agent" has the meaning set forth in Section 47(d).

"Tenth Floor Landlord" means Hudson 10th Floor LLC, a Delaware limited liability company, as successor to Adrienne Schatz and Cheryl Hirsh, as executrices of the last will and testament of Irving Schatz.

"Tenth Floor Lease" means that certain Lease, dated as of February 11, 1999, by and between Hudson 10th Floor LLC (as successor to Irving Schatz) and Seller

30

(as assignee of Henry Hudson Holdings), as amended by that certain Assignment and Assumption of Lease, dated February 12, 1999, by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) and Henry Hudson Holdings, and recorded on March 23, 1999, in Reel 2841 Page 1882, as amended by that certain unrecorded Amendment of Lease, dated August 17, 2004, by and between Irving Schatz and Henry Hudson Holdings, as amended by that certain Assignment and Assumption of Ground Lease in Lieu of Foreclosure, dated November 24, 2020, by and between Henry Hudson Holdings and Seller, and recorded December 4, 2020 as CRFN 2020000344630, as assigned to Landlord pursuant to the Tenth Floor Lease Assignment and as amended, restated, and/or supplemented from time to time in accordance with this Lease.

"Tenth Floor Lease Assignment" means that certain Assignment and Assumption Agreement, by and between Seller and Landlord, dated as of the Effective Date.

"Tenth Floor Lease Term" means the term of the Tenth Floor Lease in accordance with its terms. Landlord and Tenant acknowledge that the Tenth Floor Lease Term commenced on December 1, 1997 and terminates on November 30, 2096.

"Tenth Floor Option Outside Date" has the meaning set forth in Section 47(b).

"Tenth Floor Purchase Option" means the purchase option set forth in Article 31 of the Tenth Floor Lease.

"Tenth Floor Purchase Option Closing Date" means the date upon which the Landlord acquires the Tenth Floor Unit from Tenth Floor Landlord pursuant to the Tenth Floor Lease.

"Tenth Floor Purchase Option Deposit" has the meaning set forth in Section 47(d).

"Tenth Floor Purchase Option Exercise Notice" means the written notice delivered by Landlord to Tenth Floor Landlord to exercise the Tenth Floor Purchase Option in accordance with the Tenth Floor Lease.

"Tenth Floor Purchase Option Valuation Notice" means the written notice delivered by Landlord to Tenth Floor Landlord to commence the procedure for determining the Tenth Floor Purchase price in accordance with the Tenth Floor Lease.

"Tenth Floor Purchase Price" means the purchase price to be paid for the Tenth Floor Unit pursuant to and calculated in accordance with the Tenth Floor Lease.

"Tenth Floor Subtenant" means Tenant, in its capacity as the subtenant under the Tenth Floor Sublease.

31

4863-0344-5267, v. 18

"Tenth Floor Sublease" means that certain Sublease, dated as of the date hereof, by and between Landlord, as sublessor, and Tenth Floor Subtenant, as sublessee, as the same may be amended, restated, or supplemented from time to time in accordance with this Lease and the Tenth Floor Sublease.

"Tenth Floor Tenant Purchase Contribution" means (i) if the Tenth Floor Purchase Price is less than or equal to $8,000,000.00, an amount equal to $0.00, (ii) if the Tenth Floor Purchase Price is less than or equal to $16,000,000.00 (but greater than $8,000,000.00), an amount equal to the difference between (x) the Tenth Floor Purchase Price, *minus* (y) $8,000,000.00, (iii) if the Tenth Floor Purchase Price is greater than $16,000,000.00 and less than $20,000,000.00, an amount equal to the sum of (x) $8,000,000.00, *plus* (y) fifty percent (50%) of the Tenth Floor Purchase Price that is in excess of $16,000,000.00, (iv) if the Tenth Floor Purchase Price is greater than $16,000,000.00 and Tenant has exercised the Tenth Floor Purchase Option in accordance with Section 47(b), an amount equal to the difference between (x) the Tenth Floor Purchase Price, *minus* (y) the Tenth Floor Buyout Amount, and (v) if the Tenth Floor Purchase Price is greater than $20,000,000.00 and Landlord exercises the Tenth Floor Purchase Option in accordance with Section 47(b), an amount equal to the sum of (x) $8,000,000.00, *plus* (y) fifty percent (50%) of the Tenth Floor Purchase Price that is in excess of $16,000,000.00, provided that the Tenth Floor Tenant Purchase Contribution shall not exceed $10,500,000.00 in the aggregate.

"Tenth Floor Unit" has the meaning set forth in the Condominium Declaration.

"Term" has the meaning set forth in Section 3.

"Total Loss" means (a) during the last five (5) Lease Years of the Term, (i) a Casualty where the cost of Restoration would exceed twenty-five percent (25%) of the pre-Casualty value of the Improvements (which percentage amount shall be reduced monthly on a pro-rata basis over the applicable five (5) Lease Year period and shall be deemed to be one-one hundred twentieth $(1/120^{th})$ of twenty-five percent (25%) in the last month of the Term) or (ii) a permanent Condemnation of twenty-five percent (25%) or more of the Land or twenty-five percent (25%) or more of the Improvements and/or (b) at any time during the Term, a permanent Condemnation of all or substantially all of the Land or Improvements.

"Total Project Cost" has the meaning set forth in the Work Letter.

"Trailing 12-Month NOI" means, for the twelve (12) months immediately prior to the month in which Right-Size Event Date occurs, the amount equal to (a) all gross income derived from Subleases and other operating income earned from the Leased Premises (determined in accordance with GAAP, but specifically excluding (i) any extraordinary or non-recurring revenues and (ii) any Sublease under which the applicable subtenant thereunder is (A) not paying rent or otherwise in default beyond all notice and cure periods, (B) in bankruptcy and has not affirmed its sublease in the applicable

bankruptcy proceeding, or (C) has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Sublease) during such period, as determined by Landlord in good faith based on reporting provided by Tenant pursuant to this Lease; *minus* (b) all expenditures for Operating Expenses for the Leased Premises over such period, other than Base Rent under this Lease.

"Union MOA" means that certain Memorandum of Agreement, dated March 8, 2022, by CSC Hudson, LLC, as purchaser or employer, and Seller, as seller party, as acknowledged by 32BJ and L94.

"Union MOA Assumption" means that certain Assumption Agreement with respect to the Union MOA, made as of the Effective Date, by and among Landlord, Tenant, CSC Hudson, LLC, Store Unit Tenant and the Hotel Union.

"Union MOA Obligations" has the meaning set forth in Section 57(a).

"Unit Owners" has the meaning set forth in the Condominium Declaration. As of the Effective Date, solely for purposes of the Condominium Documents, the Tenant has been designated by Landlord as the Unit Owner of the EBC Unit and the Modified Hotel Unit.

"Unit Purchase Option" has the meaning set forth in Section 56(c).

"Unit Purchase Option Closing Date" has the meaning set forth in Section 56(c)(ii).

"Unit Purchase Option Documents" has the meaning set forth in Section 56(c)(i).

"Unit Purchase Option Notice" has the meaning set forth in Section 56(c)(i).

"Unit Purchase Price" has the meaning set forth in Section 56(c)(i).

"U.S. Publicly Traded Entity" means any Person other than an individual, the shares or other ownership interests in which are traded on a on at least one stock exchange or in the over the counter market in the United States.

"Work Letter" means the work letter attached hereto as Exhibit C.

2.      **Demise of Premises**. Landlord hereby demises and leases to Tenant and Tenant hereby leases and rents from Landlord the Leased Premises, IN ITS "AS IS" CONDITION, SUBJECT TO THE EXISTING STATE OF TITLE (WITHOUT EXPRESS OR IMPLIED WARRANTY OF LANDLORD WITH RESPECT TO THE CONDITION, QUALITY, REPAIR OR FITNESS OF THE LAND FOR A PARTICULAR USE OR TITLE THERETO, ALL SUCH WARRANTIES BEING HEREBY DISCLAIMED BY LANDLORD AND WAIVED AND RENOUNCED BY TENANT).  The foregoing disclaimer in this paragraph has been negotiated by Landlord

and Tenant, each being represented by independent counsel, and is intended as a complete negation of any representation or warranty by Landlord, express or implied, with respect to the condition, quality, repair, or fitness of the Leased Premises for a particular use, or title thereto.

3.  **Term**. The term ("Term") of this Lease shall commence on the Effective Date and terminate upon the earlier to occur of (x) the day immediately preceding the ninety-ninth (99th) annual anniversary of the Effective Date (the "Expiration Date") or (y) such earlier date as the Lease is terminated pursuant to the terms hereof.

4.  **Rent**. Tenant shall pay to Landlord, as annual rent for the Leased Premises during the Term, the following annual base rent ("Base Rent"):

(a)  From and after the Effective Date and continuing through the end of the fifth (5th) Lease Year, the annual Base Rent for the EBC Unit and the Modified Hotel Unit shall be $6,000,000.00 (payable in accordance with Section 4(f) below at a rate of $500,000.00 per month) and, from and after the Tenth Floor Purchase Option Closing Date, the Base Rent for the Tenth Floor Unit shall be $400,000.00 per year (payable in accordance with Section 4(f) below at a rate of $33,333.33 per month). From time to time, the aggregate Base Rent for all Units comprising the Leased Premises shall be referred to herein as the Base Rent.

(b)  On the first day of each of the sixth (6th) Lease Year and the eleventh (11th) Lease Year, the Base Rent shall increase to an amount equal to one hundred ten percent (110%) of the Base Rent that was in effect for the respective prior Lease Year.

(c)  On the first day of every Lease Year, starting with the twelfth (12th) Lease Year (each such date, an "Adjustment Date"), the Base Rent shall increase to an amount equal to one hundred two percent (102%) of the Base Rent that was in effect for the prior Lease Year (each such increase, a "Rent Escalation"), subject to Section 4(d) below.

(d)  Commencing on the first day of the twenty-first (21st) Lease Year and continuing every ten (10) Lease Years thereafter (i.e., on the thirty-first (31st) Lease Year, the forty-first (41st) Lease Year, the fifty-first (51st) Lease Year, and so on) (each such Lease Year, a "CPI Adjustment Year"), Base Rent shall increase to the greater of (x) the Base Rent in effect during the immediately preceding Lease Year, increased by the Rent Escalation or (y) the Base Rent for the immediately preceding Lease Year, *multiplied by* (B) the then-applicable CPI Increase Percentage (any such increase, the "CPI Escalation"). Notwithstanding the foregoing, in the event the relevant Index figure for the month referred to in clause (A) of the definition of the CPI Increase Percentage is not available on the applicable Adjustment Date, Tenant shall continue to pay, monthly in advance, the same amount of annual Base Rent as was applicable for the month immediately preceding such Adjustment Date; however, within thirty (30) days after Landlord gives Tenant Notice of any deficiency in Tenant's payments of annual Base Rent for the current period due to unavailability of such relevant Index figures (which

Notice shall be accompanied by the relevant Index figure and the calculation supporting Landlord's statement of deficiency), Tenant shall pay Landlord the amount of such deficiency and shall thereafter pay Landlord, monthly in advance, the new annual Base Rent amount resulting from the calculation stated above. By way of illustration only, attached as Exhibit H are example calculations of the Base Rent for certain CPI Adjustment Years, each based on a hypothetical Index in effect for such Lease Year. Landlord shall provide Tenant with notice of Landlord's calculation of the Base Rent for each CPI Adjustment Year (accompanied by the relevant information on which such calculation is based); provided, however, any failure to provide such notice and information shall not relieve Tenant's obligation to pay Base Rent hereunder.

(e)     The foregoing adjustments to the annual Base Rent shall never operate to reduce the annual Base Rent below the amount being paid prior to the most recent Adjustment Date (subject, however, to adjustments made with respect to the Right-Size Reduction in accordance with Section 60).

(f)     Base Rent shall be paid by Tenant in equal monthly installments in advance, commencing on the first day of the first month next following the Effective Date and continuing on the same day of each month thereafter during the Term (each such date, a "Base Rent Payment Date"), and Tenant will pay the same to Landlord by wire transfer to the account set forth above, or at such other place in the United States or to such other Person as Landlord may from time-to-time designate in writing, in immediately available funds.  If the Effective Date is a day other than the first day of a calendar month, pro rata Base Rent for the period from the Effective Date to the first Base Rent Payment Date shall be added to the Base Rent payment for the first Lease Year and must be paid in advance on the first Base Rent Payment Date (except that if the Effective Date occurs on the first day of a calendar month, the first full monthly installment of Base Rent must be paid on the Effective Date).

(g)     If any installment of Base Rent (or any portion thereof) is not paid when due, Tenant will pay Landlord interest on such overdue payment at the Default Rate, accruing from the date such installment of Base Rent was due, and continuing until the same is paid.  In addition, if such Base Rent is not paid within three (3) Business Days after the date due more than one (1) time in any calendar year, Tenant shall pay to Landlord a Late Charge on such delinquent amount. No failure by Landlord to insist upon the strict performance by Tenant of Tenant's obligations to pay any interest on amounts overdue or Late Charge pursuant to this Section 4(g) shall constitute a waiver by Landlord of its right to enforce the provisions of this Section 4(g) in any instance of non-payment of Rent thereafter occurring, and nothing contained in this Section 4(g) is intended in any way to reduce or extend the notice and cure periods, if any, provided for in this Lease for non-payment of Rent.

(h)     In addition to Base Rent, Tenant shall pay or deposit, as the case may be, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay, deposit, or discharge pursuant to this Lease, together with every fine, penalty, interest and cost Tenant is obligated to pay the party to whom such payment is

due.  Landlord and Tenant each agree to cooperate with one another to have all invoices, bills and other statements sent directly to Tenant, and Landlord will forward to Tenant, promptly after Landlord's receipt of same, any such invoices, bills and statements for which Tenant is liable hereunder.  Any Additional Rent which is payable directly to Landlord according to this Lease shall be paid in the same manner as Base Rent.  If pursuant to any provision of this Lease, Tenant is obligated to pay an item of Additional Rent to Landlord and no due date or payment period therefor is specified herein, then such item of Additional Rent shall be paid by Tenant to landlord within thirty (30) days after Landlord delivers to Tenant a bill therefor.

(i)     Simultaneously with its execution of this Lease, Tenant shall pay the amount of $36,850,000 to Seller and Landlord, in connection with Tenant's acquisition of the Personal Property and Landlord's acquisition of the Leased Premises. The portion of this amount that is allocated to the Leased Premises, as provided in Section 5(d), shall be treated as Additional Rent (the "Prepaid Rent"), which Prepaid Rent shall not offset any of Tenant's obligation to pay any other Additional Rent or other Rent due under this Lease during the Term.

5.     **Net Lease; True Lease.**

(a)     It is the intention of Landlord and Tenant that Base Rent, Additional Rent and all other sums payable by Tenant will continue to be payable in all events, and the obligations of Tenant will continue unaffected, unless the requirement to pay or perform the same are terminated or abated pursuant to an express provision of this Lease. This Lease is an absolute net lease and, notwithstanding any present or future law to the contrary, shall not terminate except as otherwise expressly provided herein, nor shall Tenant be entitled to any abatement, reduction, diminution, set-off, counterclaim, defense or deduction with respect to any Base Rent, Additional Rent or other sums payable hereunder, except as otherwise expressly set forth in this Lease.  All costs, expenses and obligations of every kind and nature whatsoever relating to the ownership, operation, management, development, construction, use, or occupancy of the Leased Premises and the appurtenances thereto and the use and occupancy thereof which may arise or become due and payable during the Term in accordance with the provisions of this Lease (whether or not the same shall become payable prior to or during the Term or thereafter, but in each case only if such payment is payable on account of a period occurring during the Term) shall be paid by Tenant except as otherwise expressly provided herein.  It is the purpose and intention of the parties to this Lease that the Base Rent due hereunder shall be absolutely net to Landlord and that this Lease shall yield, net to Landlord, the Rent provided in this Lease.  The parties intend that the obligations of Tenant hereunder shall be separate and independent covenants and agreements and shall continue unaffected unless such obligations shall have been modified or terminated pursuant to an express provision of this Lease. Notwithstanding the foregoing or anything in this Lease to the contrary, in no event shall Tenant be obligated to pay any of the following (it being agreed that such costs shall be at Landlord's sole cost and expense): (a) principal, interest or other sum due on any Fee Mortgages now or hereafter in effect with respect to the Fee Estate, (b) amounts necessary to discharge any lien or encumbrance on the Fee Estate

36

unless created or permitted by Tenant, (c) except as otherwise expressly set forth in this Lease to the contrary, legal, accounting or administrative expenses or other out-of-pocket expenses incurred by Landlord in connection with the administration of Landlord's existence or ownership or maintenance of the Fee Estate, including, without limitation, any expenses in connection with Landlord maintaining its corporate existence, (d) any transfer taxes, mortgage recording taxes or other similar taxes payable in connection with a transfer, mortgage or other encumbrance of the Fee Estate occurring after the Effective Date (including, without limitation, any transfer taxes due in connection with a transfer of the Fee Estate in accordance with Section 11 of this Lease), except to the extent any such taxes are payable in connection with Landlord's exercise of its remedies following an Event of Default, as determined in the Landlord's sole discretion, and (e) any expenses expressly required to be paid by Landlord in accordance with the terms of this Lease.

(b)     Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement, including for U.S. federal, state and local tax purposes.  Landlord holds fee title in and to the Fee Estate, and such title was not acquired or intended to be held as any type of mortgage or security interest.  Tenant shall be deemed the owner of the Leasehold Estate.  Nothing in this Lease is intended to or shall create a partnership, joint venture, or any other relationship between Landlord and Tenant, except the relationship of ground lessor and ground lessee as aforesaid. Throughout the Term, for non-tax purposes, Landlord shall treat itself as the owner and lessor of the Land and Improvements, and Tenant shall treat itself as the lessee of the Land and Improvements.  Throughout the Term, for all U.S. federal, state and local tax purposes, (i) Landlord shall be treated as owner of the Land, Existing Improvements, and any depreciable items funded by Landlord under this Lease, and shall deduct any associated depreciation, and Tenant shall be treated as lessee of the Land and the Existing Improvements, and as owner of the other depreciable items (except to the extent funded by Landlord), (ii) each of Landlord and Tenant shall treat all Rent as rent in respect of the Leased Premises, and (iii) the Improvements and other depreciable items funded, or otherwise made, by Tenant shall not be treated as Rent or any type of substitute for rent. Landlord and Tenant will not take any position inconsistent with this Section 5(b) in any federal, state or local tax returns filed by them.

(c)     This Lease is intended by Landlord and Tenant to be an operating lease under GAAP. So long as the substantive terms of this Lease remain unchanged, Landlord shall, at Tenant's sole cost and expense (including reasonable attorney's fees and court costs), cooperate with any reasonable request made by Tenant to amend this Lease, to the extent such amendment is necessary for this Lease to be treated as an operating lease under GAAP.  Notwithstanding anything in this Section 5 to the contrary, however, Tenant may elect to treat this Lease as a capital lease under GAAP.

(d)     For all U.S. federal, state and local tax purposes, Landlord and Tenant shall treat the Prepaid Rent as a prepayment of Additional Rent that is treated as a loan pursuant to Section 467 of the Code. The amount of the Prepaid Rent shall be the initial principal balance of the loan, and the loan shall be amortized in accordance with the depreciation available to Landlord for federal income tax purposes with respect to a

37

portion of Landlord's cost basis in the Improvements equal to the Prepaid Rent. Within ninety (90) days after the Effective Date, Tenant shall propose to Landlord its determination of the amount of Prepaid Rent, and a schedule for its accrual. Landlord shall not unreasonably withhold, condition or delay its consent to this proposal, and any reasonable objections shall be worked out in good faith between the parties. The Prepaid Rent shall accrue under this Lease as set forth in a separate agreement between the parties, reflecting the agreed proposal, which agreement shall also set forth further detail regarding the principal, interest and amortization of the loan. If at any time before January 1, 2025, there is a change in the use of any portion of the Leased Premises that causes a change in the mix of recovery classes, Tenant may propose an adjustment to the terms of that agreement (which adjustment shall be subject to Landlord's prior written approval, not to be unreasonably withheld, conditioned or delayed) that reflects that change, as of the month when the change takes effect, with the notional depreciation for that month and subsequent months being determined as provided in Proposed Treasury Regulation § 1.168-2(j)(3). Any dispute regarding any proposal, schedule, agreement or adjustment under this Section 5(d) shall be a Dispute subject to the terms of Section 50.

(e)  Tenant shall, at Tenant's sole cost and expense, be responsible for supplying the Leased Premises with electricity, heating, ventilating and air conditioning, water, natural gas, lighting, replacement for all lights, restroom supplies, telephone service, data and internet service, window washing, security service, janitor, pest control and disposal services (including, if applicable, hazardous, medical and biological waste disposal), and any other services consistent with satisfaction of the Applicable Standard. Landlord shall not be in default hereunder or be liable for any Losses directly or indirectly resulting from, nor shall the Base Rent or Additional Rent be abated or a constructive or other eviction be deemed to have occurred by reason of, the installation, use or interruption of use of any equipment in connection with the furnishing of any of the foregoing services, any failure to furnish or delay in furnishing any such services, whether such failure or delay is caused by accident or any condition beyond the control of Landlord or Tenant or by the making of repairs, alterations or improvements to the Leased Premises, or any limitation, curtailment, rationing or restriction on use of water, electricity, gas or any form of energy serving the Leased Premises, whether such results from mandatory governmental restriction or voluntary compliance with Legal Requirements.  Tenant will pay (or cause its subtenants to pay) directly to the proper Governmental Authorities or other third parties charged with the collection thereof all costs of utilities or services used or consumed on the Leased Premises during the Term, when due.

(f)  For the avoidance of doubt, no provision of this Lease that restricts or governs the use, occupancy, or maintenance of the Improvements (or otherwise affects the Improvements) shall be deemed to derogate or detract in any way from the provisions of Sections 5(b) – 5(e).

6.  **Title and Condition.**

38

4863-0344-5267, v. 18

(a)     Tenant acknowledges that it is fully familiar with the Leased Premises and the physical condition thereof on the Effective Date, and that the Leased Premises are demised and let to Tenant, and Tenant shall accept the Leased Premises, in the condition and state of repair which exists on the Effective Date "AS IS, WHERE IS, WITH ALL FAULTS" subject to the Permitted Encumbrances, all Legal Requirements and Insurance Requirements, including any existing violation of any thereof, without representation or warranty by Landlord.

(b)     Without limiting the effect of Landlord's covenant set forth in Section 6(c), Landlord makes no, and expressly hereby denies any, representations or warranties regarding the condition or suitability of, or title to, the Leased Premises as of the Effective Date. Tenant agrees that (i) no representations, statements or warranties, express or implied, have been made by or on behalf of Landlord in respect of the Leased Premises, the status of title thereof, the physical condition thereof (including, without limitation, the presence or absence of Hazardous Materials), the zoning or other laws, regulations, rules and orders applicable thereto, or the use that may be made of the Leased Premises, (ii) Tenant has relied on no such representations, statements or warranties, and (iii) Landlord shall in no event whatsoever be liable for any latent or patent defects in the Leased Premises.

(c)     Upon the expiration or earlier termination of this Lease, Tenant's leasehold interest in the Improvements shall terminate and title to all such Improvements shall remain with Landlord, free and clear of all claims by, through or under Tenant, without further action on the part of either party.  Tenant shall upon expiration or earlier termination of the Term, deliver the Leased Premises and all Improvements to the possession and use of Landlord, without delay and in good order, condition and repair, ordinary wear and tear and (subject to the terms of this Lease) Casualty and Condemnation excepted, and in a broom clean, free of Hazardous Materials to the extent required by this Lease, free and clear of liens and encumbrances other than Permitted Encumbrances, and in reasonably safe condition.  Tenant shall not remove any of the Improvements during the Term (except in conjunction with the making of Alterations permitted pursuant to and made in accordance with this Lease) or upon the expiration or termination of this Lease.

7.     **Taxes; Insurance and Legal Requirements.**

(a)     Subject to the provisions of Section 20, Tenant will pay directly to the applicable Governmental Authority, and discharge all Taxes or installments thereof prior to delinquency and assessment of any interest or penalties for late payment. Landlord will promptly deliver to Tenant any bill or invoice it receives with respect to the Taxes.  Notwithstanding anything in this Lease to the contrary, nothing in this Lease will obligate Tenant to pay, and the term "Taxes" shall not include, federal, state or local (i) capital stock or similar taxes, if any, of Landlord, (ii) income (including, without limitation, city, state and federal), excess profits, gross receipts or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (iii) any estate, inheritance, succession, gift, capital levy, corporate franchise or similar taxes, except to

39

4863-0344-5267, v. 18

the extent that any such taxes are levied or assessed in lieu of or in substitution for any other tax or assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect on the Effective Date, would be payable by Tenant. In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant will have the option to pay such assessment in installments; and in such event, Tenant will be liable only for those installments (and all resulting interest thereon) that become due and payable in respect of the Term or the period prior to the Term.  Tenant will prepare and file all reports and returns required by applicable Governmental Authorities.  Tenant is hereby authorized by Landlord to request, from the applicable Government Authorities having jurisdiction over the Leased Premises, that any and all Tax bills be sent directly to Tenant. Tenant shall furnish to Landlord upon request reasonable evidence of the payment of such Taxes, including receipted tax bills from the appropriate taxing authority, when and if available.

(b)    If at any time during the Term, the methods of taxation prevailing at the Effective Date shall be altered so that in lieu of or as a substitute for (and designated as such) the whole or any part of the taxes, assessments, levies, impositions or charges now levied, assessed, or imposed on real estate and the improvements thereon, there shall be levied, assessed and imposed on Landlord, (i) a tax, assessment, levy, imposition or charge, wholly or partially as a capital levy or otherwise, on the rents received therefrom, (ii) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon the Leased Premises, or (iii) a license fee measured by any portion of the Rent payable by Tenant under this Lease, then all such taxes, assessments, levies, impositions or charges or the part thereof so measured or based, shall be deemed to be included within the term "Taxes" for the purposes hereof, but only to the extent that the same would be payable if the Leased Premises was the only property of Landlord subject to the same and the income from the Leased Premises was the only income of Landlord.  Any Taxes relating to a fiscal period of a Governmental Authority, a part of which period is included within the Term and a part of which period is prior to the Effective Date or subsequent to the Expiration Date, shall (whether or not such Taxes shall be assessed, levied, confirmed, imposed upon or in respect of or become a lien upon the Leased Premises or any portion thereof, or shall become payable, during the Term) be apportioned between Landlord and Tenant as of the Effective Date or Expiration Date, as applicable, so that Tenant shall pay such Taxes in the proportion that the portion of such fiscal period included in the Term, inclusive of the Effective Date or Expiration Date, as applicable, bears to the entire fiscal period, and Landlord shall pay the remainder thereof. Landlord hereby authorizes Tenant to make, on Landlord's behalf, all payments to be made by Tenant to Persons other than Landlord pursuant to any of the provisions of this Lease directly to such Persons.

(c)    Tenant will cause the Leased Premises to comply with and conform to all of the Legal Requirements and Insurance Requirements, and Tenant will promptly comply with and conform to any such requirements, subject to the provisions of Section 20 hereof. During the Term, Tenant shall be responsible for obtaining all Permits of all Governmental Authorities which are necessary for the use and operation of its business at the Leased Premises.  Tenant shall, upon request therefor, deliver to Landlord a true

40

and complete copy of each such permit, license and approval theretofore obtained by Tenant during the Term and not previously delivered to Landlord. Tenant, at Tenant's expense, shall procure and maintain (or cause to be procured and maintained) any and all certificates of occupancy (or amended certificates of occupancy) required in connection with the use and occupancy of the Leased Premises for the Permitted Use. Tenant shall not at any time use or occupy (or permit to be used or occupied) the Leased Premises in violation of the certificate of occupancy issued for the Improvements.

(d)    Except for the SRO Regulations, Special Clinton District Regulations and CONH Regulations affecting the Leased Premises as of the Effective Date, Tenant shall not voluntarily, without the prior written consent of Landlord, apply or cause the Land or any portion of the Leased Premises to be submitted for application to, or cause the Land or any portion of the Leased Premises to be subject to: (1) any tax exemption or similar program; (2) any rent regulation or similar program; and/or (3) any program or legal structure that would be reasonably likely to (x) impose any restrictions on the use of the Improvements and/or Land or any portion thereof and/or (y) restrict cash flow with respect to the Improvements and/or Land or any portion thereof and/or (z) impair the value of the Improvements and/or Land or any portion thereof (the programs and structures set forth in clauses (1), (2) and/or (3) hereof, each, a "Rent Regulation Program"). For the avoidance of doubt, the term Rent Regulation Program shall include, without limitation, (i) the Rent Stabilization Law of 1969 (Administrative Code of the City of New York §26-501), (ii) the New York City Rent Stabilization Code (9 NYCRR 2520.1 et. seq.); (iii) the New York City Rent and Rehabilitation Law (Administrative Code of the City of New York Sections §26-401 et. seq.); (iv) the Emergency Tenant Protection Act of 1974 (McKinney's Unconsolidated §8621 et. seq.); (v) New York City Local Law of 1994 (Local Law 1994, No. 4); (vi) the 1993 Rent Regulation Reform Act (L. 1993, ch. 253); (vii) the Rent Regulation Reform Act of 1997 (L. 1997, ch. 116); (viii) New York City Rent and Eviction Regulations (9 NYCRR 2200 et. seq.); (ix) New York Consolidated Laws, Penal Law §241.00 and §241.05, Administrative Code of the City of New York §27-2115 and Housing Maintenance § 27-2004; (x) the 421-a Program; (xi) the Housing Stability and Tenant Protection Act of 2019; and (xii) the New York City Zoning Resolution §§23-154 and 23-90 et. Seq., all as the same may have been or hereafter may be amended from time to time, together with any other applicable laws, rules, orders, regulations, ordinances, judgments, decrees, injunctions, permits or requirements of any Governmental Authority having jurisdiction over the issue or matter in question (including, without limitation, DHCR and the RGB) and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Tenant, at any time in force affecting the Leased Premises or any part thereof which, in the case of each of the foregoing, relate to the rental of residential apartment units. Tenant shall not be deemed to be in breach of the provisions of this Section 7(d) to the extent that a Rent Regulation Program was instituted by statute or by a Governmental Authority without Tenant's direct or indirect consent, support or solicitation, provided, however, that in such event Tenant shall be obligated to provide written notice to Landlord of such Rent Regulation Program as soon as Tenant believes it reasonably likely to affect the Leased Premises and shall keep Landlord informed of the status of the Rent Regulation Program once instituted; provided,

41

4863-0344-5267, v. 18

however, if a CONH Application Denial, CONH Exemption Denial or Finding of Harassment is received with respect to all or any portion of the Leased Premises and Tenant has the ability to cure same by submitting a portion of the Leased Premises to a Rent Regulation Program, any such modification to the Multifamily Project shall be subject to Landlord's prior written approval (to be given or withheld in Landlord's sole and absolute discretion). Tenant represents and warrants to Landlord that as of the Effective Date, neither the Land, Leased Premises nor any portion thereof is subject to any Rent Regulation Program except for the SRO Regulations, Special Clinton District Regulations, and CONH Regulations. Landlord acknowledges and agrees that the Union MOA, the IWA, the 32BJ Agreement and the L94 Agreement are not and shall not constitute, for purposes of this Lease, a Rent Regulation Program.

(e)  Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, Tenant shall be permitted without Landlord's approval or consent, to submit this Lease for a CRT Exemption. Landlord agrees to reasonably cooperate with Tenant to provide such information or documentation as may be necessary for Tenant to qualify the Lease for a CRT Exemption, provided that (i) any such information or documentation does not modify any of the material provisions of this Lease or otherwise increase any of Landlord's obligations hereunder or decrease any of Landlord's rights hereunder and (ii) any out-of-pocket costs or expenses incurred by Landlord in connection with its cooperation under this Section 7(e) shall be Additional Rent hereunder and paid by Tenant to Landlord within thirty (30) days following written demand therefor.

(f)  Upon the reasonable request of Landlord, Tenant shall, to the extent it is legally entitled to do so, deliver to Landlord duly executed copies of any form prescribed by applicable Legal Requirements as a basis for claiming exemption from or a reduction in any U.S. federal withholding tax, together with such supplementary documentation as may be prescribed by applicable Legal Requirements, to permit Landlord to determine the withholding or deduction required to be made.

8.  **Use.**

(a)  Tenant, and any subtenant of Tenant, may use the Leased Premises for the Permitted Use and for no other purpose without the written consent of Landlord. In no event will the Leased Premises be used for any purpose that violates any provision of any recorded covenants, restrictions or agreements applicable to the Leased Premises (excluding any entered into by Landlord in violation of this Lease).  Tenant will observe, perform and comply with and carry out the provisions of any recorded covenants, restrictions or agreements, required therein to be observed and performed by Landlord and which are capable of being performed by Tenant (excluding any entered into by Landlord in violation of this Lease). Landlord shall not, after the date of this Lease, enter into any voluntary covenants, restrictions or agreements applicable to the Leased Premises which would impose any obligation or restriction with respect to the use, operation, leasing, subleasing, renting, licensing, development, management or transfer or other aspect of the Leased Premises or the Leasehold Estate (or the lessee thereof) or

42

would increase the obligations or decrease the rights of Tenant under this Lease in any material respect, or would increase the obligations or decrease the rights of the SRO Tenants or the subtenants permitted by this Lease in any material respect, and, in all events, any such covenants, restrictions or agreements shall be subject and subordinate to the Leasehold Estate hereunder and Tenant shall not be bound thereby; provided, however, the foregoing shall in no way limit Landlord's right to encumber the Fee Estate with any Fee Mortgage in accordance with Article 11, provided the same does not impact any of Tenant's rights or obligations hereunder and does not encumber, collateralize, securitize, impose a lien upon or affect the Leasehold Estate (or any portion thereof), or permit any encumbrance, lien or other security interest to be recorded or filed against Tenant's interest in the Leased Premises or the Leasehold Estate, nor adversely impact any of the rights or obligations of the SRO Tenants or the subtenants permitted by this Lease.

(b)    Tenant will not permit any unlawful occupation, business or trade to be conducted on any of the Leased Premises or any use to be made thereof contrary to applicable Legal Requirements or Insurance Requirements.  Tenant will not knowingly use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) violate any certificate of occupancy, zoning compliance certificate, or equivalent certificate affecting any of the Leased Premises, (ii) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (iii)  adversely affect in any material manner the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, (iv) cause any injury or damage to any of the Improvements (other than for Alterations permitted under this Lease), or (v) constitute a public or private nuisance or waste.

(c)    Tenant shall not knowingly use, suffer or permit the Leased Premises, or any portion thereof, to be used by Tenant, any third party or the public, as such, without restriction or in such manner as might adversely affect Landlord's title to or interest in the Leased Premises, or in such manner as might make possible a claim or claims of adverse possession by the public, as such, or third Persons, or of implied dedication of the Leased Premises, or any portion thereof.

(d)    Tenant shall not subject all or any part of the Leased Premises or Leasehold Estate to any additional condominium or cooperative form of ownership except as exists as of the Effective Date pursuant to the Condominium Documents.

(e)    Landlord may enter upon and examine any of the Leased Premises at reasonable times after reasonable notice (no less than two (2) Business Days' prior Notice) and during business hours and exercise any rights and privileges granted to Landlord under the provisions of this Lease, so long as Landlord does not unreasonably interfere with Tenant's, any SRO Tenant's or any subtenant's use and enjoyment of the Leased Premises.  During an emergency, Landlord's access to the Leased Premises will not be restricted as provided in the immediately preceding sentence.

4863-0344-5267, v. 18

9.    **Maintenance and Repair.**

(a)    Subject to Sections 14 and 16 hereof, at Tenant's sole cost and expense, will at all times, keep and maintain the Leased Premises and all Tenant's Personal Property in good condition, repair, and appearance and otherwise in such order and repair as is consistent with the Applicable Standard (including, without limitation, the sidewalks, grounds, roof and all roof components, plazas, vaults, foundations, railings, gutters, alleys and curbs in front of or adjacent to the Leased Premises, plumbing, water, sewer, and gas connections, pipes, and mains, electrical components, equipment, landscaping, parking facilities and parking areas (if any), walls (interior and exterior), footings, foundations and structural components of the Leased Premises) and any standard of operation required by the Condominium Documents, and will promptly make all repairs and replacements (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen, structural and nonstructural, ordinary and extraordinary, which may be required to be made upon or in connection with any of the Leased Premises in order to keep and maintain the Leased Premises in good condition and repair.  Tenant will do or cause others to do all shoring of the Leased Premises or of foundations and walls of the Improvements and every other act reasonably necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the Leased Premises (and, if applicable, do so in accordance with any requirements set forth in the Condominium Documents), whether or not Landlord, by reason of any Legal Requirements or Insurance Requirements, is required to take such action or is liable for failure to do so.  Landlord will not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may otherwise be provided for in any Legal Requirements now or hereafter in effect. Tenant will, in all events, make all repairs for which it is responsible hereunder promptly, and all repairs will be in a good, proper and workmanlike manner.  Landlord may, upon two (2) Business Days' prior Notice, inspect or cause independent private inspectors to make inspections of the Leased Premises to determine Tenant's compliance with this Section 9, so long as Landlord does not unreasonably interfere with Tenant's, any SRO Tenant's or any subtenant's use and enjoyment of the Leased Premises.  Except as otherwise set forth in the Work Letter, Tenant shall pay the cost of one (1) such inspection at the Leased Premises by or on behalf of Landlord in each calendar year, not to exceed $5,000.00 (as adjusted for any increase in the Index every five (5) Lease Years); provided, however, if such inspection by Landlord reveals that the Leased Premises or any portion thereof is not in the condition required by this Lease or any Event of Default is continuing, then Tenant shall pay for such additional inspections performed by Landlord to the extent reasonably necessary under the circumstances. All maintenance and repairs performed or made by or on behalf of Tenant as required hereunder shall be made in compliance with all applicable Legal Requirements and Insurance Requirements.

(b)    If Tenant is in default under any of the provisions of this Section 9, then Landlord may, after thirty (30) days' written notice to Tenant and failure of Tenant

44

to commence to cure such default during said period or to diligently prosecute such cure to completion once begun (provided that in the event of an emergency, Landlord shall notify Tenant contemporaneously with such entrance), do whatever is necessary to cure such default as may be reasonable under the circumstances for the account of and at the expense of Tenant. All actual and reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred by Landlord or any Fee Mortgagee, together with interest thereon at the Default Rate from the date of Landlord's payment or incurring of the costs and expenses to and including the date of reimbursement to Landlord by Tenant, will constitute Additional Rent payable by Tenant under this Lease and will be paid by Tenant to Landlord within ten (10) days after written demand providing documentation supporting the applicable costs and expenses incurred. The foregoing provisions will in no way reduce or lessen Tenant's responsibilities and liabilities under this Lease pertaining to the maintenance and repair of the Leased Premises.

(c)    Tenant will from time-to-time replace with other similar operational equipment or parts any of the mechanical systems or other equipment included in the Improvements and required for the operation of the Leased Premises which (i) become worn out, or unusable for the purpose for which it is intended, (ii) is taken by a Condemnation as provided in Section 14, or (iii) is lost, stolen, damaged or destroyed as provided in Section 16. Tenant will repair at its sole cost and expense all damage to the Leased Premises caused by the removal of equipment or any other Personal Property of Tenant at any time, including upon expiration or earlier termination of this Lease.

(d)    Tenant shall maintain on the Leased Premises, and to the extent in Tenant's possession, turn over to Landlord upon expiration or termination of this Lease, then current operating manuals and original warranties (to the extent applicable) for the equipment then located on the Leased Premises specifically excluding, in all cases, trade fixtures of Tenant and any subtenant at the Leased Premises which may be and which are subsequently removed by Tenant upon expiration or earlier termination of this Lease.

(e)    Tenant shall not cause, suffer, or permit, and shall use all reasonable precaution to prevent any intentional, physical and material waste, damage or injury to the Leased Premises or any overloading of the floors therein, and Tenant shall not knowingly and intentionally create or allow any condition that would invalidate any insurance required under this Lease.

(f)    It is intended by Tenant and Landlord that Landlord shall have no obligation in any manner whatsoever, to alter, replace, Restore, repair, or maintain the Leased Premises (or any fixture or equipment therein), whether structural or nonstructural, to demolish the Existing Improvements, or to furnish any services, utilities, or facilities whatsoever to the Leased Premises, all of which obligations are intended, as between Landlord and Tenant, to be those of Tenant. Tenant expressly waives the benefit of any statute or other Legal Requirement now or in the future in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate

45

this Lease because of Landlord's failure to keep the Leased Premises in good order, condition and repair.

10.    **Mechanic's Liens.**

(a)    Subject to Section 20 and this Section 10, Tenant will not, without Landlord's prior written consent, permit any lien, easement, license or other encumbrance to be recorded or filed against the Fee Estate or Leased Premises, on the Rent payable by Tenant under this Lease, or any equipment, materials or other Personal Property supplied to the Leased Premises at the request of Tenant, or anyone holding the Leased Premises, or any portion thereof, through or under Tenant, other than the Permitted Encumbrances and if any such mechanic's, laborer's, materialmen's or other lien shall at any time be filed or recorded against the Leased Premises, or any portion thereof, Tenant shall cause the same to be discharged of record or bonded over by payment, deposit, bond, order of a court of competent jurisdiction or otherwise within thirty (30) days after the date of the filing or recording of the same.

(b)    All materialmen, contractors, artisans, engineers, mechanics, laborers and any other Person now or hereafter furnishing any labor, services, materials, supplies or equipment to Tenant with respect to the Leased Premises, or any portion thereof, are hereby charged with Notice that they must look exclusively to Tenant to obtain payment for any lien.  Notice is hereby given that Landlord shall not be liable for any labor, services, materials, supplies, skill, machinery, fixtures or equipment furnished or to be furnished to Tenant upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Landlord in and to the Leased Premises, or any portion thereof.

(c)    Nothing in this Lease shall be deemed or construed in any way as constituting the consent or request of Landlord, express or implied by inference or otherwise, to any contractor, subcontractor, laborer or materialman for the performance of any labor or the furnishing of any materials for any specific improvement, alteration to or repair of the Leased Premises or any part thereof, nor as giving Tenant any right, power, or authority to contract for or permit the rendering of any services or the furnishing of materials that would give rise to the filing of any lien against the Fee Estate or any assets of Landlord.  Landlord shall be entitled to post and maintain on the Leased Premises any notices of nonresponsibility provided for under applicable Legal Requirements, and to inspect (without obligation) the Leased Premises in relation to the construction at all reasonable times and upon reasonable prior notice.

(d)    If Tenant fails to cause any lien described in Section 10(a) to be discharged within the period required thereunder, in addition to any other right or remedy, Landlord may after providing Notice to Tenant, but shall not be obligated to, discharge the same either by paying the amount claimed to be due or by procuring the discharge of such lien by deposit or by bonding proceedings, and in any such event Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action

46

for the foreclosure of such lien by the lienor and to pay the amount of the judgment in favor of the lienor with interest, costs and allowances. Any amount so paid by Landlord, with all actual out-of-pocket costs and expenses incurred by Landlord in connection therewith, together with interest thereon at the Default Rate from the respective dates of Landlord's making of the payment or incurring of the costs and expenses to and including the date of reimbursement to Landlord by Tenant, shall be paid by Tenant to Landlord within ten (10) days after Landlord's demand therefor, along with documentation supporting the applicable costs and expenses incurred.

11. **Landlord's Right to Mortgage; Landlord's Right to Transfer.**

(a) Landlord shall have the absolute and unconditional right, without the consent of Tenant, to freely, sell, assign, or transfer, at any time and from time to time, its fee title in the Land subject to the Lease and to transfer and assign its rights, titles and interests in this Lease to such transferee, assignee, or purchaser (including, without limitation, any Fee Mortgagee) (any such transferee, assignee, or purchaser, a "Successor Landlord"); provided, however, that Landlord shall provide Tenant Notice of any such sale and transfer within thirty (30) days after consummation and closing thereof. Upon any such sale, assignment, or transfer, Tenant shall attorn to any such Successor Landlord and upon such attornment, this Lease shall continue in full force and effect upon all of the terms, conditions and covenants as are set forth in this Lease. A Successor Landlord shall be and hereby is relieved and freed of all obligations of Landlord under this Lease first accruing and/or occurring after such transfer, provided that such Successor Landlord has assumed and agreed to perform and observe, in writing, all obligations of Landlord herein during the period it is the holder of Landlord's interest under this Lease (subject to the provisions hereof), but the foregoing shall not be construed to relieve any fee owner for any period of time from the full and prompt payment, performance and observance of the covenants, obligations and conditions to be paid, performed and observed by such fee owner under this Lease during the period that such fee owner is Landlord under this Lease. Without limiting the generality of the foregoing, a Successor Landlord shall not be: (i) liable for any previous act or omission of Landlord (or its predecessor in interest) under this Lease which have first accrued or occurred prior to the date on which the Successor Landlord acquires title to the Fee Estate (but the foregoing shall not abrogate the obligation of Successor Landlord with respect to a continuing default of Landlord which, and to the extent, continue following such acquisition of the Fee Estate by Successor Landlord); (ii) bound by any previous modification of this Lease, not expressly provided for in this Lease or bound by any previous payment of Base Rent, Additional Rent or sums paid more than one (1) month in advance, unless such modification or prepayment shall have been expressly approved in writing by the Fee Mortgagee; (iii) responsible for any monies then owing by Landlord to the credit of Tenant (other than those of a continuing nature and solely to the extent such amounts have actually been received by or are in the control of the Successor Landlord); (iv) subject to any credits, offsets, claims, defenses, abatements, demands or counterclaims which Tenant may have against Landlord (or its predecessors in interest) not expressly set forth in this Lease and which have theretofore accrued as of the date of the acquisition of the Fee Interest by Successor Landlord; (v) bound by any covenant to

47

undertake or complete any construction except as expressly set forth in this Lease or as expressly assumed by such Successor Landlord; and (vi) required to account for any security or other deposit other than any such deposit that is actually delivered to the Successor Landlord.

(b)    The foregoing provisions of Section 11(a), are intended to be self-operative and no confirmation shall be required from Tenant in order to effectuate same, provided, however, upon reasonable request made by any transferor of the interest of Landlord under this Lease, Tenant will deliver an acknowledgement or other instrument reasonably acceptable to Tenant in which Tenant confirms the release of any transferor from liability under this Lease accruing from and after the date of such sale, transfer, or assignment.

(c)    Subject to the foregoing terms and conditions of Section 8(a), Landlord has the absolute right, without the consent of Tenant, to encumber by mortgage, pledge, deed of trust, security agreement or other instrument in the nature thereof, including, without limitation, any modification, amendment, spreader, consolidation or renewal of any of the foregoing (a "Fee Mortgage"), any of Landlord's right, title or interest in the Fee Estate and/or this Lease (excluding the Improvements and other property of Tenant but may include Landlord's reversionary interest in the Improvements), which may include a pledge by direct or indirect owner of Landlord of its interest in Landlord; provided that any such Fee Mortgage shall at all times during the Term be subject to this Lease and subordinate to the rights, titles and interests of Tenant, any SRO Tenant and any Leasehold Mortgagee arising by virtue of this Lease (and any New Lease executed pursuant to the provisions of this Lease).  The provisions of this Section 11(c) shall be self-operative, and no instrument of any such attornment shall be required or needed by the holders of any such mortgage (a "Fee Mortgagee"); provided, however, (i) Tenant shall execute, acknowledge and deliver any documents reasonably requested by Landlord, any such transferee or Fee Mortgagee relating to such assignment of this Lease by Landlord or the Fee Mortgage financing thereof, without imposing any additional obligations upon or limiting any rights of Tenant hereunder or any SRO Tenant, and (ii) Landlord shall (or shall cause its Fee Mortgagee or such transferee, as the case may be, to) execute, acknowledge and deliver any documents reasonably requested by Tenant or any Leasehold Mortgagee confirming or otherwise evidencing such assignment of this Lease by Landlord or the Fee Mortgage financing thereof, as the case may be.

(d)    If Landlord or a Fee Mortgagee gives Tenant Notice of the name and address of a Fee Mortgagee, then Tenant shall thereafter give to any such Fee Mortgagee copies of all Notices sent by Tenant to Landlord under this Lease at the same time and in the same manner as and whenever Tenant shall give any such Notice to Landlord, and no such Notice shall be deemed given to Landlord hereunder unless and until a copy of such Notice shall have been so delivered to such Fee Mortgagee.  Tenant shall not seek to enforce any remedy it may have for any default on the part of Landlord without first giving written Notice, specifying the default in reasonable detail, to any Fee Mortgagee whose address has been given to Tenant, and affording such Fee Mortgagee

48

a reasonable opportunity (thirty (30) days from the date of such Notice in the case of a monetary default and sixty (60) days in the case of any nonmonetary default) to perform Landlord's obligations hereunder.  No nonmonetary default by Landlord under this Lease shall exist or shall be deemed to exist (i) as long as such Fee Mortgagee, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to Force Majeure, or (ii) if possession of the Leased Premises is required in order to cure such default, or if such default is not susceptible of being cured by such Fee Mortgagee within the period described above, as long as such Fee Mortgagee, in good faith, shall have notified Tenant that such Fee Mortgagee intends to institute proceedings under the Fee Mortgage to acquire possession of the Leased Premises, and, thereafter, within thirty (30) days of the giving of such notice, commences such proceedings and shall prosecute same with reasonable diligence and continuity and upon obtaining such possession, commences promptly to cure the default and prosecutes the same to completion with reasonable diligence.  In the event of the termination of this Lease by reason of Landlord's default hereunder, upon such Fee Mortgagee's written request, given within thirty (30) days after any such termination, Tenant, within fifteen (15) days after receipt of such request, shall execute and deliver to such Fee Mortgagee or its designee or nominee a new lease of the Leased Premises for the remainder of the Term of this Lease upon all of the same terms, covenants and conditions of this Lease; provided, that, concurrently therewith, such default of Landlord is cured to the extent such default (x) is not a default which is personal to Landlord, and (y) is still continuing notwithstanding such termination of the Lease.  Neither such Fee Mortgagee nor its designee or nominee shall become liable under this Lease unless and until such Fee Mortgagee or its designee or nominee becomes, and then only for so long as such Fee Mortgagee or its designee or nominee remains, the fee owner of the Leased Premises.  Such Fee Mortgagee shall have the right, without Tenant's consent, to foreclose the Fee Mortgage or to accept a deed in lieu of foreclosure of such Fee Mortgage and to convey Landlord's interests hereunder to the purchaser at such foreclosure sale or pursuant to a deed-in-lieu thereof, in either case subject to the terms of this Lease.

(e)    Landlord will give Tenant and Leasehold Mortgagee prior written notice of Landlord's intention to mortgage or pledge its interest in this Lease promptly upon electing to do so.  In no event may Landlord mortgage or pledge its interests in this Lease to any Prohibited Person.  The joint and several liability of Landlord and any immediate and remote successor in interest of Landlord (by assignment or otherwise), and the due performance of the obligations of this Lease on Landlord's part to be performed or observed, will not in any way be discharged, released or impaired by any (A) stipulation which extends the time within which an obligation under this Lease is to be performed, (B) waiver of the performance of an obligation required under this Lease, or (C) failure to enforce any of the obligations set forth in this Lease.

(f)    In no event shall the acquisition of title to the Fee Estate by a purchaser which, simultaneously therewith, leases the entire Fee Estate back to the seller thereof or its designee, be treated as an assumption, by operation of law or otherwise, of Landlord's obligations hereunder.  Notwithstanding the foregoing, Landlord shall at all

49

times be the owner of the Fee Estate (rather than merely a tenant pursuant to a ground lease of the Fee Estate) without the consent of Tenant, not to be unreasonably withheld, conditioned or delayed provided that such structure does not materially and adversely impact Tenant or the Leasehold Estate.

(g)     Subject to <u>Section 11(d)</u>, the Fee Mortgagee shall have the right, but not the obligation, through Landlord or as a Successor Landlord, to perform on behalf of Landlord any covenant or agreement under this Lease to be performed by Landlord by reason of being a Fee Mortgagee (or by power of attorney to the extent necessary and enforceable), and Tenant shall accept such performance by any Fee Mortgagee, as if performed by Landlord, and the Fee Mortgagee shall have the right to exercise any and all rights of Landlord under this Lease (through Landlord or as a Successor Landlord); provided, however, that such performance or exercise by the Fee Mortgagee shall not, prior to the Fee Mortgagee's succession to Landlord's interest in the Leased Premises through any Foreclosure Event, operate to place responsibility for the control, care, management or repair of the Leased Premises upon the Fee Mortgagee or impose responsibility for the carrying out of the terms and conditions of this Lease, nor shall the Fee Mortgagee be responsible for or liable therefor.

(h)     Tenant shall not unreasonably withhold, condition or delay its consent to any modifications to this <u>Section 11</u> and other provisions of this Lease relating to the rights of a Fee Mortgagee (including any prospective Fee Mortgagee that becomes a Fee Mortgagee contingent upon such modification), that are reasonably requested by a Fee Mortgagee (or prospective Fee Mortgagee), provided that (i) Landlord pays Tenant's reasonable, out-of-pocket costs and expenses in connection with any such modification (including, without limitation, reasonable attorneys' fees and disbursements) and (ii) any such modification does not (x) adversely affect the rights, benefits or protections of Tenant or any Leasehold Mortgagee under this Lease (or any SRO Tenant) or increase the obligations or Tenant under this Lease, (y) alter in any way the amount or time for payment of any Base Rent, Additional Rent or other sum payable hereunder, the Term, or any security required to be provided under this Lease, (z) result in any termination hereof prior to the end of the Term or (aa) require this Lease or the Leasehold Estate or any Leasehold Mortgage to be subordinate to the rights of the Fee Mortgagee (or a prospective Fee Mortgagee).

(i)     Except as expressly provided in this Lease by reason of the occurrence and continuance of an Event of Default, Tenant's tenancy and Tenant's rights under this Lease shall not be disturbed, terminated or otherwise adversely affected, nor shall this Lease be affected, by any default under any Fee Mortgage or other documents related thereto, and in the event of a foreclosure or other enforcement of any Fee Mortgage, or sale in lieu thereof, the purchaser or transferee at such foreclosure sale shall be bound to Tenant for the Term, the rights of Tenant under this Lease shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default which, in accordance with the terms hereof affords Landlord an express right to terminate this Lease, if at all, has occurred and is continuing. Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by

50

Legal Requirements.  Any Fee Mortgage shall provide, in effect, that so long as this Lease is in full force and effect, any insurance proceeds and Condemnation Award shall be permitted to be used for restoration in accordance with the provisions of this Lease.

12.    **Tenant's Right to Mortgage.**

(a)    Tenant shall from time to time and at any time, without Landlord's consent, have the right to encumber by one or more Leasehold Mortgages, the Leasehold Estate created by this Lease, and/or all of Tenant's right, title and interest in and to any Improvements at any time located on the Leased Premises and/or the direct or indirect beneficial interests in Tenant; provided, however, that no holder of any Leasehold Mortgage, nor anyone claiming by, through or under any such Leasehold Mortgage, shall by virtue thereof, acquire any greater rights hereunder than Tenant has, except the right to cure or remedy Tenant's defaults or become entitled to a New Lease as more fully set forth in this Section 12 and such other Mortgagee Protections as are expressly granted to Leasehold Mortgagees hereunder.  Landlord shall not be required to join in, or "subordinate" the Fee Estate, any Fee Mortgage or any of Landlord's interests to, any Leasehold Mortgage (but, for the avoidance of doubt, the Fee Mortgage shall remain subject and subordinate to this Lease and the Leasehold Estate in accordance with Section 11 hereof).  So long as such Leasehold Mortgage complies with the definition of Leasehold Mortgage, there shall be (A) no limit on the amount or nature of any obligation secured by a Leasehold Mortgage; (B) no restrictions on the purpose for which the proceeds of any such financing may be applied; (C) no restrictions on the nature or character of any Leasehold Mortgagee; or (D) no restrictions on the creation of participation or syndication interests in or to any Leasehold Mortgage.  Leasehold Mortgages may secure construction or permanent financing.  No Leasehold Mortgagee shall be entitled to any Mortgagee Protections unless and until Notice of the Leasehold Mortgage in question has been given to Landlord together with the name and address of such Leasehold Mortgagee.  Any Leasehold Mortgage that does not comply with the provisions of this Section 12 shall be of no force and effect against Landlord and any Fee Mortgagees.

(b)    No Leasehold Mortgage shall be effective, unless: (A) at the time of making such Leasehold Mortgage there is no existing and unremedied monetary Default and no existing and unremedied Event of Default on the part of Tenant under this Lease; (B) the holder of such Leasehold Mortgage is at all times a Qualified Institutional Lender; and (C) prior to achieving Completion of the Project, all Leasehold Mortgages, taken together, shall not secure an amount in excess of eighty-five percent (85%) of the Total Project Cost. In addition, the following shall apply with respect to each Leasehold Mortgage:

(i)    Tenant's making of a Leasehold Mortgage shall not be deemed to constitute an assignment or transfer of the Leasehold Estate, nor shall any Leasehold Mortgagee, as such, or in the exercise of its rights under this Lease, be deemed to be an assignee, transferee, or mortgagee in possession of the Leasehold Estate so as to require such Leasehold Mortgagee, as such, to assume or otherwise be

obligated to perform any of Tenant's obligations under this Lease except when, and then only for so long as, such Leasehold Mortgagee has acquired ownership and possession of the Leasehold Estate pursuant to a Foreclosure Event under its Leasehold Mortgage (as distinguished from the mere exercise of Leasehold Mortgagee's cure rights hereunder). No Leasehold Mortgagee (or Person acquiring the Leasehold Estate pursuant to a Foreclosure Event under a Leasehold Mortgage) shall be liable under this Lease unless and until such time as it becomes, and then only for so long as it remains, the owner of the Leasehold Estate.

(ii)    Notwithstanding anything to the contrary in this Lease, any Foreclosure Event under any Leasehold Mortgage (or any exercise of rights or remedies under or pursuant to any Leasehold Mortgage, including the appointment of a receiver, shall not in and of itself be deemed to violate this Lease or, in and of itself, entitle Landlord to exercise any rights or remedies, but the foregoing shall not limit Landlord's rights and remedies (subject to all other Mortgagee Protections set forth herein) if any Default or Event of Default occurs.

(iii)   If Tenant enters into any Leasehold Mortgage that complies with the definition of such term, then the Leasehold Mortgagee under such Leasehold Mortgage shall be entitled to all Mortgagee Protections (as against both Landlord and any Successor Landlord) from and after such date as Tenant or the Leasehold Mortgagee has given Landlord Notice of such Leasehold Mortgage and Leasehold Mortgagee. Tenant shall also provide to Landlord a copy of the recorded Leasehold Mortgage, within thirty (30) days after receipt thereof by Tenant.  No change of address of such Leasehold Mortgagee, amendments, supplements, and modifications of such Leasehold Mortgage or assignments of such Leasehold Mortgage, shall be effective against Landlord unless and until such Leasehold Mortgagee shall have given Landlord Notice of such change, amendment, supplement, modification or assignment.

(iv)    If a Leasehold Mortgagee is entitled to Mortgagee Protections hereunder, such entitlement shall not terminate unless and until such time, if any, as either (1) the Leasehold Mortgage shall have been satisfied and discharged of record by the Leasehold Mortgagee, except through a Foreclosure Event; (2) such Leasehold Mortgagee has consented in a signed writing to the termination of its Mortgagee Protections; or (3) after Landlord has complied with the applicable Mortgagee Protections, Landlord has validly terminated this Lease, no Leasehold Mortgagee has validly requested (and is entitled to) a New Lease, and the New Lease Option Period has expired.

(v)     Landlord shall, upon written request, acknowledge receipt of the name and address of any Leasehold Mortgagee (or proposed Leasehold Mortgagee) and confirm to such party that such party is or would be, upon closing of its loan to Tenant or its acquisition of an existing Leasehold Mortgage, a Leasehold Mortgagee (in compliance, as of the date of such confirmation, with the

52

definition of such term, including all applicable conditions and requirements set forth in such definition) entitled to all Mortgagee Protections as provided in this Lease, provided, however, that Landlord hereby acknowledges that the Landlord has received Notice of and approved the Construction Loan Mortgage and confirms that the Construction Lender constitutes a Leasehold Mortgagee, entitled to all of the Mortgagee Protections (as against both Landlord and any Successor Landlord) set forth herein from and after the Effective Date. Such confirmation may, in Landlord's discretion, be conditioned upon Landlord's receipt and verification of evidence reasonably satisfactory to Landlord that the Person seeking such confirmation is entitled to such confirmation pursuant to this Lease. Further, if, in connection with the entering into of a Leasehold Mortgage, the Leasehold Mortgagee requests reasonable modifications to this Lease, Landlord shall not unreasonably withhold, condition or delay its consent to such modifications provided that (A) such modifications do not reduce any of Landlord's rights hereunder (except to a *de minimis* extent), increase any of Landlord's obligations hereunder (except to a *de minimis* extent), or result in any adverse tax consequences, additional costs or financial penalties to Landlord or any Landlord affiliate and (B) Tenant shall pay to Landlord all reasonable, out-of-pocket costs and expenses (including reasonable attorneys' fees) actually incurred by Landlord in complying with this clause (v).

(vi)    Landlord shall, without cost to Landlord (Tenant shall pay all reasonable costs, including reasonable attorney fees, associated with the entry into such agreement), at any time and from time to time, within twenty (20) calendar days after written request by Tenant or any Leasehold Mortgagee, duly execute and deliver to Tenant or any Leasehold Mortgagee, an estoppel in such Leasehold Mortgagee's customary form (if a Leasehold Mortgagee or Tenant has requested such estoppel) and in any event in a form reasonably acceptable to Landlord, as to certain factual matters with respect to this Lease, including without limitation, the existence of any Defaults and the payment of Rent hereunder, which estoppel shall not be recorded; provided that, in either case, Landlord shall have the right to revise the factual statements therein to reflect the actual then existing circumstances.

(vii)   No Leasehold Mortgage shall attach to: (1) Landlord's interest in this Lease, in the Fee Estate and Landlord's remainder and/or reversionary interest in the Improvements; (2) Landlord's interest in any New Lease and the Fee Estate thereunder; (3) any judgment arising from Tenant's breach of this Lease; (4) Landlord's and any Fee Mortgagee's rights and remedies under this Lease; and (5) any rights of a Fee Mortgagee with respect to the Fee Estate. Any Leasehold Mortgagee in the event of a foreclosure or the grantee or successful bidder at the foreclosure, shall succeed only to the Leasehold Estate under this Lease.

4863-0344-5267, v. 18

(c)     Notwithstanding anything to the contrary in this Lease, if Tenant at any time or from time to time enters into any Leasehold Mortgage in accordance with the provisions of this Lease, and Tenant or a Leasehold Mortgagee has given Landlord Notice of such Leasehold Mortgage, then, if and for so long as, any such Leasehold Mortgage is in effect, the following shall apply:

(i)   No cancellation, termination (including Tenant's termination of this Lease pursuant to any express right of termination in this Lease or under applicable Legal Requirements), surrender, acceptance of surrender, abandonment, amendment, modification, or rejection of this Lease, or other encumbrance on the Fee Estate, shall bind a Leasehold Mortgagee if done without Leasehold Mortgagee's consent, to be granted or withheld in Leasehold Mortgagee's sole discretion.   Nothing in this paragraph shall limit the right of Landlord to terminate this Lease upon occurrence and continuance of an Event of Default beyond applicable notice, grace and cure periods and the expiration of all of Leasehold Mortgagee's notice and cure rights without cure of such Event of Default, subject however to (1) provisions of this Lease that limit the right of Landlord to terminate this Lease on account of Personal Default(s) or certain non-monetary Event of Defaults; and (2) the right of any Leasehold Mortgagee to obtain a New Lease as provided for in this Lease.

(ii)  In the event of any arbitration, appraisal, or other dispute resolution proceeding, or any proceeding relating to the determination of Base Rent or any component of any Base Rent, or any proceeding relating to the application or determination of any Casualty proceeds or Condemnation Awards (including, without limitation, the arbitration of a Dispute pursuant to Section 50 hereof):

1.   Landlord shall promptly give Notice to each Leasehold Mortgagee of the commencement of such proceeding, which Notice shall enclose copies of all Notices, papers, and other documents related to such proceeding to the extent then given or received by Landlord (or its counsel). Landlord shall provide Leasehold Mortgagee with copies of any and all additional Notices, papers, and other documents related to such proceeding when and as given or received by Landlord (or its counsel).

2.   Leasehold Mortgagee shall, at its sole cost and expense or at the sole cost and expense of Tenant (but at no cost or expense to Landlord), be entitled to participate in such proceeding.   Such participation shall, to the extent required by Leasehold Mortgagee, include:   (1) receiving copies of all Notices, demands, and other written communications and documents at the same time they are served upon or delivered to Landlord or Tenant (or their respective counsel); and (2) attending and participating in all hearings, meetings, and other sessions or proceedings relating to such dispute resolution.

4863-0344-5267, v. 18

(d) <u>Leasehold Mortgagee Notice and Cure Periods</u>.  If Tenant enters into a Leasehold Mortgage in accordance with the terms hereof and Tenant or a Leasehold Mortgagee has given Landlord Notice thereof, Tenant or the Leasehold Mortgagee shall furnish Landlord with the address to which such Leasehold Mortgagee desires copies of notices to be delivered (together with a duplicate original or certified copy of the applicable Leasehold Mortgage), Landlord hereby agrees that Landlord will thereafter deliver to such Leasehold Mortgagee at the address so given (subject to any change in such address by Notice to Landlord from such Leasehold Mortgagee) and contemporaneously with the delivery thereof to Tenant, duplicate copies of any and all written Notices of Default or termination which Landlord may from time to time give or serve upon Tenant (or its counsel) under and pursuant to the terms and provisions of this Lease (provided that Landlord shall have no liability for the failure to provide such Notice and Landlord's failure to so provide Notice to any such Leasehold Mortgagee thereof shall not be a default by Landlord under this Lease). No Notice to Tenant shall be effective unless and until so given to each Leasehold Mortgagee.  No Event of Default, surrender, and/or termination of this Lease (other than with respect to a Total Loss), or other rights or remedies of Landlord predicated upon the giving of Notice to Tenant shall be deemed to have occurred or arisen unless like Notice shall have been so given to each Leasehold Mortgagee at the same time and by the same means, which Notice shall describe in reasonable detail the alleged Default or other event allegedly giving rise to rights of Landlord.  If a Default occurs, Landlord will not exercise any remedy until Landlord has given Notice of such Default to a Leasehold Mortgagee and until the curative periods set forth below have ended without cure of the applicable Default.

(e)   If any Default of Tenant occurs, then any Leasehold Mortgagee shall have the same cure period (which cure period for the Leasehold Mortgagee shall commence upon the date Leasehold Mortgagee receives Notice of any such Default) available to Tenant under this Lease, plus the additional time provided for below (regardless of the original time fixed for performance by Tenant), within which to take (if such Leasehold Mortgagee so elects; and no Leasehold Mortgagee shall have any duty or obligation to undertake any Leasehold Mortgagee's cure of any kind) whichever of the actions set forth below shall apply to such Default:

(i) In the case of a monetary Default, Leasehold Mortgagee shall be entitled (but not required) to cure such default within a cure period ending on the later of (x) the end of Tenant's cure period under this Lease or (y) the tenth (10th) Business Day after Landlord gives Notice of such Default to Leasehold Mortgagee.  Any such cure shall be accompanied by payment to Landlord of accrued and unpaid interest at the Default Rate if and to the extent applicable.

(ii) In the case of any non-monetary Default that a Leasehold Mortgagee is reasonably capable of curing without obtaining possession of the Leased Premises (excluding, in any event, a Personal Default), Leasehold Mortgagee shall be entitled, but not required, to:  within a period ending on the later of (x) the final calendar day of Tenant's cure period for the Event of Default (if Tenant is entitled to any such cure period) or (y) the date that occurs ninety (90)

calendar days after Leasehold Mortgagee receives Notice of such Default, to cure such Default; provided, however, if such non-monetary Default is inherently not susceptible to cure within such ninety (90) calendar day period, such cure period shall be extended to the extent reasonably necessary to cure such Default so long as the Leasehold Mortgagee is proceeding with reasonable diligence to cure such Default.

(iii) In the case of (1) any non-monetary Default that is not reasonably susceptible of being cured by a Leasehold Mortgagee without obtaining possession of the Leased Premises or (2) any Personal Default, Leasehold Mortgagee shall be entitled (but not required) to do the following, so long as, for all other Defaults, such Leasehold Mortgagee has exercised or is exercising, within the applicable periods, the applicable Leasehold Mortgagee's cure rights as provided in this Lease:

1. At any time during a period ending on the later of (i) the cure period (if any) applicable to Tenant, or (ii) ninety (90) calendar days after Landlord gives to the Leasehold Mortgagee Notice of the non-monetary Default, Leasehold Mortgagee shall be entitled to institute proceedings, and (subject to any stay in any bankruptcy proceedings affecting Tenant, or any injunction, so long as such stay or injunction has not been lifted) then with reasonable diligence prosecute the same to completion (but not necessarily within such ninety (90) calendar day period or, if applicable, cure period of Tenant) to obtain possession of the Leased Premises as a mortgagee (including possession by a receiver), or (cause a Successor Tenant) to acquire the Leasehold Estate through a Foreclosure Event under its mortgage, as applicable (the obtaining of such possession or the completion of such acquisition, "Control of the Leased Premises").

2. Upon obtaining Control of the Leased Premises (whether before or after expiration of any otherwise applicable cure period), Leasehold Mortgagee or any Successor Tenant shall then be entitled (but not required) to proceed with reasonable diligence to cure such non-monetary Default (excluding Personal Defaults of Tenant, which neither Leasehold Mortgagee nor a Successor Tenant need cure at any time). A Leasehold Mortgagee or Successor Tenant having Control of the Leased Premises shall not be bound by any deadline for completion of any construction or alterations, or other performance, required of Tenant under this Lease, provided that such Leasehold Mortgagee or Successor Tenant shall with reasonable diligence prosecute completion of same and shall cure all monetary Defaults within the period provided for under this Lease for such cure.

(f)   A Leasehold Mortgagee shall not be required to continue to exercise Leasehold Mortgagee's cure rights or otherwise proceed to obtain or to exercise Control of the Leased Premises if and when the Default that such Leasehold Mortgagee was attempting to cure shall have been cured. Upon such cure and the cure of any other

56

Defaults in accordance with this Lease, this Lease shall continue in full force and effect as if no Default(s) or Event of Default(s) had occurred. Even if a Leasehold Mortgagee has commenced Leasehold Mortgagee's cure, such Leasehold Mortgagee may abandon or discontinue Leasehold Mortgagee's cure at any time, without liability to Landlord or otherwise except with regard to liabilities first arising after the Leasehold Mortgagee has Control of the Leased Premises. Leasehold Mortgagee's exercise of Leasehold Mortgagee's cure rights shall not be deemed an assumption of this Lease in whole or in part.

(g)    So long as the period for a Leasehold Mortgagee to exercise Leasehold Mortgagee's cure rights for any Default has not expired, Landlord shall not (1) re-enter the Leased Premises on account of such Default (but this shall not limit Landlord's right of access to the Leased Premises otherwise provided for under the express terms of this Lease), (2) give any Notice terminating or electing to terminate this Lease, or (3) bring a proceeding on account of such Default to (w) dispossess Tenant or subtenants under any Subleases, (x) reenter the Leased Premises, (y) terminate this Lease or the Leasehold Estate, or (z) otherwise (except as expressly permitted by this Section 12) exercise any other rights or remedies under this Lease by reason of such Default (collectively, the "Landlord Termination Rights"). Nothing in the Mortgagee Protections shall, however, be construed to either (i) extend the Term beyond the expiration date provided for in this Lease that would have applied if no Default had occurred, (ii) preclude Landlord from exercising its rights under Sections 9 and 22 and, if so exercised, Tenant shall pay Landlord in accordance with Sections 9 and 22, the failure to so pay being a Default hereunder, (iii) preclude Landlord from seeking and obtaining actual damages or injunctive and other equitable relief against Tenant on account of such Default, (iv) preclude Landlord from seeking and obtaining the benefits of Sections 38 and 28 or (v) require any Leasehold Mortgagee to cure any Personal Default as a condition to preserving this Lease or to obtaining a New Lease (but this shall not limit a Leasehold Mortgagee's obligation to seek to obtain Control of the Leased Premises, and then consummate a foreclosure, by way of the exercise of Leasehold Mortgagee's cure rights, if Leasehold Mortgagee desires to preclude Landlord from terminating this Lease on account of a Personal Default).

(h)    Leasehold Mortgagee's Right to a New Lease. Upon termination of this Lease as a result of either (i) the exercise of Landlord's Termination Rights following an Event of Default which is not cured by Tenant or Leasehold Mortgagee pursuant to this Lease, or (ii) a rejection hereof in any bankruptcy proceeding in which Tenant is the debtor, Landlord shall give Notice to Leasehold Mortgagee within ten (10) Business Days thereof (but Landlord shall not be liable for a failure to timely provide such Notice) and Leasehold Mortgagee shall have the option, within thirty (30) days after its receipt of such Notice (the "New Lease Option Period") to elect to receive from Landlord, and enter into, a new lease (a "New Lease") of the Leased Premises for the unexpired balance of the Term, on the exact same terms and conditions as in this Lease, including all rights, options or privileges of Tenant under this Lease (but excluding any rights, options or privileges or performance obligations that have already been exercised or performed or no longer apply) and each and every Fee Mortgage shall be subject and subordinate to

57

such New Lease, and Landlord agrees to execute such New Lease effective as of (or retroactively to) the date of termination of this Lease, provided such Leasehold Mortgagee: (i) shall pay to Landlord, on the delivery date of such New Lease, (A) all sums then due under this Lease, as if this Lease had not been terminated, including interest at the Default Rate, any Late Charge and (B) all reasonable expenses, including transfer, documentary, stamp, recording or similar taxes and legal costs incurred by Landlord in connection with any Default and termination of this Lease, recovery of possession of the Leased Premises, the preparation, execution of the New Lease and any memorandum of the New Lease requested by the new tenant thereof; (ii) shall take all steps reasonably necessary to remedy all non-monetary Defaults and Events of Default (other than Personal Defaults and Defaults cured by termination of the Lease) that are susceptible to cure by such Leasehold Mortgagee within a reasonable period of time; (iii) shall thereafter observe and perform all covenants and conditions in such Lease contained on the part of Tenant to be observed and performed (including, without limitation, the payment of Rent hereunder); (iv) shall pay to Landlord all sums expended by Landlord, or that Landlord may be liable for, with respect to any Subleases not terminated; (v) shall operate the Leased Premises subject to the provisions and requirements of this Lease; and (vi) shall be subject to and shall be liable to perform the obligations imposed on the tenant under such New Lease only during any period when such Person has title to the Leasehold Estate.  After termination of this Lease and during the period thereafter during which any Leasehold Mortgagee shall be entitled to enter into a New Lease (and only during such time), Landlord will not terminate the rights of any subtenant hereunder unless such subtenant shall be in default under its Sublease and has failed to cure same within the time provided under such Sublease, nor shall Landlord modify or amend any of the terms of any other Sublease to which Landlord has agreed in writing to recognize and not disturb.  During such periods, Landlord shall receive all revenues payable under the Sublease as agent of such Leasehold Mortgagee and shall deposit such revenues in a separate and segregated account in trust for the Leasehold Mortgagee, but may withdraw such sums as are required to be paid to Landlord under this Lease at the time and in the amounts due hereunder, and, upon the execution and delivery of the New Lease, Landlord shall account to the new tenant thereunder for the balance, if any (after application as aforesaid) of the revenues payable under the Sublease received by Landlord from the operation of the Leased Premises.  The collection of revenues payable under the Sublease by Landlord acting as an agent pursuant to this Section 12 shall not be deemed an acceptance by Landlord for its own account of the attornment of any party under a Sublease unless Landlord shall have agreed in writing with such party that its tenancy or contract shall be continued following the expiration of any period during which a Leasehold Mortgagee may be granted a New Lease as the tenant thereunder, in which case such attornment shall take place upon the expiration of such period but not before. Except as expressly set forth in any non-disturbance and attornment agreements executed with respect to such Sublease, under no circumstances shall Landlord be obligated to perform any obligations of any Person under any Sublease. Neither Landlord nor any new tenant shall record any New Lease made pursuant to this Section 12(h); provided, however, that concurrently with the execution of a New Lease, Landlord and the new tenant thereunder shall join in the execution of a memorandum of the New Lease, in substantially the form attached hereto as Exhibit I (with the applicable entity names as to

58

the Landlord and Tenant thereunder, any notice addresses and dates updated accordingly) and otherwise in proper form for recordation, which memorandum shall be recorded by Landlord and such new tenant in the real property records where the Land is located.

(i)    Interaction of Mortgages.    A Leasehold Mortgage shall not encumber or attach to the Fee Estate or affect, limit, or restrict Landlord's rights and remedies under this Lease except as expressly provided in this Lease.  Any Leasehold Mortgage shall attach solely to the Leasehold Estate and not the Fee Estate.  Upon a foreclosure or assignment in lieu thereof under a Leasehold Mortgage, the Leasehold Mortgagee or any Successor Tenant shall succeed only to the Leasehold Estate.  Any foreclosure or assignment in lieu thereof under a Leasehold Mortgage shall not extinguish, terminate, or otherwise adversely affect the Fee Estate (subject to this Lease) or the rights of any Fee Mortgagees as against Landlord or the Fee Estate (which shall in all events remain subject to this Lease.  If a Leasehold Mortgage expressly limits the related Leasehold Mortgagee's exercise of any Mortgagee Protections, then as between Tenant and such Leasehold Mortgagee the terms of such Leasehold Mortgage shall govern.    A Leasehold Mortgagee may, by Notice to Landlord, temporarily or permanently waive any Mortgagee Protections as specified in such Notice.  Any such waiver shall be effective in accordance with its terms as against such Leasehold Mortgagee and its successors and assigns.   Any such waiver shall not bind any subsequent Leasehold Mortgagee under a subsequent Leasehold Mortgage granted by Tenant.   The exercise of any rights or remedies of a Leasehold Mortgagee under a Leasehold Mortgage, including the appointment of a receiver and the consummation of any foreclosure, shall not constitute an Event of Default under this Lease, notwithstanding anything to the contrary in this Lease.

(j)    Bankruptcy Related Provisions.    In the event Landlord files a petition for relief under the Bankruptcy Code, Tenant shall promptly execute and deliver to each Leasehold Mortgagee any and all instruments reasonably required in connection with any such proceeding after request therefor by any Leasehold Mortgagee.

13.    **Alterations.**

(a)    After the Completion of the Project, Tenant shall obtain Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed, before making any Material Alteration and shall otherwise comply with the provisions of this Section 13.  It shall not be unreasonable for Landlord to disapprove, and Landlord may disapprove, a Material Alteration if (i) the Improvements, upon completion of such Material Alteration, (A) will not consist of a complete structure erected wholly within the boundary lines of the Land (excluding any Units of the Condominium not party of the Leased Premises or subject to the Tenth Floor Sublease) or (B) will tie-into or connect to or be dependent upon in any way on any other real property (either structurally, legally or otherwise) that is not part of the Condominium or otherwise governed by the Condominium Documents, (ii) in the case of any Material Alteration other than the demolition of all or a material portion (i.e., greater than 50%) of the Improvements, such Material Alteration will adversely affect the structural

59

integrity of the Improvements, or (iii) the completion of such Material Alteration requires satisfaction of the CONH Requirement.  At Landlord's option, any Material Alteration made without the consent of Landlord, if required pursuant to the first sentence of this Section 13(a), shall be removed and the area repaired and restored to its prior condition, at Tenant's sole cost and expense, upon demand or, at Landlord's election in its sole discretion, at the termination or expiration of the Term.

(b)    All Alterations to the Leased Premises during the Term of this Lease (whether or not such alterations constitute Material Alterations) shall be made at Tenant's sole cost and expense and shall be made in accordance with all Legal Requirements and Insurance Requirements.  Tenant shall obtain and comply with all Permits required in connection with the Alterations (if any) and promptly after request from Landlord (i) shall deliver to Landlord a true and complete copy of all such Permits (if any) and (ii) upon Tenant obtaining same following completion of the Alterations, shall deliver to Landlord all certificates of occupancy required pursuant to applicable Legal Requirements to use and occupy the Improvements (or analogous items), if and to the extent applicable.  All Alterations shall comply with all Applicable Standards and shall be constructed and completed in a good and workmanlike manner.

(c)    In the event that Tenant desires to perform any Material Alterations, Tenant shall (i) be required to have (in Landlord's sole but reasonable discretion) sufficient financial resources and liquidity available to perform and pay for all costs associated with the proposed Material Alterations in such a manner as would provide sufficient protection against liens which could arise in connection with the performance of any such Material Alterations, (ii) provide reasonable evidence to Landlord of such sufficient financial resources and liquidity, including, without limitation, completion and operating deficit guarantees, cash deposits, equity commitments and debt commitments and (iii) have furnished to Landlord a surety bond, cash deposit, Letter of Credit, guaranty or other security (in each case as selected by Tenant and reasonably acceptable to Landlord) with respect to such Material Alteration (the "Material Alteration Security").

(d)    All Material Alterations shall be made (at Tenant's sole cost and expense) as follows:

(i)    Tenant shall submit to Landlord, complete plans and specifications for all work to be done by Tenant, and Landlord will have the right to approve such plans and specifications (such approval not to be unreasonably withheld, conditioned or delayed).  All such plans and specifications shall be prepared by the licensed architect(s) and engineer(s) approved in writing by Landlord (such approval not to be unreasonably withheld, conditioned or delayed), shall comply with all applicable Legal Requirements, shall not, when completed, adversely affect the structural elements of the Leased Premises, shall comply with the insurance required under Section 15 hereof, shall be in a form sufficient to secure the approval of all applicable Governmental Authorities, and with respect to plans and specifications pertaining to alterations, improvements and additions

60

requiring Landlord's approval under this <u>Section 13</u>, shall be otherwise satisfactory to Landlord in Landlord's reasonable discretion.

(ii)   Landlord shall notify Tenant in writing within thirty (30) days whether Landlord approves or disapproves of the plans and specifications for such Material Alteration.   Tenant may submit to Landlord revised plans and specifications for Landlord's prior written approval, which approval shall in all events not be unreasonably withheld, conditioned or delayed if (a) the work to be done would not, in Landlord's reasonable judgment, materially and adversely affect the value, character, rentability or usefulness of the Leased Premises or any part thereof, or (b) the work to be done shall be required by any Legal Requirements or Insurance Requirements.   Tenant shall pay all costs, including the fees and expenses of the licensed architect(s) and engineer(s), in preparing such plans and specifications.   Tenant shall pay all Landlord's reasonable and actual out-of-pocket costs and expenses in connection with Landlord's review of any such plans and specifications.   If Landlord does not, within thirty (30) days following Tenant's written request for such consent or approval, respond in writing with Landlord's consent or approval or specific reasons for withholding consent or approval to any Material Alteration (or new or revised plans and specifications therefor) to which Tenant has requested Landlord's consent or approval, and such failure continues for an additional ten (10) days following a second written notice from Tenant to Landlord (which second written notice shall state at the top thereof, in bold and capitalized letters, "LANDLORD'S FAILURE TO RESPOND TO THIS REQUEST MAY RESULT IN A DEEMED APPROVAL") is received by Landlord, then, at Tenant's election, Landlord's consent and approval shall be deemed given thereto.

(iii)   All changes (other than de minimis changes, field changes for which no change order is proposed and which will be reflected in the final "as built" plans, or any other change costing less than $100,000.00) in any plans and specifications approved by Landlord for any Material Alteration shall be subject to Landlord's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed.   If Tenant wishes to make such change in approved plans and specifications for any Material Alteration, Tenant shall have such architect(s) and engineer(s) prepare plans and specifications for such change and submit them to Landlord for Landlord's written approval.   Landlord shall notify Tenant in writing within five (5) Business Days whether Landlord approves or disapproves such change.   Tenant may submit to Landlord revised plans and specifications for such change for Landlord's written approval.   After Landlord's written approval of such change, such change shall become part of the plans and specifications approved by Landlord.

(iv)   Tenant acknowledges and agrees that (A) any review of any plans and specifications by or on behalf of Landlord is solely for Landlord's benefit, (B) Landlord makes no representation or warranty that any plans and specifications

61

comply with any Legal Requirements or Insurance Requirements or are otherwise sufficient or correct for any purpose and (C) such review and any approval by Landlord (whether actually given or deemed given) of any plans and specifications shall not constitute any opinion or representation or warranty by or on behalf of Landlord as to the compliance thereof with any Legal Requirements or Insurance Requirements or the sufficiency or correctness thereof for any purpose or otherwise.

(e)     Tenant shall obtain and comply with all Permits required in connection with the Material Alteration (if any) and promptly after request from Landlord (i) shall deliver to Landlord a true and complete copy of all such Permits (if any) and (ii) upon Tenant obtaining same following completion of the Material Alteration, shall deliver to Landlord all certificates of occupancy required pursuant to applicable Legal Requirements to use and occupy the Improvements (or analogous items), if and to the extent applicable.  Tenant shall, through Tenant's licensed contractor, perform the Material Alteration substantially in accordance with the plans and specifications approved in writing by Landlord.  Except to the extent funded with the proceeds of any Leasehold Mortgage, insurance policy or Condemnation Award (subject, in each case, to the terms and conditions of this Lease), Tenant shall pay the entire cost of all alterations, work, additions, or improvements (including the cost of all utilities, Permits, fees, taxes, and property and liability insurance premiums in connection therewith) required to complete the Material Alteration.  Under no circumstances shall Landlord be liable to Tenant for any damage, loss, cost or expenses incurred by Tenant on account of any plans and specifications, contractors or subcontractors, design of any work, construction of any work, or delay in completion of any work (except to the extent that any damage, loss, cost or expenses incurred by Tenant on account of any work constitutes a Material Alteration, or delay in completion of any such work is the direct result of the gross negligence, illegal activity, fraud, or willful misconduct of Landlord or its agents, representatives, employees, invitees or contractors).

(f)     Tenant shall give at least ten (10) days' prior Notice to Landlord of the commencement of any work constituting a Material Alteration by outside contractors. Landlord shall have the right to post and keep posted on the Leased Premises any notices that may be provided by law or which Landlord reasonably may deem to be proper for the protection of Landlord and the Leased Premises, or any portion thereof from liens; provided that such notices do not in any material respect interfere with the use and enjoyment of the Leased Premises by any subtenant. Tenant acknowledges and agrees that, subject to the rights of Tenant's Architect, if this Lease is terminated for any reason and Landlord does not enter into a New Lease with a Leasehold Mortgagee or its designee, or, if entered into, such New Lease is terminated, then the plans and specifications and other materials relating to the construction of a Material Alteration shall (subject, in each case, to the prior rights of any Leasehold Mortgagee) become the sole property of Landlord and Landlord shall have the benefit thereof but no liability thereunder.

62

(g)    All Alterations and fixtures, whether temporary or permanent in character, made in or to the Leased Premises by Tenant, shall become part of the Leased Premises, except those which are readily removable without causing material damage to the Leased Premises (which shall be and remain the property of Tenant).  Subject to this Section 13, upon termination or expiration of this Lease, Tenant shall, at Landlord's election and at Tenant's expense, (i) remove all movable furniture, equipment, trade fixtures, office machines and other personal property from the Leased Premises to the extent owned by Tenant and (ii) those Improvements, Alterations and additions to the Leased Premises made without Landlord's consent in violation of this Lease and, in each case, repair all damage caused by any such removal pursuant to clauses (i) and (ii) of this Section 13(g).  Termination of this Lease shall not affect the obligations of Tenant pursuant to this Section 13(g) to be performed after such termination.

(h)    If required by a Fee Mortgagee, prior to the commencement of any Alteration involving any demolition or removal of the Improvements that constitute real property under the REMIC Requirements, Tenant shall provide to Landlord any reasonably requested information for the Fee Mortgagee to determine its compliance with the REMIC Test.  Any actual out-of-pocket costs or expenses incurred by Tenant arising as a result of any such request by Landlord (to the extent such costs and expenses would not have been incurred by Tenant if not for such request) shall be borne entirely by Landlord.

(i)    At least five (5) Business Days prior to the commencement of any work in connection with any such proposed Material Alteration, Tenant shall furnish to Landlord:

(i)    the Material Alteration Security;

(ii)    copies of all contracts entered into in connection with the proposed Material Alteration, in form assignable to Landlord (subject, in each case, to the prior rights of any Leasehold Mortgagee), providing for the completion of all work, labor and materials necessary to perform the proposed Material Alteration in accordance with the plans and specifications therefor, which contracts shall provide that upon any termination of this Lease or upon Landlord's re-entry upon the Leased Premises following an Event of Default prior to the complete performance of such contracts (but subject, in each case, to the prior rights of any Leasehold Mortgagee), Landlord shall be entitled to the benefit of the terms of such contracts but shall have no liability thereunder unless and solely to the extent that Landlord elects in its sole discretion to assume such contracts;

(iii)    a collateral assignment to Landlord (subject, in each case, to the prior rights of any Leasehold Mortgagee) of the contracts so furnished, duly executed and acknowledged by Tenant, by its terms to be effective upon any termination of this Lease or upon

63

4863-0344-5267, v. 18

Landlord's re-entry upon the Leased Premises following an Event of Default prior to the complete performance of such contracts, which assignment shall provide that Landlord (subject, in each case, to the prior rights of any Leasehold Mortgagee) shall be entitled to the benefit of the terms of such contracts (including the benefit of all payments made on account of said contracts including payments made prior to the effective date of such assignment) but shall have no liability thereunder unless and solely to the extent that Landlord elects in its sole discretion to assume such contracts; and

(iv)    insurance policies or certificates for such Material Alteration, issued by responsible insurers, certifying that insurance will be in force and effect at all times during the performance of such Material Alteration for "Builders All Risk" course of construction insurance, worker's compensation insurance covering all persons employed in connection with such Material Alteration and with respect to whom death or bodily injury claims could be asserted against Landlord, the Fee Mortgagees, if any, Tenant, a Subtenant or the Leased Premises, and owner's and contractor's protective liability insurance expressly covering the additional hazards resulting from such Material Alteration with limits not less than those, and otherwise subject to the same conditions and requirements, set forth in Section 15 hereof with respect to the liability insurance required thereunder (it being agreed that Tenant's obligation set forth in this sentence shall be deemed satisfied to the extent that (x) the risks required to be insured against by Tenant pursuant to this sentence are already insured against pursuant to the insurance maintained by Tenant pursuant to the requirements of Section 15 or (y) the insurance required to be provided and maintained by Tenant pursuant to this sentence is provided and maintained by Tenant's contractor(s) and Tenant has delivered to Landlord insurance policies or certificates therefor). If under the provisions of any fire, liability or other insurance policy or policies then covering the Leased Premises or any part thereof, any consent to any Alteration or series of Alterations by said insurance company or companies issuing such policy or policies is required to continue and keep such policy or policies in full force and effect, then Tenant shall obtain such consents and pay any additional premiums or charges therefor that may be imposed by said insurance company or companies. Nothing in this Section 13(i)(iv) shall diminish Tenant's obligations under Section 15.

(j)     Subject to the terms of this Section 13(j), any Material Alteration, once commenced, shall be diligently performed to completion (subject to Force Majeure, which shall not exceed the Force Majeure Cap) in accordance with the plans and specifications therefor.  If an Event of Default beyond the expiration of all applicable notice, grace and cure periods occurs that derives from Tenant's failure to (A) diligently

64

4863-0344-5267, v. 18

perform to completion, once commenced, any Material Alteration in accordance with the terms hereof, or (B) restore such portion of the Leased Premises in which such Material Alteration was being performed in accordance with the terms hereof, then, in either case, subject to the prior rights of any Leasehold Mortgagee, Landlord may draw upon Material Alteration Security in connection with such Material Alteration to the extent of the cost required to complete such Material Alteration in accordance with the plans and specifications therefor or to restore such portion of the Leased Premises in which such Material Alteration was being performed, as applicable.

(k)   Within thirty (30) days after completion of each Material Alteration, Tenant, at Tenant's sole expense, shall deliver to Landlord a certificate from Tenant's Architect certifying that the Material Alteration has been substantially completed in accordance with the plans and specifications.

(l)   Landlord (and its consultants and representatives) shall have the right, during the construction of any Material Alterations, at reasonable times upon reasonable prior notice to Tenant (but not more frequently than one (1) time per month, unless an Event of Default has occurred beyond the expiration of all applicable notice, grace and cure periods), to inspect the Leased Premises to determine whether the construction of a Material Alteration is being conducted in accordance with the provisions of this Lease, provided that Landlord (and any such consultants and representatives of Landlord) who perform such inspection shall comply with all reasonable security, safety and insurance requirements that Tenant reasonably determines are necessary to maintain a safe working environment and are generally applicable to all Persons onsite. No such observation or attendance by Landlord or its consultants or representatives shall impose upon Landlord any responsibility for any failure by Tenant or its contractors (or any other Person) to comply with any Legal Requirements, Insurance Requirements or safety practices in connection with the Leased Premises or constitute an acceptance of any portion of such Material Alteration which does not comply in all respects with the provisions of this Lease.

(m)   All Alterations and fixtures, made in or to the Leased Premises by Tenant, shall become part of the Leased Premises, except those which are readily removable without causing material damage to the Leased Premises (which shall be and remain the property of Tenant).  Subject to this Section 13, upon termination or expiration of this Lease, Tenant shall, at Landlord's election and at Tenant's expense, (i) remove all Personal Property from the Leased Premises and (ii) those Improvements, Alterations and additions to the Leased Premises made without Landlord's consent in violation of this Lease and, in each case, repair all damage caused by any such removal pursuant to clauses (i) and (ii) of this Section 13(m). All property permitted or required to be removed by Tenant at the end of the Term that is remaining in the Leased Premises after expiration or earlier termination of this Lease shall be deemed abandoned and may, at the election of Landlord, either be retained as Landlord's property or removed from the Leased Premises by Landlord at Tenant's sole cost and expense.  The provisions of this Section 13(m) shall survive the expiration of earlier termination of this Lease.

65

(n)    For the avoidance of doubt, Tenant shall have the right to make Minor Alterations to the Leased Premises without obtaining Landlord's prior consent, provided Tenant provides Landlord with at least five (5) Business Days prior Notice to Landlord relative thereto and otherwise complies with the requirements of this Section 13 with respect to the performance of Alterations. As used herein, the term "Minor Alteration" shall mean non-structural Alterations, in or to the Leased Premises that: (i) do not affect the structure or safety of the Building systems or Leased Premises; (ii) do not require a Permit to undertake; (iii) do not cost more than $500,000.00 (as adjusted for increases in the Index every five (5) Lease Years); and (iv) does not otherwise constitute a Material Alteration.

14.    **Condemnation.**

(a)    Tenant, promptly upon obtaining knowledge of any actual or proposed institution of any proceeding for Condemnation, will notify Landlord (and any Leasehold Mortgagee) thereof and Landlord (and any Fee Mortgagee and/or Leasehold Mortgagee) will be entitled to participate in any Condemnation proceeding at its own expense. Landlord, promptly upon obtaining knowledge of the institution of any proceeding for Condemnation, will notify Tenant thereof and Tenant (and any Leasehold Mortgagee) shall have the right to participate in any Condemnation proceeding at its own expense. Subject to the provisions of this Section 14 and Section 17, Tenant hereby irrevocably conveys and assigns to Landlord any Condemnation Award attributable to the Fee Estate in any period during which Landlord is entitled to any such award pursuant to this Lease; provided, however, that nothing in this Lease will be construed as, or deemed to require, the assignment to Landlord of any Condemnation Award attributable to the Leasehold Estate hereunder, Tenant's trade fixtures or other tangible personal property of Tenant, Tenant's moving expenses and similar claims, all of which shall be payable to Tenant.  Further, Landlord may not settle any such Condemnation action involving the Leasehold Estate or such other of Tenant's assets described in the preceding sentence, without the consent of Tenant as to the adequacy of the award payable to Tenant. Tenant shall have the further right to make a separate claim at Tenant's sole cost and expense, therefor against the applicable Governmental Authority instituting the Condemnation in the event any award is inadequate to compensate Tenant as hereinabove required.

(b)    If a Condemnation that is a Total Loss shall occur (which Condemnation is not a temporary taking), then, the following shall apply: This Lease shall terminate as of the date the transfer of title pursuant to such Condemnation.  In the event of any such termination, the Base Rent and Additional Rent payable by Tenant hereunder shall be apportioned as of the date of such termination.  Any Condemnation Awards shall be allocated between Landlord and Tenant in the following order of priority until exhausted:  (a) to Landlord, in proportion to the Condemnation Fair Market Value of the Fee Estate that is subject to the Condemnation; and (b) to Tenant, in proportion to the Condemnation Fair Market Value of the Leasehold Estate (subject to any applicable Fee Mortgage) that is subject to the Condemnation; provided, however, that if there are separate Condemnation Awards for the Fee Estate (subject to any applicable Leasehold

66

Mortgage) and the Leasehold Estate, the Condemnation Award shall be paid in respect of such separate claims.  Tenant and any Leasehold Mortgagee shall have the right to participate in Condemnation proceedings with Landlord.  The obligations of Landlord and Tenant to allocate the Condemnation Award shall survive termination of this Lease.

(c)    If a Condemnation that is not a Total Loss shall occur, then the following shall apply: Tenant will promptly, at its sole cost and expense, without regard to the adequacy of any Condemnation Award for such purpose, either (as elected by Tenant) diligently and promptly as commercially practicable, Restore the Improvements so taken in conformity with the requirements of Section 14 as nearly as practicable to the condition, size, quality of workmanship and market value thereof immediately prior to such Condemnation.  There shall be no abatement of Rent during such period of Restoration or thereafter.  The Condemnation Award shall be distributed in accordance with the manner set forth in Section 14(b) above, except that Tenant's entire Condemnation Award shall be deposited in a fund ("Restoration Fund") to be paid to and held and disbursed by the Proceeds Trustee under the same terms and conditions for disbursement (as if a Restoration following a Casualty as set forth in Section 16(b) hereof); provided, however, that if there are separate Condemnation Awards for the Fee Estate and the Leasehold Estate, the Condemnation Award for the Fee Estate shall be distributed to Landlord and the Condemnation Award for the Leasehold Estate shall be deposited in the Restoration Fund.

(d)    Solely in the event of a Condemnation that affects any part of the Improvements (but is not a Total Loss), as of the date of receipt of the applicable Condemnation Award, Base Rent hereunder shall be reduced by an amount equal to the Condemnation Percentage (the "Condemnation Reduction"), but shall not otherwise be abated, diminished, reduced or delayed.  For purposes of calculating any Rent Escalation or CPI Escalation pursuant to Section 4 following the reduction in Base Rent pursuant to a Condemnation Reduction, Base Rent for the Lease Year in which the Condemnation Reduction occurs and all preceding Lease Years shall be deemed to have been reduced by the Condemnation Reduction (without duplication).  For the avoidance of doubt, any Rent Escalation or CPI Escalation described in Section 4 of this Lease shall otherwise continue to apply in the same manner as set forth in Section 4 at all times following the date of the Condemnation Reduction.

(e)    If a temporary Condemnation occurs, the Condemnation Award from such temporary Condemnation shall belong to Tenant (subject to the rights of Leasehold Mortgagees and this Lease shall not be affected in any way).

(f)    Notwithstanding anything to the contrary contained herein, if any such Condemnation that is not a Total Loss occurs at any time during the last two (2) years of the Term of this Lease, Tenant, upon Notice given to Landlord within ninety (90) days following such Condemnation, may elect not to restore the Leased Premises, in which event this Lease and the Term shall terminate and expire on the date said Notice is received by Landlord and the Rent payable by Tenant hereunder shall be apportioned as of the date of such termination; provided, however, such termination shall not be

67

effective unless the Notice is accompanied by an unconditional written consent to such termination executed by any and all Leasehold Mortgagee(s), such consent to be granted or withheld in such Leasehold Mortgagee(s) sole and absolute discretion.  In such event, the entire Condemnation Award shall be paid to Landlord (subject to the rights of Fee Mortgagee).

(g)    If the condemning authority makes separate Condemnation Awards to Tenant with respect to the Leasehold Estate and to Landlord with respect to the Fee Estate, then subject to the rights of any Leasehold Mortgagee under any Leasehold Mortgage, Tenant shall, at its sole cost and expense, negotiate and settle the amount of the Condemnation Award with regard to the Leasehold Estate, and Landlord shall, subject to the rights of any Fee Mortgagee under any Fee Mortgage, at its sole cost and expense, negotiate and settle the amount of the Condemnation Award with regard to the Fee Estate.

15.    **Insurance.**

(a)    At all times throughout the Term, Tenant will maintain at its sole cost and expense the following insurance on the Leased Premises for the mutual benefit of the Landlord, Tenant, any Fee Mortgagee and any Leasehold Mortgagee hereunder (as their respective interests appear):

(i)    Property Insurance against loss or damage to the Improvements under a "Special Form" (previously, "comprehensive all risk") insurance policy or its equivalent, which will include flood insurance, earthquake insurance, wind and hail boiler explosion (if there is any boiler upon the Leased Premises), sprinkler damage/leakage, ordinance and law, and terrorism coverage. Improvements shall be insured for no less than one hundred (100%) of the full insurable value and valued on a replacement cost with no co-insurance provisions. Catastrophic sublimits must be sufficient for the Leased Premises. Landlord may require Tenant to provide catastrophic modeling from Tenant to evaluate catastrophic limits.

(ii)    Commercial general liability and excess (umbrella) liability including products liability coverage, covering Landlord and Tenant against bodily injury liability, and property damage liability, including without limitation any liability arising out of the maintenance, repair, condition or operation of the Leased Premises. If alcoholic beverages are sold or furnished by the Tenant, Dram Shop/Liquor Liability Insurance shall also be provided with limits of not less than $2,000,000.00 per occurrence. Coverage should not include exclusions for assault and battery, abuse and molestation (including human trafficking), contractual liability, independent contractors, gravity related injuries sustained by employee of an insured or any insured height limitations and residential work (if applicable). Coverage shall be written on a per occurrence form.  Such insurance policy or policies shall contain a "severability of interest" clause or endorsement which precludes the insurer from denying the claim of Tenant or

68

Landlord because of the negligence or other acts of the other. General Liability shall be in amounts of not less than $1,000,000.00 per occurrence, and $2,000,000.00 aggregated.  Tenant shall also carry commercial umbrella/excess liability insurance in an amount no less than $10,000,000.00 Landlord or Fee Mortgagee may require at their reasonable discretion, increased limits that  shall be consistent with the commercial umbrella/excess liability required by institutional owners of properties similar to the Leased Premises) per occurrence and aggregate. Excess liability/Umbrella coverage shall be as broad in coverage as the underlying insurance and shall sit excess of employers' liability and auto liability as required under this Lease. If coverage insures more than one location, the policy limit shall be written on a "per location" basis. Tenant will name the Landlord, Fee Mortgagee and Leasehold Mortgagee as an additional insured and provide a waiver of subrogation in favor of the Landlord, Fee Mortgagee and Leasehold Mortgagee.

(iii)   Auto Liability insurance resulting from losses from an automobile including Garagekeepers Legal liability (if valet services are provided on the Leased Premises by Tenant) with a combined single limit of not less than one million dollars ($1,000,000.00) per occurrence for bodily injury and property damage in any one accident covering (i) all owned autos; (ii) hired autos; and (iii) non owned autos. Tenant will name the Landlord as an additional insured and provide a waiver of subrogation in favor of the Landlord, Fee Mortgagee and Leasehold Mortgagee.

(iv)   Workers' compensation covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises providing statutory coverage and employers' liability limits of not less than $1,000,000.00 each accident for bodily injury by accident and $1,000,000.00 each employee and policy limit for bodily injury by disease. Tenant will provide a waiver of subrogation in favor of the Landlord, Fee Mortgagee and Leasehold Mortgagee.

(v)   New York disability coverage for all persons employed in connection with the Construction Project, as required by the State of New York.

(vi)   Loss of rents and/or business interruption insurance (A) covering all risks required to be covered by the insurance provided for in Section 13(a)(i), (v) and (vi) hereof; (B) in an amount equal to 100% of the  projected Base Rent and Additional Rent from the Leased Premises (on an actual loss sustained basis) for a period continuing until the Restoration of the Leased Premises is completed; the amount of such business interruption/loss of rents insurance shall be determined prior to the date of Completion and at least once each year thereafter based on Tenant's reasonable determination of the projected gross income from the Leased Premises for a twenty-four (24) month period; and (D) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and the personal property has been

69

repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six (6) months from the date that the Leased Premises is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  Except as otherwise expressly set forth in this Lease, all proceeds payable to Landlord pursuant to this clause shall be held by Landlord, and shall be applied to the obligations from time to time due and payable under this Lease; provided, however, that nothing herein contained shall be deemed to relieve Tenant of its obligation to pay Taxes, Base Rent, Additional Rent or any other amounts due hereunder on the respective dates of payment provided for herein except to the extent such amounts are actually paid out of the proceeds of such business income insurance; provided, further, if the amount of such insurance proceeds shall be in excess of such obligations, the excess shall be paid to and be retained by Tenant unless pursuant to the terms of any Leasehold Mortgage such excess is required to be paid to such Leasehold Mortgagee.

(vii) If requested by Landlord, Tenant will obtain Environmental/Pollution Legal Liability: (i) if and to the extent available for the Leased Premises and (ii) on terms and conditions reasonably acceptable to Landlord, provided that Tenant can obtain such insurance at commercially reasonable market rates. Tenant will name the Landlord, Fee Mortgagee and Leasehold Mortgagee as an additional insured.

(viii) At all times prior to Substantial Completion, and thereafter whenever Tenant is making any Alterations, repairs (including maintenance related repairs) or performing or causing to be performed other construction work of any kind on the Leased Premises (collectively, "Work"), the estimated cost of which in any one instance exceeds $250,000.00, the term "Insurance Requirement" or "Insurance Requirements" will include a requirement that Tenant obtain or cause its contractor to obtain (x) special perils property insurance or builder's risk "special perils" insurance (including wind, flood, earthquake, boiler and machinery, ordinance or law insurance) (which builder's risk insurance will be in lieu of, and not in addition to, the casualty insurance policy described in Section 15(a)(i) with respect to the Construction Project under the Work Letter) in amounts sufficient to provide full "completed value" replacement coverage for all Improvements, including the Work, and all materials and equipment on or about the Leased Premises and (y) contractors pollution liability insurance with limits of at least $1,000,000.00. Tenant shall require all contractors and subcontractors and subcontractors performing work on the Leased Premises to maintain the same coverage as outlined in Sections 15(a)(ii), (iii), and (iv) or otherwise reasonably acceptable to Landlord based on the scope involved in respect of any work or operations on or about the Leased Premises, or in connection with the Leased Premises or its operation or other insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or

70

bodily injury claims could be asserted against Landlord. In addition, all such insurance described in this Section 15(a)(viii):  (A) Shall name the Landlord and any Fee Mortgagee as an additional insured except on workers' compensation, (B) shall include    a waiver of subrogation in favor of the Landlord and Fee Mortgagee, (C) coverage shall be on a primary and non-contributory basis, and (D) if any off-site storage location listed with Tenant's insurer is used, shall cover, for full insurable value, all materials and equipment which have been delivered to and are stored at any such offsite storage location and which are intended for use with respect to the Improvements.

(b)    All companies providing insurance required by Section 15(a) must have an A- or higher rating, as such ratings are ascribed by A.M.  Best or equivalent, with a financial class of VII or higher (or otherwise agreed to by Landlord and any Fee Mortgage) and a claims paying ability/financial strength rating of "A-" or better by S&P, and must be licensed to do insurance business in the State.  The Tenant's insurance policies and those required pursuant to Section 15(a)(viii) above shall be primary and non-contributory.  If the required insurance expires, is withdrawn, becomes void because of a breach of any condition thereof by Tenant or becomes void for any other reason, Tenant must promptly obtain new or additional insurance as required under Section 15(a) above.  The deductible for the insurance coverage required under Section 15 but no including catastrophic property perils deductible may not exceed $50,000.00 unless approved by Landlord and shall be adjusted for any increase in the Index every five (5) Lease Years. Self-insurance is not permitted without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed. In addition, Tenant shall not name any person other than Landlord, any Fee Mortgagee(s) and any Leasehold Mortgagee as loss payee, without Landlord's prior consent, and shall not carry separate insurance (other than personal injury liability insurance and such additional insurance with respect to the Leased Premises as may be required from time to time by any Leasehold Mortgagee) concurrent in form or contributing in the event of loss with that required by this Lease to be furnished or which may be required to be furnished by Tenant, unless Landlord and any Fee Mortgagees and any Leasehold Mortgagees are included therein as insureds with loss payable as provided in this Lease. Tenant shall immediately notify Landlord of the carrying of any such separate insurance and shall cause the same to be delivered as required in this Lease.

(c)    Each insurance policy referred to above must, to the extent applicable, contain standard mortgagee clauses in favor of any Fee Mortgagee and Leasehold Mortgagee.  All insurance policies and endorsements required herein shall be fully paid and nonassessable. As evidence of the insurance specified in Section 15(a) required to be maintained by Tenant, Tenant will deliver to Landlord a certificate or certificates of insurance on an industry standard Acord 25 or Acord 28 (as applicable) or such other form as may be reasonably acceptable to Landlord and any Fee Mortgagee and Leasehold Mortgagee. Certificates will be furnished to the Landlord ten (10) days prior the policy effective dates and shall include copies of additional insured, waiver of subrogation, primary and non-contributory, and loss payee endorsements required in Section 15.    Each policy required pursuant to this Section 15 shall and provide as

71

follows, to the extent Tenant is reasonably able to obtain policies that so provide: (A) that any loss otherwise payable thereunder to a particular insured or loss payee will be payable notwithstanding (i) any act or omission of any other insured or loss payee which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Fee Mortgage pursuant to any provision of any Fee Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises, (B) that such policy shall provide thirty (30) days' notice (which notice shall be delivered to Landlord and Fee Mortgagee) of cancellation in coverage, or such notice as is customarily available in accordance with policy provisions, Tenant shall notify Landlord within thirty (30) days of receipt of any Notice of Cancellation from its insurer that results in a material change in the coverage terms and limits resulting in non-compliance with the insurance provisions stated herein.

(d)     Tenant will pay as they become due all premiums for insurance required by this Section 15, will timely renew or replace each policy, and will deliver to Landlord and any Fee Mortgage and any Leasehold Mortgagee a certificate (reasonably acceptable to Landlord and such Fee Mortgage and such Leasehold Mortgagee) evidencing the existing policy and such renewal or replacement policy upon policy renewal.   In the event of Tenant's failure to comply with any of the foregoing requirements of this Section 15, Landlord, following written notice to Tenant, will be entitled to procure such insurance.  Any sums expended by Landlord or any Fee Mortgagee in procuring such insurance will be Additional Rent and will be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord or such Fee Mortgagee until fully paid by Tenant within ten (10) days after written demand therefor by Landlord or such Fee Mortgagee, as the case may be, along with documentation which supports the expenses, fees and costs incurred.  Tenant shall (and/or shall cause its subtenants, if applicable, to) observe and comply with the requirements of all policies of insurance in force with respect to the Leased Premises required under this Section 15.

(e)     Notwithstanding anything to the contrary in this Section 15, any insurance which Tenant is required to obtain pursuant to Section 15(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Section 15.  In the event any such insurance is carried under a blanket policy, Tenant will deliver to Landlord and any Fee Mortgage a certificate of insurance as required in the above sections of this Section 15.

(f)     Notwithstanding anything to the contrary contained in this Section 15, in light of the length of the Term, Landlord may from time to time, upon not less than sixty (60) days' written notice to Tenant, adjust the insurance coverages required by this Section 15, including the amounts of the coverage required hereby, to conform to the insurance requirements that are, in Landlord's good faith commercially reasonable determination, then customary for leases of projects similar to the Leased Premises in the

Relevant Area or otherwise required by any Leasehold Mortgagee or by any Legal Requirements.

(g)   Anything in this Lease to the contrary notwithstanding, Landlord and Tenant, for themselves and their respective insurers or any other party claiming through or under them by way of subrogation or otherwise, hereby waive and release each other of and from any and all right of recovery, claim, action, or cause of action against each other, their agents, officers and employees, for any loss or damage that may occur to the Leased Premises, improvements to the Leased Premises, or personal property within the Leased Premises, by reason of fire or the elements, or other casualty, regardless of cause or origin including the negligence of the Landlord or Tenant, to the extent such loss is fully-insured under insurance policies carried by Landlord or Tenant (or required to be carried hereunder) and agree that no insurer shall have any right of subrogation against the other such party.  Landlord and Tenant agree to obtain, to the extent available in the jurisdiction where the Leased Premises is located, a waiver of subrogation from the respective insurance companies which have issued policies of insurance covering all risk of direct physical loss, and to have the insurance policies endorsed, if necessary, to prevent the invalidation of the insurance coverages by reason of the mutual waivers.

(h)   Tenant may also carry any additional insurance with respect to the Leased Premises as may be required from time to time by any Leasehold Mortgagee.

(i)   A lack of insurance coverage does not reduce or limit the Tenant's obligation to indemnify the Landlord set forth in this Lease.

16.   **Casualty.**

(a)   In the event the Leased Premises shall be wholly or partially damaged or destroyed by fire or other casualty (each, a "Casualty"), Tenant will promptly give Landlord written notice thereof and Tenant shall, at its own cost and expense, promptly and diligently commence and complete Restoration of the Leased Premises using, to the extent reasonably possible, materials of substantially the same or better quality than that of the materials being replaced. Notwithstanding the foregoing, during the period prior to commencing such Restoration, Tenant shall promptly take such steps as shall be necessary or advisable to preserve any undamaged portion of the Leased Premises and to ensure that the portions of the Leased Premises that are accessible to the public shall be safe and free from conditions hazardous to life and property.  Such Restoration must comply with all terms of this Lease, including, without limitation, Section 13.  This Lease shall remain in full force and effect and Tenant's obligation to pay Rent shall remain unabated during the period required for adjusting insurance claims and completion such Restoration.  Tenant shall so Restore the Leased Premises whether or not (i) such damage or destruction was insured (provided same was insurable), or (ii) the insurance proceeds are sufficient to pay in full any cost of the Restoration; and Landlord shall in no event be called upon to repair, replace or rebuild the Leased Premises or any Improvements thereon.

4863-0344-5267, v. 18

(b)     If the Net Proceeds are equal to or less than Five Million and No/100 Dollars ($5,000,000.00) (as adjusted for the Index every five (5) Lease Years) (the "Casualty Threshold"), such Net Proceeds shall be paid and disbursed directly to Tenant, to be applied to the completion of the Restoration in accordance with this Lease, solely for the purpose of completing such Restoration.

(c)     If the Net Proceeds exceed the Casualty Threshold, such Net Proceeds shall be held by and administered by the Proceeds Trustee in an Eligible Account and paid to Tenant as Restoration progresses in accordance with this Lease, solely for the purpose of completing the Restoration. Provided no Event of Default then exists under this Lease, upon completion of the Restoration and full payment therefor, the remaining portion of the Net Proceeds, if any, shall be released to Tenant or, in the event a Leasehold Mortgage is then in place, in accordance with such Leasehold Mortgage. Tenant shall, not later than the later of (x) the commencement of such Restoration or (y) if applicable, ten (10) Business Days after Notice from Landlord to Tenant demanding that a Casualty Repair Guarantor execute a deliver a Casualty Repair Guaranty to Landlord, do the following:

(i)     cause a Person approved by Landlord (such Person, the "Casualty Repair Guarantor"), such approval not to be unreasonably withheld, delayed or conditioned, to execute and deliver to Landlord, a guaranty, in form and substance approved by Landlord (such approval not to be unreasonably withheld, delayed or conditioned) guarantying for the benefit of Landlord, each Fee Mortgagee, each Leasehold Mortgagee and the respective successors and assigns of Landlord and each Fee Mortgagee and each Leasehold Mortgagee, the timely satisfaction of all obligations of Tenant to commence, perform and complete the Restoration in question (such guaranty, the "Casualty Repair Guaranty"); provided, however, so long as the Tenant named herein or an Affiliate of such Tenant (which Affiliate is Controlled by one or more of the Tenant Key Persons) is the Tenant hereunder, such obligation to provide a Casualty Repair Guaranty shall not apply (it being agreed that the foregoing shall in no way limit or vitiate Guarantor's obligations under the Completion Guaranty executed by Guarantor in connection with the Project); and

(ii)    deliver to Landlord proposed plans and specifications and a budget for such Restoration, all of which Landlord shall approve in its reasonable discretion).  Landlord agrees that it will approve the Casualty Repair Guarantor approved by Leasehold Mortgagee and the form of guaranty of the Tenant's obligations to commence, perform and complete the Restoration in question approved by Leasehold Mortgagee (with such modifications as Landlord may reasonably require to conform with the provisions of this Section 16(c)).

(d)     If requested by Notice to Tenant from Landlord, Tenant shall promptly provide to Landlord such evidence of Casualty Repair Guarantor's creditworthiness, liquidity, existence, good standing, power and authority to execute, deliver and perform its obligations under the Casualty Repair Guaranty and the due

4863-0344-5267, v. 18

authorization, execution and delivery by Casualty Repair Guarantor of the Casualty Repair Guaranty as Landlord may reasonably require.  A Casualty Repair Guarantor shall cease to be a Casualty Repair Guarantor upon timely full completion by Tenant of the applicable Restoration in accordance with this Section 16.  Except as otherwise provided in the Leasehold Mortgage (or any loan document in connection therewith), the Net Proceeds shall be deposited in an interest bearing Eligible Account, to the extent not previously disbursed for Restoration costs, be distributed to Tenant upon completion of said Restoration, provided no Event of Default has occurred and is continuing hereunder.

(e)     Subject to Tenant's rights of termination hereinafter set forth, in the event of any Casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term will nevertheless continue and there will be no abatement or reduction of Base Rent, Additional Rent or any other sums payable by Tenant hereunder.  Promptly after such Casualty (but subject to Tenant's termination rights set forth below), Tenant must (whether or not such Casualty is insured against and, if insured, whether or not the Net Proceeds are sufficient for the purpose) promptly cause a Restoration of the Improvements subject to, and otherwise in accordance with, all Insurance Requirements and Legal Requirements and the provisions of this Lease (including Section 13 hereof) and the Net Proceeds of such Casualty may be utilized by Tenant for such purpose, subject to the provisions of Section 17 hereof if such Net Proceeds have been paid over to the Proceeds Trustee.  If any such Net Proceeds have been paid over to the Proceeds Trustee in such capacity, the Proceeds Trustee must make the Net Proceeds received by it available to Tenant for Restoration, in accordance with the provisions of Section 17.

(f)     Notwithstanding anything to the contrary contained herein, if a Casualty occurs that is a Total Loss, provided Tenant shall have obtained and maintained all insurance relating to such Casualty as was required under this Lease, Tenant will have the right to terminate this Lease by written notice to Landlord given within sixty (60) days after such occurrence, so long as the following conditions precedent are satisfied: (i) in the event that the Total Loss results in the destruction of the Improvements to such an extent that the damaged portion thereof cannot be Restored, Tenant shall, at Tenant's expense (but with insurance proceeds received from the corresponding claim or to be reimbursed from insurance proceeds received if Tenant elects to perform the following work before receipt of such funds, in Tenant's sole and absolute discretion), promptly raze the Improvements and clean and otherwise put the Leased Premises in good order (unless Landlord notifies Tenant in writing within thirty (30) days after Landlord receives Tenant's notice of termination that Landlord intends to rebuild or restore the Improvements, in which case Tenant shall only raze the Improvements and clean the Leased Premises to the extent specified in such Notice from Landlord), (ii) Tenant shall pay to Landlord any and all amounts accrued or payable under this Lease (including, without limitation, all Rent) through the effective date of such termination, and (iii) as a condition precedent to the effectiveness of such termination, Tenant shall assign and pay over to Landlord the Net Proceeds with respect to such Casualty, less all costs of demolition and debris removal (provided, however, that Tenant shall be entitled to keep any insurance proceeds payable on account of any loss income or revenue from Tenant's

75

operation of the Leased Premises for periods prior to the date of such termination as well as all insurance proceeds paid out with respect to Tenant's Personal Property). Upon the expiration of such 30-day period after delivery of such notice, this Lease shall cease and terminate; provided, however, such termination shall not be effective unless the notice is accompanied (or thereafter is followed) by an unconditional written consent to such termination executed by all Leasehold Mortgagee(s). If this Lease is terminated pursuant to this Section 16(f), all insurance proceeds attributable to Restoration of the Improvements will be paid to Landlord and Landlord alone will have the right to settle any claim with the insurance with respect to such proceeds (provided, however, that Tenant shall be entitled to keep any insurance proceeds payable on account of any loss income or revenue from Tenant's operation of the Leased Premises for periods prior to the date of such termination as well as all insurance proceeds paid out with respect to Tenant's Personal Property).

(g) The provisions of this Section 16 shall be deemed an express agreement governing any case of damage or destruction of the Leased Premises by fire or other Casualty, and Section 227 of the Real Property Law of the State of New York, providing for such a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application in such case.

17. **Restoration**. In the event that the Net Proceeds of any insurance payment following a Casualty or any Condemnation Award has been paid to or otherwise held by a Proceeds Trustee in accordance with this Lease, then, provided that no Event of Default has occurred and is then continuing, the Net Proceeds or Condemnation Award paid to the Proceeds Trustee will be disbursed by the Proceeds Trustee to Tenant (or to Leasehold Mortgagee), to be applied to the Restoration, subject to the following conditions:

(a) At the time of any disbursement, no Event of Default has occurred and is continuing and no mechanics' or materialmen's liens have been filed and remain undischarged and/or unbonded.

(b) Prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration must have been approved by Landlord if and to the extent required in accordance with this Lease.

(c) Each request for disbursement must be accompanied by a statement by Tenant or its Construction Manager describing the completed work for which payment is requested and stating the cost incurred in connection therewith.

(d) Disbursements will be made from time-to-time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates, of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications approved by Landlord, and (2) unconditional lien waivers for providers of labor or materials for work which was the subject of prior paid requisitions.

4863-0344-5267, v. 18

(e)    The Proceeds Trustee may retain ten percent (10%) from each disbursement of the Net Proceeds or Condemnation Award as retainage until not later than thirty (30) days after the Restoration is substantially completed (as evidenced by the delivery of an AIA Form G704) and issuance of a temporary certificate of occupancy for the Leased Premises, if required by Legal Requirements.

(f)    Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as set forth in the applicable construction contract for the Restoration, exceeds the amount of the Net Proceeds or Condemnation Award, the amount of such excess will be paid by Tenant to the Proceeds Trustee to be added to the Net Proceeds or Condemnation Award prior to any further disbursement or, at Tenant's option, Tenant will fund at its own expense the costs of such Restoration until the remaining Net Proceeds or Condemnation Award is sufficient for the completion of the Restoration.  Except for the payment to Landlord or Fee Mortgagee of the Net Award referred to in Section 14(c), any amount of the Net Proceeds or Condemnation Award and all other amounts then held by the Proceeds Trustee which remains upon the completion of Restoration will be paid to Tenant.  For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or Condemnation Award will be deemed to be disbursed prior to any amount added by Tenant.

18.    **Subordination to Financing.**

(a)    Landlord's interest in this Lease and/or the Leased Premises shall not be subordinate to any encumbrances placed upon the Leased Premises by or resulting from any act of Tenant, and nothing herein contained shall be construed to require such subordination by Landlord.  Subject to Section 20 below and Section 10 above, Tenant shall keep the Leased Premises free from any liens for work performed, materials furnished or obligations incurred by Tenant.

(b)    This Lease is and will be superior to the lien of any Fee Mortgage. Without limiting the automatic subordination of any mortgages granted by Landlord as set forth in this Section 18(b), at Tenant's request, each Fee Mortgagee shall deliver to Tenant and cause to be recorded in the appropriate land records a commercially reasonable subordination agreement reasonably satisfactory to the parties thereto which shall provide that such Fee Mortgagee's Fee Mortgage shall at all times be fully subordinate to this Lease and any New Lease executed in accordance with Section 12(h) hereof.  So long as no Event of Default has occurred and is continuing, Tenant's tenancy will not be disturbed, nor will this Lease be affected by any default under such Fee Mortgage, and in the event of a foreclosure or other enforcement of any such Fee Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale or pursuant to a deed-in-lieu thereof will be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder will expressly survive, and this Lease will in all respects continue in full force and effect (subject to any rights of such Successor Landlord with respect to any Event of Default by Tenant that has occurred and

is continuing).  Tenant will not be named as a party defendant in any such foreclosure suit, except as may be required by Legal Requirements, and only to such extent.

(c)   At any time prior to the expiration of the Term, Tenant agrees to attorn, from time to time, to any owner of the Fee Estate, any Fee Mortgagee or Successor Landlord which succeeds to Landlord's interest under this Lease, upon the then executory terms and conditions of this Lease, for the remainder of the Term demised in this Lease, provided that such owner or Fee Mortgagee will assume the obligations of Landlord under this Lease thereafter arising.  The provisions of this Section 18(c) (x) inure to the benefit of any such owner of Fee, Estate, Fee Mortgagee, or Successor Landlord, and (y) as to Tenant, apply notwithstanding that, as a matter of law, this Lease would have otherwise terminated upon the foreclosure of the Mortgage, will be self-operative, and no further instrument will be required to give effect to said provisions.

19.   **Assignment; Subleasing**.

(a)   As used herein, the term "Transfer" means (i) any sale, assignment or other transfer of Tenant's interest in this Lease and/or the Leasehold Estate, (ii) any sublease of all or substantially all of the Leased Premises, (iii) any sale, assignment or other transfer of a Commercial Sublease, and (iv) any sale, assignment, other transfer of any interest in Tenant or in any Person that directly or indirectly owns Tenant; provided, however, that the term "Transfer" shall not include any Leasehold Mortgage that is permitted pursuant to Section 12, nor the consummation of a foreclosure or deed-in-lieu of foreclosure by the holder of a Leasehold Mortgage (but any Transfer by a Person that acquired Tenant's interest in this Lease and the Leasehold Estate, or the equity interests in Tenant or Tenant's direct or indirect owners, in each case pursuant to a foreclosure or deed-in-lieu of foreclosure, shall be a Transfer for purposes of this Lease).

(b)   Prior to Substantial Completion of the Project, Tenant may not effectuate any Transfer or sublease any portion(s) of the Leased Premises, or permit a Key Person Event to occur, unless Landlord grants its prior written consent thereto, which shall be given or withheld in Landlord's sole and absolute discretion.  From and after Substantial Completion of the Project, (i) Landlord's consent (not to be unreasonably withheld or delayed) shall be required with respect to any Transfer of the Lease, provided that Landlord may withhold its consent to any Transfer of the Lease if (A) at the time of such Transfer, an Event of Default has occurred and remains uncured and is continuing, (B) following the consummation of such Transfer, the Tenant hereunder would be, and would be Controlled by, a Prohibited Person, and/or (C) following the consummation of such Transfer, the Tenant hereunder would not be a Qualified Transferee, Landlord's consent shall not be required with respect to any Transfer to an Affiliate of Tenant, provided such Affiliate is not a Prohibited Person and is Controlled by one or more Tenant Key Person, and (iii) subject to any applicable Fallback Business Plan approved by Landlord in accordance with the Lease, Tenant may enter into one or more Subleases of the Leased Premises (it being agreed that (A) subject to the penultimate sentence of this paragraph, any Commercial Sublease demising 10,000 square feet or more of the rentable area of the Leased Premises shall require Landlord's

prior written consent (not to be unreasonably withheld, conditioned or delayed) and (B) if the Improvements are redeveloped into the Multifamily Project, such Subleases may include Residential Subleases). If requested by Tenant, Landlord and Tenant shall reasonably agree to a set of parameters with respect to Commercial Subleases that, if satisfied, the applicable Commercial Sublease will not require Landlord's prior written consent in accordance with this Section. Notwithstanding the foregoing, Landlord's consent shall not be required in connection with any Leasehold Mortgagee's exercise of its remedies under the Leasehold Mortgage, including without limitation its foreclosure on or acceptance of an assignment-in-lieu of foreclosure with respect to Tenant's interest herein and conveying Tenant's interests hereunder to the purchaser at such foreclosure sale or pursuant to such assignment-in-lieu thereof.

(c)    In no event may Tenant effectuate a Transfer to or sublease any portion of the Leased Premises to any Prohibited Person, and no Transfer or subletting shall be effective until the transferee or subtenant has provided written certification to Landlord that (A) neither such transferee or subtenant nor any Person who owns directly or indirectly any interest in such assignee or subtenant is a Prohibited Person, and (B) such transferee or subtenant has taken reasonable measures to assure than no Person who owns directly or indirectly any interest in such assignee or subtenant is a Prohibited Person; provided, however, the covenant contained in this sentence shall not apply to (i) any Person to the extent that such Person's interest is in or through a U.S. Publicly Traded Entity, (ii) any SRO Tenants, or (ii) any Person subleasing an apartment unit pursuant to a Residential Sublease, provided that Landlord has instituted commercially reasonable procedures to ensure that no such Sublease is made to a Prohibited Person.

(d)    At least ten (10) Business Days prior to consummating a Transfer, Tenant shall deliver reasonable evidence to Landlord that, following the consummation of such Transfer, the Tenant hereunder will not be, and will not be Controlled by, a Prohibited Person and will be a Qualified Transferee. Tenant agrees that in the case of an assignment of this Lease, Tenant will, not less than ten (10) Business Days prior to the execution and delivery of any such assignment as described in Section 19(b), give notice of such assignment to Landlord, any Leasehold Mortgagee and any Fee Mortgage. Tenant further agrees that in the case of such assignment, Tenant will, within five (5) Business Days after the execution and delivery of any such assignment, deliver to Landlord, any Leasehold Mortgagee and any Fee Mortgage (i) a duplicate original of such assignment, along with a Memorandum thereof in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee agrees to assume and agrees to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment. Notwithstanding anything in this Lease to the contrary, upon an assignment of this Lease to a Qualified Transferee permitted hereunder or to any other assignee or subtenant otherwise consented to in writing by Landlord in its sole and absolute discretion, the assigning Tenant shall be thereupon released from all obligations and liabilities which accrue from and after the effective date of such assignment in the event that such Qualified Transferee (or other approved assignee or subtenant) assumes all of the obligations and liabilities of the Tenant hereunder accruing from and after the

79

effective date of such assignment (and in the event that such Qualified Transferee (or other approved assignee or subtenant) assumes all of the obligations and liabilities of the Tenant hereunder prior to and after the effective date of such assignment, the assigning Tenant shall also be thereupon released from all obligations and liabilities which accrued prior to the effective date of such assignment); provided, however, following such Transfer, Guarantor shall not be released from any of its obligations under each of the Environmental Indemnity and the Indemnity Agreement unless and until a replacement Qualified Replacement Guarantor has executed and delivered to Landlord replacement indemnities in accordance with Section 19(o).

(e)   No Sublease under, or assignment of this Lease (or any rejection in bankruptcy or other default by any assignee or subtenant hereunder) will relieve the Tenant named herein of its obligations hereunder, which will continue as the obligations of a principal and not as the obligations of a surety or a guarantor.  Notwithstanding any merger, consolidation or sale (i) of Tenant, (ii) of any parent, subsidiary or Affiliate of Tenant, or (iii) of any or all of the assets of Tenant or any parent, subsidiary or Affiliate of Tenant, Tenant (and any successor of Tenant by such merger, sale or consolidation) will continue to be obligated for all of Tenant's obligations hereunder without any abatement, diminution, set-off, reduction, rebate, termination, or decrease, except as expressly provided in this Lease.  The joint and several liability of Tenant and any immediate and remote successor in interest of Tenant (by assignment or otherwise), and the due performance of the obligations of this Lease on Tenant's part to be performed or observed, will not in any way be discharged, released or impaired by any (A) stipulation which extends the time within which an obligation under this Lease is to be performed, (B) waiver of the performance of an obligation required under this Lease, or (C) failure to enforce any of the obligations set forth in this Lease.  Notwithstanding the foregoing or anything in this Lease to the contrary, upon an assignment of this Lease to a Qualified Transferee permitted hereunder or other assignee or subtenant otherwise consented to in writing by Landlord, the assigning Tenant (including, without limitation, the Tenant named herein) shall be thereupon released from all obligations and liabilities which accrue from and after the effective date of such assignment in the event that such Qualified Transferee (or other approved assignee or subtenant) assumes all of the obligations and liabilities of the Tenant hereunder accruing from and after the effective date of such assignment (and in the event that such Qualified Transferee (or other approved assignee or subtenant) assumes all of the obligations and liabilities of the Tenant hereunder prior to and after the effective date of such assignment, the assigning Tenant (including, without limitation, the Tenant named herein) shall also be thereupon released from all obligations and liabilities which accrued prior to the effective date of such assignment); provided, however, following such Transfer, Guarantor shall not be released from any of its obligations under each of the Environmental Indemnity and the Indemnity Agreement unless and until a replacement Qualified Replacement Guarantor has executed and delivered to Landlord replacement indemnities in accordance with Section 19(o).

(f)   No interest in Tenant or any Affiliate of Tenant, or in any Person owning directly or indirectly any interest in Tenant or any Affiliate of Tenant, shall be

4863-0344-5267, v. 18

transferred, assigned or conveyed to any Prohibited Person, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Landlord that (i) the transferee or any Person who owns directly or indirectly any interest in transferee, is not an Prohibited Person, (ii) the transferee has taken reasonable measures to assure than any Person who owns directly or indirectly any interest in transferee, is not a Prohibited Person, and (iii) after such transfer, Tenant shall still meet the requirements of a Qualified Transferee; provided, however, the covenant contained in this sentence shall not apply to any Person to the extent that such Person's interest is in or through a U.S. Publicly Traded Entity.

(g)    Notwithstanding any merger, consolidation or sale (i) of Tenant, (ii) of any parent, subsidiary or Affiliate of Tenant, or (iii) of any or all of the assets of Tenant or any parent, subsidiary or Affiliate of Tenant, Tenant (and any successor of Tenant by such merger, sale or consolidation) will continue to be obligated for all of Tenant's obligations hereunder without any abatement, diminution, set-off, reduction, rebate, termination, or decrease, except as expressly provided in this Lease.

(h)    Each Sublease of the Leased Premises or any part thereof shall:

(i)    at all times, be subject and subordinate to the provisions of this Lease;

(ii)    have a scheduled expiration no later than the calendar day immediately preceding the Expiration Date, unless otherwise required by Legal Requirements;

(iii)    not knowingly and intentionally cause any violation of any Legal Requirement or Insurance Requirement;

(iv)    not be with an Affiliate of Tenant without the prior written consent of Landlord (which consent may be given or withheld in Landlord's sole and absolute discretion); provided, however, Tenant may enter into Residential Subleases with one or more Affiliates of Tenant, provided that (x) no more than five percent (5%) of the aggregate residential rentable square footage of the Improvements at the Leased Premises shall be made to Affiliates of Tenant, (y) any such Residential Sublease to an Affiliate of Subtenant shall be on arms-length terms and otherwise comply with the requirements of a Residential Sublease set forth in this Lease and (z) no such Affiliate of Tenant party to a Residential Sublease shall be a Prohibited Person; and

(v)    for Commercial Subleases, contain provisions which provide that, (A) if this Lease terminates, for any reason, then at the option of Landlord, such Sublease shall terminate and subtenant shall have no rights against Landlord, (B) in such event, such subtenant, only at the option and request of Landlord, shall attorn to Landlord and

81

recognize Landlord as such subtenant's direct landlord under such Sublease, and (C) such subtenant shall execute and deliver, at any time and from time to time, upon the request of Tenant, Landlord, any Fee Mortgagee, or any Leasehold Mortgagee, any instrument necessary or appropriate to evidence such attornment.

(i)     The fact that a violation or breach of any of the terms, provisions or conditions of this Lease results from or is caused by an act or omission by any Subtenant under a sublease shall not relieve Tenant of Tenant's obligations in respect thereof. If this Lease terminates for any reason prior to the scheduled Expiration Date, then Landlord shall have the option (but no obligation whatsoever (except as otherwise expressly agreed in writing by Landlord)) at the time this Lease terminates to recognize as a direct lease between Landlord and the applicable Subtenant any sublease and such Subtenant, at Landlord's option, shall attorn to Landlord pursuant to the then-executory provisions of such sublease; provided, however, that Landlord shall not be bound by or liable for any of the matters set forth in the recognition, non-disturbance and attornment agreement, in the form attached hereto as Exhibit B. Tenant shall deliver to Landlord, within five (5) Business Days of the effective date of a Sublease, a true, correct and complete list of Subleases in effect with respect to the Leased Premises and a copy of each such Sublease (including any amendments, supplements and modifications thereof), certified by Tenant to be true, correct and complete.

(j)     Upon the occurrence and during the continuance of an Event of Default under this Lease, Landlord (and/or Landlord's designee) will have the right to collect and enjoy all rents and other sums of money payable under any Sublease of all or any portion of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord (and/or Landlord's designee), which assignment(s) may be exercised upon and after (but not before) the occurrence of an Event of Default so long as such Event of Default is continuing. In the event this Lease is terminated following an Event of Default or otherwise in accordance with the terms hereof, Landlord, may, in its sole discretion (without any obligation to do so), elect to recognize any one or more of the Subleases as a direct lease between Landlord (and/or Landlord's designee) and such subtenant. Under no circumstances shall Landlord (and/or Landlord's designee) have liability under any Subleases unless and until Landlord so elects to recognize such Sublease (or has recognized or is obligated to recognize such Sublease pursuant to Section 19(n)).

(k)     If a Transfer occurs in violation of the provisions of this Section 19, then such Transfer shall be void and of no force and effect against Landlord; provided, however, Landlord (or Landlord's designee) may collect an amount equal to the then Rent from the transferee, assignee, subtenant, or other applicable party as a fee for its use and occupancy of the Leased Premises. If the Leased Premises or any part thereof is sublet to, or occupied by, or used by, any Person other than Tenant, whether or not in violation of this Section 19, Landlord (or Landlord's designee), after the occurrence of and during the continuance of an Event of Default, including, without limitation, a subletting or occupancy in violation of this Section 19, may collect any item of rent or

82

other sums paid by any subtenant, user or occupant as a fee for its use and occupancy, and shall apply the net amount collected to the Rent reserved in this Lease.  No Transfer, subletting, occupancy or use, whether with or without Landlord's prior consent, nor any such collection or application of rent or fee for use and occupancy, shall be deemed a waiver by Landlord of any term, covenant or condition of this Lease or, except as expressly provided in such consent or as expressly provided otherwise in this Section 19, the acceptance by Landlord of such assignee, subtenant, occupant or user as tenant hereunder. The consent by Landlord to any Transfer, subletting, occupancy or use, to the extent required under this Section 19, shall not relieve Tenant from its obligation to obtain the express prior consent of Landlord to any further Transfer, subletting, occupancy or use which requires Landlord's consent hereunder.

(l)    With regard to any assignment which is permitted pursuant to this Section 19, Landlord shall cooperate with the reasonable requests of Tenant made for purposes of effectuating such assignment and the use of the Leased Premises as contemplated thereby, which cooperation shall include, without limitation, execution and delivery of any such documents, agreements, instruments, applications, licenses, permits, estoppels or consents reasonably required by the parties to consummate such assignment or transfer and/or to permit the Leased Premises to be used by such assignee or transferee as contemplated by such assignment or transfer and so long as Landlord assumes no liability thereunder or Tenant indemnifies Landlord from such liability.  Notwithstanding the foregoing, Landlord shall not be required to incur any cost or expense, nor shall Landlord be required to revise, amend or modify any terms or conditions of this Lease in order to effectuate an assignment desired by Tenant.   Tenant agrees to promptly reimburse Landlord for its actual out-of-pocket costs and reasonable attorney's fees incurred by Landlord in connection with the actions requested by Tenant hereunder.

(m)   Notwithstanding anything to the contrary contained herein, (i) no single subtenant shall be a party to more than five percent (5%) of the Residential Subleases at any one time and (ii) if a Commercial Sublease demises 20,000 or more square feet of the rentable square footage of the Improvements (any such Commercial Sublease, a "Significant Commercial Sublease"), Tenant shall deliver to Landlord a certificate or letter from a reputable national brokerage company approved by Landlord (not to be unreasonably withheld, conditioned or delayed) confirming that such subletting is for a rental which is not less than the "fair market rental" (meaning, for purposes of this clause (ii), rental which would be paid for such space (commencing at the same time as the proposed subtenant's use or occupancy) in an arms-length transaction with a third party leasing a similar amount of space in the Leased Premises for the same term and shall include, *inter alia*, all fixed, percentage and escalation rents which would be included under such Sublease for the portion of the Leased Premises demised thereunder) (any such letter or certificate, a "Market Sublease Letter").

(n)    Without limiting the automatic recognition of any subtenant by Landlord set forth in Section 19(g) or as otherwise set forth herein, Landlord shall, upon Tenant's request made at any time or from time to time, enter into a recognition, non-disturbance and attornment agreement, in the form attached hereto as Exhibit B

83

4863-0344-5267, v. 18

(with such commercially reasonable modifications as such subtenant may request) or otherwise in a commercially reasonable form reasonably acceptable to Landlord, with respect to any Commercial Sublease entered into in accordance with the provisions of this Lease; provided, that: (A) the subtenant is not a Prohibited Person and is not Tenant or an Affiliate of Tenant; (B) either (x) such Sublease is a Significant Commercial Sublease and the term of such Sublease (taking into account any renewal or extension terms) is not less than ten (10) years or (y) the subtenant under such Sublease is a national or regional credit subtenant whose creditworthiness is consistent with good industry leasing standards and which subtenant possesses or has a parent company that possesses, or which subtenant's lease obligations are guaranteed by an affiliate that possesses, a public senior unsecured long-term debt or similar rating of at least investment grade from one or more nationally recognized statistical rating organizations (such subtenant, a "National or Regional Credit Tenant"); (C) such Sublease is on terms that are commercially reasonable at the time of execution of such Sublease (taking into account security and the creditworthiness and experience of any guarantor) and Tenant shall have delivered to Landlord a Market Sublease Letter; (D) such Sublease may provide for the payment of upfront sums (including, without limitation, security deposits) to Tenant or any Affiliate of Tenant and shall preclude the prepayment of rent or any additional rent more than thirty (30) days in advance; and (E) Tenant provides Landlord with a copy of such Sublease with such other provisions as are required by this Lease. Notwithstanding the foregoing, at any time there is a Leasehold Mortgage encumbering the Leased Premises, if requested by Tenant, Landlord shall enter into a recognition, non-disturbance and attornment agreement with respect to any Commercial Sublease on substantially the same form as such Leasehold Mortgagee is willing to enter into a subordination, non-disturbance and attornment agreement with respect to such Sublease. Tenant shall reimburse Landlord for all of Landlord's actual and reasonable out-of-pocket costs and expenses incurred in connection with the entering into of any agreement pursuant to this Section 19(n). Notwithstanding the foregoing or anything else to the contrary set forth in this Lease, in no event shall Landlord be obligated to provide a recognition, non-disturbance and attornment agreement with respect to any Residential Sublease. In the event of any dispute between Tenant and Landlord with respect to the matters described in this Section 19(n), the same shall be resolved by arbitration pursuant to Section 50 hereof.

(o)    If Tenant assigns this Lease to a Qualified Transferee that is not an Affiliate of the named Tenant hereunder, then, so long as there is no Event of Default is then continuing, Tenant may propose a replacement guarantor in respect of the Environmental Indemnity, the Indemnity Agreement and any other guaranty then in effect in connection with this Lease, and Landlord shall not unreasonably withhold its consent to such replacement guarantor; provided and on the condition that, (i) such replacement guarantor is a Qualified Replacement Guarantor and (ii) such Qualified Replacement Guarantor executes and delivers to Landlord an Environmental Indemnity and Indemnity Agreement (and any other guaranty, as applicable) in the same form(s) as then in effect or on such form as is acceptable to Landlord in its sole and absolute discretion. If Tenant delivers a Qualified Replacement Guarantor meeting the conditions of this paragraph, then, upon receipt of such executed Environmental Indemnity and

Indemnity Agreement (and any other guaranty, as applicable) the Tenant named herein and original Guarantor will be released from liability and obligations thereunder accruing from and after the date such replacement Environmental Indemnity and Indemnity Agreement (and any other guaranty, as applicable) is executed.

20.      **Permitted Contests**.  Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord, any Leasehold Mortgagee and any Fee Mortgagee, Tenant may contest, in good faith and at its sole cost and expense, the existence, the amount or the validity of any Taxes, Legal Requirements or any liens encumbering the Leased Premises, the amount of the damages caused thereby, or the extent of Tenant's or Landlord's liability therefor, by appropriate proceedings provided that during the pendency thereof such contest does not require or will not cause, as appropriate: (A) the collection of, or other realization upon, the Taxes or lien so contested (unless Tenant pays same without prejudice), (B) the sale, forfeiture, loss of or damage to any of the Leased Premises, any Base Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of the same, (C) any material interference with the use, occupancy, sale or financing of any of the Leased Premises, (D) any material interference with the payment of any Base Rent or any Additional Rent, and (E) the cancellation of any fire or other insurance policy, and provided further that Tenant keeps Landlord, any Leasehold Mortgagee and any Fee Mortgagee reasonably informed as to the status of such contest and proceedings.  Tenant will provide Landlord or Leasehold Mortgagee, if there is a Leasehold Mortgage in place, as security for such contest, an amount of cash or bond equal to one hundred ten percent (110%) of the amount being contested (or such greater amount as may be required by Leasehold Mortgagee), or other form of security satisfactory in the reasonable opinion of any Leasehold Mortgagee or Landlord in that order, in assuring the payment, compliance, discharge, removal or other action, including all costs, attorneys' fees, interest and penalties, in the event that the contest is unsuccessful (which cash, bond or other security shall be sufficient to (i) pay such contested Taxes, comply with such contested Legal Requirement or discharge or remove such contested lien, as applicable, (ii) pay any interest, penalties, fines, fees and expenses which may be assessed or payable by reason of Tenant's deferral of compliance or payment, as applicable, and (iii) pay any liability reasonably likely to be payable to any independent third parties by reason of such deferral of payment or compliance).  In no event will Tenant pursue any contest with respect to any Taxes, Legal Requirement, or lien referred to above in such manner that exposes Landlord, Tenant, any Leasehold Mortgagee or any Fee Mortgagee, to any criminal or civil penalty or sanction, causes Landlord to be in default of any Fee Mortgage, causes Tenant to be in default under any Leasehold Mortgage or results in a defeasance of Landlord's interest in the Leased Premises.  Tenant shall, upon demand from Landlord, promptly pay any fine, penalty, liability or sanction that may be imposed upon Tenant or Landlord (or its employees, officers, directors, shareholders, partners, members, managers, agents or any other Indemnified Party) by virtue of any non-compliance by Tenant with Legal Requirements.  While any such proceedings are pending and the required security is held by any Fee Mortgagee or Landlord, in that order, the Fee Mortgagee or Landlord, as the case may be, will not have the right to pay, remove or cause to be discharged the Tax, Legal Requirement or lien thereby being contested unless Landlord or any Fee Mortgagee reasonably believes that

4863-0344-5267, v. 18

Tenant is not satisfying any one or more of the relevant conditions in clauses (A) through (E) preceding during the pendency of the contest. Tenant will pay any and all judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and will, promptly after the final determination of such contest, fully pay and discharge the amounts which are assessed, or imposed or are determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which are ordered as a result thereof, whereupon all such security then held hereunder shall be returned to Tenant.

21.     **Events of Default**.  The occurrence of any one or more of the following events, in each case, beyond the applicable notice, grace and cure periods set forth in this Section 21, will constitute an event of default (an "Event of Default") under this Lease:

(a)    Tenant's failure to make any payments of Base Rent, Additional Rent or other sum herein required to be paid by Tenant when due and such default continues for a period of five (5) Business Days after written Notice from Landlord or any Fee Mortgagee to Tenant.

(b)    Tenant's failure to duly perform and observe the provisions of Section 24(b) and such default continues for a period of ten (10) days after written Notice from Landlord or any Fee Mortgagee to Tenant.

(c)    Tenant's failure to maintain insurance in accordance with the requirements of Section 15 hereof.

(d)    Any default in any obligation to perform or failure to meet any required deadline for the Construction Project set forth in the Work Letter or Sections 48 and 49, including, without limitation, Tenant's failure to (i) submit the CONH Exemption Application or the CONH Application to HPD by the applicable dates set forth in Sections 49, (ii) submit to Landlord the Fallback Business Plan by the Fallback Business Plan Delivery Date, and (iii) cause Substantial Completion to occur on or before the Required Substantial Completion Date, provided, however, the foregoing deadline described in this clause (iii) shall be subject to reasonable extension as a result of delays caused by Force Majeure up to the Force Majeure Cap.

(e)    Tenant, Guarantor or any Casualty Repair Guarantor under a guaranty of any of Tenant's obligations under this Lease then in effect (i)  is adjudicated bankrupt or insolvent, or (ii) consents to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (iii)  files or acquiesces to (as applicable) a voluntary or involuntary petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, (iv) makes a general assignment for the benefit of creditors, or (v) is liquidated or dissolved or begins proceedings toward its liquidation or dissolution, and any of the foregoing remain in force, undischarged and unstayed for a period of ninety (90) days after it is entered.

86

4863-0344-5267, v. 18

(f)     A court enters an order, judgment or decree appointing a receiver or trustee for it or for any of the Leased Premises or approving a petition filed against Tenant or Guarantor (under a guaranty of this Lease then in effect) which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree remains in force, undischarged and unstayed ninety (90) days after it is entered (each, together with those items listed in Section 21(e) above, a "Bankruptcy Action").

(g)     The estate or interest of Tenant or Guarantor in any of the Leased Premises is levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process is not be vacated or discharged within sixty (60) days after such levy or attachment.

(h)     At any time that a Project Guaranty is outstanding, Guarantor fails to satisfy the Liquidity and Net Worth Threshold.

(i)     Any representation or warranty made by Tenant or Guarantor herein proves to have been incorrect when made in any material respect, such incorrect representation or warranty has, or is reasonably expected to have, a material adverse effect on Landlord or the Leased Premises, and, if Tenant did not intentionally make such false representation or warranty, Tenant does not take such action as Landlord may reasonably require to protect Landlord from or compensate Landlord for such material adverse effect within sixty (60) days after written notice from Landlord or any Fee Mortgagee to Tenant; provided, however, in cases where Tenant intentionally made such materially and adversely false representation and warranty of Tenant or intentionally breached a covenant of Tenant that materially and adversely affected Landlord, no cure or correction period shall exist.

(j)     Any fraud, embezzlement, willful misconduct, bad faith or gross negligence with respect to the Leased Premises or in any way related to this Lease on the part of Tenant, Guarantor, or any Tenant Key Person.

(k)     The occurrence of a Tenant Key Person Event, which is not retracted, replaced or cured, as the case may be, within thirty (30) days after written notice from Landlord or any Fee Mortgagee to Tenant.

(l)     With respect to any non-monetary Default under this Lease, if such Default continues for a period of thirty (30) days after Notice thereof from Landlord or any Fee Mortgagee, provided, that if such Default cannot reasonably be cured within such period of thirty (30) days, such period will be extended for such longer time as reasonably necessary provided that Tenant has commenced to cure such Default within said period of thirty (30) days and is actively, diligently and in good faith proceeding with continuity to remedy such Default, but in no event shall the cure period for any non-monetary Default exceed one hundred twenty (120) days, in the aggregate (inclusive of the initial thirty (30) day cure period).  Tenant agrees that after receiving any such notice

87

of default referred to herein, Tenant will, upon request of Landlord or any Fee Mortgagee, advise the requesting party of Tenant's progress in curing such default.

(m)   Tenant enters into or executes a Mortgage in violation of the terms and conditions of this Lease which is not voided, satisfied or discharged, as the case may be, within thirty (30) days after written Notice thereof from Landlord or any Fee Mortgagee to Tenant (unless such Mortgage is made to a Prohibited Person or any Person who owns directly or indirectly any interest in a Prohibited Person, in which case, no such Notice or cure period shall apply).

(n)   Tenant Transfers any of its rights, title, and/or interests in the Leased Premises or this Lease in violation of the terms and conditions of this Lease, which is not retracted, voided, or cured within thirty (30) days following written Notice from Landlord or Fee Mortgagee to Tenant (unless such transfer or assignment is to a Prohibited Person or any Person who owns directly or indirectly any interest in a Prohibited Person, in which case, no such Notice or cure period shall apply).

(o)   Tenant violates the terms of any of Sections 47(h) or 56, and such violation continues uncured for a period of three (3) Business Days after receipt of written notice from Landlord or Fee Mortgagee to Tenant, unless such breach causes either the Tenth Floor Purchase Option Closing or the Unit Purchase Option Closing to fail to occur, in which case, no such notice and cure shall apply.

(p)   Tenant violates the terms of Section 58(b) and does not retract, void, withdraw or cure, as the case may be, same within thirty (30) days after written notice from Landlord or any Fee Mortgagee to Tenant.

(q)   Without the prior written consent of Landlord in each instance, Tenant shall not (by any act or omission) (i) cause monetary or material non-monetary breaches of any its obligations under the Union MOA, (ii) enter into any material agreement with the Hotel Union, 32BJ, L94 or any other labor or worker's union with respect to the Project (or any employees to be employed at the Project), excluding any agreements or understandings that apply industry-wide (it being agreed that Landlord's consent shall not be unreasonably withheld, conditioned or delayed with respect to the agreements described in this clause (ii)), or (iii) use or permit the use of the Leased Premises or any portion thereof for any purpose that triggers the Snap Back Provision in the Union MOA to take effect.

(r)   The failure of Tenant to pay the Right-Size Payment on the Right-Size Event Date and such failure continues for thirty (30) days following Notice from Landlord to Tenant.

(s)   Any other event occurs which constitutes an Event of Default pursuant to the terms of this Lease.

22.   **Landlord's Remedies**. Upon the occurrence and during the continuance of an Event of Default, with or without notice or demand, except to the extent

88

such notice is expressly required pursuant to <u>Section 21</u> above or otherwise in this Lease, subject to the rights of a Leasehold Mortgagee as stated herein, Landlord shall be entitled, so long as such Event of Default remains uncured, to exercise, at its option (in its sole and absolute discretion), concurrently, successively, or in any combination, all remedies available at law or in equity, including without limitation any one or more of the following:

(a)    Terminate Tenant's right to possession of the Leased Premises by any lawful means, in which case this Lease shall terminate and Tenant immediately shall surrender possession of the Leased Premises to Landlord.  In such event Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including (i) the cost of recovering possession of the Leased Premises; (ii) the worth at the time of the award of any unpaid Base Rent and Additional Rent which had been earned at the time of termination; (iii) the worth at the time of the award of the amount by which the unpaid Base Rent and Additional Rent which would have been earned after the termination until the time of the award exceeds the amount of such rental loss that Tenant proves could reasonably have been avoided; (iv) reasonable expenses of placing the Leased Premises in good order, condition and repair; (v) reasonable expenses of reletting; (vi) reasonable and actual attorneys' fees; (vii) such amount of Base Rent and Additional Rent as Landlord would be entitled as a creditor in a bankruptcy proceeding involving Tenant under Section 502(b)(6) of the Bankruptcy Code, which amount includes the Base Rent and Additional Rent reserved by this Lease, without acceleration, for the greater of (x) one (1) year, or (y) fifteen percent (15%), not to exceed three (3) years, of the remaining Term of the Lease (such period of time, the "<u>Liability Period</u>"), following the date on which Landlord repossessed, or the Tenant surrendered, the Leased Premises to Landlord; (viii) that portion of any leasing commission paid by Landlord and applicable to the Liability Period; and (ix) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including damages for diminution in the value of the Fee Estate.  As used above, the "worth at the time of award" is computed by allowing interest at the Default Rate to accrue with respect to any unpaid installments of Rent or other sums from the date due until the date such amounts are paid in full.

(b)    Landlord shall have the right to terminate Tenant's right to possession of the Leased Premises and repossess the Leased Premises by any lawful means without terminating this Lease.  Landlord shall use good faith and commercially reasonable efforts, to the extent required by applicable law of the state where the Leased Premises are located, to re-let the Leased Premises, in whole or in part, for the account of Tenant for such rent and upon such terms as may be satisfactory to Landlord in Landlord's sole discretion.  For the purposes of that re-letting, Landlord may repair, and perform normal remodeling and alterations to the Leased Premises.  If Landlord fails to re-let the Leased Premises, Tenant shall pay to Landlord the Base Rent and Additional Rent in this Lease for the Liability Period (to the extent Landlord has not exercised its right in <u>Section 22(a)</u> above to accelerate such Rent).  If Landlord re-lets all or any part of the Leased Premises, but fails to realize a sufficient sum from the re-letting to pay the full amount of Rent in this Lease for the Liability Period, after paying all of the costs and

4863-0344-5267, v. 18

expenses of all normal and customary decoration, repairs, remodeling, alterations and additions and the expenses of the re-letting and of the collection of the rent accruing from the re-letting, Tenant shall pay to Landlord the amount of any deficiency upon Landlord's demand from time to time made.  The timing of any such demands (and lawsuits relating thereto) shall be in the sole discretion of Landlord; and irregular demands or lawsuits relating thereto shall not be deemed a waiver of any claims or rights of Landlord under this Lease or otherwise at law or equity.

(c)    Maintain Tenant's right to possession, in which case this Lease shall continue in full force and effect whether or not Tenant shall have abandoned the Leased Premises.  In such event Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover Base Rent and Additional Rent as may become due hereunder through the Liability Period.

(d)    Provided that Landlord has first exercised its rights under either Sections 22(a) or 22(b) above, to remove all or any portion Tenant's tangible Personal Property and cause the same to be stored in a public warehouse or elsewhere at Tenant's sole expense, without becoming liable for any loss or damage resulting therefrom and without resorting to legal or judicial process, procedure or action.

(e)    To bring an action against Tenant for any damages sustained by Landlord or any equitable relief available to Landlord; provided, however, Tenant's liability under this Section 22(e) shall stop accruing as of the date that Tenant surrender's possession of the Leased Premises to Landlord (excluding any liability hereunder that expressly survives termination of this Lease).

(f)    To immediately or at any time thereafter, and with or without notice, at Landlord's sole option but without any obligation to do so, correct such breach or default and charge Tenant all reasonable costs and expenses incurred by Landlord therein.  Any actual sum or sums so paid by Landlord, together with interest at the Default Rate, shall be deemed to be Additional Rent hereunder and shall be immediately due from Tenant to Landlord.  Any such acts by Landlord in correcting Tenant's breaches or defaults hereunder shall not be deemed to cure said breaches or defaults or constitute any waiver of Landlord's right to exercise any or all remedies set forth herein, until such time as Tenant pays such Additional Rent.

(g)    To immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant held by Landlord under this Lease against any sum owing by Tenant.

(h)    To seek any equitable relief available to Landlord, including, without limitation, the right of specific performance; provided, however, Tenant's liability under this Section 22(h) shall stop accruing as of the date that Tenant surrender's possession of the Leased Premises to Landlord (excluding any liability hereunder that expressly survives termination of this Lease).

(i)     To enforce, and Tenant does hereby consent to such enforcement, all of Landlord's self-help remedies available at law or in equity without Landlord resorting to any legal or judicial process, procedures or action.

(j)     If Tenant abandons or surrenders the Leased Premises, or any portion thereof, or Tenant is dispossessed by process of law or otherwise, any Personal Property belonging to Tenant and left in the Leased Premises, or any portion thereof, shall be deemed to be abandoned, at the option of Landlord, and subject to any Leasehold Mortgagee's interest therein, Landlord shall have the right to sell or otherwise dispose of such Personal Property in any commercially reasonable manner.  If Tenant abandons the Leased Premises, or any portion thereof, Landlord shall, in addition to all of its rights and remedies under this Lease or at law or equity, have the right, but not the obligation, to sublet the Leased Premises, or any portion thereof, on reasonable terms for the account of Tenant, and Tenant shall be liable for all costs of such subletting, including the cost of preparing the Leased Premises, or any portion thereof, for subtenants and leasing commissions paid to brokers; provided, however, Tenant's liability under this Section 22(j) shall stop accruing as of the date that Tenant surrender's possession of the Leased Premises to Landlord (excluding any liability hereunder that expressly survives termination of this Lease).

(k)     Subject to the rights of any Leasehold Mortgagee, Tenant hereby grants to Landlord a security interest in all of Tenant's rights, title and interests in and to the following to the extent owned by Tenant on the date Landlord terminates this Lease due to an Event of Default: (A) the Personal Property, (B) all service contracts for the Leased Premises then in effect, (C) all licenses, Permits, registrations, certificates, authorizations and governmental approvals of any kind obtained by Tenant with respect to the Leased Premises, (D) all drawings, plans, specifications and similar materials prepared by Tenant with respect to the Leased Premises (including, without limitation, the Project Plans and Specifications), (E) all warranties and guaranties of architects, engineers, contractors, subcontractors, suppliers or materialmen solely with respect to any repair, construction, maintenance, design, reconstruction or operation of the Leased Premises, or of any equipment or system constituting solely a part of the Leased Premises, (F) all pictures, paintings, drawings, prints, sculptures, tapestries or other items of art, if any, located in the Leased Premises and (G) all Subleases, including the right to receive and collect the rents or profits under all such subleases. The security interest granted to Landlord hereunder shall be subordinate and inferior to (x) any security interest now or hereafter granted to any Leasehold Mortgagee unless this Lease is terminated upon the occurrence of an Event of Default and such Leasehold Mortgagee fails to enter into a New Lease and (x) the security interest (if any) now or hereafter granted by Tenant to any purchase money and/or equipment lender.  Without limiting the foregoing, in the event that Landlord terminates this Lease after an Event of Default, Tenant agrees to assign to Landlord, Tenant's interest in the Plans and Specifications for the Project and any plans and specifications for any Alterations, if any, to the extent assignable, **"AS-IS", "WHERE IS", WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED.**

91

(l)      All powers and remedies given by this Section 22 to Landlord, subject to applicable Legal Requirements and except as otherwise expressly set forth herein, shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Landlord under this Lease, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Tenant contained in this Lease, and no delay or omission of Landlord to exercise any right or power accruing upon the occurrence of any Event of Default shall impair any other or subsequent Event of Default or impair any rights or remedies consequent thereto.  Except as otherwise expressly set forth herein, every power and remedy given by this Section 22 or by law to Landlord may be exercised from time to time, and as often as may be deemed expedient, by Landlord, subject at all times to Landlord's right in its sole judgment to discontinue any work commenced by Landlord or change any course of action undertaken by Landlord.  Suit or suits for the recovery of damages, or for a sum equal to any installment or installments of Rent payable hereunder or any deficiencies or other sums payable by Tenant to Landlord pursuant to the provisions of this Section 22, may be brought by Landlord from time to time at Landlord's election, and nothing herein contained shall be deemed to require Landlord to await the Expiration Date.  In the event of any breach or threatened breach by Tenant of any of the covenants, agreements, terms or conditions contained in this Lease, Landlord shall be entitled to enjoin such breach or threatened breach and shall have the right to invoke any rights and remedies allowed at law or in equity or by statute or otherwise as though re-entry, summary proceedings, and other remedies were not provided for in this Lease.

(m)      Except as expressly provided to the contrary herein or prohibited by applicable Legal Requirements, Tenant hereby expressly waives the service of any notice of intention to re-enter provided for in any statute, or of the institution of legal proceedings to that end which may otherwise be required to be given under any present or future law.  Except as prohibited by applicable Legal Requirements, Tenant, for and on behalf of itself and all Persons claiming by, through or under Tenant, also waives any and all rights of redemption provided by any statute now in force or hereafter enacted or otherwise and any rights of re-entry or repossession or to restore the operation of this Lease in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge or in case of re-entry or repossession by Landlord or in case of any expiration or termination of this Lease, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease.  The terms "enter", "reenter", "entry" or "reentry", as used in this Lease shall not be restricted to their technical, legal meanings.

(n)      No receipt of monies by Landlord from Tenant after termination of this Lease, or after the giving of any notice of termination of this Lease shall reinstate, continue or extend the Term or affect any notice theretofore given to Tenant, or operate as a waiver of the right of Landlord to enforce the payment of Rent payable by Tenant hereunder or thereafter falling due, or operate as a waiver of the right of Landlord to recover possession of the Leased Premises by proper remedy, except as herein otherwise expressly provided, it being agreed that after the service of notice to terminate this Lease or the commencement of suit or summary proceedings, or after final order or judgment

92

4863-0344-5267, v. 18

for the possession of the Leased Premises, Landlord may demand, receive and collect any monies due or thereafter falling due without in any manner affecting such notice, proceeding, order, suit or judgment, all such monies collected being deemed payments on account of the use and occupation of the Leased Premises or, at the election of Landlord, on account of Tenant's liability hereunder.

(o)    Each right and remedy of Landlord provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Landlord of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by Landlord of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

23.    **Notices**.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") must, to be effective for purposes of this Lease, be in writing, and they will be deemed to have been given for all purposes (i) three (3) Business Days after having been sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, (ii) one (1) day after having been sent by Federal Express or other nationally recognized air courier service, to the addresses stated below, or (iii) if such Notice is sent via email (which email shall be addressed to the email addresses set forth below and shall include the notice as a .pdf attachment thereto) (x) as of the date of the email, if such email was sent prior to 4 P.M. EST on a Business Day or (y) on the Business Day immediately succeeding the date of the email, if such email was sent on a day that is not a Business Day or after 4 P.M. EST on a Business Day, provided if a Notice is delivered via email, such Notice shall not be effective unless a hardcopy of such Notice is delivered via the method described in clauses (i) and (ii) above:

| | |
|---|---|
| If to Landlord: | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Luke Pak<br>Telephone: 214-545-5576<br>E-mail:  pak@mspcm.com |
| With a copy to: | 356W58 GROUND LESSOR LLC |

93

|  | c/o MSP Capital Investments, L.L.C. |
|  | Woodlawn Hall at Old Parkland |
|  | 3953 Maple Ave., Suite 350 |
|  | Dallas, Texas 75219 |
|  | Attn: Max Lamont |
|  | Telephone: 214-545-5577 |
|  | E-mail: lamont@mspcm.com |

And with a copy to: Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq.  & File Manager
File No. 4308.0014
Email: Dash@dsllp.com

If to Tenant: HUDSON 1701/1706, LLC and
HUDSON 1702, LLC
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Saloman Smeke Saba and Alberto Smeke Saba
Email: ss@csc-coliving.com
        as@csc-coliving.com

With a copy to: Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
E-mail: jmetzger@coleschotz.com

If any Fee Mortgagee has advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord of a default by Landlord under this Lease, Tenant will serve one or more copies of such Notice upon any Fee Mortgagee in the manner aforesaid and no such Notice of default will be effective against such Fee Mortgagee unless and until such Fee Mortgagee has been sent a copy thereof.  For the purposes of this Section 23, any party may substitute or supplement its address by giving ten (10) Business Days' notice to the other party in the manner provided above.

24.     **Memorandum of Lease; Estoppel Certificates.**

(a)     Tenant and Landlord will execute, deliver and record, file or register from time-to-time all such instruments as may be required by any present or future law

in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and will cause a memorandum of this Lease in the form attached hereto as Exhibit I, (together with the New York City Real Property Transfer Tax Return and the New York State Real Estate Transfer Tax Return required to record such memorandum of lease), which shall be submitted for recording with the Office of the City Register, New York County and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease.  The cost of such recording, including, without limitation, any and all recording fees and recordation and transfer taxes due upon such recording or otherwise upon the creation of this Lease, shall be paid by Tenant as and when due.  In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease will prevail.

(b)     Landlord and Tenant will, at no cost to the requesting party, at any time and from time to time, upon not less than thirty (30) days' prior written request by the other (or by any Leasehold Mortgagee and/or any party designated by Leasehold Mortgagee), execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant by an authorized officer thereof certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications); (ii) the dates to which Base Rent and Additional Rent payable hereunder has been paid; (iii) that to the knowledge of the party executing such certificate, no default by either Landlord or Tenant exists hereunder or specifying each such default of which such party may have knowledge; (iv) the remaining Term hereof; (v) that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against such party before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of such party or if any such proceedings are pending or threatened to said party's knowledge, specifying and describing the same; and (vi) that no rent has been paid under this Lease for more than one month in advance.  It is intended that any such statements may be relied upon by any Fee Mortgagee, Leasehold Mortgagee, the recipient of such statements or their assignees or by any prospective mortgagee, purchaser, assignee or subtenant of the Leased Premises or the Leasehold Estate.

25.     **Surrender; End of Term.**

(a)     Upon the expiration or earlier termination of this Lease, Tenant will peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated), including the fixtures and Improvements and otherwise as required by the terms of this Lease, including, without limitation, all passwords and combinations on locks, safes and vaults (if any), to Landlord free and clear of all lettings, occupancies, liens and encumbrances, other than the Permitted Encumbrances, the SRO Tenants and subtenants under Subleases, in good

95

condition and repair, except for ordinary wear and tear and damage by fire, casualty or condemnation but only to the extent Tenant is not required to repair the same hereunder. Upon such termination, the Leasehold Estate created hereby and all of Tenant's right, title and interest in and to the Leased Premises and to all subleasehold estates and interests therein created pursuant to this Lease, shall automatically (without further documentation; provided, however, that Tenant will execute such documentation that Landlord reasonably requests to evidence the same) revert to and become the sole property of Landlord, free and clear of all claims by, through or under Tenant. This Lease shall terminate without further notice upon the expiration of the Term and any holding over by Tenant after the expiration of the Term shall not constitute a renewal of this Lease or give Tenant any rights hereunder or to the Leased Premises, except as otherwise provided in this Lease. Landlord and Tenant acknowledge and agree that this Lease cannot be extended or modified except by a writing signed by Landlord and Tenant. All Alterations affixed to the Leased Premises shall remain upon the Leased Premises as the property of Landlord, but Tenant, on or before the Expiration Date, shall remove from the Leased Premises (and repair any damage caused by such installation or removal) all of Tenant's Personal Property. Landlord shall not be obligated to assume any sublease (other than the SRO Tenants) or any service contracts with respect to the Leased Premises and Tenant shall, at Landlord's option, cause any subleases and service contracts to be terminated as of the Expiration Date.

(b)    Upon the Expiration Date or earlier termination of this Lease, Tenant shall deliver to Landlord, (i) such maintenance records for the Leased Premises and all plans and specifications then pertaining to the Leased Premises as it may then have in its possession, (ii) all original licenses and permits then pertaining to the Leased Premises, including temporary or permanent certificates of occupancy then in effect for the Improvements as it may then have in its possession or control, (iii) all warranties and guarantees then in effect which Tenant has received in connection with any work or services performed or equipment installed in the Improvements or on the Leased Premises as it may then have in its possession or control, and (iv) any and all other documents of every kind and nature whatsoever in Tenant's possession relating to the operation of the Leased Premises as a building (as opposed to Tenant's use or occupancy thereof), to the extent that any of the aforesaid are in Tenant's possession, together with a duly executed assignment, without representation, warranty or recourse of any kind, in form and substance reasonably acceptable to Landlord, of each of the foregoing to the extent assignable to Landlord.

(c)    If Tenant remains in possession of the Leased Premises after the expiration of the Term hereof, Tenant, at Landlord's option and within Landlord's sole discretion, may be deemed a tenant on a month-to-month basis and shall continue to pay rentals and other sums in the amounts herein provided, except that the Base Rent shall automatically be two hundred percent (200%) of Base Rent then applicable to this Lease, and to comply with all the terms of this Lease; provided that nothing herein nor the acceptance of Rent by Landlord shall be deemed a consent to such holding over. Tenant shall defend, indemnify, protect and hold the Indemnified Parties, harmless for, from and against any and all Losses resulting from Tenant's failure to surrender possession upon

the expiration of the Term, including, without limitation, any claims made by any succeeding lessee.  The indemnity obligations of the Tenant and the rights and remedies of the Landlord under this Section 25(c) will survive for two (2) years after the expiration of the Term or the earlier termination of this Lease.

26.     **No Merger of Title**.  There will be no merger of this Lease nor of the Leasehold Estate created by this Lease with the Fee Estate in or ownership of any of the Leased Premises by reason of the fact that the same person or entity may acquire or hold or own, directly or indirectly, (i) this Lease or the Leasehold Estate created by this Lease or any interest in this Lease or in such Leasehold Estate, and (ii) the Fee Estate or ownership of any of the Leased Premises or any interest in such Fee Estate.  No such merger will occur unless and until all persons and entities having any interest in (x) this Lease or the Leasehold Estate created by this Lease, and (y) the Fee Estate in the Leased Premises or any leasehold created thereby, including, without limitation, any Fee Mortgagee's and/or Leasehold Mortgagee's respective interests therein, or any part thereof sought to be merged have joined in a written instrument effecting such merger and have duly recorded the same.

27.     **Exculpation**.    Anything  contained  herein  to  the  contrary notwithstanding (except the last sentence of Section 42), any claim based on or in respect of any liability of Landlord under this Lease will be enforced only against the interest of Landlord in the Fee Estate and all rents, insurance proceeds, Condemnation Awards and other proceeds thereof, and will not be otherwise enforced against any direct or indirect members, partners, joint venturers, tenants in common, officers, directors, shareholders, agents, representatives or affiliates of Landlord.  Tenant agrees that any assignment by Landlord to a Fee Mortgagee of Landlord's interest in this Lease, or the rent, payable hereunder, whether absolute or conditional in nature or otherwise, whether such assignment is made to any Fee Mortgagee solely as additional collateral related to a mortgage or otherwise, and the acceptance thereof by such Fee Mortgagee will not be treated as an assumption by any Fee Mortgagee of any obligations of Landlord hereunder unless such Fee Mortgagee has, by notice sent to Tenant, specifically elected to assume such obligations; provided, that the Fee Mortgagee will be treated as having assumed Landlord's obligations hereunder upon purchase of the Leased Premises pursuant to foreclosure of the Mortgage or by deed in lieu thereof, or other conveyance, subject to the limitations set forth in the first sentence hereof.

28.     **Hazardous Substances.**

(a)    For  the  purposes  hereof,  the  following  terms  shall  have  the following meanings:

"Hazardous Materials" includes, without limitation, any material, waste or substance which is (i) included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "hazardous wastes" in or pursuant to any Legal Requirements, or subject to regulation under any Law; (ii) listed in the United States Department of Transportation Optional Hazardous Material Table, 49 C.F.R. Section 172.101, as enacted as of the Effective Date or as hereafter amended, or in the United States

97

Environmental Protection Agency List of Hazardous Substances and Reportable Quantities, 40 C.F.R. Part 302, as enacted as of the Effective Date or as hereafter amended; and (iii) explosive, radioactive, asbestos, a polychlorinated biphenyl, petroleum or a petroleum product or waste oil.

"Environmental Claim" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resource damages, property damages, personal injuries or penalties) arising out of, based on or resulting from (A) the presence, or release into the environment, of any Hazardous Materials at the Leased Premises, or (B) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law. Notwithstanding the foregoing or anything to the contrary in this Lease, the term "Environmental Claim" expressly excludes any environmental condition, claim, action, investigation or written notice disclosed to Landlord prior to the Effective Date, including, without limitation, all such environmental conditions and information disclosed in the Initial Environmental Report and any other Environmental Report provided to Landlord on or prior to the Effective Date, unless the Project Budget and/or Project Plans and Specifications contemplates curing or resolving any such claim in connection with Tenant's construction of the Project and Tenant fails to ultimately cure the same in compliance with Environmental Laws.

"Environmental Laws" includes all laws and regulations pertaining to health, industrial hygiene, Hazardous Materials or the environment, including, without limitation each of the following, as enacted as of the Effective Date or as hereafter amended; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §96021 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §6901 et seq.; the Toxic Substance Control Act, 15 U.S.C. §2601 et seq.; the Water Pollution Control Act (also known as the Clean Water Act), 33 U.S.C. §1251 et seq.; the Clean Air Act, 42 U.S.C. §7401 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §1801 et seq.; the New York State Environmental Quality Review Act, N.Y. Envtl. Conserv. Law Sect. 8-0101 et seq.; Article 19 of the New York Environmental Conservation Law (air); Article 17 of the New York Environmental Conservation Law (water); The Tidal Wetlands Act, N.Y. Envtl. Conserv. Law Sect. 25-0101 et seq.; The Freshwater Wetlands Act, N.Y. Envtl. Conserv. Law Sect. 24-0101 et seq.; The Hazardous Substances Bulk Storage Act, N.Y. Envtl. Conserv. Law Sect. 40-0101 et seq.; The Oil Spill Prevention, Control and Compensation Law, New York Navigation Law, Article 12; The New York Abandoned Sites Act, N.Y. Envtl. Conserv. Law, Article 27, Title 13; Article 27 of the N.Y. Envtl. Conserv. Law (solid waste); Article 30 of the New York Labor Law (asbestos); Local Law 97 of 2019; state superfund and environmental clean-up statutes, with implementing regulations and guidelines; and all other federal, state or local laws, rules or regulations pertaining to Hazardous Materials.

"Environmental Report" means, individually and collectively as the context may require, each environmental report delivered to Landlord in connection with the Leased Premises pursuant to this Lease from time to time, including, without limitation, that certain Initial Environmental Report delivered prior to the Effective Date.

4863-0344-5267, v. 18

"Initial Environmental Report" means that certain Phase I Environmental Site Assessment, dated March 10, 2022, prepared by Roux Environmental Engineering and Geology, D.P.C. with respect to the Leased Premises.

(b)    Tenant will comply with and will cause the Leased Premises to comply with all Environmental Laws applicable to the Leased Premises and Tenant's operations thereon. Except as disclosed in any Environmental Report, (i) Tenant will not use (or permit the use of by any other Person) the Leased Premises for the generation, manufacture, storage, handling, transfer, treatment, recycling, transportation, processing, production, refinement or disposal of any Hazardous Materials (each, a "Regulated Activity"), other than in connection with Tenant's normal business operations and in commercially reasonably quantities, in each case subject to compliance with applicable Legal Requirements and the Applicable Standard; (ii) (A) Tenant will not install or permit the installation on the Leased Premises of any underground storage tanks or surface impoundments containing petroleum products without Landlord's prior written consent (to be given or withheld in its sole and absolute discretion) and will not cause the discharge of any petroleum contamination in violation of applicable Environmental Laws originating on the Leased Premises, and (B) with respect to any petroleum contamination on the Leased Premises which originates from a source off the Leased Premises, Tenant will, upon actual knowledge of same, notify all responsible third parties and any Governmental Authorities to the extent required by applicable Legal Requirements (collectively, "Third Parties") and will undertake commercially reasonable efforts to prosecute enforcement of the cleanup of the Leased Premises by such Third Parties, including, without limitation, undertaking commercially reasonable legal action, if necessary and applicable, to enforce the cleanup obligations of such Third Parties; (iii) Tenant will cause any Alterations of the Leased Premises to be done in a way which complies with Legal Requirements and the Applicable Standard, including those relating to exposure of persons working on or visiting the Leased Premises to Hazardous Materials and, in connection with any such Alteration, will remove, remediate and/or contain, as applicable, any Hazardous Materials present upon the Leased Premises to the extent that such removal, remediation and/or containment is required by applicable Environmental Laws; and (iv) Tenant will not install in the Leased Premises or permit to be installed in the Leased Premises asbestos or any asbestos-containing materials in any form that is or could be friable.  Additionally, Landlord agrees that Tenant may use household and commercial cleaners and chemicals to maintain the Leased Premises and may store items commonly carried in Tenant's business operations, provided that such use is in compliance with all Environmental Laws and Legal Requirements.

(c)    If, at any time during the Term, Hazardous Materials are found in or on the Leased Premises in violation of any Environmental Law, regardless of when such Hazardous Materials arose or were discovered, then Tenant must (at Tenant's sole cost and expense) promptly commence and diligently prosecute to completion all investigation, site monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature  to the extent required by Environmental Laws (collectively, "Remedial Work"), and in compliance with Environmental Laws; provided, that Landlord will not be required to accept any institutional control (such as a

99

deed restriction) that restricts the permitted use of the Leased Premises as either a Multifamily Project or Fallback Project as a condition to any remedial plan approved by any Governmental Authority in connection with such Remedial Work.

(d) Except as set forth in any Environmental Report and to Tenant's actual knowledge: (1) neither the Leased Premises, nor any portion thereof, has been used by Tenant or by any prior owner for Regulated Activities, and (2) as of the Effective Date, there are no Hazardous Materials present on, in or under the Leased Premises or any portion thereof in violation of any Environmental Laws. Notwithstanding the foregoing, at all times during the Term, to the extent that Tenant has actual knowledge thereof, Tenant will promptly provide Notice in writing to Landlord and any Fee Mortgagee of any of the following matters:

(i) any proceeding or investigation commenced or threatened against Tenant or Landlord by any Governmental Authority with respect to the release, threatened release or presence of any Hazardous Material affecting the Leased Premises or other potential environmental problem or liability in, under, from or migrating towards the Leased Premises;

(ii) any lien, action or written notice affecting the Leased Premises, Tenant or Landlord resulting from any violation or alleged violation of Environmental Laws;

(iii) all written notices of any pending or threatened investigation or claims made or any lawsuit or other legal action or proceeding brought by any person against (A) Tenant or Landlord or the Leased Premises, or (B) any other party occupying the Leased Premises or any portion thereof, in any such case relating to any loss or injury allegedly resulting from any Hazardous Material on or from the Leased Premises or relating to any violation or alleged violation of Environmental Laws pertaining to the Leased Premises;

(iv) the discovery of any occurrence, condition or state of facts with respect to the Leased Premises or written notice received by Tenant of any occurrence or condition on any real property adjoining or in the immediate vicinity of the Leased Premises, which reasonably could be expected to lead to the Leased Premises or any portion thereof being in violation of any Environmental Laws or subject to any restriction on ownership, occupancy, transferability or use under any Environmental Laws or which might subject Landlord or any Fee Mortgagee to any Environmental Claim; and

(v) the commencement and completion of any Remedial Work with respect to the Leased Premises or any portion thereof.

(e) TENANT WILL BE SOLELY RESPONSIBLE FOR AND WILL DEFEND, REIMBURSE, INDEMNIFY AND HOLD THE INDEMNIFIED PARTIES HARMLESS FROM AND AGAINST ALL DEMANDS, CLAIMS, ACTIONS, CAUSES OF ACTION, ASSESSMENTS, LOSSES, DAMAGES, LIABILITIES,

4863-0344-5267, v. 18

INVESTIGATIONS, OR WRITTEN NOTICES INCLUDING, COSTS AND EXPENSES OF ANY KIND (INCLUDING WITHOUT LIMITATION, REASONABLE EXPENSES OF INVESTIGATION BY ENGINEERS, ENVIRONMENTAL CONSULTANTS AND SIMILAR TECHNICAL PERSONNEL AND REASONABLE FEES AND DISBURSEMENTS OF COUNSEL), ARISING OUT OF, IN RESPECT OF OR IN CONNECTION WITH (I) TENANT'S BREACH OF ITS REPRESENTATIONS, WARRANTIES, COVENANTS OR OBLIGATIONS IN THIS SECTION 28, (II) THE OCCURRENCE OF ANY REGULATED ACTIVITY BY TENANT AT, ON OR UNDER THE LEASED PREMISES AT ANY TIME DURING OR PRIOR TO THE TERM OF THIS LEASE, OR (III) ANY REMEDIAL WORK REQUIRED TO BE PERFORMED BY TENANT PURSUANT TO ANY ENVIRONMENTAL LAW OR THE TERMS HEREOF WITH RESPECT TO MATTERS ARISING OR OCCURRING PRIOR TO OR DURING THE TERM DUE TO ACTIVITIES OF TENANT; PROVIDED, HOWEVER, THAT NONE OF THE FOREGOING INDEMNIFICATION OBLIGATIONS SHALL BE ENFORCEABLE AGAINST TENANT TO THE EXTENT THAT ANY DEMANDS, CLAIMS, ACTIONS, CAUSES OF ACTION, ASSESSMENTS, LOSSES, DAMAGES, LIABILITIES, INVESTIGATIONS, OR WRITTEN NOTICES RESULT OR ARISE FROM THE GROSS NEGLIGENCE, ILLEGAL ACTIVITY, FRAUD, OR WILLFUL MISCONDUCT OF ANY INDEMNIFIED PARTIES.

(f)     Excluding any environmental conditions disclosed to Landlord in the Initial Environmental Report prior to the Effective Date, upon Landlord's or any Fee Mortgagee's request, at any time as Landlord or such Fee Mortgagee has reasonable grounds to believe that Hazardous Materials are or have been released, stored or disposed of or on or around the Leased Premises or that the Leased Premises may be in violation of the Environmental Laws, Tenant will provide, at Tenant's sole cost and expense, an inspection or audit of the Leased Premises prepared by a hydrogeologist or environmental engineer or other appropriate consultant reasonably approved by Landlord and any Fee Mortgagee indicating the presence or absence of the reasonably suspected Hazardous Materials on the Leased Premises or an inspection or audit of the Leased Premises prepared by an engineering or consulting firm reasonably approved by Landlord and any Fee Mortgagee indicating the presence or absence of friable asbestos or substances containing asbestos on the Leased Premises. If Tenant fails to provide such inspection or audit within sixty (60) days after such request, Landlord may order the same, and Tenant hereby grants to Landlord and any Fee Mortgagee and their respective employees and agents access to the Leased Premises upon reasonable notice and a license to undertake such inspection or audit; provided that no such entry shall unreasonably interfere with Tenant's, any SRO Tenant's or any subtenant's use and enjoyment of the Leased Premises. The cost of such inspection or audit, together with interest thereon at the Default Rate from the date of demand by Landlord until actually paid by Tenant, will be promptly paid by Tenant on demand. Notwithstanding the foregoing, any inspection or audit required by this Section 28(f) shall not include environmental tests or sampling unless such tests or sampling are approved by Tenant (not to be unreasonably withheld, conditioned or delayed) or required by Environmental Law.

(g)     Tenant acknowledges that it has had the opportunity to inspect the Leased Premises prior to the Effective Date, and during such time, observe its physical characteristics and existing conditions and the opportunity to conduct such investigation and study on and of the Leased Premises and adjacent areas as Tenant deems necessary, and, except for any claims relating to Landlord's breach of its obligations pursuant to this Lease and except for any Losses resulting from the gross negligence, illegal activity, fraud, or willful misconduct of Landlord or its agents, representatives, employees, invitees or contractors (it being understood that Landlord has no obligation to make any payment or take any action except to the extent expressly required by this Lease), Tenant hereby FOREVER RELEASES AND DISCHARGES Landlord from all responsibility and liability, whether arising before or after the Effective Date, and liabilities under Environmental Laws, regarding the condition, valuation, salability or utility of the Leased Premises, or its suitability for any purpose whatsoever (including, without limitation, with respect to the presence in the soil, air, structures and surface and subsurface waters, of Hazardous Materials or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Leased Premises under current or future Environmental Laws, and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Materials on, under, adjacent to or otherwise affecting the Leased Premises).  Tenant further hereby waives any and all objections and complaints (including, without limitation to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Leased Premises is or may be subject, including, without limitation, Environmental Laws) concerning the physical characteristics and any existing conditions of the Leased Premises, whether arising before or after the Effective Date.  Tenant further hereby assumes the risk of changes in applicable laws and regulations relating to past, present and future environmental conditions on the Leased Premises and the risk that adverse physical characteristics and conditions, including the presence of Hazardous Materials or other contaminants, may not have been revealed by its investigation.

(h)     The indemnity obligations of the Tenant, the release in Section 28(g) above, and the rights and remedies of the Landlord under this Section 28 shall survive the expiration of the Term or the earlier termination of this Lease for a period of two (2) years, provided that Tenant delivers to Landlord an environmental site assessment reasonably acceptable to Landlord which (i) indicates that there are no "recognized environmental conditions" (as defined in the then applicable American Society of Testing and Materials standards for Phase I Environmental Site Assessments) in, on or under the Leased Premises and (ii) does not reveal any contamination of the Leased Premises by Hazardous Materials that could reasonably be expected to result in any material obligation with respect to the Leased Premises or to any Indemnified Party under any applicable Environmental Laws.

29.     **Representations and Warranties of Tenant**.     As a material inducement to Landlord executing this Lease, each Tenant warrants and represents as of the Effective Date to Landlord as follows:

102

(a)      Tenant is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation or formation.  Tenant is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in the state where the Leased Premises is located, and Tenant is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a material adverse effect upon the Leased Premises or Tenant's ability to perform and discharge its obligations under this Lease.  All necessary action has been taken to authorize the execution, delivery and performance by Tenant of this Lease and of the other documents, instruments and agreements provided for herein.

(b)      Tenant is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign limited liability company" or "foreign estate", as those terms are defined in the Code and the regulations promulgated thereunder. Tenant's U.S. Federal Tax Identification number and principal place of business have been provided to Landlord.  Tenant has delivered to Landlord a duly executed IRS Form W-9 certifying that Tenant is exempt from U.S. federal backup withholding.  To Tenant's actual knowledge as of the Effective Date, none of Tenant or any Affiliate of Tenant, and no Person owning directly or indirectly any interest in Tenant or any Affiliate of Tenant, is a Prohibited Person, Tenant is not a party to any lease or sublease with a Prohibited Person in respect of all or any part of the Leased Premises, provided, however, the representations contained in this sentence shall not apply to any Person to the extent that such Person's interest is in or through a U.S. Publicly Traded Entity.

(c)      The person(s) who have executed this Lease on behalf of Tenant are duly authorized to do so. Upon execution by Tenant, this Lease shall constitute the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.

(d)      Except as disclosed to Landlord in writing on or before the Effective Date, there are no suits, actions, proceedings or investigations pending, or, to its knowledge, threatened against or involving Tenant or the Leased Premises before any arbitrator or Governmental Authority, except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a material adverse effect upon the Leased Premises or Tenant's ability to perform and discharge its obligations under this Lease.

(e)      Tenant is not, and the authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in, any breach or default under any document, instrument or agreement to which Tenant or any Affiliate of Tenant is a party or by which Tenant or any Affiliate of Tenant, the Leased Premises or any of the property of Tenant or any Affiliate of Tenant is subject or bound, except for such breaches or defaults which, individually or in the aggregate, have not had, and would not reasonably be expected to

103

result in, a material adverse effect upon the Leased Premises or Tenant's ability to perform and discharge its obligations under this Lease.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not violate any applicable law, statute, regulation, rule, ordinance, code, rule or order other than violations that do not have, and are not reasonably expected to have, a material adverse effect on Landlord, Tenant or the Leased Premises.  The Leased Premises is not subject to any right of first refusal, right of first offer or option to purchase or lease granted to a third party.  Tenant has not assigned, transferred, mortgaged, hypothecated or otherwise encumbered this Lease or any rights hereunder or interest herein.

(f)     All required licenses and permits, both governmental and private, to use and operate the Leased Premises for the Permitted Use are (or will be, upon Substantial Completion) in full force and effect, except for such licenses and permits the failure of which to obtain has not had, and would not reasonably be expected to result in, a material adverse effect upon the Leased Premises or Tenant's ability to perform and discharge its obligations under this Lease.

(g)     All financial information provided by Tenant to Landlord regarding Tenant and its Affiliates (including Guarantor) (collectively, the "Financial Information") is true, correct and complete in all material respects and there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to Landlord.  Tenant understands that Landlord is relying upon the Financial Information and Tenant represents that such reliance is reasonable.  All financial statements included in the Financial Information fairly present as of the date of such financial statements the financial condition of each Person to which they pertain.  No change has occurred with respect to the financial condition of Tenant and/or the Leased Premises as reflected in the Financial Information which has not been disclosed in writing to Landlord or has had, or could reasonably be expected to result in, a material adverse effect upon the Leased Premises or Tenant's ability to perform and discharge its obligations under this Lease.

(h)     Tenant is not and will not be, and is not and will not be acting on behalf of, (i) an "employee benefit plan" within the meaning of Section 3(3) of ERISA, subject to Title I of ERISA, (ii) a "plan" within the meaning of, and subject to, Section 4975 of the Code, or (iii) an entity deemed to hold "plan assets" within the meaning of the Plan Asset Regulations.  None of the transactions contemplated by this Lease are in violation of any state statutes applicable to Tenant that regulate the investments of, and fiduciary obligations with respect to, governmental plans and that are similar to the provisions of Section 406 of ERISA or Section 4975 of the Code.

(i)     Except for Tenant's contributions to the Hotel Union Pension Fund in accordance with the Union MOA, neither Tenant nor any ERISA Affiliate maintains, contributes to, or has any obligation to contribute to, or has any direct or indirect liability with respect to any "employee benefit plan" as defined in Section 3(3) of ERISA (including any "multiemployer plan" as defined in Section 3(37) of ERISA) that is

subject to Title IV or Section 302 of ERISA or Section 412 of the Code.  Except to the extent required to comply with the terms of the Union MOA, Tenant shall take or refrain from taking, as the case may be, such actions as may be necessary to cause the representation and warranty in this paragraph remain true and accurate until the expiration or earlier termination of this Lease.

(j)     The Project Budget does not include any costs, expenses or fees associated with or pertaining to Store Unit or Store Unit Tenant's anticipated renovation, maintenance or operation of the Store Unit. A true, correct and complete copy of the Store Unit Lease has been provided to Landlord.

(k)     As of the Effective Date, the Union MOA (including the IWA, the 32BJ Agreement and the L94 Agreement referenced therein) is the only written or oral agreement that has been entered into by Tenant or any Tenant Party with the Hotel Union, 32BJ, L94 or any other labor union or organization with respect to the Project (or any employees to be employed at the Project). A true, correct and complete copy of the Union MOA has been provided to Landlord prior to the Effective Date.

30.     **Representations and Warranties of Landlord**.   As a material inducement to Tenant executing this Lease, Landlord warrants and represents as of the Effective Date to Tenant as follows:

(a)     Landlord is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation or formation.  Landlord is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in the state where the Leased Premises is located, and Landlord is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a material adverse effect upon the Leased Premises or Landlord's ability to perform and discharge its obligations under this Lease.  All necessary action has been taken to authorize the execution, delivery and performance by Landlord of this Lease and of the other documents, instruments and agreements provided for herein. Landlord is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign limited liability company" or "foreign estate", as those terms are defined in the Code and the regulations promulgated thereunder.  Landlord's U.S. Federal Tax Identification number and principal place of business have been provided to Tenant. Landlord has delivered to Tenant a duly executed IRS Form W-9 certifying that Landlord is exempt from U.S. federal backup withholding. The person(s) who have executed this Lease on behalf of Landlord are duly authorized to do so.  None of Landlord or any Affiliate of Landlord, and no Person owning directly or indirectly any interest in Landlord or any Affiliate of Landlord, is a Prohibited Person; provided, however, the representation contained in this sentence shall not apply to any Person to the extent that such Person's interest is in or through a U.S. Publicly Traded Entity.

(b)     Upon execution by Landlord, this Lease shall constitute the legal, valid and binding obligation of Landlord, enforceable against Landlord in accordance

with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, liquidation, reorganization and other laws affecting the rights of creditors generally and general principles of equity.

(c)    There are no suits, actions, proceedings or investigations pending, or, to its knowledge, threatened against or involving Landlord or the Leased Premises before any arbitrator or Governmental Authority, except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a material adverse effect upon the Leased Premises or Landlord's ability to perform and discharge its obligations under this Lease.

(d)    Landlord is not, and the authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not result in, any breach or default under any document, instrument or agreement to which Landlord or any Affiliate of Landlord is a party or by which Landlord or any Affiliate of Landlord, the Leased Premises or any of the property of Landlord or any Affiliate of Landlord is subject or bound, except for such breaches or defaults which, individually or in the aggregate, have not had, and would not reasonably be expected to result in, a material adverse effect upon the Leased Premises or Landlord's ability to perform and discharge its obligations under this Lease.  The authorization, execution, delivery and performance of this Lease and the documents, instruments and agreements provided for herein will not violate any applicable law, statute, regulation, rule, ordinance, code, rule or order.  Landlord has not assigned, transferred, mortgaged, hypothecated or otherwise encumbered this Lease or any rights hereunder or interest herein.

31.    **Entry by Landlord and Lender**.  Landlord, any Fee Mortgagee and their authorized representatives will have the right upon reasonable notice (which will be not less than two (2) Business Days except in the case of emergency) to enter the Leased Premises at all reasonable business hours (and at all other times in the event of an emergency), for (i) the purpose of inspecting the same or for the purpose of doing any work in accordance with Section 9 above, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise will create or imply any duty upon the part of Landlord or any Fee Mortgagee to make any such inspection) and (ii) the purpose of showing the Leased Premises to prospective investors, purchasers and mortgagees.  No such entry will constitute an eviction of Tenant, but any such entry shall in all events be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's or any subtenant's business, occupancy or operation and so long as Landlord or any Fee Mortgagee does not unreasonably interfere with Tenant's, any SRO Tenant's or any subtenant's use and enjoyment of the Leased Premises.

32.    **Financial Reporting.**  Tenant will submit to Landlord:

(a)    within ten (10) Business Days of the end of each calendar month during the Term until such time as all Enhanced Severance Obligations under the Union

MOA have been satisfied, a written report (which may be in the form of an excel spreadsheet) detailing the status of payment of the Enhanced Severance Obligations under the Union MOA have been delivered to the Union for transmission to the Hotel Employees, a written report (which may be in the form of an excel spreadsheet) detailing the status of payment of the Enhanced Severance Obligations, including, without limitation, (i) a list of all Hotel Employees who have executed releases in accordance with the Union MOA (and an indication as to which of such Hotel Employees the Union has been given checks for the Enhanced Severance due for distribution to the Hotel Employees) and (ii) the aggregate amount remaining in the Enhanced Severance Escrow Account to date;

(b) within ten (10) Business Days following Tenant's payment of all remaining Hotel Union Pension Fund Obligations, a written confirmation from the Hotel Union Pension Fund that all such Hotel Union Pension Fund Obligations have been satisfied in full (but only to the extent Tenant actually receives such a confirmation), and a release from the Hotel Union Pension Fund as to any outstanding withdrawal liability of Tenant with respect to the Project (but only to the extent Tenant actually receives such a release); provided that it shall not be a Default or Event of Default under this Lease in the event that Tenant does not receive either of the foregoing confirmation or release from the Hotel Union Pension Fund;

(c) until the conditions of the second sentence of Paragraph 3 of the Union MOA are satisfied (such date, the "IWA Termination Date"), Tenant shall, within ten (10) Business Days following the end of each fiscal quarter, provide Landlord with (i) a written statement attesting that to the Tenant's knowledge, Tenant has made full and complete wage and wage related payments when due in the ordinary course of business and required contributions to the Hotel Union Pension Fund under the IWA when due in the ordinary course of business, consistent with the Union MOA, and any related agreement with any labor union or organization with respect to the Project, and (ii) an Excel spreadsheet itemizing all such payments and contributions referenced in the preceding clause (i), in a form reasonably satisfactory to Landlord;

(d) from and after the IWA Termination Date, Tenant shall, within ten (10) Business Days following the end of each fiscal quarter, provide Landlord with (i) a written statement attesting that to Tenant's knowledge, Tenant has made full and complete wage and wage related payments when due in the ordinary course of business and benefit fund contributions under the 32BJ CBA, L94 CBA when due in the ordinary course of business, and any related agreement with any labor union or organization pertaining to the Project, and (ii) an Excel spreadsheet itemizing all such payments and contributions referenced in the preceding clause (i), in a form reasonably satisfactory to Landlord;

(e) within ninety (90) days of the end of each of the calendar year following Substantial Completion, annual financial statements, including:

107

(i) a certified balance sheet of Tenant as of the end of such year (certified by Tenant and an independent certified public accounting firm of recognized national or regional standing reasonably acceptable to Landlord (any such accountant, an "Approved Accountant"), a statement of profits and losses of Tenant for such year, and a statement of cash flows of Tenant for such year, setting forth in each case, in comparative form, the corresponding figures for the preceding fiscal year in reasonable detail and scope and each prepared or reviewed by an Approved Accountant and all certified by the chief financial officer or other authorized representative of Tenant; and

(ii) an unaudited balance sheet of Tenant as at the end of any quarter, an unaudited statement of profits and losses of Tenant from operations on the Leased Premises for such quarter, an unaudited statement of cash flows of Tenant for such quarter and, a computation, in reasonable detail, calculating, on a trailing twelve-month basis, the ratio of such cash flows during such period to the Base Rent required to be paid during such period, setting forth in each case, in comparative form, the corresponding figures for the similar quarter of the preceding year (or in the case of an interim balance sheet, to the end of the prior year), in reasonable detail and scope, and certified to be complete and accurate by Tenant's chief financial officer or other authorized representative; the foregoing financial statements all being prepared in accordance with GAAP;

(f) within one hundred twenty (120) days of Landlord's request:

(i) audited annual financial statements for the most recent fiscal year for which audited financial statements are available, which shall include substantially the same information as set forth in clause (a)(i) above;

provided, however, unless an Event of Default is continuing, Landlord shall not request any such audited financial statements more than once per calendar year; and

(g) within thirty (30) days following written request from Landlord (provided Landlord shall be limited to a reasonable amount of requests per Lease Year), such aforementioned balance sheets, income and cash flow statements, rent rolls, and operating statements for Tenant and the Leased Premises, certified to be true and correct in all material respects by the chief financial officer or other authorized representative of Tenant.

(h) If Tenant is a U.S. Publicly Traded Entity, quarterly 10Qs filed with the Securities and Exchange Commission will satisfy the delivery requirement contained

4863-0344-5267, v. 18

in clause (a)(i) herein and copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the delivery requirement contained in clause (c) herein.  The obligations of Tenant will continue whether or not this Lease has been assigned or subleased, unless and until Tenant shall be released from its obligations under this Lease.

(i) Tenant shall furnish to Landlord a full and complete copy of the filed Real Property and Income Expense Statement (or its successor) (the "RPIE") submitted by Tenant to the New York City Department of Finance (or its successor) ("DOF"), pursuant to §11-208.1 of the Administrative Code of the City of New York with respect to the Leased Premises for each annual fiscal period within thirty (30) days after Tenant's submission of the applicable RPIE to DOF (it being understood and agreed that, at all times during the Term, Tenant shall furnish the RPIE to the DOF prior to delinquency as required by Legal Requirements).

(j) Tenant shall deliver to Landlord and to any Fee Mortgagee or purchaser designated by Landlord all federal, state, local and foreign tax returns, reports and other tax-related documents filed by Tenant.  Together with the annual financial statements described above, following Substantial Completion, Tenant shall deliver to Landlord an annual Leased Premises operating expense statements for the Leased Premises which shall include, without limitation, an itemized breakdown of capital expenditures, in detail reasonably satisfactory to Landlord and certified to be complete and accurate by an officer of Tenant.

(k) Tenant shall deliver to Landlord: (i) promptly upon receipt, copies of any energy or emissions audit performed by an energy auditor with respect to the Leased Premises and (ii) at least five (5) Business Days prior to submission to DOB or any other Governmental Authority, copies of any other energy, emissions or environmental reporting required in compliance with Local Law 97 of 2019 or any other Environmental Laws affecting the Leased Premises, including, without limitation, any report required to be filed with DOB or any other Governmental Authority with respect to compliance with the building emissions limit for the Leased Premises, in the form required by DOB or the applicable Governmental Authority.

(l) In addition, not later than thirty (30) days after the end of each of the first three fiscal quarters of Tenant (and forty-five (45) days after the end of the fourth fiscal quarter of Tenant), Tenant shall deliver to Landlord or any Fee Mortgagee, as applicable:

(i) following Substantial Completion, (A) a rent roll of the Residential Leases on the Leased Premises, certified by Tenant, identifying the unit number, rent payable under each Residential Sublease, the security deposits, if any, deposited under such Residential Subleases, and (B) a rent roll for all other Subleases on the Leased Premises that are not Residential Subleases, certified by Tenant, identifying, each Sublease and subtenant (and stating the address of such subtenant to which Notices are to be sent pursuant to the

4863-0344-5267, v. 18

Sublease in question), the applicable subleased premises, the term of each Sublease, the commencement and termination dates of each Sublease, the base, fixed or minimum rent payable under each Sublease, the expansion and extension options contained in such Sublease, the date(s) to which base, fixed or minimum rent under the Sublease has been paid, the security deposits, if any, deposited under such Subleases, whether Notice of default has been given to, or by such subtenant, which has not been cured, and the subtenant's share, if any, of operating expenses and Taxes;

(ii) to the extent not previously provided to Landlord, a true and complete copy of each Sublease and all subsequent amendments thereto or extension notices in connection therewith, certified as true and complete by Tenant;

(iii) with respect to any Commercial Subleases, any financial reports or statements delivered or provided to Tenant, as sublandlord, by any subtenant under any Sublease for which Landlord has delivered to such subtenant a non-disturbance agreement; and

(iv) with respect to all Subleases that are not Residential Subleases, the names of the subtenants thereunder, together with a duplicate original of such Sublease and a certificate from an executive officer of Tenant certifying that, as of the effective date of the Sublease and as of the date of such quarterly reporting, to such officer's actual knowledge (A) neither the subtenants thereunder nor any Person who owns directly or indirectly any interest in any such subtenant is a Prohibited Person and (B) each such subtenant has taken reasonable measures to assure than no Person who owns directly or indirectly any interest in such subtenant is a Prohibited Person.

(m) So long as any Guaranty remains in effect in accordance with its terms, Tenant shall cause each Guarantor to deliver to Landlord as soon as available, but in no event later than ninety (90) days after such Guarantor's fiscal year end (if such Guarantor is an entity) or the calendar year (if such Guarantor is an individual), current financial statements in a form reasonably acceptable to Landlord (including, without limitation, an income and expense statement, balance sheet, and statement of cash flow), together with supporting property and mortgage debt schedules and any other financial information reasonably requested by Landlord for such Guarantor.

(n) If requested by Landlord, so long as any Guaranty remains in effect in accordance with its terms, Tenant shall cause each Guarantor to deliver true, correct, and complete copies of such Guarantor's federal, state and local tax returns to Landlord, within thirty (30) days after the filing of such tax returns.

4863-0344-5267, v. 18

(o)   Within ten (10) Business Days' after receipt of Landlord's written request therefor, so long as any Guaranty remains in effect in accordance with its terms, Tenant shall cause each Guarantor to deliver to Landlord such other supplemental information related to such Guarantor's financial statements as is reasonably requested by Landlord.

(p)   Tenant shall, from time to time, provide such other information reasonably requested by Landlord in connection with Landlord's (or any Landlord affiliate's) qualification as a REIT.

33.   **No Usury**.  The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid will be deemed reduced to such legal rate.

34.   **Broker**.  Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease other than Meridian Capital, whose fee will be paid by Tenant pursuant to a separate written agreement.  Each party hereby agrees to indemnify the other against all claims, damages, costs and expenses incurred by the indemnified party as a result of the breach of the foregoing representation or warranty by the indemnifying party.

35.   **Bankruptcy**.  As a material inducement to Landlord executing this Lease, Tenant acknowledges and agrees that Landlord is relying upon (i) the financial condition and specific operating experience of Tenant and Tenant's obligation to use the Leased Premises for the Permitted Use, (ii) Tenant's timely performance of all of its obligations under this Lease notwithstanding the entry of an order for relief for Tenant under the Title 11 of the United States Code (as amended, the "Bankruptcy Code"), and (iii) all defaults under this Lease being cured promptly and this Lease being assumed within ninety (90) days of any order for relief entered under the Bankruptcy Code for Tenant, or this Lease being rejected within such ninety (90) day period and the Leased Premises surrendered to Landlord.  Accordingly, in consideration of the mutual covenants contained in this Lease and for other good and valuable consideration, Tenant hereby agrees that:

(a)   All obligations that accrue or become due under this Lease (including the obligation to pay rent), from and after the date that a Bankruptcy Action is commenced shall be timely performed exactly as provided in this Lease and any failure to so perform shall be harmful and prejudicial to Landlord.

(b)   Any and all obligations under this Lease that accrue or become due from and after the date that a Bankruptcy Action is commenced and that are not paid as required by this Lease shall, in the amount of such rents, constitute administrative expense claims allowable under the Bankruptcy Code with priority of payment at least equal to that of any other actual and necessary expenses incurred after the commencement of the Bankruptcy Action.

4863-0344-5267, v. 18

(c)     Any extension of the time period within which Tenant may assume or reject this Lease without an obligation to cause all obligations accruing or coming due under this Lease from and after the date that a Bankruptcy Action is commenced to be performed as and when required under this Lease shall be harmful and prejudicial to Landlord.

(d)     Any time period designated as the period within which Tenant must cure all defaults and compensate Landlord for all pecuniary losses which extends beyond the date of assumption of this Lease shall be harmful and prejudicial to Landlord.

(e)     Any assignment of this Lease must result in all terms and conditions of this Lease being assumed by the assignee without alteration or amendment, and any assignment which results in an amendment or alteration of the terms and conditions of this Lease without the express written consent of Landlord shall be harmful and prejudicial to Landlord.

(f)     Any proposed assignment of this Lease to an assignee that does not possess financial condition, operating performance and experience characteristics capable of assuming and performing under this Lease shall be harmful and prejudicial to Landlord.

(g)     The rejection (or deemed rejection) of this Lease for any reason whatsoever shall constitute cause for immediate relief from the automatic stay provisions of the Bankruptcy Code, and Tenant stipulates that such automatic stay shall be lifted immediately and possession of the Leased Premises will be delivered to Landlord immediately without the necessity of any further action by Landlord.

(h)     No provision of this Lease shall be deemed a waiver of Landlord's rights or remedies under the Bankruptcy Code or applicable law to oppose any assumption and/or assignment of this Lease, to require timely performance of Tenant's obligations under this Lease, or to regain possession of the Leased Premises as a result of the failure of Tenant to comply with the terms and conditions of this Lease or the Bankruptcy Code.

(i)     Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as such, shall constitute "rent" for the purposes of the Bankruptcy Code.

(j)     For purposes of this Section 35 addressing the rights and obligations of Landlord and Tenant in the event that a Bankruptcy Action is commenced, the term "Tenant" shall include Tenant's successor in bankruptcy, whether a trustee, Tenant as debtor in possession or other responsible person.

36.     **No Waiver**.  No delay or failure by either party to enforce its rights hereunder will be construed as a waiver, modification or relinquishment thereof.  No failure by Landlord to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy against Tenant consequent upon

a breach thereof shall constitute a waiver of any such breach or of any covenant, agreement, term or condition.  No acceptance of full or partial Rent by Landlord during the continuance of any breach by Tenant shall constitute a waiver of any breach by Tenant or of any covenant, agreement, term or condition.  No covenant, agreement, term or condition of this Lease to be performed or complied with by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord.  No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

37.   **Separability**.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances will to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, will not be affected thereby, and each term and provision of this Lease will be valid and will be enforced to the extent permitted by applicable Legal Requirements.

38.   **Indemnification.**

(a)   To the extent permitted by Legal Requirements, and in addition to any other indemnities to Landlord specifically set forth in this Lease, Tenant shall indemnify, defend, and hold harmless the Indemnified Parties from and against all Losses that may be imposed upon or incurred by or asserted against any Indemnified Party by reason of any of the following occurring during the Term (except, with respect to each indemnification, to the extent caused by the gross negligence, illegal acts, fraud, or willful misconduct of such Indemnified Party):

(i)   Any events or occurrences at, in or about the Leased Premises;

(ii)   The demolition of any Existing Improvements and/or construction of the Project or any future Improvements;

(iii)   Any other work or thing done in, on or about the Leased Premises or any part thereof, including any Alterations or Restorations;

(iv)   Any use, non-use, possession, occupation, restoration, alteration, repair, condition, operation, maintenance or management of the Leased Premises or any part thereof or of any street, alley, sidewalk, curb, vault, passageway or space adjacent thereto;

(v)   Any negligence by Tenant or any subtenant, or any of its or their agents, contractors, servants, employees, or invitees (including under any Sublease);

(vi)   Any accident, injury (including death) or damage to any Person or property occurring in, on or about the Leased Premises or any part

113

thereof or in, on or about any street, alley, sidewalk, curb, vault, passageway or space adjacent thereto;

(vii) Any failure on the part of Tenant to perform or comply with any provision of this Lease on its part to be performed or complied with;

(viii) Any liability that may be asserted against Landlord or any lien or claim that may arise against or on the Leased Premises under any Legal Requirements;

(ix) Any failure on the part of Tenant to comply with any Leasehold Mortgage, other financing documentation, Lease or other contract or agreement affecting the Leased Premises, on Tenant's part to be kept, observed or performed; or

(x) Any contest permitted pursuant to Section 20.

(b) The provisions of this Section 38 and all other indemnity provisions elsewhere contained in this Lease that are granted in favor of either Landlord or Tenant shall survive the Expiration Date or earlier termination of this Lease.

(c) The obligations of Tenant under this Lease shall not in any way be affected by the absence or presence in any case of covering insurance or by the failure or refusal of any insurance carrier to perform any obligation on its part under insurance policies affecting the Leased Premises.

(d) If any claim, action or proceeding is made or brought against any of the Indemnified Parties by reason of any event to which reference is made in Section 38(d), then the following indemnification procedures shall apply. If at any time a claim shall be made or threatened, or an action or proceeding shall be commenced or threatened, against a Indemnified Party, and in any event before seeking to make any payment, consent to the entry of any judgment or award or otherwise settle any such claim that could result in liability of Tenant pursuant to its indemnification obligations under this Lease, the Indemnified Party shall give to Tenant notice of such claim, action, proceeding, settlement or payment; provided, that a failure to provide notice by such Indemnified Party shall not be deemed a failure to comply with these procedures unless Tenant is materially prejudiced thereby. Such notice shall state the basis for the claim, action, proceeding, settlement or payment and the amount thereof (to the extent such amount is determinable at the time when such notice is given), and shall permit Tenant to assume the defense of such claim, action or proceeding (and to prevent the occurrence of such settlement or payment), using the attorneys for, or approved by, Tenant's insurance carrier (if such claim, action or proceeding is covered by insurance) or by such other attorneys from a nationally-recognized law firm as Tenant shall select and Landlord shall approve, such approval not to be unreasonably withheld or delayed. Failure by Tenant to notify Landlord of its election to defend any such claim, action or proceeding or to object to any proposed settlement or payment within thirty (30) days after notice thereof shall have been given to Tenant (it being understood that if response to a filing is

114

4863-0344-5267, v. 18

required within a shorter (i.e., less than 30-day) timeframe under applicable procedural law, then such notification by Tenant must occur before the expiration of such timeframe (so long as Indemnified Party has made Tenant aware of such timeframe reasonably in advance of the expiration thereof)), shall be deemed a waiver by Tenant of its right to defend such claim, action or proceeding or to object to such proposed settlement or payment.  If any claim, action or proceeding gives rise to liability, demands, damages, judgments, costs, fines, penalties, interest, expenses or obligations, only a portion of which relate to matters that are covered by the indemnity provisions of this Lease, then Tenant shall have the right to assume the defense of, and pay the costs attendant to, only the portion of such claim, action or proceeding that relates or gives rise to amounts that would be covered by such indemnity provisions.  Any assumption of the defense of a claim, action or proceeding by Tenant shall be without prejudice to Tenant's rights to challenge subsequently whether the substance of such claim, action or proceeding is covered by the indemnity provisions of this Lease.  If Tenant prevails in any such challenge and it is determined that the substance of the claim, action or proceeding whose defense Tenant assumed was not covered by the indemnity provisions of this Lease, then Landlord shall reimburse Tenant for all out-of-pocket expenses incurred in connection therewith, including reasonable attorneys' fees and disbursements.  If Tenant assumes the defense of such claim, action or proceeding, the Indemnified Party(s) may participate, at its expense, in the defense of such claim, action or proceeding, provided, that subject to the other terms hereof, Tenant shall direct and control the defense of such claim, action or proceeding, and provided, further, that such action does not limit or render void any liability of any insurer of Landlord or Tenant hereunder in respect to the claim or matter in question.  Without limiting any other obligation under this Lease, each party shall cooperate and make available to the other all books and records and such affiliates, partners, principals, officers, directors, employees and agents as are reasonably necessary in connection with the defense.  Tenant shall not, in the defense of such claim, action or proceeding, consent to the entry of any judgment or award, or enter into any settlement, except in either event with the prior consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, unless the proposed settlement fully releases (in a form reasonably acceptable to Landlord) all claims against the Indemnified Parties and Leased Premises.  To the extent Landlord declines to consent to a bona fide offer of settlement or compromise that provides for a release of the type described in the immediately preceding sentence, Tenant shall continue to defend, but the amount of such offer shall be the limit of Tenant's liability with respect to such claim, action or proceeding with respect to the Indemnified Party that declined such offer and Landlord shall bear any excess expense or liability above such limit and Landlord shall indemnify Tenant from and against any such excess.  If Tenant does not assume the defense of any such claim, action or proceeding, Indemnified Party(s) may defend against, or settle, such claim, action or proceeding in such commercially reasonable manner as it may deem appropriate, and receive reimbursement for any and all actual out of pocket costs, expenses, liabilities and damages (including reasonable attorneys' fees and disbursements) incurred in connection therewith.

(e)    Any amounts that become payable by Tenant to any Indemnified Party, or by Landlord to Tenant, under any indemnification provisions of this Lease and

4863-0344-5267, v. 18

that are not paid within thirty (30) days after written demand therefor following payment of such amounts by the indemnifying party shall bear interest at the Interest Rate from the date of such payment by such indemnifying party.

(f)     Each party's obligations to pay all amounts described under this Section 38 shall survive the expiration or earlier termination of this Lease.

39.     **Permitted Encumbrances**.  Tenant agrees that Tenant is obligated to and will perform all obligations of the owner of the Leased Premises, and pay all expenses that the owner of the Leased Premises may be required to pay, in accordance with the Permitted Encumbrances, provided that Tenant has actual knowledge of the need to pay any such expenses.  Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and any Fee Mortgagee against any claim, loss or damage suffered by Landlord or such Fee Mortgagee by reason of Tenant's failure to perform any obligations or pay any expenses as required under any of the Permitted Encumbrances or comply with the terms and conditions of any of the Permitted Encumbrances as hereinabove provided during the term of this Lease, but only to the extent that Tenant has actual knowledge of the need to pay any such expenses prior to the corresponding payment due date thereof.

40.     **Headings**.  The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

41.     **Modifications**.  This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.  Each of Tenant and Landlord agrees that it will not modify or amend this Lease without the written consent of any Fee Mortgagee, which will not be unreasonably withheld, within any period during which there is a Fee Mortgagee hereunder.  In the event of any inconsistent instruction from Landlord and any Fee Mortgagee, Tenant will comply with the instruction of the Fee Mortgagee.

42.     **Successors and Assigns**.  The covenants of this Lease will run with the Land and will inure to the benefit of and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and will inure to the benefit of and bind Landlord, its successors and assigns.  In the event there is more than one Tenant, the obligation of each will be joint and several.  The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, will be limited to mean and include only the owner or owners of Landlord's right, title and interest in and to the Fee Estate and in the event of any transfer or transfers by Landlord of the Fee Estate, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) will be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed; and such assignee shall automatically be deemed to have assumed all of

116

Landlord's obligations arising after the date of such assignment; provided, however, that Landlord named herein or such other grantor, as applicable, shall not be released from any obligations and/or liabilities arising or occurring prior to the date of such assignment.

43.   **Counterparts**. This Lease may be executed in several counterparts, which together will be deemed one and the same instrument. It shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute one and the same instrument. The exchange of executed copies of this Lease by so-called "portable document format" (PDF) transmission shall constitute effective execution and delivery of this Lease as to the parties for all purposes, and signatures of the parties transmitted by PDF shall be deemed to be their original signatures for all purposes.

44.   **Time of the Essence**. Time is of the essence in this Lease and each and every provision hereof in which any date or time is specified.

45.   **Governing Law**. This Lease will be governed by and construed according to the laws of the State, without regard to conflicts of laws principles.

46.   **Third Party Beneficiary**. Any Fee Mortgagee will be deemed a third party beneficiary with respect to all rights and protections expressly afforded to any Fee Mortgage set forth herein. Any Leasehold Mortgagee will be deemed a third party beneficiary with respect to all Mortgagee Protections set forth herein.

47.   **Tenth Floor Purchase Option**.

(a)   Landlord and Tenant acknowledge that (i) as of the Effective Date, Seller has assigned its rights under the Tenth Floor Lease to Landlord pursuant to the Tenth Floor Lease Assignment Agreement and Landlord has subleased the Tenth Floor Unit to Tenant pursuant to the Tenth Floor Sublease, (ii) Tenth Floor Landlord and Landlord are, therefore, parties to the Tenth Floor Lease in respect of the Tenth Floor Unit, (ii) the Tenth Floor Lease includes the Tenth Floor Purchase Option, pursuant to which Landlord is granted the right to purchase the Tenth Floor Unit for the Tenth Floor Purchase Price, and (iii) notwithstanding that the Tenth Floor Lease has been subleased to Tenant pursuant to the Tenth Floor Sublease, the Tenth Floor Purchase Option remains exercisable by Landlord pursuant to the Tenth Floor Lease and Tenth Floor Lease Assignment Agreement.

(b)   Pursuant to the Tenth Floor Lease, Landlord may elect to exercise the Tenth Floor Purchase Option at any time during the Tenth Floor Lease Term, commencing on the Effective Date. Landlord intends to exercise the Tenth Floor Purchase Option prior to the first (1st) anniversary of the Effective Date (such date, the "Tenth Floor Option Outside Date"); however, Landlord shall have the right to exercise the Tenth Floor Purchase Option in accordance with this Section 47 at any time during the Term in its sole and absolute discretion. Notwithstanding the foregoing, in the event that Landlord has not exercised the Tenth Floor Purchase Option by the Tenth Floor Option Outside Date, Tenant may demand Landlord exercise the Tenth Floor Purchase

Option by written notice to Landlord and, thereafter, Landlord shall commence the procedures set forth in this Section 47 to exercise the Tenth Floor Purchase Option in accordance with the terms of the Tenth Floor Lease within five (5) Business Days after receipt of Tenant's notice. If Landlord fails to do so after such five (5) Business Day period has elapsed, Tenant may proceed to exercise the Tenth Floor Purchase Option in accordance with the terms of the Tenth Floor Lease and this Section 47 in Landlord's name and, in such event, Tenant shall perform all obligations of Landlord under Sections 47(c) and 47(d) (subject to Section 47(i)), including, without limitation, the obligation to pay the Tenth Floor Purchase Option Deposit; provided, however, Landlord shall have the right to participate in and be present for (or have its attorney or representative present for) all negotiations, arbitration proceedings or other discussions with Tenth Floor Landlord for the determination of the Tenth Floor Purchase Price (if applicable) and Tenant shall remain responsible for all costs, fees or expenses incurred by Landlord in connection with such determination, including any resulting arbitration.

(c)    Prior to exercising the Tenth Floor Purchase Option, Landlord shall send the Tenth Floor Purchase Option Valuation Notice to Tenth Floor Landlord in accordance with the terms of the Tenth Floor Lease. Landlord shall deliver a copy of such Tenth Floor Purchase Option Valuation Notice to Tenant within two (2) Business Days following Landlord's delivery of same to Tenth Floor Landlord (and shall deliver a copy of same to Leasehold Mortgagee promptly thereafter, provided that Landlord's failure to deliver same to Leasehold Mortgagee shall not result in any liability under this Lease). Tenant shall be entitled to lead any negotiations with Tenth Floor Landlord regarding the determination of the Tenth Floor Purchase Price and each of Landlord and Tenant shall make good faith efforts to negotiate for the Tenth Floor Purchase Price to be equal to or less than $16,000,000.00; provided, however, Landlord (or Tenant, if Tenant is pursuing to exercise the Tenth Floor Purchase Option in accordance with Section 47(b) above) shall have the right to accept any purchase price proposed by the Tenth Floor Landlord during such negotiations in its sole and absolute discretion. If the Tenth Floor Purchase Price is not determined by the parties within thirty (30) days of Tenth Floor Landlord's receipt of the Tenth Floor Purchase Option Valuation Notice in accordance with the Tenth Floor Lease, Landlord shall commence the arbitration procedure set forth in the Tenth Floor Lease and Landlord and Tenant shall mutually select an appraiser that meets the qualifications required by the Tenth Floor Lease. Tenant (or Tenant's representative or attorney, in Tenant's discretion) shall be entitled to be present at and participate in the arbitration proceedings, at its sole cost and expense; provided, however, any decision to be made by or on behalf of Landlord, as tenant under the Tenth Floor Lease, shall be made mutually by Landlord and Tenant. Any costs, fees or expenses payable by Landlord in connection with the arbitration, including any the fees of any arbitrator, shall be borne by Tenant.

(d)    Following determination of the Tenth Floor Purchase Price in accordance with the Tenth Floor Lease, if Landlord elects to exercise the Tenth Floor Purchase Option, Landlord shall send a Tenth Floor Purchase Option Election Notice to Tenant, which notice shall (i) identify the Tenth Floor Purchase Price determined and the amount of the deposit (the "Tenth Floor Purchase Option Deposit") to be delivered to

118

4863-0344-5267, v. 18

Tenth Floor Landlord in accordance with the Tenth Floor Lease (which Tenth Floor Purchase Option Deposit shall be equal to ten percent (10%) of the Tenth Floor Purchase Price), and (ii) attach a copy of the Exercise Notice (as defined in the Tenth Floor Lease) to be delivered to Tenth Floor Landlord, which Exercise Notice shall include a proposed Tenth Floor Purchase Option Closing Date in accordance with the Tenth Floor Lease. Landlord shall send a copy of such Tenth Floor Purchase Option Election Notice to Leasehold Mortgagee promptly after delivery to Tenant, provided that Landlord shall have no liability hereunder for a failure to timely deliver same. Landlord shall fund the Tenth Floor Purchase Option Deposit to the applicable escrow agent for the closing of the Tenth Floor Purchase Option (the "Tenth Floor Escrow Agent") simultaneously with the delivery of the Exercise Notice to Tenth Floor Landlord in accordance with the Tenth Floor Lease; provided, however, Tenant shall be responsible for reimbursement of Tenant's share of the Tenth Floor Purchase Option Deposit to Landlord (which shall be equal to 10% of the Tenth Floor Tenant Purchase Contribution with respect to the determined Tenth Floor Purchase Price), which reimbursement may be effectuated by a true-up of the escrow at the Tenth Floor Purchase Option Closing. For the avoidance of doubt, if Tenant exercises the Tenth Floor Purchase Option in accordance with Section 47(b) above, Tenant shall pay to Tenth Floor Escrow Agent the Tenth Floor Purchase Option Deposit and, in such event, Landlord shall be responsible for reimbursement of Landlord's share of the Tenth Floor Purchase Option Deposit to Tenant (which shall be equal to 10% of the Tenth Floor Buyout Amount with respect to the determined Tenth Floor Purchase Price), which reimbursement may be effectuated by a true-up of the escrow at the Tenth Floor Purchase Option Closing. In no event shall the Election Notice indicate a Tenth Floor Purchase Option Closing Date that is less than thirty (30) days following the date of the Tenth Floor Purchase Option Election Notice.

(e)     No less than five (5) Business Days prior to the scheduled Tenth Floor Purchase Option Closing Date, Tenant shall remit the Tenth Floor Tenant Purchase Contribution to Landlord by wire transfer in immediately available funds. In addition, at the Tenth Floor Purchase Option Closing, Tenant shall remit the Advisory Fee to GLR REIT Advisors, LLC (as designated by Landlord) by wire transfer in immediately available funds. The Tenth Floor Tenant Purchase Contribution funded by Tenant shall be treated as a payment of Additional Rent under this Lease, and Landlord shall thereafter remit the Tenth Floor Tenant Purchase Contribution, together with the Tenth Floor Buyout Amount to the Tenth Floor Escrow Agent on the Tenth Floor Purchase Option Closing Date. For all U.S. federal, state and local tax purposes, the payment of such Additional Rent shall be treated as a prepayment of rent that is characterized as a loan from Tenant to Landlord pursuant to Section 467 of the Code. Such loan shall be amortized in accordance with the additional depreciation made available to Landlord for federal income tax purposes in connection with Landlord's exercise of the Tenth Floor Purchase Option. In such case, further detail regarding the principal, interest and amortization of the loan shall be set forth in a separate agreement between the parties.

(f)     All out-of-pocket costs and expenses incurred by Landlord to exercise the Tenth Floor Purchase Option, including, without limitation, reasonable attorney's fees, closing costs, transfer taxes and costs associated with the negotiation

and/or preparation of any necessary amendment to this Lease to document same, shall be paid by Tenant to Landlord as Additional Rent on demand. If Tenant fails to remit the Tenth Floor Tenant Purchase Contribution as required pursuant to this Section 47, Landlord may, at any time, fund such amounts to the Tenth Floor Escrow Agent and seek reimbursement from Tenant. Tenant's obligation to pay its portion of the Tenth Floor Purchase Option Deposit, the Tenth Floor Tenant Purchase Contribution and any other costs and expenses incurred in connection with the exercise of the Tenth Floor Purchase Option shall survive the expiration or termination of this Lease. To the extent any such costs or expenses incurred by Landlord are capital expenditures taken into account through a charge to capital account or basis for federal income tax purposes (as determined in Landlord's sole judgment), Additional Rent payable under this paragraph shall be treated for federal income tax purposes in a manner consistent with Additional Rent payable pursuant to Section 47(e).

(g)    If the Tenth Floor Landlord shall default in its obligations under the Tenth Floor Lease to convey the Tenth Floor Unit to Landlord, Landlord shall have all the rights and remedies as against Tenth Floor Landlord set forth in the Tenth Floor Lease. Landlord and Tenant shall mutually agree as to any pursuit of remedies against Tenth Floor Landlord.

(h)    Any failure by Tenant to fund its portion of the Tenth Floor Purchase Option Deposit, the Tenth Floor Tenant Purchase Contribution, the Advisory Fee or reimburse Landlord for its expenses pursuant to this Section 47 may be treated as an Event of Default at the discretion of Landlord, provided that Tenant has failed to pay such amounts within five (5) Business Days after receipt of notice from Landlord of the default. In addition, Tenant shall indemnify, defend and save harmless the Landlord and the Indemnified Parties from and against any and all Losses, which may be imposed upon or suffered or incurred by or asserted against any Indemnified Party by reason of, due to or arising out of Landlord's exercise of the Tenth Floor Purchase Option or compliance with the terms and conditions of the Tenth Floor Lease.

(i)    In the event that Tenant exercises the Tenth Floor Purchase Option in accordance with Section 47(b) above and Landlord fails to pay to the Tenth Floor Escrow Agent any portion of the Tenth Floor Buyout Amount at the Tenth Floor Purchase Option Closing and, in lieu thereof, Tenant pays the full amount of the Tenth Floor Purchase Price directly, Landlord shall reimburse Tenant for same within three (3) Business Days of the Tenth Floor Purchase Option Closing Date. Landlord's obligation to pay the Tenth Floor Buyout Amount shall survive the expiration or earlier termination of this Lease. Without limiting the foregoing, if Landlord fails to pay the Tenth Floor Escrow Agent any portion of the Tenth Floor Buyout Amount at the Tenth Floor Purchase Option Closing, Tenant shall be entitled to credit such unpaid amount against any Base Rent or Additional Rent due and payable under the Lease.

(j)    Upon the Tenth Floor Purchase Option Closing Date, the Tenth Floor Unit shall become part of the Leased Premises and all of the applicable terms and conditions of this Lease shall thereafter extend to the Tenth Floor Unit hereunder;

4863-0344-5267, v. 18

provided, that any personal property existing in the Tenth Floor Unit upon the Tenth Floor Purchase Option Closing Date shall be conveyed to Tenant, as the subtenant thereunder. Within thirty (30) days following the Tenth Floor Purchase Option Closing Date, if requested by Landlord, Landlord and Tenant shall execute (i) an amendment to this Lease, prepared by Landlord, to memorialize the addition of the Tenth Floor Unit into the Leased Premises, but failure to execute such amendment shall not affect the inclusion of the Tenth Floor Unit into the Leased Premises and (ii) an amendment to the Memorandum of Lease, which shall be submitted for recording by Landlord with the applicable registrar's office. The cost of such recording, including, without limitation, any and all recording fees and transfer taxes, if any, due upon such recording, shall be paid by Tenant as and when due.

(k)   In the event of any dispute between Tenant and Landlord with respect to the matters described in this Section 47 (including, without limitation, whether to and the nature and scope of any remedies to seek against Tenth Floor Landlord in the event of a default under the Tenth Floor Purchase Option), the same shall be resolved by arbitration pursuant to Section 50 hereof.

48.   **New Construction; Fallback Business Plan.**

(a)   Landlord hereby acknowledges that, in order for Tenant to achieve Substantial Completion of the Multifamily Project, Tenant must satisfy the CONH Requirement with respect to certain components of the work to be performed at the Leased Premises, as further set forth in the Project Plans and Specifications. Notwithstanding the foregoing, Tenant shall, at its sole cost and expense, promptly after the Effective Date commence construction of the Multifamily Project (the date of such commencement, the "Commencement Date") to the extent the work comprising the Multifamily Project does not require Tenant to satisfy the CONH Requirement. Thereafter, the Tenant shall proceed with reasonable diligence and continuity to Complete the Multifamily Project in accordance with the Project Plans and Specifications, all Legal Requirements and such other terms and conditions set forth in the Work Letter and the Construction Loan Documents. The Multifamily Project constitutes a Material Alteration consented to and approved by Landlord. Nothing contained in this Section 48 releases Tenant from any of its obligations under this Lease.

(b)   In the event that Tenant satisfies the CONH Requirement with respect to the entire Leased Premises by the CONH Requirement Outside Date, Tenant shall diligently pursue completion of the Multifamily Project in accordance with the Work Letter and cause Substantial Completion of the Multifamily Project to occur by no later than the Required Substantial Completion Date, subject to delays caused by events of Force Majeure (subject to the Force Majeure Cap).

(c)   In the event that Tenant does not satisfy the CONH Requirement with respect to the entire Leased Premises by the CONH Requirement Outside Date, Landlord may, at its option at any time on or following the CONH Requirement Outside Date, deliver notice (the "Fallback Business Plan Notice") to Tenant that Tenant shall

121

thereafter be required to pursue a Fallback Project with respect to the Leased Premises. Landlord shall send a copy of such Fallback Business Plan Notice to Leasehold Mortgagee promptly after delivery to Tenant, provided that Landlord shall have no liability hereunder for a failure to timely deliver same. Within ninety (90) days following the date of the Fallback Business Plan Notice, which date shall be set forth in the Fallback Business Plan Notice (such date, the "Fallback Business Plan Delivery Date"), Tenant shall deliver to Landlord for its review and consideration, the Fallback Business Plan. Unless otherwise required in accordance with this Lease, Tenant shall not be required to withdraw any pending CONH Exemption Application or CONH Application with respect to the Multifamily Project in connection with its preparation and delivery of the Fallback Business Plan. The Fallback Project to be constructed in accordance with the Fallback Business Plan shall constitute a Material Alteration requiring the consent of Landlord in accordance with Section 13. In connection with Landlord's review and approval of the Fallback Business Plan, it shall be reasonable for Landlord to reject Tenant's Fallback Business Plan if (i) Landlord determines, in its reasonable discretion in consultation with its Construction Consultant, that it is unlikely that Tenant will be able to achieve Substantial Completion of the Fallback Project by the Required Substantial Completion Date with respect to such Fallback Project or (ii) Tenant and/or Guarantor does not have, in Landlord's reasonable discretion, sufficient financial resources and liquidity (including, without limitation, access to additional equity or debt financing) to execute the Fallback Project in accordance with the Fallback Business Plan. Notwithstanding the foregoing, Landlord's approval of the Fallback Business Plan and any revised Project Plans and Specifications that constitute a part of such Fallback Business Plan shall not be subject to Landlord's deemed approval in accordance with Section 13(d)(ii). In the event of any dispute between Tenant and Landlord with respect to the matters described in this Section 48(b), the same shall be resolved by arbitration pursuant to Section 50 hereof.

(d)    The Total Project Costs to be paid in connection with the Construction Project shall be paid (i) first, through contributions by Tenant of Tenant's Equity Contribution until the full amount of Tenant's Equity Contribution has been expended for Total Project Costs set forth in the Project Budget, and (ii) second, through disbursements by Construction Lender of the Construction Loan.  To the extent that Total Project Costs exceed the sum of the amounts paid or disbursed by Tenant of Tenant's Equity Contribution, and by Construction Lender of advances of the Construction Loan, such excess shall be paid through cash contributions by Tenant in the amount necessary to pay all remaining Total Project Costs.

(e)    Guarantor has concurrently with Tenant's execution and delivery of this Lease executed the Project Guaranties and the Indemnity Agreement.  Tenant has executed and delivered to Landlord (i) the Environmental Indemnity and the Indemnity Agreement and (ii) Certificate and Assignment of Architect's Contract and Plans and Specifications and Permits Consent and Certification, in the same form as Construction Loan requires.

4863-0344-5267, v. 18

(f)    Without the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed), Tenant shall not materially amend, modify or supplement any of the Construction Loan Documents.  Tenant shall provide to Landlord true, correct and complete copies of all of the Construction Loan Documents and, from time to time, shall deliver copies of all amendments, modifications or supplements to same.

### 49.    **Certificate of No Harassment; Tenant Protection Plan.**

(a)    Landlord acknowledges and agrees that, in order for Tenant to achieve Substantial Completion of the Multifamily Project in accordance with Legal Requirements, Tenant must (i) satisfy the CONH Requirement with respect to the entire Leased Premises and (ii) comply with a Tenant Protection Plan approved by DOB. As of the Effective Date, Landlord has received (A) a complete copy of the CONH Exemption Application(s) with respect to the entire Leased Premises for the Special Clinton District (together with all backup materials required pursuant to the CONH Regulations), by either two separate applications as one for each of the Modified Hotel Unit and the EBC Unit or one combined application for both, which CONH Exemption Application(s) have been reviewed and approved by Landlord and (B) a complete copy of a CONH Application(s) with respect to the entire Leased Premises for the SRO (together with all backup materials required pursuant to the CONH Regulations), by either two separate applications as one for each of the Modified Hotel Unit and the EBC Unit or one combined application for both, which CONH Application(s) have been reviewed and approved by Landlord. As of the Effective Date, Tenant (or its counsel) has completed a full administrative review of the historic use and operation of the Leased Premises (including, without limitation, historic DOB, HPD and other violations issued by any Governmental Authority with respect to the Leased Premises and litigation proceedings filed and other grievances brought by any SRO Tenants) (such review, an "Administrative Review") for the SRO Lookback Period to determine if there is any reasonable evidence that would be likely to result in (or otherwise support) a Finding of Harassment by HPD pertaining to the SRO Lookback Period. The results of such Administrative Review (together with all backup information pertaining thereto) have been provided to Landlord as of the Effective Date.

(b)    Within sixty (60) days following the Effective Date, Tenant shall direct its counsel to perform a full Administrative Review for the Special Clinton District Lookback Period, the results of which (together with all backup information pertaining thereto) shall be provided to Landlord no later than seventy-five (75) days following the Effective Date, which shall be set forth in a memorandum or legal opinion from Kucker Marino Winiarsky & Bittens, LLP or such other counsel reasonably acceptable to Landlord. Notwithstanding the foregoing, in the event that Tenant receives a CONH Exemption Approval for the Leased Premises under the Special Clinton District Regulations prior to completing the Administrative Review for the Special Clinton District Lookback Period, Tenant shall no longer be required to comply with this Section 49(b).

123

(c)   In furtherance of the foregoing, Tenant shall make best efforts to satisfy the CONH Requirement prior to the CONH Requirement Outside Date and shall do so exclusively in the manner set forth below unless modifications to this procedure are approved by Landlord in its sole and absolute discretion:

(i)   within ten (10) Business Days after the Effective Date (as shall be extended on a day-for-day basis due to events of Force Majeure, not to exceed sixty (60) days after the Effective Date), Tenant shall submit (x) the CONH Exemption Application for the Special Clinton District approved by Landlord to HPD and (y) the Tenant Protection Plan approved by Landlord to DOB;

1.   if Tenant receives notice from HPD (via e-mail, phone, fax or written notice) that Tenant's CONH Exemption Application has been approved (such notice, a "CONH Exemption Approval") under the Special Clinton District Regulations, Tenant shall within ten (10) Business Days of receipt of the CONH Exemption Approval submit to DOB applications for all other Permits that are necessary to achieve Substantial Completion of the Multifamily Project in accordance with the Project Plans and Specifications and all Legal Requirements;

(A)   if Tenant receives all Permits from DOB as are necessary to complete the Multifamily Project based on the CONH Exemption Approval under the Special Clinton District Regulations, Tenant shall diligently proceed to Complete the Multifamily Project;

(B)   If Tenant's applications for any such Permits are denied or any such Permits issued by DOB are subsequently revoked by DOB, in each case, on the basis that Tenant did not satisfy the CONH Requirement as to the SRO, Tenant shall promptly notify Landlord of such denial or revocation, as applicable, and submit the CONH Application for the SRO (in electronic or digital format, together with a printed copy and all required documentation and signatures and payment of the any required fees) approved by Landlord within thirty (30) days thereafter (it being agreed that any modifications, supplements or updates to the CONH Application received by Landlord shall be reviewed and approved by Landlord prior to submission to HPD, such approval not to be unreasonably withheld, conditioned or delayed);

124

2. if Tenant receives notice from HPD (via e-mail, phone, fax or written notice) that Tenant's CONH Exemption Application with respect to any portion of the Leased Premises has been denied (any such notice, a "CONH Exemption Denial") under the Special Clinton District Regulations, Tenant shall deliver a copy of such notice to Landlord promptly upon receipt and submit to HPD the CONH Application for the Special Clinton District (in electronic or digital format, together with a printed copy and all required documentation and signatures and payment of the any required fees) approved by Landlord within thirty (30) days after receipt of the CONH Exemption Denial (it being agreed that any modifications, supplements or updates to the CONH Application received by Landlord shall be reviewed and approved by Landlord prior to submission to HPD, such approval not to be unreasonably withheld, conditioned or delayed); and

(ii) if after submitting a CONH Application to HPD in accordance with this Section 49(c), Tenant receives notice from HPD (via e-mail, phone, fax or written notice) that Tenant's CONH Application with respect to any portion of the Leased Premises has been denied (any such notice, a "CONH Application Denial"), Tenant shall deliver of a copy of such CONH Application Denial to Landlord and receipt of such CONH Application Denial shall be deemed to constitute Landlord's delivery of a Fallback Business Plan Notice to Tenant in accordance with Section 48(c).

(d) The following shall apply if Tenant submits (or is required to submit) a CONH Application for the Leased Premises for the SRO or the Special Clinton District in accordance with Section 49(c):

(i) In no event shall Tenant submit a CONH Application for the Special Clinton District without completing an Administrative Review for the Special Clinton District Lookback Period and determining, in Tenant's and Landlord's mutual, reasonable discretion, that there is no reasonable evidence that would be likely to result (or otherwise support) a Finding of Harassment, such that submitting a CONH Application for the Special Clinton District would be detrimental to the Project.

(ii) The parties acknowledge and agree that, under current CONH Regulations, (i) if Tenant submits a CONH Application and Tenant receives a notice from HPD of a Finding of Harassment by HPD, Tenant will no longer be permitted to withdraw the

CONH Application and (ii) if a CONH Application Denial is issued for any portion of the Leased Premises, for a period of thirty-six (36) months after such notice is received, neither Tenant nor any subsequent owner, tenant or other party will be permitted to re-apply for a CONH with respect to any portion of the Leased Premises. As such, if at any time a CONH Application Denial or Finding of Harassment seems likely or imminent, Tenant acknowledges and agrees that it would be in the best interests of the Project to withdraw the CONH Application and Tenant shall make best efforts to do so.

(iii) If, at any time prior to Tenant's receipt of a Finding of Harassment, Tenant or Landlord (or their respective counsels) reasonably believes that HPD could determine that reasonable cause exists for a Finding of Harassment (due to the receipt of any particular communication, comment or notice from HPD with respect to a pending CONH Application or otherwise), such party shall immediately notify the other party (any such notice, a "CONH Withdrawal Notice") and include in such CONH Withdrawal Notice the basis for such party's conclusion that reasonable cause exists for a finding of harassment by HPD. Upon receipt or delivery, as applicable, of such CONH Withdrawal Notice, Tenant shall immediately withdraw the CONH Application; provided, however, if either Landlord or Tenant disagrees with the determination that a Finding of Harassment is reasonably likely to occur, either party may notify the other of its disagreement and the parties will discuss with their respective counsels in good faith for a period of up to ten (10) Business Days (such period, the "Discussion Period"). Unless both Landlord and Tenant mutually agree not to withdraw the CONH Application by the end of such Discussion Period, Tenant shall immediately commence the process of withdrawing the CONH Application at such time. If Tenant fails to commence such withdrawal within ten (10) Business Days of receipt or delivery, as applicable, of the CONH Withdrawal Notice (or, if a dispute arises over whether a Finding of Harassment is likely, within ten (10) Business Days of termination of the Discussion Period), it shall, at Landlord's option, be an automatic Event of Default. Landlord shall have the right to cause such withdrawal by notifying HPD directly on behalf of Tenant and Tenant shall cooperate with Landlord's efforts to do so (including, without limitation, by submitting any notices or communications to HPD as may be required to withdraw the CONH Application).

126

(iv) If Tenant withdraws its CONH Application in accordance with clause (iii) above at any time prior to the CONH Requirement Outside Date and Tenant desires to prepare a revised CONH Application and re-submit such CONH Application to HPD, Tenant shall notify Landlord (such notice, a "CONH Re-Application Notice") of such intention and Landlord shall reasonably assess the likelihood that Tenant may succeed in obtaining a CONH for any portion of the Leased Premises by such re-submission. Within fifteen (15) Business Days after receipt of Tenant's CONH Re-Application Notice, Landlord shall notify Tenant (such notice, the "CONH Re-Application Decision Notice") of its decision as to whether (x) Tenant shall be permitted to prepare a revised CONH Application and reapply to HPD to satisfy the CONH Requirement with respect to all or any portion of the Leased Premises or (y) Tenant shall be required to abandon all efforts to satisfy the CONH Requirement and, instead, pursue a Fallback Project.

1. If Landlord delivers Tenant a CONH Re-Application Decision Notice in accordance with clause (x) above, Tenant shall promptly submit a revised CONH Application to Landlord for review and approval and, following Landlord's approval of such revised CONH Application, submit such revised CONH Application to HPD.

2. If Landlord delivers Tenant a CONH Re-Application Decision Notice in accordance with clause (y) above, such notice shall be deemed to constitute a Fallback Business Plan Notice in accordance with Section 48(c).

(e) At all times during the construction of the Project (whether Tenant is pursuing the Multifamily Project or the Fallback Project in accordance with the terms and provisions of this Lease and the Work Letter), Tenant shall comply with all requirements of the Tenant Protection Plan submitted to DOB.

(f) Within five (5) Business Days of receipt of any communications (via e-mail, phone, fax or written notice) from DOB with respect to the Tenant Protection Plan, the Project or any SRO Tenant, notify Landlord of such communication and, if applicable, deliver a copy of any such communication to Landlord.

(g) Within five (5) Business Days of receipt of any grievance, notice or complaint from any SRO Tenant with respect to such SRO Tenant's unit or the Project, deliver a copy of such grievance, notice or complaint to Landlord and promptly propose to Landlord how to respond and resolve same with the SRO Tenant. Tenant shall not communicate any such response to any SRO Tenant or commence a resolution of any

4863-0344-5267, v. 18

grievance with an SRO Tenant without Landlord's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed).

(h)    Within five (5) Business Days of receipt of any communications (via e-mail, phone, fax or written notice) from HPD with respect to the CONH Exemption Application, the CONH Application, the Project or any SRO Tenant, notify Landlord of such communication and, if applicable, deliver a copy of any such communication to Landlord. In addition, any supplemental or revised CONH Exemption Applications to be submitted to HPD following receipt of CONH Exemption Denial, or otherwise submitted to HPD in responses to communications or inquiries received by HPD shall be reviewed and approved by Landlord prior to submission to HPD (such approval not to be unreasonably withheld, conditioned or delayed); provided, however, Landlord hereby acknowledges that the CONH Exemption Application and CONH Application may be subject to amendment, modification and/or supplement as required by HPD and any such amendments, modifications or supplements required to be made by HPD shall be promptly made by Tenant and delivered to Landlord following submission to HPD.

(i)    Tenant shall not respond to any questions, communications or notices received from HPD with respect to the CONH Exemption Application, the CONH Application or the Project without Landlord's review and approval of any such proposed responses and Landlord shall be copied on, included in or afforded the right to have a representative present during any and all meetings, calls or other communications with HPD regarding the CONH Exemption Application, the CONH Application or the Project.

(j)    If Tenant is in default under any of its obligations under this Section 49, a monetary default has occurred and is continuing, or an Event of Default is continuing, Landlord shall have the right to take over as the applicant on any CONH Exemption Application or CONH Application pending with HPD and Tenant shall promptly, upon request from Landlord, turn over any and all records with respect to such CONH Exemption Application and CONH Application and cooperate with any reasonable requests of Landlord to execute any notices, affidavits or communications with HPD regarding same (including by power of attorney to the extent necessary and enforceable).

(k)    Any and all reasonable out-of-pocket costs and expenses incurred by Landlord in connection with its oversight, review and approval of the various applications and processes required for Tenant to satisfy the CONH Requirement (including any out-of-pocket costs or expenses incurred in connection with transferring the applicable applications to Landlord following a default by Tenant under this Lease) shall be paid by Tenant within ten (10) Business Days of demand therefor from Landlord, along with documentation supporting the applicable costs and expenses incurred. Tenant's obligation to pay such costs and expenses shall survive the expiration or earlier termination of this Lease.

128

(l)    In the event of any dispute between Tenant and Landlord with respect to the matters described in this Section 49, the same shall be resolved by arbitration pursuant to Section 50 hereof.

50.    **Arbitration.**

(a)    In such cases where this Lease provides for the settlement of a dispute or question (each, a "Dispute") by arbitration, such Dispute shall be resolved by final and binding arbitration.   The arbitration shall be in accordance with the then prevailing Expedited Procedures of the Arbitration Rules for the Real Estate Industry of the American Arbitration Association ("AAA") or the successor of said procedures, except that the procedures shall be modified as follows:

(i)    There shall be three arbitrators.

(ii)    The party commencing arbitration (the "First Party") shall specify the name and address of the person to act as the arbitrator on the First Party's behalf.

(iii)    Within fifteen (15) days after the service of the demand for arbitration, the party receiving service of demand for arbitration from the First Party (the "Second Party") shall give notice to the First Party specifying the name and address of the person designated by the Second Party to act as arbitrator on its behalf, which arbitrator shall be similarly qualified.

(iv)    No arbitrator under this Section 50 shall be an employee of or counsel to Landlord or Tenant (or of an Affiliate of Landlord or Tenant), and each arbitrator under this Section 50 shall have at least twenty (20) years of experience in the County of New York, City and State of New York in commercial real estate.

(b)    Within ten (10) Business Days after the appointment of the arbitrator of the Second Party, the two party-appointed arbitrators so chosen shall appoint a third arbitrator, who shall be a competent and impartial person with qualifications satisfying those required of the first two arbitrators pursuant to Section 50(a).  If they are unable to agree upon such appointment within five (5) Business Days after expiration of such ten (10) Business Day period, the third arbitrator shall be selected by the parties themselves within five (5) Business Days after expiration of the foregoing five (5) Business Day period.

(c)    If any arbitrator appointment is not made timely under this Section 50, then either party may request the appointment be made within ten (10) Business Days by the AAA or its successor.  Each party shall pay the fees and expenses of its respective arbitrator and both shall share equally the fees and expenses of the third arbitrator. Attorneys' fees and expenses of counsel and of witnesses for the respective parties shall be paid by the respective party engaging such counsel or calling such witnesses.

4863-0344-5267, v. 18

(d)   In the event of a failure, refusal or inability of any arbitrator to act, his or her successor shall be appointed, within ten (10) Business Days, by Landlord or Tenant in the case of the party-appointed arbitrators, and jointly by the parties in the case of the third arbitrator.  If an appointment is not made timely pursuant to this Section 50(d), the arbitrator shall be appointed, at the request of any party, within ten (10) Business Days, by the AAA or its successor.

(e)   Any award issued by the arbitrators shall be final and binding on the parties.  Judgment on the award rendered by the arbitrators may be enforced and entered in any court having jurisdiction.

(f)   By agreeing to arbitration, the parties do not intend to deprive any court of its jurisdiction under Section 50(g) to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings.  In the exercise of their authority to resolve the merits of any Dispute, the arbitral tribunal shall have full authority to grant provisional remedies or to order the parties to request that a court modify or vacate any temporary or preliminary relief issued by a court, and to award damages for the failure of any party to respect the arbitral tribunal's orders.

(g)   The parties irrevocably consent and agree that (i) any action brought to compel arbitration or in aid of arbitration in accordance with the terms of this Lease, (ii) any action confirming and entering judgment upon any arbitration award, and (iii) any action for eviction or temporary injunctive relief to maintain the status quo or prevent irreparable harm, may be brought in the courts of the State of New York in New York County or the United States District Court for the Southern District of New York and for that purpose each of the parties hereby expressly and irrevocably submits itself to the jurisdiction of such courts.  Each party irrevocably waives any objection to venue or jurisdiction on its person or assets, including any objection to the laying of venue or based on the grounds of *forum non conveniens* or any right of objection to jurisdiction on account of its place of incorporation or domicile.

(h)   To the extent that Landlord has a right to participate in any arbitration proceeding, the Fee Mortgagee may reasonably participate in such proceeding; and to the extent that Tenant has a right to participate in any arbitration proceeding, the most senior Leasehold Mortgagee may reasonably participate in such proceeding.

51.   **Right to Perform.**

(a)   Subject to the rights of Leasehold Mortgagees, if Tenant at any time fails to (i) pay any Taxes in accordance with the provisions hereof, (ii) obtain, pay for, maintain or deliver any of the insurance policies that Tenant is required to obtain, pay for, maintain or deliver in accordance with the terms of this Lease or (iii) perform any other act on its part to be made or performed and, in each case, such Default shall continue beyond the notice and cure period hereunder applicable thereto, if any, then, in any such event, Landlord, without waiving or releasing Tenant from any obligation of Tenant

130

contained in this Lease, may (but shall be under no obligation to): (A) pay any Taxes required to be paid by Tenant pursuant to the provisions hereof; (B) obtain, pay for and maintain any of the insurance policies that Tenant is required to obtain, pay for and maintain in accordance with the terms of this Lease; or (C) perform any other act on Tenant's part to be made or performed as provided in this Lease, and may enter upon the Leased Premises (subject to the terms and conditions of this Lease) for such purpose and take all such action thereon as may reasonably be necessary therefor, provided that no such entry shall unreasonably interfere with Tenant's, any SRO Tenant's or any subtenant's use and enjoyment of the Leased Premises.

(b)    All sums so paid by Landlord and all reasonable costs and expenses incurred by Landlord in connection with the performance of any such act permitted to be taken by Landlord under Section 51(a), together with interest thereon at the Default Rate from the respective dates of Landlord's making of each such payment or incurring of each such sum, cost, expense, charge, payment or deposit, shall be paid by Tenant to Landlord within thirty (30) days after demand therefor, along with documentation supporting such costs and expenses incurred. Any payment or performance by Landlord pursuant to the provisions of Section 51(a) shall not be nor be deemed to be a waiver or release of the breach or Default of Tenant with respect thereto or of the right of Landlord to terminate this Lease, institute summary proceedings and/or take such other action as may be permissible hereunder if a Default by Tenant shall have occurred and be continuing. Landlord shall not be limited, in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force insurance in accordance with this Lease, to the amount of the insurance premium or premiums not paid, but Landlord also shall be entitled to recover, as damages for such breach, the uninsured amount of any loss and damages, costs and expenses of suit, including reasonable attorneys' fees, suffered or incurred by reason of damage to or destruction of the Leased Premises.

52.    **Entire Agreement.**    This Lease, the Project Guaranties, the Indemnity Agreement, the ancillary agreements expressly referred to in this Lease, the Tenth Floor Sublease, and all exhibits attached to this Lease (collectively, the "Lease Documents") contain the entire understanding between Landlord and Tenant with respect to the Leased Premises and are intended to be a full integration of all prior or contemporaneous agreements, conditions, understandings or undertakings between them with respect thereto.  There are no promises, agreements, conditions, undertakings, understandings, warranties or representations, whether oral, written, express or implied, between Landlord and Tenant with respect to the Leased Premises other than as are expressly set forth in the Lease Documents.

53.    **Waiver of Trial by Jury.**    LANDLORD AND TENANT IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS LEASE.

54.    **Exhibits.**  All exhibits attached to this Lease are incorporated by this reference as if fully set forth in this Lease.

55.    **Prevailing Party Attorneys' Fees**.  If either party brings an action or proceeding in any court of competent jurisdiction to enforce its rights or the other party's obligations under this Lease (including any proceeding brought by Landlord with respect to the collection of Rent), then the prevailing party in such action or proceeding (as determined pursuant to a final and non-appealable order or judgment of a court of competent jurisdiction) shall be entitled to be reimbursed by the non-prevailing party for all reasonable attorneys' fees and disbursements incurred by the prevailing party in connection with such action or proceeding. If neither party prevails in such action or proceeding, or if both parties prevail in part in such action or proceeding, then such court shall determine whether, and the extent to which, one party shall reimburse the other party for all or any portion of the reasonable attorneys' fees and disbursements incurred by such other party in connection with such action or proceeding.

56.    **Penthouse Unit, Supermarket Unit and Store Unit.**

(a)    Landlord and Tenant hereby acknowledge that, as of the Effective Date, (i) Store Unit Tenant is the tenant under the Store Lease with respect to the Store Unit, pursuant to the Store Unit Lease Assignment, (ii) Store Unit Owner is the Unit Owner under the Condominium Documents with respect to the Store Unit, (iii) each of the Penthouse Unit and Supermarket Unit are owned and/or leased by third parties unrelated to Tenant and neither Tenant nor Landlord has any right, title or interest in the Penthouse Unit or Supermarket Unit, and (iv) Landlord has no right, title or interest in the Store Unit or the Store Unit Lease.

(b)    Landlord further acknowledges that Store Unit Tenant may renovate the Store Unit and may use or sublease such Store Unit to a third party operator, each at its own sole cost and expense. As of the Effective Date, the Construction Loan does not include any holdbacks, reserves or advances for the renovation of the Store Unit and, therefore, (i) Tenant shall not use any funds received from Construction Lender out of proceeds of the Construction Loan to pay for (or seek reimbursement on account of) any costs or expenses associated with the renovation, maintenance, or operation of the Store Unit, (ii) Tenant shall not include any such costs or expenses in the Project Budget and (iii) Tenant shall not permit the use or renovation of the Store Unit in any way that Tenant reasonably believes could be expected to trigger the Snap Back Provision (including, without limitation, for a food and beverage operation in the nature of a restaurant, deli or coffee shop, private membership club, or the rental of residential units for periods of less than one (1) year). In the event that Landlord determines that Tenant has breached the covenants set forth in this Section 56(b), it shall be an immediate Event of Default under this Lease. For the avoidance of doubt, nothing contained herein shall be deemed to prohibit Store Unit Owner from using or permitting the use of the Store Unit for any lawful purpose, provided that neither the Store Unit Tenant nor any other Tenant Party is in possession of the Store Unit or otherwise party to the Store Unit Lease.

(c)    In the event that Tenant or any affiliate of Tenant (collectively, a "Tenant Party"), at its own cost, enters into negotiations with any third party to acquire a fee simple interest in any of the Store Unit, the Penthouse Unit, or the Supermarket

132

Unit from the applicable Unit Owner (each, a "Unit Purchase Option"), the following shall apply:

> (i) Within five (5) Business Days of receipt of the offer for such Unit Purchase Option, Tenant shall notify Landlord in writing, which notice (as to any Unit, the "Unit Purchase Option Notice") shall:
>
>> 1. if such Unit Purchase Option is as to the Penthouse Unit, include the proposed purchase price (the "Unit Purchase Price") for the Penthouse Unit (together with an appraisal or such other information used by the Tenant Party to determine the appropriate price for the Unit Purchase Option), copies of any and all documents, instruments, and agreements governing the Unit Purchase Option (collectively, the "Unit Purchase Option Documents"), and the proposed date of closing of the Unit Purchase Option (which shall be no sooner than thirty (30) days following the date of the Unit Purchase Option Notice); or
>>
>> 2. if such Unit Purchase Option is as to the Store Unit or the Supermarket Unit, set forth the proposed date of closing of the Unit Purchase Option.
>
> (ii) The terms and conditions of any such Unit Purchase Option for the Penthouse Unit and all Unit Purchase Option Documents as to the Penthouse Unit shall be subject to Landlord's approval (not to be unreasonably withheld, conditioned or delayed).
>
> (iii) Prior to the closing of the applicable Unit Purchase Option (each, a "Unit Purchase Option Closing Date"), Landlord shall provide to Tenant the following:
>
>> 1. if the Unit Purchase Option is as to the Penthouse Unit, drafts of any amendments or assignments of the Unit Purchase Option Documents and any other documents, instruments and agreements as are reasonably necessary in Landlord's reasonable discretion to convey the Penthouse Unit to Landlord and add the Penthouse Unit to the Leased Premises (it being agreed that, in connection with the closing of the Unit Purchase Option, the Tenant Party's rights to acquire the Penthouse Unit shall be conveyed to Landlord and Landlord shall lease the Penthouse Unit to Tenant pursuant to this Lease or a separate lease on substantially similar terms, with a term co-terminus with the Term of this Lease); or
>>
>> 2. if the Unit Purchase Option is as to the Store Unit or the Supermarket Unit, a draft agreement or memorandum to be recorded with the New York City Registrar's Office, which

4863-0344-5267, v. 18

agreement shall run with the land underlying such Unit and prohibit such Tenant Party and any subsequent owner, tenant or occupant from using such Unit (i) for any Prohibited Use or (ii) for any purpose that would be reasonably likely to trigger the Snap Back Provision (such agreement, the "Use Covenant"). The final form of the Use Covenant shall be subject to Tenant's approval (not to be unreasonably withheld, conditioned or delayed). The cost of recording the Use Covenant, including, without limitation, any and all recording fees and transfer taxes, if any, due upon such recording, shall be paid by Tenant as and when due.

(iv) Solely with respect to a Unit Purchase Option for the Penthouse Unit, the applicable Tenant Party shall arrange for (at Tenant's sole cost and expense) Landlord obtaining an owner's title insurance policy with respect to the Penthouse Unit, which shall only be subject to such exceptions, liens and encumbrances as are approved by Landlord in its reasonable discretion and shall include any and all endorsements reasonably requested by Landlord and available from the applicable title company issuing such policy. The cost of any title premiums and endorsements with respect to obtaining such title insurance shall be paid by Tenant or the applicable Tenant Party at the closing of such Unit Purchase Option.

(v) All out-of-pocket costs and expenses incurred by Landlord to exercise the applicable Unit Purchase Option, including, without limitation, reasonable attorney's fees, escrow fees, closing costs and costs associated with the negotiation and/or preparation of any Unit Purchase Option Documents and the Use Covenant (if applicable), shall be paid by Tenant (or the applicable Tenant Party) to Landlord as Additional Rent payable within ten (10) days after notice from Landlord along with documentation supporting the applicable costs and expenses incurred. Tenant's obligation to pay such costs and expenses shall survive the expiration or termination of this Lease.

(vi) Tenant shall indemnify, defend and save harmless the Landlord and the Indemnified Parties from and against any and all Losses, which may be imposed upon or suffered or incurred by or asserted against any Indemnified Party by reason of, due to or arising out of Landlord's exercise of (or coordination with Tenant in connection with) any Unit Purchase Option or compliance with the terms and conditions of the any documents governing the Unit Purchase Option.

(vii) Upon the Unit Purchase Option Closing Date, (A) if the applicable Unit is the Penthouse Unit, such Penthouse Unit shall become part

134

of the Leased Premises and all of the applicable terms and conditions of this Lease shall thereafter extend to the Penthouse Unit hereunder; provided, that any personal property existing in the Penthouse Unit upon the Unit Purchase Option Closing Date shall be conveyed to Tenant (or the applicable Tenant Party), as the tenant thereunder or (B) if the applicable Unit is the Store Unit or the Supermarket Unit, the applicable Tenant Party shall cause the Use Covenant to be recorded against such Unit in the New York City Registrar's Office and shall, within thirty (30) days after the Unit Purchase Option Closing Date, deliver a copy of the recorded Use Covenant to Landlord.

(viii) Solely as to the Penthouse Unit, within thirty (30) days following the Unit Purchase Option Closing Date, if requested by Landlord, Landlord and Tenant shall execute (i) an amendment to this Lease, prepared by Landlord, to memorialize the addition of the Penthouse Unit into the Leased Premises, but failure to execute such amendment shall not affect the inclusion of the Penthouse Unit into the Leased Premises and (ii) an amendment to the Memorandum of Lease, which shall be submitted for recording by Landlord with the New York City Registrar's Office. If Landlord determines in its reasonable discretion that it would be beneficial to Landlord from a tax perspective or otherwise to lease back the Penthouse Unit to Tenant (or Tenant's designated Tenant Party) pursuant to a separate ground lease, Landlord shall prepare a draft of such additional lease and deliver the same to Tenant for its review and approval within such thirty (30) day period (it being agreed that any such additional lease will be on substantially similar terms to this Lease, except as may be revised to remove any provisions that have been satisfied or no longer apply). The cost of recording any amendment to the Memorandum of Lease (or any new memorandum of lease in connection with any additional lease with respect to the Penthouse Unit), including, without limitation, any and all recording fees and transfer taxes, if any, due upon such recording, shall be paid by Tenant as and when due.

(ix) Upon the conveyance of the Penthouse Unit to the Landlord, an amount equal to the Penthouse Unit Purchase Price shall be treated as Additional Rent payable to Landlord. For all U.S. federal, state and local tax purposes, the payment of such Additional Rent, together with the Additional Rent payable in respect of the out-of-pocket costs and expenses described in clause (v) above, shall be treated as a prepayment of rent that is characterized as a loan from Tenant to Landlord pursuant to Section 467 of the Code. Such loan shall be amortized in accordance with the additional depreciation made available to Landlord for federal income tax purposes in

135

4863-0344-5267, v. 18

connection with the Penthouse Unit. In such case, further detail regarding the principal, interest and amortization of the loan shall be set forth in a separate agreement between the parties.

(x)     If the seller of the Penthouse Unit shall default in its obligations under the Unit Purchase Option Documents to convey the Penthouse Unit to Landlord as described herein, Landlord shall have all the rights and remedies as against such seller set forth in the Unit Purchase Option Documents. Landlord and Tenant shall mutually agree as to any pursuit of remedies against the seller thereof and, in the event of a dispute as to the nature and scope of any such remedies shall be submitted (by either Tenant or Landlord) to arbitration in accordance with the procedures set forth in Section 50 of this Lease.

57.    **Union Matters.**

(a)     Landlord acknowledges that Tenant has entered into the Union MOA with the Hotel Union, 32BJ and L94, which Union MOA requires that Tenant (i) satisfy the Enhanced Severance Obligations, (ii) satisfy the Hotel Union Pension Fund Obligations by the Hotel Union Pension Fund Obligations Date, (iii) satisfy the Healthcare Contribution Obligations, (iv) continue to be bound by the IWA until Tenant coverts the Leased Premises into market based residential housing, (v) upon presenting signed authorization cards to Tenant demonstrating that either 32BJ or L94 has the support of the majority of employees in an appropriate bargaining unit, recognize 32BJ and L94 and agree to be bound by the 32BJ Agreement and L94 Agreement with respect to all applicable employees, and (vi) if Tenant ultimately pursues a Fallback Project in accordance with this Lease, which Fallback Project includes a use that triggers the Snap Back Provision, recall the former Hotel Employees and be subject to the terms and conditions of the IWA and any agreements or practices supplementing the IWA (collectively, the "Union MOA Obligations").

(b)     In furtherance of the foregoing, the following shall apply:

(i)     Tenant shall (x) at all times while it or any Tenant Party holds any ownership interest in the Leased Premises or any other Unit of the Condominium, not take any action or omit to take any action, or cause or permit the use, operation or leasing of any such Unit (including the Leased Premises) that is reasonably likely to trigger the Snap Back Provision and (y) at all times during the Term of this Lease, comply with the terms of the Union MOA and ensure satisfaction of all Union MOA Obligations applicable to it;

(ii)     neither Tenant nor any Affiliate of Tenant shall, without Landlord's prior written consent (not to be unreasonably withheld, conditioned or delayed), modify the Union MOA or enter into any other agreements, letters of intent, or memoranda with the Hotel Union,

136

32BJ, L94 or any other labor union or organization with respect to the construction of the Project, operation or maintenance of the Leased Premises or any other Unit of the Condominium;

(iii)    Landlord shall, at its option, be entitled to reasonably participate in and have a representative present at any and all meetings, calls or communications between Tenant and the Hotel Union, 32BJ, L94 or any other labor union or organization involving the Project (other than routine, day-to-day operational or administrative communications and calls, provided that Tenant keeps Landlord reasonably informed of any material developments from any such communications and calls) and no material communications with such unions regarding the Union MOA, the Union MOA Obligations, the 32BJ Agreement, the L94 Agreement, the Project, the Leased Premises or any other Unit in the Condominium shall be made by Tenant without Landlord's approval (not to be unreasonably withheld, conditioned or delayed); and

(iv)    Within five (5) Business Days of receipt of any claims, charges, demands, complaints, grievances, notices, knowledge or other material communications, whether written, verbal or electronic in form, received from any Hotel Employees, the Hotel Union, 32BJ, L94 or any other labor union or organization with respect to the Union MOA, the Union MOA Obligations, the Project, the Leased Premises, or any other Unit in the Condominium, Tenant shall deliver a copy of same to Landlord (other than notices not pertaining to any demands, complaints, or grievances that are routine, day-to-day operational or administrative matters, provided that Tenant keeps Landlord reasonably informed of any material developments from such matters).

(c)    Landlord acknowledges and agrees that the Union MOA is binding on the Landlord, and, as of the Effective Date, has executed and delivered the Union MOA Assumption, as required by Article 59 of the IWA. Notwithstanding that Landlord is bound to the Union MOA as an "owner" of the Leased Premises pursuant to the Union MOA Assumption, Landlord is not responsible for and shall have no liability or obligation whatsoever in complying with (or ensuring Tenant's compliance with) the terms of the Union MOA, the IWA, the 32BJ Agreement or the L94 Agreement (including, without limitation, any potential costs or expenses incurred as a result of triggering the Snap Back Provision) during the Term of the Lease. Tenant agrees to defend, pay, protect, indemnify, save and hold harmless the Indemnified Parties from and against any and all Losses incurred by any Indemnified Party as a result of (i) Tenant's failure to timely or fully satisfy in the ordinary course of business any of the Union MOA Obligations or otherwise comply with the terms of the Union MOA, IWA, 32BJ Agreement or L94 Agreement during the Term of the Lease, (ii) any act or omission of Tenant or any Affiliate of Tenant with respect to the Leased Premises during the Term

137

of the Lease, or (iii) any act or omission of Tenant or any Affiliate of Tenant with respect to any other Unit of the Condominium that triggers the Snap Back Provision during the term of the Union MOA. In the event any action or proceeding is brought against any of the Indemnified Parties by reason of any such Loss, Tenant covenants upon notice from Landlord or any Fee Mortgagee to defend the Indemnified Parties in such action, with the expenses of such defense paid by Tenant, and the Indemnified Parties will cooperate and assist in the defense of such action or proceeding if reasonably requested to do so by Tenant. Notwithstanding the foregoing, in the event any action or proceeding is brought against any of the Indemnified Parties by reason of any such Loss, Landlord shall have the right to select its own counsel with the reasonable expenses of such defense paid by Tenant, and the Tenant will reasonably cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Landlord; provided, however, in no event shall Tenant be liable to any Indemnified Parties for any Losses caused by Landlord's or any Indemnified Party's gross negligence or willful misconduct with respect to its compliance with this Section 57 or its breach of the Union MOA. The obligations of Tenant under this Section 57(c) will survive the expiration or earlier termination of this Lease.

58.     **Condominium Provisions.**

(a)     Tenant shall timely and fully comply with and pay and perform in all material respects all terms, provisions, covenants and conditions of, and obligations under the Condominium Documents with respect to any Units that Tenant leases and/or owns at any time during the Term of the Lease, including compliance with the obligations of Unit Owners of such Units, as if the Tenant were actually the Unit Owner.

(b)     Tenant shall not, without Landlord's prior written consent in Landlord's reasonable discretion, cause the Condominium Board of Managers to modify, amend, extend, supplement, terminate or in any other manner change, or consent to the modification, amendment, extension, supplement, termination or other change to, the terms, provisions, covenants and conditions of the Condominium Documents, nor waive or consent to the waiver of any enforcement of the provisions thereof.

(c)     Tenant shall promptly deliver to Landlord a true and complete copy of each and every written notice received by Tenant from the Condominium Board of Managers or any other Unit Owner, or any applicable Governmental Authority of any breach or default by Tenant or any written notice requiring or demanding the performance of any act by Tenant (or the Unit Owner(s)) with respect to any obligation of Tenant (or Unit Owner(s)) under the provisions of the Condominium Documents, in each case, in Tenant's capacity as the designee for the Unit Owner, or any Legal Requirements applicable thereto.

(d)     In the event of damage to or destruction of the Leased Premises, Tenant shall not, without the prior written consent of Landlord, vote in opposition to a motion to repair, restore or rebuild the Leased Premises, the EBC Unit, Modified Hotel

138

Unit, Tenth Floor Unit, or any common elements appurtenant thereto or subject to or part of the Condominium.

(e)    In each and every case in which, under the provisions of the Condominium Documents, the consent or the vote of Unit Owners is required or requested on a material matter, Tenant shall not vote or give such consent without, in each and every case, the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed). Such material matters shall include, but not be limited to, a change in the Unit(s), a change in permitted use of any Unit, the Common Interest allocations as to each Unit, a vote to terminate the Condominium, a vote approving the Condominium's borrowing of funds, any matter that would potentially result in the Unit(s) or any of the Unit Owners being materially and adversely affected, and/or any material amendment or modification to the Condominium Documents.

(f)    Tenant shall promptly pay, as the same become due and payable, all common charges, common expenses, special assessments and other payments and deposits required to be paid by the Unit Owners under the Condominium Documents or any resolutions adopted pursuant thereto or otherwise billed by the Condominium Board of Managers in respect of the Leased Premises, and shall promptly upon demand, exhibit to Landlord receipts for all such payments. If Tenant fails to make any such payment within twenty (20) days after each of the same becomes due and payable, Landlord may, from time to time, at Landlord's option, but without any obligation to do so and without notice to or demand upon Tenant, make such payments, and the same shall be reimbursed by Tenant to Landlord as Additional Rent hereunder (within thirty (30) days after notice to Tenant from Landlord, along with documentation supporting the applicable costs incurred) and bear interest at the Default Rate until repaid; provided, however, that the failure of Tenant to make any such payment within thirty (30) days after notice from any person or entity acting on behalf of the Condominium and/or Landlord that the same is overdue shall constitute an immediate Event of Default under this Lease.

(g)    In the event of any failure by Tenant to perform any of the material obligations relating to the Leased Premises under the Condominium Documents within a period of thirty (30) days (or such other lesser period that the Condominium Board of Managers may require) after notice from the Condominium Board of Managers or from Landlord, or in the case of any such default which cannot with due diligence be cured or remedied within such period, if Tenant fails to proceed promptly after such notice to cure or remedy the same with due diligence (but in any case complete such cure or remedy within ninety (90) days after the obligation first became due), then in any such case, (i) Landlord may from time to time at Landlord's option, upon notice to Tenant, but without any obligation to do so, cure or remedy any such default of Tenant (Tenant hereby authorizing Landlord to enter upon the Leased Premises as may be necessary for such purposes), and all sums expended or costs incurred by Landlord for such purposes, including, without limitation, reasonable attorneys' fees and disbursements, shall become due and payable by Tenant to Landlord as Additional Rent hereunder (within thirty (30) days after written notice to Tenant from Landlord, along with documentation supporting

139

the applicable costs incurred) and shall bear interest at the Default Rate until repaid; and (ii) such failure to pay within such thirty (30) day period shall constitute an Event of Default hereunder.

(h)    Tenant shall deliver to Landlord to be held in escrow, conditional resignations, in the form attached hereto as Exhibit L, for all members of the Condominium Board of Managers and officers of the Condominium who have been elected or appointed, or who are controlled, by Tenant or its Affiliates (each, a "Tenant Condo Designee"). Upon the occurrence and during the continuance of an Event of Default, Landlord shall have the right to declare such resignations effective. In the event that any Tenant Condo Designee is removed, resigns, or otherwise vacates its position, Tenant shall cause any new replacement Tenant Condo Designee further elected or appointed by Tenant to (i) be approved by Landlord (which approval shall not be unreasonably withheld, conditioned or delayed) and (ii) deliver to Landlord a conditional resignation in the form attached hereto as Exhibit L.

(i)    Tenant agrees to defend, pay, protect, indemnify, save and hold harmless the Indemnified Parties from and against any and all Losses incurred by any Indemnified Party as a result of Tenant's failure to timely pay any common charges, common expenses, special assessments or other payments required by the Condominium Documents. In case any action or proceeding is brought against any of the Indemnified Parties by reason of any such Loss, Tenant covenants upon notice from Landlord or any Fee Mortgagee to defend the Indemnified Parties in such action, with the expenses of such defense paid by Tenant, and the Indemnified Parties will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant. The obligations of Tenant under this Section 58(i) will survive the expiration or earlier termination of this Lease.

(j)    For the avoidance of doubt, the parties agree that notwithstanding that Tenant may be designated and treated as the Unit Owner of the Leased Premises pursuant to the terms of the Condominium Documents, such designation and treatment does not supersede any of the rights of Landlord as owner of the Fee Estate or the tax treatment of Landlord pursuant to Section 6.

(k)    Tenant, as the sublessee under the Tenth Floor Sublease, acknowledges and confirms that the provisions of Section 58(a) through 58(j) above shall apply *mutatis mutandis* with respect to the Tenth Floor Unit.

59.    **Hotel Provisions.** Solely in the event that the Fallback Project includes a Hotel Project on all or any portion of the Leased Premises, the following shall apply so long as the Leased Premises or any portion thereof is operated as a Hotel under the Hotel Flag:

(a)    Tenant shall be required to obtain the consent of Landlord (not to be unreasonably withheld, conditioned or delayed) prior to Tenant selecting, engaging, entering into, terminating, amending, modifying, supplementing or waiving any rights

4863-0344-5267, v. 18

under any agreements with any Hotel Operator or Hotel Franchisor for the Project or any other Person for the provision of any services or supplies to or for the operation of the Project as a Hotel under the Hotel Flag. It is the intent of the parties hereto that Tenant shall comply in every respect with the provisions of the Hotel Management Agreement and Hotel Franchise Agreement so as to avoid any default thereunder during the Term of this Lease.  Any Hotel Management Agreement or Hotel Franchise Agreement entered into by Tenant must expire no less than one day prior to the expiration date of this Lease.

(b)    Tenant shall: (i) promptly perform and observe all of the covenants required to be performed and observed by Tenant under the Hotel Management Agreement and Hotel Franchise Agreement and do all things reasonably necessary to preserve and to keep unimpaired Tenant's material rights thereunder (including, without limitation, the timely payment of any franchise or management fees due thereunder); (ii) promptly notify Landlord of any material default under the Hotel Management Agreement or Hotel Franchise Agreement of which Tenant is aware; (iii) promptly deliver to Landlord a copy of any notice of default actually received by Tenant under the Hotel Management Agreement or Hotel Franchise Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Hotel Operator and Hotel Franchisor under the Hotel Management Agreement.

(c)    If at any time (i) Hotel Operator shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing, or (iii) a default has occurred and is continuing under the Hotel Management Agreement, Tenant shall, at the request of Landlord, terminate the Hotel Management Agreement, upon thirty (30) days' prior notice to Hotel Operator and replace Hotel Operator with a manager approved in writing by Landlord (which approval shall be given or withheld in Landlord's sole but reasonable discretion).

(d)    Tenant shall not, without the prior written consent of Landlord: (i) surrender, terminate or cancel the Hotel Management Agreement or otherwise replace Hotel Operator; (ii) reduce or consent to the reduction of the term of the Hotel Management Agreement; (iii) increase or consent to the increase of the amount of any charges or fees under the Hotel Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Hotel Management Agreement in any respect.  In the event that Tenant seeks to replace the Hotel Operator at any time during the term of this Lease pursuant to this subsection, such replacement Hotel Operator shall be approved by Landlord in writing (which approval shall be given or withheld in Landlord's sole but reasonable discretion).

(e)    Tenant shall promptly deliver to Landlord a copy of each quarterly or annual financial statement, business plan, final capital expenditures plan, notice and report actually received or submitted by it under any Hotel Management Agreement or Hotel Franchise Agreement.

4863-0344-5267, v. 18

(f)     Tenant shall indemnify, defend and hold Landlord harmless against any Losses which Landlord or any Indemnified Party may incur under or in connection with Tenant's performance under (or failure to perform in accordance with) the Hotel Management Agreement or Hotel Franchise Agreement.

60.    **Right Size Event**.

(a)     At any time that Landlord delivers (or is deemed to have delivered) a Fallback Business Plan Notice or Tenant elects to pursue a Fallback Project and submits a Fallback Business Plan to Landlord, the receipt (or deemed receipt) of such Fallback Business Plan Notice or Fallback Business Plan, as applicable, shall entitle Landlord to the Right-Size Payment in accordance with this Section 60, which Right-Size Payment shall be due and payable upon the date (the "Right-Size Event Date") that is the earlier to occur of (x) the first assignment or Transfer of this Lease to a Qualified Transferee that is not an Affiliate of the Tenant named herein as of the Effective Date in accordance with Section 19 hereof (other than an assignment or Transfer to a Leasehold Mortgagee pursuant to a Foreclosure Event (such assignment or transfer, a "Non-Triggering Transfer") which shall not constitute an assignment or Transfer for purposes of this Section 60 provided that the first assignment or Transfer subsequent to such Non-Triggering Transfer shall constitute an assignment or Transfer for purposes of this Section 60), (y) the date that is eighteen (18) months following Completion of the Fallback Project, and (z) the last day of the fifth (5th) Lease Year (such earliest occurrence, the "Right-Size Event"). Tenant shall pay the Right-Size Payment to Landlord as Additional Rent on the Right-Size Event Date.

(b)     If Tenant timely pays the Right-Size Payment, then commencing with the first calendar month following the occurrence of a Right-Size Event and payment of the Right-Size Payment, the amount of Base Rent payable shall be reduced by an amount equal to the product of (x) the Right-Size Payment, *multiplied by* (y) the Right-Size Yield (such amount, the "Right-Size Reduction"); provided that, with respect to Base Rent for the Lease Year in which the Right-Size Event occurs, only the portion of Base Rent payments due for the calendar months following the month during which the Right-Size Event occurs shall be reduced by the Right-Size Reduction, as prorated for such period. Following the reduction in Base Rent pursuant to a Right-Size Reduction, solely for purposes of calculating the subsequent Rent Escalations or CPI Escalations pursuant to Section 4, Base Rent for the Lease Year in which the Right-Size Payment occurs and all preceding Lease Years shall be deemed to have been reduced by the Right-Size Reduction (without duplication).  For the avoidance of doubt, any Rent Escalation or CPI Escalation described in Section 4 of this Lease shall otherwise continue to apply in the same manner as set forth in Section 4 at all times following the Right-Size Event Date (it being agreed that the Base Rent applied thereunder will be adjusted by the Right-Size Reduction).  By way of illustration only, Exhibit M sets forth an example application of the Right-Size Reduction to Base Rent hereunder.

(c)     In furtherance of determining the Right-Size Payment, Landlord may request an audit of Tenant's Operating Expenses, which audit shall be performed at Tenant's sole cost and expense by an independent, third-party auditor of Landlord's

142

choosing. If requested, the results of any such audit shall be used by Landlord in the determination of the Trailing 12-Month NOI used to calculate the Right-Size Payment.

(d)    For all U.S. federal, state and local tax purposes, Landlord and Tenant shall treat the Right-Size Payment as a prepayment of rent that is treated as a loan pursuant to Section 467 of the Code. The Right-Size Payment shall be the initial principal balance of the loan. The principal amount of the loan shall be deemed to amortize through equal monthly payments, beginning with the first payment of Base Rent due after the Right-Size Payment and ending with the last payment of Base Rent due on or prior to the expiration of the Term. The amount of each such monthly principal amortization amounts shall be equal to the Right-Size Payment divided by the number of months over which it is deemed to be repaid. Interest shall accrue on the unpaid balance of the loan at a rate equal to 100% of the applicable federal rate in effect on the Right-Size Event Date, based on monthly compounding, and reflecting the term of the loan. For each month during the remaining balance of the Term, additional rent shall accrue as Additional Rent in an amount equal to the interest accruing on the loan plus the principal amortization for that month. Promptly after the Right-Size Event Date, Landlord shall furnish to Tenant a schedule setting forth the monthly amounts of principal, interest and rent, determined in accordance with the foregoing, and the parties shall report interest and rental income and expense for all U.S. federal, state and local tax purposes in a manner that is consistent with that schedule.

61.    **Joint and Several.** The parties acknowledge and agree that (i) Tenant is comprised of multiple Tenant Entities; (ii) the liability of Tenant under this Lease shall be joint and several as to each Tenant Entity; (iii) the covenants, obligations and representations of Tenant under this Lease shall apply to each Tenant Entity; (iv) if consent or approval to a matter is given by any Tenant Entity, then such matter shall be deemed to be consented to or approved of by Tenant and all Tenant Entities and, accordingly, the consent or approval of each other Tenant Entity need not be obtained; and (v) the breach or default by any Tenant Entity under this Lease shall be deemed to be a breach of default by Tenant and all Tenant Entities under this Lease and, accordingly, Landlord may pursue remedies against any Tenant Entity for the breach or default by Tenant or any Tenant Entity of this Lease regardless of whether such breach or default at issue was committed by any specific Tenant Entity and, in furtherance of the foregoing, each Tenant Entity hereby expressly waives the right to raise as a defense to any action pursued by Landlord in connection with the foregoing that the underlying breach or default was committed by any other Tenant Entity. The provisions of this Section 61 shall survive the Closing or earlier termination of this Lease.

[Signature Page follows]

143

4863-0344-5267, v. 18

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

**LANDLORD:**

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: _____

Name: LUCE PAN

Title:   Authorized Signatory

*[Signature Page to Ground Lease]*

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

**TENANT:**

**HUDSON 1701/1706, LLC,**
a Delaware limited liability company

By: _____
    Name: Alberto Smeke Saba
    Title: Authorized Signatory

By: _____
    Name: Salomon Smeke Saba
    Title: Authorized Signatory

**HUDSON 1702, LLC,**
a Delaware limited liability company

By: _____
    Name: Alberto Smeke Saba
    Title: Authorized Signatory

By: _____
    Name: Salomon Smeke Saba
    Title: Authorized Signatory

*[Signature Page to Ground Lease]*

## EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND

(See Attached)

4863-0344-5267, v. 18

Lots 1701 and 1702

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1 and 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701 and 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) and **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

4884-6998-3262, v. 2

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, Units 1 and 2, New York, NY and designated as Block 1048 Lots 1701 and 1702 as shown on the Tax Map of the City of New York, County of New York

4884-6998-3262, v. 2

## EXHIBIT B

### Form of Owner's Recognition and Non-Disturbance Agreement

(See Attached)

4863-0344-5267, v. 18

# NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") is made and entered into as of the ____ day of _____, 202[__], among _____, a _____ (together with its successors and/or assigns, "**Ground Landlord**"), [_____], a [_____] ("**Sublandlord**"), and [_____], a [_____] ("**Subtenant**").

WITNESSETH:

A.     Ground Landlord is the owner of the land located in [_____] legally described on Exhibit A attached hereto and made a part hereof.  Ground Landlord has leased all or a portion of such real property (the "**Real Property**") to Sublandlord together with all improvements upon such Real Property (such improvements the "**Improvements**") pursuant to the terms of that certain Ground Lease dated as of May 4, 2022 (as may be amended, amended and restated, modified, supplemented or split, from time to time the "**Ground Lease**").

B.     Sublandlord and Subtenant have entered into a [sublease] dated [_____ ___, 2___] (as amended, restated, supplemented or otherwise modified from time to time, the "**Sublease**"), demising a portion of a building located on the Real Property to Subtenant as further described in the Sublease (the "**Leased Premises**").

C.     Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Ground Lease.

D.     Ground Landlord, Sublandlord and Subtenant desire to evidence their understanding with respect to the Ground Lease as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree and certify as follows:

1.     <u>Non-Disturbance and Attornment</u>.  Provided the Sublease is then in full force and effect, if the Ground Lease is terminated for any reason other than pursuant to a Condemnation constituting a Total Loss or during the last two (2) years of the Term, in each case as expressly set forth in the Ground Lease, Ground Landlord shall not terminate the Sublease and none of Subtenant's rights thereunder shall be affected, diminished or modified in any manner, including, without limitation, Subtenant's use and occupancy of the Leased Premises, and Ground Landlord will not join Subtenant in any action or proceeding for the purpose of terminating the Ground Lease or for the purpose of recovering possession of the Leased Premises from Sublandlord.  In the event that the Ground Lease is terminated for any reason other than pursuant to a Condemnation constituting a Total Loss or during the last two (2) years of the Term, in each case as expressly set forth in the Ground Lease, Subtenant covenants and agrees to attorn to Ground Landlord as its landlord, and Ground Landlord shall recognize Subtenant as its tenant, and the Sublease shall continue unmodified and in full force and effect as a direct lease between Subtenant and Ground Landlord, upon all the terms, covenants, conditions and agreements set forth in the Sublease, and

4863-5455-3630, v. 1

Ground Landlord shall be bound by all of the obligations of Sublandlord under the Sublease; provided, however, that in no event shall Ground Landlord be

(1)     liable for any act or omission of any prior Sublandlord under the Sublease (including, without limitation, the then Sublandlord under the Sublease);

(2)     subject to any offsets, claims or defenses which the Subtenant may have against any prior Sublandlord (including, without limitation, the then Sublandlord under the Sublease);

(3)     bound by any payment of rent which the Subtenant might have made for more than one month in advance to any prior Sublandlord under the Sublease (including, without limitation, the then Sublandlord under the Sublease);

(4)     bound by any covenant to undertake or complete any construction;

(5)     bound by any covenant or obligation to repair, restore or rebuild after a Casualty or Condemnation;

(6)     bound by any obligation to make any payment to the Subtenant; or

(7)     bound by any obligation to assign, transfer or sell the Leasehold Estate or the Improvements to the Subtenant.

Ground Landlord and Subtenant agree that if a Leasehold Mortgagee obtains a New Lease pursuant to the Ground Lease or any other agreement between Ground Landlord and the Leasehold Mortgagee whereby such Leasehold Mortgagee shall succeed to the interest of Sublandlord under the Ground Lease, none of Subtenant's rights hereunder shall be affected or diminished in any way, and this Agreement shall remain in effect in accordance with its terms.

2.      <u>Ground Landlord Confirmation</u>.   Ground Landlord confirms to Subtenant as follows (as of the date hereof):

(a)     The Ground Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way[, except as follows: _____].[1]

(b)     To Ground Landlord's knowledge, there are no defaults by Ground Landlord or Sublandlord under the Ground Lease which permit Ground Landlord to terminate the Ground Lease or Subtenant's right of possession under the Ground Lease that remain uncured.

(c)     Ground Landlord's consent to the Sublease is not required under the Ground Lease, or, if such consent is required, Ground Landlord has given such consent.

---

[1]     Identify amendments and modifications.

(d)     Ground Landlord shall look solely to Sublandlord, its successors and assigns, with respect to the exercise of Ground Landlord's claims arising out of noncompliance by the Sublandlord with its obligations under the Ground Lease.

(e)     Ground Landlord and all persons executing this Agreement on behalf of Ground Landlord are authorized to do so and such execution hereof is the binding act of Ground Landlord and enforceable against Ground Landlord.

3.      Self-Operative.  The provisions hereunder shall be self-operative and effective without the execution of any further instruments on the part of any of the parties hereto.

4.      Counterparts.  This Agreement may be executed in one or more counterparts, or by the parties executing separate counterpart signature pages, including facsimiles transmitted by telecopier or counterparts being sent by email or other electronic medium (including, without limitation, DocuSign and AdobeSign), all of which shall be deemed to be original counterparts of this Agreement and all of which taken together shall constitute one and the same agreement.

5.      Amendments; Successors and Assigns.  This Agreement may not be modified other than by an agreement in writing, signed and delivered by the parties hereto or by their respective successors in interest.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns.

6.      Notices.  All Notices required or permitted to be given, rendered or made by either party to the other pursuant to this Agreement or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Agreement) and shall be deemed to have been properly given, rendered or made, when received by personal delivery or overnight delivery or overnight courier delivery (or, if such delivery is refused, upon the date that delivery would have occurred but for such refusal) addressed to the other parties as follows:

To Ground Landlord:  c/o MSP Capital Investments, L.L.C.
                     Woodlawn Hall at Old Parkland
                     3953 Maple Ave., Suite 350
                     Dallas, Texas 75219
                     Attention: Max Lamont

With a copy to:      Duval & Stachenfeld LLP
                     555 Madison Avenue, 6th Floor
                     New York, New York 10022
                     Attention:  Danielle Ash, Esq. and File Manager
                     File No. 4308.0014

With a copy to:  [_____]
                 [_____]
                 [_____]
                 Attention:  [_____]

To Sublandlord:  [_____]
                 [_____]
                 [_____]
                 Attention:  [_____]

With a copy to:  [_____]
                 [_____]
                 [_____]
                 Attention:  [_____]

To Subtenant:    [_____]
                 [_____]
                 [_____]
                 Attention:  [_____]

With a copy to:  [_____]
                 [_____]
                 [_____]
                 Attention:  [_____]

Any party listed in this paragraph 6 may, by Notice as aforesaid, designate a different address for addresses for Notice intended for it.

No Notice shall be effective unless and until a copy of such Notice has been delivered to the intended recipient's Fee Mortgagee or Leasehold Mortgagee, as applicable, of which the sender shall have received Notice.  Any party may change its address or the name and address of its attorneys by giving Notice in compliance with this Agreement.  Notice given on behalf of a party by any attorney who represents such party shall constitute Notice by such party.

7.      Governing Law.  This Agreement shall be governed by the laws of the State of New York (without regard to conflicts of law principles).  If any of the terms of this Agreement or the application thereof to any person or circumstances shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of any such terms to any person or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

8.      Parties Bound.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns, and all covenants, conditions and agreements herein contained shall be construed as running with the land.

*[Signatures on following page.]*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

"GROUND LANDLORD"

_____,
a _____

By: _____
Name: _____
Title: _____

"SUBLANDLORD"

_____,
a _____

By: _____
Name _____
Title: _____

4863-5455-3630, v. 1

"SUBTENANT"

_____,
a _____

By: _____
Name _____
Title: _____

## EXHIBIT A

(Description of Property)

 Lots 1701 and 1702

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1 and 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701 and 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) and **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

4863-5455-3630, v. 1

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only: Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, Units 1 and 2, New York, NY and designated as Block 1048 Lots 1701 and 1702 as shown on the Tax Map of the City of New York, County of New York.

4863-5455-3630, v. 1

Lot 1706

The premises demised by that certain Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant; as modified by an Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872; as assigned by an Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882; as modified by an Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; to wit:

**THE CONDOMINIUM UNIT** (hereinafter referred to as the "Unit") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Unit being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). This Unit is also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **3.89067 %** interest in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Unit are located is situated in the County of New York and State of New York and is more fully described in the Declaration

**EXHIBIT C**

**Work Letter**

This Work Letter ("Work Letter") describes and specifies the respective rights and obligations of Landlord and Tenant with respect to the Construction Project.

1.    **Definitions**.  Capitalized terms that are defined in the Lease shall have the same meanings in this Work Letter.  Additionally, as used in this Work Letter, the following terms (when delineated with initial capital letters) shall have the respective meaning indicated for each as follows:

"**Architect's Contract**" means the agreement dated April 11, 2022, between Tenant and the Tenant's Architect with respect to the design of the Improvements.

"**Completion**", "**Complete**" or "**Completion of the Project**" means, with respect to the Multifamily Project or the Fallback Project, as applicable, shall be deemed to have occurred upon the occurrence of all of the following events:

(a) completion of construction of the Improvements constituting the applicable Project, including all Punchlist Items, in accordance with the Project Plans and Specifications, all Permits, Legal Requirements and Insurance Requirements, the Construction Loan Documents and the terms and conditions of this Lease;

(b) to the extent not previously delivered, Landlord's receipt of a written statement or certificate executed by a licensed contractor approved by Landlord (or the Construction Manager) certifying, without qualification or exception, that the construction of Improvements is substantially complete;

(c) Landlord's receipt of a permanent certificate of occupancy for the Improvements, issued by DOB, which permanent certificate of occupancy shall permit occupancy of the Improvements for their intended use (provided, however, if Tenant has obtained a temporary certificate of occupancy for the Improvements, which permits occupancy of the Improvements for their intended use and evidence reasonably satisfactory to Landlord that obtaining a permanent certificate of occupancy is not reasonably practicable or necessary to operate the Project in accordance with Legal Requirements);

(d) the expiration of any statutory periods within which valid mechanic's liens, materialman's liens and/or stop notices may be recorded and/or served by reason of the Improvements, or, alternatively, Landlord's receipt of valid, unconditional releases thereof from all Persons entitled to record said liens or serve said stop notices;

(e) Landlord's receipt, at Tenant's sole cost and expense, a set of working drawings and a final "as-built" working drawings and an improvements survey showing the location of the Improvements on the Leased Premises for the completed Project and such other information as Landlord shall reasonably require, certified to Landlord and Landlord's title company; and

147

4863-0344-5267, v. 18

(f) Landlord's receipt of evidence that Tenant has procured and placed all insurance Policies required under Section 15 of the Lease.

"**Construction Consultant**" means a consulting architect, inspector, and/or engineer designated by Landlord, the fees of which shall be paid by Tenant.

"**Construction Manager**" means Elysium Construction Inc. or such replacement Construction Manager selected by Tenant and reasonably approved by Landlord and Construction Lender, if any, to perform the Work.

"**Construction Manager Agreement**" means (i) as of the Effective Date, a Construction Manager Agreement on substantially the same terms as set forth in the Letter of Intent to Award Construction Management Agreement, executed and delivered on May 3, 2022 by Tenant and Construction Manager with respect to the Multifamily Project attached hereto as Schedule 4 and otherwise in a form reasonably acceptable to Landlord and (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, a revised or replacement Construction Manager Agreement with Construction Manager with respect to the Fallback Project in a form reasonably acceptable to Landlord.

"**Construction Schedule**" means, (i) as of the Effective Date, the schedule attached hereto as Schedule 2 establishing a timetable for Completion of the Multifamily Project, showing, on a monthly basis, the anticipated progress of the construction and that Substantial Completion of the Multifamily Project will be achieved not later than the Required Substantial Completion Date applicable to the Multifamily Project and (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, any revised construction schedule establishing a timetable for Completion of the Fallback Project, approved by Landlord in connection with Landlord's approval of the Fallback Business Plan, showing, on a monthly basis, the anticipated progress of the construction and that Substantial Completion of the Fallback Project will be achieved not later than the Required Substantial Completion Date applicable to the Fallback Project, in each case, as modified from time to time in accordance with this Lease. For the avoidance of doubt, Tenant shall not amend the Construction Schedule without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

"**Contracts**" means all contracts and subcontracts entered into for the provision of goods and services in connection with the design, construction, maintenance, management and operation of the Improvements, including the Architect's Contract and the Construction Manager Agreement.

"**Costs of the Improvement**" shall have the meaning ascribed thereto in Section 2 of the New York Lien Law.

"**Direct Construction Costs**" means all "direct costs" such as the cost of all labor, materials, equipment and fixtures, to the extent same constitute Costs of Improvement, as itemized in the Project Budget.

"**Draw Request**" means a properly completed and executed written application by Tenant to Construction Lender in the form attached to the Construction Loan Documents setting forth the requested advance of the Construction Loan to be paid by Construction Lender.

148

"**GMP**" means, (i) as of the Effective Date, a guaranteed maximum price contract with respect to the Total Project Costs for the Multifamily Project, reasonably acceptable to Landlord or (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, any revised guaranteed maximum price contract with respect to the Total Project Costs for the Fallback Project, reasonably acceptable to Landlord.

"**Other Costs of the Improvement**" means all "indirect costs" such as architect's, engineer's and attorney's fees, interest, real estate taxes, survey costs and insurance premiums, to the extent same constitute Costs of Improvement, as itemized in the Project Budget.

"**Project Budget**" means, (i) as of the Effective Date, the budget for the Work required to Complete the Multifamily Project attached hereto as Schedule 1 specifying all sources and uses, costs and expenses of every kind and nature whatever to be incurred by Tenant in designing, constructing and developing the Multifamily Project in accordance with the Project Plans and Specifications, as the same may be amended from time to time with the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed) and (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, the budget for the Work required to Complete the Fallback Project approved by Landlord in connection with the approval of the Fallback Business Plan in accordance with the Lease, specifying all sources and uses, costs and expenses of every kind and nature whatever to be incurred by Tenant in designing, constructing and developing the Fallback Project in accordance with the Project Plans and Specifications, as the same may be amended from time to time with the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed).

"**Project Plans and Specifications**" means, (i) as of the Effective Date, the plans and specifications identified on Schedule 3 attached hereto with respect to the Multifamily Project, as amended from time to time in accordance with this Lease and (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, such amended plans and specifications approved by Landlord in connection with the approval of the Fallback Business Plan in accordance with the Lease, as amended from time to time in accordance with the Lease. For the avoidance of doubt, Tenant shall not amend the Project Plans and Specifications without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

"**Punchlist Items**" means, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation, the non-completion of which does not prevent the use and occupancy of the Project for its intended purpose or the issuance of a temporary certificate of occupancy from DOB.

"**Required Substantial Completion Date**" means, (i) with respect to the Multifamily Project, May 4, 2024 or (ii) following approval by Landlord of the Fallback Business Plan in accordance with the Lease, with respect to the Fallback Project, May 4, 2025.

"**Substantial Completion**" means, with respect to the Multifamily Project or the Fallback Project, as applicable, shall be deemed to have occurred upon the occurrence of all of the following events:

(a) completion of construction of the Improvements constituting the applicable Project, excluding all Punchlist Items, in accordance with the Project Plans and Specifications, all Permits, Legal Requirements and Insurance Requirements, the Construction Loan Documents and the terms and conditions of this Lease;

(b) Landlord's receipt of a written statement or certificate executed by a licensed contractor approved by Landlord (or the Construction Manager) certifying, without qualification or exception, that the construction of Improvements is substantially complete;

(c) Landlord's receipt of a temporary certificate of occupancy for the Improvements, issued by DOB, which temporary certificate of occupancy shall permit occupancy of the Improvements for their intended use and shall permit leasing and occupancy by the intended subtenants thereof; and

(d) Landlord has received a certification from the Construction Consultant that (together with copies of) all lien releases from all contractors and other persons entitled to record a valid lien or serve a valid stop notice on the Improvements have been received, which lien releases may be conditioned solely on the final disbursement of Construction Loan proceeds to pay any remaining amounts due to such contractors.

"**Tenant's Architect**" means Tang Studio Architect, LLC.

"**Total Project Costs**" means all Direct Construction Costs, Other Costs of Improvement and all other costs necessary to Complete the Project in accordance with the Project Plans and Specifications and otherwise in accordance with this Lease and the Construction Loan Documents. As of the Effective Date, the estimated Total Project Costs based on the Project Budget are $412,148,097.00.

"**Work**" means all materials and labor required in order to construct and Complete the Project in accordance with the Project Plans and Specifications, all Permits and Legal Requirements, the Construction Loan Documents and the terms and conditions of this Lease.

2.      Project Plans and Specifications.

(a)      Landlord will review any proposed revisions to the Plans and Specifications.  Except in connection with the initial approval of the updated Plans and Specifications pursuant to the Fallback Business Plan in accordance with Section 48(c) (the initial approval of which shall be governed by Section 48(c) and Article 13 of the Lease), within ten (10) Business Days after receipt of any revisions to the Project Plans and Specifications, Landlord shall (i) return one (1) copy of such revised Project Plans and Specifications to Tenant with Landlord's suggested modifications and/or written approval (which shall not be unreasonably withheld, conditioned or delayed) or (ii) otherwise provide Tenant with Landlord's suggested modifications and/or approval.  If such revised Project Plans and Specifications are returned to Tenant with comments, but not bearing approval of Landlord, or Landlord otherwise provides Tenant's with its suggested modifications, such revised Project Plans and Specifications shall be immediately revised by Tenant and resubmitted to Landlord for approval within twenty (20) Business Days of

their receipt by Tenant; provided, however, if Tenant so chooses and notifies Landlord of such choice, Tenant may revoke its request to modify the Project Plans and Specifications and continue to pursue Completion of the Project without giving effect to the requested modification.  Unless (i) Landlord returns such revised Project Plans and Specifications or (ii) otherwise provides Tenant with Landlord's suggested modifications, in either case within ten (10) Business Days, Tenant shall have the right to give Landlord a second request (which second request shall state at the top thereof, in bold and capitalized letters, "LANDLORD'S FAILURE TO RESPOND TO THIS REQUEST MAY RESULT IN A DEEMED APPROVAL") and if Landlord fails to return such revised Project Plans and Specification or otherwise provide Tenant with Landlord's suggested modifications without five (5) Business Days of such second notice, Landlord shall be deemed to have approved such revisions to the Plans and Specifications.

(b)	Upon Completion of the Project, Tenant shall deliver to Landlord two (2) copies of an "as-built" set of Project Plans and Specifications for the Leased Premises, together with such other information in an electronic media as required by Landlord to place the information from the "as-built" Project Plans and Specifications in Landlord's database.

3.	Project Budget.  Tenant represents and warrants that, as of the Effective Date, the amounts set forth in the Project Budget present a full and complete itemization by category of all costs, expenses and fees which Tenant reasonably expects to pay or reasonably anticipates becoming obligated to pay to Complete and operate the Multifamily Project through Substantial Completion of the Multifamily Project.  Tenant is unaware of any other material costs, expenses or fees which are not covered by the Project Budget.  The Project Budget shall specify all Total Project Costs of every kind and nature whatsoever to be incurred.  The initial Project Budget, which has been agreed to by Tenant and Landlord, is attached to this Work Letter as Schedule 1 and made a part hereof.  All changes to the Project Budget shall in all respects be subject to the prior written approval of Landlord (not to be unreasonably withheld, conditioned or delayed).  With the prior written approval of Landlord, which approval may be granted or withheld in Landlord's reasonable discretion (and subject to the terms of the Construction Loan Documents), any cost savings, actual or estimated, affecting any approved Project Budget category, and any contingency line item, may be reallocated by Tenant to any other approved Total Project Costs.

4.	Construction Schedule.  Tenant agrees that the Construction Schedule that Tenant submitted to Landlord prior to the Effective Date is a reasonable estimate of the current projected timing for the construction and Completion of the Project.  The Construction Schedule pertaining to the Completion of the Multifamily Project that Tenant submitted to Landlord prior to the Effective Date was approved by Landlord in writing.

5.	Tenant's Equity Contribution.  As of the Effective Date, Tenant has caused the Tenant's Equity Contribution to be paid for Total Project Costs in accordance with the Project Budget, the Construction Schedule, this Lease and the Construction Loan Documents. Tenant acknowledges that all of such Tenant's Equity Contributions must be so applied in accordance with the Project Budget prior to submitting any Draw Request for any advance of the Construction Loan in accordance with the Construction Loan Documents.

4863-0344-5267, v. 18

6.      Construction Monitoring; Construction Covenants.

(a)      Within thirty (30) days of the Effective Date, Tenant shall enter into a Construction Manager Agreement (including a GMP) and an Assignment of Construction Manager Consent reasonably approved by Landlord with Construction Manager with respect to the Multifamily Project. Following approval by Landlord of the Fallback Business Plan in accordance with the Lease, Tenant shall no later than thirty (30) days following such approval, enter into a Construction Manager Agreement (including a GMP) and an Assignment of Construction Manager Consent reasonably approved by Landlord with Construction Manager with respect to the Fallback Project, reflecting the Project Plans and Specifications approved by Landlord with respect to the Fallback Project.

(b)      Tenant shall commence construction-related activities of the Project promptly following the Effective Date in accordance with Section 48(a), and prosecute such construction with diligence and continuity in accordance with the Construction Schedule and the Project Plans and Specifications in a good and workmanlike manner.  The Improvements shall be Substantially Completed not later than the Required Substantial Completion Date, subject to delays caused by Force Majeure up to the Force Majeure Cap.

(c)      If at any time, Landlord or Construction Lender determines that Construction of the Project has fallen more than sixty (60) days behind the Construction Schedule (subject to reasonably delays due to Force Majeure, but in no event more than ninety (90) days beyond the Construction Schedule) and such construction has not been rescheduled in a manner acceptable to Landlord and Construction Lender within ten (10) days after Landlord's or Construction Lender's determination, at Landlord's option, such failure shall constitute an Event of Default.

(d)      Tenant shall comply, in all material respects, with and use its commercially reasonable efforts to enforce all Contracts and shall not agree to any material alterations or amendments of any Contract (other than changes to account for modifications to the Project Plans and Specifications and/or the Project Budget that have been made in accordance with the terms of this Lease and the Construction Loan Documents, non-material, administrative amendments and modifications and corrections of scrivener's errors, and such other alterations and amendments consented to by Landlord (such consent not to be unreasonably withheld, conditioned or delayed), to the end that all Contractors promptly and diligently perform all of the obligations on their part to be performed under their respective Contracts.

7.      Trust Funds.  Tenant will receive the advances by Construction Lender of the Construction Loan to be made hereunder and will hold the same as a trust fund for the purpose of paying the costs of the Construction Project in accordance with the Project Budget and Tenant agrees not to expend any of the advances by Construction Lender of the Construction Loan for any purpose except in connection with the uses and purposes provided for in this Lease and the Construction Loan Documents, without the prior written consent of Landlord. For the avoidance of doubt, in no event shall any advances of the Construction Loan be used by Tenant or any Tenant Party in connection with its renovation, maintenance or operation of the Store Unit.

8.   <u>Liability of Landlord</u>.  Landlord shall in no event be responsible or liable to any Person and neither the Construction Manager, nor any subcontractor, laborer or material supplier shall have any right or claim against Landlord under this Lease or the administration thereof.

9.   <u>Construction Loan; Draw Requests</u>.  Tenant shall cause the Construction Loan proceeds to be applied to Total Project Costs in accordance with the Project Budget, the Construction Schedule, this Lease and the Construction Loan Documents and shall timely satisfy all conditions required for such advances of the Construction Loan as and when required pursuant to the Construction Loan Documents or as necessary to cause Substantial Completion not later than the Required Substantial Completion Date (subject to the terms of this Work Letter).  At all times while the Construction Loan is outstanding, Tenant shall, not less frequently than once per calendar month, provide, to the extent not previously provided to Landlord, to Landlord, a true and complete copy of the Draw Requests (and all supporting materials required pursuant to the Construction Loan Documents) provided to Construction Lender to obtain the proceeds of the Construction Loan.

10.   <u>Performance of the Work</u>.  Tenant shall, at its sole cost, construct, install and Complete the Project pursuant to the following requirements:

(a)   Tenant shall commence, and shall thereafter prosecute diligently to Completion, the Project and cause the Project to be Substantially Completed not later than the Required Substantial Completion Date, subject to delays caused by Force Majeure up to the Force Majeure Cap. As of the Effective Date, Tenant shall only be permitted to commence and pursue Completion of the Multifamily Project in accordance with the Project Plans and Specifications approved by Landlord as of the Effective Date. If Landlord approves the Fallback Business Plan in accordance with <u>Section 48(c)</u> of the Lease, Tenant shall be permitted to pursue Completion of the Fallback Project in accordance with the Project Plans and Specifications approved by Landlord in connection with the Fallback Business Plan.

(b)   Tenant shall cause the Project to be performed in a good and workmanlike manner, in compliance, in all material respects, with all applicable Legal Requirements and in substantial conformity with the applicable Project Plans and Specifications.

(c)   Tenant shall promptly after request from time to time from Landlord, meet with Landlord and Landlord's Construction Consultant to discuss progress of the Project. Notwithstanding anything to the contrary in this Lease or any of its exhibits or schedules, Landlord shall have no responsibility or liability with respect to the construction, design, development or Completion of the Construction Project, including, without limitation, satisfaction of the CONH Requirement, compliance with the Union MOA, compliance with the Condominium Documents or any other Legal Requirements.

(d)   All materials used in the construction, installation and completion of the Work shall be at least equal to the Applicable Standard.

(e)   Tenant agrees that no off-site improvements are needed as part of the construction of the Construction Project.

4863-0344-5267, v. 18

11.    <u>Changes Orders and Other Construction Matters</u>.    Other than change orders permitted under the terms of the Construction Loan Documents, Tenant shall (a) not execute or consent to any change orders without the consent of the Landlord (not to be unreasonably withheld, conditioned or delayed) and, if such consent is obtained or Tenant executes or consents to any change orders, Tenant shall provide Landlord, upon request from Landlord, a true and complete copy of all of such change orders (to the extent not previously provided to Landlord), (b) not, in any material respect, amend or modify the agreements with the Construction Manager or Tenant's Architect without the consent of the Landlord, (c) promptly after request from Landlord, deliver to Landlord, a true and complete copy of each subcontract for the Construction Project (to the extent not previously provided to Landlord) or (d) not amend or modify, in any material respect, the Project Budget or the Construction Schedule without Landlord's prior written consent, not to be unreasonably withheld, conditioned or delayed.

12.    <u>Landlord's Right to Complete Construction</u>.    If the Commencement Date has not occurred in accordance with <u>Section 48(a)</u> of the Lease, a delay or discontinuance occurs in the construction for the Construction Project for a period of thirty (30) consecutive days after Notice from Landlord concerning such delay or discontinuance (other than a delay or discontinuance caused by Force Majeure), or if Substantial Completion has not been achieved on or before the Required Substantial Completion Date (unless the delay is due solely to Force Majeure, subject to the Force Majeure Cap), without limitation of any other rights and remedies of Landlord, then, subject to the rights of Leasehold Mortgagees, exercise its rights under this <u>Section 12</u>. Landlord shall have the right to enter upon and take possession of the Leased Premises and all material, equipment and supplies thereon and do anything necessary or desirable to cause Completion of the Construction Project and to fulfill the obligations of Tenant hereunder and to manage, maintain, repair and protect the Leased Premises.  Without limiting the generality of the foregoing and for the purposes aforesaid, Tenant hereby appoints and constitutes Landlord its lawful attorney-in-fact with full power of substitution to (i) use any funds of Tenant, including any funds that might not have been paid for the purpose of Completion of the Construction Project, (ii) make such changes to the Project Plans and Specifications as Landlord may deem desirable to cause Completion, (iii) execute all applications and certificates in the name of Tenant which may be required to carry out the intent and purpose hereof and (iv) employ such contractors, subcontractors, architects and others as Landlord may reasonably deem appropriate.

13.    <u>Representations and Warranties Pertaining to the Construction Project</u>. Tenant hereby makes the following representations and warranties to Landlord, as of the Effective Date:

(a)    (i) Tenant either (x) has obtained all Permits necessary for the Construction of the Project or (y) will be able to obtain all such Permits so necessary at the times needed to permit timely Completion of the Project; and (ii) other than satisfaction of the CONH Requirement, no authorization or approval or other action by, and no notice to or filing with any Governmental Authority is required for the due execution, delivery and performance by Tenant of this Lease or the Construction Loan Documents to which it is a party;

(b)    The Leased Premises complies in all material respects with all Legal Requirements now affecting the Leased Premises.  Tenant has not received any written notification or threat of any actions or proceedings regarding the noncompliance or

154

nonconformity of the Leased Premises with Legal Requirements or Permits, nor is Tenant otherwise aware of any such pending actions or proceedings;

(c)    Tenant has, and at all times shall have obtained, all Permits necessary to construct, occupy, operate and market the Leased Premises and Improvements as and to the extent then required and shall maintain compliance with all Legal Requirements applicable to the Leased Premises and Improvements necessary for the transaction of its business.  The Leased Premises is a separate legal parcel lawfully created in full compliance with all subdivision laws and ordinances, and is properly zoned for the Project.  The contemplated Project may be constructed as of right; and

(d)    The Project Budget sets forth Tenant's good faith estimates of the amounts necessary to pay all costs to be incurred in connection with the construction of the Improvements and the Completion of the Project as contemplated by this Lease.  The Construction Schedule sets forth Tenant's good faith estimate of the time in which the Project can reasonably be completed by the Construction Manager and other contractors working ordinary schedules with due consideration to prevailing conditions.

14.    Whole Agreement; No Oral Modification.  This Work Letter, together with the Lease, embodies all representations, warranties and agreements of Landlord and Tenant with respect to the matter described herein, and this Work Letter may not be altered or modified except by an agreement in writing signed by the parties.

15.    Paragraph Headings.  The paragraph headings contained in this Work Letter are for convenient reference only and shall not in any way affect the meaning or interpretation of such paragraphs.

16.    Notices.  All Notices required or contemplated hereunder shall be given to the parties in the manner specified for giving Notices under the Lease.

17.    Binding Effect.  This Work Letter shall be construed under the laws of the State where the Leased Premises is located and shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

18.    Conflict.  In the event of conflict between this Work Letter and any other exhibits or addenda to the Lease, this Work Letter shall prevail.

*[Schedules follow]*

155

4863-0344-5267, v. 18

# SCHEDULE 1

(Project Budget)

4863-0344-5267, v. 18

| PROJECT BUDGET | | | | | |
|---|---|---|---|---|---|
| **Uses** | **Total** | **Per Unit** | **PGSF** | **PRSF** | **% of Costs** |
| Purchase Price | $207,500,000 | $473,744 | $444 | $677 | 50.3% |
| Hard Costs | $52,301,277 | $119,409 | $112 | $171 | 12.7% |
| Hard Cost Contingency | $4,300,000 | $9,817 | $9 | $14 | 1.0% |
| Soft Costs | $21,521,250 | $49,135 | $46 | $70 | 5.2% |
| Soft Cost Contingency | $1,500,000 | $3,425 | $3 | $5 | 0.4% |
| Closing & Financing Costs | $19,657,985 | $44,881 | $42 | $64 | 4.8% |
| Ground Rent Reserve | $12,800,000 | $29,224 | $27 | $42 | 3.1% |
| Parkview Interest Reserve | $29,593,125 | $67,564 | $63 | $97 | 7.2% |
| 10th Floor Buyout | $13,000,000 | $29,680 | $28 | $42 | 3.2% |
| Union Severance, Pension and Healthcare | $47,250,000 | $107,877 | $101 | $154 | 11.5% |
| Developer Fee | $2,724,460 | $6,220 | $6 | $9 | 0.7% |
| **Total Uses** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

| **Sources** | **Total** | **Per Unit** | **PGSF** | **PRSF** | **% of Costs** |
|---|---|---|---|---|---|
| GLR Ground Lease - Funds at Close | $170,000,000 | $388,128 | $364 | $555 | 41.2% |
| GLR Ground Lease - 10th Floor | $8,000,000 | $18,265 | $17 | $26 | 1.9% |
| Parkview Leasehold Financing | $207,000,000 | $472,603 | $443 | $676 | 50.2% |
| Developer Equity | $27,148,097 | $61,982 | $58 | $89 | 6.6% |
| **Total Sources** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

# SCHEDULE 2

(Construction Schedule)

4863-0344-5267, v. 18





Hudson Hotel Conversion
358 West 58th Street
New York, NY

# SCHEDULE 3

(Description of Project Plans and Specifications)

4863-0344-5267, v. 18

# 7 COLUMBUS CIRCLE

353 WEST 57 STREET, NEW YORK, NY 10019



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

| OWNER | OWNER'S REPRESENTATIVE | ARCHITECT | MECHANICAL ENGINEER | INTERIOR DESIGNER | LIGHTING DESIGNER |
|---|---|---|---|---|---|
| **CSC COLIVING** | **GARDINER & THEOBALD** | **TANG STUDIO ARCHITECT** | **MG ENGINEERING, P.C.** | **B-HUBER** | **LIGHTING WORKSHOP** |
| 6 ST. JOHNS LANE | 535 5TH AVE. | 1452 COLLEGE POINT BLVD. | 116 W. 32ND ST. | C. SIMÓN BOLÍVAR 239, | 20 JAY ST. SUITE 504 |
| NEW YORK, NY 10013 | NEW YORK, NY 10017 | COLLEGE POINT, NY 11356 | NEW YORK, NY 10001 | COL AMERICANA, LAFAYETTE, | BROOKLYN, NY 11201 |
| (212) 419-3149 | (212) 661-6624 | (347) 612-3249 | (212) 643-9055 | 44160 GUADALAJARA, JAL., MEXICO | (212) 796-6510 X 17 |

DRAWING TITLE:

## COVERSHEET

PROJECT #:   21-49   DATE: 04.15.2022

SHEET TITLE :

## G - 001.00

**PROJECT:**

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

*DESIGN INTENT NOT FOR CONSTRUCTION*

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
## DRAWING LIST

PROJECT #:  21-49   DATE: 04.15.2022
SHEET TITLE :

## G - 002.00

### ISSUED SETS

| # | SHEET NO | SHEET TITLE | 50% CD - 2022.04.15 | # | SHEET NO | SHEET TITLE | 50% CD - 2022.04.15 |
|---|---|---|---|---|---|---|---|
| | | ARCHITECTURAL DRAWINGS | | | | ARCHITECTURAL DRAWINGS | |
| 01 | G-001.00 | COVERSHEET | ● | 60 | A-145.00 | REFLECTED CEILING PLAN - 18TH FLOOR | ● |
| 02 | G-002.00 | DRAWING LIST | ● | 61 | A-146.00 | REFLECTED CEILING PLAN- 19TH FLOOR | ● |
| 03 | G-003.00 | BC TABLES & INSPECTIONS | ● | 62 | A-147.00 | REFLECTED CEILING PLAN - 20TH FLOOR | ● |
| 04 | G-004.00 | GENERAL NOTES | ● | 63 | A-148.00 | REFLECTED CEILING PLAN - 21TH FLOOR | ● |
| 05 | G-005.00 | ACCESSIBILITY NOTES | ● | 64 | A-148.00 | REFLECTED CEILING PLAN - 22ND FLOOR | ● |
| 06 | G-006.00 | UNIT COUNT | ● | 65 | A-150.00 | REFLECTED CEILING PLAN - 23ND FLOOR | ● |
| 07 | G-007.00 | UNIT BY FLOOR | ● | 66 | A-400.00 | TYPICAL PLAN : STUDIO | ● |
| 08 | DM-100.00 | DEMOLITION PLAN - SUB-CELLAR | ● | 67 | A-401.00 | TYPICAL PLAN : (1) BED | ● |
| 09 | DM-101.00 | DEMOLITION PLAN - CELLAR | ● | 68 | A-402.00 | TYPICAL PLAN : (2) BED | ● |
| 10 | DM-102.00 | DEMOLITION PLAN - GROUND FLOOR | ● | 69 | A-403.00 | TYPICAL PLAN : (2) BED | ● |
| 11 | DM-103.00 | DEMOLITION PLAN - MEZZANINE FLOOR | ● | 70 | A-404.00 | TYPICAL PLAN : (2) BED | ● |
| 12 | DM-104.00 | DEMOLITION PLAN - 2ND FLOOR | ● | 71 | A-405.00 | TYPICAL PLAN : (2) BED | ● |
| 13 | DM-105.00 | DEMOLITION PLAN - 3RD FLOOR | ● | 72 | A-406.00 | TYPICAL PLAN : (3) BED | ● |
| 14 | DM-106.00 | DEMOLITION PLAN - 4TH FLOOR | ● | 73 | A-407.00 | TYPICAL PLAN : (3) BED | ● |
| 15 | DM-107.00 | DEMOLITION PLAN - 5TH FLOOR | ● | 74 | A-408.00 | TYPICAL PLAN : (3) BED | ● |
| 16 | DM-108.00 | DEMOLITION PLAN - 6TH FLOOR | ● | 75 | A-410.00 | TYPICAL REFLECTED CEILING PLAN : STUDIO | ● |
| 17 | DM-109.00 | DEMOLITION PLAN - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | ● | 76 | A-411.00 | TYPICAL REFLECTED CEILING PLAN : (1) BED | ● |
| 18 | DM-110.00 | DEMOLITION PLAN - 11TH FLOOR | ● | 77 | A-412.00 | TYPICAL REFLECTED CEILING PLAN : (2) BED | ● |
| 19 | DM-111.00 | DEMOLITION PLAN - 14TH FLOOR | ● | 78 | A-413.00 | TYPICAL REFLECTED CEILING PLAN : (2) BED | ● |
| 20 | DM-112.00 | DEMOLITION PLAN - 15TH FLOOR | ● | 79 | A-414.00 | TYPICAL REFLECTED CEILING PLAN : (2) BED | ● |
| 21 | DM-113.00 | DEMOLITION PLAN - 16TH FLOOR | ● | 80 | A-415.00 | TYPICAL REFLECTED CEILING PLAN : (2) BED | ● |
| 22 | DM-114.00 | DEMOLITION PLAN - 17TH FLOOR | ● | 81 | A-416.00 | TYPICAL REFLECTED CEILING PLAN : (3) BED | ● |
| 23 | DM-115.00 | DEMOLITION PLAN - 18TH FLOOR | ● | 82 | A-417.00 | TYPICAL REFLECTED CEILING PLAN : (3) BED | ● |
| 24 | DM-116.00 | DEMOLITION PLAN - 19TH FLOOR | ● | 83 | A-418.00 | TYPICAL REFLECTED CEILING PLAN : (3) BED | ● |
| 25 | DM-117.00 | DEMOLITION PLAN - 20TH FLOOR | ● | 84 | A-420.00 | TYPICAL FINISH FLOORING : STUDIO | ● |
| 26 | DM-118.00 | DEMOLITION PLAN - 21TH FLOOR | ● | 85 | A-421.00 | TYPICAL FINISH FLOORING : (1) BED | ● |
| 27 | DM-119.00 | DEMOLITION PLAN - 22ND FLOOR | ● | 86 | A-422.00 | TYPICAL FINISH FLOORING : (2) BED | ● |
| 28 | DM-120.00 | DEMOLITION PLAN - 23ND FLOOR | ● | 87 | A-423.00 | TYPICAL FINISH FLOORING : (2) BED | ● |
| 29 | A-100.00 | PROPOSED PLAN - SUB-CELLAR | ● | 88 | A-424.00 | TYPICAL FINISH FLOORING : (2) BED | ● |
| 30 | A-101.00 | PROPOSED PLAN - CELLAR | ● | 89 | A-425.00 | TYPICAL FINISH FLOORING : (2) BED | ● |
| 31 | A-102.00 | PROPOSED PLAN - GROUND FLOOR | ● | 90 | A-426.00 | TYPICAL FINISH FLOORING : (3) BED | ● |
| 32 | A-103.00 | PROPOSED PLAN - MEZZANINE FLOOR | ● | 91 | A-427.00 | TYPICAL FINISH FLOORING : (3) BED | ● |
| 33 | A-104.00 | PROPOSED PLAN - 2ND FLOOR | ● | 92 | A-428.00 | TYPICAL FINISH FLOORING : (3) BED | ● |
| 34 | A-105.00 | PROPOSED PLAN - 3RD FLOOR | ● | 93 | A-430.00 | ENLARGED PLAN: TRASH ROOM | ● |
| 35 | A-106.00 | PROPOSED PLAN - 4TH FLOOR | ● | 94 | A-500.00 | DETAILS: PARTITION TYPE | ● |
| 36 | A-107.00 | PROPOSED PLAN - 5TH FLOOR | ● | 95 | A-501.00 | DETAILS: CEILING & FLOORING | ● |
| 37 | A-108.00 | PROPOSED PLAN - 6TH FLOOR | ● | 96 | A-502.00 | DETAILS: TYPICAL CEILING | ● |
| 38 | A-109.00 | PROPOSED PLAN - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | ● | 97 | A-600.00 | SCHEDULE - INTERIOR DOOR / WINDOW | ● |
| 39 | A-110.00 | PROPOSED PLAN - 11TH FLOOR | ● | 98 | A-610.00 | SCHEDULE - SPECIFICATION | ● |
| 40 | A-111.00 | PROPOSED PLAN - 14TH FLOOR | ● | 99 | A-700.00 | INTERIOR ELEVATIONS | ● |
| 41 | A-112.00 | PROPOSED PLAN - 15TH FLOOR | ● | 100 | A-710.00 | INTERIOR ELEVATIONS - KITCHEN | ● |
| 42 | A-113.00 | PROPOSED PLAN - 16TH FLOOR | ● | | | | |
| 43 | A-114.00 | PROPOSED PLAN - 17TH FLOOR | ● | | | | |
| 44 | A-115.00 | PROPOSED PLAN - 18TH FLOOR | ● | | | | |
| 45 | A-116.00 | PROPOSED PLAN - 19TH FLOOR | ● | | | | |
| 46 | A-117.00 | PROPOSED PLAN - 20TH FLOOR | ● | | | | |
| 47 | A-118.00 | PROPOSED PLAN - 21TH FLOOR | ● | | | | |
| 48 | A-119.00 | PROPOSED PLAN - 22ND FLOOR | ● | | | | |
| 49 | A-120.00 | PROPOSED PLAN - 23ND FLOOR | ● | | | | |
| 50 | A-135.00 | REFLECTED CEILING PLAN - 3RD FLOOR | ● | | | | |
| 51 | A-136.00 | REFLECTED CEILING PLAN - 4TH FLOOR | ● | | | | |
| 52 | A-137.00 | REFLECTED CEILING PLAN - 5TH FLOOR | ● | | | | |
| 53 | A-138.00 | REFLECTED CEILING PLAN - 6TH FLOOR | ● | | | | |
| 54 | A-139.00 | RCP - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | ● | | | | |
| 55 | A-140.00 | REFLECTED CEILING PLAN - 11TH FLOOR | ● | | | | |
| 56 | A-141.00 | REFLECTED CEILING PLAN - 14TH FLOOR | ● | | | | |
| 57 | A-142.00 | REFLECTED CEILING PLAN- 15TH FLOOR | ● | | | | |
| 58 | A-143.00 | REFLECTED CEILING PLAN - 16TH FLOOR | ● | | | | |
| 59 | A-144.00 | REFLECTED CEILING PLAN - 17TH FLOOR | ● | | | | |

## SCOPE OF WORK

CONVERT EXISTING COMMERCIAL (HOTEL) BUILDING TO RESIDENTIAL (APARTMENT) AND COMMERCIAL MIX-USE BUILDING. INTERIOR RENOVATION AS PER PLAN. OBTAIN NEW CERTIFICATE OF OCCUPANCY

### PROJECT INFORMATION (PER CO# 120156311)

| ADDRESS: | 353 WEST 57 STREET, NEW YORK, NY 10019 (BIN #:1026317 ) | | |
|---|---|---|---|
| BLOCK: | 1048 | LOT: | 7502 |
| ZONE: | C6-4 / C1-8 / SPECIAL CLINTON DISTRICT | MAP: | 8c |
| OCCUPANCY GROUP: | EXISTING: | COM (1938 BC) / R-1 (2014 BC EQUIV.) | |
| | PROPOSED: | J-2 (1938 BC)/R-2 (2014 EQUIV.) | |
| USE GROUP: | EXISTING: | 5, 6, 10, 12 | |
| | PROPOSED: | 2, 6, 10, 12 (TBD) | |
| CONSTRUCTION CLASS: | EXISTING: | 1 (1938 BC) | |
| | PROPOSED: | 1 (1938 BC, NO CHANGE) | |
| MDL CLASS: | EXISTING: | HAEA | |
| | PROPOSED: | HAEA | |
| CONSTRUCTION CODE | 1968 NYC BC | | |

### ZONING MAP

### TAX MAP

### LIST OF APPLICATIONS

| | ARCHITECTURAL APPLICATIONS | |
|---|---|---|
| 01 | | M00XXXXXX-I1 |
| 02 | | M00XXXXXX-I1 |
| 03 | | M00XXXXXX-I1 |
| | MEP APPLICATIONS | |
| 04 | MECHANICAL APPLICATION | M00XXXXXX-I1 |
| 05 | PLUMBING APPLICATION | M00XXXXXX-I1 |
| 06 | BOILER APPLICATION | M00XXXXXX-I1 |
| 07 | FIRE ALARM APPLICATION | FDNY TM_____ |
| 08 | SPRINKLER APPLICATION | M00XXXXXX-I1 |
| | STRUCTURAL APPLICATIONS | |
| 09 | | |

## 1938 NYC BUILDING CODE ANALYSIS (FOR CONSTRUCTION CLASS - NO CHANGE)

### C26-239.0, CLASS 1-FIREPROOF STRUCTURES.

| CONSTRUCTION ELEMENT | RATING IN HRS |
|---|---|
| EXTERIOR WALLS (EXCEPT PANEL WALLS, AND EXTERIOR BEARING WALLS IN PRIVATE DWELLINGS THIRTY-FIVE FEET OR LESS IN HEIGHT), FIRE WALLS, PARTY WALLS, PIERS, COLUMNS, OTHER STRUCTURAL MEMBERS WHICH CARRY WALLS (EXCEPT LINTELS) AND GIRDERS CARRYING COLUMNS; | 4 |
| OTHER GIRDERS, FIRE PARTITIONS, FLOORS INCLUDING THE BEAMS AND GIRDERS, BEAMS, ROOFS AND FLOOR FILLINGS, AND REQUIRED STAIRWAY ENCLOSURES OTHER THAN IN SCHOOLS AND SCHOOLS ANDSTRUCTURES LESS THAN ONE HUNDRED FEET IN HEIGHT. | 3 |
| EXTERIOR PANEL WALLS IN ALL STRUCTURES AND EXTERIOR BEARING WALLS IN PRIVATE DWELLINGS THIRTY-FIVE FEET OR LESS IN HEIGHT AND REQUIRED STAIRWAY ENCLOSURES IN SCHOOLS AND STRUCTURES LESS THAN ONE HUNDRED FEET IN HEIGHT. | 2 |
| PERMANENT INTERIOR PARTITIONS | INCOMBUSTIBLE MATERIALS |

### 1968 NYC BUILDING CODE ANALYSIS

### TABLE 4-2 AREA AND HEIGHT LIMITATIONS FOR SPRINKLERED BUILDINGS AND SPACES"

| OCCUPANCY GROUP | | TYPE OF CONSTRUCTION |
|---|---|---|
| | | TYPE IA (1968 EQUIV.) |
| J-2 | AREA | N.L. |
| | HEIGHT | |
| ALL OTHER O.G. | AREA | N.L. |
| | HEIGHT | |

### TABLE 5-1 / 5-2, FIRE SEPARATION AND FIRE DIVISION

| OCCUPANCY | C | E | J-2 |
|---|---|---|---|
| C | 2 | 2 | 1 |
| E | 2 | 2 | 1ª |
| J-2 | 2 | 2 | 2 |

KEY: FIRE-RESISTANCE RATINGS ARE GIVEN IN HOURS. FOR TABLE 5-1, READ ABOVE HEAVY LINE. FOR TABLE 5-2, READ BELOW HEAVY LINE.
NR—NO REQUIREMENT
a. AN OFFICE, OR GROUP OF OFFICES, WHOSE USE IS ACCESSORY TO AN OCCUPANCY, AND TOTALS FOUR HUNDRED SQUARE FEET OR LESS IN AREA SHALL NOT BE REQUIRED TO HAVE A FIRE SEPARATION. SUCH OFFICE, OR GROUP OF OFFICES, TOTALLING MORE THAN FOUR HUNDRED SQUARE FEET IN AREA SHALL NOT BE REQUIRED TO HAVE A FIRE SEPARATION IF SUCH OFFICES EXIT DIRECTLY, WITHOUT HAVING TO PASS THROUGH THE AREA OF THE RELATED OCCUPANCY.

### 1968 BC. TABLE 6-1, DETERMINATION OF EXIT AND ACCESS REQUIREMENTS

| OCCUPANCY GROUP OF BUILDING OR SPACE | | GROUP DESIGNATION | MAXIMUM TRAVEL DISTANCE (FT.)ª | | CAPACITY NUMBER OF PERSONS PER UNIT OF WIDTH | | | | CORRIDORS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | UNSPRINKLERED | SPRINKLERED | DOORS OPENINGSᴹ | | | RAMPSᵇ, CORRIDORS, EXIT PASSAGEWAYSⁱ, HORIZONTAL EXITS | MIN. WIDTH (IN.) | MAX. DEAD ENDᵇ (LENGTH IN FT.) |
| | | | | | TO OUTDOORS AT GRADE | ALL OTHER EXIT AND CORRIDOR DOORS | STAIRS, ESCALATORSᵏ | | | |
| HIGH HAZARD | | A | N.P. | 150 | 50 | 40 | 30 | 50 | 36 | N.P. |
| STORAGE | | B-1 | 100 | 150 | 75 | 60 | 45 | 75 | 36 | 50 |
| | | B-2 | 125 | 175 | 75 | 60 | 45 | 75 | 36 | N.R. |
| MERCANTILE | | C | 150 | 200 | 100 | 80 | 60 | 100 | 36 | 50 |
| INDUSTRIAL | | D-1 | 125 | 175 | 100 | 80 | 60 | 100 | 44 | 50 |
| | | D-2 | 150 | 200 | 100 | 80 | 60 | 100 | 44 | 50 |
| BUSINESS | | E | 200 | 300 | 100 | 80 | 60 | 100 | 44 | 50 |
| ASSEMBLYᵞ | | F | 150 | 200 | 100 | 80 | 60 | 100 | 44 | 30 |
| EDUCATIONAL | | G | 150 | 200 | 100 | 80 | 60 | 100 | 66ᵈ | 30ᵈ |
| INSTITUTIONAL | | H-1 | 125 | 175 | 50 | 40 | 30 | 50 | 36 | 40 |
| | | H-2 | 125 | 175 | 30 | 15 | 30 | 96ᶠ | 36 | 30ᵍ |
| | | J-1 | 150 | 200 | 50 | 40 | 30 | 50 | 36 | 40 |
| RESIDENTIAL | | J-2 | 150 | 200 | 50 | 40 | 30 | 50 | 36 | 40 |
| | | J-3 | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. | N.R. |

N.P. — NOT PERMITTED
N.R. — NO REQUIREMENTS (EXCEPT AS PROVIDED IN SECTION 27-375)
*SEE TABLE 8-1 FOR EXIT AND ACCESS REQUIREMENTS APPLYING TO PLACES OF ASSEMBLY
**NOTES:
A FOR METHOD OF MEASUREMENT, SEE SUBDIVISION (C) OF SECTION 27-360 OF THIS ARTICLE.
B REDUCE LISTED CAPACITY OF RAMPS BY TWENTY-FIVE PERCENT WHEN SLOPE EXCEEDS ONE IN TEN.
C EXCEPT FOR PUBLIC GARAGES. (SEE ARTICLE TEN OF SUBCHAPTER SEVEN OF THIS CHAPTER.)
D THERE SHALL NOT BE MORE THAN ONE CLASSROOM ON EACH SIDE OF A CORRIDOR BETWEEN AN EXIT AND THE END OF THE CORRIDOR (DEAD END).
E APPLIES TO CORRIDORS SERVING CLASSROOMS. OTHER CORRIDORS SHALL HAVE A MINIMUM WIDTH OF FORTY-FOUR INCHES.
F APPLIES TO CORRIDORS SERVING PATIENTS. OTHER CORRIDORS SHALL HAVE A MINIMUM WIDTH OF FORTY-FOUR INCHES.
G THERE SHALL BE NO PATIENT BEDROOMS BETWEEN AN EXIT AND THE END OF THE CORRIDOR (DEAD END).
H SEE SUBDIVISION (D) OF SECTION 27-369 OF ARTICLE FIVE OF THIS SUBCHAPTER FOR PERMISSIBLE INCREASE.
I SEE SECTION 27-369 OF ARTICLE FIVE OF THIS SUBCHAPTER.
J SEE SECTION 27-370 OF ARTICLE FIVE OF THIS SUBCHAPTER.
K SEE SECTION 27-378 OF ARTICLE FIVE OF THIS SUBCHAPTER.
M WHERE A DOOR OPENING IS DIVIDED BY MULLIONS INTO TWO OR MORE DOORS OPENINGS, EACH SUCH OPENING SHALL BE MEASURED SEPARATELY IN COMPUTING THE NUMBER OF UNITS OF EXIT WIDTH.

### 1968 BC, TABLE 6-3, MAX. OCCUPANT LOAD-SPACES W/ ONE DOOR

| OCCUPANCY GROUP CLASSIFICATION | MAX. OCCUPANT LOAD WITH ONE DOOR |
|---|---|
| A | 10 |
| B | 50 |
| C | 75 |
| D | 50 |
| E | 75 |
| F | 75 |
| G | 75 |
| H | 15 |
| J | 20 |

## SPECIAL INSPECTION CATEGORY

| Y | N | SPECIAL INSPECTIONS | CODE/SECTION |
|---|---|---|---|
| | | STRUCTUAL STELL - WELDING | BC 1704.3.1 |
| | | STRUCTUAL STELL - DETAILS | BC 1704.3.2 |
| | | STRUCTUAL STELL - HIGH STRENGTH BOLTING | BC 1704.3.3 |
| | | STRUCTUAL COLD-FRAMED STEEL | BC 1704.3.4 |
| | | CONCRETE - CAST-IN-PLACE | BC 1704.4 |
| | | CONCRETE - PRECAST | BC 1704.4 |
| | | CONCRETE - PRESTRESSED | BC 1704.4 |
| | | MASONRY | BC 1704.5 |
| | | WOOD - INSTALLTION OF HIGH-LOAD DIAPHRAMS | BC 1704.6.1 |
| | | WOOD - INSTALLATION OF METAL0PLATE-CONNECTED TRUSSES | BC 1704.6.2 |
| | | WOOD - INSTALLATION OF PREFABRICATED I-JOISTS | BC 1704.6.3 |
| | | SUBGRADE INSPECTION | BC 1704.7.1 |
| | | SUBSURFACE CONDITIONS - FILL PLACEMENT & IN-PLACE DENSITY | BC 1704.7.2 BC 1704.7.3 |
| | | SUBSURFACE INVESTIGATIONS (BORINGS/TEST PITS) TR4 | BC 1704.7.4 |
| | | DEEP FOUNDATION ELEMETS TR5 | BC 1704.8 |
| | | HELICAL PIILES (bb #2014-020) TR5H | BC 1704.8.5 |
| | | WALL PANELS, CURATIN WALLS, AND VENEERS | BC 1704.9 |
| | | SPRAYED FIRE-RESISTANT MATERIALS | BC 1704.10 |
| | | MASTIC AND INTUMESCENT FIRE-RESISTANT COATINGS | BC 1704.11 |
| | | EXTERIOR INSULATION AND FINISH SYSTEMS (EIFS) | BC 1704.12 |
| | | ALTERNATIVE MATERIALS - OTCR BUILDING BUILLETINS# | BC 1704.13 |
| | | SMOKE CONTRL SYSTEMS | BC 1704.14 |
| | | MECHANICAL SYSTEMS | BC 1704.15 |
| | | FUEL-OIL STORAGE AND FUEL-OIL PIPING SYSTEMS | BC 1704.16 |
| | | HIGH-PRESSURE STEAM PIPING (WELDING) | BC 1704.17 |
| | | HIGH TEMPATURE HOT WATER PIPING (WELDING) | BC 1704.18 |
| | | HIGH-PRESSURE FUEL-GAS PIPING (WELDING) | BC 1704.19 |
| | | STRUCTURAL STABILITY - EXISTING BUILDINGS | BC 1704.20.1 |
| | | EXCAVATIONS - SHEETING, SHORING AND BRACING | BC 1704.20.2 |
| | | UNDERPINNING | BC 1704.20.3 BC 1814 |
| | | MECHANICAL DEMOLITION | BC 1740.20.4 |
| | | RAISING AND MOMVING OF A BUILDING | BC 1704.20.5 |
| | | SOIL PERDCOLATION TEST - PRIVAE ON SITE STORM WATER DRAINAGE DISPOSAL SYSTEMS, AND DETAITION FACILITIES | BC 1704.21.1.2 |
| | | PRIVATE ON-SITE STORM WATER DRAINAGE DISPOSAL SYSTEMS, AND DETENTION FACILITIES INSTALLATION | BC 1704.21.2 |
| | | INDIVIDUAL ON-SITE PRIVATE SEWAGE DISPOSAL SYSTEMS INSTALLATION | BC 1704.22 |
| | | SOIL PERCOLATION TEST - INDIVIDUAL ON-SITE PRIVATEA SEWAGE DISPOSAL SYSTEMS | BC 1704.22 |
| | | SPRINKLER SYSTEMS | BC 1704.23 |
| | | STAND PIPESYSTEMS | BC 1704.24 |
| | | HEATING SYSTEMS | BC 1704.25 |
| | | CHIMNEYS | BC 1704.26 |
| Y | | FIRE-RESISTANT PENETRATIONS AND JOINTS | BC 1704.27 |
| | | ALUMINUM WELDING | BC 1704.28 |
| | | FLOOD ZONE COMPLIANCE (ATTAC FEMA ELEVATION/DRY FLOODPROOFING CERTIFICATE WHERE APPLICABLE) | BC 1704.29 BC G105 |
| | | LUMINOUS EGRESS PATH MARKINGS TR7 | BC 1704.30 BC 1024.8 |
| | | EMERGENCY AND STANDBY POWER SYSTEMS (GENERATORS) | BC 1704.31 |
| | | POST-INSTALLED ANCHORS (bb#2014-018, 2014-019) | BC 1704.32 |
| | | SEISMIC ISOLATION SYSTEMS | BC 1701.8 |
| | | CONCRETE DESIGN MIX TR3 | BC 1905.3 BC 1913.5 |
| | | CONCRETE DAMPLING AND TESTING TR2 | BC 1905.6 BC 1913.10 |

## PROGRESS INSPECTION CATEGORY

| Y | N | PROGRESS INSPECTION CATEGORIES | CODE/SECTION |
|---|---|---|---|
| | | PRELIMINARY | 28-116.2.1, BC 110.2 |
| | | FOOTING AND FOUNDATION | BC 110.3.1 |
| | | LOWEST FLOOR ELEVATION | BC 110.3.2 |
| | | STRUCTRAL WOOD FRAME | BC 110.3.3 |
| Y | | ENERGY CODE COMPLIANCE INSPECTIONS TR8 | BC 110.3.5 |
| Y | | FIRE-RESISTANCE RELATED CONSTRUCTION | BC 110.3.4 |
| | | PUBLIC ASSEMBLY EMERGENCY LIGHTING | 28-116.2.2 |
| | | FINAL | 28-116.2.4.2, BC 110.5, DIRECTIVE 14 OF 1975, AND 1RCNY §101-10 |

### ENERGY CONSERVATION STATEMENT AND NOTES:

"TO THE BEST OF MY KNOWLEDGE, BELIEF AND PROFESSIONAL JUDGEMENT, ALL WORK UNDER THIS APPLICATION IS **COMPLIED** WITH THE NYCECC 2020.

---

**PROJECT:**

## 353 W. 57 TH ST
### NEW YORK, NY 10019
**BLOCK: 1048   LOT: 7502**

**OWNER:**

### CSC COLIVING
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

**ARCHITECT:**

### TANG STUDIO ARCHITECT LLC
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

**MEP ENGINEER:**

### MG ENGINEERING, P.C.
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

**STRUCTURAL ENGINEER:**

**INTERIOR DESIGNER:**

### B-HUBER
SIMON BOLIVAR 239 COLONIA LAFAYETTE GUADALAJARA, MEXICO

**LIGHTING DESIGNER:**

### LIGHTING WORKSHOP
20 JAY ST. #504
BROOKLYN, (N.) NY 11201
(212) 796-6510

**DOB NOW JOB NUMBER:**

**DOB APPROVAL STAMP:**

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

**SEAL:**

**DRAWING TITLE:**

## BC TABLE & INSPECTIONS

| PROJECT #: 21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE:

## G - 003.00

## ABBREVIATIONS

| | |
|---|---|
| ADJ. | ADJACENT |
| A.F.F. | ABOVE FINISHED FLOOR |
| A.C.T | ACOUSTICAL CEILING TILE |
| ADA | AMERICANS WITH DISABILITIES ACT |
| ADAAG | ADA ACCESSIBILITY GUIDELINES |
| BLK. | BLOCKING |
| CL | CENTERLINE |
| CLR. | CLEAR |
| CLG. | CEILING |
| CNTR. | COUNTER |
| CNT. | CENTER |
| CONC. | CONCRETE |
| COL. | COLUMN |
| C.O.W. | CENTER OF WALL |
| CPT. | CARPET |
| CONT. | CONTINUOUS |
| CONST. | CONSTRUCTION |
| C.G. | CORNER GUARD |
| CMU | CONCRETE MASONRY UNIT |
| DEMO | DEMOLITION |
| DIM. | DIMENSION |
| DTL. | DETAIL |
| DWG. | DRAWING |
| DIA. | DIAMETER |
| DN. | DOWN |
| DR. | DOOR |
| ELEC. | ELECTRICAL |
| E.P. | ELECTRICAL PANELBOARD |
| EMER. | EMERGENCY |
| EQ. | EQUAL |
| (E) | EXISTING |
| EA. | EACH |
| EXT. | EXTERIOR |
| FBO. | FURNISHED BY OWNER |
| F.C. | FIXTURE CONTRACTOR |
| F.F. | FINISH FLOOR |
| F.D. | FLOOR DRAIN |
| FR | FRAME |
| F.R.T. | FIRE RETARDANT TREATED |
| F.S. | FIRE EXTINGUISHER |
| FURN. | FURNISH |
| F.O.W. | FACE OF WALL |
| GA. | GAUGE |
| G.B. | GRAB BAR |
| G.C. | GENERAL CONTRACTOR |
| GWB. | GYPSUM WALL BOARD |
| HC | HOLLOW CORE |
| H.M. | HOLLOW METAL |
| HGT. | HEIGHT |
| HORIZ. | HORIZONTAL |
| IN. | INCH |
| INST. | INSTALL |
| INSUL. | INSULATION |
| KE | KITCHEN EQUIPMENT |
| L.O.D. | LEASE OUTLINE DRAWING |
| L.L. | LANDLORD |
| MAX | MAXIMUM |
| MAT'L. | MATERIAL |
| M.D.F. | MAIN DISTRIBUTION FACILITY |
| MECH. | MECHANICAL |
| MFR. | MANUFACTURER |
| MIR. | MIRROR |
| MIN. | MINIMUM |
| M.A. | MOISTURE RESISTANT |
| M.O. | MASONRY OPENING |
| N/A | NOT APPLICABLE |
| (N) | NEW |
| N.I.C. | NOT IN CONTRACT |
| NO. | NUMBER |
| N.P. | NEUTRAL PIER |
| N.T.S. | NOT TO SCALE |
| O.C. | ON CENTER |
| O.D. | OUTSIDE DIAMETER |
| OPG. | OPENING |
| OPP. | OPPOSITE |
| PT. | PAINT |
| PLYWD. | PLYWOOD |
| P-LAM. | PLASTIC LAMINATE |
| PNL | PANEL |
| QTY. | QUANTITY |
| RCP | REFLECTED CEILING PLAN |
| R.B. | RUBBER BASE |
| REINF. | REINFORCING |
| REQ'D. | REQUIRED |
| REV. | REVISED/REVISION |
| SC | SOLID CORE |
| SCHED. | SCHEDULE |
| SIM. | SIMILAR |
| SPEC. | SPECIFICATION |
| SQ. | SQUARE |
| SUSP. | SUSPENDED |
| TEMP. | TEMPERED |
| TYP. | TYPICAL |
| UON | UNLESS OTHERWISE NOTED |
| V.C.A. | VINYL COMPOSITION TILE |
| V.I.F. | VERIFY IN FIELD |
| VERT. | VERTICAL |
| WD | WOOD |

## GENERAL NOTES

**GENERAL NOTES:**
1. ALL WORK SHALL CONFORM TO THE REQUIREMENTS OF THE NEW YORK CITY BUILDING CODES.
2. CONTRACTOR TO CHECK AND VERIFY ALL CONDITIONS AND DIMENSIONS AT THE SITE BEFORE COMMENCING THE WORK. THE ARCHITECT SHALL BE NOTIFIED OF ANY UNUSUAL CONDITIONS.
3. CONTRACTOR IS TO FILE WORKMAN'S COMPENSATION AND TO SECURE ALL PERMITS BEFORE THE START OF WORK.
4. THE CONTRACTOR SHALL NOT SCALE DRAWING TO OBTAIN DIMENSIONS. IF THERE IS A DISCREPANCY ON OR LACK OF DIMENSION, THE ARCHITECT SHALL BE NOTIFIED AND THE INFORMATION WILL BE PROVIDED.
5. THE ENGINEER / ARCHITECT HAS NOT BEEN RETAINED FOR FIELD SUPERVISION OR INSPECTION.
6. THE CONTRACTOR IS TO RETAIN A LICENSED PROFESSIONAL ENGINEER AS PART OF HAS CONTRACT, ON BEHALF OF THE OWNER TO PERFORM ALL REQUIRED CONTROLLED INSPECTION WORK AS MAY BE REQUIRED.
7. CONTRACTOR SHALL TAKE ALL NECESSARY PRECAUTIONS TO INSURE THE SAFETY AFFECTED BY THIS WORK.
8. FIVE DAYS PRIOR NOTICE SHALL BE GIVEN TO THE ADJOINING PROPERTY OWNERS AFFECTED BY THIS WORK.
9. THERE ARE NO STRUCTURAL CHANGES TO BE MADE UNDER THIS APPLICATION.
10. DRAPES, CURTAIN, SCENERY TO BE FLAME PROOF AS PER B.S.A CAL.21 SEC C19-161-1.
11. ALL MATERIALS, ASSEMBLIES, FORMS AND METHODS OF CONSTRUCTION AND SERVICE EQUIPMENT SHALL MEET THE FOLLOWING REQUIREMENT:
    11.1. IT SHALL HAVE BEEN ACCEPTED PRIOR TO THE EFFECTIVE DATE OF CODE.
    11.2. IT SHALL HAVE BEEN ACCEPTED FOR USE UNDER THE PRESCRIBED CODE TEST METHOD BY THE COMMISSIONER.
    11.3. IT SHALL HAVE BEEN APPROVED BY THE BOARD OF STANDARDS AND APPEAL.

**GENERAL INTERIOR DEMOLITION NOTES:**
1. THE OWNER HAS FIRST SALVAGE RIGHTS ON ALL ITEMS REMOVED.
2. COORDINATE DEMOLITION WORK WITH NEW CONSTRUCTION SHOWN ELSEWHERE IN THE DRAWINGS. DUE CARE IS TO BE TAKEN TO AVOID UNDUE DAMAGE TO ADJACENT FINISHES SCHEDULED TO REMAIN.
3. REMOVE ALL DEBRIS, RUBBISH AND OTHER MATERIALS RESULTING FROM DEMOLITION OPERATIONS FROM THE BUILDING SITE. DO NOT ALLOW MATERIAL AND DEBRIS TO ACCUMULATE ON SITE. COORDINATE LOCATION OF DUMPSTER WITH OWNER PRIOR TO IT IS DELIVERY.
4. COORDINATE DEMOLITION IN AREAS THAT ARE TO REMAIN OCCUPIED DURING CONSTRUCTION. PROVIDE FREE AND SAFE ACCESS FOR OWNER TO AND FROM OCCUPIED AREAS OF THE BUILDING AT ALL TIMES.
5. PROVIDE DUST BARRIERS TO PROTECT OCCUPIED AREAS OF BUILDING DURING DEMOLITION AND NEW YORK.
6. COORDINATE DEMOLITION, RELOCATING, DISCONNECTING AND CAPPING OF HVAC, PLUMBING AND ELECTRICAL SERVICES WITH THE APPROPRIATE SUBCONTRACTORS PRIOR TO START OF DEMOLITION. PROVIDE BY-PASS CONNECTIONS AS NECESSARY TO MAINTAIN CONTINUITY OF SERVICES TO OCCUPIED AREAS OF THE BUILDING. PROVIDE ADEQUATE NOTICE TO OWNER IF SHT-DOWN OF SERVICES IS REQUIRED.
7. IF UNANTICIPATED HVAC, ELECTRICAL, PLUMBING OR STRUCTURAL ELEMENTS ARE ENCOUNTERED WHICH CONFLICT WITH INTENDED FUNCTION OR DESIGN, NOTIFY ARCHITECT IMMEDIATELY.
8. GENERAL CONTRACTOR IS TO CATALOG AND PROPERLY STORE ALL EXISTING ITEMS SCHEDULED TO BE REINSTALLED
9. MASONRY SHALL BE DEMOLISHED IN SMALL SECTIONS AND BRACING AND SHORING SHALL BE USED WHERE NECESSARY TO AVOID COLLAPSE OF THE STRUCTURE. SHORING MUST BE DONE IN A MANNER THAT WILL NOT INTERFERE WITH NEW WORK. IN NO CASE WILL PRESENTLY SUPPORTED LOADS BE ALLOWED TO BE UNSUPPORTED.
10. PROTECT FLOORS WITH APPROPRIATED COVERINGS WHERE NECESSARY.
11. PROMPTLY REPAIR DAMAGES TO ADJACENT AREAS SCHEDULED TO REMAIN CAUSED BY DEMOLITION WORK.
12. REMOVE PROTECTIVE AT COMPLETION OF WORK AND LEAVE INTERIOR AREAS BROOM CLEAN.
13. REMOVE ALL ELECTRICAL RECEPTACLES, SWITCHES, LIGHTING FIXTURES AND WIRING AS REQUIRED IN AREA OF NEW WORK. SEE PLANS FOR FINAL ELECTRICAL LAYOUT. IF AN EXISTING SWITCH, LIGHT FIXTURE OR RECEPTACLE IS LOCATED IN A REQUIRED LOCATION. THAT ITEM MAY REMAIN UNLESS THE EXISTING ITEM OR WIRING IS FAULTY. FILED DETERMINE.
14. PROVIDE TEMPORARY SHORING AS REQUIRED.

**SMOKE DETECTOR NOTES:**
1. EACH DWELLING UNIT SHALL BE EQUIPPED WITH AN APPROVED TYPE SMOKE DETECTOR DEVICE, RECEIVING PRIMARY POWER FROM THE BUILDING WIRING WITH NO SWITCHES IN THE CIRCUIT OTHER THAN OVER CIRCUIT DEVICE PROTECTING THE BRANCH CIRCUIT AS PER C26-1705.3.
2. SUCH SMOKE DETECTORS SHALL BE EITHER THE IONOZATION-CHAMER TYPE OR THE PHOTO-ELECTRIC TYPE AS PER C26-1705.3.
3. A CERTIFICATE OF SATISFACTORY INSTALLATION FOR SMOKE DETECTORS MUST BE FILED WITH THE DIVISION OF CODE ENFORCEMENT 10 DAYS AFTER INSTALLATION.

**CARBON MONOXIDE NOTES:**
1. HARDWIRED CARBON MONOXIDE DETECTORS SHALL COMPLY WITH RS17-13 AND INSTALLED IN ACCORDANCE WITH RS17-14. IT SHALL BE PROVIDED IN EVERY DWELLING UNIT WITHIN FIFTEEN FEET OF THE PRIMARY ENTRANCE OF EACH BEDROOM.
2. ALL NEW FIXTURE WILL INSTALL WITH NEW SUPPLY STOP VALVES AND NEW BALL SHUTOFF VALVES FOR THE KITCHEN AS WHOLE.
3. BALL TYPE SHUT-OFF VALVES WILL INSTALL ON PLUMBING RISER WITH SOFT-SEATED, SPRING LOADED AMERICAN MADE CHECK VALVES AND VACUUM BREAKERS CLOSE TO THE SHUTOFF VALVES TO FACILITATE FUTURE MAINTENANCE; WITH E-ELBOW SWINGS AT ALL HOT WATER CONNECTIONS TO RISE.
4. NO PLASTIC FITTING WILL BE USE IN THIS PROJECT
5. NO WATER LINE WILL INSTALL IN FLOOR
6. NAIL PLATE WILL BE INSTALLED AT WET-WALL EXTENSION TO PROTECT WATER LINE FORM NAILS AND DRILL BITS.
7. GAS LEAK DETECTOR WILL INSTALL WITHIN THE APARTMENT KITCHEN AREA. AUTOMATIC SOLENOID SHUTOFF VALVE WILL INSTALL ON GAS SHUTOFF VALVE BEFORE THE APARTMENT BRANCH PIPING, POWERED BY WIRED CONNECTION.
8. NO GARBAGE DISPOSALS WILL INSTALL AT KITCHEN SINK
9. WATER PRESSURE VARIES FROM FLOOR TO FLOOR AND CAN EXCEED 90 PSI. A PRESSURE TEST MUST BE CONDUCTED FOR ALL PLUMBING ALTERATIONS/RENOVATIONS WHERE BRANCH PIPING IS EXPOSED. IF THE PRESSURE TEST YIELDS A RESULTS HIGHER THAN 90 PSI. THE UNIT OWNER IS REQUIRED TO INSTALL PRESSURE REDUCING VALVES ON SUPPLY LINES AND ACCESS PANELS FOR SERVICING.

## CONSTRUCTION NOTES

1. WATER PROOF IN ALL WET AREAS.
2. CONTINUES MEMBRANE WATER-PROOFING INSTALLED UNDER FLOOR FINISH AND UP PERIMETER WALLS 6"  ABOVE FLOOR LINE OR PER LOCAL CODE; WHICH IS MORE RESTRICTIVE SHALL PREVAIL AND APPLY.
3. GC IS RESPONSIBLE FOR VERIFYING SITE DIMENSIONS AND CONDITIONS.
4. EMERGENCY LIGHTING CIRCUITS MUST BE ON A DEDICATED BREAKER. BREAKER LOCKS MUST BE INSTALLED ON THE EMERGENCY LIGHTING BREAKER AND THE FIRE ALARM BREAKER.
5. SITE SUPER TO VERIFY SPACE DIMENSIONS AFTER DEMOLITION.
6. GC MUST COORDINATE ALL WALL OPENINGS' OVERALL DIMENSION DIRECTLY WITH MILLWORK SHOP DRAWINGS.
7. STRUCTURAL COLUMNS SHALL BE COVERED BY 5/8" FIRE-RATED DRYWALL AS PART OF THE DEMISING WALL, AND SHALL BE SEALED TO THE UNDERSIDE OF THE STRUCTURE ABOVE IN THE SAME MANNER AS DEMISING WALLS.
8. FIRESTOP ALL EXISTING AND NEW PENETRATIONS.
9. ALL FLOOR PENETRATIONS MUST BE FIRESTOPPED AND SEALED LIQUID TIGHT.
10. FLOOR TRANSITIONS MUST BE FLUSH. AT STOREFRONT, ALIGN FINISHED FLOOR WITH BORDER PAVER ELEVATION OF THE WALKWAY WITH A THRESHOLD OF MINIMAL THICKNESS (NOT TO EXCEED 1/2") PROVIDED AT THE DOORS. VINYL, RUBBER, OR METAL REDUCER STRIPS ARE NOT PERMITTED.
11. CEILING SUPPORT SYSTEMS SHALL ATTACH TO STRUCTURAL MEMBERS ONLY; NOT PERMITTED TO BE ATTACHED TO THE LANDLORD'S ROOF OR FLOOR DECKING, BRIDGING OR WIND BRACING, AND SHALL COMPLY WITH SEISMIC SPECIFICATIONS.
12. GC TO PROVIDE ACCESS TO ALL TENANT AND LANDLORD SYSTEMS AND CONTROLS WITHIN THE PREMISES, INCLUDING DIRECT ACCESS TO ANY FIRE SPRINKLER VALVE, BY MEANS OF FLUSH ACCESS PANELS.

## PARTITION FRAMING NOTES

1. ALL LIGHT GAUGE METAL STUD WALLS AND PARTITIONS REQUIRE GYPSUM BOARD ON BOTH SIDES FOR THE FULL HEIGHT OF THE STUDS (UNLESS SPECIFICALLY DETAILED OTHERWISE).
2. ALL SUSPENDED WALLS SHALL HAVE GYPSUM BOARD THAT EXTENDS AT LEAST 4 INCHES ABOVE THE SUSPENDED CEILING (UNLESS SPECIFICALLY DETAILED OTHERWISE).
3. ALL STUD WALLS AND PARTITIONS SHALL HAVE CONTINUOUS LINES OF BRIDGING SPACED AT 4'-0" ON-CENTER. THE BRIDGING SHALL BE SECURELY FASTENED TO THE STUDS WITH EITHER WELDS OR SCREWS.
4. ALL STUDS SHALL BE 'C'-TYPE WITH FLANGE STIFFENERS.
5. THE MATERIALS AND DETAILS SHOWN ARE FOR TYPICAL INSTALLATIONS. WHERE THE STUD MANUFACTURER RECOMMENDS OR LOCAL ORDINANCES AND/OR CODES ARE MORE RESTRICTIVE OR OF HIGHER STANDARDS, THESE SHALL PREVAIL AND APPLY.

TYPICAL FASTENERS:
A. STEEL STUDS TO STEEL STUDS OR TRACKS:
   #8-18 X 1/2" TEKS-2 WITH PHIL PAN-HEAD FOR 25 GA. OR 20 GA.
   #10-16 X 9/16" TEK-3 WITH PHIL PAN-HEAD FOR INTERCONNECTION OF 18 GA. OR 16 GA.
B. STEEL STUDS OR TRACKS TO WOOD PURLINS, GIRDERS, AND BEAMS:
   #14-10 X 1/2" H.W.H. TYPE 'S' METAL-TO-WOOD TEKS
C. STEEL STUDS OR TRACKS TO STRUCTURAL STEEL (WIDE FLANGE BEAMS, COLUMNS, GIRDERS, STEEL TUBE SHAPES, ETC): TEKS-3 OR TEKS-4 GAUGE AND LENGTH AS REQUIRED FOR THE COMBINED THICKNESS OF THE MATERIAL TO BE DRILLED
D. PLYWOOD TO STEEL STUDS:
   #10-24 X 3/4" TEKS-3 (PLYMETAL TEKS) WITH THIN WAFER HEAD.
E. GYPSUM BOARD TO STEEL STUDS:
   #7 X 1/4" TYPE 'S' BUGLE HEAD SCREWS FOR 3/8" TO 5/8" GYPSUM BOARD TO 25 GA. OR 20 GA. METAL STUDS.
   #6 X 1/4" TYPE 'S-12' BUGLE HEAD SCREWS FOR 3/8" TO 5/8" GYPSUM BOARD TO 18 GA. OR 16 GA. METAL STUDS OR TRACKS.

## CONSTRUCTION SYMBOLS

| Symbol | Description |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING WALL TO DEMOLISH |
| | PROPERTY LINE |
| | BUILDING SEPARATION LINE |
| N.I.C. | NOT IN CONTRACT |
| | PARTITION TYPE |
| ROOM NAME #### | ROOM TAG |
| DOOR NOTE NOTE | EGRESS DOOR NAME |
| (#) | DOOR TAG |
| (#) | WINDOW TAG |
| # / # | SECTION CUT SYMBOL |
| # / # | ELEVATION SYMBOL |
| # / # | DETAIL SYMBOL WITH BUBBLE |
| ₵ | CENTER LINE |
| /1\ | REVISION DELTA |
| ⊚ | SMOKE DETECTOR / CARBON MONOXIDE DETECTOR, HARD-WIRED |
| | EXIT SIGN |
| | EXIT SIGN W/ INTEGRAL EMERGENCY LIGHT |

## NOTES

**GENERAL DEMOLITION NOTES**

1. EXISTING UTILITIES AND UNDERGROUND STRUCTURES SHOWN ON THE PLAN ARE BASED UPON THE BEST AVAILABLE PUBLIC RECORDS AND/OR PRIVATE RECORDS AS SUPPLIED BY THE PROJECT OWNER AND/OR DATA OBTAINED VERBALLY FROM OWNERS OR OFFICIALS ASSOCIATED WITH THE PARTICULAR UTILITY. NEITHER THE OWNER NOR THE ENGINEER GUARANTEE ACCURACY OR COMPLETENESS OF THIS INFORMATION AND ASSUME NO RESPONSIBILITY FOR IMPROPER LOCATIONS ON THE CONSTRUCTION PLANS. OTHER UNDERGROUND FACILITIES NOT SHOWN ON THE DRAWINGS MAY BE ENCOUNTERED DURING THE COURSE OF THE WORK. ALL INVERT ELEVATIONS SHOWN ON THE DRAWINGS SHALL BE VERIFIED BY THE CONTRACTOR PRIOR TO CONSTRUCTION.
2. IF CHANGED CONDITIONS ARE ENCOUNTERED, THE CONTRACTOR SHALL NOTIFY THE ENGINEER PROMPTLY OF (1) PREEXISTING SUBSURFACE CONDITIONS DIFFERING FROM THOSE INDICATED IN THE PLANS, OR (2) PREEXISTING UNKNOWN SUBSURFACE CONDITIONS, OR AN UNUSUAL NATURE, DIFFERING MATERIALLY FROM THOSE ORIGINALLY ENCOUNTERED AND GENERALLY RECOGNIZED AS INHERENT IN WORK OF THE CHARACTER PROVIDED FOR IN THE CONTRACT. THE CONTRACTOR AND OR OWNER SHALL MAKE NO CLAIMS TO THE ENGINEER FOR RE-COMPENSATION FOR EXTRA WORK RESULTING FROM CHANGED CONDITIONS UNLESS THE ENGINEER HAS APPROVED THE WORK IN WRITING.
3. CONTRACTOR SHALL CALL THE UTILITIES UNDERGROUND LOCATION CENTER FOR FIELD LOCATION OF ALL UTILITIES AND SHALL NOT BEGIN EVACUATION UNTIL ALL KNOWN UNDERGROUND FACILITIES IN THE VICINITY OF THE PROPOSED WORK HAVE BEEN LOCATED AND MARKED. IF THE UTILITY IS NOT A SUBSCRIBER OF THE UNDERGROUND LOCATION CENTER THEN THE CONTRACTOR SHALL GIVE NOTICE TO THAT UTILITY.
4. THE CONTRACTOR IS RESPONSIBLE FOR REVIEW OF ALL UTILITY PURVEYOR, AND CITY OR STATE RECORDS RELATIVE TO THE EXISTING UNDERGROUND UTILITIES. THE CONTRACTOR IS RESPONSIBLE FOR AVOIDING DAMAGE TO THESE FACILITIES AND SHALL  RESTORE ALL UTILITIES AT CONTRACTOR'S OWN EXPENSE.
5. VERIFY THAT ALL UTILITY SERVICES TO BE DEMOLISHED AND/OR ABANDONED HAVE BEEN DISCONNECTED.
6. ERECT BARRIERS, SHORING AND THE LIKE TO PROTECT PERSONNEL, CONSTRUCTION AND VEGETATION TO REMAIN. COMPLY WITH ALL STATE AND LOCAL AGENCY REQUIREMENTS.
7. DO NOT SHUT OFF OR CAP UTILITIES WITHOUT PRIOR NOTICE. COORDINATE WORK WITH LOCAL UTILITY PURVEYORS.
8. MAINTAIN VEHICULAR AND PEDESTRIAN TRAFFIC ROUTES: ENSURE MINIMUM INTERFERENCE WITH ROADS, STREETS, SIDEWALKS, AND ADJACENT FACILITIES; DO NOT CLOSE OR OBSTRUCT STREETS, SIDEWALKS, OR PASSAGEWAYS WITHOUT PERMISSION FROM AUTHORITIES HAVING JURISDICTION; MAINTAIN FIRE ACCESS ALONG ACCESS ROAD AT ALL TIMES; MEET ALL APPLICABLE CODES AND ORDINANCES.
9. PROTECT FROM HARM ANY TRESS, OR OTHER OBJECTS SELECTED TO REMAIN.
10. RESTORE ANY IMPROVEMENTS DAMAGED BY THIS WORK TO THEIR ORIGINAL CONDITION, AS ACCEPTABLE TO OWNER. REPAIR ANY DAMAGE TO ADJAVENT STRUCTURES, UTILITIES, SITE, AND WORK OF THIS CONTRACT TO REMAIN AT NO ADDITIONAL COST TO OWNER.
11. AVOID BLASTING ON SITE. DO NOT USE EXPLOSIVES.
12. SPRINKLE DEBRIS W/ WATER AS NECESSARY TO LIMIT DUST TO LOWEST PRACTICAL  LEVEL. DO NOT SPRINKLE TO EXTENT CAUSING FLOODING, CONTAMINATED RUNOFF OR ICING.
13. REMOVE EXISTING ABOVE-GRADE AND BELOW-GRADE IMPROVEMENTS AS INDICATED AND AS NECESSARY TO FACILITATE NEW CONSTRUCTION. CARE SHALL BE TAKEN THAT DAMAGE DOES NOT OCCUR TO EXISTING PAVEMENT WHICH IS TO REMAIN IN PLACE AND THAT ALL PAVEMENT REMOVALS ARE ACCOMPLISHED BY MAKING A NEAT VERTICAL SAW CUT AT THE BOUNDARIES OF THE AREA TO BE REMOVED. MAKE CUTS AT CLOSEST PAVING JOINT.
14. THE CONTRACTOR WILL BE RESPONSIBLE FOR FURNISHING, SETTING AND MARKING ALL LINE AND LOCATION STAKES, INCLUDING OFFSETS AND GENERAL CONSTRUCTION STAKING. WHEN WORK REQUIRING CONTROL IS BEING PERFORMED, ALL NECESSARY RELATED EQUIPMENT, SUPPLIES AND INSTRUMENTS SHALL BE ON SITE. A QUALIFIED LAYOUT ENGINEER, SURVEYOR, OR TECHNICAL SPECIALIST MUST BE ASSIGNED TO THE CONTRACTOR'S CREW FOR THIS WORK. THIS EQUIPMENT AND PERSONNEL MUST BE  AVAILABLE, AT NO ADDITIONAL COST, TO OWNER FOR THE PURPOSE OF VERIFYING LAYOUT AND CERTIFYING THE ACCURACY OF THE WORK ON THE SITE.
15. TRAFFIC: DO NOT OBSTRUCT WALKS OR PUBLIC WAYS WITHOUT WRITTEN PERMISSION OF GOVERNING AUTHORITIES AND OF THE OWNER. WHERE ROUTES ARE PERMITTED TO BE CLOSED, PROVIDE ALTERNATE ROUTES IF REQUIRED.
16. THE REFUSE RESULTING FROM CLEARING AND GRUBBING SHALL BE DISPOSED OF BY THE CONTRACTOR IN A MANNER CONSISTENT WITH ALL GOVERNMENT REGULATIONS. IN NO CASE SHALL REFUSE MATERIAL BE LEFT ON THE PROJECT SITE, SHOVED ONTO ABUTTING PRIVATE PROPERTIES, OR BE BURIED IN EMBANKMENTS OR TRENCHES ON  THE PROJECT SITE. DEBRIS SHALL NOT BE DEPOSITED IN ANY STREAM OR BODY OF WATER, WETLAND, OR IN ANY STREET OR ALLEY, OR UPON ANY PRIVATE PROPERTY  EXCEPT BY WRITTEN CONSENT OF THE PRIVATE PROPERTY OWNER. MAINTAIN HAULING ROUTES CLEAN AND FREE OF ANY DEBRIS RESULTING FROM DEMOLITION WORK ON THIS PROJECT.
17. COMPLETELY REMOVE ALL GROWTH INCLUDING COMPLETE ROOT SYSTEMS OF SHRUBS, HERBACEOUS WEEDS AND GRASSES, WITHIN THE LIMITS OF CLEARING AS NECESSARY FOR CONSTRUCTION.

---

PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:



DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
## GENERAL NOTES

PROJECT #:   21-49     DATE: 04.15.2022
SHEET TITLE :
## G - 004.00

404.2.4.2 DOORWAYS WITHOUT DOORS OR GATES, SLIDING DOORS, AND FOLDING DOORS. DOORWAYS LESS THAN 36 INCHES WIDE WITHOUT DOORS OR GATES, SLIDING DOORS, OR FOLDING DOORS SHALL HAVE MANEUVERING CLEARANCES COMPLYING WITH TABLE 404.2.4.2. APPROACH FROM FRONT, PERPENDICULAR TO DOORWAY MINIMUM MANEUVERING CLEARANCE IS TO BE 48", PARALLEL TO DOORWAY TO BE 0". SEE FIGURE (a) FRONT APPROACH.



HINGED DOOR CLEAR WIDTH · FRONT APPROACH, PULL SIDE · FRONT APPROACH, PUSH SIDE *IF BOTH CLOSER AND LATCH ARE PROVIDED · hinge APPROACH, PULL SIDE · HINGE APPROACH, PULL SIDE · HINGE APPROACH, PUSH SIDE *IF BOTH CLOSER AND LATCH ARE PROVIDED **48 MIN IF BOTH CLOSER AND LATCH PROVIDED · LATCH APPROACH, PULL SIDE *54 MIN IF CLOSER IS PROVIDED · LATCH APPROACH, PUSH SIDE *48 MIN IF CLOSER IS PROVIDED · FRONT APPROACH AT DOORWAYS WITHOUT DOORS

SIDE APPROACH AT DOORWAYS WITHOUT DOORS · PULL SIDE AT RECESSED DOOR · PUSH SIDE AT RECESSED DOOR · PUSH SIDE, DOOR PROVIDED WITH BOTH CLOSER AND LATCH AT RECESSED DOOR · CLEAR FLOOR SPACE · T-SHAPE · CIRCULAR · FORWARD APPROACH · PARALLEL APPROACH · CLEAR WIDTH OF AN ACCESSIBLE ROUTE

TWO DOORS IN A SERIES · CLEAR WIDTH AT 180° TURN · CLEAR WIDTH AT 180° TURN (EXCEPTION) · UNOBSTRUCTED FORWARD REACH · OBSTRUCTED HIGH FORWARD REACH · UNOBSTRUCTED SIDE REACH · OBSTRUCTED HIGH SIDE REACH



ADAPTABLE BATHROOM REQUIRED DIMENSIONS

CLEARANCE REQUIREMENTS @ DOORS IN A SERIES

(A) BEFORE REMOVAL OF CABINETS AND BASE · (B) CABINETS AND BASE REMOVED AND HEIGHT ALTERNATIVE



HANDICAP ADAPTABLE KITCHEN DETAIL

(A) BEFORE REMOVERAL OF CABINETS AND BASE · (B) CABINETS AND BASE REMOVED AND HEIGHT ALTERNATIVES

METAL PLATE DETAIL FOR GRAB BAR

**GRAB BAR NOTE** (2014 NYC BC APPENDIX P, P102.8.3 EXCEPTION):
GRAB BARS ARE **NOT REQUIRED** TO BE INSTALLED WHERE REINFORCEMENT FOR SUCH GRAB BARS IS INSTALLED AND LOCATED TO PERMIT FUTURE INSTALLATION OF GRAB BARS COMPLYING WITH SECTION P102.8.3.
PROPOSED:
1. GRAB BAR REINFORCEMENT TO BE INSTALLED PER DETAIL ON G-006.
2. NO GRAB BARS WILL BE INSTALLED UNLESS FUTURE TENANT WITH DISABILITIES REQUEST PRIOR TO MOVE IN.



505.10.1 TOP AND BOTTOM HANDRAIL EXTENSIONS AT RAMPS
RAMP HANDRAILS SHALL EXTEND HORIZONTALLY ABOVE THE LANDING 12 INCHES (305 MM) MINIMUM BEYOND THE TOP AND BOTTOM OF RAMP RUNS. EXTENSIONS SHALL RETURN TO A WALL, GUARD, OR FLOOR, OR SHALL BE CONTINUOUS TO THE HANDRAIL OF AN ADJACENT RAMP RUN.

505.4 HANDRAIL HEIGHT

## ACCESSIBILITY NOTES

ACCESSIBILITY & USABILITY FOR THE PHYSICALLY HANDICAPPED SHALL BE PROVIDED IN PUBLIC AREAS. THE PROVISIONS SHALL COMPLY WITH THE REQUIREMENTS OF THE AMERICAN NATIONAL INSTITUTE, INC. (ANSI A 117.1) AS REQUIRED BY THE NYC BUILDING CODE, SHOWN GRAPHICALLY ON THIS SHEET AND IN NOTES BELOW.

**305  CLEAR FLOOR OR GROUND SPACE**
**305.1 GENERAL.** CLEAR FLOOR OR GROUND SPACE SHALL COMPLY WITH 305.
**305.2 FLOOR SURFACE.** FLOOR SURFACES OF A CLEAR FLOOR SPACE SHALL COMPLY WITH SECTION 302. CHANGES IN LEVEL ARE NOT PERMITTED WITHIN THE CLEAR FLOOR SPACE. (EXCEPTION: SLOPES NOT STEEPER THAN 1:48 SHALL BE PERMITTED
**305.3 SIZE.** THE CLEAR FLOOR SPACE SHALL BE 48 INCHES MINIMUM IN LENGTH AND 30 INCHES MINIMUM IN WIDTH.
**305.4 KNEE AND TOE CLEARANCE.** UNLESS OTHERWISE SPECIFIED, CLEAR FLOOR OR GROUND SPACE SHALL BE PERMITTED TO INCLUDE KNEE AND TOE CLEARANCE COMPLYING WITH SECTION 306.

**404  DOORS AND DOORWAYS**
**404.1 GENERAL.** DOORS AND DOORWAYS THAT ARE PART OF AN ACCESSIBLE ROUTE SHALL COMPLY WITH SECTION 404
**404.2 DOUBLE-LEAF DOORS AND GATES.** AT LEAST ON OF THE ACTIVE LEAVES OF DOORWAYS WITH TWO LEAVES SHALL COMPLY WITH SECTION 404.2.2 AND 4.4.2.3
**404.2.2 CLEAR WIDTH.** DOORWAYS SHALL HAVE A CLEAR OPENING WIDTH OF 32 INCHES MINIMUM. CLEAR OPENING WIDTH OF DOORWAYS WITH SWINGING DOORS SHALL BE MEASURED BETWEEN THE FACE OF DOOR AND STOP, WITH THE DOOR OPEN 90 DEGREES. OPENINGS MORE THAT 24 INCHES IN DEPTH AT DOORS WITHOUT DOORS SHALL PROVIDE A CLEAR OPENING WIDTH OF 36 INCHES MINIMUM. THERE SHALL BE NO PROJECTIONS INTO THE CLEAR OPENING WIDTH LOWER THAN 34 INCHES ABOVE THE FLOOR. PROJECTIONS INTO THE CLEAR OPENING WIDTH BETWEEN 34 INCHES AND 80 INCHES ABOVE THE FLOOR SHALL NOT EXCEED 4 INCHES.

PROJECT:

### 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
### ACCESSIBILITY NOTES

PROJECT #:  21-49   DATE: 04.15.2022
SHEET TITLE :
## G - 005.00



**UNIT COUNT TABLE - WITH Light & Air EASEMENT**
(04.15.2022 updated)

| | Studio | 1 Bed | 2 Bed | 3 Bed | Total (MARKET RATE) | SRO | Total (W/ SRO) | ZFA (SF) * | GFA (SF) ** | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | | | | | | | | 2,973.00 | 2,973.00 | Tent. (2) Res Lobbies FA |
| 002 | | | | | | | | | | |
| 003 | 0 | 1 | 7 | 1 | 9 | 0 | 9 | 20,373.73 | 22,453.00 | |
| 004 | 4 | 3 | 13 | 2 | 22 | 0 | 22 | 18,896.16 | 21,351.00 | |
| 005 | 3 | 4 | 18 | 2 | 27 | 0 | 27 | 18,755.28 | 19,618.00 | |
| 006 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,755.28 | 19,618.00 | |
| 007 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,756.23 | 19,618.00 | 007~010 & 012 - Same layout (one Studio to be combined with the adjacent unit, due to the MGE finding: telephone room has to stay) |
| 008 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,756.23 | 19,618.00 | |
| 009 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,756.23 | 19,618.00 | |
| 010 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,734.11 | 19,618.00 | |
| 011 | 3 | 3 | 16 | 4 | 26 | 1 | 27 | 18,734.11 | 19,618.00 | |
| 012 | 2 | 2 | 19 | 3 | 26 | 0 | 26 | 18,734.11 | 19,618.00 | (one Studio to be combined with the adjacent unit, due to the MGE finding |
| 014* | 2 | 5 | 12 | 7 | 26 | 0 | 26 | 18,734.11 | 19,618.00 | *Skipped the 13th floor. |
| 015* | 2 | 1 | 8 | 6 | 17 | 1 | 18 | 13,635.34 | 14,361.00 | (one Studio to be combined with the adjacent unit, due to the MGE finding |
| 016* | 1 | 0 | 11 | 5 | 17 | 0 | 17 | 12,767.34 | 13,493.00 | |
| 017* | 1 | 1 | 14 | 2 | 18 | 1 | 19 | 12,778.16 | 13,493.00 | |
| 018* | 1 | 0 | 12 | 2 | 15 | 3 | 18 | 12,104.52 | 12,819.00 | w/ Setback |
| 019* | 2 | 0 | 14 | 1 | 17 | 1 | 18 | 11,996.78 | 12,819.00 | |
| 020* | 2 | 1 | 6 | 5 | 14 | 4 | 18 | 12,136.63 | 12,819.00 | |
| 021* | 1 | 5 | 4 | 1 | 11 | 12 | 23 | 11,440.78 | 12,099.00 | w/ Setback | 1 of 1 Studios are tight in size (can be swapped w/ SRO on the othe floor?) |
| 022* | 1 | 4 | 3 | 1 | 9 | 16 | 25 | 11,242.30 | 11,904.00 | current Laundry conversion included; 1 of 1 Studios are tight in size |
| 023* | 1 | 0 | 11 | 3 | 15 | 0 | 15 | 11,242.30 | 11,904.00 | |
| 024* | 0 | 0.5 | 0 | 1 | 1.5 | 0 | 1.5 | 6,214.91 | 6,545.00 | w/ Setback | Special luxury unit layout + duplex manager unit, pending changes |
| 025* | 0 | 0.5 | 0 | 0 | 0.5 | 0 | 0.5 | 1,991.40 | 3,226.00 | duplex manager unit, pending changes |
| Total | 36 | 41 | 263 | 61 | 401 | 39 | 440 | 328,509.04 | 348,821.00 | |
| % | 8.98% | 10.22% | 65.59% | 15.21% | 100.00% | | | | | |

Max. D.U (ZFA / 680): ***   483.10
Max. D.U (GFA / 680): ****   512.97

| Room Count | x 1 | x 1 | x 2 | x 3 | Total |
|---|---|---|---|---|---|
| | 36 | 41 | 526 | 183 | 786 |

**Note:**

| | |
|---|---|
| * | ZFA & GFA #s are based on the zoning analysis done by R Wade Johnsong Design, PLLC, dated 08/31/2021. |
| ** | GFA #s are for comparison purpose |
| *** | TBD, assuming only the FA for 003~024 are for Residential conversion. The 001~002 are for non-Res use. |
| **** | TBD, assuming no deduction, the entire GFA is overbuilt and can be treated as ZFA |
| SRO note | SRO (1856 & 1857) occupied by one tenant, presumably merged. Therefore, total SRO unit count is #39 |

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**TABLE**
**UNIT COUNT**

PROJECT #:   21-49      DATE: 04.15.2022
                        SHEET TITLE :

**G - 006.00**

**7 COLUMBUS CIRCLE**

Date: 04.15

Note: * Due to the elimination of 13 from floor naming system, to match the jobsite condition, 14* = 13th floor ~ 23* = 22nd floor, etc.

### UNIT - BY FLOOR

| # | TYPE | ROOM | AREA | UNIT TYP. | BATH NEW | BATH RE-USE | KITCHEN |
|---|------|------|------|-----------|----------|-------------|---------|
| | | **FLOOR: 03** | | | | | |
| 1 | 2UNIQUE | 300 | 690 SF | 2 BED | 2 | 0 | 4 Modules |
| 2 | TYP 2.0A | 301 | 542 SF | 2 BED | 2 | 0 | 4 Modules |
| 3 | TYP 2.0A | 302 | 561 SF | 2 BED | 2 | 0 | Customized |
| 4 | 1UNIQUE | 303 | 557 SF | 1 BED | 1 | 0 | 4 Modules |
| 5 | 3UNIQUE | 304 | 1065 SF | 3 BED | 2 | 0 | 4 Modules |
| 6 | 2UNIQUE | 305 | 864 SF | 2 BED | 2 | 0 | Customized |
| 7 | 2UNIQUE | 306 | 830 SF | 2 BED | 2 | 0 | Customized |
| 8 | 2UNIQUE | 307 | 532 SF | 2 BED | 2 | 0 | Customized |
| 9 | 2UNIQUE | 308 | 612 SF | 2 BED | 2 | 0 | Customized |
| | | **Sub-Total** | | | 17 | 0 | |
| | | **FLOOR: 04** | | | | | |
| 1 | TYP 3.0 | 400 | 1045 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 401 | 578 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 402 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 403 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 404 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 405 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.0 | 406 | 537 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 2.0 | 407 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 1.0 | 408 | 344 SF | 1 BED | 1 | 0 | 3 Modules |
| 10 | TYP 2.0 | 409 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 410 | 537 SF | 2 BED | 1 | 1 | 4 Modules |
| 12 | 0UNIQUE | 411 | 420 SF | STUDIO | 1 | 0 | 3 Modules |
| 13 | 0UNIQUE | 412 | 494 SF | STUDIO | 1 | 0 | 4 Modules |
| 14 | TYP 2.0 | 414 | 566 SF | 2 BED | 1 | 1 | 4 Modules |
| 15 | TYP 2.0 | 415 | 540 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.1 | 416 | 554 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | 1UNIQUE | 417 | 623 SF | 1 BED | 1 | 0 | 3 Modules |
| 18 | TYP 0.1 | 418 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 19 | TYP 2.0 | 419 | 520 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | 2UNIQUE | 420 | 491 SF | 2 BED | 1 | 0 | 3 Modules |
| 21 | TYP 2.0 | 421 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | 3UNIQUE | 422 | 911 SF | 3 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 22 | 14 | |
| | | **FLOOR: 05 (new)** | | | | | |
| 1 | TYP 3.0 | 500 | 1045 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 501 | 578 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 502 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 503 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 504 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 505 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3 | 506 | 572 SF | 2 BED | 0 | 2 | Customized |
| 8 | TYP 2.0 | 507 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0 | 508 | 534 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 2.0 | 509 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 510 | 520 SF | 2 BED | 1 | 1 | 4 Modules |
| 12 | TYP 2.0B | 511 | 521 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | TYP 1.0 | 512 | 375 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | 0UNIQUE | 514 | 453 SF | STUDIO | 1 | 0 | 4 Modules |
| 15 | 1UNIQUE | 515 | 487 SF | 1 BED | 1 | 0 | 4 Modules |
| 16 | TYP 2.0 | 516 | 566 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.0E | 517 | 493 SF | 2 BED | 2 | 0 | 4 Modules |
| 18 | TYP 2.0 | 518 | 540 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 519 | 508 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 2.1 | 520 | 562 SF | 2 BED | 1 | 1 | 4 Modules |
| 21 | TYP 2.1 | 521 | 628 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | 1UNIQUE | 522 | 478 SF | 1 BED | 1 | 0 | 4 Modules |
| 23 | TYP 0.1 | 523 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 24 | TYP 2.0 | 524 | 520 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 2.0 | 525 | 536 SF | 2 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 526 | 607 SF | 2 BED | 1 | 1 | 4 Modules |
| 27 | TYP 3.2 | 527 | 954 SF | 3 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 29 | 18 | |
| | | **FLOOR: 06 (updated)** | | | | | |
| 1 | TYP 3.0 | 600 | 1044 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 601 | 577 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 602 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 603 | 716 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 604 | 281 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 605 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3 | 606 | 580 SF | 2 BED | 0 | 2 | Customized |
| 8 | TYP 2.0 | 607 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0 | 608 | 534 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 2.0 | 609 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 610 | 520 SF | 2 BED | 1 | 1 | 4 Modules |
| 12 | TYP 2.0 | 611 | 521 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | TYP 1.0 | 612 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 614 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 15 | TYP 2.0D | 615 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 616 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 617 | 655 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 618 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 619 | 504 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 620 | 1009 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 621 | 560 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 622 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 623 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 624 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 2.0 | 625 | 620 SF | 2 BED | 1 | 1 | 4 Modules |
| 26 | TYP 3.2 | 626 | 959 SF | 3 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 28 | 20 | |
| | | **FLOOR: 07,08,09,10 & 12 (updated)** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |

### FLOOR: 07,08,09,10 & 12 continued

| # | TYPE | ROOM | AREA | UNIT TYP. | NEW | RE-USE | KITCHEN |
|---|------|------|------|-----------|-----|--------|---------|
| 3 | TYP 1.1 | 702 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 2 | 0 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 08** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 702 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 2 | 0 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 09** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 702 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 2 | 0 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 10** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 702 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 2 | 0 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |

### FLOOR: 12

| # | TYPE | ROOM | AREA | UNIT TYP. | NEW | RE-USE | KITCHEN |
|---|------|------|------|-----------|-----|--------|---------|
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 12** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 702 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 11 (new)** | | | | | |
| 1 | TYP 3.0 | 1100 | 1047 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 1101 | 594 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 1102 | 505 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 1103 | 738 SF | 2 BED | 2 | 0 | 4 Modules |
| 5 | TYP 0.0 | 1104 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0B | 1105 | 567 SF | 2 BED | 2 | 0 | 4 Modules |
| 7 | TYP 2.3 | 1106 | 578 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 2.0 | 1107 | 537 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0B | 1108 | 526 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 2.0B | 1109 | 582 SF | 2 BED | 2 | 0 | 4 Modules |
| 11 | TYP 2.0 | 1110 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 12 | TYP 2.0 | 1111 | 525 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 1112 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 1.0 | 1114 | 360 SF | 1 BED | 1 | 0 | 4 Modules |
| 15 | 3UNIQUE | 1115 | 849 SF | 3 BED | 1 | 1 | Customized |
| 16 | TYP 2.0 | 1116 | 577 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 1117 | 663 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0B | 1118 | 531 SF | 2 BED | 2 | 0 | 4 Modules |
| 19 | TYP 2.0B | 1119 | 533 SF | 2 BED | 2 | 0 | 4 Modules |
| 20 | TYP 3.1 | 1120 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.0 | 1121 | 556 SF | 2 BED | 2 | 0 | 4 Modules |
| 22 | TYP 0.1 | 1122 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0E | 1123 | 524 SF | 2 BED | 2 | 0 | 4 Modules |
| 24 | 0UNIQUE | 1124 | 297 SF | STUDIO | 1 | 0 | 4 Modules |
| 25 | TYP 2.0E | 1125 | 613 SF | 2 BED | 2 | 0 | 4 Modules |
| 26 | 3UNIQUE | 1126 | 840 SF | 3 BED | 2 | 0 | 4 Modules |
| | | **Sub-Total** | | | 36 | 10 | |
| | | **FLOOR: 14* (new)** | | | | | |
| 1 | TYP 3.0 | 1400 | 1047 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 1401 | 594 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 1.1 | 1402 | 517 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.2 | 1403 | 748 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 1404 | 253 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 1.0 | 1405 | 387 SF | 1 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.0 | 1406 | 583 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 3.3 | 1407 | 716 SF | 3 BED | 2 | 0 | Customized |
| 9 | TYP 2.0 | 1408 | 533 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 1409 | 598 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.4 | 1410 | 522 SF | 2 BED | 1 | 1 | 4 Modules |
| 12 | TYP 2.0 | 1411 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 1412 | 353 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0 | 1414 | 341 SF | 1 BED | 1 | 0 | 4 Modules |
| 15 | 3UNIQUE | 1415 | 855 SF | 3 BED | 1 | 1.5 | Customized |
| 16 | TYP 2.0E | 1416 | 546 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.0E | 1417 | 511 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 3.3 | 1418 | 720 SF | 3 BED | 2 | 0 | Customized |
| 19 | TYP 3.3 | 1419 | 703 SF | 3 BED | 1 | 1 | Customized |
| 20 | 1UNIQUE | 1420 | 409 SF | 1 BED | 1 | 0 | 4 Modules |
| 21 | 3UNIQUE | 1421 | 971 SF | 3 BED | 1 | 2 | 4 Modules |
| 22 | TYP 0.1 | 1422 | 270 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 1423 | 519 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 1424 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 2.0 | 1425 | 625 SF | 2 BED | 1 | 1 | 4 Modules |
| 26 | 3UNIQUE | 1426 | 983 SF | 3 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 30 | 16.5 | |
| | | **FLOOR: 15* (updated, + 2 units)** | | | | | |
| 1 | TYP 2.0F | 1500 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 3.3 | 1501 | 711 SF | 3 BED | 2 | 0 | Customized |
| 3 | TYP 2.0 | 1502 | 528 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | 3UNIQUE | 1503 | 788 SF | 3 BED | 1 | 1 | Customized |
| 5 | 3UNIQUE | 1504 | 531 SF | 2 BED | 2 | 0 | 4 Modules |
| 6 | TYP 2.0D | 1505 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 1.0 | 1506 | 352 SF | 1 BED | 1 | 0 | 3 Modules |
| 8 | TYP 3.4 | 1507 | 893 SF | 3 BED | 2 | 0 | Customized |
| 9 | TYP 2.0E | 1508 | 496 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 3.3 | 1509 | 710 SF | 3 BED | 2 | 0 | Customized |
| 11 | TYP 3.3 | 1510 | 698 SF | 3 BED | 1 | 1 | Customized |
| 12 | TYP 2.0E | 1511 | 496 SF | 2 BED | 2 | 0 | 4 Modules |

### FLOOR: 12 (right column) / 16* / 17* / 18* / 19* / 20* / 21*

| # | TYPE | ROOM | AREA | UNIT TYP. | NEW | RE-USE | KITCHEN |
|---|------|------|------|-----------|-----|--------|---------|
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 12** | | | | | |
| 1 | TYP 3.0 | 700 | 1049 SF | 3 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 701 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 2.0 | 1602 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | TYP 2.2 | 703 | 738 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 0.0 | 704 | 259 SF | STUDIO | 1 | 0 | 3 Modules |
| 6 | TYP 2.0 | 705 | 559 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.3A | 706 | 579 SF | 2 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 707 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0C | 708 | 530 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 709 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0 | 710 | 524 SF | 2 BED | 0 | 2 | 4 Modules |
| 12 | TYP 2.0 | 711 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 1.0 | 712 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 14 | TYP 2.0B | 714 | 574 SF | 2 BED | 1 | 1 | 4 Modules |
| 15 | TYP 2.0D | 715 | 635 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.0 | 716 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.4 | 717 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.0 | 718 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 19 | TYP 2.0 | 719 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 20 | TYP 3.1 | 720 | 991 SF | 3 BED | 1 | 1 | Customized |
| 21 | TYP 2.1 | 721 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 22 | TYP 0.1 | 722 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 23 | TYP 2.0 | 723 | 521 SF | 2 BED | 1 | 1 | 4 Modules |
| 24 | TYP 2.0 | 724 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 25 | TYP 3.2 | 725 | 991 SF | 3 BED | 1 | 1 | 4 Modules |
| 26 | TYP 2.0 | 726 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 26 | 22 | |
| | | **FLOOR: 16* (new)** | | | | | |
| 1 | TYP 2.0F | 1600 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0F | 1601 | 596 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 2.0 | 1602 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | TYP 3.3 | 1604 | 704 SF | 3 BED | 2 | 0 | Customized |
| 5 | TYP 2.0 | 1605 | 541 SF | 2 BED | 1 | 1 | 4 Modules |
| 6 | TYP 3.3 | 1606 | 708 SF | 3 BED | 2 | 0 | Customized |
| 7 | TYP 3.4 | 1607 | 894 SF | 3 BED | 2 | 0 | Customized |
| 8 | TYP 2.0E | 1608 | 560 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0 | 1609 | 499 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 2.0B | 1610 | 529 SF | 2 BED | 2 | 0 | 4 Modules |
| 11 | TYP 2.1 | 1611 | 717 SF | 3 BED | 2 | 0 | Customized |
| 12 | TYP 2.1 | 1612 | 593 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | TYP 3.5 | 1614 | 765 SF | 3 BED | 1 | 1 | Customized |
| 14 | TYP 2.0 | 1615 | 280 SF | STUDIO | 1 | 0 | 3 Modules |
| 15 | TYP 2.0 | 1616 | 519 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 2.4 | 1617 | 558 SF | 2 BED | 1 | 1 | 4 Modules |
| 17 | TYP 2.5 | 1617 | 582 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 24 | 9 | |
| | | **FLOOR: 17* (new)** | | | | | |
| 1 | TYP 2.0F | 1700 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0F | 1701 | 600 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 2.0 | 1702 | 527 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | TYP 2.0 | 1703 | 541 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 2.0 | 1704 | 529 SF | 2 BED | 1 | 1 | 4 Modules |
| 6 | TYP 2.0 | 1705 | 593 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.0 | 1706 | 524 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 2.0 | 1707 | 537 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | 1UNIQUE | 1708 | 433 SF | 1 BED | 1 | 0 | 3 Modules |
| 10 | TYP 2.0 | 1709 | 554 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.0E | 1710 | 499 SF | 2 BED | 2 | 0 | 4 Modules |
| 12 | TYP 2.0B | 1711 | 523 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | TYP 3.3 | 1712 | 715 SF | 3 BED | 2 | 0 | Customized |
| 14 | TYP 3.5 | 1714 | 765 SF | 3 BED | 1 | 1 | Customized |
| 15 | TYP 2.0 | 1715 | 571 SF | 2 BED | 1 | 1 | 4 Modules |
| 16 | TYP 0.1 | 1716 | 276 SF | STUDIO | 1 | 0 | 3 Modules |
| 17 | TYP 2.0 | 1717 | 519 SF | 2 BED | 1 | 1 | 4 Modules |
| 18 | TYP 2.5 | 1718 | 582 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 21 | 13 | |
| | | **FLOOR: 18* (updated, + 1 unit)** | | | | | |
| 1 | TYP 2.0F | 1800 | 605 SF | 2 BED | 2 | 0 | 4 Modules |
| 2 | TYP 3.3 | 1801 | 720 SF | 3 BED | 2 | 0 | Customized |
| 3 | TYP 2.0 | 1802 | 523 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | TYP 2.0 | 1803 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 3.3 | 1804 | 710 SF | 3 BED | 2 | 0 | Customized |
| 6 | TYP 2.0B | 1805 | 529 SF | 2 BED | 2 | 0 | 4 Modules |
| 7 | TYP 2.6 | 1806 | 649 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 2.0E | 1807 | 506 SF | 2 BED | 2 | 0 | 4 Modules |
| 9 | TYP 2.0 | 1808 | 556 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 1809 | 534 SF | 2 BED | 2 | 0 | 4 Modules |
| 11 | TYP 2.0 | 1810 | 543 SF | 2 BED | 2 | 0 | 4 Modules |
| 12 | 2UNIQUE | 1811 | 627 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | TYP 2.1 | 1812 | 571 SF | 2 BED | 1 | 1 | 4 Modules |
| 14 | TYP 0.1 | 1814 | 290 SF | STUDIO | 1 | 0 | 3 Modules |
| 15 | TYP 2.0E | 1815 | 519 SF | 2 BED | 2 | 0 | 4 Modules |
| | | **Sub-Total** | | | 23 | 6 | |
| | | **FLOOR: 19* (updated, + 2 units)** | | | | | |
| 1 | TYP 2.0F | 1900 | 601 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 1901 | 607 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 2.0 | 1902 | 519 SF | 2 BED | 1 | 1 | 4 Modules |
| 4 | TYP 2.0 | 1903 | 583 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 3.3 | 1904 | 704 SF | 3 BED | 2 | 0 | Customized |
| 6 | TYP 2.0 | 1905 | 522 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 2.0 | 1906 | 525 SF | 2 BED | 1 | 1 | 4 Modules |
| 8 | TYP 2.6 | 1907 | 654 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 2.0E | 1908 | 501 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | TYP 2.0 | 1909 | 525 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 2.4 | 1910 | 534 SF | 2 BED | 2 | 0 | 4 Modules |
| 12 | TYP 2.0 | 1911 | 496 SF | 2 BED | 2 | 0 | 4 Modules |
| 13 | 2UNIQUE | 1912 | 627 SF | 2 BED | 1 | 1 | 4 Modules |
| 14 | TYP 0.2 | 1914 | 267 SF | STUDIO | 1 | 0 | 3 Modules |
| 15 | TYP 0.1 | 1915 | 289 SF | STUDIO | 1 | 0 | 3 Modules |
| 16 | TYP 2.0 | 1916 | 515 SF | 2 BED | 2 | 0 | 4 Modules |
| 17 | TYP 2.5 | 1917 | 564 SF | 2 BED | 2 | 0 | 4 Modules |
| | | **Sub-Total** | | | 24 | 8 | |
| | | **FLOOR: 20* (updated, + 2 units)** | | | | | |
| 1 | TYP 2.0 | 2000 | 607 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 2001 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | 1UNIQUE | 2002 | 345 SF | 1 BED | 1 | 0 | 3 Modules |
| 4 | 3UNIQUE | 2003 | 785 SF | 3 BED | 1 | 1 | Customized |
| 5 | TYP 3.6 | 2004 | 708 SF | 3 BED | 1 | 1 | Customized |
| 6 | TYP 2.6 | 2005 | 651 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | 3UNIQUE | 2006 | 700 SF | 3 BED | 2 | 0 | Customized |
| 8 | TYP 3.3 | 2007 | 717 SF | 3 BED | 1 | 1 | Customized |
| 9 | TYP 2.0E | 2008 | 495 SF | 2 BED | 2 | 0 | 4 Modules |
| 10 | 3UNIQUE | 2009 | 777 SF | 3 BED | 1 | 1 | Customized |
| 11 | TYP 0.2 | 2010 | 267 SF | STUDIO | 1 | 0 | 3 Modules |
| 12 | TYP 0.1 | 2011 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 13 | TYP 2.0 | 2012 | 516 SF | 2 BED | 1 | 1 | 4 Modules |
| 14 | TYP 2.5 | 2014 | 564 SF | 2 BED | 1 | 1 | 4 Modules |
| | | **Sub-Total** | | | 16 | 9 | |
| | | **FLOOR: 21* (updated)** | | | | | |
| 1 | TYP 1.2 | 2100 | 413 SF | 1 BED | 1 | 0 | 3 Modules |
| 2 | TYP 1.0 | 2101 | 355 SF | 1 BED | 1 | 0 | 3 Modules |
| 3 | 1UNIQUE | 2102 | 398 SF | 1 BED | 1 | 0 | 4 Modules |
| 4 | TYP 2.0E | 2103 | 524 SF | 2 BED | 2 | 0 | 4 Modules |
| 5 | TYP 2.0 | 2104 | 564 SF | 2 BED | 1 | 1 | 4 Modules |

### Right column: FLOOR 22* / 23* + summary

| # | TYPE | ROOM | AREA | UNIT TYP. | NEW | RE-USE | KITCHEN |
|---|------|------|------|-----------|-----|--------|---------|
| 6 | TYP 3.6 | 2105 | 677 SF | 3 BED | 1 | 1 | 4 Modules |
| 7 | 1UNIQUE | 2106 | 348 SF | 1 BED | 1 | 0 | 3 Modules |
| 8 | 1UNIQUE | 2107 | 424 SF | 1 BED | 1 | 0 | 4 Modules |
| 9 | TYP 2.1 | 2108 | 566 SF | 2 BED | 1 | 1 | 4 Modules |
| 10 | TYP 0.1 | 2109 | 293 SF | STUDIO | 1 | 0 | 3 Modules |
| 11 | TYP 2.0E | 2110 | 519 SF | 2 BED | 2 | 0 | 4 Modules |
| | | **Sub-Total** | | | 13 | 3 | |
| | | **FLOOR: 22* (updated, + 1 unit)** | | | | | |
| 1 | TYP 1.2 | 2200 | 414 SF | 1 BED | 1 | 0 | 3 Modules |
| 2 | TYP 2.0 | 2201 | 534 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 3.3 | 2202 | 706 SF | 3 BED | 2 | 0 | Customized |
| 4 | 2UNIQUE | 2203 | 575 SF | 2 BED | 2 | 0 | Customized |
| 5 | TYP 2.0E | 2204 | 495 SF | 2 BED | 2 | 0 | 4 Modules |
| 6 | 1UNIQUE | 2205 | 460 SF | 1 BED | 1 | 0 | 3 Modules |
| 7 | 0UNIQUE | 2206 | 238 SF | STUDIO | 1 | 0 | 3 Modules |
| 8 | 1UNIQUE | 2207 | 370 F | 1 BED | 1 | 0 | 3 Modules |
| 9 | 1UNIQUE | 2208 | 409 SF | 1 BED | 1 | 0 | 3 Modules |
| | | **Sub-Total** | | | 11 | 2 | |
| | | **FLOOR: 23* (updated, + 1 unit)** | | | | | |
| 1 | TYP 2.0F | 2300 | 603 SF | 2 BED | 1 | 1 | 4 Modules |
| 2 | TYP 2.0 | 2301 | 605 SF | 2 BED | 1 | 1 | 4 Modules |
| 3 | TYP 2.0B | 2302 | 526 SF | 2 BED | 2 | 0 | 4 Modules |
| 4 | TYP 2.0 | 2303 | 537 SF | 2 BED | 1 | 1 | 4 Modules |
| 5 | TYP 2.0 | 2304 | 531 SF | 2 BED | 1 | 1 | 4 Modules |
| 6 | TYP 2.0 | 2305 | 579 SF | 2 BED | 1 | 1 | 4 Modules |
| 7 | TYP 3.3 | 2306 | 724 SF | 3 BED | 1 | 1 | Customized |
| 8 | TYP 2.0 | 2307 | 549 SF | 2 BED | 1 | 1 | 4 Modules |
| 9 | TYP 3.6 | 2308 | 696 SF | 3 BED | 1 | 1 | 4 Modules |
| 10 | TYP 2.0 | 2309 | 531 SF | 2 BED | 1 | 1 | 4 Modules |
| 11 | TYP 3.6 | 2310 | 792 SF | 3 BED | 1 | 1 | 3 Modules |
| 12 | TYP 2.1 | 2311 | 568 SF | 2 BED | 1 | 1 | 4 Modules |
| 13 | TYP 0.1 | 2312 | 292 SF | STUDIO | 1 | 0 | 3 Modules |
| 14 | TYP 2.0 | 2314 | 519 SF | 2 BED | 1 | 1 | 4 Modules |
| 15 | TYP 2.5 | 2315 | 564 SF | 2 BED | 1 | 1 | 3 Modules |
| | | **Sub-Total** | | | 16 | 13 | |

| | Count | Percent | |
|---|-------|---------|---|
| **Studio** | 36 | 8.98% | |
| TYP 0.0 | 10 | 2.49% | |
| TYP 0.1 | 18 | 4.49% | |
| TYP 0.2 | 2 | 0.75% | |
| 0UNIUQE | 5 | 1.25% | |
| **1 Bedroom** | 40 | 9.98% | |
| TYP 1.0 | 15 | 3.74% | |
| TYP 1.1 | 10 | 2.49% | |
| TYP 1.2 | 2 | 0.50% | |
| 1UNIQUE | 13 | 3.24% | |
| **2 Bedroom** | 263 | 65.59% | |
| TYP 2.0 | 149 | 37.16% | 50.87% |
| TYP 2.0A | 2 | 0.50% | |
| TYP 2.0B | 16 | 3.99% | |
| TYP 2.0C | 5 | 1.25% | |
| TYP 2.0D | 6 | 1.50% | |
| TYP 2.0E | 17 | 4.24% | |
| TYP 2.0F | 9 | 2.24% | |
| TYP 2.1 | 15 | 3.74% | |
| TYP 2.2 | 10 | 2.49% | |
| TYP 2.3 | 3 | 0.75% | |
| TYP 2.3A | 5 | 1.25% | |
| TYP 2.4 | 8 | 2.00% | |
| TYP 2.5 | 6 | 1.50% | |
| TYP 2.6 | 3 | 0.75% | |
| 2UNIQUE | 9 | 2.24% | |
| **3 Bedroom** | 60 | 15.00% | |
| TYP 3.0 | 10 | 2.50% | |
| TYP 3.1 | 7 | 1.75% | |
| TYP 3.2 | 7 | 1.75% | |
| TYP 3.3 | 17 | 4.25% | |
| TYP 3.4 | 2 | 0.50% | |
| TYP 3.5 | 3 | 0.75% | |
| TYP 3.6 | 4 | 1.00% | |
| 3UNIQUE | 10 | 2.50% | |

---

DESIGN INTENT
NOT FOR CONSTRUCTION

**PROJECT:**

## 353 W. 57 TH ST

NEW YORK, NY 10019

BLOCK: 1048   LOT: 7502

**OWNER:**

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

**ARCHITECT :**

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

**MEP ENGINEER:**

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

**STRUCTURAL ENGINEER:**

**INTERIOR DESIGNER:**

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

**LIGHTING DESIGNER:**

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

**DOB NOW JOB NUMBER:**

**DOB APPROVAL STAMP:**

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

**SEAL:**

**DRAWING TITLE:**

## TABLE
## UNIT BY FLOOR

| PROJECT #:  21-49 | DATE: 04.15.2022 |
|---|---|

**SHEET TITLE:**

## G - 007.00



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**SUB-CELLAR**

PROJECT #:  21-49     DATE: 04.15.2022
SHEET TITLE :

**DM-100.00**

**1** DEMOLITION PLAN - SUB-CELLAR
SCALE:  1/8" = 1'-0"

**DEMOLITION LEGEND**

EXISTING WALL TO REMAIN
EXISTING EXTERIOR WALL TO REMAIN
EXISTING  TO BE REMOVED
EXISTING PLUMBING CHASE
SRO UNIT
MECHANICAL/PLUMBING CHASE AREA
PROPERTY LINE
N.I.C.    NOT IN CONTRACT

57TH STREET

58TH STREET

TENANT SPACE ALTERNATE SCOPE.
NOT PART OF BASE SCOPE.



TENANT SPACE ALTERNATE SCOPE.
NOT PART OF BASE SCOPE.

DESIGN INTENT
NOT FOR CONSTRUCTION

57TH STREET

58TH STREET

+74'-1 3/4"
T.O STRUC. SLAB

**PROJECT:**

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

| | |
|---|---|
| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| ––– | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**DEMOLITION PLAN**
CELLAR

| PROJECT #:   21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE :

**1** DEMOLITION PLAN - CELLAR
SCALE:  1/8" = 1'-0"

## DM-101.00



TENANT SPACE ALTERNATE SCOPE. NOT PART OF BASE SCOPE.

57TH STREET

58TH STREET

+86'-11 5/8" T.O STRUC. SLAB

ESCALATOR TO BE REMOVED

+84'-9 1/8" T.O STRUC. SLAB

+84'-2 1/2" T.O STRUC. SLAB

+85'-2 1/4" T.O STRUC. SLAB

+86'-3 5/8" T.O STRUC. SLAB

**DEMOLITION LEGEND**

- EXISTING WALL TO REMAIN
- EXISTING EXTERIOR WALL TO REMAIN
- EXISTING  TO BE REMOVED
- EXISTING PLUMBING CHASE
- SRO UNIT
- MECHANICAL/PLUMBING CHASE AREA
- PROPERTY LINE
- N.I.C.   NOT IN CONTRACT

**1** DEMOLITION PLAN - GROUND FLOOR
SCALE:  1/8" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**GROUND FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022
SHEET TITLE :

**DM-102.00**



**LOT LINE**

DEMOLITION PLAN - MEZZANINE FLOOR
SCALE: 1/8" = 1'-0"

DM-103.00

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**MEZZANINE FLOOR**

PROJECT #:   21-49    DATE: 04.15.2022
SHEET TITLE :

**DEMOLITION LEGEND**

EXISTING WALL TO REMAIN
EXISTING EXTERIOR WALL TO REMAIN
EXISTING  TO BE REMOVED
EXISTING PLUMBING CHASE
SRO UNIT
MECHANICAL/PLUMBING CHASE AREA
PROPERTY LINE
N.I.C.   NOT IN CONTRACT



**LOT LINE**

ZONE C1-8

ZONE C6-4

ROOF TERRACE
5331 SQ. FT.

57TH STREET

58TH STREET

ESCALATOR TO BE REMOVED

+109'-10 5/8"
T.O STRUC. SLAB

+108'-2"
T.O STRUC. SLAB

**DEMOLITION LEGEND**

- EXISTING WALL TO REMAIN
- EXISTING EXTERIOR WALL TO REMAIN
- EXISTING TO BE REMOVED
- EXISTING PLUMBING CHASE
- SRO UNIT
- MECHANICAL/PLUMBING CHASE AREA
- PROPERTY LINE
- **N.I.C.** NOT IN CONTRACT

**1** DEMOLITION PLAN - 2ND FLOOR
SCALE: 1/8" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**2ND FLOOR**

PROJECT #:   21-49     DATE: 04.15.2022
SHEET TITLE :

**DM-104.00**



**LOT LINE**

57TH STREET

58TH STREET

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DESIGN INTENT
NOT FOR CONSTRUCTION

**DEMOLITION LEGEND**

| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**DEMOLITION PLAN**
**3RD FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE :

**1**  DEMOLITION PLAN - 3RD FLOOR
SCALE:  1/8" = 1'-0"

**DM-105.00**



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**DEMOLITION PLAN**
**4TH FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022
SHEET TITLE :

**DM-106.00**

**1**  DEMOLITION PLAN - 4TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
5TH FLOOR

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE :

**DM-107.00**

NEIGHBOR'S ROOF
(HALF FLOOR LOWER)

57TH STREET

58TH STREET

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1  DEMOLITION PLAN - 5TH FLOOR**
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**6TH FLOOR**

PROJECT #:   21-49      DATE: 04.15.2022
SHEET TITLE :

**DM-108.00**

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**   DEMOLITION PLAN - 6TH FLOOR
SCALE:  1/8" = 1'-0"

57TH STREET

58TH STREET



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**DEMOLITION PLAN**
**7TH-10TH & 12TH FLOOR**

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**DM-109.00**

57TH STREET

58TH STREET

GUESTROOM 751
GUESTROOM 750
GUESTROOM 749
GUESTROOM 752
GUESTROOM 753
GUESTROOM 754
CLOSET 7107
CLOSET 7106
ELEC.A 7103
GUESTROOM 747
GUESTROOM 743
GUESTROOM 737
GUESTROOM 733
GUESTROOM 731
GUESTROOM 730
GUESTROOM 729
GUESTROOM 728
GUESTROOM 727
GUESTROOM 726
GUESTROOM 725
GUESTROOM 723
GUESTROOM 720

STAIR A
GUESTROOM 755
CLOSET 7111
CORR. 7110
CORRIDOR 798
LINEN 7100
EXISTING LINEN SHOOT ELEC.B TO BE EXPANDED INTO TRASH CHUTE
ELEC.B 797

GUESTROOM 756
GUESTROOM 748
GUESTROOM 746
GUESTROOM 744
GUESTROOM 742
GUESTROOM 740
GUESTROOM 738
GUESTROOM 736
GUESTROOM 734
GUESTROOM 732
TELE. 794
MAIDS 795
ELEV. S8
ELEV. S7
STAIR B
DN UP
FLUE
GUESTROOM 719

GUESTROOM 761
GUESTROOM 757
GUESTROOM 718
GUESTROOM 717
GUESTROOM 716
GUESTROOM 758
GUESTROOM 760
GUESTROOM 759
TYP. A

GUESTROOM 714
GUESTROOM 715
GUESTROOM 712
GUESTROOM 711
CORR. 792
GUESTROOM 710
GUESTROOM 709
GUESTROOM 708
GUESTROOM 707
GUESTROOM 706
GUESTROOM 705
GUESTROOM 704
GUESTROOM 703

GUESTROOM 774
GUESTROOM 775
GUESTROOM 776
GUESTROOM 773
GUESTROOM 777
GUESTROOM 772
CORR. 780
STAIR D
DN UP
GUESTROOM 771
CL. 781
ELEC.D 782
CORRIDOR 784
GUESTROOM 770
GUESTROOM 769
GUESTROOM 768
GUESTROOM 767
GUESTROOM 766
GUESTROOM 765
GUESTROOM 763
VENDING LOUNGE 7101
PANTRY
ICE
ELEC.C 787
CLOSET 788
GUESTROOM 700
CORRIDOR 790
ELEV. P6
ELEV. P5
ELEV. P4
ELEV. P3
ELEV. P2
ELEV. P1
STAIR C
UP DN

DEMOLITION LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  DEMOLITION PLAN - 7TH, 8TH, 9TH, 10TH & 12ND FLOOR
SCALE:  1/8" = 1'-0"



**57TH STREET**

**58TH STREET**

### Floor Plan Labels

- GUESTROOM 1151 — 418 SQ. FT.
- GUESTROOM 1150 — 263 SQ. FT.
- S.S. 11109
- GUESTROOM 1149 — 279 SQ. FT.
- CL. 11108 — 18 SQ. FT.
- GUESTROOM 1153 — 394 SQ. FT.
- STAIR A
- CL. 11105 / CL. 11106
- GUESTROOM 1145 — 423 SQ. FT.
- GUESTROOM 1141 — 353 SQ. FT.
- GUESTROOM 1139 — 174 SQ. FT.
- GUESTROOM 1137 — 349 SQ. FT.
- GUESTROOM 1133 — 353 SQ. FT.
- GUESTROOM 1130 — 365 SQ. FT.
- GUESTROOM 1127 — 354 SQ. FT.
- GUESTROOM 1126 — 353 SQ. FT.
- GUESTROOM 1123 — 405 SQ. FT.
- CL. 11107 — 18 SQ. FT.
- ELEC.A 11103
- CORRIDOR 1198
- LINEN 11100
- ELEC.B 11197 — 15 SQ. FT.
- GUESTROOM 1155 — 408 SQ. FT.
- CL. 11111 — 26 SQ. FT.
- CLOSET 11104 — 125 SQ.FT.
- TELE 1194
- MAIDS 1195 — 77 SQ. FT.
- ELEV. S8
- DN UP
- STAIR B
- GUESTROOM 1120 — 378 SQ. FT.
- GUESTROOM 1121 — 203 SQ. FT.
- CORR. 11110
- GUESTROOM 1148 — SQ. FT.
- GUESTROOM 1144 — 370 SQ. FT.
- GUESTROOM 1140 — 198 SQ. FT.
- GUESTROOM 1136 — 338 SQ. FT.
- GUESTROOM 1132 — 402 SQ. FT.
- ELEV. S7
- CL. 1193
- FLUE
- GUESTROOM 1161 — 251 SQ. FT.
- GUESTROOM 1116 — 398 SQ. FT.
- GUESTROOM 1117 — 312 SQ. FT.
- GUESTROOM 1157 — 420 SQ. FT.
- GUESTROOM 1158 — 185 SQ. FT.
- GUESTROOM 1160 — 204 SQ. FT.
- GUESTROOM 1114 — 176 SQ. FT.
- GUESTROOM 1115 — 184 SQ. FT.
- GUESTROOM 1112 — 180 SQ. FT.
- GUESTROOM 1111 — 178 SQ. FT.
- GUESTROOM 1110 — 353 SQ. FT.
- GUESTROOM 1109 — 352 SQ. FT.
- GUESTROOM 1175 — 183 SQ. FT.
- GUESTROOM 1176 — 214 SQ. FT.
- GUESTROOM 1173 — 431 SQ. FT.
- CORR. 1192
- GUESTROOM 1108 — 376 SQ. FT.
- GUESTROOM 1105 — 426 SQ. FT.
- CORR. 1180
- GUESTROOM 1177 — 256 SQ. FT.
- GUESTROOM 1170 — 220 SQ. FT.
- TENANT 1169 (SRO) 372 SQ.FT.
- GUESTROOM 1167 — 356 SQ. FT.
- GUESTROOM 1165 — 178 SQ. FT.
- GUESTROOM 1163 — 265 SQ. FT.
- PANTRY
- ICE
- STAIR D
- VENDING LOUNGE 1101 — 204 SQ.FT.
- ELEC.C 1187 +203'-9 1/4" T.O STRUC. SLAB
- CL. 1188
- GUESTROOM 1100 — 697 SQ. FT.
- GUESTROOM 1171 — 412 SQ. FT.
- ELEC.D 1181
- CL. 1182
- CORRIDOR 1184
- CL. 1185
- ELEV. P6
- ELEV. P5
- ELEV. P4
- ELEV. P3
- ELEV. P2
- ELEV. P1
- STAIR C
- TOILET 1189
- CORRIDOR 1190

### Title Block

**PROJECT:**

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

**OWNER:**

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

**ARCHITECT :**

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

**MEP ENGINEER:**

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

**STRUCTURAL ENGINEER:**

**INTERIOR DESIGNER:**

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

**LIGHTING DESIGNER:**

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

**DOB NOW JOB NUMBER:**

**DOB APPROVAL STAMP:**

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

**SEAL:**

**DRAWING TITLE:**

**DEMOLITION PLAN**
**11ST FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE :

## DM-110.00

### DEMOLITION LEGEND

| | |
|---|---|
| ▭ | EXISTING WALL TO REMAIN |
| ▬ | EXISTING EXTERIOR WALL TO REMAIN |
| ⬚ (red dashed) | EXISTING TO BE REMOVED |
| ⬚ (blue dashed) | EXISTING PLUMBING CHASE |
| ⬚ (orange dashed) | SRO UNIT |
| ▨ | MECHANICAL/PLUMBING CHASE AREA |
| ─ ─ | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**   DEMOLITION PLAN - 11ST FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

## DEMOLITION PLAN
14TH FLOOR

PROJECT #:   21-49          DATE: 04.15.2022
                                              SHEET TITLE :

## DM-111.00

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**   DEMOLITION PLAN - 14TH FLOOR
SCALE:  1/8" = 1'-0"





**57TH STREET**

**58TH STREET**

PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**16TH FLOOR**

PROJECT #:   21-49       DATE: 04.15.2022

SHEET TITLE :

**DM-113.00**

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  DEMOLITION PLAN - 16TH FLOOR
SCALE:  1/8" = 1'-0"



**57TH STREET**

**58TH STREET**

PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

## DEMOLITION LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**DEMOLITION PLAN**
**17TH FLOOR**

PROJECT #:   21-49    DATE: 04.15.2022

SHEET TITLE :

**DM-114.00**

**1**  DEMOLITION PLAN - 17TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**18TH FLOOR**

PROJECT #:   21-49       DATE: 04.15.2022

SHEET TITLE :

**DM-115.00**

57TH STREET

58TH STREET

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**   DEMOLITION PLAN - 18TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**19TH FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022
SHEET TITLE :

**57TH STREET**

**58TH STREET**

GUESTROOM 1945 420 SQ. FT.
GUESTROOM 1943 179 SQ. FT.
GUESTROOM 1941 176 SQ. FT.
GUESTROOM 1939 178 SQ. FT.
GUESTROOM 1937 176 SQ. FT.
GUESTROOM 1935 176 SQ. FT.
GUESTROOM 1933 175 SQ. FT.
GUESTROOM 1931 178 SQ. FT.
GUESTROOM 1930 177 SQ. FT.
GUESTROOM 1929 177 SQ. FT.
GUESTROOM 1928 170 SQ. FT.
GUESTROOM 1927 183 SQ. FT.
GUESTROOM 1925 181 SQ. FT.
GUESTROOM 1923 225 SQ. FT.

ELEC.A 19103 12 SQ. FT.
STAIR A
**STAIR A**
UP

CORRIDOR 1998
LINEN 19100
ELEC.B 1997 14 SQ. FT.

TERRACE BELOW

GUESTROOM 1946 415 SQ. FT.
GUESTROOM 1944 178 SQ. FT.
GUESTROOM 1940 358 SQ. FT.
GUESTROOM 1938 177 SQ. FT.
GUESTROOM 1936 179 SQ. FT.

TELE. 1994 22 SQ. FT.
MAID 1995 76 SQ. FT.

ELEV. S8
DN  UP
**STAIR B**

ELEV. S7

GUESTROOM 1922 220 SQ. FT.

CL. 1993

GUESTROOM 1916 (SRO) 379 SQ. FT.

GUESTROOM 1917 319 SQ. FT.

GUESTROOM 1912 177 SQ. FT.
GUESTROOM 1915 176 SQ. FT.

GUESTROOM 1910 175 SQ. FT.
GUESTROOM 1911 177 SQ. FT.

GUESTROOM 1906 356 SQ. FT.
CORR. 1992
GUESTROOM 1907 357 SQ. FT.

GUESTROOM 1904 178 SQ. FT.
GUESTROOM 1905 179 SQ. FT.

GUESTROOM 1902 214 SQ. FT.
AVAIL 1988 27 SQ. FT.
GUESTROOM 1903 174 SQ. FT.

GUESTROOM 1957 207 SQ. FT.
GUESTROOM 1955 373 SQ. FT.
GUESTROOM 1953 358 SQ. FT.
GUESTROOM 1952 179 SQ. FT.
GUESTROOM 1950 269 SQ. FT.

PANTRY
ICE
VENDING LOUNGE 19101 190 SQ. FT.
S.S 1986 13 SQ. FT.
ELEC.C 1987 14 SQ. FT.
STAIR C
**STAIR C**
DN  UP

GUESTROOM 1901 192 SQ. FT.

TERRACE BELOW

CORRIDOR 1990
CL. 1985 12 SQ. FT.

**STAIR D**
DN UP
STAIR D
ELEC.D 1981 22 SQ. FT.
CORRIDOR 1984

ELEV. P6
ELEV. P5
ELEV. P4
ELEV. P3
ELEV. P2
ELEV. P1

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  DEMOLITION PLAN - 19TH FLOOR
SCALE:  1/8" = 1'-0"

**DM-116.00**



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**20TH FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE :

**DM-117.00**

## DEMOLITION LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1** | DEMOLITION PLAN - 20TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**21ST FLOOR**

PROJECT #:  21-49      DATE: 04.15.2022
SHEET TITLE :

**DM-118.00**

57TH STREET

58TH STREET

WIN.
3'-3"W. X 4'-8" H
31" SILL

ROOF

ELEC.A
21103
14 SQ. FT.

STAIR A

TENANT
2147
415 SQ. FT.

TENANT
2145
(SRO)
174 SQ. FT.

TENANT
2133
353 SQ. FT.
353 SQ.FT.

TENANT
2135
(SRO)
362 SQ. FT.

TENANT
2131
177 SQ. FT.

TENANT
2131
174 SQ. FT.

TENANT
2130
177 SQ. FT.

TENANT
2129
(SRO)
176 SQ. FT.

TENANT
2128
175 SQ. FT.

TENANT
2127
392 SQ. FT.

CORRIDOR
2198

LINEN
21100

ELEC.B
2197
13 SQ. FT.

ELEC.B

ELEV. S8

DN   UP

ELEV. S7

STAIR B

ROOF

KITCHEN

TENANT
2146
(SRO)
416 SQ. FT.

TENANT
2144
177 SQ. FT.

TENANT
2142
180 SQ. FT.

TENANT
2140
(SRO)
177 SQ. FT.

TENANT
2138
(SRO)
356 SQ. FT.

TENANT
2134
406 SQ. FT.

TELE.
2194
23 SQ. FT.

MAIDS
2195
42 SQ. FT.

CL.
2193
6 SQ. FT.

TENANT
2114
(SRO)
380 SQ. FT.

TENANT
2117
312 SQ. FT.

KITCHEN

TENANT
2112
176 SQ. FT.

TENANT
2115
178 SQ. FT.

TENANT
2111
176 SQ. FT.

TENANT
2106
(SRO)
354 SQ. FT.

TENANT
2107
(SRO)
354 SQ. FT.

CORR.
2192

TENANT
2102
377 SQ. FT.

KITCHEN

TENANT
2103
417 SQ. FT.

AVAIL
2088
24 SQ. FT.

DN

STAIR C

UP

ROOF

TENANT
2156
(SRO)
204 SQ. FT.

TENANT
2156
193 SQ. FT.

NO SURVEY
POSSIBLE
(SRO)
169 SQ. FT

OWNER/EXECUTIVE
SUITE
2153
799 SQ. FT.

NO SURVEY
POSSIBLE

S.S
2186
12 SQ. FT.

ELEC.C
2187
14 SQ. FT.

CORRIDOR
2190

STAIR D

STAIR D

DN

UP

CORRIDOR
2184

ELEC.D
2181
22 SQ. FT.

CL.
2185
21 SQ. FT.

ELEV. P6

ELEV. P5

ELEV. P4

ELEV. P3

ELEV. P2

ELEV. P1

**DEMOLITION LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | EXISTING  TO BE REMOVED |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| **N.I.C.** | NOT IN CONTRACT |

**1**  DEMOLITION PLAN - 21ST FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**22ND FLOOR**

PROJECT #:  21-49          DATE: 04.15.2022
                                  SHEET TITLE :

**DM- 119.00**

57TH STREET

58TH STREET

ELEC.A
22103
14 SQ. FT.

STAIR A

TENANT
2247
415 SQ. FT.

(SRO)
TENANT
2245
174 SQ. FT.

TENANT
2239
(SRO)
353 SQ. FT.

TENANT
2235
(SRO)
352 SQ. FT.

TENANT
2231
(SRO)
177 SQ. FT.

TENANT
2229
176 SQ. FT.

NO SURVEY
POSSIBLE

TENANT
2228
176 SQ. FT.

TENANT
2227
(SRO)
203 SQ. FT.

ROOF

ROOF
BELOW

CORRIDOR
2298

LINEN
22100
30 SQ. FT.

EXISTING LINEN SHOOT
TO BE EXPANDED INTO
TRASH CHUTE

ELEC.B
2297
13 SQ. FT.

UP

(SRO)
418 SQ. FT.

VACANT
2244
416 SQ. FT.

NO SURVEY
POSSIBLE

TENANT
2240
357 SQ. FT.

(SRO)
356 SQ. FT.
TENANT
2236
356 SQ. FT.

(SRO)
197 SQ. FT.
TENANT
2232
197 SQ. FT.

NO SURVEY
POSSIBLE

TELE.
2294
42 SQ. FT.

CL.
2295
12 SQ. FT.

CL.
2296
10 SQ. FT.

CL.
2093
6 SQ. FT.

ELEV. S8

ELEV. S7

DN   UP

STAIR B

KIT.

TENANT
2214
380 SQ. FT.

W
W

LAUNDRY
2217
312 SQ. FT.

W   W W W D D

TENANT
2212
(SRO)
175 SQ. FT.

TENANT
2210
176 SQ. FT.

TENANT
2215
178 SQ. FT.

(SRO)
TENANT
2211
176 SQ. FT.

CORR.
2092

TENANT
2206
(SRO)
354 SQ. FT.

(SRO)
TENANT
2207
354 SQ. FT.

NO SURVEY
POSSIBLE
(SRO)

TENANT
2204
(SRO)
204 SQ. FT.

TENANT
2203
417 SQ. FT.

AVAIL.
2288
24 SQ. FT.

TENANT
2257
204 SQ. FT.

TENANT
2256
NO ACCESS

TENANT
2255
(SRO)
160 SQ. FT.

TENANT
2253
(SRO)
388 SQ. FT.

TENANT
2250
441 SQ. FT.

NO SURVEY
POSSIBLE

CORRIDOR
2290

S.S
2286
12 SQ. FT.

ELEC.C
2287
14 SQ. FT.

STAIR C

UP C

STAIR C

DN

ROOF
BELOW

CL.
2285
21 SQ. FT.

ELEV. P6   ELEV. P5   ELEV. P4   ELEV. P3   ELEV. P2   ELEV. P1

STAIR D

STAIR D   DN   UP

CORRIDOR
2284

ELEC.D
2281
22 SQ. FT.

STAIR A

ELEC.A

**DEMOLITION LEGEND**

EXISTING WALL TO REMAIN

EXISTING EXTERIOR WALL TO REMAIN

EXISTING  TO BE REMOVED

EXISTING PLUMBING CHASE

SRO UNIT

MECHANICAL/PLUMBING CHASE AREA

PROPERTY LINE

N.I.C.   NOT IN CONTRACT

**1**  DEMOLITION PLAN - 22ND FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**DEMOLITION PLAN**
**23RD FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE :

**DM-120.00**

**57TH STREET**

**58TH STREET**

ROOF BELOW

GUESTROOM 2347 / 409 SQ. FT.
GUESTROOM 2345 / 175 SQ. FT.
GUESTROOM 2339 / 355 SQ. FT.
GUESTROOM 2335 / 352 SQ. FT.
GUESTROOM 2333 / 178 SQ. FT.
GUESTROOM 2331 / 175 SQ. FT.
GUESTROOM 2330 / 178 SQ. FT.
GUESTROOM 2329 / 178 SQ. FT.
GUESTROOM 2328 / 177 SQ. FT.
GUESTROOM 2327 / 204 SQ. FT.

ELEC.A 23103 / 15 SQ. FT.

STAIR A

CORRIDOR 2398

LINEN 23100 / 31 SQ. FT.

ELEC.B 2397 / 13 SQ. FT.

ELEV. S8
ELEV. S7

DN   UP

STAIR B

GUESTROOM 2346 / 416 SQ. FT.
GUESTROOM 2344 / 177 SQ. FT.
GUESTROOM 2342 / 181 SQ. FT.
GUESTROOM 2340 / 178 SQ. FT.
GUESTROOM 2336 / 358 SQ. FT.
GUESTROOM 2334 / 198 SQ. FT.
GUESTROOM 2332 / 207 SQ. FT.

TELE. 2394 / 23 SQ. FT.
MAIDS 2395 / 72 SQ. FT.

CL. 2393 / 6 SQ. FT.

FLUE

GUESTROOM 2314 / 377 SQ. FT.
GUESTROOM 2317 / 314 SQ. FT.

GUESTROOM 2312 / 176 SQ. FT.
GUESTROOM 2315 / 180 SQ. FT.

GUESTROOM 2310 / 176 SQ. FT.
GUESTROOM 2311 / 176 SQ. FT.

GUESTROOM 2306 / 356 SQ. FT.
GUESTROOM 2307 / 357 SQ. FT.

CORR. 2392

GUESTROOM 2304 / 174 SQ. FT.
GUESTROOM 2305 / 180 SQ. FT.

GUESTROOM 2302 / 176 SQ. FT.

AVAIL. 2388 / 26 SQ. FT.

GUESTROOM 2303 / 231 SQ. FT.

WIN. 3'-3"W. X 4'-8" H 31" SILL

WIN. 3'-3"W. X 4'-8" H 31" SILL

+309'-9 3/4" T.O STRUC. SLAB

GUESTROOM 2357 / 205 SQ. FT.
GUESTROOM 2356 / 191 SQ. FT.
GUESTROOM 2353 / 360 SQ. FT.
GUESTROOM 2352 / 171 SQ. FT.
GUESTROOM 2350 / 262 SQ. FT.

VENDING LOUNGE 23101 / 177 SQ. FT.

ELEC.C 2387 / 14 SQ. FT.

STAIR C
STAIR C

CORRIDOR 2390

CL. 2385 / 20 SQ. FT.

CORRIDOR 2384

STAIR D

ELEC.D 2381 / 22 SQ. FT.

ELEV. P6
ELEV. P5
ELEV. P4
ELEV. P3
ELEV. P2
ELEV. P1

**DEMOLITION LEGEND**

EXISTING WALL TO REMAIN
EXISTING EXTERIOR WALL TO REMAIN
EXISTING  TO BE REMOVED
EXISTING PLUMBING CHASE
SRO UNIT
MECHANICAL/PLUMBING CHASE AREA
PROPERTY LINE
N.I.C.   NOT IN CONTRACT

**1**   DEMOLITION PLAN - 23RD FLOOR
SCALE:  1/8" = 1'-0"



LAP POOL
(24'X48')

PADEL COURT
(33'X66')

BASKETBALL
COURT
(50'X90')

TENANT SPACE ALTERNATE SCOPE.
NOT PART OF BASE SCOPE.

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
SUB-CELLAR

PROJECT #:   21-49          DATE: 04.15.2022
                            SHEET TITLE :

**A-100.00**

**1**  PROPOSED PLAN - SUB-CELLAR
SCALE:  1/8" = 1'-0"



LAP POOL
(24'X48')

PADEL COURT
(33'X66')

BASKETBALL
COURT
(50'X...)

TENANT SPACE ALTERNATE SCOPE.
NOT PART OF BASE SCOPE.

+74'-1 3/4"
T.O STRUC. SLAB

**PROJECT:**

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
CELLAR

| PROJECT #:   21-49 | DATE: 04.15.2022 |

SHEET TITLE :

# A-101.00

**1** PROPOSED PLAN - CELLAR
SCALE:  1/8" = 1'-0"



TENANT SPACE. ALTERNATE SCOPE
NOT PART OF BASE SCOPE

SERVICE ELEV. 9

SERVICE KITCHEN

CHANGING ROOM

STORAGE

STORAGE

LOBBY

ADMINISTRATION CONTROL

MAIL

COLD STORAGE

BIKE ROOM (x250)

SECURITY CONTROL

AMAZON STORAGE

M RESTROOMS

W RESTROOMS

AMAZON STORAGE

VESTIBULE
E-332

STORAGE

**1**  PROPOSED PLAN - GROUND FLOOR
SCALE:  1/8" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
GROUND FLOOR

PROJECT #:  21-49          DATE: 04.15.2022
SHEET TITLE :

**A-102.00**



TENANT SPACE ALTERNATE SCOPE.
NOT PART OF BASE SCOPE.

**1** PROPOSED PLAN - MEZZANINE FLOOR
SCALE:  1/8" = 1'-0"

PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
MEZZANINE FLOOR

PROJECT #:   21-49      DATE: 04.15.2022

SHEET TITLE :

# A-103.00



**1** PROPOSED PLAN - 2ND FLOOR
SCALE: 1/8" = 1'-0"

PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**2ND FLOOR**

PROJECT #:  21-49   |   DATE: 04.15.2022

SHEET TITLE :

**A-104.00**



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
3RD FLOOR

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**A-105.00**

LAUNDRY
624 SQ. FT.

STORAGE
1282 SQ. FT.

STAIR A

#303
1 BED
557 SQ. FT.

TRASH
COMPACTOR
ROOM

#300
2 BED
690 SQ. FT.

#301
2 BED
543 SQ. FT.

#302
2 BED
560 SQ. FT.

STAIR B

TBD -
VERIFY IF THIS
MECH ROOM CAN
BE RE-CLAIMED

#304
3 BED
1065 SQ. FT.

UNLIKELY TO HAVE
WINDOWS AVAILABLE DUE
TO THE GLASS CANOPY

STORAGE
968 SQ. FT.

NEW CORRIDOR

#306
2 BED
806 SQ. FT.

#305
2 BED
864 SQ. FT.

#308
2 BED
601 SQ. FT.

STAIR D

#307
2 BED
529 SQ. FT.

NEW CORRIDOR

NEW CORRIDOR

STAIR C

| FLOOR 003 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 0 | 0 |
| 1 BED | 1 | 1 |
| 2 BED | 7 | 14 |
| 3 BED | 1 | 3 |
| **TOTAL** | **9** | **18** |
| SRO | 0 | |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  PROPOSED PLAN - 3RD FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**4TH FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**A-106.00**

### FLOOR 004

| | UNIT # | BED # |
|---|---|---|
| STUDIO | 4 | 4 |
| 1 BED | 3 | 3 |
| 2 BED | 13 | 26 |
| 3 BED | 2 | 6 |
| **TOTAL** | **22** | **39** |
| SRO | 0 | |

**LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  PROPOSED PLAN - 4TH FLOOR
SCALE:  1/8" = 1'-0"



**NEIGHBOR'S ROOF**
(HALF FLOOR LOWER)

PENDING
LIGHT & AIR EASEMENT

EXIST. LINEN CHUTE,
TO BE REPLACED WITH 24" TRASH CHUTE

ROOF BELOW

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

SEAL:

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

DRAWING TITLE:

**PROPOSED PLAN**
5TH FLOOR

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**A-107.00**

| FLOOR 005 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 3 | 3 |
| 1 BED | 4 | 4 |
| 2 BED | 18 | 36 |
| 3 BED | 2 | 6 |
| TOTAL | 27 | 49 |
| SRO | 0 | |

**LEGEND**

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1**  PROPOSED PLAN - 5TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
6TH FLOOR

PROJECT #:  21-49     DATE: 04.15.2022

SHEET TITLE :

**A-108.00**

## FLOOR 006

|  | UNIT # | BED # |
|---|---|---|
| STUDIO | 2 | 2 |
| 1 BED | 2 | 2 |
| 2 BED | 19 | 38 |
| 3 BED | 3 | 9 |
| **TOTAL** | **26** | **51** |
| SRO | 0 | |

### LEGEND

- EXISTING WALL TO REMAIN
- EXISTING EXTERIOR WALL TO REMAIN
- PROPOSED WALL
- EXISTING PLUMBING CHASE
- SRO UNIT
- EXISTING COLUMN
- MECHANICAL/PLUMBING CHASE AREA
- PROPERTY LINE
- N.I.C.   NOT IN CONTRACT

**1**   PROPOSED PLAN - 6TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

CSC COLIVING

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

TANG STUDIO ARCHITECT LLC

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

MG ENGINEERING, P.C.

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

B-HUBER

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

LIGHTING WORKSHOP

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

SEAL:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

DRAWING TITLE:

**PROPOSED PLAN**
**7TH-10TH & 12TH FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**A-109.00**

**FLOOR 007-010 & 012**

|  | UNIT # | BED # |
|---|---|---|
| STUDIO | 2 | 2 |
| 1 BED | 2 | 2 |
| 2 BED | 19 | 38 |
| 3 BED | 3 | 9 |
| **TOTAL** | **26** | **51** |
| SRO | 0 | |

LEGEND

EXISTING WALL TO REMAIN
EXISTING EXTERIOR WALL TO REMAIN
PROPOSED WALL
EXISTING PLUMBING CHASE
SRO UNIT
EXISTING COLUMN
MECHANICAL/PLUMBING CHASE AREA
PROPERTY LINE
N.I.C.   NOT IN CONTRACT

**1**  PROPOSED PLAN - 7TH, 8TH, 9TH, 10TH & 12ND FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

| | |
|---|---|
| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

### FLOOR 011

| | UNIT # | BED # |
|---|---|---|
| STUDIO | 0 | 0 |
| 1 BED | 1 | 1 |
| 2 BED | 7 | 14 |
| 3 BED | 1 | 3 |
| **TOTAL** | **9** | **18** |
| SRO | 0 | |

### LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**PROPOSED PLAN**
**11ST FLOOR**

PROJECT #:  21-49     DATE: 04.15.2022

SHEET TITLE :

**A-110.00**

**1**  PROPOSED PLAN - 11ST FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048 LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022 50% CD SUBMISSION

04.04.2022 SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**14TH FLOOR**

PROJECT #: 21-49    DATE: 04.15.2022

SHEET TITLE :

**A-111.00**

## FLOOR 014

| | UNIT # | BED # |
|---|---|---|
| STUDIO | 2 | 2 |
| 1 BED | 5 | 5 |
| 2 BED | 12 | 24 |
| 3 BED | 7 | 21 |
| **TOTAL** | **26** | **52** |
| SRO | | 1 |

### LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**1** PROPOSED PLAN - 14TH FLOOR
SCALE: 1/8" = 1'-0"



**PROJECT:**

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| FLOOR 015 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 2 | 2 |
| 1 BED | 1 | 1 |
| 2 BED | 8 | 16 |
| 3 BED | 6 | 18 |
| TOTAL | 17 | 37 |
| SRO | | 1 |

04.15.2022  50% CD SUBMISSION
04.04.2022  SD SUBMISSION

SEAL:

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

DRAWING TITLE:

**PROPOSED PLAN**
15TH FLOOR

PROJECT #:  21-49      DATE: 04.15.2022

SHEET TITLE :

**A-112.00**

**1**  PROPOSED PLAN - 15TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

## FLOOR 016

|  | UNIT # | BED # |
|---|---|---|
| STUDIO | 1 | 1 |
| 1 BED | 0 | 0 |
| 2 BED | 11 | 22 |
| 3 BED | 5 | 15 |
| **TOTAL** | **17** | **38** |
| SRO |  | 0 |

### LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| --- | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**16TH FLOOR**

PROJECT #:  21-49       DATE: 04.15.2022

SHEET TITLE :

**A-113.00**

**1** PROPOSED PLAN - 16TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

SEAL:

PROPOSED PLAN - 17TH FLOOR
SCALE:  1/8" = 1'-0"

A-114.00

| FLOOR 017 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 1 | 1 |
| 1 BED | 1 | 1 |
| 2 BED | 14 | 28 |
| 3 BED | 2 | 6 |
| **TOTAL** | **18** | **36** |
| SRO | | 1 |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

DRAWING TITLE:

**PROPOSED PLAN**
**17TH FLOOR**

PROJECT #:  21-49      DATE: 04.15.2022
SHEET TITLE :



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

SEAL:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

| FLOOR 018 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 1 | 1 |
| 1 BED | 0 | 0 |
| 2 BED | 12 | 24 |
| 3 BED | 2 | 6 |
| TOTAL | 15 | 31 |
| SRO | | 3 |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

DRAWING TITLE:

**PROPOSED PLAN**
**18TH FLOOR**

PROJECT #:  21-49      DATE: 04.15.2022
SHEET TITLE :

**A-115.00**

**1**   PROPOSED PLAN - 18TH FLOOR
SCALE:  1/8" = 1'-0"



## FLOOR 019

| | UNIT # | BED # |
|---|---|---|
| STUDIO | 2 | 2 |
| 1 BED | 0 | 0 |
| 2 BED | 14 | 28 |
| 3 BED | 1 | 3 |
| TOTAL | 17 | 33 |
| SRO | | 1 |

### LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

**PROJECT:**

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT NOT FOR CONSTRUCTION**

| 04.15.2022 | 50% CD SUBMISSION |
|---|---|
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**19TH FLOOR**

| PROJECT #:  21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE :

**A-116.00**

**1**  PROPOSED PLAN - 19TH FLOOR
SCALE:  1/8" = 1'-0"



**PROJECT:**

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| FLOOR 020 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 2 | 2 |
| 1 BED | 1 | 1 |
| 2 BED | 6 | 12 |
| 3 BED | 5 | 15 |
| **TOTAL** | **14** | **30** |
| SRO | | 4 |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**20TH FLOOR**

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**A-117.00**

**1**   PROPOSED PLAN - 20TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| FLOOR 021 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 1 | 1 |
| 1 BED | 5 | 5 |
| 2 BED | 4 | 8 |
| 3 BED | 1 | 3 |
| **TOTAL** | **11** | **17** |
| SRO | 0 | |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**21ST FLOOR**

PROJECT #: 21-49   DATE: 04.15.2022
SHEET TITLE :

**A-118.00**

1   PROPOSED PLAN - 21ST FLOOR
SCALE:   1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| FLOOR 022 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 1 | 1 |
| 1 BED | 4 | 4 |
| 2 BED | 3 | 6 |
| 3 BED | 1 | 3 |
| **TOTAL** | **9** | **14** |
| SRO | 16 | |

| LEGEND | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**22ND FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**A-119.00**

**1**   PROPOSED PLAN - 22ND FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| FLOOR 023 | | |
|---|---|---|
| | UNIT # | BED # |
| STUDIO | 1 | 1 |
| 1 BED | 0 | 0 |
| 2 BED | 11 | 22 |
| 3 BED | 3 | 9 |
| TOTAL | 15 | 32 |
| SRO | 0 | |

LEGEND

| | |
|---|---|
| | EXISTING WALL TO REMAIN |
| | EXISTING EXTERIOR WALL TO REMAIN |
| | PROPOSED WALL |
| | EXISTING PLUMBING CHASE |
| | SRO UNIT |
| | EXISTING COLUMN |
| | MECHANICAL/PLUMBING CHASE AREA |
| | PROPERTY LINE |
| N.I.C. | NOT IN CONTRACT |

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**PROPOSED PLAN**
**23RD FLOOR**

PROJECT #:  21-49    DATE: 04.15.2022
SHEET TITLE :

**A-120.00**

**1**  PROPOSED PLAN - 23RD FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

*DESIGN INTENT*
*NOT FOR CONSTRUCTION*

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**REFLECTED CEILING PLAN**
**3RD FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022
SHEET TITLE :

**A-135.00**

**LAUNDRY**
624 SQ. FT.

**STORAGE**
1282 SQ. FT.

STAIR A

#303
1 BED
557 SQ. FT.

**TRASH COMPACTOR ROOM**

STAIR B

#300
2 BED
690 SQ. FT.

#301
2 BED
543 SQ. FT.

#302
2 BED
560 SQ. FT.

#304
3 BED
1065 SQ. FT.

TBD -
VERIFY IF THIS
MECH ROOM CAN
BE RE-CLAIMED

CEILING
EXISTING
PA-01

UNLIKELY TO HAVE
WINDOWS AVAILABLE DUE
TO THE GLASS CANOPY

**STORAGE**
968 SQ. FT.

NEW CORRIDOR

#306
2 BED
806 SQ. FT.

#305
2 BED
864 SQ. FT.

WIN.
3'-2 W. X 5'-10" H
2'-7" SILL

#308
2 BED
601 SQ. FT.

#307
2 BED
529 SQ. FT.

STAIR D

NEW CORRIDOR

NEW CORRIDOR

STAIR C

## LIGHTING LEGEND

**EXISTING**

EX'G  — DOWNLIGHTS

EX'G  — ILLUMINATED MIRROR

**NEW**

L1  — DOWNLIGHTS

L2  — UNDER CABINET TASK LIGHT

L3  — WALL WASHER LIGHT

L4  — ILLUMINATED MIRROR

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED

## NOTES:

1.  AMENITY SPACE LIGHTING DESIGN PENDING
2.  3RD FLOOR LIGHTING DESIGN PENDING
3.  **RESIDENTIAL CORRIDOR RCP:**
    3.1.  ALL EXISTING ACT TILE TO BE
          REPLACED BY GYB. DROP CEILING.
          EXISTING CEILING HEIGHT TO BE
          MAINTAINED
    3.2.  ALL EXISTING GYB. DROP CEILING TO
          BE PATCH AND PAINT
4.  SEE A-410 FOR TYPICAL RESIDENTIAL UNITS
    RCP DESIGN INTENT

**1**  REFLECTED CEILING PLAN  - 3RD FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

## LIGHTING LEGEND

**EXISTING**

EX'G ⚪ DOWNLIGHTS

EX'G – – – ILLUMINATED MIRROR

**NEW**

L1 ⚪ DOWNLIGHTS

L2 – – – UNDER CABINET TASK LIGHT

L3 —— WALL WASHER LIGHT

L4 ――― ILLUMINATED MIRROR

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**4TH FLOOR**

PROJECT #:  21-49     DATE: 04.15.2022

SHEET TITLE :

**A-136.00**

**1**   REFLECTED CEILING PLAN - 4TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION

04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**REFLECTED CEILING
PLAN
5TH FLOOR**

PROJECT #:  21-49          DATE: 04.15.2022

SHEET TITLE :

## A-137.00

**NEIGHBOR'S ROOF**
(HALF FLOOR LOWER)

PENDING
LIGHT & AIR EASEMENT

## LIGHTING LEGEND

**EXISTING**

EX'G ⬤ DOWNLIGHTS

EX'G – – – ILLUMINATED MIRROR

**NEW**

L1 ⬤ DOWNLIGHTS

L2 — — — UNDER CABINET TASK LIGHT

L3 ———— WALL WASHER LIGHT

L4 ———— ILLUMINATED MIRROR

## LEGEND

SD/CMD | SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**1**  REFLECTED CEILING PLAN  - 5TH FLOOR
SCALE:  1/8" = 1'-0"



**PROJECT:**

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**6TH FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**A-138.00**

---

### LIGHTING LEGEND

**EXISTING**

EX'G ⬤ DOWNLIGHTS

EX'G ----- ILLUMINATED MIRROR

**NEW**

L1 ⬤ DOWNLIGHTS

L2 ----- UNDER CABINET TASK LIGHT

L3 ——— WALL WASHER LIGHT

L4 ----- ILLUMINATED MIRROR

### LEGEND

SD/CMD   SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

### NOTES:

1.  AMENITY SPACE LIGHTING DESIGN PENDING
2.  3RD FLOOR LIGHTING DESIGN PENDING
3.  **RESIDENTIAL CORRIDOR RCP:**
    3.1.  ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
    3.2.  ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4.  SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

---

**1**  REFLECTED CEILING PLAN  - 6TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION

04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**7TH-10TH & 12TH FLOOR**

PROJECT #: 21-49    DATE: 04.15.2022

SHEET TITLE :

## A-139.00

### LIGHTING LEGEND

**EXISTING**

EX'G  ● DOWNLIGHTS

EX'G  - - - ILLUMINATED MIRROR

**NEW**

L1  ● DOWNLIGHTS

L2  — — UNDER CABINET TASK LIGHT

L3  —— WALL WASHER LIGHT

L4  - - - ILLUMINATED MIRROR

### LEGEND

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

### NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**1**  REFLECTED CEILING PLAN - 7TH, 8TH, 9TH, 10TH & 12ND FLOOR
SCALE:  1/8" = 1'-0"



**PROJECT:**

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

**OWNER:**

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

**ARCHITECT :**

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

**MEP ENGINEER:**

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

**STRUCTURAL ENGINEER:**

**INTERIOR DESIGNER:**

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

**LIGHTING DESIGNER:**

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

**DOB NOW JOB NUMBER:**

**DOB APPROVAL STAMP:**

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

**SEAL:**

## LIGHTING LEGEND

**EXISTING**

| EX'G | ⬤ | DOWNLIGHTS |
| EX'G | --- | ILLUMINATED MIRROR |

**NEW**

| L1 | ⬤ | DOWNLIGHTS |
| L2 | --- | UNDER CABINET TASK LIGHT |
| L3 | — | WALL WASHER LIGHT |
| L4 | --- | ILLUMINATED MIRROR |

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**DRAWING TITLE:**

## REFLECTED CEILING PLAN
**11ST FLOOR**

PROJECT #:   21-49      DATE: 04.15.2022

**SHEET TITLE :**

# A-140.00

**1**   REFLECTED CEILING PLAN  - 11ST FLOOR
SCALE:  1/8" = 1'-0"



**REFLECTED CEILING PLAN - 15TH FLOOR**
SCALE: 1/8" = 1'-0"

**LIGHTING LEGEND**

EXISTING

| | | |
|---|---|---|
| EX'G | ● | DOWNLIGHTS |
| EX'G | - - - - | ILLUMINATED MIRROR |

NEW

| | | |
|---|---|---|
| L1 | ● | DOWNLIGHTS |
| L2 | — — — | UNDER CABINET TASK LIGHT |
| L3 | ——— | WALL WASHER LIGHT |
| L4 | ——— | ILLUMINATED MIRROR |

**LEGEND**

SD/CMD — SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**NOTES:**

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**PROJECT:**

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| | |
|---|---|
| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**REFLECTED CEILING PLAN**
15TH FLOOR

PROJECT #:  21-49      DATE: 04.15.2022

SHEET TITLE :

**A-142.00**



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:

## LIGHTING LEGEND

**EXISTING**

EX'G ⬤ DOWNLIGHTS

EX'G - - - - ILLUMINATED MIRROR

**NEW**

L1 ⬤ DOWNLIGHTS

L2 — — — UNDER CABINET TASK LIGHT

L3 ———— WALL WASHER LIGHT

L4 - - - - ILLUMINATED MIRROR

## LEGEND

SD/CMD ▭  SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE
   REPLACED BY GYB. DROP CEILING.
   EXISTING CEILING HEIGHT TO BE
   MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO
   BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS
   RCP DESIGN INTENT

DESIGN INTENT
NOT FOR CONSTRUCTION

DRAWING TITLE:

## REFLECTED CEILING PLAN
**14TH FLOOR**

PROJECT #:  21-49       DATE: 04.15.2022

SHEET TITLE :

**1**   REFLECTED CEILING PLAN  - 14TH FLOOR
SCALE:  1/8" = 1'-0"

## A-141.00



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
NOT FOR CONSTRUCTION

## LIGHTING LEGEND

**EXISTING**

EX'G   ● DOWNLIGHTS

EX'G   – – – ILLUMINATED MIRROR

**NEW**

L1   ● DOWNLIGHTS

L2   – – – UNDER CABINET TASK LIGHT

L3   —— WALL WASHER LIGHT

L4   —— ILLUMINATED MIRROR

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**REFLECTED CEILING PLAN**
**16TH FLOOR**

PROJECT #:   21-49     DATE: 04.15.2022

SHEET TITLE :

**A-143.00**

**1** REFLECTED CEILING PLAN - 16TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

**LIGHTING LEGEND**

EXISTING

| EX'G | ● | DOWNLIGHTS |
| EX'G | – – | ILLUMINATED MIRROR |

NEW

| L1 | ● | DOWNLIGHTS |
| L2 | – – | UNDER CABINET TASK LIGHT |
| L3 | —— | WALL WASHER LIGHT |
| L4 | —— | ILLUMINATED MIRROR |

**LEGEND**

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**NOTES:**

1.  AMENITY SPACE LIGHTING DESIGN PENDING
2.  3RD FLOOR LIGHTING DESIGN PENDING
3.  **RESIDENTIAL CORRIDOR RCP:**
    3.1.  ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
    3.2.  ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4.  SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**17TH FLOOR**

PROJECT #:   21-49        DATE: 04.15.2022

SHEET TITLE:

**A-144.00**

**1**   REFLECTED CEILING PLAN - 17TH FLOOR
SCALE:  1/8" = 1'-0"



**PROJECT:**

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

## LIGHTING LEGEND

**EXISTING**

| | | |
|---|---|---|
| EX'G ● | | DOWNLIGHTS |
| EX'G – – – | | ILLUMINATED MIRROR |

**NEW**

| | | |
|---|---|---|
| L1 ● | | DOWNLIGHTS |
| L2 – – – | | UNDER CABINET TASK LIGHT |
| L3 ——— | | WALL WASHER LIGHT |
| L4 – – – | | ILLUMINATED MIRROR |

## LEGEND

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**18TH FLOOR**

PROJECT #:   21-49      DATE : 04.15.2022

SHEET TITLE :

**A-145.00**

**1**  REFLECTED CEILING PLAN  - 18TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

**LIGHTING LEGEND**

EXISTING

EX'G  ⬤  DOWNLIGHTS

EX'G  – – –  ILLUMINATED MIRROR

NEW

L1  ⬤  DOWNLIGHTS

L2  – – –  UNDER CABINET TASK LIGHT

L3  ———  WALL WASHER LIGHT

L4  – – –  ILLUMINATED MIRROR

**LEGEND**

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**NOTES:**

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**19TH FLOOR**

PROJECT #:  21-49      DATE: 04.15.2022

SHEET TITLE :

**A-146.00**

**1**   REFLECTED CEILING PLAN  - 19TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

## LIGHTING LEGEND

**EXISTING**

EX'G  ⬤  DOWNLIGHTS

EX'G  — — —  ILLUMINATED MIRROR

**NEW**

L1  ⬤  DOWNLIGHTS

L2  — — —  UNDER CABINET TASK LIGHT

L3  ———  WALL WASHER LIGHT

L4  ─ ─ ─  ILLUMINATED MIRROR

## LEGEND

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**20TH FLOOR**

PROJECT #:  21-49      DATE: 04.15.2022

SHEET TITLE :

**A-147.00**

**1**   REFLECTED CEILING PLAN  - 20TH FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**21ST FLOOR**

PROJECT #:   21-49      DATE: 04.15.2022

SHEET TITLE :

**A-148.00**

## LIGHTING LEGEND

**EXISTING**

EX'G  ○  DOWNLIGHTS

EX'G  - - -  ILLUMINATED MIRROR

**NEW**

L1  ○  DOWNLIGHTS

L2  - - -  UNDER CABINET TASK LIGHT

L3  ——  WALL WASHER LIGHT

L4  - - -  ILLUMINATED MIRROR

## LEGEND

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

## NOTES:

1.  AMENITY SPACE LIGHTING DESIGN PENDING
2.  3RD FLOOR LIGHTING DESIGN PENDING
3.  **RESIDENTIAL CORRIDOR RCP:**
    3.1.  ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
    3.2.  ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4.  SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**1**  REFLECTED CEILING PLAN - 21ST FLOOR
SCALE:  1/8" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022  50% CD SUBMISSION
04.04.2022  SD SUBMISSION

SEAL:

DRAWING TITLE:
**REFLECTED CEILING PLAN**
**22ND FLOOR**

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**A-149.00**

**LIGHTING LEGEND**

EXISTING

EX'G  ⬤  DOWNLIGHTS
EX'G  – – –  ILLUMINATED MIRROR

NEW

L1  ⬤  DOWNLIGHTS
L2  – – –  UNDER CABINET TASK LIGHT
L3  ——  WALL WASHER LIGHT
L4  ====  ILLUMINATED MIRROR

**LEGEND**

SD/CMD  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**NOTES:**

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

**1**  REFLECTED CEILING PLAN - 22ND FLOOR
SCALE: 1/8" = 1'-0"



PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

*DESIGN INTENT NOT FOR CONSTRUCTION*

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**REFLECTED CEILING PLAN**
**23RD FLOOR**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE:

**A-150.00**

---

**LIGHTING LEGEND**

**EXISTING**

EX'G  ●  DOWNLIGHTS

EX'G  – – –  ILLUMINATED MIRROR

**NEW**

L1  ●  DOWNLIGHTS

L2  – – –  UNDER CABINET TASK LIGHT

L3  ——  WALL WASHER LIGHT

L4  – – –  ILLUMINATED MIRROR

**LEGEND**

SD/CMD  ▭  SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**NOTES:**

1. AMENITY SPACE LIGHTING DESIGN PENDING
2. 3RD FLOOR LIGHTING DESIGN PENDING
3. **RESIDENTIAL CORRIDOR RCP:**
   3.1. ALL EXISTING ACT TILE TO BE REPLACED BY GYB. DROP CEILING. EXISTING CEILING HEIGHT TO BE MAINTAINED
   3.2. ALL EXISTING GYB. DROP CEILING TO BE PATCH AND PAINT
4. SEE A-410 FOR TYPICAL RESIDENTIAL UNITS RCP DESIGN INTENT

---

**1**  REFLECTED CEILING PLAN - 23RD FLOOR
SCALE:  1/8" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL PLAN**
STUDIO

PROJECT #:   21-49      DATE: 04.15.2022
SHEET TITLE :

**A-400.00**



**1**   STUDIO - TYPE 0.0
SCALE:  1/2" = 1'-0"



**2**   STUDIO - TYPE 0.1
SCALE:  1/2" = 1'-0"



**1** | (1) BEDROOM - TYPE 1.0
SCALE: 1/2" = 1'-0"



**2** | (1) BEDROOM - TYPE 1.1
SCALE: 1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**

SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**

20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

SEAL:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

DRAWING TITLE:

**TYPICAL PLAN**
(1) BEDROOM

PROJECT #:  21-49 | DATE: 04.15.2022
SHEET TITLE :

**A-401.00**

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION

04.04.2022   SD SUBMISSION

SEAL:



**TYP 2.0**
**(2) BED**
**529 SQ. FT.**

MASTER BEDROOM
02
90 SQ. FT.

LIVING & DINING
152 SQ. FT.

BEDROOM 01
80 SQ. FT.

EXISTING BATHROOM

NEW BATHROOM
TYP.A

CORRIDOR

W/D MODULE

4 MODULES

SOFFIT ABOVE. TYP.

DRAWING TITLE:

**TYPICAL PLAN**
(2) BEDROOMS

PROJECT #:   21-49      DATE: 04.15.2022

SHEET TITLE :

**A-402.00**

**1**   (2) BEDROOMS - TYPE 2.0
SCALE:  1/2" = 1'-0"

PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:



TYP 2.1
(2) BED
565 SQ. FT.

MASTER BEDROOM
02
95 SQ. FT.

EXISTING BATHROOM

LIVING & DINING
171 SQ. FT.

CORRIDOR

4 MODULES

BEDROOM 01
102 SQ. FT.

NEW BATHROOM
TYP. A

W/D MODULE

SOFFIT ABOVE. TYP.

DRAWING TITLE:

**TYPICAL PLAN**
(2) BEDROOMS

PROJECT #:  21-49       DATE: 04.15.2022
SHEET TITLE :

# A-403.00

**1**  (2) BEDROOMS - TYPE 2.1
SCALE:  1/2" = 1'-0"



**CORRIDOR**

**NEW BATHROOM**
TYP.A

PROVIDE ACCESS PANEL FOR SHAFT BEHIND

**CLOSET**

4 MODULES

**MASTER BEDROOM**
02
118 SQ. FT.

**SHAFT**

**LIVING & DINING**
171 SQ. FT.

**TYP 2.2**
(2) BED
731 SQ. FT.

**SHAFT**

**BEDROOM**
01
108 SQ. FT.

**EXISTING BATHROOM**

W/D MODULE

DESIGN INTENT
NOT FOR CONSTRUCTION

---

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL PLAN**
(2) BEDROOMS

PROJECT #:   21-49          DATE: 04.15.2022
                                    SHEET TITLE :

**A-404.00**

**1** | (2) BEDROOMS - TYPE 2.2
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL PLAN**
(2) BEDROOMS

PROJECT #:   21-49     DATE: 04.15.2022
                                    SHEET TITLE :

**A-405.00**



BEDROOM
01
80 SQ. FT.

LIVING & DINING
145 SQ. FT.

**TYP 2.3**
(2) BED
590 SQ. FT.

MASTER BEDROOM
02
96 SQ. FT.

W/D
MODULE

NEW
KITCHENETTE

EXISTING
BATHROOM
(MODIFIED)
TYP.A

NEW
BATHROOM
NON-TYPE

12" DEEP DROP SOFFIT ABOVE
KITCHENETTE

CORRIDOR

**1**   (2) BEDROOMS - TYPE 2.3
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:



BEDROOM
01
122 SQ. FT.

MASTER BEDROOM
02
205 SQ. FT.
CEILING
EXISTING

EXISTING
BATHROOM

SD/CMD   4  2'10" X 6'8"

SD/CMD   4  2'10" X 6'8"

SOFFIT ABOVE. TYP

**4 MODULES**

**TYP 3.0**
(3) BED
1049 SQ. FT.

LIVING & DINING
205 SQ. FT.

**NEW KITCHENETTE**

12" DROP SOFFIT ABOVE
KITCHENETTE

12" DROP SOFFIT ABOVE KITCHENETTE

BEDROOM
03
119 SQ. FT.

W/D
MODULE

30" X 70"
0.75-HR FPSC

2  2'10" X 6'8"

SD/CMD

2'10" X 6'8"

**NEW
BATHROOM**
TYP.A

**CORRIDOR**

7'-9"    2'-6"    6'-6"
10'-3"

---

DRAWING TITLE:

**TYPICAL PLAN**
(3) BEDROOMS

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**1**  (3) BEDROOMS - TYPE 3.0
SCALE:  1/2" = 1'-0"

**A-406.00**



**1** | (3) BEDROOMS - TYPE 3.1
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER :

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER :

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL PLAN**
(3) BEDROOMS

PROJECT #:  21-49    DATE: 04.15.2022
                              SHEET TITLE :

**A-407.00**

PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:



**TYP 3.0**
**(3) BED**
**716 SQ. FT.**

MASTER BEDROOM 01 — 99 SQ. FT.

BEDROOM 02 — 87 SQ. FT.

LIVING & DINING — 150 SQ. FT.

BEDROOM 03 — 85 SQ. FT.

NEW BATHROOM TYP.A

NEW BATHROOM NON-TYPE

NEW KITCHENETTE

CORRIDOR

W/D MODULE

DESIGN INTENT
NOT FOR CONSTRUCTION

DRAWING TITLE:

**TYPICAL PLAN**
**(3) BEDROOMS**

PROJECT #:  21-49        DATE: 04.15.2022

SHEET TITLE :

**1**   (3) BEDROOMS - TYPE 3.3
SCALE:  1/2" = 1'-0"

**A-408.00**





**1** REFLECTED CEILING PLAN - STUDIO - TYPE 0.0
SCALE: 1/2" = 1'-0"

**2** REFLECTED CEILING PLAN - STUDIO - TYPE 0.1
SCALE: 1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
STUDIO

PROJECT #: 21-49     DATE: 04.15.2022

SHEET TITLE:

**A-410.00**

**LIGHTING LEGEND**

**EXISTING**

EX'G ⊕ DOWNLIGHTS

EX'G — — — ILLUMINATED MIRROR

**NEW**

L1 ⊙ DOWNLIGHTS AT BATHROOM

L1A ⊙ DOWNLIGHTS AT COORIDOR

L2 — — — UNDER CABINET TASK LIGHT

L3 ———— WALL WASHER LIGHT

L4 — — — ILLUMINATED MIRROR

**LEGEND**

SD/CMD   SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED



**LIGHTING LEGEND**

**EXISTING**

| EX'G | ● | DOWNLIGHTS |
| EX'G | -- -- | ILLUMINATED MIRROR |

**NEW**

| L1 | ● | DOWNLIGHTS AT BATHROOM |
| L1A | ● | DOWNLIGHTS AT COORIDOR |
| L2 | — — — | UNDER CABINET TASK LIGHT |
| L3 | ——— | WALL WASHER LIGHT |
| L4 | - - - - | ILLUMINATED MIRROR |

**LEGEND**

SD/CMD — SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

**1** REFLECTED CEILING PLAN - TYPE 1.0
SCALE: 1/2" = 1'-0"

**2** REFLECTED CEILING PLAN - TYPE 1.1
SCALE: 1/2" = 1'-0"

---

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
(1) BEDROOM

| PROJECT #: 21-49 | DATE: 04.15.2022 |

SHEET TITLE :

**A-411.00**



CORRIDOR

CORRIDOR
GYP
PA-01

EXISTING
BATHROOM

CEILING
8'-0"AFF
PA-01

NEW
BATHROOM
TYP.A

CEILING
8'-0"AFF
PA-01

SOFFIT
8'-0" AFF
PA-01.

SOFFIT FOR SIDEWALL
SPRINKLER HEAD & LIGHT.

SOFFIT
8'-0" AFF
PA-01.

TYP 2.0
(2) BED
529 SQ. FT.

MASTER BEDROOM
02
90 SQ. FT.

CEILING
EXISTING
PA-01

LIVING & DINING
152 SQ. FT.

CEILING
EXISTING
PA-01

BEDROOM 01
80 SQ. FT.

CEILING
EXISTING
PA-01

SOFFIT
8'-0" AFF
PA-01.

7'-7"

16'-7"

2'-7"

5'-0"

10'-0"

8'-3"        7'-4"        8'-7"

26'-7"

**LIGHTING LEGEND**

EXISTING

EX'G ⬤ DOWNLIGHTS

EX'G - - - ILLUMINATED MIRROR

NEW

L1 ⬤ DOWNLIGHTS AT BATHROOM

L1A ⬤ DOWNLIGHTS AT COORIDOR

L2 - - - UNDER CABINET TASK LIGHT

L3 ——— WALL WASHER LIGHT

L4 - - - - ILLUMINATED MIRROR

**LEGEND**

SD/CMD    SMOKE DETECTOR / CARBON
          MONOXIDE DETECTOR -
          HARDWIRED & INTERCONNECTED
          WALL-MOUNTED

**1**  REFLECTED CEILING PLAN - TYPE 2.0
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
(2) BEDROOMS

PROJECT #:  21-49        DATE: 04.15.2022
SHEET TITLE :

**A-412.00**

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

SEAL:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

DESIGN INTENT
NOT FOR CONSTRUCTION



**LIGHTING LEGEND**

**EXISTING**

| EX'G | ⚪ | DOWNLIGHTS |
| EX'G | – – – | ILLUMINATED MIRROR |

**NEW**

| L1 | ⚪ | DOWNLIGHTS AT BATHROOM |
| L1A | ⚪ | DOWNLIGHTS AT COORIDOR |
| L2 | – – – | UNDER CABINET TASK LIGHT |
| L3 | —— | WALL WASHER LIGHT |
| L4 | ········ | ILLUMINATED MIRROR |

**LEGEND**

| SD/CMD | SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED |

DRAWING TITLE:

**TYPICAL RCP**
(2) BEDROOMS

PROJECT #:   21-49          DATE: 04.15.2022

SHEET TITLE :

**A-413.00**

**1**  REFLECTED CEILING PLAN - TYPE 2.1
SCALE:  1/2" = 1'-0"



PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

CORRIDOR
CORRIDOR
GYP:
PA-01

NEW
BATHROOM
TYP.A
CEILING
8'-0"AFF
PA-01

W/D
MODULE

L4
L1
L1

2
A-501

9'-0"

3
A-501

9'-10"

CLOSET

3
A-501

10'-8"

MASTER BEDROOM
02
118 SQ. FT.
CEILING
EXISTING

SHAFT

LIVING & DINING
171 SQ. FT.
CEILING
EXISTING
PA-01

**TYP 2.2**
(2) BED
731 SQ. FT.

1
A-501

7'-4"

BEDROOM
01
108 SQ. FT.
CEILING
EXISTING
PA-01

EXISTING
BATHROOM
CEILING
8'-0"AFF
PA-01

W/D
MODULE

4 MODULES

## LIGHTING LEGEND

**EXISTING**

| | | |
|---|---|---|
| EX'G | ● | DOWNLIGHTS |
| EX'G | --- | ILLUMINATED MIRROR |

**NEW**

| | | |
|---|---|---|
| L1 | ● | DOWNLIGHTS AT BATHROOM |
| L1A | ● | DOWNLIGHTS AT COORIDOR |
| L2 | --- | UNDER CABINET TASK LIGHT |
| L3 | --- | WALL WASHER LIGHT |
| L4 | --- | ILLUMINATED MIRROR |

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED

DRAWING TITLE:

**TYPICAL RCP**
(2) BEDROOMS

PROJECT #:   21-49   |   DATE: 04.15.2022
SHEET TITLE :

**A-414.00**

**1**   REFLECTED CEILING PLAN - TYPE 2.2
SCALE:  1/2" = 1'-0"



PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

LIVING & DINING
144 SQ. FT.

CEILING
EXISTING
PA-01

## TYP 2.3
(2) BED
**590 SQ. FT.**

BEDROOM
01
80 SQ. FT.

CEILING
EXISTING
PA-01

MASTER BEDROOM
02
94 SQ. FT.

CEILING
EXISTING
PA-01

NEW KITCHENETTE

CEILING
EXISTING
PA-01

W/D
MODULE

EXISTING
BATHROOM
(MODIFIED)
TYP.A

CEILING
8'-0"AFF
PA-01

NEW
BATHROOM
NON-TYPE

CEILING
8'-0"AFF
PA-01

CORRIDOR

CORRIDOR
GYP.
PA-01

## LIGHTING LEGEND

**EXISTING**

EX'G   DOWNLIGHTS
EX'G   ILLUMINATED MIRROR

**NEW**

L1   DOWNLIGHTS AT BATHROOM
L1A   DOWNLIGHTS AT COORIDOR
L2   UNDER CABINET TASK LIGHT
L3   WALL WASHER LIGHT
L4   ILLUMINATED MIRROR

## LEGEND

SD/CMD   SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED

DRAWING TITLE:

**TYPICAL RCP**
(2) BEDROOMS

PROJECT #:   21-49        DATE: 04.15.2022
SHEET TITLE :

## A-415.00

**1**   REFLECTED CEILING PLAN - TYPE 2.3
SCALE:   1/2" = 1'-0"



**REFLECTED CEILING PLAN - TYPE 3.0**
SCALE: 1/2" = 1'-0"

**LIGHTING LEGEND**

**EXISTING**

| EX'G | | DOWNLIGHTS |
| EX'G | | ILLUMINATED MIRROR |

**NEW**

| L1 | | DOWNLIGHTS AT BATHROOM |
| L1A | | DOWNLIGHTS AT COORIDOR |
| L2 | | UNDER CABINET TASK LIGHT |
| L3 | | WALL WASHER LIGHT |
| L4 | | ILLUMINATED MIRROR |

**LEGEND**

SD/CMD — SMOKE DETECTOR / CARBON MONOXIDE DETECTOR - HARDWIRED & INTERCONNECTED WALL-MOUNTED

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
(3) BEDROOMS

| PROJECT #:   21-49 | DATE: 04.15.2022 |

SHEET TITLE :

**A-416.00**



**1** REFLECTED CEILING PLAN - TYPE 3.1
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
(3) BEDROOMS

PROJECT #:  21-49       DATE: 04.15.2022

SHEET TITLE :

**A-417.00**

CORRIDOR

CORRIDOR
GYP.
PA-01

L1A    L1A    L1A    L1A    L1A    L1A    L1A

SOFFIT
7'-10" AFF
PA-01.

NEW
BATHROOM
NON-TYPE

CEILING
8'-0"AFF
PA-01

NEW KITCHENETTE

CEILING
EXISTING
PA-01

3'-5"

4
A-501

NEW
BATHROOM
TYP.A

CEILING
8'-0"AFF
PA-01

12" DEEP SOFFIT FOR
SIDEWALL SPRINKLER HEAD &
ABOVE KITCHENETTE.

L2

W/D
MODULE

SD/CMD

SOFFIT
8'-0" AFF
PA-01.

SD/CMD

SOFFIT
8'-0" AFF
PA-01.

TYP 3.0

(3) BED

716 SQ. FT.

LIVING & DINING
150 SQ. FT.

CEILING
EXISTING
PA-01

SOFFIT
8'-0" AFF
PA-01.

7'-8"

SOFFIT
8'-0" AFF
PA-01.

3
A-501

MASTER BEDROOM
01
99 SQ. FT.

CEILING
EXISTING
PA-01

9'-7"

BEDROOM
02
87 SQ. FT.

CEILING
EXISTING
PA-01

9'-7"

10'-2"

BEDROOM
03
85 SQ. FT.

CEILING
EXISTING
PA-01

3
A-501

1
A-501

1
A-501

## LIGHTING LEGEND

**EXISTING**

EX'G ● DOWNLIGHTS

EX'G – – – ILLUMINATED MIRROR

**NEW**

L1 ● DOWNLIGHTS AT BATHROOM

L1A ● DOWNLIGHTS AT COORIDOR

L2 – – – UNDER CABINET TASK LIGHT

L3 ——— WALL WASHER LIGHT

L4 – – – ILLUMINATED MIRROR

## LEGEND

SD/CMD    SMOKE DETECTOR / CARBON
MONOXIDE DETECTOR -
HARDWIRED & INTERCONNECTED
WALL-MOUNTED

**1**  REFLECTED CEILING PLAN - TYPE 3.3
SCALE:  1/2" = 1'-0"

---

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL RCP**
**(3) BEDROOMS**

PROJECT #:   21-49    DATE: 04.15.2022

SHEET TITLE :

**A-418.00**

## PRELIMINARY FINISH SCHEDULE - WALLS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |

## PRELIMINARY FINISH SCHEDULE - FLOORS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

## PRELIMINARY FINISH SCHEDULE - CEILING

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01  PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01  OPTION A - EXISTING FLOORING

**01** PRELIMINARY FINISH SCHEDULE- APARTMENTS



**TYP 0.0**
STUDIO
258 SQ. FT.

CORRIDOR
PT-10

10'-3"



**TYP 0.1**
STUDIO
292 SQ. FT.

CORRIDOR
PT-10

---

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL FINISH**
**FLOORING**
STUDIO

PROJECT #:   21-49    DATE: 04.15.2022

SHEET TITLE :

**A-420.00**

---

**1** FINISH PLAN - STUDIO - TYPE 0.0
SCALE:  1/2" = 1'-0"

**2** FINISH PLAN - STUDIO - TYPE 0.1
SCALE:  1/2" = 1'-0"



**PRELIMINARY FINISH SCHEDULE - WALLS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |

**PRELIMINARY FINISH SCHEDULE - FLOORS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

**PRELIMINARY FINISH SCHEDULE - CEILING**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01 | PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01 | OPTION A - EXISTING FLOORING

01 | PRELIMINARY FINISH SCHEDULE- APARTMENTS

**TYP 1.0**
**(1) BED**
**348 SQ. FT.**

FL-01

PT-01

CORRIDOR
PT-10

**1** | FINISH PLAN - TYPE 1.0
SCALE:  1/2" = 1'-0"

**TYP 1.1**
**(1) BED**
**511 SQ. FT.**

FL-01

PT-01

**2** | FINISH PLAN  - TYPE 1.1
SCALE:  1/2" = 1'-0"

PROJECT:

# 353 W. 57 TH ST
### NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:
**TYPICAL FINISH**
**FLOORING**
**(1) BEDROOM**

PROJECT #:  21-49 | DATE: 04.15.2022
SHEET TITLE :

# A-421.00



CORRIDOR
PT-10

**TYP 2.0**
**(2) BED**
**529 SQ. FT.**

PT-01   PT-01

FL-01   FL-01   FL-01

**PRELIMINARY FINISH SCHEDULE - WALLS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |

**PRELIMINARY FINISH SCHEDULE - FLOORS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

**PRELIMINARY FINISH SCHEDULE - CEILING**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01   PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01   OPTION A - EXISTING FLOORING

01 | PRELIMINARY FINISH SCHEDULE- APARTMENTS

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**TYPICAL FINISH**
**FLOORING**
**(2) BEDROOMS**

| PROJECT #:   21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE :

**A-422.00**

1 | FINISH PLAN - TYPE 2.0
SCALE:  1/2" = 1'-0"



**PRELIMINARY FINISH SCHEDULE - WALLS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITETAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITETAIL | |

**PRELIMINARY FINISH SCHEDULE - FLOORS**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

**PRELIMINARY FINISH SCHEDULE - CEILING**

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITETAIL | |

PT-01   PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01   OPTION A- EXISTING FLOORING

**01 | PRELIMINARY FINISH SCHEDULE- APARTMENTS**

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL FINISH FLOORING**
**(2) BEDROOMS**

| PROJECT #:  21-49 | DATE: 04.15.2022 |

SHEET TITLE :

**A-423.00**

**1 | FINISH PLAN - TYPE 2.1**
SCALE:  1/2" = 1'-0"

## PRELIMINARY FINISH SCHEDULE - WALLS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT  WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

## PRELIMINARY FINISH SCHEDULE - FLOORS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

## PRELIMINARY FINISH SCHEDULE - CEILING

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01  PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01  OPTION A- EXISTING FLOORING

**01** PRELIMINARY FINISH SCHEDULE- APARTMENTS



**CORRIDOR**
PT-10

PT-01

W. MOD

FL-01

FL-01

**TYP 2.2**
**(2) BED**
**731 SQ. FT.**

FL-01

4 MODULES

W/D MODULE

---

PROJECT:

# 353 W. 57 TH ST
## NEW YORK, NY 10019
### BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

**DESIGN INTENT**
**NOT FOR CONSTRUCTION**

| 04.15.2022 | 50% CD SUBMISSION |
|---|---|
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**TYPICAL FINISH**
**FLOORING**
**(2) BEDROOMS**

| PROJECT #:   21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE :

# A-424.00

**1** FINISH PLAN - TYPE 2.2
SCALE:  1/2" = 1'-0"

### PRELIMINARY FINISH SCHEDULE - WALLS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL |  |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE WHITEBAIL | |

### PRELIMINARY FINISH SCHEDULE - FLOORS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

### PRELIMINARY FINISH SCHEDULE - CEILING

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|------|------|----------|--------|---------------|-----------------|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
OPTION A - EXISTING FLOORING

**01** PRELIMINARY FINISH SCHEDULE- APARTMENTS



TYP 2.3
(2) BED
590 SQ. FT.

FL-01   FL-01   FL-01

PT-01

PT-01

W/D MODULE

NEW
NON-TYP

CORRIDOR
PT-10

ODULE
W/D

**1** FINISH PLAN - TYPE 2.3
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION
04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**TYPICAL FINISH FLOORING**
(2) BEDROOMS

PROJECT #:  21-49   |   DATE: 04.15.2022
SHEET TITLE :

**A-425.00**

### PRELIMINARY FINISH SCHEDULE - WALLS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

### PRELIMINARY FINISH SCHEDULE - FLOORS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

### PRELIMINARY FINISH SCHEDULE - CEILING

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01  PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01  OPTION A- EXISTING FLOORING

**01 | PRELIMINARY FINISH SCHEDULE- APARTMENTS**



**TYP 3.0**
**(3) BED**
**1049 SQ. FT.**

FL-01
FL-01
FL-01
FL-01

4 MODULES

W/D MODULE

**CORRIDOR**
PT-10

PT-01

NC

**1 | FINISH PLAN - TYPE 3.0**
SCALE:  1/2" = 1'-0"

---

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST, NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| | | |
|---|---|---|
| 04.15.2022 | 50% CD SUBMISSION | |
| 04.04.2022 | SD SUBMISSION | |

SEAL:

DRAWING TITLE:

**TYPICAL FINISH**
**FLOORING**
**(3) BEDROOMS**

PROJECT #:  21-49          DATE- 04.15.2022
SHEET TITLE :

**A-426.00**



### PRELIMINARY FINISH SCHEDULE - WALLS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

### PRELIMINARY FINISH SCHEDULE - FLOORS

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

### PRELIMINARY FINISH SCHEDULE - CEILING

| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
|---|---|---|---|---|---|
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
OPTION A - EXISTING FLOORING

**01** | PRELIMINARY FINISH SCHEDULE- APARTMENTS

CORRIDOR
PT-10

W/D MODULE

CORRIDOR
PT-10

FL-01

FL-01

FL-01

FL-01

FL-01

**TYP 3.1**
**(3) BED**
**988 SQ. FT.**

PT-01

PT-01

W/D MODULE

PT-01

UP
**STAIR C**
DN

---

**PROJECT:**

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**TYPICAL FINISH**
**FLOORING**
**(3) BEDROOMS**

PROJECT #:  21-49    DATE: 04.15.2022

SHEET TITLE :

**A-427.00**

**1** | FINISH PLAN - TYPE 3.1
SCALE:  1/2" = 1'-0"

| PRELIMINARY FINISH SCHEDULE - WALLS | | | | | |
|---|---|---|---|---|---|
| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
| PA-01 | WALL FINISH | PAINT (NEW WALLS) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |
| TL-01 | WALL FINISH | CERAMIC TILE | MATTE | RESTORE BRIGHT WHITE 2 IN. X 6 IN. CERAMIC BULLNOSE WALL TRIM /DALTILE | |
| PW-02 | WALL FINISH | PAINT (EXISTING WOOD PANEL) | MATTE | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

| PRELIMINARY FINISH SCHEDULE - FLOORS | | | | | |
|---|---|---|---|---|---|
| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
| (OP-01) FL-01 | FLOOR FINISH | EXISTING FLOOR | | KEEP EXISTING FLOORING | |
| (OP-02) LVT | FLOOR FINISH | LVT | MATTE | LVT C16 (ASTM F1700/3261) PASSES/ THA ABADI GROUP | |
| PT-01 | FLOOR FINISH (BATHROOM) | PORCELAIN FLOOR TILE | TBD | ALPE BLACK  PORCELAIN FLOOR AND WALL TILE 12 IN. X 24 IN. CERAMIC TILE | |
| PT-10 | CORRIDOR FLOOR | REUSE EXISTING FLOORING, PATCH AND REPAIR | EX'G | - REMOVE EXISTING TOP CARPET | |

| PRELIMINARY FINISH SCHEDULE - CEILING | | | | | |
|---|---|---|---|---|---|
| CODE | TYPE | MATERIAL | FINISH | COLOR / MODEL | IMAGE REFERENCE |
| PA-01 | CEILING FINISH | GYPSUM BOARD | PA- PAINT FINISH | 261 - C1 / SW 7103 SHERWIN WILLIAMS MATTE  WHITEBAIL | |

PT-01 PORCELAIN TILE- BATHROOM / TRESHOLD AND NEW FLOORING AREA
FL-01 OPTION A- EXISTING FLOORING

**01 | PRELIMINARY FINISH SCHEDULE- APARTMENTS**



CORRIDOR
PT-10

PT-01

W/D MODULE

PT-01

**TYP 3.0**
**(3) BED**
**716 SQ. FT.**

FL-01   FL-01   FL-01   FL-01

**1 | FINISH PLAN - TYPE 3.3**
SCALE:  1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
|---|---|
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**TYPICAL FINISH**
**FLOORING**
**(3) BEDROOMS**

| PROJECT #:   21-49 | DATE: 04.15.2022 |
|---|---|

SHEET TITLE :

**A-428.00**



## NOTES

**1** ADEQUATE LIGHTING SHALL BE PROVIDED IN REFUSE ROOMS.

**2** REFUSE CHUTES, REFUSE ROOMS, HOPPERS AND ALL PARTS OF THE REFUSE COLLECTING SYSTEM SHALL BE MAINTAINED IN A CLEAN AND SANITARY CONDITION AT ALL TIMES, FREE OF VERMIN, ODORS AND DEFECTS, AND SHALL BE MAINTAINED IN GOOD OPERATING CONDITION. FUSED SPRINKLER HEADS SHALL BE REPLACED PROMPTLY.

**3** THE OWNER SHALL ESTABLISH A PROGRAM TO ENSURE THAT THE REFUSE CHUTE AND THE REFUSE ROOM AND APPURTENANCES WILL BE TREATED AS OFTEN AS MAY BE NECESSARY TO PREVENT INFESTATION WITH INSECTS OR RODENTS. THE OWNER SHALL MAINTAIN A RECORD OF SUCH TREATMENTS WHICH SHALL BE AVAILABLE AT ALL TIMES FOR INSPECTION BY THE DEPARTMENT.

**4** COLLECTION AND DISPOSAL OF REFUSE WITHIN PREMISES. THE COLLECTION AND DISPOSAL OF REFUSE WITHIN ANY BUILDING OR ON ANY PREMISES SHALL BE PERFORMED AS DEEMED NECESSARY TO PROVIDE FOR THE SAFETY, HEALTH AND WELL BEING OF THE OCCUPANTS OF BUILDINGS AND OF THE PUBLIC. THE CONSTRUCTION, OPERATION, MAINTENANCE, CLEANLINESS AND SANITATION OF REFUSE CHUTES AND REFUSE ROOMS AND EXTERMINATION TREATMENT FOR INSECTS AND RODENTS, AND THE KEEPING OF RECORDS OF SUCH TREATMENTS FOR REFUSE CHUTES AND REFUSE ROOMS SHALL BE IN ACCORDANCE WITH REGULATIONS ESTABLISHED BY THIS DEPARTMENT IN CONSULTATION WITH THE DEPARTMENT OF HEALTH.

**5** SPRINKLER OPERATION AND WATER SUPPLY. SPRINKLERS SHALL BE DESIGNED TO OPERATE AUTOMATICALLY AT A TEMPERATURE NOT EXCEEDING ONE HUNDRED SIXTY-FIVE DEGREES FAHRENHEIT. THEY MAY BE ELECTRICALLY CONTROLLED PROVIDED SUCH SPRINKLERS ARE APPROVED BY THE BOARD OF STANDARDS AND APPEALS. SPRINKLERS MAY BE CONNECTED TO THE COLD WATER SUPPLY OF THE BUILDING AT THE POINT WHERE SUCH SERVICE ENTERS THE BUILDING OR AT THE BASE OF A WATER SUPPLY RISER PROVIDED THE PIPING OF SUCH SERVICE OR RISER IS OF ADEQUATE SIZE. NO CONNECTIONS, EXCEPT THOSE FOR SPRINKLERS, SHALL BE MADE TO THE SPRINKLER PIPING.

---

PROJECT:

### 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**TRASH ROOM**

PROJECT #:  21-49   |   DATE: 04.15.2022
SHEET TITLE :

## A-430.00

---

**1** | TRASH COMPACTOR ROOM @ 3RD FLOOR
SCALE:  1/2" = 1'-0"

## PARTITION NOTES

**TYPICAL GYP. BOARD PARTITION NOTES:**

1. GYP BOARD SHALL BE 5/8" THICK U.N.O
2. TYPE "X" GYP BOARD AT ALL FIRE-RATED ASSEMBLES UNLESS ASSEMBLY DESIGN REQUIRES OTHERWISE
3. STUD SPACING 16" O.C. U.N.O. REFER TO LIMITING HEIGHT SCHEDULE ON THIS SHEET FOR MAXIMUM SPANS & MINIMUM FRAMING METAL THICKNESS
4. PARTITIONS (STUDS & ALL LAYERS OF GYP BOARD) TO EXTEND FULL HEIGHT TO UNDERSIDE OF FLOOR OR ROOF ABOVE U.N.O.
5. PROVIDE U.L RATED DYNAMIC HEAD-OF-WALL ASSEMBLY TO ACCOMMODATE REQUIRED STRUCTURAL DEFLECTION AT ALL FULL HEIGHT FIRE RATED PARTITIONS.
6. PROVIDE U.L. FIRE RATED BOTTOM OF WALL ASSEMBLE AT ALL FIRE RATED WALLS & SHAFT WALLS
7. PROVIDE FIRE-RATED CONTROL JOINTS WHEN REQUIRED AT FIRE RATED PARTITIONS.
8. PROVIDE DYNAMIC HEAD-OF-WALL DEFLECTION ASSEMBLY TO ACCOMMODATE REQUIRED STRUCTURAL DEFLECTION AT ALL FULL HEIGHT NON-RATED PARTITION. PROVIDE ACOUSTICAL SEALANT AT BOTH SIDES OF WALL.
9. PROVIDE MOISTURE AND MOLD RESISTANT GYP BOARD (GREEN BOARD) BEHIND ALL CERAMIC-TILED AND NON-TILED PARTITIONS AT NON-WET(MOISTURE ONLY) AREAS (RESTROOMS, JANITOR CLOSET, ETC.) WHETHER OR NOT INDICATED.
10. PROVIDE 3/4" FIRE RATED PLYWOOD OR CONTINUOUS 10" WIDE 14 GA. STEEL BACKER PLATE AS REQUIRED AT TOILET ACCESSORIES.

**TYPICAL CMU PARTITION NOTES:**

1. PARTITIONS TO EXTEND FULL HEIGHT TO UNDERSIDE OF FLOOR OR ROOF ABOVE U.N.O
2. PROVIDE ACOUSTICAL SEALANT & BACKER ROD AT HEAD & CONTROL JOINTS IN NON-RATED PARTITIONS. HEAD JOINT DESIGN TO ACCOMMODATE REQUIRED STRUCTURAL DEFLECTION.
3. PROVIDE U.L. FIRE-RATED DYNAMIC HEAD-OF-WALL & CONTROL JOINTS ASSEMBLIES AT ALL FIRE-RATED PARTITIONS.
4. ALL CMU TO BE LIGHTWEIGHT U.N.O
5. FIRE RATING TO BE BASED UPON EQUIVALENT THICKNESS METHOD PER THE BUILDING CODE.
6. PROVIDE HEAD-OF-WALL SEISMIC RESTRAINT AT ALL FULL HEIGHT PARTITIONS.

## PARTITION NOTES

### INTERIOR FRAMING LIMITING HEIGHT

| SIZE | STUD SPACING | DESIGN LIMIT | GAUGE (THICKNESS) | LIMITING HT. L/240 | LIMITING HT. L/360 |
|---|---|---|---|---|---|
| 2-1/2" (250S125-18/33) | 16" | 5 PSF | 25 GAUGE (18 MIL) | 11'-3" | 9'-10" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 12'-10" | 11'-2" |
| | 24" | 5 PSF | 25 GAUGE (18 MIL) | 10'-7" | 9'-3" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 11'-7" | 10'-0" |
| 3-5/8" (362S125-18/33) | 16" | 5 PSF | 25 GAUGE (18 MIL) | 14'-4" | 12'-4" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 16'-5" | 14'-3" |
| | 24" | 5 PSF | 25 GAUGE (18 MIL) | 13'-5" | 11'-7" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 14'-9" | 12'-9" |
| 6" (600S125-18/33) | 16" | 5 PSF | 25 GAUGE (18 MIL) | 19'-9" | 17'-11" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 24'-6" | 21'-4" |
| | 24" | 5 PSF | 25 GAUGE (18 MIL) | 16'-9" | 16'-9" |
| | | 5 PSF | 20 GAUGE (33 MIL) | 21'-7" | 18'-10" |

NOTE: GC TO VERIFY ALL EXISTING INTERIOR CEILING HEIGHT

---

### TYPE 0

**INTERIOR PARTITION - NON-LOAD BEARING**

Labels: DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / METAL RUNNER (TOP TRACK) / ACOUSTIC INSULATION WHERE NECESSARY / METAL STUDS. SEE BELOW / 5/8" GYPSUM WALL BOARD / METAL RUNNER (BOTTOM TRACK) / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 0 | 2 1/2" | 3 3/4" | N/A | | | UNIT INTERIOR | |
| 0A | 2 1/2" | 3 3/4" | N/A | | | UNIT INTERIOR WET AREA | WET AREA. 5/8" GREEN BOARD |
| 0B | 3 5/8" | 4 7/8" | N/A | | | INTERIOR WALL WITH E.P. | |
| 0C | 3 5/8" | 4 7/8" | N/A | | | INTERIOR WALL WITH E.P. | WET AREA. 5/8" GREEN BOARD |

NOTE:
1. WET AREA TO HAVE GREEN BOARD. G.C TO INSTALL WATER PROOFING MEMBRANE TO 6" HEIGHT ON WALL
2. GC TO INSTALL 3/4" FIRE RETARDANT PLY WD. BLOCKING BETWEEN STUDS AS REQ'D FOR GRAB BAR MOUNTING WHERE NECESSARY
3. ACOUSTIC INSULATION WHERE NEEDED

**0 — PARTITION TYP 0** — SCALE: 3" = 1'-0"

---

### TYPE 1

**INTERIOR PARTITION - NON-LOAD BEARING - UL U419**

Labels: UNDERSIDE OF DECK OR SLAB / DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / METAL RUNNER (TOP TRACK) / ACOUSTIC INSULATION WHERE NECESSARY / METAL STUD. SEE BELOW / 5/8" GYPSUM WALL BOARD, TYPE 'X', LEVEL 5 / METAL RUNNER (BOTTOM TRACK) / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 1 | 3 5/8" | 4 7/8" | 1 HR | 48 | | BETWEEN UNITS, CORRIDOR | SEE PLAN FOR LOCATION |
| 1A | 3 5/8" | 4 7/8" | 1 HR | 48 | | BETWEEN UNITS, CORRIDOR | WET AREA. 5/8" GREEN BOARD |

NOTE:
1. WET AREA TO HAVE GREEN BOARD. G.C TO INSTALL WATER PROOFING MEMBRANE TO 6" HEIGHT ON WALL
2. GC TO INSTALL 3/4" FIRE RETARDANT PLY WD. BLOCKING BETWEEN STUDS AS REQ'D FOR GRAB BAR MOUNTING WHERE NECESSARY
3. ACOUSTIC INSULATION WHERE NEEDED

**1 — PARTITION TYP 1** — SCALE: 3" = 1'-0"

---

### TYPE 2

**INTERIOR PARTITION - NON-LOAD BEARING**

Labels: UNDERSIDE OF DECK OR SLAB / DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / METAL RUNNER (TOP TRACK) / METAL STUD. SEE BELOW / (2) LAYERS OF 5/8" GYPSUM WALL BOARD ON BOTH SIDES, TYPE 'X', LEVEL 5 / METAL RUNNER (BOTTOM TRACK) / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 2 | 3 5/8" | 6 1/8" | 2 HR | | | STAIR SHAFT | SEE PLAN FOR LOCATION |
| 2A | 3 5/8" | 6 1/8" | 2 HR | | | | WET AREA. 5/8" GREEN BOARD |

NOTE:
1. WET AREA TO HAVE GREEN BOARD. G.C TO INSTALL WATER PROOFING MEMBRANE TO 6" HEIGHT ON WALL
2. GC TO INSTALL 3/4" FIRE RETARDANT PLY WD. BLOCKING BETWEEN STUDS AS REQ'D FOR GRAB BAR MOUNTING WHERE NECESSARY
3. ACOUSTIC INSULATION WHERE NEEDED

**2 — PARTITION TYP 2** — SCALE: 3" = 1'-0"

---

### TYPE 3

**FURRING WALL - LOAD BEARING - UL W460**

Labels: UNDERSIDE OF DECK OR SLAB / DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / METAL RUNNER (TOP TRACK) / METAL STUD MIN. 20 GA. @ 24" O.C. SEE BELOW / ACOUSTIC INSULATION / (3) LAYERS OF 5/8" GYPSUM WALL BOARD ON BOTH SIDES, TYPE 'X', LEVEL 5 / METAL RUNNER (BOTTOM TRACK) / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 3 | 3 1/2" | 7 3/4" | 3 HR | N/A | | TRASH ROOM | SEE PLAN FOR LOCATION |

NOTE:
1. WHERE REQUIRED FOR LATERAL SUPPORT OF STUDS, SUPPORT MAY BE PROVIDED BY MEANS OF STEEL STRAPS, CHANNELS OR OTHER SIMILAR MEANS AS SPECIFIED IN THE DESIGN OF A PARTICULAR STEEL STUD WALL SYSTEM

**3 — PARTITION TYP 3** — SCALE: 3" = 1'-0"

---

### TYPE 4

**FURRING WALL - NON-LOAD BEARING**

Labels: UNDERSIDE OF DECK OR SLAB / DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / METAL RUNNER (TOP TRACK) / 5/8" GYPSUM WALL BOARD, / METAL STUD. SEE BELOW / METAL RUNNER (BOTTOM TRACK) / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 4 | 2 1/2" | 3 1/8" | NR | | | FURRING LOCATION | SEE PLAN FOR LOCATION |
| 4A | 2 1/2" | 3 1/8" | NR | | | FURRING LOCATION | WET AREA. 5/8" GREEN BOARD |
| 4B | 3 5/8" | 4 1/4" | NR | | | FURRING LOCATION | SEE PLAN FOR LOCATION |
| 4C | 3 5/8" | 4 1/4" | NR | | | FURRING LOCATION | WET AREA. 5/8" GREEN BOARD |

NOTE:
1. WET AREA TO HAVE GREEN BOARD. G.C TO INSTALL WATER PROOFING MEMBRANE TO 6" HEIGHT ON WALL
2. GC TO INSTALL 3/4" FIRE RETARDANT PLY WD. BLOCKING BETWEEN STUDS AS REQ'D FOR GRAB BAR MOUNTING WHERE NECESSARY
3. ACOUSTIC INSULATION WHERE NEEDED

**4 — PARTITION TYP 4** — SCALE: 3" = 1'-0"

---

### TYPE 5

**CONVERTING EXISTING 1HR WALL TO 2HR WALL - NON-LOAD BEARING**

Labels: UNDERSIDE OF DECK OR SLAB / DYNAMIC HEAD OF WALL ASSEMBLY TO ACCOMMODATE STRUCTURAL DEFLECTION. AT FIRE RATED WALLS PROVIDE U.L. FIRE RATED ASSEMBLY / EXISTING ASSEMBLY / ADD (1) LAYER OF 5/8" GYPSUM WALL BOARD ON EACH SIDE. TYPE 'X', LEVEL 5 / EXISTING ASSEMBLY. 1 HR RATED / BASE AS SCHEDULED / CONTINUOUS ACOUSTICAL SEALANT, BOTH SIDES OF WALL / FINISH FLOOR AS SCHEDULED

| WALL TYPE | STUD | SYSTEM THICKNESS | FIRE RATING | STC | INSULATION | LOCATION | REMARKS |
|---|---|---|---|---|---|---|---|
| 5 | N/A | - | 2 HR | | | UTILITY CLOSET ON HALLWAY | SEE PLAN FOR LOCATION |

NOTE:

**5 — PARTITION TYP 5** — SCALE: 3" = 1'-0"

**6 — PARTITION TYP 6** — SCALE: 3" = 1'-0"

---

PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**DETAIL:**
**PARTITION TYPE**

PROJECT #: 21-49     DATE: 04.15.2022

SHEET TITLE :

## A-500.00



**1** CEILING SOFFIT DETAIL - SP+LIGHT
SCALE: 3" = 1'-0"

**2** CEILING SOFFIT DETAIL - SP ONLY
SCALE: 3" = 1'-0"

**3** CEILING SOFFIT DETAIL - WALL WASHER ONLY
SCALE: 3" = 1'-0"

**4** CEILING SOFFIT DETAIL - SP + KITCHENETTE SOFFIT
SCALE: 3" = 1'-0"

**5** CEILING SOFFIT DETAIL - SP + KITCHENETTE SOFFIT
SCALE: 3" = 1'-0"

**6** TYPICAL WOOD FLOORING DETAIL
SCALE: 3" = 1'-0"

**7** TYPICAL TILE FLOORING DETAIL
SCALE: 3" = 1'-0"

**8** TYPICAL WOOD AND TILE FLOOR TRANSITION DETAIL
SCALE: 3" = 1'-0"

**9** TYPICAL WOOD AND CARPET FLOOR TRANSITION DETAIL
SCALE: 3" = 1'-0"

**10** RESERVED
SCALE: 3" = 1'-0"

**11** RESERVED
SCALE: 3" = 1'-0"

PROJECT:

# 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA, MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022    50% CD SUBMISSION

04.04.2022    SD SUBMISSION

SEAL:

DRAWING TITLE:

**DETAIL:
CEILING & FLOORING**

PROJECT #:   21-49      DATE: 04.15.2022

SHEET TITLE :

# A-501.00



**1** COMPRESSION STRUCT. DETAIL AT ACOUSTIC CEILING TILE
SCALE: 3" = 1'-0"

**2** TYPICAL BRACING CONNECTION
SCALE: 3" = 1'-0"

**3** SEISMIC BRACING DIAGRAM
SCALE: 3" = 1'-0"

**4** BRACE AT STUCRCTURE
SCALE: 3" = 1'-0"

**5** STUD BRIDGING
SCALE: 3" = 1'-0"

**6** BRACING CONNECTION
SCALE: 3" = 1'-0"

**7** STUD TO TRACK
SCALE: 3" = 1'-0"

**7** SUSPENDED GYPSUM BOARD CEILING
SCALE: 3" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**DETAIL:
TYPICAL CEILING**

PROJECT #:  21-49        DATE: 04.15.2022
SHEET TITLE :

**A-502.00**

## DOOR NOTES

| | |
|---|---|
| 1 | MDL SECTION 51(a), PEEPHOLES: IN EVERY MULTIPLE DWELLING, THE OWNER SHALL PROVIDE AND MAINTAIN A PEEPHOLE IN THE ENTRANCE DOOR OF EACH HOUSING UNIT. SUCH PEEPHOLE SHALL BE LCOATED TO ENABLE A PERSON IN SUCH HOUSING UNIT TO VIEW FROM THE INSDIE OF THE ENTRANCE DOOR. ANY PERSON IMMEDIATELY OUTSIDE OF THE ENTRANCE DOOR TO SUCH HOUSING UNIT. |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

## INTERIOR DOOR SCHEDULE

| TYPE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| ELEVATION | 3'-0" PEEP HOLE | 2'-10" | 2'-6" | 2'-10" | 3'-0" FUSIBLE LINK MTL. LOUVER | 3'-0" | | |
| QUANTITY | | | | | | | | |
| DOOR SIZE | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | | |
| PANEL THICKNESS | 1 3/4" | 1 3/8" | 1 3/8" | 1 3/4" | 1 3/4" | 1 3/4" | | |
| LOCATION | APARTMENT ENTRANCE DOOR | ADA BATHROOM / BEDROOM, SEE PLAN | NEW NON-TYPE BATHROOM, SEE PLAN | BATHROOM / BEDROOM, SEE PLAN | MECHANICAL, UTILITY ROOMS | TRASH ROOM | | |
| FIRE RATING | 0.75 HR | N/A | N/A | N/A | 1.5 HR | 1.5 HR | | |
| MATERIAL | HOLLOW METAL | HOLLOW-CORE COMPOSITE | HOLLOW-CORE COMPOSITE | SOLID-CORE WOOD | HOLLOW METAL | HOLLOW METAL | | |
| FRAME MATERIAL | METAL | COMPOSITE | COMPOSITE | N/A | METAL | METAL | | |
| FINISH | PAINTED | MILLENNIUM OAK, OR SIMILAR | MILLENNIUM OAK, OR SIMILAR | PAINTED | PAINTED | PAINTED | | |
| SWING | SINGLE | SINGLE | SINGLE | SINGLE | SINGLE | SINGLE | | |
| HARDWARE | PEEP HOLE / SELF-CLOSING HINGE / HEAVY DUTY LATCH SET / HEAVY DUTY DEAD BOLT KEY FROM OUTSIDE, THUMB-TURN FROM INSIDE / A CHAIN GUARD | UNKEYED | UNKEYED | UNKEYED / W/ FUSIBLE LINK FIRE RATED LOUVER | SELF-CLOSING HINGE / W/ FUSIBLE LINK FIRE RATED LOUVER | SELF-CLOSING HINGE | | |
| MANUFACTURER | L.I.F. INDUSTRIES, INC | GENERIC | GENERIC | PACIFIC ENTRIES | L.I.F. INDUSTRIES, INC | L.I.F. INDUSTRIES, INC | | |
| MODEL | FLUSH HM FIRE RATED DOORS - F | | | FLUSH HM FIRE RATED DOORS - FL | FLUSH HM FIRE RATED DOORS - FL | FLUSH HM FIRE RATED DOORS - FL | | |
| NOTE | OR APPROVED EQUIV. | | | OR APPROVED EQUIV. | OR APPROVED EQUIV. | OR APPROVED EQUIV. | | |
| REMARKS | "FPSC" | | | "SLIDING BARN DOOR" | | | | |

## WINDOW NOTES

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

## WINDOW SCHEDULE

| TYPE | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| ELEVATION | 3'-2" 5'-10" | 2'-8" 6'-0" | | | | | | |
| QUANTITY | | | | | | | | |
| WINDOW SIZE | SEE ELEVATION FOR DETAIL | SEE ELEVATION FOR DETAIL | | | | | | |
| LOCATION | EXISTING WINDOW OPENING, SEE PLAN | 3RD FLOOR FACING 58TH STREET | | | | | | |
| MATERIAL | HOLLOW METAL | HOLLOW METAL | | | | | | |
| FRAME MATERIAL | METAL | METAL | | | | | | |
| FINISH | PAINTED | PAINTED | | | | | | |
| U-FACTOR | 0.40 | 0.40 | | | | | | |
| SHGC | 0.36 | 0.36 | | | | | | |
| VT | NR | NR | | | | | | |
| AIR LEAKAGE | 0.20 | 0.20 | | | | | | |
| MANUFACTURER | | | | | | | | |
| MODEL | | | | | | | | |
| NOTE | | | | | | | | |
| REMARKS | | | | | | | | |

TBD

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:
**SCHEDULE: INTERIOR DOOR & WINDOW**

PROJECT #:   21-49       DATE: 04.15.2022
SHEET TITLE :
**A-600.00**

## FINISH SCHEDULE

### WALL

| CODE | MATERIAL | FINISH | BRAND | MODEL | COLOR/FINISH | SUPPLIER | NOTES |
|---|---|---|---|---|---|---|---|
| PA-01 | PAINT (NEW WALL) | MATTE | SHERWIN WILLIAMS | 261-C1/SW 7103 | MATT WHITEBAIL | | |
| PW-02 | PAINT (EXISTING WD) | MATTE | SHERWIN WILLIAMS | 261-C1/SW 7103 | MATT WHITEBAIL | | |
| TL-01 | CERAMIC TILE | MATTE | DALTILE | RESTORE BRIGHT WHITE 2"X6" CERAMIC BULLNOSE WALL TRIM DALTILE | RESTORE BRIGHT WHITE | | |
| | | | | | | | |
| | | | | | | | |

### FLOORS

| CODE | MATERIAL | FINISH | BRAND | MODEL | COLOR/FINISH | SUPPLIER | NOTES |
|---|---|---|---|---|---|---|---|
| FL-01 OPT.01 | EXIST. FLOOR | N/A | N/A | KEEP EXISTING FLOOR | N/A | N/A | |
| LVT-01 (OPT.01) | LVT | MATTE | THE ABADI GROUP | LVT C16 (ASTM F1700/3261) | PASSES | THE ABADI GROUP | |
| PT-01 | PORCELAIN FLOOR TILE (ADA TYPE B BATHRM) | TBD | ALPE | ALPE BLACK PORCELAIN FLOOR WALL TILE 12" X 24" | BLACK | ALPE | |
| | | | | | | | |
| | | | | | | | |

### CEILIING

| CODE | MATERIAL | FINISH | BRAND / SUPPLIER | MODEL | COLOR/FINISH | SUPPLIER | NOTES |
|---|---|---|---|---|---|---|---|
| PA-01 | PAINT (GYB CEILING) | PA FINISH | SHERWIN WILLIAMS | 261-C1/SW 7103 | MATT WHITEBAIL | SHERWIN WILLIAMS | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## LIGHTING SCHEDULE

| QUANTITY | SYMBOL | TYPE | LOCATION | DESCRIPTION | BRAND | PART | LAMP | SYSTEM WATTAGE | NOTES |
|---|---|---|---|---|---|---|---|---|---|
| | ◯ | L1 | RESIDENTIAL BATHROOM | - RECESSED DIMMABLE LED 2700K SHOWER LIGHT WITH WET LOCATION LISTING - TRIMMED - NOMINAL 2 3/4" APERTURE WITH 4 3/8" O.D. TRIM - NOMINAL 3 1/8" RECESSING DEPTH ABOVE CEILING MATERIAL | AMERLUX | EZ-NC-A17-T-12-(VOLTAGE)-0/10V + EZRSHW-A17-T-(FINISH)-VWF-27 | LED (INTERGRAL) 2700K CCT | 12W | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED WALL BOX DIMMER - DESIGNER TO CONFIRM FINISH |
| | ◯ | L1A | RESIDENTIAL CORRIDOR | - RECESSED DIMMABLE LED 2700K SHOWER LIGHT WITH WET LOCATION LISTING - TRIMMED - NOMINAL 2 3/4" APERTURE WITH 4 3/8" O.D. TRIM - NOMINAL 3 1/8" RECESSING DEPTH ABOVE CEILING MATERIAL | AMERLUX | EZ-NC-A17-T-12-(VOLTAGE)-0/10V + EZRSHW-A17-T-(FINISH)-VWF-27 | LED (INTERGRAL) 2700K CCT | 18W | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED WALL BOX DIMMER - DESIGNER TO CONFIRM FINISH |
| | - - - - | L2 | RESIDENTIAL KITCHEN | - SURFACE MOUNTED LED 2700K LENSED UNDERCABINET FIXTURE - INTEGRAL DRIVER - NOMINAL 2" DEEP - WITH INTEGRAL SWITCH | FEELUX | TUN-27K-SF-STD-S-(LENGTH)-ZT-RSW-120-240V | LED (INTERGRAL) 2700K CCT | 3.5 W/LF | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED CONTROL SYSTEM - DESIGNER TO CONFIRM FINISH - REFER TO ARCHITECTURAL DRAWINGS FOR CONTINUOUS LENGTH INFORMATION - CABINET TO HAVE "LIP" TO CONCEAL FIXTURE FROM VIEW |
| | ▬ | L3 | RESIDENTIAL AT SELECTED NEW WALL | - RECESSED MOUNTED 2700K LED LENSED DOWNLIGHT WITH INTEGRAL DRIVER - FIXTURE HIDDEN IN CONSTRUCTED BULKHEAD - NOMINAL 2.64" WIDTH X 7.38" HEIGHT X LENGTH PER PLAN - 250 LUMENS/FT | FOCAL POINT | F2M2PR-ALH-FL2-250LF-27K 90+-1C-UNV-UNV-TF-WH-(LENGTHS PER PLAN) | LED (INTERGRAL) 2700K CCT | 3.0 W/LF | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED CONTROL SYSTEM - REFER TO ARCHITECTURAL DRAWINGS FOR CONTINUOUS LENGTH INFORMATION - ARCHITECT TO VERIFY FLANGE BASED ON SPECIFIED CEILING - FIXTURE TO BE RECESSED IN BUILKHEAD |
| | ▬ | L3 - ALT | RESIDENTIAL AT SELECTED NEW WALL | - RECESSED MOUNTED 2700K LED LENSED DOWNLIGHT WITH INTEGRAL DRIVER - FIXTURE HIDDEN IN CONSTRUCTED BULKHEAD - NOMINAL 2 3/8" WIDTH X 6.5" HEIGHT X LENGTH PER PLANS - 350 LUMENS/FT | LUMENWERX | VIA2PERS-HLO-SW-80-350-27-(LENGTHS PER PLAN)-UNV-D1-1-DTR-W-(CONROLS) | LED (INTERGRAL) 2700K CCT | 3.3 W/LF | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED CONTROL SYSTEM - REFER TO ARCHITECTURAL DRAWINGS FOR CONTINUOUS LENGTH INFORMATION - ARCHITECT TO VERIFY FLANGE BASED ON SPECIFIED CEILING - FIXTURE TO BE RECESSED IN BUILKHEAD |
| | - - - - | L4 | RESIDENTIAL BATHROOMS | - SURFACE MOUNTED MIRRORS WITH INTEGRATED 2700K LED - SPECIFICATION TO BE CONFIRMED BY DESIGNER | PURE EDGE | PLAZA-L-LED-27K | LED (INTERGRAL) 2700K CCT | 115W | - EE TO VERIFY VOLTAGE - EE TO COORDINATE DIMMING DRIVER WITH SPECIFIED CONTROL SYSTEM - DESIGNER TO CONFIRM SPECIFICATION |

## FIXTURE SPECIFICATION

### BATHROOM

| QUANTITY | REF. | ITEM | SIZE | BRAND | DESCRIPTION | MODEL | NOTES |
|---|---|---|---|---|---|---|---|
| | BA-10 | SHOWER PAN | 60" X 36" | OVE DECORS | WHITE ACRYLIC SHOWER BASE WITH REVERSIBLE DRAIN. FIBERGLASS REINFORCED ACRYLIC BASE WITH STYLISH SIDE HIDDEN TRENCH DRAIN ALLOWING FOR RAPID EVACUATION OF WATER COLOR/FINISH: WHITE | | OR APPROVED EQUAL |
| | BA-09 | SHOWER GLASS | 46.18" X 72.01" | OVE DECORS | ANNIE SHOWER SCREEN 45" CHROME GLASS/METAL COLOR/FINISH: GLASS PANEL MATTE | | OR APPROVED EQUAL |
| | VA-01 | VANITY | 24" | THE ADADI GROUP | VANITY CABINET COLOR FINISH: MATTE WHITE | TBD | OR APPROVED EQUAL |
| | BA-06 | SHOWER TRIM OPT.1 | | DELTA/ARTEXA MX | SHOWER TRIM IN CHROME COLOR/FINISH: CHROME | MODEL T14232 | OR APPROVED EQUAL |
| | BA-07 | SHOWER TRIM OPT.2 | | DELTA/ARTEXA MX | SHOWER TRIM IN CHROME COLOR/FINISH: CHROME | MODEL TBD | |
| | BA-02 | TOWEL BAR | 24" | DELTA/ARTEXA MX | 24" TOWEL BAR IN CHROME, METAL COLOR/FINISH:CHROME | MODEL#: 759240 | OR APPROVED EQUAL |
| | VA-02 | MIRROR | 18" X 30" | LOWES | SAINT BIRCH LED LIGHTED CLEAR RECTANGULAR FRAMELESS BATHROOM MIRROR | MODEL#SBHZ183BBLM | OR APPROVED EQUAL |
| | BA-08 | W.C | | DELTA/ARTEXA MX | ROUND FRONT TOILET IN WHITE COLOR/FINISH: WHITE | MODEL#: C41913-WH | |
| | BA-01 | FAUCET | | DELTA/ARTEXA MX | SINGLE HANDLE BATHROOM FAUCET IN CHROME COLOR/FINISH: CHROME | MODEL#:559LF-LPU | |
| | BA-02 | PAPER ROLL HOLDER | | DELTA/ARTEXA MX | TISSUE HOLDER IN CHROME, METAL COLOR/FINISH:CHROME | MODEL#:7590 | |
| | BA-04 | GRAB BAR OPT.1 | 24" | DELTA/ARTEXA MX | ADA GRAB BAR - 2PCS CONTEMPORARY COLOR/FINISH: CHROME | MODEL#:41824 | |
| | BA-05 | GRAB BAR OPT.2 | 24" | DELTA/ARTEXA MX | ADA GRAB BAR - 2PCS CONTEMPORARY COLOR/FINISH: MATTE BLACK | MODEL#:41824 | |

### KITCHEN

| QUANTITY | REF. | ITEM | SIZE | BRAND | DESCRIPTION | MODEL | NOTES |
|---|---|---|---|---|---|---|---|
| | A | ELECTRIC RANGE | 30" | GE | GE® 30" FREE-STANDING ELECTRIC RANGE | JBS360RMSS | |
| | B | ELECTRIC RANGE | 24" | GE | GE® 24" SELF CLEAN FREE-STANDING ELECTRIC RANGE | JA624RNSS | |
| | C | REFRIGERATOR | 30" | FRIGIDAIRE | BOTTOM FREEZER REFRIGERATOR | FRTD2021AS | |
| | D | DISHWASHER | 24" | FRIGIDAIRE | TOP CONTROL BUILT-IN TALL TUB DISHWASHER | FDSH4501AS | |
| | E | DRANGE HOOD | 30" | BROAN-TUTONE | TWO-SPEEY NON-DUCTED RANGE HOOD | RL6200 | |
| | F | REFRIGERATOR | 22" | FRIGIDAIRE | 22" COMPACT COUNTER DEPTH TOP FREEZER REFRIGERATOR | FFPE4533UM | |
| | G | DISHWASHER | 24" | FISHER & PAYKEL | ELECTRIC FRONT CONTROL BUILT-IN DISHWASHER | DD24SAX9N | |
| | H | RANGE / MICROWAVE | 30" | FRIGIDAIRE | OVER THE RANGE MICROWAVE | FFMV1846 | |
| | I | WASHER/DRYER | 24" | GE | VENTLESS ELECTRIC WAHSER/DRYER | GFQ14ESSNWW | |
| | | CABINETRY MATERIAL | | FORMICA | KITCHEN FORMICA NEUTRAL WHITE 918-58 COLOR/FINISH: 58 (MATTE) FINISH | 918-58 | |
| | | COUNTERTOPS &BACK SPLASH OPT.1 | | DEKTON/ COSENTINO | DEKTON AURA 15 NATURAL COLOR/FINISH: ARUA NATURAL | | |
| | | COUNTERTOPS &BACK SPLASH OPT.2 | 10" X 5" | CAESARSTONE | QUARTZ COUNTERTOP IN WHITE ATTICA 10"X5" COLOR/FINISH: WHITE ATTICA | | |
| | | KITCHEN FACET OPT.1 | | THE HOME DEPOT/KOHLER | SIMPLICE SINGLE-HANDLE PULL-DOWN SPRAYER KITCHEN FAUCET IN POLISHED CHROME, METAL COLOR/FINISH : CHROME | | |
| | | KITCHEN FACET OPT.2 | | THE HOME DEPOT/GROHE | CONCETTO SINGLE-HANDLE PULL-OUT SPRAYER KITCHEN FAUCET 1.75 GPM IN STARLIGHT CHROME,, METAL COLOR/FINISH : CHROME | | |
| | | KITCHEN FACET OPT.3 | | THE HOME DEPOT/DELTA | DELTA KITCHEN FAUCET, METAL COLOR/FINISH : CHROME | | |
| | | KITCHEN SINK | 24" | KOHLER | ELKAY CROSSTOWN UNDERMOUNT STAINLESS STEEL 24" SINGLE BOWL KITCHEN SINK WITH BOTTOM GRID AND DRAIN COLOR/FINISH: STAINLESS STEEL | EFRU2115TC | |

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:
**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :
**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:
**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:
**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:
**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT NOT FOR CONSTRUCTION

| | |
|---|---|
| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:
**SPECIFICATION**

PROJECT #:  21-49    DATE: 04.15.2022
SHEET TITLE :

**A-610.00**



**1** INTERIOR ELEVATION
SCALE: 1/2" = 1'-0"



**CORRIDOR CEILING NOTE:**
1. ALL EXISTING ACT TILE IN CORRIDOR TO BE REMOVED AND REPLACED BY GYP. BOARD CEILING. TYP.
2. ALL EXISTING GYP. BOARD CEILING IN CORRIDOR TO BE PATCH AND REPAINT
3. CEILING PAINTED IN PA-01

**CORRIDOR WALL NOTE:**
1. PATCH AND REPAIR EXISTING CORRIDOR WALL
2. WALL PAINTED IN PA-01

**CORRIDOR FLOORING NOTE:**
1. REMOVE EXISTING CORRIDOR CARPET
2. PATCH AND REPAIR EXISTING FLOORING

**2** INTERIOR ELEVATION
SCALE: 1/2" = 1'-0"

PROJECT:

## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER:

**CSC COLIVING**

6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**

1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**

116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

| 04.15.2022 | 50% CD SUBMISSION |
| 04.04.2022 | SD SUBMISSION |

SEAL:

DRAWING TITLE:

**INTERIOR ELEVATION**

| PROJECT #: 21-49 | DATE: 04.15.2022 |

SHEET TITLE :

## A-700.00





**CORRIDOR**

GRAB BAR REINFORCEMENT TO BE INSTALLED AS REQUIRED

GRAB BAR REINFORCEMENT TO BE INSTALLED AS REQUIRED CONTROL AREA

BATHROOM TILE PER INTERIOR DESIGNER

GRAB BAR REINFORCEMENT TO BE INSTALLED AS REQUIRED

V.I.F.

1. SHOWER PAN- ADENA
DESCRIPTION: White Acrylic Shower Base with Reversible Drain
MEASUREMENTS: 60 X 36
MATERIALS: Fiberglass reinforced acrylic base with stylish side hidden trench drain allowing for rapid evacuation of water
COLOR/FINISH: White

2. VANITY- Vanity Cabinet TBD 24"

3. SHOWER- MODEL T14259-BL-PP
DESCRIPTION: Monitor 14 Series Shower Trim In Matte Black

4. ADA BAR- Towel bar
DESCRIPTION: 12" Towel Bar In Matte Black
MODEL#: 75912-BL
MEASUREMENTS: 12"
MATERIALS: Metal
COLOR/FINISH: Matte Black

5. MIRROR- 18 inchx30 inch- Saint Birch LED Lighted Clear Rectangular Frameless Bathroom Mirror

6. WC- Round Front Toilet In White
FOUNDATIONS©MODEL#: C41913-WH

**1 | ADA BATHROOM**
SCALE: 1/2" = 1'-0"



04 | KITCHEN PLAN- 3 MODULES
ESC 1/2"=1'-0"

04 | KITCHEN PLAN- 4 MODULES-B
ESC 1/2"=1'-0"

LED LIGHT ALL ALONG UPPER CABINETS FACING DOWN





Backsplash- Quartz Countertop Sample in White Attica-Caesarstone

Single Handle Pull-Out Kitchen Faucet In Matte Black (Mod- Trinsic Delta)

24" Workstation Undermount Single Bowl 16 Gauge Stainless Steel (Delta)

24" Front Control Built-In Dishwasher Stainless steel- Fisher & Paykel

24" Standard clean electric range stove

Frigidaire - 4.5 Cu. Ft. Mini Fridge with Top Freezer - Silver

05 | KITCHEN PLAN- 3 MODULES ELEVATIONS
ESC 1/2"=1'-0"

05 | KITCHEN PLAN- 3 MODULES SECTION
ESC 1/2"=1'-0"

05 | KITCHEN PLAN- 4 MODULES-B ELEVATIONS
ESC 1/2"=1'-0"

05 | KITCHEN PLAN- 4 MODULES-B SECTION
ESC 1/2"=1'-0"

KITCHENETTE APPLIANCES SPECIFICATIONS BASED ON APPLIANCES LIST PROVIDED BY TANG ARCHITECTS

**2 | 3 MODULES KITHCEN**
SCALE: 1/2" = 1'-0"

**3 | 4 MODULES KITHCEN**
SCALE: 1/2" = 1'-0"

PROJECT:

**353 W. 57 TH ST**
NEW YORK, NY 10019
BLOCK: 1048   LOT: 7502

OWNER:

**CSC COLIVING**
6 ST. JOHNS LANE NEW YORK, NY 10013
(212) 419-3149

ARCHITECT :

**TANG STUDIO ARCHITECT LLC**
1452 COLLEGE POINT BLVD.
COLLEGE POINT, NY 11356

MEP ENGINEER:

**MG ENGINEERING, P.C.**
116 W. 32ND ST. NEW YORK, NY 10001
(212) 643-9055

STRUCTURAL ENGINEER:

INTERIOR DESIGNER:

**B-HUBER**
SIMON BOLIVAR 239 COLONIA LAFAYETTE
GUADALAJARA. MEXICO

LIGHTING DESIGNER:

**LIGHTING WORKSHOP**
20 JAY ST. #504
BROOKLYN, NY 11201
(212) 796-6510

DOB NOW JOB NUMBER:

DOB APPROVAL STAMP:

DESIGN INTENT
NOT FOR CONSTRUCTION

04.15.2022   50% CD SUBMISSION
04.04.2022   SD SUBMISSION

SEAL:

DRAWING TITLE:

**INTERIOR ELEVATION**
BATHROOM & KITCHEN

SHEET TITLE :

PROJECT #:  21-49   DATE: 04.15.2022

**A-710.00**

# SCHEDULE 4

(LOI for Construction Manager Agreement)

4863-0344-5267, v. 18

re:                Hudson Hotel
                    Letter of Intent to Award Construction Management Agreement

Dear Sir/Madam:

This letter serves as written confirmation of our intent, on behalf of Hudson 1701/1706, LLC and Hudson 1701, LLC (collectively, "Owner") to award the Construction Management Agreement ("CMA") for [Elysium] as construction manager for the renovation of the Hudson Hotel project located at 353 West 57th Street, New York, NY. It outlines the terms and conditions that would form the basis of the agreement between your firm and Owner. Alberto Smeke and Salomon Smeke are the individuals who control the Owner, and Gardiner & Theobald, Inc. will act as Owner's representative throughout the project.

The overall agreement between you and Owner will be subject to the following terms:

1. You will be engaged for preconstruction services for a fixed fee and fixed duration of $25,000 per month;

2. You and Owner shall undertake our best efforts to finalize the CMA within two weeks of execution of this letter of intent;

3. You will be engaged for construction management services for the full scope of the project, which shall include the apartments and infrastructure work;

4. The CMA shall be based on a fixed fee, fixed insurance rates, and fixed general conditions costs;

5. The CMA shall be awarded on the basis of a draft guaranteed maximum price budget and scheduled, each of which are enclosed behind this letter of intent;

6. It is the intent of the Owner that the architect and the design professionals shall deliver 100% construction documents on or before June 1, 2022. You will make your best efforts to confirm pricing based on these documents within four (4) weeks of receipt;

7. You will undertake, under authority of this letter, immediate on-site works as described in the attached preconstruction agreement, including but not limited to, surveying, probes, and other field investigation efforts;

8. You agree to be covered, to the extent such program does cover you, by the Owner's site-specific insurance policy(ies);

9. Your budget and schedule do and shall take into account logistics and phasing strategies developed with Owner and its consultants to accommodate the existing SRO tenants;

10. You recognize that time is of the essence in this project and agree that should the Certificate of No Harassment be obtained earlier than anticipated – or is

61458/0006-43012118v2

determined to not be necessary – that you shall accelerate your work schedule with no change to the GMP;

11. You acknowledge that your preconstruction services shall include efforts to support the completion of the design and bid services for the façade and amenity scope of work, and shall be invited to submit a proposal to perform such work, but that such work shall not be included in the GMP for the project and that you understand that such work may be performed concurrently with the remainder of the project, in which case no additional general conditions or general requirements shall be charged to Owner for such work;

12. The final agreements shall be substantially the same as described in the following documents:

    a.  Construction Management Preconstruction Agreement

    b.  CMA

    c.  Key Business Terms sheet

Each party shall bear its own costs and expenses incurred under and in connection with this letter and the negotiations contemplated hereunder. Further, this letter constitutes a general, non-binding letter of intent and is not intended to, and does not, create a legal, binding commitment or obligation on the part of the parties or any of their affiliates. It is understood that neither of the parties hereto shall be legally bound to the other by reason of this letter, no shall any rights, liabilities, or obligations arise as a result of this letter other than good faith negotiation in furtherance of binding agreements to follow.

As you are aware, the Owner is seeking to close on its lease and financing on May 4, 2022. Your counter-execution of this letter will help to facilitate that closing and permit Owner and you to move forward on the project.

If you agree with the provisions of this letter and the attached documents, please execute this letter in the space provided below and return the fully-executed letter to our attention before [DATE/TIME]. If we do not received the fully-executed letter by such date, this letter and the provisions hereof shall, at our sole option, expire and be of no force or effect.

We very much look forward to working with you on this project.

Sincerely yours,

HUDSON 1701/1706, LLC and HUDSON 1702, LLC

By: _____
Alberto Smeke
Authorized Signatory

2

AGREED AND ACCEPTED BY:

Elysium Construction Inc

By: _____

Name:  Alan Kenny

Title:   Principal

3

## EXHIBIT D

**Form of Environmental Indemnity Agreement**

4863-0344-5267, v. 18

## ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS ENVIRONMENTAL INDEMNITY AGREEMENT** (this "**Agreement**") is made as of the _____ day of April, 2022, by **HUDSON 1702, LLC,** a Delaware limited liability company ("**Tenant 1702**") and **HUDSON 1701/1706, LLC**, a Delaware limited liability company ("**Tenant 1701/1706**"; together with Tenant 1702, individually and collectively as the context may require, on a joint and several basis, "**Tenant**") and **ALBERTO SMEKE SABA**, an individual, residing at 2008 East 3rd Street, Brooklyn, New York 11223 ("**A Saba**") and **SALOMON SMEKE SABA**, an individual, residing at 4 Lady Bess Drive, Deal, New Jersey 07723 ("**S Saba**"; and together with A Saba, individually and collectively as the context may require, on a joint and several basis, "**Guarantor**") (Borrower and Guarantor, collectively, "**Indemnitor**"), in favor of **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "**Landlord**"), having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219.

## RECITALS

A.    On the Effective Date, (i) Landlord and Tenant are entering into that certain Ground Lease (as the same may be amended, restated, and/or supplemented from time to time, the "**Ground Lease**"), with respect to the EBC Unit and the Modified Hotel Unit of that certain 353 West 57th Street Condominium (the "**Condominium**"), established pursuant to that certain Amended and Restated Declaration pursuant to Article 9-B of the Real Leased Premises Law of the State of New York, dated February 12, 1999, and recorded on July 16, 1999, in Reel 2913 Page 1753, as amended by that certain Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999, in Reel 2979 Page 2159, as the same may be amended, restated, and/or supplemented by from time to time (the "**Condominium Declaration**"), located at 353-361 West 57th Street, New York, New York (collectively, the "**Ground Leased Premises**") and (ii) Landlord, as sublandlord, and Tenant 1701/1706, as subtenant, are entering into that certain Sublease (as the same may be amended, restated, and/or supplemented from time to time, the "**Sublease**"; and together with the Ground Lease, collectively, the "**Lease**") with respect to the 10th Floor Unit of the Condominium (the "**Subleased Premises**"; and together with the Ground Leased Premises, collectively, the "**Leased Premises**");

B.    Indemnitors execution and delivery of this Agreement is a condition precedent to Landlord entering into the Lease. Indemnitor is willing to enter into this Agreement to induce Landlord to enter into the Lease;

C.    Landlord is unwilling to enter into the Lease unless Indemnitor agrees to provide the indemnification, representations, warranties, covenants and other matters described in this Agreement for the benefit of the Indemnified Parties; and

D.      Capitalized terms used herein but not defined herein shall the meanings ascribed to such terms in the Ground Lease.

**NOW THEREFORE,** in consideration of the foregoing, the parties hereto agree as follows:

**AGREEMENT**

1.      **Environmental Representations and Warranties**. Indemnitor represents and warrants that except as otherwise disclosed in writing by Indemnitor as of the date hereof or by the Initial Environmental Report with respect to the Leased Premises delivered to Landlord by Indemnitor in connection with entering into the Lease, a copy of which has been provided to Landlord (a) there are no Hazardous Materials (defined below) or underground storage tanks in, on, or under the Leased Premises, except those that are (i) in compliance with all Environmental Laws (defined below) and with permits issued pursuant thereto (to the extent such permits are required by Environmental Law), (ii) de minimis amounts necessary to operate the Leased Premises for the purposes set forth in the Lease which will not result in an environmental condition in, on or under the Leased Premises and which are otherwise permitted under and used in compliance with Environmental Law and (iii) fully disclosed to Landlord in writing; (b) there are no past, present or threatened Releases (defined below) of Hazardous Materials in, on, under or from the Leased Premises which have not been fully remediated in accordance with Environmental Law; (c) to Indemnitor's knowledge, there is no threat of any Release of Hazardous Materials migrating to the Leased Premises; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Leased Premises which has not been fully remediated in accordance with Environmental Law; (e) Indemnitor does not know of, and has not received, any written notice or other communication from any Person (including but not limited to a Governmental Authority) relating to Hazardous Materials or Remediation (defined below) thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions in connection with the Leased Premises, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Indemnitor has truthfully and fully disclosed to Landlord, in writing, any and all information relating to environmental conditions in, on, under or from the Leased Premises that is known to Indemnitor and has provided to Landlord all material information that is contained in files and records of Indemnitor, including but not limited to any reports relating to Hazardous Materials in, on, under or from the Leased Premises and/or to the environmental condition of the Leased Premises.

2.      **Environmental Covenants**. Indemnitor covenants and agrees to comply with all obligations of Tenant set forth in Section 28 of the Ground Lease.

3.      **Indemnified Rights/Cooperation and Access**. After the occurrence of an Event of Default or if the Indemnified Parties have a reasonable basis to believe that an environmental hazard exists on the Leased Premises that, in the reasonable judgment of the Indemnified Parties, endangers any tenant or other occupant of the Leased Premises or their guests or the general public or may materially and adversely affect the value of the Leased Premises, upon reasonable notice to Indemnitor, Indemnitor shall, at Indemnitor's expense, promptly cause an engineer or consultant satisfactory to the Indemnified Parties to conduct any environmental assessment or

S - 2

4882-8597-7885, v. 3

audit (the scope of which shall be determined in the sole discretion of the Indemnified Parties) and take any samples of soil, groundwater or other water, air, or building materials or any other invasive testing requested by Landlord and promptly deliver the results of any such assessment, audit, sampling or other testing; provided, however, if such results are not delivered to the Indemnified Parties within a reasonable period the Indemnified Parties and any other Person designated by the Indemnified Parties, including but not limited to any receiver, any representative of a governmental entity, and any environmental consultant, shall have the right, but not the obligation, to enter upon the Leased Premises at all reasonable times to assess any and all aspects of the environmental condition of the Leased Premises and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in the sole discretion of the Indemnified Parties) and taking samples of soil, groundwater or other water, air, or building materials, and reasonably conducting other invasive testing. Indemnitor shall cooperate with and provide the Indemnified Parties and any such Person designated by the Indemnified Parties with access to the Leased Premises.

    **4.**    **Indemnification**. Indemnitor covenants and agrees, at its sole cost and expense, to protect, defend, indemnify, release and hold Indemnified Parties harmless from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Materials in, on, above, or under the Leased Premises; (b) any past, present or threatened Release of Hazardous Materials in, on, above, under or from the Leased Premises; (c) any activity by Indemnitor, any Person affiliated with Indemnitor, and any tenant or other user of the Leased Premises in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Leased Premises of any Hazardous Materials at any time located in, under, on or above the Leased Premises; (d) any activity by Indemnitor, any Person affiliated with Indemnitor, and any tenant or other user of the Leased Premises in connection with any actual or proposed Remediation of any Hazardous Materials at any time located in, under, on or above the Leased Premises, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal, remedial or corrective action required under any Environmental Law; (e) any past, present or threatened (in writing) material non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Leased Premises or operations thereon, including but not limited to any failure by Indemnitor, any Person affiliated with Indemnitor, and any tenant or other user of the Leased Premises to comply with any order of any Governmental Authority in connection with any Environmental Laws; (f) subject to the provisions of Section 2(d) hereof, the imposition, recording or filing or the threatened imposition, recording or filing of any Environmental Lien encumbering the Leased Premises; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any acts of Indemnitor, any Person affiliated with Indemnitor, and any subtenant or other user of the Leased Premises in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Materials at any facility or incineration vessel containing such or similar Hazardous Materials; (i) any acts of Indemnitor, any Person affiliated with any Indemnitor, and any subtenant or other user of the Leased Premises in accepting any Hazardous Materials for transport to disposal or treatment facilities, incineration vessels or sites from which there is a Release, or a threatened

4882-8597-7885, v. 3

Release of any Hazardous Materials which causes the incurrence of costs for Remediation; (j) any personal injury, wrongful death, or property or other damage relating to Hazardous Materials at the Leased Premises arising under any statutory or common law or tort law theory, including but not limited to damages assessed for private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Leased Premises; (k) any material misrepresentation or inaccuracy in any representation or warranty pertaining to environmental matters or material breach or failure to perform any covenants or other obligations pursuant to this Agreement or the Lease, and (l) any other matters set forth in Section 28(e) of the Ground Lease.

5.      **Duty to Defend and Attorneys' and Other Fees and Expenses**. Upon written request by any Indemnified Party, Indemnitor shall defend same (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties (which approval shall not be unreasonably withheld, conditioned or delayed) in connection with the matters identified in Section 4 above. Notwithstanding the foregoing, with prior notice to Indemnitor, any Indemnified Parties may, in their reasonable discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding, providing that no compromise or settlement shall be entered without Indemnitor's consent, which consent shall not be unreasonably withheld. Upon demand, Indemnitor shall pay or, in the reasonable discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

6.      **Definitions**. Capitalized terms used herein and not specifically defined herein shall have the respective meanings ascribed to such terms in the Lease. As used in this Agreement, the following terms shall have the following meanings:

The term "**Legal Action**" means any claim, suit or proceeding, whether administrative or judicial in nature.

The term "**Losses**" includes any actual losses, damages (excluding any consequential, special and punitive damages, except to the extent that the same constitute consequential, special and punitive damages required to be paid by any Indemnified Party to a third party not affiliated with such Indemnified Party), costs and expenses, fees, claims, suits, judgments, awards, liabilities (including but not limited to strict liabilities), obligations, debts, fines, penalties, charges, costs of Remediation (whether or not performed voluntarily, but subject to Indemnitor's right to contest any required Remediation pursuant to Section 2 hereof), amounts paid in settlement (subject to Indemnitor's rights pursuant to Section 5 hereof), litigation costs, reasonable attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including but not limited to costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances whether solid, liquid or gas), or whatever kind or nature, and whether or not incurred in connection with any judicial or administrative proceedings, actions, claims, suits, judgments or awards.

S - 4

4882-8597-7885, v. 3

The term "**Release**" includes, but is not limited to, any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

The term "**Remediation**" includes, but is not limited to, any response, remedial, removal, or corrective action required under any Environmental Laws; any activity to clean up, detoxify, decontaminate, contain or otherwise remediate any Hazardous Material required under any Environmental Laws; any actions to prevent, cure or mitigate any Release of any Hazardous Material; any action required to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Materials required under any Environmental Laws.

7.      **Enforcement**. Indemnified Parties may enforce the obligations of Indemnitor without first resorting to or exhausting any remedies under the Lease with respect to any of the Leased Premises, through foreclosure proceedings or otherwise, provided, however, that nothing herein shall inhibit or prevent Landlord from exercising any power of sale under, the Lease, or exercising any other rights and remedies thereunder. It is not necessary for an Event of Default to have occurred for Indemnified Parties to exercise their rights pursuant to this Agreement.

8.      **Survival**. The obligations and liabilities of Indemnitor under this Agreement shall survive the expiration of the term of the Ground Lease for a period of two (2) years, provided that Indemnitor delivers to Landlord an environmental site assessment reasonably acceptable to Landlord which (i) indicates that there are no "recognized environmental conditions" (as defined in the then applicable American Society of Testing and Materials standards for Phase I Environmental Site Assessments) in, on or under the Leased Premises and (ii) does not reveal any contamination of the Leased Premises by Hazardous Materials that could reasonably be expected to result in any material obligation with respect to the Leased Premises or to any Indemnified Party under any applicable Environmental Laws. Notwithstanding the provisions of this Agreement to the contrary, the liabilities and obligations of Indemnitor hereunder shall not apply to the extent that Indemnitor can reasonably prove that such liabilities and obligations arose solely from Hazardous Materials that: (a) were not present on or a threat to the Leased Premises prior to the date that Landlord or their nominee acquired title to the Leasehold Estate, and (b) were not the result of any act or negligence of Indemnitor or any of Indemnitor's affiliates, agents or contractors.

9.      **Interest**. Any amounts payable to any Indemnified Parties under this Agreement shall become immediately due and payable on demand and, if not paid within thirty (30) days of such demand therefor, shall bear interest at the Default Rate in the Lease.

10.     **Jury Trial**. INDEMNITOR HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING TO THIS AGREEMENT OR THE LEASE OR ANY ACTS OR OMISSIONS OF ANY INDEMNIFIED PARTIES IN CONNECTION THEREWITH.

4882-8597-7885, v. 3

**11.** **Subrogation**. Indemnitor shall take any and all reasonable actions, including institution of legal action against third parties, necessary or appropriate to obtain reimbursement, payment or compensation from such Person responsible for the presence of any Hazardous Materials at, in, on, under or near the Leased Premises or otherwise obligated by law to bear the cost. Indemnified Parties shall be and hereby are subrogated to all of Indemnitor's rights now or hereafter in such claims.

**12.** **Indemnitor's Representations and Warranties**. Indemnitor represents and warrants, as of the date of this Agreement, that:

(a)     it has the full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; the execution, delivery and performance of this Agreement by Indemnitor has been duly and validly authorized; and all requisite action has been taken by Indemnitor to make this Agreement valid and binding upon Indemnitor, enforceable in accordance with its terms;

(b)     its execution of, and compliance with, this Agreement is in the ordinary course of business of Indemnitor and will not result in the breach of any term or provision of any governing instrument of Indemnitor or result in the breach of any term or provision of, or conflict with or constitute a default under, or result in the acceleration of any obligation under, any agreement, indenture or loan or credit agreement or other instrument to which Indemnitor or the Leased Premises is subject, or to Indemnitor' s knowledge result in the violation of any law, rule, regulation, order, judgment or decree to which Indemnitor or the Leased Premises is subject;

(c)     to Indemnitor's knowledge, there is no action, suit, proceeding or investigation pending or threatened (in writing) against it which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of Indemnitor, or in any material impairment of the right or ability of Indemnitor to carry on its business substantially as now conducted, or in any material liability on the part of Indemnitor, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of Indemnitor contemplated herein, or which would be likely to impair materially the ability of Indemnitor to perform under the terms of this Agreement;

(d)     it does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)     to the best of Indemnitor's knowledge, no approval, authorization, order, license or consent of, or registration or filing with, any governmental authority or other person, and no approval, authorization or consent of any other party is required in connection with this Agreement; and

(f)     this Agreement constitutes a valid, legal and binding obligation of Indemnitor, enforceable against it in accordance with the terms hereof subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally and to general

principals of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

**13.**    **No Waiver**. No delay by any Indemnified Party in exercising any right, power or privilege under this Agreement shall operate as a waiver of any such privilege, power or right.

**14.**    **Notice of Legal Actions**. Each party hereto shall, within five (5) Business Days of receipt thereof, give written notice to the other party hereto of (i) any notice, advice or other communication from any Governmental Authority or any source whatsoever with respect to Hazardous Materials on, from or affecting the Leased Premises, and (ii) any legal action brought against such party or related to the Leased Premises, with respect to which Indemnitor may have liability under this Agreement. Such notice shall comply with the provisions of Section 17 hereof.

**15.**    **Intentionally Deleted.**

**16.**    **Taxes**. Indemnitor has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by it and has paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by it. Indemnitor has no knowledge of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

**17.**    **Notices**. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Agreement (collectively "**Notice**" or "**Notices**") must, to be effective for purposes of this Agreement, be in writing, and they will be deemed to have been given for all purposes (i) three (3) Business Days after having been sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, (ii) one (1) day after having been sent by Federal Express or other nationally recognized air courier service, to the addresses stated below, or (iii) if such Notice is sent via email (which email shall be addressed to the email addresses set forth below and shall include the notice as a .pdf attachment thereto) (x) as of the date of the email, if such email was sent prior to 4 P.M. EST on a Business Day or (y) on the Business Day immediately succeeding the date of the email, if such email was sent on a day that is not a Business Day or after 4 P.M. EST on a Business Day, provided if a Notice is delivered via email, such Notice shall not be effective unless a hardcopy of such Notice is delivered via the method described in clauses (i) and (ii) above:

4882-8597-7885, v. 3

**If to Indemnitor:**

Hudson 1702, LLC
c/o CSC Coliving LLC
6 St. Johns Lane
New York, New York 10013
Attention: Alberto Smeke Saba
Email: AS@csc-coliving.com
Attention: Salomon Smeke Saba
Email: SS@csc-coliving.com

Hudson 1701/1706, LLC
c/o CSC Coliving LLC
6 St. Johns Lane
New York, New York 10013
Attention: Alberto Smeke Saba
Email: AS@csc-coliving.com
Attention: Salomon Smeke Saba
Email: SS@csc-coliving.com

Alberto Smeke Saba
c/o CSC Coliving LLC
6 St. Johns Lane
New York, New York 10013
Email: AS@csc-coliving.com

Salomon Smeke Saba
c/o CSC Coliving LLC
6 St. Johns Lane
New York, New York 10013
Email: SS@csc-coliving.com

**With a copy to:**

Cole Schotz, P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attention: Jordan Metzger, Esq.
Email: jmetzger@coleschotz.com

4882-8597-7885, v. 3

|  |  |
|---|---|
| **If to Landlord:** | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Luke Pak<br>Telephone: 214-545-5576<br>E-mail:  pak@mspcm.com |
|  | 356W58 GROUND LESSOR LLC<br>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Max Lamont<br>Telephone: 214-545-5577<br>E-mail:  lamont@mspcm.com |
| **With a copy to:** | Duval & Stachenfeld LLC<br>555 Madison Avenue, 6th Floor<br>New York, New York 10022<br>Attention: Danielle Ash, Esq. & File Manager<br>File No. 4308.0014<br>Email: Dash@dsllp.com |

For the purposes of this Section 17, any party may substitute or supplement its address by giving ten (10) Business Days' notice to the other party in the manner provided above.

**18.     Duplicate Originals; Counterparts**. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**19.     No Oral Change**. This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Indemnitor or any Indemnified Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

S - 9

4882-8597-7885, v. 3

**20.** **Headings, Etc**. The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**21.** **Number and Gender/Successors and Assigns**. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person referred to may require. Without limiting the effect of specific references in any provision of this Agreement, the term "**Indemnitor**" shall be deemed to refer to each and every Person comprising an Indemnitor from time to time, as the sense of a particular provision may require, and to include the heirs, executors, administrators, legal representatives, successors and assigns of Indemnitor, all of whom shall be bound by the provisions of this Agreement, provided that no obligation of Indemnitor may be assigned except with the written consent of Landlord. Subject to the limitations provided in this Agreement, each reference herein to Landlord shall be deemed to include its respective successors and assigns. This Agreement shall inure to the benefit of Indemnified Parties and their respective successors and assigns.

**22.** **Release of Liability**. Any one or more parties liable upon or in respect of this Agreement may be released without affecting the liability of any party not so released.

**23.** **Rights Cumulative**. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which Landlord has under the Lease or would otherwise have at law or in equity.

**24.** **Inapplicable Provisions**. If any term, condition or covenant of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

**25.** **Miscellaneous**.

(a) Wherever pursuant to this Agreement (i) Landlord exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Landlord, or (iii) any other decision or determination is to be made by Landlord, the decision of Landlord to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Landlord, shall be in the sole discretion of Landlord and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b) Wherever pursuant to this Agreement it is provided that Indemnitor pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of each Indemnified Party, whether retained firms, the reimbursements for the expenses of the in-house staff or otherwise.

(c) If Indemnitor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

(d) Subject to Section 2(f) of this Agreement, Indemnitor hereby confirms the right of Landlord (or a receiver appointed by Landlord), upon reasonable advance notice to Indemnitor (except in cases of emergency), to enter upon and inspect all or any portion of the

S - 10

4882-8597-7885, v. 3

Leased Premises for the purpose of determining the existence, location, nature and magnitude of any past or present release or threatened release of any Hazardous Material into, onto, beneath, or from the property. All reasonable costs and expenses incurred by Landlord pursuant to this provision, including, without limitation, costs of consultants and contractors, costs of repair of any physical injury to the Leased Premises, costs of normal and customary tests and studies, court costs and attorneys' fees, whether incurred in litigation or not and whether before or after judgment, shall be payable by Indemnitor and, to the extent advanced or incurred by any Indemnified Party, shall be reimbursed to such Indemnified Party by Indemnitor upon demand.

[NO FURTHER TEXT ON THIS PAGE]

4882-8597-7885, v. 3

IN WITNESS WHEREOF, this Agreement has been executed by Indemnitor and is effective as of the day and year first above written.

TENANT:

HUDSON 1702, LLC,
a Delaware limited liability company


By_____
      Name:
      Title:


By_____
      Name:
      Title:

HUDSON 1701/1706, LLC,
a Delaware limited liability company


By_____
      Name:
      Title:

By_____
      Name:
      Title:


GUARANTOR:

_____
      Alberto Smeke Saba


_____
      Salomon Smeke Saba

4882-8597-7885, v. 3

## EXHIBIT A

## LEGAL DESCRIPTION

Lots 1701 and 1702

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1 and 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701 and 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) and **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

4882-8597-7885, v. 3

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only: Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, Units 1 and 2, New York, NY and designated as Block 1048 Lots 1701 and 1702 as shown on the Tax Map of the City of New York, County of New York.

Lot 1706

The premises demised by that certain Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant; as modified by an Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872; as assigned by an Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882; as modified by an Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; to wit:

**THE CONDOMINIUM UNIT** (hereinafter referred to as the "Unit") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Unit being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). This Unit is also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **3.89067 %** interest in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Unit are located is situated in the County of New York and State of New York and is more fully described in the Declaration

4882-8597-7885, v. 3

## EXHIBIT E

## Form of Completion Guaranty

4863-0344-5267, v. 18

## COMPLETION GUARANTY

THIS COMPLETION GUARANTY (this "**Guaranty**') is entered into as of [_____ ____], 2022 by **ALBERTO SMEKE SABA**, an individual, residing at 2008 East 3rd Street, Brooklyn, New York 11223 ("**A Saba**") and **SALOMON SMEKE SABA**, an individual, residing at 4 Lady Bess Drive, Deal, New Jersey 07723 ("**S Saba**"; and together with A Saba, individually and collectively as the context may require, on a joint and several basis, "**Guarantor**"), in favor of **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "**Landlord**"), having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219.

### RECITALS

A.      On the Effective Date, (i) Landlord and Hudson 1701/1706, LLC, a Delaware limited liability company ("**Tenant 1701/1706**") and Hudson 1702, LLC, a Delaware limited liability company ("**Tenant 1702**"; and together with Tenant 1701/1706, collectively, on a joint and several basis, "**Tenant**") are entering into that certain Ground Lease (as the same may be amended, restated, and/or supplemented from time to time, the "**Ground Lease**"), with respect to the EBC Unit and the Modified Hotel Unit of that certain 353 West 57th Street Condominium (the "**Condominium**"), established pursuant to that certain Amended and Restated Declaration pursuant to Article 9-B of the Real Leased Premises Law of the State of New York, dated February 12, 1999, and recorded on July 16, 1999, in Reel 2913 Page 1753, as amended by that certain Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999, in Reel 2979 Page 2159, as the same may be amended, restated, and/or supplemented by from time to time (the "**Condominium Declaration**"), located at 353-361 West 57th Street, New York, New York (collectively, the "**Ground Leased Premises**") and (ii) Landlord, as sublandlord, and Tenant 1701/1706, as subtenant, are entering into that certain Sublease (as the same may be amended, restated, and/or supplemented from time to time, the "**Sublease**"; and together with the Ground Lease, collectively, the "**Lease**") with respect to the 10th Floor Unit of the Condominium (the "**Subleased Premises**"; and together with the Ground Leased Premises, collectively, the "**Leased Premises**");

B.      Guarantor's execution and delivery of this Guaranty is a condition precedent to Landlord entering into the Lease. Guarantor is willing to enter into this Guaranty to induce Landlord to enter into the Lease; and

C.      Capitalized terms used herein but not defined herein shall the meanings ascribed to such terms in the Ground Lease.

**NOW THEREFORE,** in consideration of the foregoing, the parties hereto agree as follows:

1.      Completion Guaranty and Agreement. Guarantor unconditionally guarantees the full performance by Tenant of, and agrees to perform all of Tenant's obligations under the Lease which pertain to construction of the Project, including, without limitation, to Substantially Complete the Project by the Required Substantial Completion Date, subject to delays caused by events of Force Majeure up to the Force Majeure Cap. Guarantor unconditionally guaranties the lien free Completion of the Project (including, if Landlord delivers a Fallback Business Plan Notice and Tenant is required to commence the Fallback Project in accordance with the Lease, the Completion of the Fallback Project) in accordance with the requirements of the Lease and the terms herein. Further, Guarantor hereby guarantees the payment by Tenant of any funds necessary to Complete the Project in accordance with the Lease, including, without limitation, any costs of the Project in excess of those set forth in the Project Budget. Guarantor shall assume responsibility for and shall fully perform all of such obligations promptly on receiving written notice from Landlord that Tenant has failed to perform any of such obligations in accordance with the Lease.

2.      Lien Free Completion. Completion of the Project free and clear of liens shall be deemed to have occurred upon either (a) Landlord's receipt of all the required items set forth in the Work Letter required to satisfy Completion of the Project or (b) Landlord's receipt of such other evidence of lien-free Completion of the Project as Landlord deems satisfactory in its sole discretion.

3.      Obligations of Guarantor Upon Default of Tenant. If construction of the Project is not commenced and completed in the manner and within the time required by the Lease, or if, prior to the expiration of the time limits for said Completion set forth in the Lease, construction of the Project should cease or be halted prior to Completion, and such cessation or halt constitutes an Event of Default (as defined in the Lease), Guarantor shall, promptly upon demand of Landlord: (a) diligently proceed to Complete the Project at Guarantor's sole cost and expense; (b) fully pay and discharge all claims for labor performed and material and services furnished in connection with the Project; and (c) release and discharge all claims of stop notices, mechanic's liens, materialman's liens and equitable liens that may arise in connection with the Project.

4.      Remedies. If Guarantor fails to promptly perform its obligations under this Guaranty, Landlord shall have the following remedies:

4.1      At Landlord's option, and without any obligation to do so, to proceed to perform on behalf of Guarantor any or all of Guarantor's obligations hereunder and Guarantor shall, upon demand and whether or not construction is actually completed by Landlord, pay to Landlord all sums expended by Landlord in performing Guarantor's obligations hereunder together with interest thereon at the Default Rate; and

4.2      From time to time and without first requiring performance by Tenant or exhausting any or all remedies under the Lease, to bring any action at law or in equity or both to compel Guarantor to perform its obligations hereunder, and to collect in any such action compensation for all Losses sustained or incurred by Landlord as a consequence of the failure of Guarantor to perform its obligations together with interest thereon at the Default Rate.

4.3      **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IN ADDITION TO ALL OF LANDLORD'S OTHER RIGHTS**

2

HEREUNDER AND UNDER THE LEASE, WHETHER OR NOT LANDLORD SHALL ELECT TO COMPLETE THE PROJECT IN ACCORDANCE WITH SECTION 4.1 ABOVE, LANDLORD SHALL HAVE THE OPTION, IN ITS SOLE DISCRETION, TO REQUIRE THAT GUARANTOR PAY (AS THE GUARANTOR'S SOLE AND EXCLUSIVE LIABILITY HEREUNDER IN SUCH EVENT) TO LANDLORD AS LIQUIDATED DAMAGES AN AMOUNT EQUAL TO THE EXCESS, IF ANY, OF (I) ALL OF THE HARD COSTS AND SOFT COSTS WHICH WOULD HAVE BEEN INCURRED IN CONNECTION WITH THE COMPLETION OF THE PROJECT (EVEN IF LANDLORD DOES NOT INTEND TO SO COMPLETE THE CONSTRUCTION WORK) FREE OF LIENS AND IN ACCORDANCE WITH THE PROJECT PLANS AND SPECIFICATIONS, AND THE OTHER PROJECT DOCUMENTS, INCLUDING, WITHOUT LIMITATION, THOSE HARD COSTS AND SOFT COSTS OCCASIONED BY, OR ARISING AS A RESULT OF, ANY EVENT OF DEFAULT UNDER THE LEASE (IRRESPECTIVE OF THE ABSENCE OF ANY AMOUNT IN THE BUDGET FOR A PARTICULAR ITEM OF SUCH HARD COST OR SOFT COST). FOR PURPOSES OF THIS SECTION 4.3, THE AFORESAID HARD COSTS AND SOFT COSTS SHALL INITIALLY BE EQUAL TO THE AMOUNT OF SUCH HARD COSTS AND SOFT COSTS AS ESTIMATED, IN GOOD FAITH, BY LANDLORD, TOGETHER WITH REASONABLE DOCUMENTATION TO SUPPORT SUCH ESTIMATE (AND SUCH OTHER DOCUMENTATION REASONABLY REQUESTED BY GUARANTOR TO FURTHER SUPPORT SUCH ESTIMATE); PROVIDED HOWEVER THAT, IN THE EVENT GUARANTOR DISPUTES SUCH AMOUNTS, GUARANTOR SHALL DELIVER NOTICE THEREOF WITHIN TEN (10) BUSINESS DAYS AND SHALL WITHIN FIFTEEN (15) BUSINESS DAYS THEREAFTER, SUBMIT TO LANDLORD A GOOD FAITH ESTIMATE OF SUCH AMOUNTS PREPARED BY A CONSULTANT APPOINTED BY GUARANTOR TO BE REVIEWED BY LANDLORD, TOGETHER WITH REASONABLE DOCUMENTATION TO SUPPORT SUCH ESTIMATE. IN THE EVENT THAT LANDLORD AND THE CONSULTANT APPOINTED BY GUARANTOR ARE UNABLE TO AGREE AS TO SUCH AMOUNTS, THEY SHALL JOINTLY SELECT A MUTUALLY ACCEPTABLE NEUTRAL EXPERT (HAVING AT LEAST TEN (10) YEARS OF MULTIFAMILY AND COMMERCIAL CONSTRUCTION EXPERIENCE IN NEW YORK, NEW YORK) TO MAKE A FINAL DETERMINATION. THE NEUTRAL EXPERT SHALL REVIEW EACH APPLICABLE ESTIMATE AND THE SUPPORTING DOCUMENTATION AND SHALL SELECT ONE OF THE TWO ESTIMATES AS THE FINAL AMOUNT. ANY SUCH AMOUNT DETERMINED PURSUANT TO THE AFORESAID SHALL BE CONCLUSIVE FOR PURPOSES OF DETERMINING THE GUARANTOR'S LIABILITY HEREUNDER AND GUARANTOR SHALL PAY THE COSTS OF SUCH NEUTRAL EXPERT. GUARANTOR'S OBLIGATIONS TO MAKE SUCH PAYMENT SHALL BE DUE NO LATER THAN TEN (10) DAYS FOLLOWING THE GIVING OF A WRITTEN DEMAND THEREFOR FROM LANDLORD, THE AGREEMENT OF THE APPLICABLE CONSULTANTS OR THE DECISION OF THE NEUTRAL EXPERT. IT IS AGREED THAT IF LANDLORD SO ELECT TO RECEIVE SUCH PAYMENT, ANY SUCH PAYMENT SHALL BE RETAINED BY LANDLORD AS LIQUIDATED DAMAGES. THE PARTIES ACKNOWLEDGE AND AGREE THAT THE ACTUAL DAMAGES OF LANDLORD IN SUCH EVENT WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE. AFTER NEGOTIATION, THE

3

**PARTIES HAVE AGREED THAT, CONSIDERING ALL THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS GUARANTY, THE LIQUIDATED DAMAGES AMOUNT AS DETERMINED IN ACCORDANCE WITH THE FOREGOING IS A REASONABLE ESTIMATE OF THE DAMAGES THAT LANDLORD WOULD INCUR IN THE EVENT THAT TENANT HAS NOT TIMELY AND FULLY COMPLETED THE PROJECT IN ACCORDANCE WITH THE LEASE. THE PAYMENT OF THE LIQUIDATED DAMAGES AMOUNT TO LANDLORD UNDER THE CIRCUMSTANCES PROVIDED FOR HEREIN IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO LANDLORD. FOR THE AVOIDANCE OF DOUBT, UPON GUARANTOR'S PAYMENT OF SUCH LIQUIDATED DAMAGES AMOUNT, THIS GUARANTY SHALL TERMINATE AND GUARANTOR SHALL HAVE NO FURTHER LIABILITY HEREUNDER.**

5.    <u>Rights of Landlord</u>. Guarantor authorizes Landlord, without giving notice to Guarantor or obtaining Guarantor's consent and without affecting the liability of Guarantor, from time to time to: (a) approve modifications to the Project Plans and Specifications so long as such modifications are not Non-Qualifying Material Modifications (hereinafter defined); (b) [intentionally omitted]; (c) otherwise modify the Lease, including, without limitation, advancing additional funds in its discretion for purposes related to the purposes specified in the Lease; or (d) assign this Guaranty in whole or in part.  For purposes of this Guaranty, the term "**Non-Qualifying Material Modifications**" shall mean any discretionary material modifications made by Landlord (or any contractor or agent of Landlord) to the Project Plans and Specifications, the Construction Manager Agreement, any construction contract pertaining to the Project, or the Project Budget; provided, however, any changes that are (A) required by Legal Requirements, (B) necessary to correct errors or defects in the Project Plans and Specifications, (C) necessary for the issuance by any Governmental Authority of any required Permits, (D) as a result of field or emergency conditions, or (E) due to events or occurrences outside of the control of Landlord (or any contractor or agent of Landlord) shall not be Non-Qualifying Material Modifications.

6.    <u>Waiver of Estoppel Defense</u>. Guarantor hereby waives the right to require Landlord to (a) proceed against Tenant or any other guarantor or pledgor, (b) proceed against or exhaust any security Landlord may hold, or (c) pursue any other right or remedy for Guarantor's benefit. Guarantor agrees that Landlord may proceed against Guarantor for the obligations guaranteed herein without taking any action against Tenant or any other, guarantor or pledgor, and without proceeding against or exhausting any security Landlord hold. Guarantor agrees that Landlord may unqualifiedly exercise, in Landlord' absolute discretion, any and all rights and remedies available to it against Tenant or any other, guarantor or pledgor without impairing Landlord's rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities shall remain independent and unconditional. Guarantor agrees that Landlord's exercise of certain of such rights or remedies may affect or eliminate Guarantor's right of subrogation or recovery against Tenant and that Guarantor may incur a partially or totally nonreimbursable liability under this Guaranty.

7.    <u>Additional Waivers</u>.

7.1    Guarantor agrees that its liability under, and the enforceability of, this Guaranty are absolute and are not contingent upon the genuineness, validity or enforceability of

4

the Lease or the availability of any defense to Tenant, any other guarantor of the Lease, any pledgor of collateral for any Person's obligations to Landlord or any other Person related to the Lease.

7.2     Guarantor acknowledges and agrees that Guarantor's liability may be larger in amount and more burdensome than that of Tenant. Guarantor's liability under this Guaranty shall not be limited or affected in any way by any impairment or any diminution or loss of value of the Leased Premises, from whatever cause.

7.3     Guarantor waives diligence and all demands, protests, presentments and notices of every kind or nature, including notices of protest, dishonor, nonpayment, acceptance of this Guaranty and creation, renewal, extension, modification or accrual of any of the obligations under the Lease. Guarantor also waives the right to plead all statutes of limitation as a defense to Guarantor's liability under, or the enforceability of, this Guaranty.

7.4     Guarantor waives the right to plead any and all statutes of limitations as a defense to Guarantor's liability hereunder or the enforcement of this Guaranty. No failure or delay on Landlord's part in exercising any power, right or privilege hereunder shall impair any such power, right or privilege or be construed as a waiver of or an acquiescence therein.

8.     <u>Guarantor Informed of Tenant's Condition</u>. Guarantor acknowledges that it has had an opportunity to review the Lease, the Leased Premises and Tenant's financial condition and ability to pay Tenant's obligations under the Lease. Guarantor agrees to keep itself fully informed of all aspects of Tenant's financial condition and the performance of Tenant's obligations to Landlord and that Landlord have no duty to disclose to Guarantor any information pertaining to Tenant or the Leased Premises. Guarantor represents and warrants to Landlord that: (a) Guarantor has received a copy of the Lease; (b) Landlord has not made any representations or warranties to Guarantor regarding the credit worthiness of Tenant or the prospects of sources of payment under the Lease other than Tenant; and (c) this Guaranty is executed at the request of Tenant.

9.     <u>Subrogation, Reimbursement and Contribution Rights</u>. Guarantor agrees that its rights of subrogation and reimbursement against Tenant, its right of subrogation against the Leased Premises or the pledgor of such collateral or security and its right of contribution from any guarantor of the Lease shall be subordinate to Landlord's rights against Tenant, in such collateral or security, against any such pledgor and against any such guarantor.

10.     <u>Guaranty Continues if Payments Are Avoided or Recovered from Landlord</u>. If all or any portion of the obligations guaranteed under this Guaranty are paid or performed, Guarantor's obligations under this Guaranty shall continue and remain in full force and effect if all or any part of such payment or performance is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, and (b) termination of the Lease.

11.     <u>Subordination</u>. Until all of the obligations under this Guaranty have been paid in full, Guarantor agrees that all existing and future debts, obligations and liabilities of Tenant to Guarantor (collectively referred to as "**Subordinated Debt**") shall be and hereby are expressly subordinated to the obligations hereunder, and the right of payment of the Subordinated Debt is

5

expressly deferred to the prior payment in full of the obligations hereunder. For purposes of this Section 11, any obligation hereunder shall not be deemed paid in full until it has been paid in full in U.S. Dollars.

11.1    Until the obligations under this Guaranty have been paid in full, without Landlord' prior written consent:

(a)    Guarantor shall not (i) collect or receive any cash or non-cash payments on the Subordinated Debt, (ii) assert rights or declare a default under or enforce payment of the Subordinated Debt by legal proceedings or otherwise, or (iii) assign or transfer all or any part of the Subordinated Debt;

(b)    Guarantor shall not permit Tenant to (i) pay to any Guarantor all or any part of the Subordinated Debt, (ii) transfer any Leased Premises to Guarantor in payment of or as security for the payment of all or any part of the Subordinated Debt, (iii) execute or deliver any instrument as evidence of all or any part of the Subordinated Debt, or (iv) establish any sinking fund, reserve, or like set aside of funds or other Leased Premises for the redemption, retirement or repayment of all or any part of the Subordinated Debt; and

(c)    Without the prior written consent of Landlord, Guarantor shall not file any petition against Tenant under any chapter or provision of any present or future federal bankruptcy legislation, or amendments to such legislation, or any complaint, petition or other pleading against Tenant calling for its reorganization, liquidation, composition or receivership, or for other similar relief under federal or state law.

11.2    Upon any distribution of assets of Tenant upon any dissolution, winding up, liquidation or reorganization of Tenant, whether in bankruptcy, insolvency, reorganization or receivership proceedings, or upon an assignment for the benefit of creditors or any other marshaling of the assets and liabilities of Tenant, or otherwise:

(a)    Landlord shall be entitled to receive payment in full of the obligations under this Guaranty before Guarantor is entitled to receive any payment on account of the Subordinated Debt; and

(b)    any payment by, or distribution of assets of, Tenant of any kind or character, whether in cash, property or securities, to which Guarantor would be entitled except for this subordination shall be paid or delivered by the Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee, or otherwise, directly to Landlord for the benefit of Landlord to be held as additional security for the obligations under this Guaranty in an interest bearing account until all of the obligations under this Guaranty have been paid in full.

11.3    Should Guarantor receive any payment or distribution of any kind in conflict with this Section 11, Guarantor shall hold such funds or property as trustee for Landlord, and shall pay or transfer to Landlord for the benefit of Landlord all such funds or property promptly upon receipt on account of the obligations guaranteed hereunder, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty; provided,

6

4889-5344-7709, v. 3

however, nothing herein shall limit Guarantor's right to receive distributions so long as no Event of Default has occurred and is continuing.

11.4   Guarantor authorizes and directs Tenant to take all necessary or appropriate action to effectuate and maintain the subordination provided in this Guaranty.

11.5   No right of Landlord to enforce the subordination in this Guaranty shall at any time or in any way be prejudiced or impaired by any act or failure to act by Tenant, Landlord or any other Person or by any noncompliance by the Tenant, Landlord or any other Person with the terms, provisions and covenants of this Guaranty or of the Lease regardless of any knowledge of such acts, failures to act, or non-compliance that Landlord may have or be otherwise charged with.

11.6   Nothing express or implied in this Section 11 shall give any Person other than Tenant, Landlord and Guarantor any benefit or any legal or equitable right, remedy or claim under this Section 11.

11.7   If Guarantor institutes or participates in any suit, action or proceeding against Tenant in violation of the terms of Guarantor's subordination Tenant may interpose as a defense or dilatory plea this subordination, and Landlord are irrevocably authorized to intervene and to interpose such defense or plea in its name or in Tenant's name.

12.   Representations and Warranties. Guarantor represents and warrants to Landlord that:

12.1   Authority of Guarantor. Guarantor has all requisite power and authority to conduct its business, manage its affairs, and to own and lease its properties.

12.2   Execution, Delivery and Performance of Guaranty. Guarantor has all requisite power and authority to execute and deliver this Guaranty, and perform all obligations under this Guaranty. The execution and delivery of this Guaranty, and performance by Guarantor of all obligations under this Guaranty have been duly authorized by all necessary action and do not and will not:

(a)   result in or require the creation or imposition of any lien, right of others, or other encumbrance of any nature (other than under this Guaranty and any related security documents) upon the Leased Premises now or in the future owned or leased by Guarantor;

(b)   violate any provision of any law, regulation, judgment, decree or award having applicability to Guarantor;

(c)   result in a breach of, constitute a default under, or cause or permit the acceleration of any obligation owed under, any indenture, loan agreement, lease, or any other agreement or instrument, to which Guarantor is a party or by which Guarantor or any of its property is bound or affected; or

(d)   require any consent or approval not already obtained of any Person having any interest in Guarantor.

12.3     Enforceability. This Guaranty, when executed and delivered, shall constitute the valid and binding obligation of Guarantor, enforceable in accordance with its terms.

12.4     Financial and Other Information.

(a)     All Guarantor's financial information furnished to Landlord for the benefit of Landlord in connection with the Lease: (i) is complete and fairly represents Guarantor's financial condition; and (ii) accurately presents the financial condition of Guarantor. All other reports, papers, data and information furnished to Landlord for the benefit of Landlord by and regarding Guarantor in connection with the Lease are accurate and correct in all material respects and complete insofar as completeness is necessary to give Landlord a true and accurate knowledge of their subject matter. Without limiting the generality of the foregoing, there has been no material adverse change in the condition, financial or otherwise, of Guarantor since the date of the financial statements and other reports, papers, data and information furnished to Landlord for the benefit of Landlord.

12.5     Tax Liability. Guarantor has filed all required tax returns (federal, state and local) and has paid all taxes shown on them to be due and all property taxes due, including interest and penalties, if any. The charges, accruals and reserves on the books of Guarantor for taxes or other governmental charges are adequate.

12.6     Compliance with Laws. Guarantor has substantially complied in all material respects with all laws, regulations and requirements applicable to his business and has obtained all authorizations, consents, approvals, orders, licenses, exemptions from, and has accomplished all filings or registrations or qualifications with, any court or governmental department, public body, authority, commission, board, bureau, agency or instrumentality, that may be necessary for the transaction of its business.

12.7     Compliance With Agreements. Guarantor has complied in all material respects with all indentures, credit agreement, leases and all other agreements and instruments to which Guarantor is a party or by which Guarantor or any of its Leased Premises is bound or affected.

12.8     Litigation. To Guarantor's actual knowledge, there are no material actions, suits or proceedings pending or threatened (in writing) against or affecting Guarantor or any Leased Premises of Guarantor before any court or governmental department, public body or authority.

12.9     No Default. No Event of Default with respect to the Lease, or condition, event, act or omission which, with the giving of notice or the passage of time, or both, would be an Event of Default, has occurred and is continuing.

13.     Tenant. As used in this Guaranty, "Tenant" shall include any successor to Tenant with respect to the Lease and any estate created by the commencement of a case under the Bankruptcy Code or any other insolvency, bankruptcy, reorganization or liquidation proceeding, or by any trustee under the Bankruptcy Code, liquidator, sequestrator or receiver of Tenant or Tenant's Leased Premises or similar person duly appointed pursuant to any law generally

8

governing any insolvency, bankruptcy, reorganization, liquidation, receivership or like proceeding.

14.     Opportunity to Review. Guarantor acknowledges that it has had the opportunity to review the matters discussed and contemplated by the Lease, including the remedies Landlord may pursue against Tenant in the event of a default under the Lease, the value of the Leased Premise and Tenant's financial condition and ability to perform under the Lease. Guarantor further has had the opportunity to review this Guaranty with its counsel.

15.     Changes, Waivers, Revocations and Amendments in Writing. No terms or provisions of this Guaranty may be changed, waived, revoked or amended without Landlord's prior written consent. No delay or failure of Landlord in exercising any right hereunder shall affect such right, nor shall any single or partial exercise of any right preclude any further exercise thereof. Should any provision of this Guaranty be determined by a court of competent jurisdiction to be unenforceable, all of the other provisions shall remain effective.

16.     Reasonableness and Effect of Waivers. Guarantor warrants and agrees that each of the waivers set forth in this Guaranty is made with full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any Legal Requirements or public policy, such waiver shall be effective only to the maximum extent permitted by Legal Requirements.

17.     Cumulative Remedies; No Waiver. The rights, powers and remedies of Landlord under this Guaranty are cumulative and not exclusive of any other right, power or remedy which Landlord would otherwise have. No failure or delay on the part of Landlord in exercising any such right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under this Guaranty or under the other Lease.

18.     No Third Parties Benefited. This Guaranty is made for the purpose of setting forth certain rights and obligations of Guarantor and Landlord, and no other Person shall have any rights under or by reason of this Guaranty.

19.     Interpretation. Whenever the context requires, all terms used herein in the singular shall be construed in the plural and vice versa, and each gender shall include each other gender. The term "Tenant" shall mean both the named Tenant and any other person at any time and from time to time assuming or otherwise becoming primarily liable on any or all obligations under this Guaranty. Section headings in this Guaranty are included for convenience of reference only and are not a part of this Guaranty for any other purpose.

20.     Effectiveness Independent of Other Guaranty(ies). This Guaranty shall be effective regardless of whether any other individual or entity executes a guaranty of any or all obligations under this Guaranty, and regardless of whether any other guaranty of any or all obligations under this Guaranty is ever released by Landlord or otherwise unenforceable for any reason.

21.     Assignment of Guaranty. Landlord may assign this Guaranty with the Lease, without in any way affecting Guarantor's liability hereunder. This Guaranty shall inure to the

9

benefit of Landlord and its successors and assigns, and shall bind Guarantor and such Guarantor's respective heirs, executors, administrators, successors and assigns.

22.    Consent to Jurisdiction; Waiver of Immunities.

22.1    Guarantor irrevocably submits to the jurisdiction of any New York or federal court sitting in New York City in any action or proceeding arising out of or relating to this Guaranty, and Guarantor irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York or federal court. Guarantor irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  Guarantor irrevocably appoints _____ (the "**Process Agent**"), with an office at _____ , as his agent to receive on behalf of Guarantor service of copies of the summons and complaint and any other process that may be served in any such action or proceeding. Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's address above, and Guarantor irrevocably authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service Guarantor also irrevocably consents to the service of any process in any such action or proceeding by the mailing of copies of such process to Guarantor at its address specified in Section 23.1. Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

22.2    Nothing in this Section shall affect the right of Landlord to serve legal process in another manner permitted by law or affect the right of Landlord to bring any action or proceeding against Guarantor or its property in the courts of any other jurisdictions.

22.3    To the extent that Guarantor has or may later acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, Guarantor irrevocably waives such immunity in respect of its obligations under this Guaranty.

23.    Financial Reporting.

(a)    At all times while this Guaranty remains outstanding, Guarantor shall provide to Landlord, at the times and in the manner specified therein, all financial reporting set forth in Section 10 of the Carry Guaranty.

(b)    If, at any time, any financial information provided by Guarantor demonstrates that Guarantor has failed to satisfy the Net Worth and Liquidity Threshold, such failure shall be an immediate Event of Default hereunder.

24.    Miscellaneous.

24.1    Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Guaranty (collectively "Notice" or "Notices") must, to be effective for purposes of this Guaranty, be in writing, and they will be deemed to have been given for all

10

purposes (i) three (3) Business Days after having been sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, (ii) one (1) day after having been sent by Federal Express or other nationally recognized air courier service, to the addresses stated below, or (iii) if such Notice is sent via email (which email shall be addressed to the email addresses set forth below and shall include the notice as a .pdf attachment thereto) (x) as of the date of the email, if such email was sent prior to 4 P.M. EST on a Business Day or (y) on the Business Day immediately succeeding the date of the email, if such email was sent on a day that is not a Business Day or after 4 P.M. EST on a Business Day, provided if a Notice is delivered via email, such Notice shall not be effective unless a hardcopy of such Notice is delivered via the method described in clauses (i) and (ii) above:

If to Guarantor:

Alberto Smeke Saba
2008 East 3rd Street
Brooklyn, New York 11223
Email: AS@csc-coliving.com

Salomon Smeke Saba
4 Lady Bess Drive
Deal, New Jersey 07723
Email: SS@csc-coliving.com

With a copy to:

Cole Schotz, P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attention: Jordan Metzger, Esq.
Email: jmetzger@coleschotz.com

If to Landlord:

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Luke Pak
Telephone: 214-545-5576
E-mail:  pak@mspcm.com

With a copy to:

356W58 GROUND LESSOR LLC

11

c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Max Lamont
Telephone: 214-545-5577
E-mail:  lamont@mspcm.com

And with a copy to:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq.  & File Manager
File No. 4308.0014
Email: Dash@dsllp.com

For the purposes of this Section 24, any party may substitute or supplement its address by giving ten (10) Business Days' notice to the other party in the manner provided above.

24.2    Governing Law. All questions with respect to the construction of this Guaranty and the rights and liabilities of the parties to this Guaranty shall be governed by the laws of the State of New York, without regard to conflicts of laws principles.

24.3    Binding on Successors. This Guaranty shall inure to the benefit of, and shall be binding upon, the successors and assigns of each of the parties to this Guaranty. Landlord may assign this Guaranty with one or more of the Lease, without in any way affecting Guarantor's liability under it or them.

24.4    Attorneys' Fees.

(a)    Guarantor shall reimburse Landlord for all reasonable out-of-pocket attorneys' fees, costs and expenses, incurred by Landlord in connection with the enforcement of Landlord' rights under this Guaranty and each of the other Lease, including, without limitation, reasonable attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements or for enforcement of rights under any state of federal statute, including, without limitation, reasonable attorneys' fees, costs and expenses incurred to protect Landlord' security and attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) seeking relief from stay in a bankruptcy proceeding. The term "expenses" means any expenses incurred by Landlord and/or Landlord in connection with any of the out-of-court, or state, federal or bankruptcy proceedings referred to above, including, without limitation, the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Landlord in connection with any such proceeding.

(b)    Landlord shall also be entitled to its reasonable attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. This

12

4889-5344-7709, v. 3

provision is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

24.5 Counterparts. This Guaranty may be executed in any number of original counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one instrument. The original signature page of any counterpart may be detached from such counterpart and attached to any other counterpart identical to such counterpart (except having additional signature pages executed by other parties to this Guaranty) without impairing the legal effect of any such signature(s).

24.6 Entire Agreement. This Guaranty constitutes the entire agreement and understanding between the parties in respect of the subject matter of this Guaranty and supersedes all prior agreements and understandings with respect to such subject matter, whether oral or written.

24.7 Waivers. Waiver by any Landlord of any term, covenant or condition under this Guaranty or the Lease, or of any default by Guarantor under this Guaranty or the Lease, or any failure by any Landlord to insist upon strict performance by Guarantor of any term, covenant or condition contained in this Guaranty or the Lease, shall be effective or binding on such Landlord only if made in writing by such Landlord; no such wavier shall be implied from any omission by such Landlord to take action with respect to any such term, covenant, condition or default. No express written waiver by any Landlord of any term, covenant, condition or default shall affect any other term, covenant, condition or default or cover any other time period than the application of any such term, covenant or condition to the matter as to which a waiver has been given or the default or time period specified in such express waiver. This Guaranty may be amended only by an instrument in writing signed by the parties to this Guaranty.

24.8 Severability. If any part of this Guaranty is declared invalid for any reason, such shall not affect the validity of the rest of the Guaranty. The other parts of this Guaranty shall remain in effect as if this Guaranty had been executed without the invalid part. The parties declare that they intend and desire that the remaining parts of this Guaranty continue to be effective without any part or parts that have been declared invalid.

24.9 Joint and Several Liability. If more than one person has signed this Guaranty, it shall be the joint and several obligation of all such persons.

25. Waiver of Trial by Jury. EACH OF LANDLORD AND GUARANTOR WAIVES TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS GUARANTY OR THE LEASE OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LANDLORD AND GUARANTOR. BOTH LANDLORD AND GUARANTOR HAVE OBTAINED THE ADVICE OF THEIR RESPECTIVE LEGAL COUNSEL BEFORE SIGNING THIS GUARANTY AND ACKNOWLEDGE THAT THEY VOLUNTARILY AGREED TO THIS WAIVER OF THEIR RIGHT TO TRIAL BY JURY WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND LEGAL CONSEQUENCE.

4889-5344-7709, v. 3

[*Remainder of page intentionally left blank;
signatures begin on following page*]

14

4889-5344-7709, v. 3

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR:**

_____

**ALBERTO SMEKE SABA**

_____

**SALOMON SMEKE SABA**

## EXHIBIT F

## Form of Carry Guaranty

4863-0344-5267, v. 18

## CARRY GUARANTY

THIS CARRY GUARANTY (this "**Guaranty**") is entered into as of [_____ ___], 2022 (the "**Effective Date**") by **ALBERTO SMEKE SABA**, an individual, residing at 2008 East 3rd Street, Brooklyn, New York 11223 ("**A Saba**"), and **SALOMON SMEKE SABA**, an individual, residing at 4 Lady Bess Drive, Deal, New Jersey 07723 ("**S Saba**"; and together with A Saba, individually and collectively as the context may require, on a joint and several basis, "**Guarantor**"), in favor of **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "**Landlord**"), having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219.

### RECITALS

A.      On the Effective Date, (i) Landlord and Hudson 1701/1706, LLC, a Delaware limited liability company ("**Tenant 1701/1706**") and Hudson 1702, LLC, a Delaware limited liability company ("**Tenant 1702**"; and together with Tenant 1701/1706, collectively, on a joint and several basis, "**Tenant**") are entering into that certain Ground Lease (as the same may be amended, restated, and/or supplemented from time to time, the "**Ground Lease**"), with respect to the EBC Unit and the Modified Hotel Unit of that certain 353 West 57th Street Condominium (the "**Condominium**"), established pursuant to that certain Amended and Restated Declaration pursuant to Article 9-B of the Real Leased Premises Law of the State of New York, dated February 12, 1999, and recorded on July 16, 1999, in Reel 2913 Page 1753, as amended by that certain Amendment to Amended and Restated Declaration, dated September 30, 1999, and recorded on October 27, 1999, in Reel 2979 Page 2159, as the same may be amended, restated, and/or supplemented by from time to time (the "**Condominium Declaration**"), located at 353-361 West 57th Street, New York, New York (collectively, the "**Ground Leased Premises**") and (ii) Landlord, as sublandlord, and Tenant 1701/1706, as subtenant, are entering into that certain Sublease (as the same may be amended, restated, and/or supplemented from time to time, the "**Sublease**"; and together with the Ground Lease, collectively, the "**Lease**") with respect to the 10th Floor Unit of the Condominium (the "**Subleased Premises**"; and together with the Ground Leased Premises, collectively, the "**Leased Premises**");

B.      Guarantor's execution and delivery of this Guaranty is a condition precedent to Landlord entering into the Lease. Guarantor is willing to enter into this Guaranty to induce Landlord to enter into the Lease; and

C.      Capitalized terms used herein but not defined herein shall the meanings ascribed to such terms in the Ground Lease.

**NOW THEREFORE,** in consideration of the foregoing, the parties hereto agree as follows:

1

## AGREEMENT

1.   Guaranty.

(a)   Subject to the provisions of Section 2 below, the Guarantor hereby absolutely, irrevocably and unconditionally guarantees the due and punctual payment and performance of all Base Rent and Additional Rent due from Tenant when and as the same shall become due and payable under the Lease (including, without limitation, all Taxes, insurance premiums for all insurance policies required pursuant to the terms of the Lease, any interest due on unpaid Rent at the Default Rate, any Late Charges and all other operating expenses with respect to the Leased Premises) (collectively, the "**Guaranteed Obligations**") (it being understood that, as of the date of satisfaction of the Guaranty Termination Conditions (as hereinafter defined) (the "**Termination Date**"), Guarantor's liability under this Guaranty shall terminate; provided however, Guarantor shall be liable for any and all of the Guaranteed Obligations pursuant to this Guaranty that became due and payable prior to such Termination Date). Landlord may accept such tender or may decline to accept such tender in its sole and absolute discretion (provided that any such nonacceptance shall not affect the occurrence of the Tender Date). Notwithstanding the foregoing or anything to the contrary set forth in this Guaranty, the Guaranteed Obligations shall not include the Right-Size Payment.

(b)   As used herein, the term, "**Guaranty Termination Conditions**" shall be satisfied upon compliance with any of the following conditions:  (A) satisfaction of the CONH Requirement with respect to the entire Leased Premises in accordance with the Lease and Tenant's receipt of all Permits necessary to achieve Substantial Completion of the Multifamily Project; (B) following Landlord's delivery to Tenant of a Fallback Business Plan Notice, the earlier to occur of (x) Completion of the Fallback Project or (y) the Leased Premises having achieved a 1.25x Coverage Ratio; or (C) subsequent to the occurrence of an Event of Default, within sixty (60) days of receipt of a notice of Landlord's intention to terminate the Lease, subject to extension by Landlord in its sole discretion, Guarantor has tendered, or caused to be tendered to Landlord all of the items set forth on Exhibit A attached hereto and made a part hereof (the date of such full tender, the "**Tender Date**").

(c)   For purposes of this Guaranty, the following terms shall have the following meanings: "**Coverage Ratio**" means, as of any date of determination, the ratio of Net Operating Income for the trailing three (3) months prior to the date of determination, *divided by* all Rent due during such period; and "**Net Operating Income**" means, for the applicable period tested, all gross income derived from Subleases and other operations on the Leased Premises, *less* Taxes, insurance premiums and reasonable operating expenses with respect to the Leased Premises, as reasonably determined by Landlord from financial statements and related reporting received from Tenant.

2.   Intentionally Omitted.

3.   Changes Do Not Affect Liability. Guarantor agrees that Landlord may without notice to Guarantor and without limiting Guarantor's liability under, or affecting the enforceability of, this Guaranty:

2

(a)    grant extensions of time, renewals or other indulgences and modifications to Tenant or any other party under the Lease;

(b)    change, amend or modify the Lease;

(c)    discharge or release any party or parties liable under the Lease or any Leased Documents;

(d)    accept or make compositions or other arrangements or file or refrain from filing a claim in any bankruptcy proceeding of Tenant, any other Guarantor of the Lease, or any other Person related to the Lease;

(e)    credit payments in such manner and order of priority to Base Rent, Additional Rent or other obligations as any Landlord may determine; and

(f)    otherwise deal with Tenant, any other Guarantor of the Lease, or any other person related to the Lease as Landlord may determine in its discretion.

4.    <u>Waiver of Estoppel Defense</u>. Guarantor hereby waives the right to require Landlord to (a) proceed against Tenant or any other guarantor or pledgor, (b) proceed against or exhaust any other guaranty or indemnity Landlord may in connection with the Lease, or (c) pursue any other right or remedy for Guarantor's benefit. Guarantor agrees that Landlord may proceed against Guarantor for the Guaranteed Obligations guaranteed herein without taking any action against Tenant or any other, guarantor or pledgor, and without proceeding against or exhausting any other guaranty or indemnity Landlord may be entitled in connection with the Lease. Guarantor agrees that Landlord may unqualifiedly exercise, in Landlord' absolute discretion, any and all rights and remedies available to it against Tenant or any other, guarantor or pledgor without impairing Landlord' rights and remedies in enforcing this Guaranty, under which Guarantor's liabilities shall remain independent and unconditional. Guarantor agrees that Landlord's exercise of certain of such rights or remedies may affect or eliminate Guarantor's right of subrogation or recovery against Tenant and that Guarantor may incur a partially or totally nonreimbursable liability under this Guaranty.

5.    <u>Additional Waivers</u>.

(a)    Guarantor agrees that its liability under, and the enforceability of, this Guaranty are absolute and are not contingent upon the genuineness, validity or enforceability of any of the Lease or the availability of any defense to Tenant, any other guarantor of the Lease, or any other person related to the Lease.

(b)    Guarantor acknowledges and agrees that Guarantor's liability may be larger in amount and more burdensome than that of Tenant. Guarantor's liability under this Guaranty shall continue until all sums due under the Lease have been paid in full and shall not be limited or affected in any way by any impairment or any diminution or loss of value of the Leased Premises, from whatever cause.

(c)    Guarantor waives diligence and all demands, protests, presentments and notices of every kind or nature, including notices of protest, dishonor, nonpayment, acceptance of

3

this Guaranty and creation, renewal, extension, modification or accrual of any of the obligations under the Lease.

(d)     To the extent permitted by Legal Requirements, Guarantor waives the right to plead any and all statutes of limitations as a defense to Guarantor's liability hereunder or the enforcement of this Guaranty. No failure or delay on Landlord' part in exercising any power, right or privilege hereunder shall impair any such power, right or privilege or be construed as a waiver of or an acquiescence therein. In addition, Guarantor waives any and all rights or defenses arising by reason of the application by Tenant of the proceeds of any advances by Landlord under the Lease for purposes other than the purposes represented by Tenant to Landlord were intended or understood by Landlord.

6.     <u>Guarantor Informed of Tenant's Condition</u>. Guarantor acknowledges that it has had an opportunity to review the Lease, the Indemnity Agreement, the value of the security for the Lease and Tenant's financial condition and ability to pay its Guaranteed Obligations under the Lease. Guarantor agrees to keep itself fully informed of all aspects of Tenant's financial condition and the performance of Tenant's obligations to Landlord and that Landlord has no duty to disclose to Guarantor any information pertaining to Tenant or any security for the Lease. Guarantor represents and warrants to Landlord that: (a) Guarantor has received copies of the Lease; (b) Landlord has not made any representations or warranties to Guarantor regarding the credit worthiness of Tenant or the prospects of sources of payment under the Lease, other than Tenant; and (c) this Guaranty is executed at the request of Tenant.

7.     <u>Subrogation, Reimbursement and Contribution Rights</u>. Guarantor agrees that its rights of subrogation and reimbursement against Tenant, its right of subrogation against any other security for the Lease or the pledgor of such security and its right of contribution from any guarantor of the Lease shall be subordinate to Landlord' rights against Tenant, in such security, against any such pledgor and against any such guarantor.

8.     <u>Guaranty Continues if Payments Are Avoided or Recovered from Landlord</u>. If all or any portion of the obligations guaranteed under this Guaranty are paid or performed, Guarantor's obligations under this Guaranty shall continue and remain in full force and effect if all or any part of such payment or performance is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise, irrespective of (a) any notice of revocation given by Guarantor prior to such avoidance or recovery, and (b) payment in full of the Lease.

9.     <u>Subordination</u>. Until all of the Guaranteed Obligations have been paid in full, Guarantor agrees that all existing and future debts, obligations and liabilities of Tenant to Guarantor (collectively referred to as "**Subordinated Debt**") shall be and hereby are expressly subordinated to the Guaranteed Obligations, and the right of payment of the Subordinated Debt is expressly deferred to the prior payment in full of the Guaranteed Obligations. For purposes of this <u>Section 9</u>, any Guaranteed Obligation shall not be deemed paid in full until it has been paid in full in U.S. Dollars.

(a)     Until the Guaranteed Obligations have been paid in full, without Landlord's prior written consent:

4

(i)      Guarantor shall not (i) collect or receive any cash or non-cash payments on the Subordinated Debt, (ii) assert rights or declare a default under or enforce payment of the Subordinated Debt by legal proceedings or otherwise, or (iii) assign or transfer all or any part of the Subordinated Debt;

(ii)      Guarantor shall not permit Tenant to (i) pay to any Guarantor all or any part of the Subordinated Debt, (ii) transfer any of the Leased Premises to Guarantor in payment of or as security for the payment of all or any part of the Subordinated Debt, (iii) execute or deliver any instrument as evidence of all or any part of the Subordinated Debt, or (iv) establish any sinking fund, reserve, or like set aside of funds or other Leased Premises for the redemption, retirement or repayment of all or any part of the Subordinated Debt; and

(iii)      Guarantor shall not file any petition against Tenant under any chapter or provision of any present or future federal bankruptcy legislation, or amendments to such legislation, or any complaint, petition or other pleading against Tenant calling for its reorganization, liquidation, composition or receivership, or for other similar relief under federal or state law.

(b)      Upon any distribution of assets of Tenant upon any dissolution, winding up, liquidation or reorganization of Tenant, whether in bankruptcy, insolvency, reorganization or receivership proceedings, or upon an assignment for the benefit of creditors or any other marshaling of the assets and liabilities of Tenant, or otherwise:

(i)      Landlord shall be entitled to receive payment in full of the Guaranteed Obligations before Guarantor is entitled to receive any payment on account of the Subordinated Debt; and

(ii)      any payment by, or distribution of assets of, Tenant of any kind or character, whether in cash, Leased Premises or securities, to which Guarantor would be entitled except for this subordination shall be paid or delivered by the Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee, or otherwise, directly to Landlord for the benefit of Landlord to be held as additional security for the Guaranteed Obligations in an interest bearing account until all of the Guaranteed Obligations have been paid in full.

(c)      Should Guarantor receive any payment or distribution of any kind in conflict with this Section 9, Guarantor shall hold such funds or Leased Premises as trustee for Landlord, and shall pay or transfer to Landlord for the benefit of Landlord all such funds promptly upon receipt on account of the Guaranteed Obligations, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty; provided, however, nothing herein shall limit Guarantor's right to receive distributions from Tenant so long as no Event of Default has occurred and is continuing.

(d)      Guarantor authorizes and directs Tenant to take all necessary or appropriate action to effectuate and maintain the subordination provided in this Guaranty.

(e)      No right of Landlord to enforce the subordination in this Guaranty shall at any time or in any way be prejudiced or impaired by any act or failure to act by Tenant, Landlord

5

or any other Person or by any noncompliance by the Tenant, Landlord or any other Person with the terms, provisions and covenants of this Guaranty or of the Lease regardless of any knowledge of such acts, failures to act, or non-compliance that Landlord may have or be otherwise charged with.

(f)    Nothing express or implied in this Section 9 shall give any Person other than Tenant, Landlord and Guarantor any benefit or any legal or equitable right, remedy or claim under this Section 9.

(g)    If Guarantor institutes or participates in any suit, action or proceeding against Tenant in violation of the terms of Guarantor's subordination Tenant may interpose as a defense or dilatory plea this subordination, and Landlord are irrevocably authorized to intervene and to interpose such defense or plea in its name or in Tenant's name.

10.    Financial Reporting.

(a)    Guarantor to deliver to Landlord as soon as available, but in no event later than ninety (90) days after such Guarantor's fiscal year end (if such Guarantor is an entity) or the calendar year (if such Guarantor is an individual), current financial statements in a form reasonably acceptable to Landlord (including, without limitation, an income and expense statement, balance sheet, and statement of cash flow), together with supporting property and mortgage debt schedules and any other financial information reasonably requested by Landlord for such Guarantor.

(b)    If requested by Landlord, Guarantor shall deliver true, correct, and complete copies of such Guarantor's federal, state and local tax returns to Landlord, within thirty (30) days after the filing of such tax returns.

(c)    Within ten (10) Business Days' after receipt of Landlord's written request therefor, Guarantor shall deliver to Landlord such other supplemental information related to such Guarantor's financial statements as is reasonably requested by Landlord.

11.    Representations and Warranties. Guarantor represents and warrants to Landlord that:

(a)    Authority of Guarantor. Guarantor has all requisite power and authority to conduct its business, manage its affairs, and to own and lease its properties.

(b)    Execution, Delivery and Performance of Guaranty. Guarantor has all requisite power and authority to execute and deliver this Guaranty, and perform all Guaranteed Obligations. The execution and delivery of this Guaranty, and performance by Guarantor of all Guaranteed Obligations have been duly authorized by all necessary action and do not and will not:

(i)    result in or require the creation or imposition of any lien, right of others, or other encumbrance of any nature (other than under this Guaranty, the Lease and any related documents) upon any Leased Premises now or in the future owned or leased by Guarantor;

(ii)    violate any provision of any law, regulation, judgment, decree or award having applicability to Guarantor;

6

(iii)    result in a breach of, constitute a default under, or cause or permit the acceleration of any obligation owed under, any indenture, loan agreement, lease, or any other agreement or instrument, to which Guarantor is a party or by which Guarantor or any of its Leased Premises is bound or affected; or

(iv)    require any consent or approval not already obtained of any Person having any interest in Guarantor.

(c)    Enforceability. This Guaranty, when executed and delivered, shall constitute the valid and binding obligation of Guarantor, enforceable in accordance with its terms.

(d)    Financial and Other Information. All Guarantor's financial information furnished to Landlord for the benefit of Landlord in connection with the Lease: (a) is complete and fairly represents Guarantor's financial condition in all material respects; and (b) accurately presents the financial condition of Guarantor as of the date of such financial information in all material respects. All other reports, papers, data and information furnished to Landlord for the benefit of Landlord by and regarding Guarantor in connection with the Lease are accurate and correct in all material respects and complete in all material respects insofar as completeness in all material respects is necessary in all material respects to give Landlord a true and accurate knowledge of their subject matter in all material respects. Without limiting the generality of the foregoing, there has been no material adverse change in the condition, financial or otherwise, of Guarantor since the date of the financial statements and other reports, papers, data and information furnished to Landlord for the benefit of Landlord.

(e)    Tax Liability. Guarantor has filed or filed extensions for all required tax returns (federal, state and local) and has paid all taxes shown on them to be due and all Leased Premises taxes due, including interest and penalties, if any. The charges, accruals and reserves on the books of Guarantor for taxes or other governmental charges are adequate.

(f)    Intentionally Omitted.

(g)    Compliance With Agreements. Guarantor has complied in all material respects with all indentures, credit agreement, leases and all other agreements and instruments to which Guarantor is a party or by which Guarantor or any of its Leased Premises is bound or affected.

(h)    Litigation. To Guarantor's actual knowledge, there are no actions, suits or proceedings pending or threatened (in writing) against or affecting Guarantor or property of Guarantor before any court or governmental department, public body or authority that would have a material adverse effect on Guarantor's ability to perform its obligations under this Guaranty.

(i)    No Default. To Guarantor's actual knowledge, no Event of Default with respect to the Lease, or condition, event, act or omission which, with the giving of notice or the passage of time, or both, would be an Event of Default, has occurred and is continuing.

12.    Tenant. As used in this Guaranty, "Tenant" shall include any successor to Tenant with respect to the Lease and any estate created by the commencement of a case under the Bankruptcy Code or any other insolvency, bankruptcy, reorganization or liquidation proceeding,

7

or by any trustee under the Bankruptcy Code, liquidator, sequestrator or receiver of Tenant or Tenant's property or similar person duly appointed pursuant to any law generally governing any insolvency, bankruptcy, reorganization, liquidation, receivership or like proceeding.

13.     Opportunity to Review. Guarantor acknowledges that it has had the opportunity to review the matters discussed and contemplated by the Lease, including the remedies Landlord may pursue against Tenant in the event of a default under the Lease, the value of the security or collateral for the Lease and Tenant's financial condition and ability to perform under the Lease. Guarantor further has had the opportunity to review this Guaranty with its counsel.

14.     Changes, Waivers, Revocations and Amendments in Writing. No terms or provisions of this Guaranty may be changed, waived, revoked or amended without Landlord' prior written consent. No delay or failure of Landlord in exercising any right hereunder shall affect such right, nor shall any single or partial exercise of any right preclude any further exercise thereof. Should any provision of this Guaranty be determined by a court of competent jurisdiction to be unenforceable, all of the other provisions shall remain effective.

15.     Reasonableness and Effect of Waivers. Guarantor warrants and agrees that each of the waivers set forth in this Guaranty is made with full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any of such waivers is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the maximum extent permitted by law.

16.     Cumulative Remedies; No Waiver. The rights, powers and remedies of Landlord under this Guaranty are cumulative and not exclusive of any other right, power or remedy which Landlord would otherwise have. No failure or delay on the part of Landlord in exercising any such right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under this Guaranty or under the other Lease.

17.     No Third Parties Benefited. This Guaranty is made for the purpose of setting forth certain rights and obligations of Guarantor and Landlord, and no other person shall have any rights under or by reason of this Guaranty.

18.     Interpretation. Whenever the context requires, all terms used herein in the singular shall be construed in the plural and vice versa, and each gender shall include each other gender. The term "Tenant" shall mean both the named Tenant and any other person at any time and from time to time assuming or otherwise becoming primarily liable on any or all Guaranteed Obligations prior to any foreclosure sale. Section headings in this Guaranty are included for convenience of reference only and are not a part of this Guaranty for any other purpose.

19.     Effectiveness Independent of Other Guaranty(ies). This Guaranty shall be effective regardless of whether any other individual or entity executes a guaranty of any or all Guaranteed Obligations, and regardless of whether any other guaranty of any or all Guaranteed Obligations is ever released by Landlord or otherwise unenforceable for any reason.

20.     Assignment of Guaranty. Landlord may assign this Guaranty with the Lease, without in any way affecting Guarantor's liability under this Guaranty or the Lease. This Guaranty

4894-0995-9197, v. 6

shall inure to the benefit of Landlord and its successors and assigns, and shall bind Guarantor and such Guarantor's respective heirs, executors, administrators, successors and assigns.

21.   Consent to Jurisdiction; Waiver of Immunities.

(a)   Guarantor irrevocably submits to the jurisdiction of any New York or federal court sitting in New York City in any action or proceeding arising out of or relating to this Guaranty, and Guarantor irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York or federal court. Guarantor irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Legal Requirements.

(b)   Nothing in this Section shall affect the right of Landlord to serve legal process in another manner permitted by law or affect the right of Landlord to bring any action or proceeding against Guarantor or its Leased Premises in the courts of any other jurisdictions.

(c)   To the extent that Guarantor has or may later acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its Leased Premises, Guarantor irrevocably waives such immunity in respect of its obligations under this Guaranty.

22.   Miscellaneous.

(a)   Notices. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Guaranty (collectively "Notice" or "Notices") must, to be effective for purposes of this Guaranty, be in writing, and they will be deemed to have been given for all purposes (i) three (3) Business Days after having been sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, (ii) one (1) day after having been sent by Federal Express or other nationally recognized air courier service, to the addresses stated below, or (iii) if such Notice is sent via email (which email shall be addressed to the email addresses set forth below and shall include the notice as a .pdf attachment thereto) (x) as of the date of the email, if such email was sent prior to 4 P.M. EST on a Business Day or (y) on the Business Day immediately succeeding the date of the email, if such email was sent on a day that is not a Business Day or after 4 P.M. EST on a Business Day, provided if a Notice is delivered via email, such Notice shall not be effective unless a hardcopy of such Notice is delivered via the method described in clauses (i) and (ii) above:

If to Guarantor:

Alberto Smeke Saba
2008 East 3rd Street
Brooklyn, New York 11223
Email: AS@csc-coliving.com

9

Salomon Smeke Saba
4 Lady Bess Drive
Deal, New Jersey 07723
Email: SS@csc-coliving.com

With a copy to:

Cole Schotz, P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attention: Jordan Metzger, Esq.
Email: jmetzger@coleschotz.com

If to Landlord:


356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Luke Pak
Telephone: 214-545-5576
E-mail:  pak@mspcm.com

With a copy to:

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Max Lamont
Telephone: 214-545-5577
E-mail:  lamont@mspcm.com

And with a copy to:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq.  & File Manager
File No. 4308.0014
Email: Dash@dsllp.com


For the purposes of this Section 22(a), any party may substitute or supplement its address by giving ten (10) Business Days' notice to the other party in the manner provided above.

10

(b)      Governing Law. All questions with respect to the construction of this Guaranty and the rights and liabilities of the parties to this Guaranty shall be governed by the laws of the State of New York, without regard to conflicts of law principles.

(c)      Binding on Successors. This Guaranty shall inure to the benefit of, and shall be binding upon, the successors and assigns of each of the parties to this Guaranty.

(d)      Attorneys' Fees.

(i)      Guarantor shall reimburse Landlord for all reasonable out-of-pocket attorneys' fees, costs and expenses, incurred by Landlord in connection with the enforcement of Landlord' rights under this Guaranty and the Lease, including, without limitation, reasonable attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements or for enforcement of rights under any state of federal statute, including, without limitation, reasonable attorneys' fees, costs and expenses incurred to protect Landlord's security and attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) seeking relief from stay in a bankruptcy proceeding. The term "expenses" means any expenses incurred by Landlord in connection with any of the out-of-court, or state, federal or bankruptcy proceedings referred to above, including, without limitation, the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by Landlord in connection with any such proceeding.

(ii)      Landlord shall also be entitled to its reasonable attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment. This provision is separate and several and shall survive the merger of this Guaranty into any judgment on this Guaranty.

(e)      Counterparts. This Guaranty may be executed in any number of original counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one instrument. The original signature page of any counterpart may be detached from such counterpart and attached to any other counterpart identical to such counterpart (except having additional signature pages executed by other parties to this Guaranty) without impairing the legal effect of any such signature(s).

(f)      Entire Agreement. This Guaranty constitutes the entire agreement and understanding between the parties in respect of the subject matter of this Guaranty and supersedes all prior agreements and understandings with respect to such subject matter, whether oral or written.

(g)      Waivers. Waiver by any Landlord of any term, covenant or condition under this Guaranty or the Lease, or of any default by Guarantor under this Guaranty or the Lease, or any failure by any Landlord to insist upon strict performance by Guarantor of any term, covenant or condition contained in this Guaranty or the Lease, shall be effective or binding on such Landlord only if made in writing by such Landlord; no such wavier shall be implied from any omission by such Landlord to take action with respect to any such term, covenant, condition or default. No express written waiver by any Landlord of any term, covenant, condition or default shall affect any other term, covenant, condition or default or cover any other time period than the application

11

4894-0995-9197, v. 6

of any such term, covenant or condition to the matter as to which a waiver has been given or the default or time period specified in such express waiver. This Guaranty may be amended only by an instrument in writing signed by the parties to this Guaranty.

(h)    Severability. If any part of this Guaranty is declared invalid for any reason, such shall not affect the validity of the rest of the Guaranty. The other parts of this Guaranty shall remain in effect as if this Guaranty had been executed without the invalid part. The parties declare that they intend and desire that the remaining parts of this Guaranty continue to be effective without any part or parts that have been declared invalid.

(i)    Joint and Several Liability. If more than one person has signed this Guaranty, it shall be the joint and several obligation of all such persons.

23.    Waiver of Trial by Jury. EACH OF LANDLORD AND GUARANTOR WAIVES TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS GUARANTY OR THE OTHER LEASE OR THE CONDUCT OF THE RELATIONSHIP BETWEEN LANDLORD AND GUARANTOR. BOTH LANDLORD AND GUARANTOR HAVE OBTAINED THE ADVICE OF THEIR RESPECTIVE LEGAL COUNSEL BEFORE SIGNING THIS GUARANTY AND ACKNOWLEDGE THAT THEY VOLUNTARILY AGREED TO THIS WAIVER OF THEIR RIGHT TO TRIAL BY JURY WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND LEGAL CONSEQUENCE.

[*Remainder of page intentionally left blank;
signatures begin on following page*]

12

4894-0995-9197, v. 6

S - 1

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the date first above written.

**GUARANTOR:**

_____

**ALBERTO SMEKE SABA**

_____

**SALOMON SMEKE SABA**

S - 1

**EXHIBIT A**
Tender Requirements

(i)     Payment of all sums then due and payable under this Guaranty, together with an amount equal to the sum of all Guaranteed Obligations reasonably projected by Landlord to be incurred by Tenant during the period from the Tender Date through and including the date that is six (6) months following the Tender Date.

(ii)    An assignment of the Lease conveying to Landlord or its nominee, such entity to be designated (the date of such designation, the "**Notice Date**") by Landlord promptly upon request therefor by Guarantor, the Leasehold Estate created pursuant to the Lease (the "**Leased Premises**"), subject to no liens or encumbrances other than Permitted Encumbrances or which are otherwise specifically approved of by Landlord in writing from time to time during the term of the Lease.

(iii)   All transfer taxes and other sums of any nature whatsoever which are required to be paid in connection with any such transfer of the Leased Premises to Landlord (Landlord agreeing to execute promptly any required transfer tax returns).

(iv)    [intentionally omitted].

(v)     Phase I environmental report dated not more than thirty (30) days prior to the date of the Tender, issued by a qualified environmental consultant and otherwise in conformity with any applicable regulatory requirements binding upon Landlord and relating to environmental reports and their acceptance by Landlord and indicating that the Leased Premises is in compliance or deemed compliance with all Environmental Laws relating to Hazardous Substances; provided, however, that if such Phase I report discloses potential contamination, Landlord shall have the right, at Tenant's expense, to secure a Phase II assessment within ninety (90) days after receipt of the Phase I report (the "**Phase II Assessment Period**") and to perform, at Tenant's expense, tests incidental thereto, which Phase II report shall establish an estimated cost of remediation and Tenant shall complete the following requirements (collectively, the "**Phase II Requirements**"): (A) deposit with Landlord an amount equal to 110% of the estimated remediation costs, and (B) if then available in the insurance market, (1) secure and procure, for the benefit of Landlord, an environmental insurance policy in form and substance and from an insurer reasonably acceptable to Landlord, which policy shall insure against all remediation costs in excess of such estimated remediation costs, and (2) if such environmental remediation policy shall provide for a deductible in excess of the estimated remediation costs, then Tenant shall deposit with Landlord the amount of such excess in addition to the deposit of the estimated remediation costs;  and upon commencement and through the expiration of the Phase II Assessment Period, Guarantor's liability for interest on the Lease (provided no Event of Default is occurring) shall be limited to the then current non-default rate of interest provided for in the Lease Agreement; if upon expiration of the Phase II Assessment Period, the Phase II Requirements have not been completed, from and after such date

S - 2

4894-0995-9197, v. 6

Guarantor shall be liable for interest on any unpaid Rent under Lease at the Default Rate.

(vi)    [intentionally omitted]

(vii)   A certification from Tenant (which is subject to verification by Landlord to its accuracy) that Tenant or any party affiliated with Tenant has not entered into any management or leasing agreements or service contracts for the Leased Premises which must be assumed by Landlord and which cannot be cancelled on not more than sixty (60) days' notice without material penalty, unless in the case of a service contract the same is at market and is with a person, party or entity not affiliated with Tenant, in which event the same shall be cancelable on not more than twelve (12) months' notice without material penalty.

(viii)  A certification from Tenant (which is subject to verification by Landlord as to its accuracy) that there exist no expenses, whether for capital items or operating expenses, relating to the Leased Premises, which are unpaid and in respect of which Landlord is obliged to assume liability, except for expenses (a) which are due and payable for less than thirty (30) days and for which there is money available from the Leased Premises sufficient to pay the same, or (b) which Tenant is contesting (which may be due and payable for more than thirty (30) days) in good faith and for which there is money available from the Leased Premises sufficient to pay the same.

(ix)    Tenant's execution of notices to subtenants of the Leased Premises of the transfer in a form to be provided by Landlord no later than the Notice Date.

(x)     All subtenant deposits, interest thereon and prepaid rents, and Tenant's agreement and the agreement of Guarantor to hold Landlord harmless against any claims of any subtenant in respect of such deposits, interest thereon and prepaid rents which were not properly held or applied by Tenant.  It is understood that Landlord will timely execute an assumption of and hold Tenant and Guarantor harmless from and against any claims of subtenants in respect of any such subtenant deposits, interest and prepaid rents which are turned over by Tenant to Landlord and which are subsequent thereto not properly held or applied by Landlord.

(xi)    All personal property of Tenant located upon and used in connection with the operation of the Leased Premises (together with a bill of sale therefor), an assignment of all Subleases, construction contracts, architect's agreements, insurance policies, building permits, any purchase contract relating to the Penthouse Unit (if any) and all correspondence relating thereto, development rights and agreements, other permits and warranties, together with all original leases, lease correspondence, keys, combination to locks, plans and specification, certificates of occupancy, and all occupancy, construction and operation files related to the Leased Premises (together with a general instrument of transfer transferring the same) all to the extent any of the above exist and are in the possession or control of the Tenant, Guarantor or their agents.

S - 3

(xii)     Tenant's share (as pro-rated through the date of transfer) of all real estate taxes, sewer and water rents (based upon estimated readings) and other assessments for the term of Tenant's ownership.

(xiii)    Certificate by Tenant of non-foreign status.

(xiv)    Any net cash flow generated by the Leased Premises from and after the Default which causes a demand for payment under this Guaranty and any reserves held by Tenant as of the Tender Date.

(xv)     Written confirmation from Tenant that in the event Landlord subsequently elects to exercise remedies under the Lease and take possession of the Leased Premises through an eviction proceeding, Tenant shall not file an answer in any such action, or contest, attempt to stay or raise any defense in such action.

(xvi)    Such other documents and instruments as may be reasonably and customarily required in order to conclude the transfer of the Leasehold Estate in the Leased Premises of record.

All defined terms used in this Exhibit A, unless defined in this Exhibit A or the Guaranty to which this Exhibit A is attached, shall have the meanings ascribed to them in the Ground Lease.

4894-0995-9197, v. 6

## **EXHIBIT G**

## **Form of Indemnity Agreement**

4863-0344-5267, v. 18

# INDEMNITY AGREEMENT

THIS INDEMNITY AGREEMENT ("Agreement") is made as of this ___ day of May, 2022 (the "Effective Date"), by **HUDSON 1701/1706, LLC** and **HUDSON 1702, LLC**, each a Delaware limited liability company (collectively, on a joint and several basis, "Tenant"), and **ALBERTO SMEKE SABA** and **SALOMON SMEKE SABA**, each an individual (individually and collectively as the context may require, "Guarantor"; and together with Tenant, collectively, on a joint and several basis, "Indemnitors" and each, an "Indemnitor"), to and for the benefit of **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "Landlord").

WHEREAS, Tenant and Landlord are parties entering into that certain Ground Lease, dated as of the Effective Date (as the same may be amended, restated, supplemented and/or modified from time to time, the "Lease"). Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Lease;

WHEREAS, Guarantors are the owners of direct or indirect equity or beneficial interests in Tenant and, therefore, will benefit from Landlord entering into the Lease with Tenant; and

WHEREAS, Indemnitors' execution and delivery of this Guaranty is a condition precedent to Landlord entering into the Lease and, in order to induce Landlord to enter into the Lease, the parties hereby agree as follows:

1.      Indemnity.

(a)      Indemnitors agree, on a joint and several basis, at their sole cost and expense, to protect, defend, indemnify, release and hold harmless the Indemnified Parties from any and all Losses incurred by any Indemnified Party arising out of or related to Section 57(c) and Section 58(i) of the Lease; provided, however, Indemnitors shall only be liable for such Losses to the extent that such Losses were due to events or circumstances that first arose or occurred (as opposed to having first been discovered) prior to the date that Tenant or any Affiliate of Tenant ceased to have possession of the Leased Premises and to be the named Tenant under the Lease, whether by reason of assignment, termination, operation of law, the institution of any Foreclosure Event by a Leasehold Mortgagee or otherwise.

(b)      Notwithstanding anything contained herein or in the Lease to the contrary, the indemnities set forth in this Agreement shall exclude (and Indemnitors shall not be liable for) any Loss caused by: (i) the gross negligence, fraud, illegal acts or willful misconduct of Landlord or any other Indemnified Party; or (ii) Indemnitor's failure to perform any obligation under Section 57(c) and Section 58(i) of the Lease solely as a result of Landlord's express prohibition of such action in writing.

2.      Duty to Defend and Attorneys' and Other Fees and Expenses. Upon written request by any Indemnified Party, Indemnitor shall defend same (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties (which approval shall not be unreasonably withheld, conditioned or delayed) in connection with the matters identified in Section 1 above; provided, however, that subject to any conflict of interest, at the time, Cole Schotz P.C. shall be deemed pre-approved by the Indemnified Parties. Notwithstanding the foregoing, with prior notice to Indemnitor, any Indemnified Parties may, in their reasonable discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys may control the resolution of any claim or proceeding solely involving the Indemnified Parties, providing, however, that no compromise or settlement shall be entered without Indemnitor's prior written consent, which consent shall not be unreasonably withheld.  For the avoidance of doubt, with respect to the resolution of any claim or proceeding involving any Indemnitor in whole or in part, the Indemnitor and its

61458/0006-42929694v2

*D&S COMMENTS 4-19-22*

attorneys shall control the resolution of such claim or proceeding with respect to Indemnitor.  Upon demand but only after the occurrence and during the continuance of an Event of Default under the Lease, Indemnitor shall pay or, in the reasonable discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of actual and reasonable out-of-pocket fees and disbursements of attorneys, consultants, and other professionals in connection therewith; provided, however, if no Event of Default under the Lease has occurred and is continuing, then the Indemnified Parties shall be responsible for all fees and disbursements of attorneys, consultants, and other professionals retained by the Indemnified Parties outside of the attorneys provided by Indemnitor.

3.     Survival.  Indemnitors' obligations hereunder shall survive the expiration or earlier termination of the Lease and any transfer of the Leasehold Estate (whether by assignment, sublease, operation of law or otherwise, including, without limitation, following a Foreclosure Event by a Leasehold Mortgagee pursuant to and in accordance with the Lease) for a period of twelve (12) months.

4.     Indemnitor Representations and Warranties. Each Indemnitor represents and warrants that, to the actual knowledge of Indemnitor, as of the Effective Date:

(a)     This Agreement has been duly executed and delivered by each Indemnitor and constitute the legal, valid and binding obligations of Indemnitor, enforceable against Indemnitor in accordance with its terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law);

(b)     The execution, delivery and performance of this Agreement by each Indemnitor will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance upon any of the property or assets of Indemnitor pursuant to the terms of any agreement or instrument to which Indemnitor is a party or by which any of Indemnitor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Indemnitor or any of Indemnitor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Indemnitor of this Agreement has been obtained and is in full force and effect;

(c)     There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Indemnitor's knowledge, threatened in writing against or affecting Indemnitor, which actions, suits or proceedings, if determined against Indemnitor, would adversely affect the condition (financial or otherwise) or business of Indemnitor;

(d)     Indemnitor is not in default in any respect in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument to which Indemnitor is bound and which affects the Leased Premises and the business operations conducted on the Leased Premises;

(e)     Indemnitor has (i) not executed this Agreement with the intent to hinder, delay or defraud any creditor and (ii) received reasonably equivalent value in exchange for its obligations under this Agreement and the Lease, as applicable, to which Indemnitor is a party.  No petition in bankruptcy has been filed against Indemnitor in the last ten (10) years, and Indemnitor has not in the last ten (10) years made an assignment for the benefit of creditors or taken advantage of any existing law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors

2

4878-4180-6107, v. 9
61458/0006-42929694v2

*D&S COMMENTS 4-19-22*

("Creditors' Rights Laws").  Indemnitor is not contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Indemnitor's assets, and Indemnitor has no actual knowledge of any Person contemplating the filing of any such petition against Indemnitor;

(f)    All information submitted in writing by Indemnitor or Indemnitor's agents to Landlord and in all financial statements, reports, certificates and other documents submitted in connection with the Lease, is accurate, complete and correct in all material respects as of the date of such item.  There is no fact presently known to Indemnitor which has not been disclosed to Landlord which adversely affects, nor as far as Indemnitor can reasonably foresee, might materially adversely affect, the business, operations or condition (financial or otherwise) of Indemnitor.  Indemnitor has not knowingly and intentionally failed to disclose any fact known to Indemnitor that could cause any representation or warranty made herein to be materially false or misleading.  There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect such that it adversely affects the business operations or the financial condition of Indemnitor; and

(g)    None of Indemnitor or any Affiliate of Indemnitor, and no Person owning directly or indirectly any interest in Indemnitor or any Affiliate of Indemnitor, is a Prohibited Person.

5.    <u>Notices of Legal Actions</u>. Each party hereto shall, within five (5) Business Days of receipt thereof, give written notice to any other party hereto of any notice, claim, charge, demand, grievance or other communication described in Sections 57(b)(iv) and 58(c) of the Lease, or any other such notice, claim, charge, demand, grievance or other communication that may claim or indicate the potential of any claim or liability under this Agreement. Such notice shall comply with the provisions of <u>Section 6</u> of this Agreement.

6.    <u>Notices</u>. All notices, demands, requests, consents, approvals, and other instruments or communications required or permitted to be given pursuant to the provisions of this Agreement (collectively "<u>Notice</u>" or "<u>Notices</u>") must, to be effective for purposes of this Agreement, be in writing, and they will be deemed to have been given for all purposes (i) three (3) Business Days after having been sent by United States registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, (ii) one (1) day after having been sent by Federal Express or other nationally recognized overnight air courier service, to the addresses stated below, or (iii) if such Notice is sent via email (which email shall be addressed to the email addresses set forth below and shall include the notice as a .pdf attachment thereto) (x) as of the date of the email, if such email was sent prior to 4 P.M. EST on a Business Day or (y) on the Business Day immediately succeeding the date of the email, if such email was sent on a day that is not a Business Day or after 4 P.M. EST on a Business Day, provided if a Notice is delivered via email, such Notice shall not be effective unless a hardcopy of such Notice is delivered via the method described in clauses (i) and (ii) above:

|                   |                                      |
|-------------------|--------------------------------------|
| If to Landlord:   | 356W58 GROUND LESSOR LLC             |
|                   | c/o MSP Capital Investments, L.L.C.  |
|                   | Woodlawn Hall at Old Parkland        |
|                   | 3953 Maple Ave., Suite 350           |
|                   | Dallas, Texas 75219                  |
|                   | Attn: Luke Pak                       |
|                   | Telephone: 214-545-5576              |
|                   | E-mail: pak@mspcm.com                |
|                   |                                      |
| With a copy to:   | 356W58 GROUND LESSOR LLC             |

3

4878-4180-6107, v. 9
61458/0006-42929694v2

*D&S COMMENTS 4-19-22*

<table>
<tr><td></td><td>c/o MSP Capital Investments, L.L.C.<br>Woodlawn Hall at Old Parkland<br>3953 Maple Ave., Suite 350<br>Dallas, Texas 75219<br>Attn: Max Lamont<br>Telephone: 214-545-5577<br>E-mail:  lamont@mspcm.com</td></tr>
<tr><td>And with a copy to:</td><td>Duval & Stachenfeld LLP<br>555 Madison Avenue, 6th Floor<br>New York, NY 10022<br>Attention: Danielle Ash, Esq.  & File Manager<br>File No. 4308.0014<br>Email: Dash@dsllp.com</td></tr>
<tr><td>If to Tenant:</td><td>c/o CSC Co-Living<br>6 St. Johns Lane<br>New York, New York 10013<br>Attention: Sal Smeke and Alberto Smeke<br>Email: ss@csc-coliving.com<br>          as@csc-coliving.com</td></tr>
<tr><td>With a copy to:</td><td>Cole Schotz P.C.<br>1325 Avenue of the Americas, 19th Floor<br>New York, New York 10019<br>Attn: Jordan J. Metzger, Esq.<br>E-mail: jmetzger@coleschotz.com</td></tr>
<tr><td>If to Guarantors:</td><td>Sal Smeke<br>c/o CSC Co-Living<br>6 St. Johns Lane<br>New York, New York 10013<br>Email: ss@csc-coliving.com<br><br>Alberto Smeke<br>c/o CSC Co-Living<br>6 St. Johns Lane<br>New York, New York 10013<br>Email: as@csc-coliving.com</td></tr>
<tr><td>With a copy to:</td><td>Cole Schotz P.C.<br>1325 Avenue of the Americas, 19th Floor<br>New York, New York 10019<br>Attn: Jordan J. Metzger, Esq.<br>E-mail: jmetzger@coleschotz.com</td></tr>
</table>

7.     Entire Agreement.  This Agreement, the Lease, and the Project Guaranties are the entire agreement among the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

4

4878-4180-6107, v. 9<br>61458/0006-42929694v2

8.      Severability.  If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

9.      Applicable Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard for conflicts of laws principles or otherwise.

10.     Captions.  The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions.

11.     Attorneys' Fees.  In the event of any litigation arising out of this Agreement, the prevailing party pursuant to a final and non-appealable order or judgment shall be entitled to reasonable attorneys' fees and costs actually incurred.

12.     Successors Bound.  The covenants of this Agreement will inure to the benefit of and bind each Indemnitor, the heirs, distributees, personal representatives, successors and permitted assigns of each Indemnitor and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and will inure to the benefit of and bind Landlord, its successors and assigns.

13.     Waiver.  Excuse or waiver of the performance by the other party of any obligation under this Agreement shall only be effective if evidenced by a written statement signed by the party so excusing or waiving.  No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by a party of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

14.     No Oral Change.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Indemnitor or any Indemnified Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

15.     Submission to Jurisdiction.  Each of Landlord, any other Indemnified Parties and Indemnitors hereby consents to the exclusive jurisdiction of any state or federal court located within the State of New York and irrevocably agree that all actions or proceedings relating to this Agreement or the transactions contemplated hereunder shall be litigated in such courts, and each of Landlord, any other Indemnified Parties and Indemnitors waives any objection which it may have based on lack of personal jurisdiction, improper venue or *forum non conveniens* to the conduct of any proceeding in any such court and waive personal service of any and all process upon them.

16. Waiver of Right to Trial by Jury.  EACH OF LANDLORD, ANY OTHER INDEMNIFIED PARTIES AND INDEMNITORS WAIVE ANY RIGHT TO TRIAL BY JURY ON ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF LANDLORD, ANY OTHER INDEMNIFIED PARTIES OR INDEMNITORS WITH RESPECT HERETO, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.  EACH OF LANDLORD, ANY OTHER INDEMNIFIED

PARTIES AND INDEMNITORS AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.  EACH PARTY TO THIS AGREEMENT ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL REGARDING THIS SECTION AND THAT IT FULLY UNDERSTANDS ITS TERMS, CONTENT AND EFFECT, AND THAT IT VOLUNTARILY AND KNOWINGLY AGREES TO THE TERM OF THIS SECTION.

17.     <u>No Third Party Beneficiary</u>.  This Agreement does not create, and shall not be construed as creating, any rights or claims enforceable by any person or entity other than the parties hereto, it being the intention of the parties hereto that no one shall be deemed to be a third party beneficiary of this Agreement.

18.     <u>Counterparts</u>.  This Agreement may be executed in several counterparts, which together will be deemed one and the same instrument.  It shall not be necessary that any single counterpart be signed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute one and the same instrument.  The exchange of executed copies of this Agreement by so-called "portable document format" (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties for all purposes, and signatures of the parties transmitted by PDF shall be deemed to be their original signatures for all purposes.

(Signatures on next page)

4878-4180-6107, v. 9
61458/0006-42929694v2

IN WITNESS WHEREOF, the undersigned have executed this Agreement on the day and year first above written.

**INDEMNITORS:**

**HUDSON 1701/1706, LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**HUDSON 1702, LLC**, a Delaware limited liability company

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

[*Signatures continue on following page*]

_____
**ALBERTO SMEKE SABA**, an individual


_____
**SALOMON SMEKE SABA**, an individual


**[*End of Signatures*]**

# EXHIBIT H

## Example Calculations of Base Rent

4863-0344-5267, v. 18

| GROUND RENT CALCULATION - BASE RENT EXAMPLE | |
|---|---|
| **Calculation** | **Notes** |
| Year 1 Base Rent (assumes 10th floor buyout) $6,400,000.00<br>Rent Escalation:<br>Year 6 and 11                                        10.00%<br>Thereafter per annum                           2.00% | (b)    On the first day of each of the sixth (6th) Lease Year and the eleventh (11th) Lease Year, the Base Rent shall increase to an amount equal to one hundred ten percent (110%) of the Base Rent that was in effect for the respective prior Lease Year.<br><br>(c)    On the first day of every Lease Year, starting with the twelfth (12th) Lease Year (each such date, an "Adjustment Date"), the Base Rent shall increase to an amount equal to one hundred two percent (102%) of the Base Rent that was in effect for the prior Lease Year (each such increase, a "Rent Escalation"), subject to Section 4(d) below. |

| GROUND RENT CALCULATION - CPI ADJUSTMENT EXAMPLE | |
|---|---|
| **Calculation** | **Notes** |
| Initial CPI Adjustment Year                          21<br>CPI Period 0                                              100<br>CPI First Adjustment (Year 21)                 168<br>CPI Increase Percentage                       168.00%<br><br>CPI Cap (First Adjustment)                    180.60%<br>**Applied CPI**                                   **168.00%** | "CPI Increase Percentage" shall mean the increase in (A) the Index for the last full calendar month preceding the applicable Adjustment Date, *over and above* (B) the corresponding Index for the calendar month in which the preceding Adjustment Date occurred, expressed as a percentage rounded to two (2) decimals.  Notwithstanding the foregoing, the CPI Increase Percentage shall in no event exceed (i) for the first CPI Adjustment Year, 180.60% (3% annual cap) or (ii) for any subsequent CPI Adjustment Year, 137.70% (3.25% annual cap). |

| GROUND RENT SCHEDULE - EXAMPLE | | | | |
|---|---|---|---|---|
| **Lease Year** | **Base Rent** | **Y-O-Y % Change** | **CPI Adj. Change** | |
| 1 | $6,400,000.00 | | | |
| 2 | $6,400,000.00 | 0.00% | | |
| 3 | $6,400,000.00 | 0.00% | | |
| 4 | $6,400,000.00 | 0.00% | | |
| 5 | $6,400,000.00 | 0.00% | | |
| 6 | $7,040,000.00 | 10.00% | | |
| 7 | $7,040,000.00 | 0.00% | | |
| 8 | $7,040,000.00 | 0.00% | | |
| 9 | $7,040,000.00 | 0.00% | | |
| 10 | $7,040,000.00 | 0.00% | | |
| 11 | $7,744,000.00 | 10.00% | | |
| 12 | $7,898,880.00 | 2.00% | | |
| 13 | $8,056,857.60 | 2.00% | | |
| 14 | $8,217,994.75 | 2.00% | | |
| 15 | $8,382,354.65 | 2.00% | | |
| 16 | $8,550,001.74 | 2.00% | | |
| 17 | $8,721,001.77 | 2.00% | | |
| 18 | $8,895,421.81 | 2.00% | | |
| 19 | $9,073,330.25 | 2.00% | | |
| 20 | $9,254,796.85 | 2.00% | | |
| 21 | $10,752,000.00 | 16.18% | 168.00% | |

## **EXHIBIT I**

**Form of Memorandum of Lease**

4863-0344-5267, v. 18

## EXHIBIT I

### Form of Memorandum of Lease

<u>Record and Return to</u>:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq. & File Manager
File No.: 4308.0014

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "<u>Memorandum</u>"), is made as of the _____ day of _____, 2022, between **356W58 GROUND LESSOR, LLC**, a Delaware limited liability company ("<u>Landlord</u>"), having an office at Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219, and **HUDSON 1701/1706, LLC** ("<u>Tenant 1</u>") and **HUDSON 1702, LLC** ("<u>Tenant 2</u>"; together with Tenant 1, individually and collectively, "<u>Tenant</u>"), each a Delaware limited liability company, having an address c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013.

RECITALS

WHEREAS, Landlord and Tenant have executed a certain Lease, dated as of the date hereof (the "<u>Lease</u>"), under which Landlord leases to Tenant that certain real property described in <u>Exhibit A</u> attached hereto (the "<u>Leased Premises</u>");

WHEREAS, the term of the Lease is for a period beginning on the date hereof through and including May 31, 2121; and

WHEREAS, Landlord and Tenant desire to enter into this Memorandum to be recorded in order that third parties will have notice of the existence of the Lease.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, and intending to be legally bound hereby, Landlord and Tenant agree as follows:

1.    <u>Recitals Incorporated</u>.  The foregoing recitals are incorporated by reference into this Section as if set forth in the Section in full.

2.    <u>Incorporation of the Lease</u>.  The Lease is unrecorded and is herein expressly incorporated by reference for a complete statement of the rights and obligations of Landlord and Tenant with respect to the Leased Premises.  Any conflict between this Memorandum and the Lease shall be governed by the terms of the Lease.

4870-4888-6548, v. 4

3. <u>Release</u>. The parties agree to promptly execute and record a release of this Memorandum of Lease at any time after the Lease expires or is terminated in accordance with its terms.

[Remainder of Page Intentionally Left Blank; Signatures Follow]

4870-4888-6548, v. 4

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum as of the day and year first above written.

**<u>LANDLORD</u>:**

**356W58 GROUND LESSOR, LLC**,
a Delaware limited liability company

By: _____
      Name:
      Title:

STATE OF _____ )
                          )    ss.:
COUNTY OF _____ )

On the ___ day of _____ in the year 2022 before me, the undersigned, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

*[additional signature(s) follow]*

4870-4888-6548, v. 4

**TENANT:**

**HUDSON 1701/1706, LLC**,
a Delaware limited liability company


By:     _____
        Name: Alberto Smeke Saba
        Title: Authorized Signatory


By:     _____
        Name: Salomon Smeke Saba
        Title: Authorized Signatory


STATE OF _____ )
                          )    ss.:
COUNTY OF _____ )

On the ___ day of _____ in the year 2022 before me, the undersigned, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

4870-4888-6548, v. 4

**TENANT**:

**HUDSON 1702, LLC**,
a Delaware limited liability company

By: _____
Name: Alberto Smeke Saba
Title: Authorized Signatory

By: _____
Name: Salomon Smeke Saba
Title: Authorized Signatory

STATE OF _____   )
                          )      ss.:
COUNTY OF _____   )

On the ___ day of _____ in the year 2022 before me, the undersigned, _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

4870-4888-6548, v. 4

EXHIBIT A

Description of the Leased Premises

[**NTD: Insert description of EBC Unit and Modified Hotel Unit.**]

4870-4888-6548, v. 4

## <u>EXHIBIT J</u>

**Permitted Encumbrances**

4863-0344-5267, v. 18

1. Rights of tenants as tenants only, pursuant to written, unrecorded leases, with no options to purchase, rights of first refusal or offer, or other such rights on all or any part of the land.

2. Restrictive Covenants as recited in Liber 656 of Deeds, Page 133, Liber 658 of Deeds, Page 127, Liber 657 of Deeds, Page 80, Liber 1634 of Deeds, Page 385, Liber 999 of Deeds, Page 239, Liber 1006 of Deeds, Page 40, Liber 1613 of Deeds, Page 85, Liber 1006 of Deeds, Page 45, Liber 1037 of Deeds, Page 165, Liber 1069 of Deeds, Page 123, Liber 1609 of Deeds, Page 160, Liber 1006 of Deeds, Page 43, Liber 1031 of Deeds, Page 428, Liber 1031 of Deeds, Page 426, Liber 1037 of Deeds, Page 168, Liber 1069 of Deeds, Page 125, Liber 642 of Deeds, Page 494 and Liber 644 of Deeds, Page 428.  Policy insures that as of the date hereof said Restrictive Covenants have not been violated and that a future violation will not cause a forfeiture or reversion of title.

3. The policy will except the terms, conditions and easements set forth in the Declaration of Condominium and By-Laws **dated 4/11/1985 and recorded 4/24/1985** in the Office of the City Register of the City of New York, County of New York, in **Reel 902 Page 1**. Policy insures that a valid condominium has been created pursuant to Article 9B of the Real Property Law, as amended.

    A) First Amendment to Declaration dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286.

    B) Amended and Restated Declaration made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753.

    C) Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159.

4. Ground Lease, by and between 356W58 Ground Lessor LLC, as landlord, and Hudson 1702, LLC and Hudson 1701/1706, LLC, as tenant, dated _____, as evidenced by a Memorandum of Lease dated ____ and recorded on _____ as CRFN _____.  (affects the fee interest of Lots 1701 and 1702 and the leasehold interest of Lot 1706).

5. Survey by Montrose Surveying Co., LLP dated 2/3/2020 and updated 1/10/2022 (the "Survey") shows the following:

    A. Encroachments onto and projections over West 57th Street by:  bike racks, entrance cornice, window sill, entrance trim, awning, door when open, light, Siamese, stand pipe, camera, roof cornice, canopy, and decoration.

    B. Southerly wall and base of 14 story portion of building in easterly portion of premises encroach up to 0.04 feet and up to 0.15 feet, respectively, onto West 57th Street; base encroaches up to 0.15'.  Policy insures said wall and base may remain as long as the building stands.

    C. Southerly wall of 2 story portion of building on premises encroaches up to 0.04 feet onto West 57th Street. Policy insures said wall may remain as long as the building stands.

    D. Southerly wall and base of 14 story portion of building in westerly portion of premises encroach up to 0.07 feet and up to 0.15 feet, respectively, onto West 57th Street.  Policy insures said wall and base may remain as long as the building stands.

    E. Easterly wall of 1 story building on property adjoining on the west encroaches up to 0.01 feet onto premises.

F.    Projections from westerly wall of 14 story portion of building on premises over property adjoining on the west by:  metal roof.

G.    Part of the westerly and easterly walls of building on westerly and easterly portions of premises are party walls.  Policy insures said wall may continue to be used as a party wall for so long as the building stands and policy insures that said party wall has a legal right to remain and that same can remain for so long as same shall stand.

H.    Vent pipe of building on property adjoining on the west anchored to wall of 14 story portion of building on premises.

I.    Independent wall added above party wall; west side of said wall above party wall, in westerly portion of premises.

J.    Projections from westerly walls of building on premises over properties adjoining on the west by: window sills and wires.

K.    Windows on 14 story portion of building, high 3 story portion of building, 23 story portion of building and 27 story portion of building, all on premises, when open, may project over property adjoining on the west.

L.    Southerly independent wall of 1 story brick building on property adjoining on the northwest encroaches up to 0.02 feet onto premises.

M.    Projection from westerly wall of 27 story portion of building on premises over property adjoining on the west by:  air conditioner unit.

N.    Westerly wall of 14 story portion of building on premises leans up to 0.10' over property adjoining on the west. Policy insures that said wall may remain for so long as the building stands.

O.    Encroachments onto and projections over West 58th Street by:  window of 3rd story, ledge, window sill, door when open, light, siamese, camera, vent and light at 7th story.

P.    Northerly wall of 14 story portion of building and base in northwesterly portion of premises encroach up to 0.03 feet and up to 0.11 feet, respectively, onto West 58th Street.  Policy insures said wall and base may remain as long as the building stands.

Q.    Stucco on northerly wall of high 5 story portion of building on premises encroaches onto/projects onto West 58th Street up to 0.39 feet.  Policy insures said wall may remain as long as the building stands.

R.    Northerly wall and base of 14 story portion of building in northeasterly portion of premises encroach up to 0.03 feet and up to 0.13 feet onto West 58th Street.  Policy insures said wall and base may remain as long as the building stands.

S.    Easterly wall of 14 story portion of building in northeasterly portion of premises encroaches up to 0.02' onto property adjoining on the east. Policy insures said wall may remain as long as the building stands.

T.    Spaces sealed between easterly walls of building on premises and west side of wall of building on property adjoining on the east, in northeasterly portion of premises.

U.      West side of westerly wall of building on property adjoining on the east encroaches up to 0.02 feet onto premises.

V.      Westerly wall of 45 story brick building on property adjoining on the east leans up to 0.01 foot' over premises.

W.      Projections from easterly walls of building on premises over properties adjoining on the east by: window sill and roof cap.

X.      Windows on westerly wall of  45 story brick building on property adjoining on the east, when open, may project over subject premises.

Y.      Wire runs along basement extension building on property adjoining on the east at roof.

Z.      Windows on 23 story portion of building, 14 story portion of building and 26 story portion of building on premises, when open, may project over property adjoining on the east.

AA.     Projection from easterly wall of 14 story portion of building on premises over property adjoining on the east by:  metal at roof.

BB.     Westerly independent wall of basement brick and frame building on property adjoining on the east encroaches up to 0.04 feet onto premises.

# EXHIBIT K

## SRO Tenants

SRO TENANTS

| NAME | ROOM # | RENT AMOUN | WEEKLY/ MONTHLY | DOA | EMAIL |
|---|---|---|---|---|---|
| Simmons Arlene | 1169 | 501.11 | Monthly | 9.5.1988 | |
| Radunovich Milan | 1546 | 418.79 | Monthly | 1.13.1977 | TESSR4444@YAHOO.COM |
| Gilbert Fred | 1722 | 277.36 | Monthly | 5.25.1968 | |
| Levi Emil | 1846 | 86.81 | Weekly | 9.4.1979 | EHL100@AOL.COM |
| Leach Ken | 1856 | 501.11 | Monthly | 11.1.1985 | KENLEACH217@AOL.COM |
| Lamb Owen | 1916 | 396.69 | Monthly | 9.10.1979 | OWENLAMB@AOL.COM |
| Magno Zoe | 2017 | 96.81 | Monthly | 11.30.1979 | |
| Carter Teresa | 2031 | 422.27 | Monthly | 5.1.1977 | |
| Palma Flora | 2039 | 402.57 | Monthly | 3.1.1976 | |
| Orturbia Susana | 2045 | 502.26 | Monthly | 2.25.1978 | |
| Khan Kwasa | 2106 | 419.95 | Monthly | 8.19.1977 | |
| Leo Jenkins | 2107 | 130.62 | Weekly | 8.17.1984 | |
| Rodriguez  Yolanda | 2114 | 543.12 | Monthly | 3.5.1980 | |
| Marouils George | 2129 | 429.6 | Monthly | 8.29.1979 | |
| Jay Vanderbilt | 2135 | 255.34 | Monthly | 11.1.2008 | JAY.VANDERBILT@VA.GOV |
| Quioque Caridad | 2138 | 484.88 | Monthly | 8.29.1980 | |
| Rodriquez Maria | 2139 | 340.37 | Monthly | 1.28.1983 | LADYROD57@AOL.COM |
| Brockenborough Pat | 2140 | 393.02 | Monthly | 1.7.1974 | |
| Sanchez Bonifacio | 2145 | 255.34 | Monthly | 10.29.1971 | |
| Ledesma Lucy | 2146 | 278.92 | Weekly | 7.19.1982 | |
| Hirsch Judy | 2155 | 83.47 | Weekly | 9.25.1967 | |
| Schwantes Claudia | 2157 | 419.47 | Monthly | 4.22.1981 | LAUDIABALDONERI@GMAIL.CO |
| Natos Nick | 2204 | 419.51 | Monthly | 5.18.1981 | |
| Cowie Margaret | 2206 | 538.19 | Monthly | 10.3.1982 | MIMIYUYU31@GMAIL.COM |
| Carroll William | 2207 | 419.46 | Monthly | 8.16.1980 | |
| Nathaniel Virginia | 2211 | 404.88 | Monthly | 7.11.1994 | |
| Phyu Hnin Hla | 2212 | 415.32 | Monthly | 5.12.1972 | HNIN.HLA.PHYU@UNDO.ORG |
| Chane Peggy | 2227 | 242.58 | Monthly | 1.14.1969 | PEGGYCHANE@GMAIL.COM |
| Blakely Iris | 2231 | 484.34 | Monthly | 7.2.1978 | |
| Ramos Letcias | 2232 | 454.74 | Monthly | 4.5.1981 | |
| Reddy Kenneth | 2235 | 393.02 | Monthly | 9.1.1982 | |
| Morrow Jenatte | 2236 | 96.81 | Weekly | 12.3.1970 | IEMORROW2236@YAHOO.COM |
| Chin Daisy | 2239 | 402.57 | Monthly | 7.26.1982 | |
| Bendana Renata | 2244 | 506.89 | Monthly | 1.29.1974 | IRBENDANA@GMAIL.COM |

| | | | | |
|---|---|---|---|---|
| Evelyn Lagarde | 2245 | 416.47 | Monthly | 10.29.1971 |
| Lavilla Amparo | 2253 | 457.06 | Monthly | 7.7.1981 |
| Danielle Marton | 2255 | 96.82 | Weekly | 8.1.1978 |

**Total of INHOUSE Tena**  **37**

| PHONE NUMBERS | Land Line Phone | phone extension |
|---|---|---|
| 212-554-6469 | 554-6469 | 1169 |
| 917-225-3729 | 554-6163 | 1546 |
| 516-431-7461 | 554-6403 | 1722 |
| 212-956-1231 | 554-6273 | 1846 |
| 917-881-8747 | 554-6453 | 1856 |
| 917-806-0000 | 554-6292 | 1916 |
| 917-678-8901 | 554-6332 | 2017 |
| 212-765-4657 | 554-6339 | 2031 |
| 212-757-6592 | 554-6276 | 2039 |
| 646-418-1498 | 554-2045 | 2045 |
| 212-757-6884 | 554-6270 | 2106 |
| 212-247-4449 | 554-6033 | 2107 |
| 917-887-1696 | 554-6361 | 2114 |
| 212-554-6341 | 554-6341 | 2129 |
| 212-646-7500 EXT 3666 | 554-2135 | 2135 |
| 212-977-3739 | 554-6369 | 2138 |
| 212-245-1022 | 554-6178 | 2139 |
| 212-554-6369 | 554-6363 | 2140 |
| 212-554-6372 | 554-6372 | 2145 |
| 917-678-8065 | 554-2146 | 2146 |
| 212-265-7730 | 554-6135 | 2155 |
| 646-236-6456 | 554-6378 | 2157 |
| 212-586-5863 | 554-6143 | 2204 |
| 212-245-4353 | 554-6382 | 2206 |
| 212-554-6264 | 554-6264 | 2207 |
| 646-498-7332 | 554-2211 | 2211 |
| 917-821-4623 | 554-2212 | 2212 |
| 401-390-4937 | 554-6447 | 2227 |
| 212-554-6391 | 554-6390 | 2231 |
| 347-407-3471 | 554-6391 | 2232 |
| 212-333-5179 | 554-6334 | 2235 |
| 929-216-1058 | 554-6230 | 2236 |
| 212-541-9177 | 554-6394 | 2239 |
| 917-370-0048 | 554-6398 | 2244 |

| 646-468-7729 | 554-6349 | 2245 |
| 212-554-6401 | 554-6401 | 2253 |
| 917-639-3915 | 554-6241 | 2255 |

## **EXHIBIT L**

### **Form of Condominium Board Resignation**

4863-0344-5267, v. 18

<u>**Condominium Board Resignation**</u>

<u>**353 West 57th Street Condominium**</u>

_____, 2022

Board of Managers
353 West 57th Street Condominium
353 West 57th Street
New York, New York 10019

Re:      <u>353 West 57th Street Condominium (the "**Condominium**")</u>

Ladies & Gentlemen:

Effective as of the date hereof, the undersigned, being all of the voting members of the Board of Managers of the Condominium (the "**Board**") for the EBC Unit Class and the Hotel Unit Class, all of whom have been appointed by _____, a _____ ("<u>Owner</u>"), pursuant to (i) that certain Appointment to Board of Managers, dated as of _____, made by Owner, and (ii) that certain Amended and Restated Declaration Establishing a Plan for Condominium Ownership of Premises Located at 353-361 West 57th Street (a/k/a 356 West 58th Street) in the Borough of Manhattan, City, County and State of New York Pursuant to Article 9- B of the Real Property Law of the State of New York, dated as of February 12, 1999, and recorded in the New York County Office of the Register of the City of New York on July 16, 1999, in Reel 2913 Page 1753, and amended by that certain Amendment to Amended and Restated Declaration Establishing a Plan for Condominium Ownership of Premises Located at 353-361 West 57th Street (a/k/a 356 West 58th Street) in the Borough of Manhattan, City, County and State of New York Pursuant to Article 9-B of the Real Property Law of the State of New York, dated as of September 30, 1999, and recorded in the New York County Office of the Register of the City of New York on October 27, 1999, in Reel 2979 Page 2159, as the same has been or may be amended, amended and restated, assigned, supplemented, or modified hereby tender their respective resignations as members of the Board.

*[No further text on this page; signature page follows.]*

**[<u>NTD</u>: signature blocks to be inserted]**

_____

_____

_____

*[Signature Page to Condo Board Resignation]*

**Error! Unknown document property name.**
*ACTIVE 64608123v2*

## **EXHIBIT M**

**Example Calculations of Right-Size Payment and Minimum Payment**

4863-0344-5267, v. 18

| Right-Size Example Calculations | | |
|---|---|---|
| **Trailing 12-Month NOI** | | **Notes** |
| Gross Income | $75,000,000 | Residential, Retail, Commercial and Misc. Revenue |
| Operating Expenses & RE Tax | ($50,000,000) | |
| **Trailing 12-Month NOI** | **$25,000,000** | Gross Income - Operating Expenses & RE Taxes |
| | | |
| **Right-Size Base Rent** | | **Notes** |
| Trailing 12-Month NOI | $25,000,000 | |
| *divided by* | 3.65x | Applied to Year 6 Scheduled Base Rent ($7,040,000) |
| Adjusted Base Rent (Year 6) | $6,849,315 | Trailing 12-Month NOI / 3.65 |
| *divided by* | 110% | |
| **Right-Size Base Rent** | **$6,226,650** | Trailing 12-Month NOI / Right-Size Coverage / 110% |
| | | |
| **Minimum Payment** | | **Notes** |
| (i) Then Applicable Annual Base Rent | $6,400,000 | per Lease |
| *less* | | |
| (ii) Right-Size Base Rent | $6,226,650 | per Lease |
| **Year 5 Base Rent - Right Size Base Rent** | **$173,350** | |
| 30 Year Treasury | 2.91% | |
| Spread | 0.75% | |
| Index Yield | 3.66% | 30 Year Treasury + Spread |
| Origination Yield | 3.53% | |
| **(y) Right-Size Yield** | **3.53%** | Minimum of Origination Yield and Index Yield |
| | | |
| **Minimum Payment** | **$4,910,763** | [(i) - (ii)] / (y) |
| | | |
| **Right-Size Payment** | | **Notes** |
| (a) Year 5 Base Rent - Right Size Base Rent | $173,350 | |
| (b) cap | $2,000,000 | per Lease |
| Minimum of (a) and (b) | $173,350 | |
| Right Size Yield | 3.53% | |
| **Right-Size Payment** | **$4,910,763** | |
| | | |
| | | |
| **SUMMARY** | | **Notes** |
| **Right-Size Payment** | **$4,910,763** | |
| | | |
| **Right-Size Base Rent (Year 5)** | **$6,226,650** | |
| **Right-Size Base Rent (Year 6)** | **$6,849,315** | Year 5 Rent x 110% (per Lease) |