# EXHIBIT E

**HUDSON 1702, LLC and HUDSON 1701/1706 LLC,**
**Collectively as Borrower**

**AND**

**PARKVIEW FINANCIAL REIT, LP**
**as Lender**

**AND**

**PARKVIEW FINANCIAL REIT, LP,**
**as Administrative Agent**

**BUILDING LOAN AGREEMENT**
**($81,782,527.00)**

Dated:           As of May 4, 2022

Location:      County of New York
                     State of New York

Tax Map Designation:

| Street Address: | 353-361 West 57th a/k/a 356 West 58th Condominium Units ##1, 2 and 6 |
| | New York, New York |
| | |
| Section: | |
| Block: | 1048 |
| Lots: | 1701, 1702, 1706 |

RECORD AND RETURN TO:

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, CA  90025
Attention:  Paul S. Rahimian

FF\12518702.7

## BUILDING LOAN AGREEMENT

THIS BUILDING LOAN AGREEMENT is entered into as of the 4th day of May, 2022 (the "Effective Date"), by HUDSON 1702, LLC, a Delaware limited liability company having an office at c/o CSC Coliving LLC, 6 St. Johns Lane, New York, New York 10013 ("1702") and HUDSON 1701/1706, LLC, a Delaware limited liability company having an office at c/o CSC Coliving LLC, 6 St. Johns Lane, New York, New York 10013 ("1701/1706") (1702 and 1701/1706", collectively, "Borrower"), and PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership having an office at 11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025 ("Lender", and collectively with such additional lenders as may become a lender pursuant to this Agreement, "Lenders"), and PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership having an office at 11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025 (as contractual representative of the Lenders to the extent and in the manner provided in Article XI hereof (in such capacity, the "Administrative Agent")).

## RECITALS

A.    1702 is the owner of the leasehold estate in certain property commonly known as Hotel Unit #2 in the 353 West 57th Street Condominium, and more particularly described in Exhibit A-1 attached hereto ("1702 Leasehold Property"), demised pursuant to the Ground Lease described in Exhibit B attached hereto (the "Ground Lease"), and (ii) 1701/1706 is the owner of the leasehold estate in certain real property commonly known as Hotel Unit #1 in the 353 West 57th Street Condominium, and more particularly described in Exhibit A-2 attached hereto ("1701 Leasehold Property"), demised pursuant to the Ground Lease, and the subleasehold estate in certain property commonly known as the 10th Floor Unit in the 353 West 57th Street, and more particularly described in Exhibit A-3 attached hereto (the "Subleasehold Property") (the 1702 Leasehold Property, the 1701 Leasehold Property and the Subleasehold Property, collectively, the "Property"), demised pursuant to the Sublease Agreement described in Exhibit C attached hereto (the "Sublease").

B.    Borrower proposes to redevelop an approximately 362,800 square foot hotel into an approximately 399-unit (exclusive of the 39 SRO units) multifamily property with 54,590 square feet of commercial space and a 3,500 square foot penthouse unit, together with all appurtenances now or hereafter located on the Property (the "Improvements").

C.    Borrower desires to borrow from Lenders a building loan in the principal amount of $81,782,527.00 or so much thereof as may be advanced pursuant to the terms of this Agreement (hereinafter referred to the "Loan" or the "Building Loan"), to finance actual costs incurred by the Borrower in connection with the construction of the Improvements on the Property by the Borrower.

1

D.      Lenders are willing to extend credit to Borrower in the amount requested, pursuant to the terms and provisions set forth herein.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Administrative Agent and Lenders hereby agree as follows:

Article I
## DEFINITIONS

The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below.  Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

"Account Bank" means JPMorgan Chase Bank, N.A., having an address at 4 New York Plaza, 14th Floor, New York, New York 10004-2413.

"Administrative Agent" means Parkview Financial REIT, LP, a Delaware limited partnership, or any successor administrative agent for the Loan appointed pursuant to the Co-Lender Agreement.

"Affiliate" means any person or entity which controls, is controlled by or is under common control with any other person or entity.  For purposes of this definition, "control" (which includes the correlative meanings of "controlled by" and "under common control with" means the effective power, directly or indirectly, to direct or cause the direction of the management and policies of a person or entity; provided, however, that a Person shall not be deemed to lack control of another Person if certain decisions are subject to "major decisions" consent or approval rights of limited partners, shareholders or members, as applicable, pursuant to such Person's organizational documents.

"Architect" means Tang Studio Architect, LLC, a New York professional service limited liability company, having an office at 1452 College Point Blvd, College Point, New York 11356.

"Architect's Contract" means the agreement dated April 11, 2022 between Borrower and the Architect with respect to the design of the Improvements.

"Architect Assignment" means the Assignment of Architect's Contract and Plans and Specifications and Permits, Consents and Certifications executed by Borrower in favor of Administrative Agent assigning Borrower's interest in the Architect's Contract, Plans and Specifications, Permits and other contracts, franchises and interests of Borrower relating to the Project.

"Authorized Representative" means a person designated by the applicable entity and approved by Administrative Agent for the purpose of certifying and taking all other actions necessary or which Administrative Agent or Lenders may deem desirable under this Agreement.

FF\12518702.7

"Borrower's Account" means an account with Account Bank, Account No. 836525722 in the name of Borrower.

"Borrower's Funds" shall mean the funds to be deposited by Borrower in the Borrower's Funds Account pursuant to Section 5.7 hereof.

"Borrower's Funds Account" shall mean a non-interest bearing account maintained with Account Bank for the purpose of receiving Borrower's Funds and making advances of Loan proceeds.

"Building Loan Cost Breakdown" means, collectively, the Trade Schedule Breakdown and the Schedule of Other Costs of Improvement, as same have been reviewed and accepted by Administrative Agent, and as revised from time to time after the date hereof with the prior review and acceptance of Administrative Agent.

"Building Loan Mortgage" or "Mortgage" means the Building Loan Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in the principal amount of $81,782,527.00 executed by Borrower, as mortgagor, in favor of Administrative Agent, as mortgagee, encumbering the Property.

"Building Loan Note" or "Note" means the Building Loan Note in the principal amount of $81,782,527.00 made by Borrower, as maker, and payable to the order of Lenders, as payee, which evidences the Building Loan.

"Business Day" means any day, except a Saturday, Sunday or any other day in which commercial banks in Los Angeles, California are authorized or required by law to close. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be deemed calendar days.

"Closing" means the date the Building Loan Mortgage is executed and delivered to the Title Insurer for recording in the Register's Office for the City of the New York, New York County.

"CM Assignment" means the Assignment of Construction Manager Agreement Consent and Certification executed by Borrower in favor of Administrative Agent assigning Borrower's interest in the Construction Management Agreement to Administrative Agent.

"Collateral" means the Property and/or Improvements.

"Co-Lender Agreement" means such Co-Lender Agreement as may be entered into between Parkview Financial REIT, LP, in its capacities as Lender and Administrative Agent and such other Lenders as may become party thereto.

"Commitment" means, as to each Lender, such Lender's obligation to make disbursements of Loan Proceeds pursuant to Article II. As of the Effective Date, Parkview Financial REIT, LP holds the entire Commitment.

"Completion Date" means May 1, 2024 (subject to Section 8.2 hereof).

3

FF\12518702.7

"Completion Guaranty" means that certain Guaranty of Completion dated as of the date hereof given by Guarantors to Administrative Agent and Lenders.

"Construction Management Agreement" means that certain agreement to manage the construction of the Improvements to be entered into by and between Borrower and Construction Manager, which Construction Management Agreement shall be satisfactory in form and substance to Administrative Agent.

"Construction Manager" means a construction manager to be retained by Borrower pursuant to the Construction Management Agreement, which Construction Manager shall be subject to the approval of Administrative Agent.

"Construction Schedule" means the construction schedule showing the estimated commencement and completion of construction for each stage of the Project to be submitted to Administrative Agent pursuant to Section 3.1(C)(n), as the same may be revised or updated by Borrower from time to time in accordance with the terms of Section 8.12 hereof.

"Contractors" means all contractors, subcontractors, architects, engineers, designers, consultants, suppliers, materialmen and like providers of goods and services in connection with the Project, including the Architect and the Construction Manager.

"Contracts" means all contracts and subcontracts entered into for the provision of goods and services in connection with the design, construction, maintenance, management and operation of the Improvements, including the Architect's Contract and the Construction Manager Agreement.

"Costs of Improvement" shall have the meaning ascribed thereto in Section 2 of the Lien Law, as such term applies to the Improvements being financed with the proceeds of the Building Loan.

"Direct Construction Costs" means all "direct costs" such as the cost of all labor, materials, equipment and fixtures, to the extent same constitute Costs of Improvement, as itemized in the Trade Breakdown Schedule.

"Environmental Indemnity" means the Environmental Indemnity executed by Borrower and Guarantors in favor of Administrative Agent and Lenders.

"Environmental Report" means the Phase I Environmental Site Assessment dated March 10, 2022 prepared by Roux Environmental Engineering and Geology, D.P.C.

"Event of Default" has the meaning set forth in Article IX of this Agreement.

"Extended Maturity Date 1" means May 1, 2025.

"Extended Maturity Date 2" means November 1, 2025.

4

"Ground Lessor" means 356W58 Ground Lessor LLC, a Delaware limited liability company, having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219.

"Guarantor" means, individually and collectively, Alberto Smeke Saba, an individual residing at 2008 East 3rd Street, Brooklyn, New York 11223; and Salomon Smeke Saba, an individual residing at 403 Avenue T, Brooklyn, New York 11223.

"Guaranty" means that certain Guaranty executed by Guarantor in favor of Administrative Agent and Lenders dated as of the date hereof.

"Hazardous Materials" means (i) any chemical, compound, material, mixture or substance that is now or may later be defined or listed in, or otherwise classified pursuant to, any Hazardous Materials Law as a "hazardous substance", "hazardous material", "hazardous waste", "extremely hazardous waste", "acutely hazardous waste", "radioactive waste", "infectious waste", "biohazardous waste", "toxic substance", "pollutant", "toxic pollutant", "contaminant" as well as any formulation not mentioned herein intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity "EP toxicity," or "TCLP toxicity"; (ii) petroleum, natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas) and ash produced by a resource recovery facility utilizing a municipal solid waste stream, and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources; (iii) any substance, chemical, material or element defined as "hazardous", "toxic", or otherwise regulated, under any environmental laws adopted by New York State, or its agencies or political subdivisions, including the New York State Environmental Conservation Law; (iv) asbestos in any form; (v) urea formaldehyde foam insulation; (vi) transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls (PCBs) in excess of fifty (50) parts per million; (vii) radon; and (viii) any other chemical, material, or substance that, because of its quantity, concentration, or physical or chemical characteristics, exposure to which is limited or regulated for health and safety reasons by any governmental authority, or which poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment.

"Hazardous Materials Laws" means all present and future federal, state and local laws, ordinances, regulations, permits, guidance documents, policies, decrees, orders and any other requirements, whether statutory, regulatory or contractual, of governmental authorities relating to health, safety, the environment or the use, handling, disposal or transportation of any Hazardous Materials including, without limitation, the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"); 42 U.S.C. Section 9601 et seq,; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Hazardous Materials Transportation Act, as amended (49 U.S.C. §§5101-5127, formerly codified at 49 U.S.C. §1801, et seq.); the Atomic Energy Act, as amended, 42 U.S.C. Section 2011 et seq.; the Federal Insecticide, Fungicide and Rodenticide

5

Act, as amended, 7 U.S.C. Section 136 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; each as now and hereafter amended, and the regulations thereunder, and any other applicable local, state and/or federal laws or regulations that govern (i) the existence, cleanup and/or remedy of contamination on the Property; (ii) the protection of the environment from released, spilled, deposited or otherwise emplaced contamination; (iii) the control of hazardous wastes; or (iv) the use, generation, transport, treatment, removal or recovery of Hazardous Materials, including any and all building materials.

"Immediate Family Member" means, with respect to any Person, such Person's spouse, parent, grandparent, child, step-child, sibling, step-sibling, grandchild, step-grandchild or other lineal descendants.

"Improvements" shall include the real property, personal property and the tangible and intangible properties which Borrower intends to construct on the Property with the proceeds of the Building Loan in accordance with the Plans and Specifications and all off-site improvements which are required to be completed in connection with such construction on the Property.

"In-Balance" means, with respect to the Loan Administrative Agent's determination, on a line item basis, from time to time that the sum of (a) any undisbursed Building Loan funds and Project Loan funds, together with all Borrower's Funds then deposited with Administrative Agent plus (b) all sums, if any, provided by Borrower and the unadvanced balance of the Improvement Allowance, in each case as shown in the Project Cost Breakdown, plus (c) without duplication of the above clauses (a) and (b) of this definition, all reserve, deficiency collateral and/or balancing deposits made by Borrower or Guarantor to (or as directed by) Administrative Agent pursuant to the terms of the Loan Documents, shall at all times be equal to or greater than the amount which Administrative Agent from time to time determines necessary to: (i) pay through completion all costs of the development and construction of the Project in accordance with the Project Cost Breakdown, on a line item basis; (ii) pay all sums which may accrue under the Loan Documents prior to the repayment of the Loan; and (iii) enable Borrower to perform and satisfy all covenants of Borrower contained in the Loan Documents.

"Lien" shall mean any mortgage, lien (statutory or otherwise), deed of trust, pledge, charge (per charging order), encumbrance, security interest, hypothecation, easement, restrictive covenant, or any agreement to enter into or create any of the foregoing.

"Lien Law" means the Lien Law of the State of New York.

"Liquidity" means, as of any date of determination and with respect to any Person, the value of (i) all cash and cash equivalents (including municipal bonds, investment grade corporate bonds and U.S. Treasuries) owned by such Person on such determination date and held by such Person in unrestricted and unencumbered domestic accounts and over which such Person has sole control, plus (ii) the market value on such determination date of the unrestricted and unencumbered marketable securities actively traded on a U.S. stock exchange owned by such Person.

6

"Liquidity and Net Worth Threshold" means a minimum Liquidity of $10,000,000.00 and a minimum Net Worth of $150,000,000.00.

"Loan" or "Building Loan" shall have the meaning ascribed thereto in the Recitals above.

"Loan Documents" means this Agreement, the Project Loan Agreement, the Building Loan Note, the Project Loan Note, the Building Loan Mortgage, the Project Loan Mortgage, the Architect Assignment, the CM Assignment, the Security Agreement and all other agreements, instruments or documents executed by Borrower and/or Guarantor evidencing, securing or otherwise delivered to Lenders or Administrative Agent in connection with the Loan.

"Loan Facility" means, collectively, the Building Loan and the Project Loan.

"Loan Party" means Borrower and Guarantor.

"Loan Proceeds" means the proceeds of the Building Loan.

"Material Action" means a decision or act to institute proceedings to have Borrower or Sole Member, as applicable, be adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against Borrower or Sole Member or to file a petition seeking, or consent to, reorganization or relief with respect to Borrower or Sole Member under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of Borrower or Sole Member or a substantial part of either of their respective property, or make an assignment for the benefit of creditors of Borrower or Sole Member, or admit in writing Borrower or Sole Member's inability to pay its debts generally as they become due, or take action in furtherance of any such action.

"Maturity Date" means November 1, 2024.

"Operating Agreement" collectively means the Limited Liability Company Operating Agreement of 1701/1706 dated as of March 12, 2022 among 1701/1706's members, and the Limited Liability Company Operating Agreement of 1702 dated as of March 16, 2022 among 1702's members, as each may have been amended on or prior to the date hereof.

"Other Costs of Improvement" means all "indirect costs" such as architect's, engineer's and attorney's fees, interest, real estate taxes, survey costs and insurance premiums, to the extent same constitute Costs of Improvement, as itemized in a Schedule of Other Costs of Improvement.

"Participant" shall have the meaning set forth in Article X hereof.

"Permits" means all permits, licenses, operating authorizations, certificates, variances, waivers, approvals or other authorizations of any kind issued or granted by any governmental authority which are required in connection with (i) the lawful and proper operation and maintenance of the Property; (ii) construction of the Improvements; and (ii) any existing use of the Property.

"Permitted Encumbrances" has the meaning set forth in Section 6.10.

7

"Person" means any natural person, individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government (or any agency, instrumentality or political subdivision thereof), or other legal person.

"Plans and Specifications" means the plans and specifications for the Improvements, as approved by Administrative Agent as provided herein and as may be revised from time-to-time in accordance with the terms of this Agreement.   The plans and specifications as of the date of this Agreement (the "Preliminary Drawings") are described on Exhibit D to this Agreement.  The final Plans and Specifications (the "Final Plans and Specifications") shall be delivered to and be satisfactory to Administrative Agent within six (6) months after the Effective Date, and shall be substantially in accordance with the Preliminary Drawings.

"Potential Event of Default" means an event of which Borrower has knowledge which, with the giving of notice or the lapse of time, or both, would become an Event of Default.  If Administrative Agent or Lenders decline to extend the maturity date of the Loan pursuant to Section 2.7 hereto or make a disbursement of the Loan pursuant to Section 3.2 hereof, Administrative Agent shall advise Borrower of the Potential Event of Default causing such decline or non-disbursement, as applicable.

"Project" means, as the context requires, (a) the Property and the Improvements or (b) the project of constructing the Improvements on the Property in accordance with the Plans and Specifications and this Agreement.

"Project Cost Breakdown" means, the schedule of Project Costs, including, without limitation, the Building Loan Cost Breakdown, as same have been reviewed and accepted by the Lender, and as revised from time to time after the date hereof with the prior review and acceptance of the Lender.

"Project Costs" means Direct Construction Costs, Other Costs of Improvement and all other costs necessary to complete the Improvements in accordance with the Plans and Specifications and otherwise in accordance with this Agreement.

"Project Loan Note" means the note in the principal amount of $125,217,473.00 made by Borrower, as maker, and payable to the order of Lenders, as payee, which evidences the Project Loan.

"Project Loan Mortgage" means the Project Loan Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing in the principal amount of $125,217,473.00 executed by Borrower, as mortgagor, in favor of Administrative Agent, as mortgagee, encumbering the Property.

"Property" means the real property as defined in the Recitals above and more particularly described in Exhibit "A" to this Agreement.

"Property Laws" means (i) all zoning, building, environmental and other laws, ordinances, rules, regulations, and restrictions of any governmental authority, including, without limitation, the Americans with Disabilities Act to the extent applicable, the Subdivision Map Act

8

and those relating to the presence of asbestos and/or hazardous wastes, (ii) any building permits or any conditions, easements, rights-of-way, covenants, restrictions of record or any recorded or unrecorded agreement affecting or concerning the Property, including, without limitation, planned development permits, condominium declarations and any owner participation, development or regulatory agreements with any governmental authority and (iii) requirements of insurance companies or similar organizations, affecting the operation and use of the Property or consummation of the transactions contemplated by the Loan Documents.

"Prorata Share" means, as to each Lender, the ratio, expressed as a percentage, of (a) the amount of such Lender's Commitment to (b) the aggregate amount of the Commitment of all Lenders hereunder; provided, however, that if at the time of the determination the Commitments have terminated or have been reduced to zero, the "Prorata Share" of each Lender shall be the prorata share of such Lender in effect immediately prior to such termination or reduction.

"Protective Advance" means any advance made by Administrative Agent in accordance with the provisions of Article XI of this Agreement to protect the Collateral securing the Loan.

"REIT" means Parkview Financial REIT, LP, a Delaware limited partnership, its successors and assigns.

"Requisite Lenders" means, as of any date of determination, so long as there are exactly two (2) Lenders, both Lenders, and at all other times, Lender(s) holding in the aggregate more than 70% of the aggregate Commitment amounts.

"Security Agreement" shall mean the Pledge and Security Agreement (Membership Interests) dated as of the date hereof, given by Sole Member to Lender, with respect to its membership interests in Borrower.

"Separateness Provisions" shall have the meaning as described as such term in Section 7.3 hereof.

"Schedule of Other Costs of Improvement" schedule of costs, other than Direct Construction Costs, to be incurred by the Borrower in connection with the Building Loan or the construction of the Improvements, reviewed and accepted by Administrative Agent, as the same may be revised from time to time after the date hereof with the prior review and acceptance of Administrative Agent.

"Sole Member" means CSC Hudson, LLC, a Delaware limited liability company having an office at 6 Saint Johns Lane, 7th Floor, New York, New York 10013

"Title Insurer" means First American Title Insurance Company, acting by and through Royal Abstract of New York, LLC, its authorized agent.

"Title Policy" has the meaning set forth in Section 3.1(C).

9

"Trade Breakdown Schedule" means the trade breakdown schedule of Direct Construction Costs, reviewed and accepted by the Lender, as the same may be revised from time to time after the date hereof with the prior review and acceptance of the Lender.

"Transfer" means any sale, installment sale, exchange, mortgage, pledge, hypothecation, assignment, or other transfer, conveyance or disposition, whether voluntarily, involuntarily or by operation or otherwise.

"UCC" means the New York Uniform Commercial Code in effect from time to time.

## Article II
## THE LOAN

2.1     Loan.  Subject to the terms and conditions of this Agreement, Lender agrees to make and disburse the Building Loan to Borrower.  The Building Loan shall be evidenced and repaid in accordance with the terms of the Note.

2.2     Purpose.  Amounts disbursed to or on behalf of Borrower for the Building Loan shall be used for the payment of Direct Construction Costs and Other Costs of Improvement and for no other purposes.

2.3     Mortgage.  The Note shall be secured, in part, by the Mortgage.

2.4     Origination Fee; Exit Fee.

        (a)     Borrower agrees to pay to Lenders at Closing a non-refundable loan origination fee in the amount of $3,105,000.00 ("Origination Fee").

        (b)     If all or any part of the unpaid principal balance of the Loan is repaid, at any time and for any reason, including (1) any regularly scheduled payment of the Loan, including without limitation payments made on the Maturity Date, (2) any payment of the Loan upon acceleration of the Loan following the occurrence of an Event of Default, (3) any optional prepayment of the Loans or (4) any mandatory prepayment of the Loan, then Borrower agrees to make a payment to Administrative Agent for the account of each Lender in an aggregate amount equal to four-tenths percent (0.40%) of the amount of such principal payment or prepayment ("Exit Fee"); provided, however, if the Loan is refinanced with Administrative Agent or any Lender, then the Exit Fee shall be waived.  Borrower acknowledges that the Exit Fee is earned by each Lender in full as of the Effective Date.

2.5     Maturity Date.  All sums due and owing under this Agreement and the other Loan Documents shall be repaid in full on the Maturity Date.

2.6     Full Repayment, Satisfaction or Release.  Upon receipt of all sums owing and outstanding under the Loan Documents, and the full performance of all other obligations secured by the Mortgage, Administrative Agent shall satisfy or release the Property and Improvements and all other collateral for the Loan from the lien of the Mortgage and terminate all other Loan Documents related to the collateral described therein, or upon the request of Borrower assign the Mortgage subject to the provisions of Section 5.20 thereof; provided, however, that all of the

10

following conditions shall be satisfied at the time of, and with respect to, such satisfaction or release, Administrative Agent shall have received all escrow, closing and recording costs, the costs of preparing and delivering such satisfaction or release, the payment of any and all sums then due and payable under the Loan Documents, and the full payment and performance of all other obligations secured by the Mortgage, including, without limitation, those set forth in the Note and the Mortgage. Lenders' obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of execution of such satisfaction or release, and any commitment of Lenders to lend any undisbursed portion of the Loan shall thereafter be cancelled.

    2.7    Option to Extend.

    (i)    Extended Maturity Date 1. Borrower shall have the option to extend the term of the Loan from the Maturity Date (for purposes of this Section, the "Original Maturity Date"), to the Extended Maturity Date 1, upon satisfaction of each of the following conditions precedent:

    (a)    Borrower shall provide Administrative Agent with written notice (which notice shall be revocable until thirty (30) days prior to the Original Maturity Date) by way of certified mail or overnight courier of Borrower's request to exercise the option to extend ("First Option to Extend") not more than ninety (90) days but not less than thirty (30) days prior to the Original Maturity Date (and Administrative Agent agrees to advise Borrower if the conditions precedent have been satisfied within ten (10) Business Days after receipt of such notice);

    (b)    As of the date of Borrower's delivery of notice of request to exercise the First Option to Extend, and as of the Original Maturity Date, no Event of Default shall have occurred and be continuing, and no Potential Event of Default shall exist, and Borrower shall so certify in writing;

    (c)    Borrower shall execute or cause the execution of all documents reasonably required by Administrative Agent to exercise the First Option to Extend and shall deliver to Administrative Agent, at Borrower's sole cost and expense, such title insurance endorsements to the Title Policy reasonably required by Administrative Agent;

    (d)    There shall have occurred no material adverse change, as determined by Administrative Agent in its sole good faith discretion, in the financial condition of Borrower or any Guarantor or other person or entity in any manner obligated to Lender and/or Administrative Agent under the Loan Documents from that which existed on the Effective Date;

    (e)    Borrower shall have simultaneously duly and validly exercised the Option to Extend with respect to the Project Loan;

    (f)    At least 15 days before the Original Maturity Date, Borrower shall pay to Lender a documentation fee in the amount of $14,975.00;

    (g)    At least 15 days before the Original Maturity Date, Borrower shall pay to Lender an extension fee in the amount of $517,500.00; and

(h)     The CONH Requirement (as defined in the Ground Lease) shall have been satisfied, as documented by evidence reasonably satisfactory to Administrative Agent.

(ii)     Extended Maturity Date 2.  Borrower shall have the option to extend the term of the Loan from the Extended Maturity Date 1 to the Extended Maturity Date 2, upon satisfaction of each of the following conditions precedent:

(a)     Borrower shall have timely and properly exercised the First Option to Extend, pursuant to paragraph 2.7(i) above;

(b)     Borrower shall provide Administrative Agent with written notice (which notice shall be revocable until thirty (30) days prior to the Extended Maturity Date 1) by way of certified mail or overnight courier of Borrower's exercise of the second option to extend ("Second Option to Extend") not more than ninety (90) days but not less than thirty (30) days prior to the Extended Maturity Date 1 (and Administrative Agent agrees to advise Borrower if the conditions precedent have been satisfied within ten (10) Business Days after receipt of such notice);

(c)     As of the date of Borrower's delivery of notice of request to exercise the Second Option to Extend, and as of the Extended Maturity Date 1, no Event of Default shall have occurred and be continuing, and no Potential Event of Default shall exist, and Borrower shall so certify in writing;

(d)     Borrower shall execute or cause the execution of all documents reasonably required by Administrative Agent to exercise the Second Option to Extend and shall deliver to Administrative Agent, at Borrower's sole cost and expense, such title insurance endorsements to the Title Policy reasonably required by Administrative Agent;

(e)     There shall have occurred no material adverse change, as determined by Administrative Agent in its sole good faith discretion, in the financial condition of Borrower or any Guarantor or other person or entity in any manner obligated to Lender and/or Administrative Agent under the Loan Documents from that which existed on the Original Maturity Date;

(f)     At least 15 days before the Extended Maturity Date 1, Borrower shall pay to Lender a documentation fee in the amount of $14,975.00; and

(g)     At least 15 days before the Extended Maturity Date 1, Borrower shall pay to Lender an extension fee in the amount of $1,035,000.00.

Except as modified by the First Option to Extend and the Second Option to Extend, the terms and conditions of this Agreement and the other Loan Documents as modified and approved by Administrative Agent and Lenders shall remain unmodified and in full force and effect.

FF\12518702.7

## Article III
## CONDITIONS PRECEDENT

3.1    Initial Disbursement. Lenders' obligation to make the initial disbursement of the Loan is subject to Lenders' approval of the estimated closing statement prepared by the Title Insurer and the satisfaction of the following conditions precedent:

A.    Loan Documents.    Administrative Agent shall have received, in form and substance satisfactory to Administrative Agent, each of this Agreement, the Project Loan Agreement, the Building Loan Note, the Project Loan Note, the Building Loan Mortgage, the Project Loan Mortgage, the CM Assignment, the Architect Assignment, the Environmental Indemnity, the Guaranty, the Completion Guaranty, the Security Agreement and all other Loan Documents, each originally executed.

B.    Borrower and Sole Member.    Administrative Agent shall have received the following concerning Borrower and its members and indirect owners, in form and substance satisfactory to Administrative Agent:

(i)    With respect to Borrower, (i) a copy of Borrower's Operating Agreement certified to be true and complete by Borrower's Authorized Representative (which shall contain the Separateness Provisions); (ii) a copy of Borrower's Certificate of Formation and any amendments, certified by the Secretary of State of Borrower's State of formation; (iii) a recent good-standing certificate regarding Borrower issued by Borrower's State of formation, and if Borrower's State of formation is other than New York, a recent certificate confirming that Borrower is qualified to do business and in good standing in the State of New York; (iv) a certificate of Borrower's Authorized Representative, including a copy of resolutions, indicating that Borrower is duly authorized to execute and deliver the Loan Documents, complete the construction of the Project and perform its obligations under such Loan Documents; (v) a certificate with respect to the incumbency and a signature certificate setting forth the signatures of Borrower's Authorized Representative; and (vi) such other documents as Administrative Agent shall reasonably request with respect to Borrower's existence and authorization.

(ii)    With respect to Sole Member, (i) a copy of Sole Member's operating agreement certified to be true and complete by Sole Member's Authorized Representative; (ii) a copy of Sole Member's Certificate of Formation and any amendments, certified by the Secretary of State of Sole Member's State of formation; (iii) a recent good-standing certificate regarding Sole Member issued by Sole Member's State of formation, and if Sole Member's State of formation is other than New York, a recent certificate confirming that Sole Member is qualified to do business and in good standing in the State of New York; (iv) a certificate of Sole Member's Authorized Representative, including a copy of resolutions, indicating that Sole Member is duly authorized to execute and deliver the Loan Documents, complete the construction of the Improvements and perform its obligations under such Loan Documents; (v) a certificate with respect to the incumbency and a signature certificate setting forth the signatures of Sole Member's Authorized Representative; and (vi) such other documents as Administrative Agent shall reasonably request with respect to Sole Member's existence and authorization.

13

C.    The Property and Construction of the Improvements. If checked in the following paragraphs, and if applicable, Administrative Agent shall have received the following items or the following conditions shall have been satisfied concerning the Property and the construction of the Improvements, in form and substance satisfactory to Administrative Agent.

(a)    ☒    A 2006 ALTA Policy of Title Insurance with Extended Coverage with such endorsements as Administrative Agent may require (the "Title Policy"), issued by the Title Insurer, showing the Building Loan Mortgage to be a first-priority lien upon the Property in an amount at least equal to the Building Loan, free and clear of all liens, encumbrances, conditions, restrictions and other exceptions to title except for those approved by Administrative Agent, and containing a pending disbursements clause;

(b)    ☒    an appraisal by Administrative Agent's appraiser or an appraiser engaged by Administrative Agent showing the current value of the Property and the value of the Property with the completed Project in an amount satisfactory to Administrative Agent;

(c)    ☒    a survey by a licensed surveyor satisfactory to and certified to Administrative Agent;

(d)    ☒    copies of all of the Contracts, including the Architect's Contract and the Construction Management Agreement, together with a Certificate of Architect in the form attached to the Architect Assignment, signed by the Architect; a Certificate of Construction Manager in the form attached to the CM Assignment signed by the Construction Manager; and such other certificates and consents signed by such other Contractors as Administrative Agent shall request;

(e)    ☒    the Project Cost Breakdown, including, without limitation, the Trade Schedule Breakdown and the Schedule of Other Costs of Improvement;

(f)    ☒    the Preliminary Drawings;

(g)    ☒    a certificate executed by Borrower's Authorized Representative setting forth (i) all Permits necessary for the construction of the Improvements, operation and maintenance of the Project and otherwise to perform Borrower's obligations under the Loan Documents and (ii) the dates on which the Permits which have been obtained were obtained and the date Borrower expects to obtain each Permit which has not been obtained, together with copies of all Permits already obtained;

(h)    ☒    the Environmental Report and any other initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with any governmental agency in connection with the Property, the Improvements or the Project;

(i)    ☐    soils and geological reports and test results by a soils engineer satisfactory to Lenders, including evidence that the Plans and Specifications conform to the recommendations of such engineer;

(j)    ☒    the Environmental Report;

14

FF\12518702.7

(k)   ☐   a report prepared by an engineer satisfactory to Administrative Agent on the design and specifications of the Improvements reviewing the degree of probable damage from earthquake;

(l)   ☒   evidence that the Project, the construction of the Improvements and the Property with the completed Improvements complies or will comply with all Property Laws;

(m)   ☒   evidence that the insurance required by Section 2.11 of the Mortgage is in effect; and

(n)   ☒   a construction schedule showing the estimated commencement and completion of construction for each stage of the Improvements (the "Construction Schedule").

D.   Representations and Warranties.   All of Borrower's representations and warranties contained in this Agreement are true and correct in all material respects.

E.   Other Conditions Precedent.   If checked in the following sections, and if applicable, Administrative Agent shall have received the following, in form and substance satisfactory to Administrative Agent:

(i)   ☒   the results of a search of the New York Secretary of State's UCC records concerning Borrower, Sole Member and the Guarantor;

(ii)   ☒   the results of a search of the UCC Records with respect to Borrower and Sole Member from the Secretary of State of Borrower's and Sole Member's State of formation, if other than New York;

(iii)   ☒   such financial statements concerning Borrower and the Guarantor as Administrative Agent shall require;

(iv)   ☒   an opinion of counsel to Borrower, Sole Member and the Guarantor satisfactory to Administrative Agent concerning the existence and power of Borrower, and the Sole Member, the due authorization, execution, delivery and enforceability of the Loan Documents and such other matters as Administrative Agent shall require;

(v)   ☒   evidence that Borrower has paid not less than $22,593,000.00 (the "Equity Requirement") of Project Costs from its own funds and the Loan is In-Balance;

(vi)   ☒   payment of the Origination Fee to Lender and the payment of all of Lender's fees, including, without limitation the following:

(1)   $12,500.00 appraisal fee;

(2)   $1,495.00 environmental review fee;

(3)   $100,000.00 in house valuation fee;

15

> (4)   $75,000.00 drawing/cost review fee;
>
> (5)   $2,500.00 insurance review fee;
>
> (6)   $125,000.00 reimbursement for Lender's legal fees;
>
> (7)   $25,000.00 ground lease review fee;
>
> (8)   $2,435.00 background credit fee; and
>
> (9)   $1,600.00 zoning report fee.

(vii)   ☒   payment of $1,035,000.00 to Meridian Capital, as broker origination fee;

(viii)   ☒   payment of escrow and title insurance costs;

(ix)   ☒   payment of mortgage recording fees and taxes; and

(x)   ☒   such other documents, agreements, certificates and assurances as Lender shall require.

3.2   Subsequent Disbursements.

Lenders' obligation to make any disbursements (other than the initial disbursement) of the Loan shall be subject to the satisfaction of the following conditions precedent:

(a)   There shall exist no Event of Default or Potential Event of Default under this Agreement or any of the Loan Documents.

(b)   The Loan is In-Balance pursuant to Section 5.7 below.

(c)   The Title Company shall have issued (i) a written continuation of title showing title to the Property to be vested in the Borrower and no exceptions to title other than the Permitted Encumbrances, and (ii) a written commitment to insure the priority of the lien of the Building Loan Mortgage, subject only to the Permitted Encumbrances and any other excepts approved by Administrative Agent in writing for an amount equal to the full amount of each advance of the Loan and all previous advances of the Loan made by the Lenders to the Borrower pursuant to this Agreement. If required by Administrative Agent, such continuations of title shall contain affirmative insurance that covenants and restrictions, if any, reported against the Property have not been violated by the Improvements.

(d)   There shall have occurred no material adverse change in the condition of Borrower, any Guarantor, the General Contractor or with respect to the Project, and no event shall have occurred which will give Lenders reasonable cause to believe that the construction of the Improvements cannot be completed by the Completion Date in accordance with the Plans and Specifications and the terms of this Agreement.

16

FF\12518702.7

(e)     The Property shall not have been materially injured or damaged by fire or other casualty, or, in the event of such damage, Borrower shall have satisfied all of the conditions, if any, and its obligations under Section 2.12 of the Mortgage;

(f)     All representations and warranties contained in this Agreement are true and correct in all material respects (but qualified so as to reflect any changes in fact that have occurred since the date of when such representation or warranty was last made and not otherwise in violation of the terms of the Loan Documents, provided that such qualification does not show a material adverse change in the condition of Borrower, any Guarantor or with respect to the Project); and

(g)     The conditions to disbursements set forth in Article V hereof shall have been satisfied.

<h3 style="text-align:center">Article IV<br>BORROWER'S ACCOUNT</h3>

The Loan Proceeds, and, if applicable, any sums in any other accounts referenced in this Agreement (to the extent that Administrative Agent has control over disbursement from such account) (the "Controlled Accounts"), when qualified for disbursement, shall be deposited into the Borrower's Account or otherwise disbursed to or for the benefit or account of Borrower in accordance with the Loan Documents.  As additional security for Borrower's performance under the Loan Documents, Borrower hereby irrevocably pledges and assigns to Administrative Agent for the benefit of all Lenders the Borrower Account and all monies at any time deposited in the Borrower Account.  Borrower shall not, without obtaining the prior written consent of Administrative Agent, further pledge, assign or grant any security interest in the Borrower's Account, or any funds on deposit in the Borrower's Account, or permit any lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements to be filed thereon, except those naming Administrative Agent for the benefit of all Lenders as the secured party, to be filed with respect thereto.  This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC.  Borrower shall deliver to Administrative Agent within thirty (30) days of the date of this Agreement a control agreement, in form and substance satisfactory to Administrative Agent, executed by Borrower, the Account Bank and Administrative Agent, to perfect Administrative Agent's security interest in the Account.

<h3 style="text-align:center">Article V<br>DISBURSEMENTS</h3>

5.1     Disbursements

(a)     Lenders shall disburse (i) first, Borrower's Funds and any other amounts deposited with Administrative Agent pursuant to Section 5.7 to put the Loan "In Balance," and (ii) second, after the foregoing amounts are disbursed, the Loan Proceeds to or for the account of Borrower at such times (but no more frequently than once every fourteen (14) Business Days) as Borrower may request and in accordance with the terms and conditions of this Agreement. Lenders shall disburse Loan Proceeds not later than ten (10) Business Days after Borrower has submitted and Administrative Agent has received the request for advance, and has satisfied all of

17

the conditions precedent to such disbursement as required pursuant to the applicable provisions of Article III and/or this Article V.

(b)     Each request for disbursement shall be subject to an administrative fee of $5,000.00, which shall be paid by the Borrower to Administrative Agent, and not from the Loan Proceeds (provided, that if there is a specific line item for the administrative fee to be funded out of Loan Proceeds in the Cost Breakdown, then the administrative fee may be paid from Loan Proceeds);

(c)     Each disbursement shall be made on a line item basis for costs set forth in the Building Loan Cost Breakdown based upon the percentage completion of such line item, as reasonably determined by Administrative Agent. No Loan Proceeds will be disbursed for any line item in the Building Loan Cost Breakdown in excess of the amount allocated to that line item. Notwithstanding the foregoing, if there is a savings in a particular line item set forth in the Trade Breakdown Schedule or in the Schedule of Other Costs of Improvement, and if such savings is substantiated by evidence satisfactory to the Administrative Agent, the Borrower shall have the right, upon prior approval of the Administrative Agent, to reallocate such savings to other line items in the Trade Breakdown Schedule and the Schedule of Other Costs of Improvement with respect to which additional costs have been incurred unless, in the reasonable opinion of the Administrative Agent, its counsel or the Title Company, such reallocation would adversely affect or impair in any manner whatsoever the lien or priority of lien of the Building Loan Mortgage. No reallocations between line items shall be permitted without the Administrative Agent's prior written consent, which may be granted or withheld in Administrative Agent's sole good faith discretion. If a particular line item is 100% complete and after payment of all costs for such line item excess funds remain in such line item, Borrower may draw down such excess to pay costs under other line items, provided that Administrative Agent is satisfied that such draw down is permitted pursuant to the Lien Law.

(d)     Lenders shall not withhold any retainages with respect to disbursements made hereunder. In no event will disbursements include costs covered by a prior disbursement.

5.2     <u>Conditions to Initial Disbursement</u>. Lenders shall make an initial disbursement of the Building Loan upon the satisfaction of the conditions precedent set forth in this Article V and in Section 3.1 above in the amount set forth in the estimated closing statement, as prepared by the Title Insurer.

5.3     <u>Conditions to Disbursement of Direct Construction Costs</u>. Lenders shall make each disbursement of the Loan to pay for Direct Construction Costs upon the satisfaction of the following conditions, if checked in the following sections, in form and substance satisfactory to Administrative Agent:

(a)     ☒     Borrower shall have delivered to Administrative Agent a completed application for disbursement on AIA form G-702, signed by the Borrower, the Architect (if required by Administrative Agent), and the Construction Manager, together with all of the following, not less than ten (10) Business Days before the date on which Borrower requests the disbursement to be made:

18

(i)　☐　if required by Administrative Agent, completed checks payable to the Construction Manager or other Contractors;

(ii)　☒　if required by Administrative Agent, executed copies of all Contracts not previously delivered to and approved by Administrative Agent, which Administrative Agent shall have approved;

(iii)　☒　a report signed by the Architect, the Construction Manager or such other Person as Administrative Agent shall determine showing the estimated percentage of completion of each item or element of the Project and corresponding figures showing the percentage of the amount of the line item of the Building Loan Cost Breakdown expended on such item or element of the Project;

(iv)　☒　conditional lien releases to a current date from all Contractors and other persons entitled to record a valid lien or serve a valid stop notice who will be paid from the current disbursement and unconditional lien releases from all Contractors and other persons entitled to record a valid lien or serve a valid stop notice who have been paid from prior disbursements;

(v)　☒　if required by Administrative Agent, invoices in form and substance satisfactory to Administrative Agent completed by the Contractors who have supplied labor or material to the Project and are entitled to be paid from the requested disbursement, together with appropriate certifications of delivery of materials to the jobsite (if applicable); and

(vi)　☒　copies of any other documents or items which, Administrative Agent, in its good faith judgment, deems reasonably necessary and appropriate;

(b)　☒　Administrative Agent shall have received evidence satisfactory to Administrative Agent that all Permits required in connection with the work for which the disbursement is sought have been issued;

(c)　☐　at such time as foundations are completed, Administrative Agent shall have received a survey as required by Section 8.8(b) hereof, and if required by Administrative Agent, a certificate from the Architect acceptable to Administrative Agent certifying that the foundations have been constructed in conformity with all recommendations of the soils report approved by Administrative Agent;

(d)　☒　an ALTA endorsement to the Title Policy required pursuant to Section 3.2(c) above and such other endorsements to the Title Policy satisfactory to Administrative Agent as the Administrative Agent may, in its reasonable discretion, determine are necessary;

(e)　☒　Administrative Agent or a consultant retained by Administrative Agent shall have inspected the Project and provided to Administrative Agent a report verifying that (i) the Improvements are being constructed substantially in accordance with the Plans and Specifications, the Building Loan Cost Breakdown, all Permits and all requirements and recommendations of any engineers, consultants and governmental entities; (ii) the materials and labor being paid for with the proceeds of the disbursement of the Loan being requested have

19

FF\12518702.7

been incorporated into the Project or rendered in connection with the Project, respectively; (iii) the Loan is In-Balance; and (iv) the statements of Borrower, the Architect, the Construction Manager and any other person signing the application for disbursement are true.

5.4 <u>Conditions to Disbursement of Other Costs of Improvement</u>. Subject to the satisfaction of the conditions precedent set forth in Section 3.2, Lenders shall make each disbursement of the Loan to pay for Other Costs of Improvement upon Borrower's written request accompanied by invoices, statements or such other evidence that Borrower has duly incurred the cost requested to be disbursed as Administrative Agent shall request, together with an endorsement to the Title Policy as provided in Section 5.3(d), and such other conditions set forth in Section 5.3(a) as Administrative Agent shall request.

5.5 <u>Conditions to Disbursements of Developer Fees</u>. Subject to the satisfaction of the conditions precedent set forth in Section 3.1, notwithstanding other provisions of this Article V, at Administrative Agent's sole option, Loan Proceeds in the amount of $2,700,000.00 for developer fees shall be disbursed at Closing.

5.6 <u>Stored Materials</u>. Notwithstanding the other provisions of this Article V, Administrative Agent shall have the right to determine in its sole discretion whether to make disbursements of Loan Proceeds for materials to be purchased by Borrower or any Contractor employed in connection with the construction of the Project at the date of a request for disbursement but not yet incorporated (and which will not be incorporated within 60 days thereafter) into the Improvements. Any disbursements for such materials shall be subject to the following further conditions: (a) Administrative Agent on behalf of Lenders has a valid, perfected first-priority security interest in all such materials; (b) the insurance policies required in the Mortgage cover such materials; (c) such materials are stored at the Property, in a secure or bonded warehouse located in the State in which the Property is situated and readily accessible for inspection and access by Administrative Agent or in another location and protected against theft or damage by means approved by Administrative Agent; and (d) title to such materials has passed (or upon the payment of the costs thereof with the proceeds of such disbursement will pass) to Borrower free and clear of all liens, claims, security interests or encumbrances other than Administrative Agent's security interest in such materials. Borrower's and Lenders' interest shall otherwise be fully protected including the provision of applicable insurance and transportation to the Property for those materials and equipment stored off the Property.

5.7 <u>In-Balance</u>. If at any time the Loan is not In-Balance, Lenders shall not be required to make further disbursements of the Loan under this Agreement unless and until each of the following have been satisfied in Administrative Agent's discretion:

(a) Borrower shall have either (i) paid from its own funds sufficient costs of construction so that the Loan is In-Balance or (ii) deposited with Administrative Agent into the Borrower's Funds Account in cash the amount necessary to put the Loan "In Balance." No interest shall be paid by Administrative Agent on amounts deposited with Administrative Agent pursuant to this Section 5.7;

(b) If Borrower has chosen to pay from its own funds sufficient costs of construction so that the Loan is In-Balance, Borrower shall have delivered to Administrative

Agent a description of the work paid for by Borrower out of its own funds, together with copies of the invoices paid by Borrower; and

   (c)  If Borrower has chosen to pay from its own funds sufficient costs of construction so that the Loan is In-Balance, Borrower shall have delivered to Administrative Agent unconditional lien releases from all Contractors and other persons entitled to record a valid lien or serve a valid stop notice who were paid by Borrower.

   Borrower's failure to cause the Loan to be In-Balance within 30 days of Borrower's receipt of written notice from Administrative Agent that the Loan is not In-Balance shall constitute an Event of Default.

   5.8 Persons to Whom Disbursements Made. At Administrative Agent's option, disbursements of the Loan may be made to Borrower or for Borrower's account to the Person to whom Borrower is obligated with respect to the amount being disbursed.

   5.9 The Loan Administrator. At Borrower's sole cost and expense (not to exceed $10,000.00 per month), at all times while the Project is being constructed, Administrative Agent may retain a construction loan administrator to administer this Agreement, determine Borrower's satisfaction of the conditions precedent for any disbursement, coordinate disbursements of the Loan and perform such other services as Administrative Agent may desire.

   5.10 Lenders' Verification. Any of the items required to be delivered by Borrower to Lenders and/or Administrative Agent in connection with this Agreement may be verified by the Administrative Agent, or an agent designated by Administrative Agent by, amongst other things, inspection of the construction of the Improvements or such other investigation as Administrative Agent, or any such agent may deem necessary or desirable; it being understood, however, that any inspections or approvals shall be for Lenders' sole benefit, and shall in no way abrogate or modify in any manner the effect of any certifications made by Borrower pursuant to this Article V or Borrower's representations and warranties made pursuant to Article VI below.

   5.11 Lender's Discretion. Lenders will not be required to make disbursements of the Loan for any portion of the Improvements if any inspection performed by Administrative Agent or its representative respecting such portion of the Improvements discloses any material state of facts reasonably objectionable to Lenders.

   5.12 Tenant Finish Line Item. A portion of the Loan in the amount of $10,000,000.00 (the "Tenant Finish Line Item") has been allocated by Administrative Agent and Borrower for disbursement in connection with Direct Construction Costs incurred by Borrower in the construction of tenant finish work under executed and delivered leases of commercial space in the Improvements (the "Tenant Finish Work"). Administrative Agent shall make disbursement from the Tenant Finish Line Item to pay for Direct Construction Costs actually incurred by Borrower for Tenant Finish Work, provided that (A) other than with respect to the first $5,000,000.00 of proceeds advanced from the Tenant Finish Line Item, the Tenant Finish Work is being done under executed and delivered leases of commercial space in the Improvements which are in full force and effect and have otherwise been entered into in accordance with the provisions of this Agreement and the provisions of the Mortgage, (B) the Tenant Finish Work is

being done to building standards, as accepted by Administrative Agent, or better and otherwise pursuant to plans and specifications which have been accepted in all respects by Administrative Agent, the tenant under the lease pursuant to which the same are being made, and, to the extent required by law, have been approved by all appropriate governmental authorities, (C) all required permits, licenses and approvals, if any, required for the construction of such Tenant Finish Work have been issued by or obtained from the appropriate governmental authorities, and (D) the aggregate disbursements for Tenant Finish Work shall in no event exceed the actual Direct Construction Costs incurred by Borrower in the construction of the Tenant Finish Work, as substantiated by evidence satisfactory to Administrative Agent.  The funds available in the Tenant Finish Line Item shall not be disbursed for anything other than Tenant Finish Work unless Administrative Agent shall otherwise agree to the contrary in its sole and absolute discretion.

## Article VI
## REPRESENTATIONS AND WARRANTIES

Borrower makes the representations and warranties set forth in this Article VI to Lenders.

6.1     Existence.  Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business and is in good standing under the laws of the State of New York.  Sole Member is a limited liability company duly organized validly existing and in good standing under the laws of the State of Delaware, and is duly qualified to do business and is in good standing under the laws of the State of New York.

6.2     Intentionally omitted.

6.3     Borrower and Sole Member Formation and Organizational Documents.  Borrower has delivered to Administrative Agent all of the relevant formation and organizational documents of Borrower and Sole Member (and the partners, members, managers or joint venturers of Borrower and Sole Member).  Borrower hereby certifies that: (i) the above documents are all of the relevant formation and organizational documents of Borrower and Sole Member; (ii) they remain in full force and effect; and (iii) they have not been amended or modified since they were delivered to Administrative Agent.  Borrower shall promptly provide Administrative Agent with copies of any future amendments or modifications of the formation or organizational documents of Borrower and Sole Member.

6.4     Power.  Borrower has all necessary limited liability company power to enter into the Loan Documents to which it is a party, complete the construction of the Project and perform its obligations under such Loan Documents.

6.5     Enforceability of Loan Documents.  Borrower and Sole Member have taken all action necessary to authorize the execution, delivery and performance of the Loan Documents.  All consents of the members and managers of Borrower necessary to authorize Borrower to enter into the Loan Documents have been obtained.  The Loan Documents have been duly executed and delivered by Borrower and Sole Member and are the legal, valid and binding obligations of

22

Borrower and Sole Member, enforceable against Borrower and Sole Member respectively in accordance with their respective terms.

6.6     Enforceability of Guaranty.  The Guaranty and the Completion Guaranty have been duly executed and delivered by Guarantor and constitute the legal valid and binding obligations of Guarantor enforceable against Guarantor in accordance with their respective terms.

6.7     Approvals.  (a) Borrower either (i) has obtained all Permits necessary for the construction of the Project or (ii) will be able to obtain all such Permits so necessary at the times needed to permit timely completion of the Project; and (b) no authorization or approval or other action by, and no notice to or filing with any governmental authority or regulatory body is required for the due execution, delivery and performance by Borrower of the Loan Documents to which it is a party.

6.8     No Conflict.  Borrower's execution and delivery of, and its performance of its obligations under, the Loan Documents to which it is a party do and will not conflict with (a) any (i) contractual or legal restriction or obligation, or (ii) court or regulatory order, binding on or affecting Borrower, or (b) any restriction contained in any of Borrower's constituent or governing documents.

6.9     Pending Litigation or Other Proceedings.  There is no pending or, to the knowledge of Borrower, threatened (in writing) action, proceeding or investigation before any court, governmental agency or arbitrator against or affecting Borrower, the Property or any of Borrower's other assets which, if decided adversely to Borrower, would materially and adversely affect the financial condition of Borrower or of any of Borrower's assets, including, without limitation, the Property, or would materially and adversely affect the present or future ability of Borrower to perform its obligations under the Loan Documents to which it is a party.

6.10     Solvency.  Borrower is not insolvent and will not be rendered insolvent by the transactions contemplated by the Loan Documents.  After giving effect to such transactions, Borrower will not be left with an unreasonably small amount of capital with which to engage in its business or undertakings, nor will Borrower have intended to incur, or believe that it has incurred, debts beyond its ability to pay such debts as they mature.

6.11     No Liens.  There are no liens or encumbrances upon or with respect to the Property except the liens and encumbrances shown on the Title Policy (such liens and encumbrances, together with any other encumbrances entered into in accordance with the terms of the Loan Documents from time to time collectively, the "Permitted Encumbrances").

6.12     Title.  Borrower has good, marketable and indefeasible title to its leasehold and/or subleasehold interests in the Property, as applicable, free and clear of all material encumbrances except the Permitted Encumbrances.  The Building Loan Mortgage, when properly recorded in the Office of the Register of the City of New York, New York County, will create, (a) a valid, perfected first-priority lien on Borrower's leasehold and/or subleasehold interest, as applicable, in the "Real Property" (as defined in the Building Loan Mortgage"), subject only to the Permitted Encumbrances, and (b) together with the Uniform Commercial Code financing

23

statement, when properly filed with the New York and Delaware Secretary of State, will create, respectively, a valid, perfected first-priority security interest in the "Personal Property" (as defined in the Mortgage) to the extent such a lien may be perfected by such a filing, subject only to the Permitted Encumbrances. Except for any Permitted Encumbrance or any lien which has been "insured over" to the satisfaction of Administrative Agent, there are no liens or claims for work, labor or materials affecting the Property. The Permitted Encumbrances do not materially adversely impair Borrower's current use and operation of any of the Property or otherwise materially adversely impair Borrower's ability to perform any of its obligations under the Loan Documents.

6.13   Taxes. Borrower has paid and discharged all installments for the payment of "Impositions" (as defined in the Mortgage) due to date, and all other material taxes, levies, maintenance charges, utilities charges or any other governmental or private assessment or charge, imposed against, affecting or relating to the Property other than those which have not become due and payable, together with any fine, penalty, interest or cost for non-payment pursuant to such returns or pursuant to any assessments received by it.

6.14   Property Laws. The Property complies in all material respects with all Property Laws now affecting the Property. Borrower has not received any written notification or threat of any actions or proceedings regarding the noncompliance or nonconformity of the Property with Property Laws or Permits, nor is Borrower otherwise aware of any such pending actions or proceedings.

6.15   Compliance with Laws; Use. Borrower has, and at all times shall have obtained, all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market the Property and Improvements as and to the extent then required and shall maintain compliance with all governmental requirements applicable to the Property and Improvements and all other applicable statutes, laws, regulations and ordinances necessary for the transaction of its business. The Property is a separate legal parcel lawfully created in full compliance with all subdivision laws and ordinances, and is properly zoned for the Project. The contemplated Project may be constructed as of right.

6.16   Loan Proceeds and Adequacy. The undisbursed amount of the Loan, together with all other sums, if any, to be provided by Borrower of the Ground Lessor in the Building Loan Cost Breakdown, are sufficient to construct the Project in accordance with the terms and conditions of this Agreement.

6.17   Americans with Disabilities Act Compliance. The Improvements have been designed and shall be constructed and completed, and thereafter maintained in full and strict compliance with the requirements and regulations of the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et seq., as the same shall have been or shall be amended from time to time (the "ADA"). At Administrative Agent's written request from time to time, Borrower shall provide Administrative Agent with written evidence of such compliance satisfactory to Administrative Agent. Borrower shall be solely responsible for all costs of compliance with the ADA and reporting with respect thereto.

24

6.18    Tax Liability. Borrower has filed (subject to permitted extensions) all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

6.19    Liability for Hazardous Materials. Borrower has no liability, contingent or otherwise, under any Hazardous Materials Law or with respect to any activity involving Hazardous Materials on or about the Property.

6.20    Hazardous Materials Activity. Other than as disclosed to Administrative Agent pursuant to the Environmental Report, there exists no activity involving Hazardous Materials on or about the Property in violation of any Hazardous Materials Law and Borrower has not caused or, to the knowledge of Borrower, permitted to occur any condition which could reasonably be expected to cause a release of any Hazardous Materials in violation of any Hazardous Materials Law on or about the Property.

6.21    Hazardous Materials Laws. Neither Borrower nor, to the knowledge of Borrower, any other party, has been or is involved in operations at the Property which could reasonably be expected to lead to (i) the imposition of liability on Borrower under any Hazardous Materials Law, or on any subsequent or former owner of the Property, or (ii) the creation of a lien on the Property under any Hazardous Material Law. Borrower has not permitted any tenant or occupant of the Property to engage in any activity that could reasonably be expected to impose a claim or liability under any Hazardous Material Law on such tenant or occupant, on Borrower or on any other subsequent or former owner of the Property.

6.22    No Option or Other Rights. No option to purchase, right of first refusal or similar right exists with respect to the Property other than as set forth in the Ground Lease and the Sublease.

6.23    Insurance. Borrower has complied with all of the requirements of Section 2.11 of the Mortgage with respect to insurance.

6.24    Intentionally Omitted.

6.25    Independent Parcel. (a) The Property is an independent parcel which does not rely on any drainage, sewer, access, parking, structural or other facilities located on any property not included in the Property or on public or utility easements for the fulfillment of any zoning, building code or other requirement of any governmental authority that has jurisdiction over the Property; (b) Borrower, directly or indirectly, has the right to use all amenities, easements, public or private utilities, parking, access routes or other items necessary or currently used for the construction of the Improvements and the operation of the Property; (c) all public utilities are available at the boundaries of the Property in sufficient quantities to support the ordinary use of the Improvements as they are contemplated by the Plans and Specifications; and (d) the Property is either (i) contiguous to or (ii) benefits from an irrevocable unsubordinated easement permitting access from the Property to a physically open, dedicated public street, and has all necessary permits for ingress and egress. No building or other improvement not located on the Property relies on any part of the Property to fulfill any zoning requirements, building code or other

governmental or municipal requirements for structural support or to furnish to such building or improvement any essential building systems or utilities.

6.26 No Contractual Defaults. There are no material defaults by Borrower under any material contract to which Borrower is a party relating to the Property, including, without limitation, any management, rental, service, supply, security, maintenance or similar contract. Borrower has not received written notice of any existing circumstances in respect of which it could receive any notice of default or breach in respect of any material contracts affecting or concerning the Property.

6.27 Intentionally omitted.

6.28 Financial Position. The financial statements and all financial data delivered to Lenders relating to Borrower and the Guarantor are true, correct and complete in all material respects. Such financial statements fairly present the financial position of the parties who are their subjects as of the dates indicated. No material adverse change has occurred in such financial position since the date of such financial statements, and, except for the Loan, Borrower has incurred no indebtedness since the date of any such statements.

6.29 Disclosure. None of Borrower's representations or warranties contained in this Agreement or any other document, certificate or written statement furnished to Lenders by or on behalf of Borrower contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in this Agreement or in such other document, certificate or written statement (when taken in their entirety) not misleading. There is no fact known to Borrower which materially or adversely affects the business, operations, assets or condition (financial or otherwise) of Borrower or the Property which has not been disclosed in this Agreement or in another written statement delivered to Administrative Agent by Borrower.

6.30 Commencement of Work on the Property. Prior to the Effective Date, neither Borrower nor anyone else on Borrower's behalf has commenced construction of the Improvements or brought upon the Property any materials to be incorporated into the Improvements.

6.31 Building Loan Cost Breakdown and Construction Schedule. The Project Cost Breakdown sets forth Borrower's good faith estimates of the amounts necessary (i) to pay all costs to be incurred in connection with the construction of the Improvements and the completion of the Project as contemplated by this Agreement, (ii) to pay all sums which may accrue under the Loan Documents prior to repayment of the Loan, including interest on the Loan, and (iii) to enable Borrower to perform all of its covenants and obligations contained in the Loan Documents. The Construction Schedule sets forth Borrower's good faith estimate of the time in which the Project can reasonably be completed by the General Contractor and other Contractors working ordinary schedules with due consideration to prevailing conditions.

6.32 Patriot Act. Neither Borrower nor any Guarantor nor any of their subsidiaries or Affiliates is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act or any enabling legislation or executive order relating thereto. Neither Borrower, any Guarantor nor any of their subsidiaries or affiliates is in violation of

26

(a) the Trading with the Enemy Act, (b) any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the USA Patriot Act of 2001, 31 U.S.C. Section 5318, or any similar law, rule or regulation. None of Borrower, any Guarantor, or any of their subsidiaries or affiliates (i) is a blocked person described in Section 1 of Executive Order 13224 of the President of the United States or (ii) to the best of its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

6.33 <u>Contracts</u>. All Contracts entered into by Borrower as of the date of this Agreement have been duly authorized, executed and delivered by Borrower and are in full force and effect with no existing defaults thereunder.

Article VII

**SEPARATENESS PROVISIONS**

Borrower hereby represents, warrants and covenants to Administrative Agent and Lenders as follows:

7.1 <u>Limited Purpose</u>. The sole purpose to be conducted by Borrower since its organization is to engage in the following activities: (i) to acquire, own, hold, lease, operate, manage, maintain, develop and improve the Property and construct the Improvements; (ii) to enter into and perform its obligations under the Loan Documents and the Ground Lease; (iii) to sell, transfer, service, convey, dispose of, pledge, assign, borrow money against, finance, refinance or otherwise deal with the Property and Improvements to the extent permitted under the Loan Documents; and (iv) to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of New York that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above mentioned purposes.

7.2 <u>Limitations on Debt, Actions</u>. Notwithstanding anything to the contrary in the Loan Documents or in any other document governing the formation, management or operation of Borrower, Borrower shall not:

(a) guarantee any obligation of any person or entity, including any Affiliate, or become obligated for the debts of any other person or entity or hold out its credit as being available to pay the obligations of any other person or entity;

(b) engage, directly or indirectly, in any business other than as required or permitted to be performed under Section 7.1;

(c) incur, create or assume any indebtedness or liabilities other than:

(i) the Loan,

(ii) the Ground Lease,

(iii) the Sublease; and

27

FF\12518702.7

(iv)   trade debt incurred with respect to the construction of the Project and related activities required or permitted to be performed under Section 7.1;

(d)   make or permit to remain outstanding any loan or advance to, or own or acquire any stock or securities of, any person or entity;

(e)   to the fullest extent permitted by law, engage in any dissolution, liquidation, consolidation, merger, sale or Transfer of any of its assets outside the ordinary course of Borrower's business;

(f)   buy or hold evidence of indebtedness issued by any other person or entity (other than cash or investment-grade securities);

(g)   form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity;

(h)   own any asset or property other than the Property, Improvements and incidental personal property necessary for the ownership or operation of the Property and Improvements; or

(i)   take any Material Action without the unanimous written approval of all members of Borrower.

7.3   <u>Separateness Provisions</u>. In order to maintain its status as a separate entity and to avoid any confusion or potential consolidation with any affiliate, Borrower represents and warrants that in the conduct of its operations since its organization it has and will continue to observe the following covenants (collectively, the "Separateness Provisions"): (i) maintain books and records and bank accounts separate from those of any other person or entity; (ii) maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets; (iii) comply with all organizational formalities necessary to maintain its separate existence; (iv) hold itself out to creditors and the public as a legal entity separate and distinct from any other entity; (v) maintain separate financial statements, showing its assets and liabilities separate and apart from those of any other Person and not have its assets listed on any financial statement of any other person or entity except that Borrower's assets may be included in a consolidated financial statement of its' affiliate so long as appropriate notation is made on such consolidated financial statements to indicate the separateness of Borrower from such affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliate or any other person or entity; (vi) prepare and file its own tax returns separate from those of any person or entity to the extent required by applicable law, and pay any taxes required to be paid by applicable law; (vii) allocate and charge fairly and reasonably any common employee or overhead shared with affiliates; (vii) not enter into any transaction with any affiliate, except on an arm's-length basis on terms which are intrinsically fair and no less favorable than would be available for unaffiliated third parties, and pursuant to written, enforceable agreements; (ix) conduct business in its own name, and use separate stationery, invoices and checks bearing its own name; (x) not commingle its assets or funds with those of any other person or entity; (xi) not assume, guarantee or pay the debts or obligations of any other person or entity; (xii) correct any known misunderstanding as to its separate identity; (xiii) not

28

permit any affiliate to guarantee or pay its obligations (other than guarantees and indemnities pursuant to the Loan Documents, approved Contracts, the Ground Lease and the Sublease); (xiv) not make loans or advances to any other person or entity; (xv) pay its liabilities and expenses from its own funds (to the extent there exists sufficient cash flow from the Property to do so); (xvi) maintain a sufficient number of employees in light of its contemplated business operation and pay the salaries of its own employees, if any, only from its own funds (to the extent there exists sufficient cash flow from the Property to do so); (xvii) maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character in light of its contemplated business operations (to the extent there exists sufficient cash flow from the Property to do so); (xviii) cause to be maintained an independent member or manager as required by Administrative Agent until the Loan is repaid in full; and (xix) cause the managers, officers, employees, agents and other representatives of Borrower to act at all times with respect to Borrower consistently and in furtherance of the foregoing and in the best interests of Borrower. Failure of Borrower to comply with any of the covenants contained in this Section or any other covenants contained in this Agreement shall not affect the status of Borrower as a separate legal entity.

## Article VIII
## COVENANTS

8.1    Maintenance of Existence.  Borrower shall (and cause Sole Member to) maintain and preserve its respective existence and all rights and franchises material to its respective business.

8.2    Construction Period.  Borrower shall commence construction of the Project promptly following and in any event within 30 days from the date of this Agreement, and prosecute such construction with diligence and continuity in accordance with the Construction Schedule and the Plans and Specifications in a good and workmanlike manner.  The Improvements shall be completed substantially in accordance with the Plans and Specifications not later than the Completion Date.  Notwithstanding the foregoing, the Completion Date may be extended for a period equal to the period of delays caused by fire, earthquake, floods, inclement weather or other acts of God, acts of public enemies, riot, insurrection, governmental regulation of the sale of materials and supplies or the transportation thereof, lockouts, strikes directly affecting the work of construction, or shortages of material or labor resulting directly from governmental control or diversion, but in no event may the time for completion of the Improvements extend beyond 90 days after the Completion Date.

8.3    Contractors.

(a)    Borrower shall comply, in all material respects, with and use its commercially reasonable efforts to enforce all Contracts and shall not agree to any material alterations or amendments of any Contract (other than changes to account for modifications to the Plans and Specifications and/or the Cost Breakdown that have been made in accordance with the terms of this Agreement, non-material, administrative amendments and modifications and corrections of scrivener's errors, and such other alterations and amendments consented to by Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed), to

29

the end that all Contractors promptly and diligently perform all of the obligations on their part to be performed under their respective Contracts.

(b)      Borrower shall, at Administrative Agent's request, deliver to Administrative Agent financial statements with respect to Construction Manager and such major trade subcontractor as Administrative Agent shall designate; all of which shall be subject to Administrative Agent's good faith determination that the same are financially and otherwise qualified to perform the work or supply the materials which they are required, but Administrative Agent's failure to disapprove any such Contractor shall not constitute a warranty or representation by Administrative Agent or any Lender that any such Contractor not so disapproved is in fact so qualified.

(c)      If requested by Administrative Agent, Borrower shall from time to time provide to Administrative Agent copies of such Contracts as are entered into after the date of this Agreement as well as collateral assignments of Borrower's interests in such Contracts together with appropriate consents to such assignments by the Contractors which are parties to such Contracts which provide that such Contractors will provide for Lenders the services contracted to Borrower, notwithstanding the occurrence of an Event of Default or foreclosure of the Mortgage.

8.4      Approval of Changes in Plans and Specifications.

(a)      Borrower shall make no change in the Plans and Specifications without the prior written approval of Administrative Agent, given in Administrative Agent's sole discretion, if such change would (i) itself result in a cost increase in an amount greater than one percent (1%) of the Loan over the amount then set forth for such cost in the Building Loan Cost Breakdown, (ii) together with all previous changes, result in an aggregate cost increase in an amount greater than three percent (3%) of the Loan over the amounts set forth for the changed items in the Building Loan Cost Breakdown, (iii) affect the structural components of the Improvements or (iv) cause the estimated time to complete the Improvements to extend beyond the Completion Date.  The Plans and Specifications shall not be modified in any way which would detract from the value of the Project.  Required changes shall be submitted for approval on a form reasonably acceptable to Administrative Agent accompanied by a copy of the plans and specifications as changed.  Such changes must, prior to being effective, be duly approved by Administrative Agent and all other persons required by Administrative Agent.  Administrative Agent is under no duty to review, or inform Borrower of, the quality or suitability of the Plans and Specifications or any amendment or alteration to them.

(b)      As a condition to any such required approval, Administrative Agent may require, in its sole discretion, confirmation satisfactory to Administrative Agent that performance of the work contemplated under such change shall not increase the total cost of the Project beyond that set forth in the Building Loan Cost Breakdown; and if it appears that performance of such work shall result in such an increase, Administrative Agent may, in its sole discretion, condition its approval upon a deposit by Borrower of the amount of such increase in accordance with Section 5.7 above.

(c)      Borrower acknowledges that the process of obtaining the information and confirmation needed to put Administrative Agent in a position to approve changes in the Plans

30

and Specifications may cause delays, and Borrower consents to such delays and agrees to cooperate diligently with Administrative Agent in the gathering of the information required. All Contracts entered into by Borrower shall, to the extent reasonably possible, contain provisions implementing the provisions of this Section 8.4.

(d)    Upon completion of the Project, Borrower shall deliver to Administrative Agent a complete set of "as built" working drawings and an improvements survey showing the location of the Improvements on the Property and such additional information as Administrative Agent shall reasonably require.

8.5    Purchase of Materials under Conditional Sales Contract.    No materials, equipment, fixtures or any other part of the Improvements, or articles of personal property placed in the Improvements, shall be purchased or installed under any security agreement or other arrangements in which the seller reserves or purports to reserve a security interest in any such items or the right to remove or to repossess any such items or to consider them personal property after their incorporation in the work of construction, other than pursuant to customary equipment leases made in the ordinary course of Borrower's business, unless authorized by Administrative Agent in writing.

8.6    Compliance with Applicable Laws.    All work on the Improvements shall be performed in strict compliance with all applicable laws, including, without limitation, the Permits and Property Laws.

8.7    Assessments and Improvement Districts.    Without Administrative Agent's prior written consent, Borrower shall not cause or otherwise consent to the formation of any assessment district, improvement district, community facilities district, special district, special improvement district, governmental district or other similar district   (any of the foregoing hereinafter referred to as a "District"); nor shall Borrower cause or otherwise consent to the levying of special taxes or assessments against the Property and Improvements by any such District. Borrower shall immediately give notice to Administrative Agent of any notification or advice that Borrower may receive from any municipality or other third party of any intent or proposal to include the Property and Improvements in any District or to levy any such special taxes or assessments. Administrative Agent shall have the right to file a written objection to the inclusion of all or any part of the Property and Improvements in any District, or to the levy of any such special taxes or assessments, either in its own name or in the name of Borrower, and to appear at, and participate in, any hearing with respect to the formation of any such District or the levy or such special taxes or assessments.

8.8    Intentionally Omitted.

8.9    Liens and Stop Payment Notices.    If a claim of lien is filed which affects the Property or Improvements, Borrower shall, within forty-five (45) calendar days after notice of the filing of such lien to Borrower from whatever source derived:  (a) pay and discharge the claim of lien or bonded stop payment notice; (b) effect the release thereof by recording or delivering to Administrative Agent a surety bond in sufficient form and amount; or (c) provide Administrative Agent with other assurances which Administrative Agent deems, in its sole discretion, to be satisfactory for the payment of such claim of lien or bonded stop payment notice

31

and for the full and continuous protection of Administrative Agent and Lenders from the effect of such lien or bonded stop payment notice.

8.10    Inspection.   Administrative Agent, through its officers, agents and contractors, shall have the right at all reasonable times at Borrower's expense:

(a)    To enter upon the Property and inspect the work of construction to determine that such work is in conformity with the Plans and Specifications and all the requirements of this Agreement; and

(b)    To examine, copy and make extracts of, the books, records, accounting data and other documents, including but not limited to all permits, licenses, consents and approvals of all governmental authorities having jurisdiction over Borrower, the Improvements or the Property, and all Contractors. Such books, records and documents shall be made available to Administrative Agent promptly upon written request.

Borrower acknowledges that Lenders and Administrative Agent are under no duty to supervise or to inspect the work of construction or any books and records, and that any such inspection is for the sole purpose of preserving the rights of Administrative Agent and Lenders under this Agreement. A failure to inspect the work shall not constitute a waiver of any of the rights of Administrative Agent or any Lender rights under this Agreement. Inspection not followed by notice of default shall not constitute a waiver of any Potential Event of Default or Event of Default then existing; nor shall it constitute an acknowledgement that there has been or will be compliance with the Plans and Specifications or that the construction is free from defective materials or workmanship.

8.11    Intentionally Omitted.

8.12    Changes to Construction Schedule.    Borrower may change the Construction Schedule, so long as such change does not change the Completion Date. If Borrower so changes the Construction Schedule, Borrower shall submit to Administrative Agent a revised Construction Schedule.

8.13    Changes to Project Cost Breakdown. If Borrower desires a change in the nature, type or amount of Project Costs that are currently estimated in the Project Cost Breakdown, Borrower shall submit to Administrative Agent a revised Project Cost Breakdown setting forth its good faith revised estimate of Project Costs, on a line item basis, and their source of payment. Such revised Building Loan Cost Breakdown must be approved by Administrative Agent before the revised Project Cost Breakdown replaces the then current Project Cost Breakdown. Borrower shall execute and deliver any amendment to this Agreement as may be necessary or desirable in the opinion of Administrative Agent or pursuant to the Lien Law to maintain, perfect or insure Lenders' and Administrative Agent's security provided for in this Agreement in connection with any such revised Project Cost Breakdown. Borrower shall pay all filing and other fees and expenses (including reasonable attorneys' fees) incurred by Administrative Agent and Lenders in connection with such action. Administrative Agent shall charge a fee of $14,875.00 for reviewing such revised Project Cost Breakdown after the delivery of the Final Plans and Specifications.

FF\12518702.7

8.14    Distributions.  Upon the occurrence and during the continuance of an Event of Default, Borrower shall not make any distributions of its assets to any member of Borrower, whether or not such a distribution is permitted under the terms of Borrower's Operating Agreement, including, without limitation, repayment of any loans made by a member to Borrower, any accrued interest on such loans, return of capital contributions, distributions upon termination, liquidation or dissolution of Borrower or any development, property management, accounting or other fees payable to a member in Borrower.

8.15    Publicity.  Borrower shall permit Lenders to publicize its involvement in the financing of the Property, including without limitation permitting Lenders to (a) maintain a sign indicating such involvement at a location on the Property reasonably acceptable to Borrower and Administrative Agent, (b) take pictures of the Property and post them on any Lender's website, and (c) use Lender's providing financing to Borrower in any Lender's promotional materials; provided, however, that any such publicity shall not identify Borrower or Guarantors by name without the consent of Borrower or Guarantor, as applicable.

8.16    Reporting.  Borrower shall deliver the following information to Administrative Agent:

(a)    as soon as available, but in no event later than ninety (90) days after Borrower's fiscal year end, a financial statement as of the end of Borrower's fiscal year (including, without limitation, an income and expense statement) signed and certified to be true, complete and correct, by an authorized officer of the Borrower.

(b)    within fifteen (15) days of Administrative Agent's request, Borrower shall cause to be delivered to Lender such quarterly and other financial information regarding any persons or entities in any way obligated to repay the Loan as Administrative Agent may specify. If audited financial information is prepared, Borrower shall deliver to Administrative Agent copies of that information within fifteen (15) days of its final preparation.

(c)    within fifteen (15) days of filing, complete copies of federal and state tax returns for Borrower and Guarantor, together with all schedules thereto, each of which shall be signed and certified by an authorized officer of the Borrower to be true and complete copies of such returns. In the event an extension is filed, Borrower shall deliver to Administrative Agent a copy of the extension within thirty (30) days from filing.

(d)    Borrower shall maintain complete books of account and other records for the Property and Improvements and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by Administrative Agent upon reasonable prior notice.

8.17    Affiliate Transactions.  Borrower shall not enter into any agreement (including, without limitation, leases) respecting the Property with any Affiliate unless Administrative Agent has approved of such transaction and agreement, which approval may be granted or withheld in Administrative Agent's discretion. Without limitation of the foregoing approval right, Borrower shall, at Administrative Agent's request, insert a provision in any such agreement permitting Administrative Agent (or its affiliate) or any other purchaser of the Property at a foreclosure sale

33

to terminate such agreement without cause or any payment upon such party's acquisition of the Property through foreclosure, deed-in-lieu of foreclosure or otherwise. Nothing in this Section 8.17 shall be construed as permitting Borrower to enter into any agreement respecting the Property with an Affiliate that the Borrower would not be permitted to enter into with a person or entity that is not an Affiliate under any of the Loan Documents.

8.18    Notice of Certain Matters. Borrower shall give notice to Administrative Agent, within seven (7) Business Days of actual knowledge thereof, of each of the following:

(a)    any litigation or claim of any kind affecting or relating to the Property or the construction of the Improvements;

(b)    any material dispute (i) between Borrower, any of Borrower's members, or any Guarantor (ii) between any of them and any governmental entity relating to the Property or the construction of the Improvements; or (iii) between Borrower and Construction Manager;

(c)    any trade name hereafter used by Borrower or any change in Borrower's principal place of business;

(d)    all changes in the Plans and Specifications which result in a cost increase or decrease, in the aggregate, in excess of one percent (1%) of the Loan;

(e)    the occurrence of any Event of Default or Potential Event of Default and Borrower's plans for curing same;

(f)    the existence of any lien or encumbrance other than a Permitted Encumbrance on the Property;

(g)    copies of any future amendments or modifications of the formation or organizational documents of Borrower or its sole member; and.

(h)    any other event or condition causing a material adverse change in the financial condition of Borrower or any Guarantor, in the condition of the Property or the ability of Borrower to construct the Improvements in accordance with the Construction Schedule, the Building Loan Cost Breakdown or the Plans and Specifications.

8.19    Expenses. Borrower shall pay each Lender and Administrative Agent within ten (10) days after demand all reasonable out-of-pocket costs and expenses incurred by Administrative Agent in connection with: (a) the preparation of this Agreement and all other Loan Documents; (b) the administration of this Agreement, the other Loan Documents, and any other documents required by any Lender and/or Administrative Agent (including in connection with any extension of the Maturity Date) as and to the extent required pursuant to the Loan Documents; and (c) the enforcement or satisfaction by such Lender and/or Administrative Agent of any of Borrower's or Guarantor's obligations under this Agreement, the Guaranty, or the other Loan Documents. For all purposes of this Agreement, Lender's and Administrative Agent's costs and expenses shall include, without limitation, all appraisal fees, cost engineering and inspection fees, reasonable out-of-pocket legal fees and expenses, accounting fees, environmental consultant fees, auditor fees, recording taxes, recording fees, filing fees, UCC

34

filing fees and/or UCC vendor fees, flood certification vendor fees, tax service vendor fees, and the cost to Administrative Agent of any title insurance premiums, title surveys, mortgage recording taxes (if applicable), release, reconveyance, satisfaction and notary fees. Borrower recognizes and agrees that formal written appraisals of the Property by a licensed independent appraiser may be required by Lenders' internal procedures on an annual and/or specialized basis and that any Lender may, at its option, require inspection of the Property by an independent supervising architect and/or cost engineering specialist (i) prior to each advance; (ii) at least once each month during the course of construction even though no disbursement is to be made for that month; (iii) upon completion of the Improvements; and (iv) at least semi-annually thereafter. If any of the services described above are provided by an employee of a Lender or its affiliates, such Lender's and/or Administrative Agent costs and expenses for such services shall be calculated in accordance with such Lender's and/or Administrative Agent's standard charge for such services.

8.20    ERISA Compliance. Borrower shall at all times comply with the provisions of the Employment Retirement Income Security Act of 1974, as amended from time to time, including all regulations promulgated and case law thereunder, ("ERISA") with respect to any retirement or other employee benefit plan to which it is a party as employer, and as soon as possible after Borrower knows, or has reason to know, that any Reportable Event (as defined in ERISA) with respect to any such plan of Borrower has occurred, it shall furnish to Administrative Agent a written statement setting forth details as to such Reportable Event and the action, if any, which Borrower proposes to take with respect thereto, together with a copy of the notice of such Reportable Event furnished to the Pension Benefit Guaranty Corporation.

8.21    Transfer and Further Encumbrance. Borrower shall not permit the Property and/or Improvements or any part thereof or any direct or indirect, legal or beneficial interest therein to be Transferred (including, without limitation, through sale or transfer of a majority or controlling interest of the corporate stock or partnership interests or membership interests of Borrower to any other person, including any other member or partner), without the prior written consent of Administrative Agent.  ; provided, however, that, notwithstanding the foregoing, the following Transfers shall be permitted to be made without the consent of Administrative Agent or any Lender: (a) any Transfer made pursuant to the terms of the Ground Lease by the lessor thereunder, (b) any Transfer made pursuant to a foreclosure, deed-in-lieu of foreclosure, assignment-in-lieu of foreclosure or any other enforcement of remedies under the Security Agreement, the Mortgage or any other Loan Document, (c) the Transfer in the aggregate of not more than forty-nine percent (49%) of the direct or indirect stock, partnership interests, beneficial interests or membership interests in the sole member of Borrower, so long as Guarantor shall continue to directly or indirectly "control" (within the meaning set forth in the definition of "Affiliate" contained herein) Borrower and its sole member after giving effect to such Transfer, (d) the Transfer of any direct or indirect stock, partnership interests, beneficial interests or membership interests in Borrower to an Immediate Family Member of the transferee, or a trust established for the benefit of the transferee and/or the transferee's Immediate Family Member, as a gift or for estate planning purposes, so long as Guarantor shall continue to directly or indirectly "control" (within the meaning set forth in the definition of "Affiliate" contained herein) Borrower after giving effect to such Transfer, (e) the Transfer of the direct or indirect stock, partnership interests, beneficial interests or membership interests in the sole member of Borrower among the Persons owning direct or indirect interests in Borrower immediately prior to

35

such Transfer, so long as Guarantor shall continue to directly or indirectly "control" (within the meaning set forth in the definition of "Affiliate" contained herein) Borrower after giving effect to such Transfer, (f) the Transfer of the direct or indirect stock, partnership interests, beneficial interest or membership interests in the sole member of Borrower to an Affiliate of such transferee, so long as Guarantor shall continue to directly or indirectly "control" (within the meaning set forth in the definition of "Affiliate" contained herein) Borrower and the sole member of Borrower after giving effect to such Transfer, (g) the change of the trustee of any direct or indirect owner of the sole member of Borrower that is a trust, so long as Guarantor shall continue to directly or indirectly "control" (within the meaning set forth in the definition of "Affiliate" contained herein) Borrower and the sole member of Borrower after giving effect to such Transfer, (h) any Transfer directly as a result of the legal incapacity of a natural person, of any direct or indirect stock, partnership interests, beneficial interests or membership interests in Borrower previously held by such natural person to the Person or Persons lawfully entitled thereto, (i) any leases of the Property or the Improvements made by Borrower in accordance with the terms of the Ground Lease, the Sublease and the Loan Documents, and (j) a Permitted Encumbrance. Additionally, Borrower shall not permit or create any Lien on the Property and/or Improvements or any part thereof other than liens created pursuant to the Loan Documents and the Permitted Encumbrances.

8.22    Taxes and Other Liabilities.    Borrower shall pay and discharge prior to delinquency thereof, any and all indebtedness, obligations, assessments and taxes, both real and personal, owed by or relating to Borrower and Borrower's properties (including federal and state income taxes), except such as Borrower may in good faith contest or as to which a bona fide dispute may arise, provided provision is made to the satisfaction of Administrative Agent for eventual payment thereof in the event that it is found that the same is an obligation of Borrower.

8.23    Assignment.    Without the prior written consent of Lenders, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void. In this regard, Borrower acknowledges that Lenders would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in developing and constructing commercial real property, Lenders' knowledge of Borrower, and Lenders' understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lenders would rely on security which already exists.

8.24    Hazardous Materials Indemnity.    Borrower hereby agrees to defend by attorneys and other professionals reasonably approved by the Indemnitees (hereafter defined), indemnify and hold harmless Lenders, Administrative Agent and their parents, subsidiaries and affiliates, any Participant and all of their affiliates, directors, employees agents and successors and assigns (collectively, "Indemnitees") for, from and against any and all actual losses, damages, liabilities, claims, actions, judgments, court costs and out-of-pocket legal or other expenses (including, without limitation, reasonable attorneys' fees and expenses) which Indemnitees may incur as a direct or indirect consequence of (a) the use, generation, manufacture, storage, treatment, release, threatened release, discharge, disposal, transportation or presence of any Hazardous Materials which are found in, on, under, about or migrating from the Property; (b) any violation or claim of violation of any Hazardous Materials Laws with respect to the Property; (c) any indemnity claim by a third party against one or more Indemnitees in connection with any of the foregoing; or (d)

36

the breach of any covenants (or representations and warranties) of Borrower in Sections 6.19, 6.20 and 6.21. Such indemnity shall include, without limitation: (i) the costs, whether foreseeable or unforeseeable, of any repair, cleanup or detoxification of the Property, or the removal or remediation of any Hazardous Materials (regardless of the medium) from the Property, or the taking of any emergency action, which is required by any governmental entity or is otherwise necessary to render the Property in compliance with all Hazardous Materials Laws; (ii) all other direct or indirect consequential damages (including, without limitation, any third party tort claims or governmental claims, fines or penalties against any and all Indemnitees); and (iii) all court costs and attorneys' fees and expenses paid or incurred by any and all Indemnitees. Each Indemnitee shall have the right at any time to appear in, and to participate in as a party if it so elects, and be represented by counsel of its own choice in, any action or proceeding initiated in connection with any Hazardous Materials Laws that affect the Property. Borrower shall pay to the applicable Indemnitees within ten (10) days after demand any amounts owing under this indemnity, together with interest from the date the indebtedness arises until paid at the rate of interest applicable to the principal balance of the Note. Notwithstanding the foregoing, the indemnity shall not apply to any losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses caused by any Indemnitee's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment.

8.25    Further Assurances. Borrower shall execute and deliver from time to time, promptly after any request by Administrative Agent, any instrument, agreement or document and shall take such other action as may be reasonably necessary or desirable in the opinion of Administrative Agent to maintain, perfect or insure Lenders' or Administrative Agent's security provided for in this Agreement and the other Loan Documents, including, without limitation, the execution of such amendments to this Agreement, the Mortgage and the other Loan Documents and the delivery of such endorsements to the Title Policy, all as shall be required to comply with the Lien Law or as Administrative Agent shall reasonably require, and shall pay all fees and expenses (including reasonable attorneys' fees) incurred by Administrative Agent and Lenders in connection with such action.

8.26    Tenth Floor Unit. Within one year after the Effective Date, Borrower shall cause the option to purchase the ground leasehold estate in the 10th Floor Unit, as more particularly provided in Section 47 of the Ground Lease (the "Tenth Floor Unit Buyout"), to be exercised. Borrower shall diligently proceed to cause the closing of the Tenth Floor Unit Buyout to occur as provided in Section 47 of the Ground Lease.

Article IX
**EVENTS OF DEFAULT**

9.1    Events of Default. The occurrence of any of the following shall be an "Event of Default:"

(a)    Borrower's failure to pay within ten (10) days after any monthly installment of principal or interest under the Note is due,

(b)    Borrower's failure to pay the entire Obligations on the Maturity Date;

37

(c) (i) Borrower's failure to observe or perform its obligations under Section 2.5(a) of the Mortgage or to maintain the insurance required to be maintained under Section 2.11 of the Mortgage, (ii) the occurrence of any Transfer in violation of Section 2.14 of the Mortgage or Section 8.21 hereof, or (iii) the failure of Borrower to cooperate in making the Property available for inspections under Section 8.10 above or "Tests and Studies" (as defined in the Mortgage) in violation of the provisions of Section 2.16 of the Mortgage;

(d) the occurrence of a monetary default under any of the Loan Documents (other than a default under Section 9.1(a) or 9.1(b) hereof and the failure of any such default to be cured within five days of written notice thereof from Administrative Agent;

(e) the failure of Borrower, within 30 days following written notice from Administrative Agent, to observe or perform any non-monetary covenant or other agreement contained in any Loan Document; provided, however, that the notice and 30-day grace period set forth above shall be applicable only to a failure to observe or perform any covenant or other agreement which is reasonably susceptible of being cured; provided further, that should Borrower be unable to cure its failure within such 30-day period despite beginning to cure such failure promptly after receipt of notice and prosecuting such attempt diligently during such 30-day period, the cure period shall be extended for up to an additional 90 days so long as Borrower continues diligently to prosecute the cure during such additional period;

(f) any written representation, warranty or financial statement given by Borrower or any Guarantor with respect to the Loan or the Project shall have been untrue in any material respect when given and the same is not cured within 30 days following written notice from Administrative Agent; provided, however, that the 30-day grace period set forth above shall be applicable only to a breach of a representation or warranty which is reasonably susceptible of being cured; provided further, that should Borrower be unable to cure its breach within such 30-day period despite beginning to cure such failure promptly after receipt of notice and prosecuting such attempt diligently during such 30-day period, the cure period shall be extended for up to an additional 90 days so long as Borrower continues diligently to prosecute the cure during such additional period;

(g) the occurrence of an Event of Default under the Project Loan Agreement;

(h) Borrower shall be unable, or shall admit in writing its inability, to pay its debts when due, or shall make an assignment for the benefit of creditors; or Borrower shall apply for or consent to the appointment of any receiver, trustee or similar officer for Borrower or for all or any substantial part of Borrower's property; or Borrower shall institute (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debts, dissolution, liquidation, or similar proceedings relating to such person under the laws of any jurisdiction;

(i) Guarantor shall be unable, or shall admit in writing its inability, to pay its debts when due, or shall make an assignment for the benefit of creditors; or Guarantor shall apply for or consent to the appointment of any receiver, trustee or similar officer for such person or for all or any substantial part of his property; or Guarantor shall institute (by petition, application, answer, consent or otherwise) any bankruptcy, insolvency, reorganization,

38

arrangement, readjustment of debts, dissolution, liquidation, or similar proceedings relating to such person under the laws of any jurisdiction, unless within sixty (60) days thereafter Guarantor has been replaced as a guarantor under the Guaranty and the Completion Guaranty by a replacement guarantor satisfactory to Administrative Agent in its sole discretion who complies with the Liquidity and Net Worth Threshold;

(j) if a receiver, trustee or similar officer shall be appointed for Borrower or for all or any substantial part of Borrower's property without the application or consent of Borrower, and such appointment shall continue undischarged for a period of 60 days (whether or not consecutive); or any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings shall be instituted (by petition, application or otherwise) against Borrower and shall remain undismissed for a period of 60 days (whether or not consecutive);

(k) if a receiver, trustee or similar officer shall be appointed for Guarantor, or for all or any substantial part of his property without the application or consent of Guarantor, and such appointment shall continue undischarged for a period of 60 days (whether or not consecutive); or any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceedings shall be instituted (by petition, application or otherwise) against Guarantor and shall remain undismissed for a period of 60 days (whether or not consecutive), unless within thirty (30) days thereafter Guarantor has been replaced as a guarantor under the Guaranty and the Completion Guaranty by a replacement guarantor satisfactory to Administrative Agent in its sole discretion who complies with the Liquidity and Net Worth Threshold;

(l) the Property or all or any material part of the assets of Borrower shall become subject to attachment, execution or judicial seizure (whether by enforcement of money judgment, by writ or warrant of attachment, or by any other process);

(m) any material part of the assets of Guarantor shall become subject to attachment, execution or judicial seizure (whether by enforcement of money judgment, by writ or warrant of attachment, or by any other process), unless within sixty (60) days thereafter Guarantor has been replaced as a guarantor under the Guaranty and the Completion Guaranty by a replacement guarantor satisfactory to Administrative Agent in its sole discretion who complies with the Liquidity and Net Worth Threshold;

(n) subject to Borrower's right to contest the same pursuant to Section 8.9 hereof, Borrower shall be in default in the payment of any indebtedness or the performance of any other obligation secured by a lien on the Property, other than a mechanic lien, and (i) such default is declared and is not cured within the time, if any, specified for such a cure in any applicable agreement or (ii) such lien is not bonded or otherwise discharged within forty-five (45) days after notice from whatever source derived;

(o) any of the Loan Documents shall cease to be a valid, binding and enforceable obligation of Borrower and/or Guarantor and/or Sole Member; or the lien of the Mortgage or any Loan Document securing any of Borrower's obligations shall cease to be a

39

valid, enforceable, perfected and first-priority lien on the property it purports to encumber; or Borrower shall assert such cessation or failure in writing;

(p)    Borrower is enjoined, restrained or in any way prevented by court order from constructing the Improvements or continuing with the development of the Project, and such proceedings have not or injunction has not been dismissed or stayed within 90 days from the date of filing of such proceeding or entry of such injunction;

(q)    Administrative Agent's determination that construction of the Improvements has fallen more than 60 days behind the Construction Schedule (subject to the provisions of Section 8.2 hereof) and such construction has not been rescheduled in a manner acceptable to Administrative Agent within ten days after Administrative Agent's determination, unless such construction shall have fallen behind schedule for reasons solely beyond Borrower's control, in which case Borrower shall resume work immediately after the reason for such cessation shall have terminated; provided, however, under no circumstances shall any delay result in the extension of the Maturity Date or shall construction fall more than 90 days behind the Construction Schedule, irrespective of the cause of such delay;

(r)    Borrower shall be in default under the Ground Lease or the Sublease beyond any applicable notice and cure periods provided therein; or

(s)    the death of both Guarantors unless replaced within thirty (30) days with a satisfactory replacement guarantor approved by Administrative Agent in its sole discretion who complies with the Liquidity and Net Worth Threshold.

9.2    Acceleration.  Upon the occurrence of an Event of Default, the entire unpaid balance of the Note including all accrued interest may, at the option of Administrative Agent, become immediately due and payable and Administrative Agent shall have such rights of enforcement as may be afforded under this Agreement, any of the other Loan Documents or under applicable law.

9.3    Right to Complete Construction.  In addition to Administrative Agent's rights set forth in Section 9.2, upon the occurrence of an Event of Default, Administrative Agent shall have the right to enter into possession of the Property and perform any work necessary to complete the Improvements substantially in accordance with the Plans and Specifications, and employ watchmen to protect the Property and Improvements from injury.  All sums so expended by Administrative Agent shall be deemed to have been paid to Borrower and secured by the Mortgage.  Effective upon the occurrence of an Event of Default, Borrower assigns to Administrative Agent all of Borrower's interest in all Contracts, but this assignment shall not, in the absence of an affirmative written assumption of such Contracts by Administrative Agent, be deemed to impose upon Administrative Agent any of Borrower's obligations under any such Contract.  Borrower constitutes and appoints Administrative Agent its true and lawful attorney-in-fact, with full power of substitution, to complete the Improvements in the name of Borrower. Borrower empowers such attorney to (a) use any funds of Borrower, including any Borrower's Funds which may remain undisbursed under this Agreement, for the purpose of completing the Project; (b) make such additions, changes, and corrections in the Plans and Specifications as Administrative Agent deems desirable to complete the Project in an economically sound manner;

40

(c) employ such contractors, subcontractors, agents, architects, and inspectors as shall be required for said purposes; (d) pay, settle, or compromise all existing bills and claims which may be liens against the Property or Improvements, or as may be necessary or desirable for the completion of the Improvements or for clearance of title; (e) execute all applications and certificates in the name of Borrower which may be required by any Contract; (f) prosecute and defend all actions or proceedings in connection with the Property or the construction of the Project and take such action and require such performance as Borrower deems necessary under any guaranty of completion; and (g) do any and every act which Borrower might do in its own behalf. This power of attorney, which shall be deemed to be a power coupled with an interest, cannot be revoked. Borrower assigns and quitclaims to Administrative Agent all sums undisbursed under the Loan effective as of the date of the occurrence of any Event of Default.

9.4     Right to Advance or Post Funds. Where disputes have arisen which, in the good faith opinion of Administrative Agent, may endanger the timely completion of the Improvements or the performance of any covenant contained in this Agreement, Administrative Agent may advance Lenders' funds for the account of Borrower without prejudice to Borrower's rights, if any, to recover such funds from the party to whom paid. Such agreement or agreements may take the form which Administrative Agent, in its discretion, deems proper, including but not limited to agreements to indemnify a title insurer against possible assertion of lien claims or to pay disputed amounts to contractors if Borrower is unable or unwilling to pay the same. All sums paid or agreed to be paid pursuant to any such undertaking shall be for the account of Borrower, Borrower shall upon Administrative Agent's demand reimburse Administrative Agent for any such payments with interest at the rate then applicable under the Note until date of reimbursement, and such advances and interest shall be secured by the Mortgage.

9.5     Stoppage of Construction by Administrative Agent. Where any deviations from the Plans and Specifications appear (other than those made in accordance with the terms of this Agreement), or defective or unworkmanlike labor or materials are being used in the construction of the Improvements, or upon receipt of knowledge of encroachments to which there has been no consent, Administrative Agent shall have, in addition to any other remedies hereunder, the right to immediately order the cessation of construction and demand that the condition be corrected. After issuance of such an order, no further work shall be done on the Improvements without the prior written consent of Administrative Agent, which such consent shall not be unreasonably withheld if the condition has been corrected to Administrative Agent's satisfaction (or evidence satisfactory to Administrative Agent that it will be so corrected has been provided to Administrative Agent). If corrective action satisfactory to Administrative Agent is not commenced within ten (10) days after written demand by Administrative Agent, Administrative Agent shall have the right, but not the obligation, to undertake such action at Borrower's expense in the manner described in Section 9.6 below.

9.6     Curing of Defaults by Disbursement. Upon the occurrence of an Event of Default which may be cured by the payment of money, Administrative Agent, without waiving any right of acceleration or foreclosure under the Note or the Mortgage which Lenders may have by reason of such Event of Default, or any other right or any Administrative Agent may have against Borrower because of such default, shall have the right to make such payment from the Loan, thereby curing such Event of Default.

FF\12518702.7

9.7 <u>Remedies are Cumulative</u>. All remedies of Lenders and Administrative Agent provided for in this Agreement are cumulative and shall be in addition to any other rights and remedies provided in the Note, the Mortgage or any of the other Loan Documents or by law. The exercise of any rights of Lenders or Administrative Agent under this Agreement shall not in any way constitute a cure or waiver of a default under this Agreement or elsewhere, or invalidate any act done pursuant to any notice of default, or prejudice Lenders or Administrative Agent in the exercise of any of their other rights unless, in the exercise of such rights, Lenders realizes all amounts owed to them under this Agreement and under the Note, the Mortgage and the other Loan Documents.

Article X
**LOAN SALES AND PARTICIPATION; DISCLOSURE OF INFORMATION**

Borrower agrees that Lenders may elect, at any time, to sell, assign or grant participation in all or any portion of Lenders' rights and obligations under the Loan Documents, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities ("Participant"), at such Lender's sole discretion. Borrower further agrees that (i) any Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) and (ii) such actual or potential purchaser(s), assignee(s) or participant(s) may disseminate to their affiliates and each of their respective partners, members, managers, parents, subsidiaries, directors, officers, shareholders, principals, affiliates, financing sources (actual and potential), potential investors, employees, agents, attorneys, accountants, auditors, affiliates, advisors, consultants, and representatives, all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to such Lender with respect to: (a) the Property and Improvements and their operation; (b) any party connected with the Loan (including, without limitation, the Borrower, any partner, shareholder, joint venturer, manager or member of Borrower, any constituent partner, shareholder, joint venturer, manager or member of Borrower, or any Guarantor); and/or (c) any lending relationship other than the Loan which such Lender may have with any party connected with the Loan who agrees to keep such information confidential. In the event of any such sale, assignment or participation, such Lender and the parties to such transaction shall share in the rights and obligations of such Lender as set forth in the Loan Documents only as and to the extent they agree among themselves. In connection with any such sale, assignment or participation, Borrower further agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each purchaser, assignee, or participant, and upon written request by any Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation; provided that no such amendment or modification shall materially increase any payment or other obligation of Borrower or Guarantor, or materially decrease the rights or benefits to Borrower or Guarantor, under the Loan Documents. The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any purchaser, assignee or participant.

FF\12518702.7

Article XI

## AGENT AND LENDERS

11.1    Appointment and Authorization.

A.    Each Lender hereby irrevocably appoints and authorizes the Administrative Agent to take such action as contractual representative on such Lender's behalf and to exercise such powers under this Agreement, the other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof and thereof, together with such powers as are reasonably incidental thereto. Not in limitation of the foregoing, each Lender authorizes and directs the Administrative Agent to enter into the Loan Documents for the benefit of the Lenders.

B.    Nothing herein shall be construed to deem the Administrative Agent a trustee or fiduciary for any Lender or to impose on the Administrative Agent duties or obligations other than those expressly provided for herein. Without limiting the generality of the foregoing, the use of the terms "Administrative Agent", "Agent", "agent" and similar terms in the Loan Documents or Guaranty with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, use of such terms is merely a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

11.2    Parkview Financial REIT, LP as Lender.    Parkview Financial REIT, LP, as a Lender, shall have the same rights and powers under this Agreement and any other Loan Document as any other Lender and may exercise the same as though it were not the Administrative Agent. Parkview Financial REIT, LP and its affiliates may each accept deposits from, maintain deposits or credit balances for, invest in, lend money to, act as trustee under indentures of, serve as financial advisor to, and generally engage in any kind of business with the Borrower, Guarantor or any other affiliate thereof as if it were any other bank and without any duty to account therefor to the other Lenders. Further, the Administrative Agent and any affiliate may accept fees and other consideration from the Borrower for services in connection with this Agreement and otherwise without having to account for the same to the other Lenders. The Lenders acknowledge that, pursuant to such activities, Parkview Financial REIT, LP or its affiliates may receive information regarding the Borrower, other loan parties, other subsidiaries and other Affiliates (including information that may be subject to confidentiality obligations in favor of such Person) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them.

11.3    Collateral Matters; Protective Advances.

A.    Each Lender hereby authorizes the Administrative Agent, without the necessity of any notice to or further consent from any Lender, from time to time prior to a default, to take any action with respect to any Collateral or Loan Documents which may be necessary to perfect and maintain perfected the Liens upon the Property and Improvements granted pursuant to any of the Loan Documents.

43

B.    The Lenders hereby authorize the Administrative Agent, at its option and in its discretion, to release any Lien granted to or held by the Administrative Agent upon any of the Property and Improvements (i) upon termination of the Commitments and indefeasible payment and satisfaction in full of all of the obligations of Borrower hereunder; and (ii) as expressly permitted by, but only in accordance with, the terms of the applicable Loan Document.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section.

C.    Upon any sale and transfer of Collateral which is expressly permitted pursuant to the terms of this Agreement, and upon at least five (5) Business Days' prior written request by the Borrower, the Administrative Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Administrative Agent for the benefit of the Lenders herein or pursuant hereto upon the Collateral that was sold or transferred; provided, however, that (i) the Administrative Agent shall not be required to execute any such document on terms which, in the Administrative Agent's opinion, would expose the Administrative Agent to liability or create any obligation or entail any consequence other than the release of such Liens without recourse or warranty and (ii) such release shall not in any manner discharge, affect or impair the obligations of Borrower or any Liens upon (or obligations of the Borrower in respect) of all interests retained by the Borrower, including (without limitation) the proceeds of such sale or transfer, all of which shall continue to constitute part of the Collateral.  In the event of any sale or transfer of Collateral, or any foreclosure with respect to any of the Collateral, the Administrative Agent shall be authorized to deduct all of the expenses reasonably incurred by the Administrative Agent from the proceeds of any such sale, transfer or foreclosure.

D.    The Administrative Agent shall have no obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or any other Loan Party or is cared for, protected or insured or that the liens granted to the Administrative Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Administrative Agent in this Section or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its sole discretion, given the Administrative Agent's own interest in the Collateral as one of the Lenders and that the Administrative Agent shall have no duty or liability whatsoever to the Lenders, except to the extent resulting from its gross negligence or willful misconduct.

E.    Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against Borrower or any other obligor hereunder under the Loan Documents with respect to exercising claims against or rights in the Collateral without the written consent of all Lenders.

44

11.4    Indemnification of Administrative Agent. Regardless of whether the transactions contemplated by this Agreement, the other Loan Documents are consummated, each Lender agrees to indemnify the Administrative Agent (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) pro rata in accordance with such Lender's respective Pro Rata Share, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against the Administrative Agent (in its capacity as Administrative Agent but not as a "Lender") in any way relating to or arising out of the Loan Documents, any transaction contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under the Loan Documents (collectively, "Indemnifiable Amounts"); provided, however, that no Lender shall be liable for any portion of such Indemnifiable Amounts to the extent resulting from the Administrative Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, non-appealable judgment provided, however, that no action taken in accordance with the directions of the Requisite Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section. Without limiting the generality of the foregoing, each Lender agrees to reimburse the Administrative Agent (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so) promptly upon demand for its ratable share of any out-of-pocket expenses (including the reasonable fees and expenses of the counsel to the Administrative Agent) incurred by the Administrative Agent in connection with the preparation, negotiation, execution, administration, or enforcement (whether through negotiations, legal proceedings, or otherwise) of, or legal advice with respect to the rights or responsibilities of the parties under, the Loan Documents, any suit or action brought by the Administrative Agent to enforce the terms of the Loan Documents and/or collect any obligation of Borrower hereunder, any "lender liability" suit or claim brought against the Administrative Agent and/or the Lenders, and any claim or suit brought against the Administrative Agent and/or the Lenders arising under any Hazardous Materials Laws. Such out-of-pocket expenses (including counsel fees) shall be advanced by the Lenders on the request of the Administrative Agent notwithstanding any claim or assertion that the Administrative Agent is not entitled to indemnification hereunder upon receipt of an undertaking by the Administrative Agent that the Administrative Agent will reimburse the Lenders if it is actually and finally determined by a court of competent jurisdiction that the Administrative Agent is not so entitled to indemnification. The agreements in this Section shall survive the payment of the Loan and all other amounts payable hereunder or under the other Loan Documents and the termination of this Agreement. If the Borrower shall reimburse the Administrative Agent for any Indemnifiable Amount following payment by any Lender to the Administrative Agent in respect of such Indemnifiable Amount pursuant to this Section, the Administrative Agent shall share such reimbursement on a ratable basis with each Lender making any such payment.

11.5    Lender Credit Decision Etc. Each Lender expressly acknowledges and agrees that neither the Administrative Agent nor any of its officers, directors, employees, agents, counsel, attorneys-in-fact or other affiliates has made any representations or warranties to such Lender and that no act by the Administrative Agent hereafter taken, including any review of the affairs of the Borrower, any Guarantor or Affiliate, shall be deemed to constitute any such representation or warranty by the Administrative Agent to any Lender. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or counsel to the Administrative Agent, or any of their respective officers,

45

directors, employees, agents or counsel, and based on the financial statements of the Borrower, Guarantors or Affiliates, and inquiries of such Persons, its independent due diligence of the business and affairs of the Borrower, the Guarantors and other Persons, its review of the Loan Documents, the legal opinions required to be delivered to it hereunder, the advice of its own counsel and such other documents and information as it has deemed appropriate, made its own credit and legal analysis and decision to enter into this Agreement and the transactions contemplated hereby. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Lender or counsel to the Administrative Agent or any of their respective officers, directors, employees and agents, and based on such review, advice, documents and information as it shall deem appropriate at the time, continue to make its own decisions in taking or not taking action under the Loan Documents. The Administrative Agent shall not be required to keep itself informed as to the performance or observance by the Borrower of the Loan Documents or any other document referred to or provided for therein or to inspect the properties or books of, or make any other investigation of, the Borrower. Except for notices, reports and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent under this Agreement or any of the other Loan Documents or Guaranty, the Administrative Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Borrower, any Guarantor or any other Affiliate thereof which may come into possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or other Affiliates. Each Lender acknowledges that the Administrative Agent's legal counsel in connection with the transactions contemplated by this Agreement is only acting as counsel to the Administrative Agent and is not acting as counsel to such Lender.

11.6 <u>No Set-Offs</u>. Each Lender hereby acknowledges that the exercise by any Lender of offset, set-off, banker's lien or similar rights against any deposit account or other property or asset of Borrower, whether or not located in California, could result under certain laws in significant impairment of the ability of all Lenders to recover any further amounts in respect of the Loan. Therefore, each Lender agrees not to charge or offset any amount owed to it by Borrower against any of the accounts; property or assets of Borrower or any of its affiliates held by such Lender without the prior written approval of Administrative Agent and Requisite Lenders.

Article XII
**MISCELLANEOUS**

12.1 <u>Notices</u>. Any notice, demand or request required under this Agreement shall be given in writing at the addresses set forth below by personal service; email; overnight courier; or registered or certified, first class mail, return receipt requested.

If to Borrower:

> Hudson 1702, LLC
> c/o CSC Coliving LLC

46

6 St. Johns Lane
New York, New York  10013
Attention: Alberto Smeke Saba
Email: AS@csc-coliving.com
Attention:  Salomon Smeke Saba
Email:  SS@csc-coliving.com

Hudson 1701/1706 LLC
c/o CSC Coliving LLC
6 St. Johns Lane
New York, New York  10013
Attention:  Alberto Smeke Saba
Email: AS@csc-coliving.com
Attention:  Salomon Smeke Saba
Email:  SS@csc-coliving.com

With a copy to:

Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York  10019
Attention:  Jordan Metzger, Esq.
Email:  jmetzger@coleschotz.com

If to Administrative Agent:

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, CA 90025
Attention:  Paul S. Rahimian
Email: paul@parkviewfinancial.com

If to Lenders:

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, CA 90025
Attention:  Paul S. Rahimian
Email: Paul@parkviewfinancial.com

Such addresses may be changed by notice to the other parties given in the same manner as required above.  Any notice, demand or request shall be deemed received as follows:  (i) if sent by personal service, at the time such personal service is effected; (ii) if sent by overnight courier, on the Business Day immediately following deposit with the overnight courier; and (iii) if sent by mail, 48 hours following deposit in the mail.

FF\12518702.7

12.2    Governing Law.  All questions with respect to the construction of this Agreement and the rights and liabilities of the parties to this Agreement shall be governed by the laws of the State of New York.

12.3    Binding on Successors.  This Agreement shall inure to the benefit of, and shall be binding upon, the successors and assigns of each of the parties to this Agreement.

12.4    Attorneys' Fees.

(a)    Borrower shall reimburse Lenders and Administrative Agent for all reasonable out-of-pocket attorneys' fees, costs and expenses, incurred by any Lender or Administrative Agent in connection with the enforcement of their respective rights under this Agreement and each of the other Loan Documents, including, without limitation, reasonable out-of-pocket attorneys' fees, costs and expenses for trial, appellate proceedings, out-of-court negotiations, workouts and settlements or for enforcement of rights under any state or federal statute, including, without limitation, reasonable attorneys' fees, costs and expenses incurred to protect Lenders' security and attorneys' fees, costs and expenses incurred in bankruptcy and insolvency proceedings such as (but not limited to) seeking relief from stay in a bankruptcy proceeding.  The term "expenses" means any out-of-pocket expenses incurred by any Lender or Administrative Agent in connection with any of the out-of-court, or state, federal or bankruptcy proceedings referred to above, including, without limitation, the fees and expenses of any appraisers, consultants and expert witnesses retained or consulted by any Lender or Administrative Agent in connection with any such proceeding.

(b)    Each Lender and Administrative Agent shall also be entitled to its reasonable out-of-pocket attorneys' fees, costs and expenses incurred in any post-judgment proceedings to collect and enforce the judgment.  This provision is separate and several and shall survive the merger of this Agreement into any judgment on this Agreement.

12.5    Counterparts.  This Agreement may be executed in any number of original counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one instrument.  The original signature page of any counterpart may be detached from such counterpart and attached to any other counterpart identical to such counterpart (except having additional signature pages executed by other parties to this Agreement) without impairing the legal effect of any such signature(s).

12.6    Entire Agreement.  This Agreement and the other Loan Documents constitutes the entire agreement and understanding between and among the parties in respect of the subject matter of this Agreement and supersedes all prior agreements and understandings with respect to such subject matter, whether oral or written.

12.7    Waivers.  Waiver by any Lender or Administrative Agent of any term, covenant or condition under this Agreement or the Loan Documents, or of any default by Borrower under this Agreement or the Loan Documents, or any failure by any Lender or Administrative Agent to insist upon strict performance by Borrower of any term, covenant or condition contained in this Agreement or the Loan Documents, shall be effective or binding on such Lender, only if made in writing by such Lender or Administrative Agent; no such wavier shall be implied from any

48

omission by any Lender or Administrative Agent to take action with respect to any such term, covenant, condition or default. No express written waiver by any Lender or Administrative Agent of any term, covenant, condition or default shall affect any other term, covenant, condition or default or cover any other time period than the application of any such term, covenant or condition to the matter as to which a waiver has been given or the default or time period specified in such express waiver. This Agreement may be amended only by an instrument in writing signed by the parties to this Agreement.

12.8    Severability. If any part of this Agreement is declared invalid for any reason, such shall not affect the validity of the rest of the Agreement. The other parts of this Agreement shall remain in effect as if this Agreement had been executed without the invalid part. The parties declare that they intend and desire that the remaining parts of this Agreement continue to be effective without any part or parts that have been declared invalid.

12.9    Relationship; Indemnity; No Third Parties Beneficiaries.

(a)    The relationship of Borrower and Lenders and Administrative Agent under the Loan Documents is, and shall at all times remain, solely that of borrower and lender; and neither Lenders nor Administrative Agent undertakes or assumes any responsibility or duty to Borrower or to any third party with respect to the Property or the construction of the Improvements. Notwithstanding any other provision of the Loan Documents: (i) no Lender or Administrative Agent is or shall be construed as, a partner, joint venturer, alter-ego, manager, controlling person or other business associate or participant of any kind of Borrower, and neither Administrative Agent nor Lender intends ever to assume such status; (ii) neither Administrative Agent nor any Lender intends ever to assume any responsibility to any person for the quality, suitability, safety or condition of the Property or the Improvements; and (iii) neither Administrative Agent nor any Lender shall be deemed responsible for or a participant in any acts, omissions or decisions of Borrower. No Lender or Administrative Agent shall be directly or indirectly liable or responsible for any loss, claim, cause of action, liability, indebtedness, damage or injury of any kind or character to any person or property arising from any construction on, or occupancy or use of, any of the Property, whether caused by or arising from: (i) any defect in any building, structure, grading, fill, landscaping or other improvements on the Property or in any on-site or off-site improvement or other facility therein or thereon; (ii) any act or omission of Borrower or any of Borrower's agents, employees, independent contractors, licensees or invitees; (iii) any accident on or about the Property or any fire, flood or other casualty or hazard thereon unless such event shall occur after Administrative Agent has completed a foreclosure on the Property and neither Borrower nor any affiliate of Borrower is the then owner, either legal or beneficial, of the Property and no act or omission of Borrower shall in any way be related to such event; (iv) the failure of Borrower, any of Borrower's licensees, employees, invitees, agents, independent contractors or other representatives to maintain the Property in a safe condition; and (v) any nuisance made or suffered on any part of the Property unless such event shall occur after Administrative Agent has completed a foreclosure on the Property and neither Borrower nor any affiliate of Borrower is the then owner, either legal or beneficial, of the Property and no act or omission of Borrower shall in any way be related to such event.

49

(b)     Borrower indemnifies and agrees to hold Lenders and Administrative Agent harmless from any actual damages resulting from any construction of the relationship of the parties to this Agreement other than as set forth above due to the actions, admissions or statements of Borrower, other than those that are the result of Lender's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment.  Neither Administrative Agent nor any Lender is under any obligation to supervise, inspect or inform Borrower or any third party of any aspect of the work of construction or any other matter referred to in this Agreement.  Any inspection or review made by any Lender or Administrative Agent is made for the purpose of determining whether or not the obligations of Borrower under this Agreement are being properly discharged; and neither Borrower nor any third party shall be entitled to rely upon any such inspection or review.

(c)     This Agreement is made and entered into for the sole protection and benefit of Lenders, Administrative Agent and Borrower.  All conditions of the obligations of Lenders to make advances under this Agreement are imposed solely and exclusively for the benefit of Lenders and may be freely modified by Lenders with the agreement of Borrower or waived by Lenders in whole or in part at any time if in their sole discretion it deems it advisable to do so.  No person other than Borrower shall have standing to require any Lender to make any Loan advances or to be a beneficiary of this Agreement or of any of the advances to be made under this Agreement.

12.10  WAIVER OF RIGHT TO TRIAL BY JURY.  TO THE EXTENT PERMITTED BY APPLICABLE STATE LAW, EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

12.11  INTENTIONALLY OMITTED

12.12     USA Patriot Act Notice; Compliance.  The USA Patriot Act of 2001 (Public Law 107-56) and federal regulations issued with respect thereto require all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution.  Consequently, any Lender may from time to time request, and Borrower shall provide to such Lender, Borrower's name, address, tax identification number and/or such other identification information as shall be necessary for such

FF\12518702.7

Lender to comply with federal law. An "account" for the purposes of this Section may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

12.13   Delay Outside Lenders' Control.   Lenders shall not be liable in any way to Borrower or any third party for Lenders' failure to perform or delay in performing under the Loan Documents (and any Lender may suspend or terminate all or any portion of such Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of such Lender deemed probable), or from any Act of God or other cause or event beyond such Lender's control.

12.14   Authority to File Notices.   Borrower irrevocably appoints, designates, and authorizes Administrative Agent as its agent (such agency being coupled with an interest) to file for record any notices of completion, cessation of labor, or any other notice that Administrative Agent and/or any Lender deems necessary or desirable to protect its interest under this Agreement or under the Note, the Mortgage or any of the other Loan Documents.

12.15   Commissions and Brokerage Fee.   Borrower shall indemnify Lender from any responsibility and/or liability for the payment of any commission, charge or brokerage fees to anyone which may be payable in connection with the making, purchase or refinance of the Loan, it being understood that any such commission, charge, or brokerage fees will be paid directly by Borrower to the party or parties entitled thereto.

12.16   Trust Fund.   Borrower, in compliance with Section 13 of the Lien Law, covenants that it shall receive and hold the advances of the Building Loan hereunder and the right to receive the same as a trust fund for the purpose of first paying the "cost of the improvement", as such quoted term is defined in the Lien Law, before using any part thereof for any other purpose.

12.17   Affidavit.   An affidavit pursuant to Section 22 of the Lien Law of New York is attached hereto as Exhibit "F" and made a part hereof.

[NO FURTHER TEXT ON THIS PAGE]

51

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWER:

HUDSON 1702, LLC,
a Delaware limited liability company,

By_____
    Name:  Alberto Smeke Saba
    Title:   Authorized Signatory

By_____
    Name:  Salomon Smeke Saba
    Title:   Authorized Signatory

HUDSON 1701/1706, LLC
a Delaware limited liability company

By_____
    Name:  Alberto Smeke Saba
    Title:   Authorized Signatory

By_____
    Name:  Salomon Smeke Saba
    Title:   Authorized Signatory

[Signatures continued on next page]

*Signature Page to Building Loan Agreement*

ADMINISTRATIVE AGENT:

PARKVIEW FINANCIAL REIT, LP,
a Delaware limited partnership

By:    Parkview Financial Fund GP, Inc.,
        a California corporation,
        its general partner

By_____
        Name:  Ted Jung
        Title:   Chief Credit Officer

LENDERS:

PARKVIEW FINANCIAL REIT, LP,
a Delaware limited partnership

By:    Parkview Financial Fund GP, Inc.
        a California corporation,
        its general partner

By: _____
        Name: Ted Jung
        Title:  Chief Credit Officer

*Signature Page to Building Loan Agreement*

STATE OF NEW YORK                    )
                                     )  ss.:
COUNTY OF NEW YORK                   )


On the 28 day of APRIL in the year 2022, before me, the undersigned, a Notary Public in and for said State, personally appeared Alberto Smeke Saba, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                             _____
                                             Notary Public

                                             DEVIKA S. RAGHOOBAR
                                             Notary Public, State of New York
                                             No. 01RA6421861
                                             Qualified in Queens County
                                             Commission Expires 9/13/2025


STATE OF NEW YORK                    )
                                     )  ss.:
COUNTY OF NEW YORK                   )


On the 28 day of APRIL in the year 2022, before me, the undersigned, a Notary Public in and for said State, personally appeared Salomon Smeke Saba, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                             _____
                                             Notary Public

                                             DEVIKA S. RAGHOOBAR
                                             Notary Public, State of New York
                                             No. 01RA6421861
                                             Qualified in Queens County
                                             Commission Expires 9/13/2025


[Notary Page to Building Loan Agreement]

STATE OF CALIFORNIA )
                               ss.:

COUNTY OF LOS ANGELES )

On the 28th day of April, in the year 2022, before me, the undersigned, a Notary Public in and for said State, personally appeared Ted Jung, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacities, and that by his signatures on the instrument, the individual, or the persons or entities upon behalf of which the individual acted, executed the instrument.

                                                    Notary Public

*Notary Page to Building Loan Agreement*

EXHIBIT A-1

PROPERTY DESCRIPTION [1702 LEASEHOLD PROPERTY]

FF\12518702.7

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 356 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Unit No. 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and **Amendment to Amended and Restated Declaration** dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lot 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1706, the premises encumbered by the Insured Mortgage is the leasehold interest demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872, Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882, Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease made by EC 58th Street LLC to 356W58 Ground Lessor, LLC, dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New

York, and the Sublease Agreement, by and between 356W58 Ground Lessor LLC, as sublandlord, and Hudson 1701/1706, LLC, as subtenant, dated as of May 4, 2022, as evidenced by a Memorandum of Sublease dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New York.

EXHIBIT A-2

PROPERTY DESCRIPTION [1701 LEASEHOLD PROPERTY]

FF\12518702.7

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 356 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Unit No. 1** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and **Amendment to Amended and Restated Declaration** dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lot 1701 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1706, the premises encumbered by the Insured Mortgage is the leasehold interest demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872, Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57 LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882, Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease made by EC 58th Street LLC to 356W58 Ground Lessor, LLC, dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New

York, and the Sublease Agreement, by and between 356W58 Ground Lessor LLC, as sublandlord, and Hudson 1701/1706, LLC, as subtenant, dated as of May 4, 2022, as evidenced by a Memorandum of Sublease dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New York.

EXHIBIT A-3

PROPERTY DESCRIPTION [SUBLEASEHOLD]

Exhibit A – Page 3

FF\12518702.7

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 356 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and **Amendment to Amended and Restated Declaration** dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **3.89067 %** interest (as to Unit 6, Lot 1706) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

As to Unit 1706, the premises encumbered by the Insured Mortgage is the leasehold interest demised by that Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant, Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872, Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882, Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630, Assignment and Assumption of Ground Lease made by EC 58th Street LLC to 356W58 Ground Lessor, LLC, dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New

York, and the Sublease Agreement, by and between 356W58 Ground Lessor LLC, as sublandlord, and Hudson 1701/1706, LLC, as subtenant, dated as of May 4, 2022, as evidenced by a Memorandum of Sublease dated as of May 4, 2022 and to be recorded contemporaneously herewith in the Office of the Register of the City of New York, County of New York.

EXHIBIT "B"

[Description of Ground Lease]

Ground Lease dated as of May _4_, 2022 between Hudson 1701/1706, LLC and Hudson 1702, LLC, collectively, as Tenant, and 356W58 Ground Lessor LLC, as Landlord.

Exhibit B – Page 1

EXHIBIT "C"

[Description of Sublease]

SUBLEASE AGREEMENT ("Sublease") is made and entered into as of the _____ day of _____, 2022, between 356W58 GROUND LESSOR LLC, a Delaware limited liability company (hereinafter called "Sublessor"), and HUDSON 1701/1706, LLC, a Delaware limited liability company

Exhibit C – Page 1

FF\12518702.7

EXHIBIT "D"

[Plans and Specifications]

Exhibit D – Page 1

FF\12518702.7

| # | SHEET NO | SHEET TITLE | 50% CD - 2022.04.15 | | | | # | SHEET NO | SHEET TITLE | 50% CD - 2022.04.15 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ARCHITECTURAL DRAWINGS | | | | | | | ARCHITECTURAL DRAWINGS | |
| 01 | G-001.00 | COVERSHEET | • • | | | | 60 | A-145.00 | REFLECTED CEILING PLAN - 18TH FLOOR | • • |
| 02 | G-002.00 | DRAWING LIST | • • | | | | 61 | A-146.00 | REFLECTED CEILING PLAN - 19TH FLOOR | • • |
| 03 | G-003.00 | BC TABLES & INSPECTIONS | • • | | | | 62 | A-147.00 | REFLECTED CEILING PLAN - 20TH FLOOR | • • |
| 04 | G-004.00 | GENERAL NOTES | • • | | | | 63 | A-148.00 | REFLECTED CEILING PLAN - 21TH FLOOR | • • |
| 05 | G-005.00 | ACCESSIBILITY NOTES | • • | | | | 64 | A-149.00 | REFLECTED CEILING PLAN - 22ND FLOOR | • • |
| 06 | G-006.00 | UNIT COUNT | • • | | | | 65 | A-150.00 | REFLECTED CEILING PLAN - 23ND FLOOR | • • |
| 07 | G-007.00 | UNIT BY FLOOR | • • | | | | 66 | A-400.00 | TYPICAL PLAN - STUDIO | • • |
| 08 | DM-100.00 | DEMOLITION PLAN - SUB-CELLAR | • • | | | | 67 | A-401.00 | TYPICAL PLAN - (1) BED | • • |
| 09 | DM-101.00 | DEMOLITION PLAN - CELLAR | • • | | | | 68 | A-402.00 | TYPICAL PLAN - (2) BED | • • |
| 10 | DM-102.00 | DEMOLITION PLAN - GROUND FLOOR | • • | | | | 69 | A-403.00 | TYPICAL PLAN - (2) BED | • • |
| 11 | DM-103.00 | DEMOLITION PLAN - MEZZANINE FLOOR | • • | | | | 70 | A-404.00 | TYPICAL PLAN - (2) BED | • • |
| 12 | DM-104.00 | DEMOLITION PLAN - 2ND FLOOR | • • | | | | 71 | A-405.00 | TYPICAL PLAN - (2) BED | • • |
| 13 | DM-105.00 | DEMOLITION PLAN - 3RD FLOOR | • • | | | | 72 | A-406.00 | TYPICAL PLAN - (3) BED | • • |
| 14 | DM-106.00 | DEMOLITION PLAN - 4TH FLOOR | • • | | | | 73 | A-407.00 | TYPICAL PLAN - (3) BED | • • |
| 15 | DM-107.00 | DEMOLITION PLAN - 5TH FLOOR | • • | | | | 74 | A-408.00 | TYPICAL PLAN - (3) BED | • • |
| 16 | DM-108.00 | DEMOLITION PLAN - 6TH FLOOR | • • | | | | 75 | A-410.00 | TYPICAL REFLECTED CEILING PLAN - STUDIO | • • |
| 17 | DM-109.00 | DEMOLITION PLAN - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | • • | | | | 76 | A-411.00 | TYPICAL REFLECTED CEILING PLAN - (1) BED | • • |
| 18 | DM-110.00 | DEMOLITION PLAN - 14TH FLOOR | • • | | | | 77 | A-412.00 | TYPICAL REFLECTED CEILING PLAN - (2) BED | • • |
| 19 | DM-111.00 | DEMOLITION PLAN - 14TH FLOOR | • • | | | | 78 | A-413.00 | TYPICAL REFLECTED CEILING PLAN - (2) BED | • • |
| 20 | DM-112.00 | DEMOLITION PLAN - 15TH FLOOR | • • | | | | 79 | A-414.00 | TYPICAL REFLECTED CEILING PLAN - (2) BED | • • |
| 21 | DM-113.00 | DEMOLITION PLAN - 16TH FLOOR | • • | | | | 80 | A-415.00 | TYPICAL REFLECTED CEILING PLAN - (2) BED | • • |
| 22 | DM-114.00 | DEMOLITION PLAN - 17TH FLOOR | • • | | | | 81 | A-416.00 | TYPICAL REFLECTED CEILING PLAN - (2) BED | • • |
| 23 | DM-115.00 | DEMOLITION PLAN - 18TH FLOOR | • • | | | | 82 | A-417.00 | TYPICAL REFLECTED CEILING PLAN - (3) BED | • • |
| 24 | DM-116.00 | DEMOLITION PLAN - 19TH FLOOR | • • | | | | 83 | A-418.00 | TYPICAL REFLECTED CEILING PLAN - (3) BED | • • |
| 25 | DM-117.00 | DEMOLITION PLAN - 20TH FLOOR | • • | | | | 84 | A-420.00 | TYPICAL FINISH FLOORING - STUDIO | • • |
| 26 | DM-118.00 | DEMOLITION PLAN - 21TH FLOOR | • • | | | | 85 | A-421.00 | TYPICAL FINISH FLOORING - (1) BED | • • |
| 27 | DM-119.00 | DEMOLITION PLAN - 22ND FLOOR | • • | | | | 86 | A-422.00 | TYPICAL FINISH FLOORING - (2) BED | • • |
| 28 | DM-120.00 | DEMOLITION PLAN - 23ND FLOOR | • • | | | | 87 | A-423.00 | TYPICAL FINISH FLOORING - (2) BED | • • |
| 29 | A-100.00 | PROPOSED PLAN - SUB-CELLAR | • • | | | | 88 | A-424.00 | TYPICAL FINISH FLOORING - (2) BED | • • |
| 30 | A-101.00 | PROPOSED PLAN - CELLAR | • • | | | | 89 | A-425.00 | TYPICAL FINISH FLOORING - (2) BED | • • |
| 31 | A-102.00 | PROPOSED PLAN - GROUND FLOOR | • • | | | | 90 | A-426.00 | TYPICAL FINISH FLOORING - (3) BED | • • |
| 32 | A-103.00 | PROPOSED PLAN - MEZZANINE FLOOR | • • | | | | 91 | A-427.00 | TYPICAL FINISH FLOORING - (3) BED | • • |
| 33 | A-104.00 | PROPOSED PLAN - 2ND FLOOR | • • | | | | 92 | A-428.00 | TYPICAL FINISH FLOORING - (3) BED | • • |
| 34 | A-105.00 | PROPOSED PLAN - 3RD FLOOR | • • | | | | 93 | A-430.00 | ENLARGED PLAN TRASH ROOM | • • |
| 35 | A-106.00 | PROPOSED PLAN - 4TH FLOOR | • • | | | | 94 | A-500.00 | DETAILS PARTITION TYPE | • • |
| 36 | A-107.00 | PROPOSED PLAN - 5TH FLOOR | • • | | | | 95 | A-501.00 | DETAILS CEILING & FLOORING | • • |
| 37 | A-108.00 | PROPOSED PLAN - 6TH FLOOR | • • | | | | 96 | A-502.00 | DETAILS TYPICAL CEILING | • • |
| 38 | A-109.00 | PROPOSED PLAN - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | • • | | | | 97 | A-600.00 | SCHEDULE - INTERIOR DOOR / WINDOW | • • |
| 39 | A-110.00 | PROPOSED PLAN - 14TH FLOOR | • • | | | | 98 | A-610.00 | SCHEDULE - SPECIFICATION | • • |
| 40 | A-111.00 | PROPOSED PLAN - 14TH FLOOR | • • | | | | 99 | A-700.00 | INTERIOR ELEVATIONS | • • |
| 41 | A-112.00 | PROPOSED PLAN - 15TH FLOOR | • • | | | | 100 | A-710.00 | INTERIOR ELEVATIONS - KITCHEN | • • |
| 42 | A-113.00 | PROPOSED PLAN - 16TH FLOOR | • • | | | | | | | |
| 43 | A-114.00 | PROPOSED PLAN - 17TH FLOOR | • • | | | | | | | |
| 44 | A-115.00 | PROPOSED PLAN - 18TH FLOOR | • • | | | | | | | |
| 45 | A-116.00 | PROPOSED PLAN - 19TH FLOOR | • • | | | | | | | |
| 46 | A-117.00 | PROPOSED PLAN - 20TH FLOOR | • • | | | | | | | |
| 47 | A-118.00 | PROPOSED PLAN - 21TH FLOOR | • • | | | | | | | |
| 48 | A-119.00 | PROPOSED PLAN - 22ND FLOOR | • • | | | | | | | |
| 49 | A-120.00 | PROPOSED PLAN - 23ND FLOOR | • • | | | | | | | |
| 50 | A-135.00 | REFLECTED CEILING PLAN - 3RD FLOOR | • • | | | | | | | |
| 51 | A-136.00 | REFLECTED CEILING PLAN - 4TH FLOOR | • • | | | | | | | |
| 52 | A-137.00 | REFLECTED CEILING PLAN - 5TH FLOOR | • • | | | | | | | |
| 53 | A-138.00 | REFLECTED CEILING PLAN - 6TH FLOOR | • • | | | | | | | |
| 54 | A-139.00 | RCP - 7TH, 8TH, 9TH, 10TH & 12TH FLOOR | • • | | | | | | | |
| 55 | A-140.00 | REFLECTED CEILING PLAN - 14TH FLOOR | • • | | | | | | | |
| 56 | A-141.00 | REFLECTED CEILING PLAN - 14TH FLOOR | • • | | | | | | | |
| 57 | A-142.00 | REFLECTED CEILING PLAN - 15TH FLOOR | • • | | | | | | | |
| 58 | A-143.00 | REFLECTED CEILING PLAN - 16TH FLOOR | • • | | | | | | | |
| 59 | A-144.00 | REFLECTED CEILING PLAN - 17TH FLOOR | • • | | | | | | | |

PROJECT
## 353 W. 57 TH ST
NEW YORK, NY 10019
BLOCK: 1048  LOT: 7502

OWNER
CSC COLIVING

ARCHITECT
TANG STUDIO ARCHITECT LLC

MEP ENGINEER
MG ENGINEERING, P.C.

INTERIOR DESIGNER
B-HUBER

LIGHTING DESIGNER
LIGHTING WORKSHOP

DRAWING TITLE
## DRAWING LIST

## G - 002.00

EXHIBIT "E"

Intentionally Omitted

FF\12518702.7

EXHIBIT "F"

AFFIDAVIT PURSUANT TO SECTION 22 OF THE
LIEN LAW OF THE STATE OF NEW YORK

STATE OF NEW YORK          )
                                :ss.:
COUNTY OF NEW YORK      )

Alberto Smeke Saba and Salomon Smeke Saba, each, being duly sworn, depose and say:

Each Deponent has an address as c/o CSC Coliving LLC, 6 St. John's Lane, New York, New York 10013.

Each Deponent is an authorized signatory of each of Hudson 1702, LLC and Hudson 1701/1706, LLC, the Borrowers mentioned in the within Building Loan Agreement.

The consideration paid, or to be paid, by the Borrowers for the Building Loan described therein is $-0-, and all other expenses constituting cost of the improvement incurred, or to be incurred, in connection with the Building Loan, and advanced or to be advanced pursuant to the Building Loan Agreement are as follows:

Architect and Engineering Fees …………………………….…....$1,250,000

Real Estate Taxes…………………………………………….$10,415,858

Ground Rent……………………………………………….……$12,800,000

Insurance…………………………………………………..…………$1,255,392

Contingency…………………………………………………...…….$4,300,000

In addition to the above items the following sums shall be disbursed to the Borrowers for the cost of the improvements incurred and paid for by the Borrowers subsequent to the commencement of construction of the improvement, but prior to the date of the initial advance of the Building Loan under the Building Loan Agreement:

None

The net sum available to the Borrowers for the improvement is FIFTY-ONE MILLION SEVEN HUNDRED SIXTY-ONE THOUSAND TWO HUNDRED SEVENTY-SEVEN and

Exhibit F – Page 1

FF\12518702.7

00/100 Dollars ($51,761,277.00), less such amounts (i) as, may not be advanced and disbursed under the Building Loan Agreement due to the nonsatisfaction of conditions to the advance and disbursement of such amounts contained in the Building Loan Agreement, and (ii) as may become due or payable for additional insurance premiums, interest on the Building Loan, ground rents, taxes, assessments, water rents and sewer rents accruing during the construction of the improvement.

[NO FURTHER TEXT ON THIS PAGE]

FF\12518702.7

This statement is made pursuant to Section 22 of the Lien Law of the State of New York and is hereby made a part of the Building Loan Agreement.

The facts herein stated are true to the knowledge of the deponents.

_____
Alberto Smeke Saba

_____
Salomon Smeke Saba

Sworn to before me this
28 day of April, 2022

_____
Notary Public

DEVIKA S. RAGHOOBAR
Notary Public, State of New York
No. 01RA6421861
Qualified in Queens County
Commission Expires 9/13/2025

Exhibit F – Page 2

FF\12518702.4