# EXHIBIT I

## LEASEHOLD FINANCING AGREEMENT

THIS LEASEHOLD FINANCING AGREEMENT (this "**Agreement**") is made and entered into as of the 4th day of May, 2022 (the "**Effective Date**"), between **PARKVIEW FINANCIAL REIT, LP**, a Delaware limited partnership, whose address is 11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025, as a lender and **PARKVIEW FINANCIAL REIT, LP**, a Delaware limited partnership, as contractual representative of the lenders, whose address is 11601 Wilshire Boulevard, Suite 2100, Los Angeles, California 90025 (collectively referred to herein, together with its successors and assigns, as "**Construction Lender**"), **356W58 GROUND LESSOR LLC**, a Delaware limited liability company, having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219 (together with its successors and assigns, "**Landlord**"), and **HUDSON 1701/1706, LLC**, a Delaware limited liability company ("**Tenant 1701/1706**") and **HUDSON 1702, LLC**, a Delaware limited liability company, each having an address of c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013 ("**Tenant 1702**"; and together with Tenant 1701/1706, collectively, on a joint and several basis, "**Tenant**").


WITNESSETH:

WHEREAS, (i) Landlord and Tenant have executed that certain Ground Lease covering the leased premises described on Exhibit A-1 attached hereto and made a part hereof (the "**Ground Leased Premises**"), dated as of the Effective Date (as amended, restated, supplemented, and/or modified from time to time, the "**Ground Lease**") and (ii) Landlord and Tenant 1701/1706 have executed that certain Sublease covering the subleased premises described on Exhibit A-2 attached hereto and made a part hereof (the "**Subleased Premises**"; and together with the Ground Leased Premises, collectively, the "**Leased Premises**"), dated as of the Effective Date, but effective ten (10) days thereafter (as amended, restated, supplemented, and/or modified from time to time, the "**Sublease**"; and together with the Ground Lease, collectively, the "**Lease**"). Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Ground Lease;

WHEREAS, in connection with Tenant's construction and development of the Project in accordance with the Lease and Work Letter, Tenant is obtaining a leasehold mortgage loan in the maximum principal amount of up to $207,000,000 (the "**Construction Loan**"), which Construction Loan is secured by the Construction Loan Mortgage, which encumbers the entirety of Tenant's leasehold interest in the Leased Premises;

WHEREAS, Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease, (ii) the Completion Guaranty executed by Guarantor in favor of Landlord, dated as of the Effective Date (the "**Lease Completion Guaranty**"), (iii) the Carry Guaranty executed by Guarantor in favor of Landlord, dated as of the Effective Date (the "**Lease Carry Guaranty**"), (iv) the Environmental Indemnity executed by Tenant and Guarantor in favor of Landlord, dated as of the Effective Date (the "**Lease Environmental Indemnity**"), and (v) the Indemnity Agreement executed by Tenant and Guarantor in favor of Landlord, dated as of the Effective Date (the "**Union MOA and Condo Indemnity**"; and together with the Lease Completion Guaranty, the Lease Carry Guaranty, the Lease Environmental Indemnity, collectively, as each may be amended, restated, supplemented and/or otherwise modified from time to time, the "**Lease Guaranties**"); and

WHEREAS, Landlord, Tenant and Construction Lender desire to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of this Agreement.

NOW, THEREFORE, the parties hereto covenant and agree as follows:

1

4866-5415-7342, v. 11

1.      Construction Lender as Leasehold Mortgagee; Proceeds Trustee. Landlord acknowledges that it has been notified that Tenant intends to obtain the Construction Loan from Construction Lender and, in connection therewith, grant a Leasehold Mortgage on the Leased Premises to Construction Lender. Landlord agrees that the making of the Construction Loan and the encumbering of Tenant's interest in the Leased Premises does not constitute a default under the Lease.  Landlord further agrees that Construction Lender is deemed a "Leasehold Mortgagee" pursuant to the terms of the Lease and Construction Lender is entitled to all of the rights and benefits of a Leasehold Mortgagee under and pursuant to the terms of the Lease.  Construction Lender elects to be the Proceeds Trustee and agrees that it will hold and disburse Condemnation Awards, Net Proceeds and the Restoration Fund in accordance with the terms and provisions of the Lease, notwithstanding the existence of any default under the Construction Loan Mortgage and the other Construction Loan Documents (including, without limitation, the existence of any Bankruptcy Action with respect to Tenant or Guarantor), including, without limitation, for use for any Restoration following a Casualty or Condemnation in accordance with the Lease.

2.      Notices. Landlord shall give Construction Lender, at the address set forth below or at such other address as Construction Lender may specify in writing to Landlord, a copy of any written notice of any default under the Lease, at the same time as such written notice is given to Tenant, and shall include in the delivery to Construction Lender a copy of the notice of default and all other documents or instruments delivered to Tenant in connection therewith.

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, California 90025
Attention: Paul S. Rahimian

3.      Bankruptcy Matters.

(a)      In the event that any Bankruptcy Action is filed by or against Landlord, (i) Landlord shall provide Construction Lender with prompt written notice thereof, along with copies of any filings, and (ii) Construction Lender shall be entitled, but not obligated, to participate in such proceeding, through counsel selected by Construction Lender.

(b)      In the event that a trustee in bankruptcy for Landlord rejects the Lease pursuant to Section 365 of the Bankruptcy Code, then:  (i) Tenant shall not make any election to terminate the Lease pursuant to Section 365(h)(1)(A) of the Bankruptcy Code without the prior written consent of Construction Lender, and (ii) Construction Lender is appointed the agent and attorney-in-fact of Tenant  for the purpose of making any election to terminate the Lease or remain in possession pursuant to Section 365(h)(1)(A) of the Bankruptcy Code, which appointment is coupled with an interest and irrevocable..

(c)      In the event that a trustee in bankruptcy for Landlord rejects the Lease pursuant to Section 365 of the Bankruptcy Code and Tenant fails to timely elect to retain its rights under the Lease, then Tenant shall be deemed not to reject the Lease, but rather to retain its rights under the Lease, pursuant to Section 365(h)(1)(A)(ii) of the Bankruptcy Code, including any right of use, possession, quiet enjoyment, subletting, assignment or hypothecation, all encumbered by the Construction Loan Mortgage.

(d)      Landlord agrees that if Tenant remains in possession of the Leased Premises pursuant to Section 365(h)(1) of the Bankruptcy Code, the term "possession" as

2

used therein shall include the right to assign, sublet, license, use and/or occupancy of all or any portion thereof to other entities, all in accordance with and as set forth in the Lease.

(e)     This Agreement is a "subordination agreement" under section 510(a) of the Bankruptcy Code and shall be enforceable in any insolvency proceeding.

(f)     Construction Lender, on behalf of itself and its successors and assigns, hereby agrees that it shall not file, commence or collude with any Person to bring a Bankruptcy Action against Tenant or any Guarantor; provided, however, that nothing contained in this subparagraph (f) shall be construed to restrict Construction Lender from filing a claim or participating in any such Bankruptcy Action not filed or commenced or colluded in by Construction Lender.

4.     Construction Lender Assumption.  If pursuant to and in compliance with the terms of the Lease, Construction Lender assumes the interest of Tenant under the Lease, Landlord shall within sixty (60) days after receipt of written request, deliver to Construction Lender an agreement in substantially the same form of this Agreement for the benefit of any Leasehold Mortgagee (which is a Qualified Institutional Lender holding a Leasehold Mortgage) of Construction Lender's interest in the Lease; provided that, in either case, Landlord shall have the right to revise the factual statements therein to reflect the actual then-existing circumstances.

5.     Construction Loan Guaranties. Landlord hereby acknowledges that Guarantor has executed and delivered the following guaranties to Construction Lender (collectively, the "**Construction Loan Guaranties**"): (i) that certain Completion Guaranty, dated as of the Effective Date (the "**CL Completion Guaranty**"), (ii) that certain Guaranty, dated as of the Effective Date (the "**CL Payment and Carry Guaranty**"), (iii) that certain Environmental Indemnity Agreement, dated as of the Effective Date (the "**CL Environmental Indemnity**"). Construction Lender hereby acknowledges that Guarantor has executed and delivered the Lease Guaranties to Landlord in accordance with the Lease.

6.     Guaranty Claims.

(a)     For purposes of this Agreement, the following terms shall have the following meanings:

(i)     "**Completion Costs**" means, collectively, any payment or settlement received in respect of a claim made by Landlord against Guarantor under the Lease Completion Guaranty in respect of the guaranteed obligations thereunder, which amounts are required to achieve Completion of the Multifamily Project.

(ii)     "**Foreclosure Event**" has the meaning set forth in the Ground Lease.

(iii)     "**Lease Carry Obligations**" means Guarantor's obligations under the Lease Carry Guaranty, including, without limitation, payment of all Base Rent and Additional Rent due under the Lease until termination of the Lease Carry Guaranty in accordance with its terms.

(iv)     "**Lender Guaranty Claim**" means any claim made by Construction Lender under any Construction Loan Guaranty in accordance with the terms thereof.

3

4866-5415-7342, v. 11

(b)     Construction Lender and Landlord acknowledge and agree that (i) the CL Completion Guaranty is solely with respect to Total Project Costs due in connection with the Completion of the Multifamily Project and does not contemplate the construction of the Fallback Project, (ii) the Lease Completion Guaranty is with respect to Total Project Costs due in connection with the Completion of the Project, including the Fallback Project, if approved by Landlord in accordance with the Ground Lease, (iii) each of the CL Completion Guaranty and the Lease Completion Guaranty provide the applicable beneficiary thereunder the right to seek liquidated damages in lieu of compelling the Guarantor to satisfy the obligations thereunder, (iv) each of the CL Carry Guaranty and the Lease Carry Guaranty provide Tenant the right to tender (each, a "**Tender**") the Leased Premises to the beneficiary thereof in accordance with its respective terms, and (v) if Landlord delivers (or is deemed to have delivered) a Fallback Business Plan Notice to Landlord or Tenant otherwise elects to submit a Fallback Business Plan to Landlord (due to Tenant's inability to satisfy the CONH Requirement by the CONH Requirement Outside Date or otherwise) in accordance with the Ground Lease, the Lease Carry Guaranty may require Guarantor to pay Lease Carry Obligations for a period of time that exceeds that required by the CL Carry Guaranty.

(c)     Except to the extent deposited with Landlord pursuant to the Work Letter, Construction Lender agrees that it will utilize any and all amounts received from Guarantor following exercise of a Lender Guaranty Claim under the CL Completion Guaranty, after deduction for any reasonable attorney's fees and expenses and other costs of collection incurred in connection with the enforcement of the CL Completion Guaranty (collectively, "**Net Recoveries**") to (i) pay Total Project Costs as to the Multifamily Project or (ii) hold such Net Recoveries in trust for the benefit of Landlord to pay such Total Project Costs. If the Lease is terminated in accordance with its terms and a New Lease with Construction Lender in accordance with Section 12(h) of the Ground Lease is not entered into prior to the end of the New Lease Option Period in accordance with Section 12(h) of the Ground Lease, Construction Lender shall, promptly after demand from Landlord, pay any Net Recoveries to Landlord; provided, however that any Net Recoveries in excess of Total Project Costs for the Multifamily Project may be retained by Construction Lender if Completion of the Multifamily Project has occurred.

(d)     If Completion of the Multifamily Project has not occurred as of the date the New Lease is executed and delivered by Construction Lender in accordance with Section 12 of the Ground Lease, the Construction Lender shall deposit, or cause the deposit of, Net Recoveries with Landlord, or Construction Lender shall acknowledge it is holding the same in trust for the benefit of Landlord to pay for Total Project Costs.

(e)     In addition, if either (x) as of the date the New Lease is executed and delivered by Construction Lender in accordance with Section 12 of the Ground Lease or (y) the date that a Successor Tenant takes possession of the Leased Premises (either such date, the "**Takeover Date**"), the CONH Requirement has not been satisfied and the CONH Requirement Outside Date has then occurred or a Fallback Business Plan Notice was (or was deemed to have been) delivered in accordance with the Ground Lease, the following shall apply:

> (v)     such event shall be deemed to constitute Landlord's deliver of a Fallback Business Plan Notice under the Ground Lease (or New Lease, as applicable), such that

4

Construction Lender or Successor Tenant, as applicable, shall have ninety (90) days from the Takeover Date to deliver a Fallback Business Plan to Landlord for its review and approval in accordance with the Ground Lease or New Lease, as applicable); and

(vi)     as a condition to Landlord entering into a New Lease with Construction Lender or Successor Tenant stepping into the obligations of Tenant under the Lease in accordance with the Ground Lease, if Construction Lender has engaged a third-party developer, general contractor or construction manager to take over and complete the Project (a "**Project Developer**"), such Project Developer shall provide a guaranty from a Qualified Replacement Guarantor in substantially the same form as the Lease Completion Guaranty in respect of Completion of the Fallback Project (such requirement, the "**Fallback Completion Guaranty Requirement**").

(f)     Construction Lender will, from time to time following request from Landlord (but not more often than once in any calendar quarter), advise Landlord as to the amount, if any, of Net Recoveries (or remaining proceeds available for advances under the Construction Loan) for Total Project Costs of the Multifamily Project.

(g)     Landlord agrees that, so long as Construction Lender is proceeding with reasonable diligence to enforce the obligations of Guarantor under the Construction Loan Guaranties, Landlord will defer execution on any judgment against Guarantor that has become final by appeal or lapse of time for appeal on the Lease Guaranties, provided, however, Landlord's obligation to defer execution and collection on any such judgment (or payment) shall terminate at such time as both (i) Construction Lender's rights to cure under Section 12(e) of the Ground Lease have terminated without cure of the relevant Defaults and (ii) the New Lease Option Period has terminated without execution and delivery of the New Lease in accordance with Section 12(h) of the Ground Lease; provided further, that, subject to Section 6(e) of this Agreement, Landlord may seek and obtain collection of such judgment (or payment in settlement of any claims for payment under the Lease Guaranties) if Guarantor is the subject of a Bankruptcy Action or if Landlord determines that failure to promptly collect upon such judgment or settlement will materially prejudice Landlord's ability to collect upon such judgment or settlement or exercise its rights and remedies under the Lease or otherwise at law or equity.

(h)     To the extent that Landlord receives payment of Completion Costs pursuant to the Lease Completion Guaranty or a judgment against Guarantor for claims for such Completion Costs under the Lease Completion Guaranty, Landlord shall, to the extent not expended on the reasonable costs of collection of such Completion Costs, make such collections available to Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, or Construction Lender (if Construction Lender is mortgagee in possession), as the case may be, for payment of Total Project Costs if the Lease (or New Lease, if applicable) has not been terminated and such Person(s) have (i) agreed in writing to assume the obligations of Tenant to Complete the Project in accordance with the Ground Lease and Work Letter, subject to reasonable requisition requirements of Landlord and (ii) if the CONH Requirement has not been

5

satisfied and the CONH Requirement Outside Date has then occurred or a Fallback Business Plan Notice has been (or was deemed to have been) delivered, satisfied the Fallback Completion Guaranty Requirement. In no event shall any such collections under the Lease Completion Guaranty be made available to Tenant or any Affiliate of Tenant. Construction Lender hereby acknowledges and agrees that if it becomes a Successor Tenant or new tenant under the Lease in accordance with the terms thereof, it shall assume the obligations of Tenant to Complete the Project in accordance with the terms of the Lease and Work Letter.

(i)       If Net Recoveries are to be made available by Landlord for payment of Total Project Costs, Landlord may condition such availability upon the Successor Tenant providing assurances, reasonably satisfactory to Landlord, that such Net Recoveries will be applied to payment of Total Project Costs. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, to the extent Total Project Costs include interest on the Construction Loan (or any other Leasehold Mortgage), payment of such interest, from Net Recoveries will be deferred until Completion of the Project has occurred.

(j)       Additionally, Landlord agrees that if it receives payment of any Lease Carry Obligations, it shall either (x) apply the receipts (less the actual, reasonable costs of obtaining such collections) to the expenses for which they were collected, in which event Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, Construction Lender (if Construction Lender is mortgagee in possession or is undertaking obligations to Complete the Project in accordance with the Ground Lease) or New Tenant, as the case may be, shall not be liable for such expenses or (y) make such receipts (less the actual, reasonable costs of obtaining such collections) available to Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, Construction Lender (if Construction Lender is mortgagee in possession or is undertaking obligations to Complete the Project in accordance with the Ground Lease) or New Tenant, as the case may be to pay for such expenses, in which event such Person shall be liable for the failure to pay such expenses.

(k)       Notwithstanding Section 6(f) of this Agreement, in no event shall Construction Lender accept a Tender of the Leased Premises under the CL Payment and Carry Guaranty unless (x) Construction Lender has complied with or intends thereafter to comply with the obligations of a Leasehold Mortgagee under Section 12(h) of the Ground Lease to obtain a New Lease or (y) Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, or Construction Lender (if Construction Lender is mortgagee in possession) cures all applicable Defaults under the Ground Lease in accordance with Section 12 thereof. Subject to Section 5 of this Agreement, if Guarantor exercises (or seeks to exercise) its rights to Tender the Leased Premises to Construction Lender and, at such time, the Takeover Date has occurred, Construction Lender shall pay to Landlord any and all amounts received from Guarantor following exercise of a Lender Guaranty Claim under the CL Payment and Carry Guaranty which are Lease Carry Obligations (including, without limitation, any proceeds of the Construction Loan available for such costs and any amounts held by Construction Lender in any applicable reserves for such costs), which shall be applied to Guarantor's obligations under the Lease Carry Guaranty.

(l)       Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, except as set forth in this Section 5, Landlord shall not (i) be

6

prohibited from enforcing or otherwise collecting under any Lease Guaranty or (ii) be deemed to have subordinated and shall not be obligated to subordinate any of its rights and remedies under the Lease Guaranties or any other guaranties issued by Guarantor to or for the benefit of Construction Lender pursuant to or in connection with the Lease. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, except as set forth in this Section 6, Construction Lender shall not (i) be prohibited from enforcing or otherwise collecting under any Construction Loan Guaranty or (ii) be deemed to have subordinated and shall not be obligated to subordinate any of its rights and remedies under the Construction Loan Guaranties or any other guaranties issued by Guarantor to or for the benefit of Landlord pursuant to or in connection with the Lease.

(m)    Nothing in this Section 6 shall be deemed to derogate from any rights inuring to Construction Lender as a Leasehold Mortgagee pursuant to the Ground Lease.

(n)    Notwithstanding anything contained herein to the contrary, from and after the date that Construction Lender transfers its interest in the Construction Loan to a Qualified Institutional Lender, Construction Lender shall have no further obligations or liabilities hereunder for any obligations accruing following the date of such transfer, and the other parties hereto shall look only to such Qualified Institutional Lender with respect to such obligations or liabilities, provided that (x) such Qualified Institutional Lender assumes all of the obligations of the Construction Lender under this Agreement in writing, and (y) to the extent that Construction Lender has retrieved from Guarantor any Net Recoveries or Lease Carry Guaranty Obligations, such amounts are transferred to such Qualified Institutional Lender or Landlord, as applicable, in compliance with all of the obligations of Construction Lender under this Section 6.

7.    Hotel Union Pension Fund Obligations.

(a)    As further set forth in the Ground Lease, (i) Tenant is responsible for satisfying the Hotel Union Pension Fund Obligations by the Hotel Union Pension Fund Obligations Date in accordance with the Union MOA (which obligations are guaranteed by Guarantor pursuant to the Union MOA and Condo Indemnity) and (ii) as of the Effective Date, as required by the Union MOA, Landlord has assumed the Union MOA and is, therefore, directly liable to the Hotel Union and the Hotel Union Pension Fund for satisfaction of such obligations if Tenant fails to satisfy such obligations or otherwise breach the Union MOA.

(b)    The parties acknowledge that the Project Budget includes a line item in the amount of $13,021,368.00 for the Hotel Union Pension Fund Obligations, which amount (the "**Withdrawal Liability Amount**") is to be funded with proceeds of the Construction Loan, as further set forth in 5.6(c) of the Construction Loan Agreement. Construction Lender hereby acknowledges and agrees that, notwithstanding any default or event of default by Tenant under the Construction Loan Documents or under the Lease, if Tenant or Landlord delivers to Construction Lender a demand letter from the Hotel Union Pension Fund (the "**Withdrawal Liability Demand**"), Construction Lender shall advance such amount to the Hotel Union Pension Fund. In furtherance of the foregoing, in the event that, prior to Landlord's disbursement of the Withdrawal Liability Amount in accordance with the Construction Loan Agreement, Tenant either (x) defaults under any of its obligations under the Lease and Landlord delivers a copy of the applicable default notice to Construction Lender or (y) defaults under any of its obligations under the Construction

7

Loan Documents, of which Landlord shall be provided notice by Construction Lender, the following shall apply:

    (i)    If Landlord delivers a written request (the "**Withdrawal Liability Escrow Notice**") to Construction Lender to advance the Withdrawal Liability Amount in accordance with this clause (i), Construction Lender shall within five (5) Business Days of receipt of such Withdrawal Liability Escrow Notice deposit the entire Withdrawal Liability Amount with First American Title Insurance Company (the "**Escrow Agent**") (it being agreed that (A) Construction Lender shall make such deposit in accordance with this clause (i) notwithstanding any pending dispute by Tenant with respect to the applicable default, and (B) Tenant agrees that such deposit shall not be deemed to constitute a waiver of any default by Tenant under the Construction Loan Documents);

    (ii)    Escrow Agent shall hold such Withdrawal Liability Amount in escrow in accordance with the terms and conditions of the form of escrow agreement attached hereto as Exhibit B (the "**Withdrawal Liability Escrow Agreement**");

    (iii)    Pursuant to the Withdrawal Liability Escrow Agreement, upon Landlord's presentation of the Withdrawal Liability Demand to Escrow Agent, Escrow Agent shall release the Withdrawal Liability Demand in accordance with the terms of the Withdrawal Liability Escrow Agreement; and

    (iv)    All escrow fees and other out-of-pocket costs and expenses of Landlord in opening and maintaining the Withdrawal Liability escrow shall be paid by Tenant as Additional Rent under the Ground Lease.

    (c)    This Section 7 shall survive termination of this Agreement and the Lease.

8.    Miscellaneous.

    (a)    Landlord has not received actual notice of any prior sale, transfer, assignment, hypothecation or pledge of Tenant's right, title or interest in, to or under the Lease or the Leased Premises.

    (b)    All parties to this Agreement represent (i) they are authorized and empowered to execute, deliver and perform this Agreement, (ii) any consents necessary in connection with such execution, delivery and performance have been duly obtained, and (ii) neither the execution, delivery or performance of its obligations under this Agreement is or could result in a violation of any applicable law, rule, regulation, statute, court order

8

or other governmental pronouncement, or a default under any agreement or organizational document, to which it is a signatory or by which its properties may be bound.

(c)     This Agreement may be executed in one or more counterparts, or by the parties executing separate counterpart signature pages, including facsimiles transmitted by telecopier or counterparts being sent by email or other electronic medium, all of which shall be deemed to be original counterparts of this Agreement and all of which taken together shall constitute one and the same agreement.

(d)     This Agreement may not be modified other than by an agreement in writing, signed by the parties hereto or by their respective successors in interest.

(e)     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns, subject to the provisions set forth in the Lease, and all covenants, conditions and agreements herein contained shall be construed as running with the land.  Without limiting the generality of the foregoing, Construction Lender's rights under this Agreement shall inure to the benefit of Construction Lender's successors and/or assigns (including a purchaser at a foreclosure sale) which are not Tenant, an Affiliate of Tenant, or a Prohibited Person, subject to the terms and conditions of the Lease. In addition to the foregoing and notwithstanding anything to the contrary specified herein, Construction Lender shall have the right to (i) designate a Subsidiary of Construction Lender to prosecute and/or consummate a Foreclosure Event on behalf of Construction Lender, and (ii) assign its Leasehold Mortgage to one or more subsidiaries of Construction Lender, each of which is wholly owned and controlled by Construction Lender (each, a "**Foreclosure Subsidiary**"), and, in the case of each of the foregoing clauses (i) and (ii), such Foreclosure Subsidiary shall be deemed a "Leasehold Mortgagee" pursuant to the terms of the Lease and shall be entitled to all of the rights and benefits of a Leasehold Mortgagee under and pursuant to the terms of the Lease (but subject to the terms and conditions thereof).

(f)     Guarantor shall be a third party beneficiary of this Agreement, solely for purposes of Section 6 of this Agreement.

*[remainder of page intentionally left blank; signature pages follow]*

4866-5415-7342, v. 11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**CONSTRUCTION LENDER:**

**PARKVIEW FINANCIAL REIT, LP**, a Delaware limited partnership, as Administrative Agent

By:    Parkview Financial Fund GP, Inc.,
         a California corporation,
         its General Partner

By: _____
         Name: Ted Jung
         Title:  Chief Credit Officer

9

**LANDLORD:**

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: _____

Name: Lucie Pall

Title: Authorized Signatory

*[Signature Page to Leasehold Financing Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**TENANT:**

**HUDSON 1701/1706, LLC,**
a Delaware limited liability company

By: _____
       Name: Alberto Smeke Saba
       Title:  Authorized Signatory

By: _____
       Name: Salomon Smeke Saba
       Title:  Authorized Signatory

**HUDSON 1702, LLC,**
a Delaware limited liability company

By: _____
       Name: Alberto Smeke Saba
       Title:  Authorized Signatory

By: _____
       Name: Salomon Smeke Saba
       Title:  Authorized Signatory

*[Signature Page to Leasehold Financing Agreement]*

**EXHIBIT A-1**

**Description of Ground Leased Premises**

13

4866-5415-7342, v. 11

Lots 1701 and 1702

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1 and 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration").  These Units are also designated as **Tax Lots 1701 and 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) and **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

4884-6998-3262, v. 2

**EXHIBIT A**

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, Units 1 and 2, New York, NY and designated as Block 1048 Lots 1701 and 1702 as shown on the Tax Map of the City of New York, County of New York

4884-6998-3262, v. 2

## EXHIBIT A-2

## Description of Subleased Premises

14

Lot 1706

The premises demised by that certain Lease dated as of 2/11/1999 made by and between Irving Schatz, as landlord and Ian Schrager Hotels LLC, as tenant; as modified by an Amended and Restated Memorandum of Lease made between Ian Schrager Hotels LLC and Irving Schatz dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1872; as assigned by an Assignment and Assumption of Lease made by and between Ian Schrager Hotels LLC (f/k/a West 57th LLC) to Henry Hudson Holdings LLC dated as of 2/12/1999 and recorded 3/23/1999 in Reel 2841 Page 1882; as modified by an Unrecorded Amendment to Lease made by and between Irving Schatz, as landlord, and Henry Hudson Holdings LLC, as tenant, dated as of 8/17/2004, as evidenced by Assignment and Assumption of Ground Lease in Lieu of Foreclosure made by Henry Hudson Holdings LLC to EC 58th Street LLC dated as of 11/24/2020 and recorded 12/4/2020 as CRFN 2020000344630; to wit:

**THE CONDOMINIUM UNIT** (hereinafter referred to as the "Unit") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Unit being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration").  This Unit is also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **3.89067 %** interest in the Common Elements (as such term is defined in the Declaration).

4884-6998-3262, v. 2

**The Land** on which the Building and Unit are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

4884-6998-3262, v. 2

**EXHIBIT B**

**Form of Withdrawal Liability Escrow Agreement**

15

# ESCROW AGREEMENT
## (Withdrawal Liability)

**File Number:**     1118978
**Date:**           May 4, 2022

**Escrow Agent:**    First American Title Insurance Company, 666 Third Avenue, 5th Floor New York, NY 10017 Phone: 800-437-1234   Fax: 212-922-0881

Reference is hereby made to that certain Leasehold Financing Agreement, dated May 4, 2022 (the "Agreement"), by and among Parkview Financial REIT, LP ("Lender"), 356W58 Ground Lessor LLC ("Landlord") and Hudson 1701/1706, LLC ("Tenant 1701/1706") and Hudson 1702, LLC ("Tenant 1702"; and together with Tenant 1701/1706, collectively and jointly and severally, "Tenant"). A true, correct and complete copy of the Agreement has been delivered to Escrow Agent as of the date hereof. Capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Agreement.

Pursuant to Section 7(b) of the Agreement, in the event that Tenant either (x) defaults under any of its obligations under the Lease and Landlord delivers a copy of the applicable default notice to Lender or (y) defaults under any of its obligations under the Construction Loan Documents (any such event, a "Tenant Default"), Lender shall deposit with Escrow Agent the Withdrawal Liability Amount in accordance with the Agreement, which amount is currently $13,021,368.00. Prior to depositing the Withdrawal Liability Amount Lender shall notify all parties to this Escrow Agreement that it is depositing the Withdrawal Liability Amount and the amount of the Withdrawal Liability Amount. Notwithstanding anything contained herein to the contrary, notice sent pursuant to this paragraph 2 may be by email only. Upon receipt, Escrow Agent shall hold such Withdrawal Liability Amount in accordance with the following terms and conditions:

1)   Escrow Agent shall open a separate escrow under escrow number 1118978, for the sole benefit of Landlord and Tenant, to hold the Withdrawal Liability Amount. Provided Escrow Agent has received a completed and form W9, the Withdrawal Liability Amount shall be held in a segregated, interest bearing account with a Federally insured financial institution and shall not be commingled with any other funds of Escrow Agent.

2)   If Landlord or Tenant presents to Escrow Agent a copy of the Withdrawal Liability Demand, then Escrow Agent shall disburse the Withdrawal Liability Amount to the Hotel Union Pension Fund in accordance with the instructions set forth on Exhibit A attached hereto. Prior to disbursing same Escrow Agent shall notify all parties to this Escrow Agreement and request who to contact at the Hudson Union Pension Fund to verify the wire instructions.

3)   Escrow Agent is acting as a stakeholder only with respect to the Withdrawal Liability Amount. If there is any dispute as to whether a Tenant Default occurred, giving rise to Lender's obligation to deposit the Withdrawal Liability Amount with Escrow Agent, Escrow Agent shall nonetheless disburse the Withdrawal Liability Amount to the Hotel Union Pension Fund within five (5) Business Days of receipt of the Withdrawal Liability Demand. Upon making delivery of the Withdrawal Liability Amount in the manner herein provided, Escrow Agent shall have no further liability hereunder. Tenant and Landlord agree that Escrow Agent shall ignore any objection Escrow Agent receives to disbursing the Withdrawal Liability Amount and Escrow Agent is authorized and directed to disburse the Withdrawal Liability Amount as set forth in paragraph 2 above  upon receipt of a Withdrawal Liability Demand

4)   Tenant shall pay any and all escrow fees charged by Escrow Agent to hold the Withdrawal Liability Amount in accordance with the provisions of this Escrow Agreement. Escrow Agent shall charge the following escrow fees: $0.

5)   Escrow Agent has executed this Agreement in order to confirm that Escrow Agent has received a copy of the Agreement and is prepared to receive the Withdrawal Liability Amount from Lender in the event of a Tenant Default, and to hold the Withdrawal Liability Amount in escrow, pursuant to the provisions hereof.

Upon making such delivery of the Withdrawal Liability Amount and performance of any other services included in this agreement (this "Escrow Agreement"), Escrow Agent will thereupon be released and acquitted from any further liability concerning the Withdrawal Liability Amount, it being expressly understood that such liability in any event is limited by the terms and conditions set forth herein.  By acceptance of the Withdrawal Liability Amount, Escrow Agent is in no way assuming any responsibility for the validity or authenticity of any instrument deposited hereunder or any instrument pursuant to which this escrow is established. Escrow Agent shall incur no liability resulting from the failure of any financial institution used by it as an escrow depository. Landlord and Tenant acknowledge that Escrow Agent is serving

4875-9480-9118, v. 9

solely as an accommodation to the parties hereto, and except for the gross negligence or willful misconduct of the Escrow Agent, Escrow Agent shall have no liability of any kind whatsoever arising out of or in connection with its activity as Escrow Agent.

Escrow Agent may resign at any time by giving ten (10) days' prior written notice of resignation to Lender, Landlord and Tenant, such resignation to be effective on the date specified in such notice. If Escrow Agent resigns as escrow agent for any reason, Lender, Landlord and Tenant shall appoint a bank or trust company or title company as successor Escrow Agent, whereupon such successor Escrow Agent shall succeed to all rights and obligations of the resigning Escrow Agent as if originally named hereunder, and the resigning Escrow Agent shall duly and promptly transfer and deliver to such successor Escrow Agent the Withdrawal Liability Amount (if then in receipt of same) held by the resigning Escrow Agent hereunder.

This Agreement shall automatically terminate and be of no further force or effect upon the complete disbursement of the Withdrawal Liability Amount in accordance with the terms and conditions of this Escrow Agreement.

All notices or other communications required or permitted to be given pursuant to this Escrow Agreement shall be in writing and shall be considered as properly given or made (i) upon the date of personal delivery (if notice is delivered by personal delivery), (ii) upon the date of electronic mail delivery (if notice is delivered by electronic mail), provided that such notice has been given simultaneously in accordance with at least one other method of delivery set forth in this paragraph, (ii) on the day one (1) business day after deposit with a nationally recognized overnight courier service (if notice is delivered by nationally recognized overnight courier service with next business day delivery specified), or (iii) on the third (3rd) business day following mailing from within the United States by United States mail, postage prepaid, certified mail return receipt requested (if notice is given in such manner), and in any case addressed to the parties at the addresses set forth below (or to such other addresses as the parties may specify by due notice to Escrow Agent):

If to Escrow Agent:

First American Title Insurance Company
666 Third Avenue, 5th Floor
New York, New York 10017
Attention: Matthew Clay
Telephone: 917-710-2174
E-Mail: mclay@firstam.com
Reference number: 118978

With a copy to:

First American Title Insurance Company
666 Third Avenue, 5th Floor
New York, New York 10017
Attention: Andrew Jaeger
Telephone: 212-551-9433
E-Mail: ajaeger@firstam.com
Reference number: 118978

If to Landlord:

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Luke Pak
Telephone: 214-545-5576
E-mail: pak@mspcm.com

With a copy to:

4875-9480-9118, v. 9

356W58 GROUND LESSOR LLC
c/o MSP Capital Investments, L.L.C.
Woodlawn Hall at Old Parkland
3953 Maple Ave., Suite 350
Dallas, Texas 75219
Attn: Max Lamont
Telephone: 214-545-5577
E-mail:  lamont@mspcm.com

And with a copy to:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, NY 10022
Attention: Danielle Ash, Esq.  & File Manager
File No. 4308.0014
Email: Dash@dsllp.com

If to Tenant:

HUDSON 1701/1706, LLC and
HUDSON 1702, LLC
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Saloman Smeke Saba and Alberto Smeke Saba
Email: ss@csc-coliving.com; as@csc-coliving.com

With a copy to:

Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
E-mail: jmetzger@coleschotz.com

If to Lender:

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, CA 90025
Attention:  Paul S. Rahimian
Email: paul@parkviewfinancial.com


Any change in the terms or conditions hereof may be made only in writing signed by all parties or their duly authorized representatives.


[Remainder of Page Intentionally Left Blank; Signature Pages Follow]


4875-9480-9118, v. 9

**<u>ESCROW AGENT</u>:**

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
      Name:
      Title:

4875-9480-9118, v. 9

**LENDER:**

**PARKVIEW FINANCIAL REIT, LP**, a Delaware limited partnership

By:    Parkview Financial Fund GP, Inc.,
         a California corporation,
         its General Partner


By:   _____
        Name:
        Title:

4875-9480-9118, v. 9

**LANDLORD:**

**356W58 GROUND LESSOR LLC**, a Delaware limited liability company

By: _____
     Name:
     Title:

4875-9480-9118, v. 9

**TENANT**:


**HUDSON 1701/1706, LLC**,
a Delaware limited liability company


By:     _____
       Name:
       Title:


By:     _____
       Name:
       Title:


**HUDSON 1702, LLC**,
a Delaware limited liability company


By:     _____
       Name:
       Title:


By:     _____
       Name:
       Title:


4875-9480-9118, v. 9

**Exhibit A**

**Hotel Union Pension Fund Payment Instructions**

Wire Transfer Instructions:
Bank Routing Number:   021000021
SwiftCode:   CHASUS33
General Bank Reference Address:  JP Morgan Chase New York, NY  10017
Bank Account Number:  838223360
Account Name: New York Hotel Trades Council & Hotel Association of NYC, Inc. – Pension Fund

4875-9480-9118, v. 9