# EXHIBIT M

**SECOND AMENDMENT TO GROUND LEASE**

THIS SECOND AMENDMENT TO GROUND LEASE (this "Second Amendment") is effective as of the  1  day of May    , 2023 (the "Second Amendment Effective Date"), by and among **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "Landlord"), **HUDSON 1701/1706, LLC** ("Tenant 1"), and **HUDSON 1702, LLC** ("Tenant 2"; and together with Tenant 1, individually and collectively, as the context may require, joint and severally, and together with their respective successors or assigns permitted by the Lease, "Tenant"), each a Delaware limited liability company.

W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into that certain Ground Lease, dated as of May 4, 2022, as amended by that certain First Amendment to Ground Lease, dated as of January 3, 2023 (the "Original Lease"; as the same is amended by this Second Amendment and as may be further amended, restated, assigned and/or modified from time to time, the "Lease"), pursuant to which Landlord ground leased to Tenant the Leased Premises described therein;

WHEREAS, Tenant has requested that the Construction Lender under the Lease be replaced in connection with certain amendments and supplements to the Construction Loan Documents, which have been reviewed and approved by Landlord as of the Seconded Amendment Effective Date;

NOW, THEREFORE, in consideration of these presents, and for other good and valuable consideration, the mutual delivery of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Recitals Incorporated; Defined Terms.  The foregoing recitals are hereby incorporated into this Second Amendment as if fully set forth herein.  Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Original Lease.

2.      Construction Lender Definition.  The definition of "Construction Lender" is hereby deleted and replaced with the following:

"Construction Lender" means NW HUDSON LENDER LLC, a Delaware limited liability company.

For the avoidance doubt, from and after the Second Amendment Effective Date, Parkview Financial REIT, LP (the "Original Construction Lender") shall no longer be deemed to be a Leasehold Mortgagee under the Lease or be entitled to any of the Mortgagee Protections set forth therein.

3.      Withdrawal Liability Installment Payments. Notwithstanding anything to the contrary contained in the Lease, the failure of Tenant to (i) make any Withdrawal Liability Installment Payment when due pursuant to the Hotel Union Pension Fund Demand Letter dated September 29, 2022, or (ii) pay the entire remaining Hotel Union Pension Fund Obligations by the Hotel Union Pension Fund Obligations Date, shall, in either case, constitute an immediate Event of Default under the Lease.

4.      Project Budget. Schedule 1 to Exhibit C of the Lease is hereby deleted and replaced with the Project Budget attached hereto as Exhibit A.

5.      Leasehold Financing Agreement. As a condition to entering into this Second Amendment, Landlord requires and Tenant hereby confirms that it has delivered to Landlord one (1) fully

executed original of the Leasehold Financing Agreement, in the same form as attached hereto as Exhibit B (the "Replacement Leasehold Financing Agreement"), executed by Tenant and Construction Lender. From and after the Second Amendment Effective Date, (i) the original Leasehold Financing Agreement, dated May 4, 2022, by and among, Landlord, Tenant, and Original Construction Lender, is hereby deemed terminated and of no further force or effect (except to the extent of any provisions therein that expressly survive termination), and (ii) the Replacement Leasehold Financing Agreement shall govern as to the Project Guaranties and other matters set forth therein as among Construction Lender, Landlord and Tenant.

6.      Governing Law; Ratification.  This Second Amendment shall be governed by the laws of the State of New York without regard to conflicts of laws principles. Except as otherwise specifically amended by this Second Amendment, all of the terms of the Original Lease shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto.  From and after the Second Amendment Effective Date, all references in the Original Lease to the "Lease" shall be deemed references to the Original Lease, as amended by this Second Amendment.

7.      Counterparts; Facsimile Signatures.  This Second Amendment may be executed in more than one counterpart, which, when taken together, shall constitute one instrument.  This Second Amendment may be executed and delivered by facsimile transmission, electronic mail (e-mail) transmission, or Portable Document Format ("PDF") transmission.  Signature pages to this Second Amendment delivered by facsimile transmission, electronic mail (e-mail) transmission, or PDF transmission shall be given the same legal force and effect as original signatures.

8.      Incorporation. Sections 41, 42, 43, 44, 45, 46, 53, 55 and 61 of the Original Lease are hereby incorporated by reference as if set forth in full in this Second Amendment.

[The remainder of this page is intentionally left blank; signature pages follow]

4895-2336-6487, v. 3                                          2

IN WITNESS WHEREOF, Landlord and Tenant have caused this Second Amendment to be executed as of the Second Amendment Effective Date.

**LANDLORD**:

**356W58 GROUND LESSOR LLC**,
a Delaware limited liability company

By: _____
Name: LUKE PAK
Title: Authorized Signatory

*[Signature Page to Second Amendment to Ground Lease – Hudson Hotel]*

**TENANT**:

**HUDSON 1701/1706, LLC**,
a Delaware limited liability company

By: _____
      Name:   Alberto Smeke Saba
      Title:   Authorized Signatory

By: _____
      Name:   Salomon Smeke Saba
      Title    Authorized Signatory

**HUDSON 1702, LLC**,
a Delaware limited liability company

By: _____
      Name:   Alberto Smeke Saba
      Title:   Authorized Signatory

By: _____
      Name:   Salomon Smeke Saba
      Title:   Authorized Signatory

*[Signature Page to Second Amendment to Ground Lease – Hudson Hotel]*

EXHIBIT A

PROJECT BUDGET

(attached hereto)

4895-2336-6487, v. 3

| PROJECT BUDGET (Capitalized Lender Budget) | | | | | |
|---|---|---|---|---|---|
| | Budget (As of 5/1/2023) | | | | |
| Uses | Total | Spent To Date | Draw At A-Note Closing | Balance to Complete | % of Costs |
| Purchase Price | $207,500,000 | $207,500,000 | $0 | $0 | 49.6% |
| Hard Costs | $58,736,703 | $15,199,706 | $1,507,240 | $42,029,757 | 14.0% |
| Hard Cost Contingency | $4,165,091 | $0 | $0 | $4,165,091 | 1.0% |
| Soft Costs | $5,220,281 | $2,427,395 | $648,205 | $2,144,680 | 1.2% |
| Soft Cost Contingency | $1,516,543 | $0 | $0 | $1,516,543 | 0.4% |
| Closing & Financing Costs | $19,657,985 | $19,657,985 | $0 | $0 | 4.7% |
| Ground Rent Reserve | $12,800,000 | $7,543,696 | $533,333 | $4,722,971 | 3.1% |
| Interest Reserve | $31,431,776 | $10,006,659 | $0 | $21,425,117 | 7.5% |
| Operating Reserve | $4,108,887 | $3,108,887 | $79,683 | $920,317 | 1.0% |
| Real Estate Tax Reserve | $12,105,871 | $2,805,197 | $2,650,841 | $6,649,832 | 2.9% |
| 10th Floor Buyout | $10,163,750 | $10,163,750 | $0 | $0 | 2.4% |
| Union Buyout MOA Items | $48,200,696 | $47,813,265 | $0 | $387,431 | 11.5% |
| Developer Fee | $2,724,460 | $2,724,460 | $0 | $0 | 0.7% |
| **Total Uses** | **$418,332,043** | **$328,951,000** | **$5,419,303** | **$83,961,741** | **100.0%** |
| | | | | | |
| Sources | | | | | |
| GLR Ground Lease - Funds at Close | $170,000,000 | $170,000,000 | $0 | $0 | 40.6% |
| GLR Ground Lease - 10th Floor | $8,000,000 | $8,000,000 | $0 | $0 | 1.9% |
| Leasehold Financing | $207,000,000 | $117,618,957 | $5,419,303 | $83,961,741 | 49.5% |
| Developer Equity | $33,332,043 | $33,332,043 | $0 | $0 | 8.0% |
| **Total Sources** | **$418,332,043** | **$328,951,000** | **$5,419,303** | **$83,961,741** | **100.0%** |

*This Project Budget does not include the Hotel Union Pension Fund Obligations, which pursuant to the Hotel Union Pension Fund Demand Letter dated September 29, 2022 is equal to $17,285,224 in the aggregate. Such Hotel Union Pensi Fund Obligations shall be paid in quarterly installments of $490,888.25 per quarter until the Hotel Union Pension Funds Obligation Date, as further set forth in the Lease.*

EXHIBIT B

REPLACEMENT LEASEHOLD FINANCING AGREEMENT

(attached hereto)

4895-2336-6487, v. 3

## LEASEHOLD FINANCING AGREEMENT

THIS LEASEHOLD FINANCING AGREEMENT (this "**Agreement**") is made and entered into as of the 1st day of May, 2023 (the "**Effective Date**"), between **NW HUDSON LENDER LLC**, a Delaware limited liability company, whose address is c/o Northwind Group, 489 Fifth Avenue, 28th Floor, New York, New York 10017, Attention: Ran Eliasaf, as a lender (together with its successors and assigns, "**Construction Lender**"), **356W58 GROUND LESSOR LLC**, a Delaware limited liability company, having an address at c/o MSP Capital Investments, L.L.C., Woodlawn Hall at Old Parkland, 3953 Maple Ave., Suite 350, Dallas, Texas 75219 (together with its successors and assigns, "**Landlord**"), and **HUDSON 1701/1706, LLC**, a Delaware limited liability company ("**Tenant 1701/1706**") and **HUDSON 1702, LLC**, a Delaware limited liability company, each having an address of c/o CSC Co-Living 6 St. Johns Lane, New York, New York 10013 ("**Tenant 1702**"; and together with Tenant 1701/1706, collectively, on a joint and several basis, "**Tenant**").

WITNESSETH:

WHEREAS, (i) Landlord and Tenant have executed that certain Ground Lease, dated May 4, 2022 (the "**Lease Date**"), as amended by that certain First Amendment to Ground Lease (the "**First Amendment**"), dated January 3, 2023, as further amended by that certain Second Amendment to Ground Lease, dated as of the Effective Date (collectively, as the same may be further amended, restated, and/or supplemented from time to time, the "**Lease**"), covering the leased premises described on Exhibit A attached hereto and made a part hereof (the "**Leased Premises**"). Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Lease;

WHEREAS, in connection with Tenant's construction and development of the Project in accordance with the Lease and Work Letter, Tenant obtained a leasehold mortgage loan in the maximum principal amount of up to $207,000,000 (the "**Construction Loan**") on the Lease Date, which Construction Loan is secured by the Construction Loan Mortgage, which encumbers the entirety of Tenant's leasehold interest in the Leased Premises;

WHEREAS, in connection with the Construction Loan and Lease, Landlord, Tenant and Parkview Financial REIT, LP, a Delaware limited partnership ("**Parkview**") entered into that certain Leasehold Financing Agreement, dated as of the Lease Date (the "**Original Agreement**");

WHEREAS, as of the Effective Date, (i) the Construction Loan is being modified pursuant to those certain amendments and modifications to the Construction Loan Documents described on Schedule 1 attached hereto (collectively, the "**Construction Loan Modifications**"), which Construction Loan Modifications are subject to Landlord's approval as set forth in the Lease, (ii) Parkview is assigning a portion of the Construction Loan to Construction Lender, and (iii) from and after the Effective Date, Construction Lender is succeeding Parkview as the administrative agent under the Construction Loan;

WHEREAS, as a condition to Landlord approving the Construction Loan Modifications, as of the Effective Date, the Original Agreement is being terminated and this Agreement shall thereafter supersede and replace the Original Agreement in its entirety;

WHEREAS, Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease, (ii) the Completion Guaranty executed by Guarantor in favor of Landlord, dated as of the Lease Date (the "**Lease Completion Guaranty**"), (iii) the Carry Guaranty executed by Guarantor in favor of Landlord, dated as of the Lease Date (the "**Lease Carry Guaranty**"), (iv) the Environmental Indemnity executed by Tenant and Guarantor in favor of Landlord, dated as of the Lease Date (the "**Lease**

4096" = "1" "FF\JLEVIN\JLEVIN\12583832.2                                    May 04, 2022  7:48 AM" ""
89429355.2
44970870v4

**Environmental Indemnity**"; and together with the Lease Completion Guaranty, and the Lease Carry Guaranty, collectively, as each may be amended, restated, supplemented and/or otherwise modified from time to time, the "**Lease Guaranties**"), and (v) the Indemnity Agreement executed by Tenant and Guarantor in favor of Landlord, dated as of the Lease Date (as the same may be amended, restated, supplemented and/or otherwise modified from time to time, the "**Union MOA and Condo Indemnity**"); and

WHEREAS, Landlord, Tenant and Construction Lender desire to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of this Agreement.

NOW, THEREFORE, the parties hereto covenant and agree as follows:

1.     <u>Construction Lender as Leasehold Mortgagee; Proceeds Trustee</u>. Landlord acknowledges that it has been notified that, as of the Effective Date, a portion of the Construction Loan is being assigned to Construction Lender in connection with the Construction Loan Modifications. Landlord agrees that the making of the Construction Loan Modifications and the assignment of a portion of the Construction Loan and the administrative agent rights thereunder to Construction Lender does not constitute a default under the Lease. Landlord further agrees that Construction Lender is deemed a "Leasehold Mortgagee" pursuant to the terms of the Lease and Construction Lender is entitled to all of the rights and benefits of a Leasehold Mortgagee under and pursuant to the terms of the Lease. Construction Lender elects to be the Proceeds Trustee and agrees that it will hold and disburse Condemnation Awards, Net Proceeds and the Restoration Fund in accordance with the terms and provisions of the Lease, notwithstanding the existence of any default under the Construction Loan Mortgage and the other Construction Loan Documents (including, without limitation, the existence of any Bankruptcy Action with respect to Tenant or Guarantor), including, without limitation, for use for any Restoration following a Casualty or Condemnation in accordance with the Lease.

2.     <u>Notices</u>. Landlord shall give Construction Lender, at the address set forth below or at such other address as Construction Lender may specify in writing to Landlord, a copy of any written notice of any default under the Lease, at the same time as such written notice is given to Tenant, and shall include in the delivery to Construction Lender a copy of the notice of default and all other documents or instruments delivered to Tenant in connection therewith.

> NW HUDSON LENDER LLC
> c/o Northwind Group
> 489 Fifth Avenue, 28th Floor,
> New York, New York 10017
> Attention: Ran Eliasaf
>
> with a copy to:
>
> POLSINELLI
> 600 Third Avenue
> New York, New York 10016
> Attention: John D. Vavas, Esq.

3.     <u>Bankruptcy Matters</u>.

(a)     In the event that any Bankruptcy Action is filed by or against Landlord, (i) Landlord shall provide Construction Lender with prompt written notice thereof, along with copies of any filings, and (ii) Construction Lender shall be entitled, but not obligated, to participate in such proceeding, through counsel selected by Construction Lender.

4892-4925-0135, v. 10

(b)  In the event that a trustee in bankruptcy for Landlord rejects the Lease pursuant to Section 365 of the Bankruptcy Code, then: (i) Tenant shall not make any election to terminate the Lease pursuant to Section 365(h)(1)(A) of the Bankruptcy Code without the prior written consent of Construction Lender, and (ii) Construction Lender is appointed the agent and attorney-in-fact of Tenant  for the purpose of making any election to terminate the Lease or remain in possession pursuant to Section 365(h)(1)(A) of the Bankruptcy Code, which appointment is coupled with an interest and irrevocable.

(c)  In the event that a trustee in bankruptcy for Landlord rejects the Lease pursuant to Section 365 of the Bankruptcy Code and Tenant fails to timely elect to retain its rights under the Lease, then Tenant shall be deemed not to reject the Lease, but rather to retain its rights under the Lease, pursuant to Section 365(h)(1)(A)(ii) of the Bankruptcy Code, including any right of use, possession, quiet enjoyment, subletting, assignment or hypothecation, all encumbered by the Construction Loan Mortgage.

(d)  Landlord agrees that if Tenant remains in possession of the Leased Premises pursuant to Section 365(h)(1) of the Bankruptcy Code, the term "possession" as used therein shall include the right to assign, sublet, license, use and/or occupancy of all or any portion thereof to other entities, all in accordance with and as set forth in the Lease.

(e)  This Agreement is a "subordination agreement" under section 510(a) of the Bankruptcy Code and shall be enforceable in any insolvency proceeding.

(f)  Construction Lender, on behalf of itself and its successors and assigns, hereby agrees that it shall not file, commence or collude with any Person to bring a Bankruptcy Action against Tenant or any Guarantor; provided, however, that nothing contained in this subparagraph (f) shall be construed to restrict Construction Lender from filing a claim or participating in any such Bankruptcy Action not filed or commenced or colluded in by Construction Lender.

4.  <u>Construction Lender Assumption</u>.  If pursuant to and in compliance with the terms of the Lease, Construction Lender assumes the interest of Tenant under the Lease, Landlord shall within sixty (60) days after receipt of written request, deliver to Construction Lender an agreement in substantially the same form of this Agreement for the benefit of any Leasehold Mortgagee (which is a Qualified Institutional Lender holding a Leasehold Mortgage) of Construction Lender's interest in the Lease; provided that, in either case, Landlord shall have the right to revise the factual statements therein to reflect the actual then-existing circumstances.

5.  <u>Construction Loan Guaranties</u>. Landlord hereby acknowledges that Guarantor has executed and delivered the following guaranties to Construction Lender (collectively, the "**Construction Loan Guaranties**"): (i) that certain Completion Guaranty, dated as of the Lease Date (the "**CL Completion Guaranty**"), (ii) that certain Guaranty, dated as of the Lease Date (the "**CL Payment and Carry Guaranty**"), (iii) that certain Environmental Indemnity Agreement, dated as of the Lease Date (the "**CL Environmental Indemnity**"). Construction Lender hereby acknowledges that Guarantor has executed and delivered the Lease Guaranties to Landlord in accordance with the Lease.

6.  <u>Guaranty Claims</u>.

3

(a)    For purposes of this Agreement, the following terms shall have the following meanings:

(i)    "**Completion Costs**" means, collectively, any payment or settlement received in respect of a claim made by Landlord against Guarantor under the Lease Completion Guaranty in respect of the guaranteed obligations thereunder, which amounts are required to achieve Completion of the Multifamily Project.

(ii)    "**Foreclosure Event**" has the meaning set forth in the Lease.

(iii)    "**Lease Carry Obligations**" means Guarantor's obligations under the Lease Carry Guaranty, including, without limitation, payment of all Base Rent and Additional Rent due under the Lease until termination of the Lease Carry Guaranty in accordance with its terms.

(iv)    "**Lender Guaranty Claim**" means any claim made by Construction Lender under any Construction Loan Guaranty in accordance with the terms thereof.

(b)    Construction Lender and Landlord acknowledge and agree that (i) the CL Completion Guaranty is solely with respect to Total Project Costs due in connection with the Completion of the Multifamily Project and does not contemplate the construction of the Fallback Project, (ii) the Lease Completion Guaranty is with respect to Total Project Costs due in connection with the Completion of the Project, including the Fallback Project, if approved by Landlord in accordance with the Lease, (iii) each of the CL Completion Guaranty and the Lease Completion Guaranty provide the applicable beneficiary thereunder the right to seek liquidated damages in lieu of compelling the Guarantor to satisfy the obligations thereunder, (iv) each of the CL Carry Guaranty and the Lease Carry Guaranty provide Tenant the right to tender (each, a "**Tender**") the Leased Premises to the beneficiary thereof in accordance with its respective terms, and (v) if Landlord delivers (or is deemed to have delivered) a Fallback Business Plan Notice to Landlord or Tenant otherwise elects to submit a Fallback Business Plan to Landlord (due to Tenant's inability to satisfy the CONH Requirement by the CONH Requirement Outside Date or otherwise) in accordance with the Lease, the Lease Carry Guaranty may require Guarantor to pay Lease Carry Obligations for a period of time that exceeds that required by the CL Carry Guaranty.

(c)    Except to the extent deposited with Landlord pursuant to the Work Letter, Construction Lender agrees that it will utilize any and all amounts received from Guarantor following exercise of a Lender Guaranty Claim under the CL Completion Guaranty, after deduction for any reasonable attorney's fees and expenses and other costs of collection incurred in connection with the enforcement of the CL Completion Guaranty (collectively, "**Net Recoveries**") to (i) pay Total Project Costs as to the Multifamily Project or (ii) hold such Net Recoveries in trust for the benefit of Landlord to pay such Total Project Costs. If the Lease is terminated in accordance with its terms and a New Lease with Construction Lender in accordance with Section 12(h) of the Lease is not entered into prior to the end of the New Lease Option Period in accordance with Section 12(h) of the Lease, Construction Lender shall, promptly after demand from Landlord, pay any Net Recoveries to Landlord; provided, however that any Net Recoveries in excess of Total Project Costs

4

for the Multifamily Project may be retained by Construction Lender if Completion of the Multifamily Project has occurred.

(d)    If Completion of the Multifamily Project has not occurred as of the date the New Lease is executed and delivered by Construction Lender in accordance with Section 12 of the Lease, the Construction Lender shall deposit, or cause the deposit of, Net Recoveries with Landlord, or Construction Lender shall acknowledge it is holding the same in trust for the benefit of Landlord to pay for Total Project Costs.

(e)    In addition, if either (x) as of the date the New Lease is executed and delivered by Construction Lender in accordance with Section 12 of the Lease or (y) the date that a Successor Tenant takes possession of the Leased Premises (either such date, the "**Takeover Date**"), the CONH Requirement has not been satisfied and the CONH Requirement Outside Date has then occurred or a Fallback Business Plan Notice was (or was deemed to have been) delivered in accordance with the Lease, the following shall apply:

(v)    such event shall be deemed to constitute Landlord's delivery of a Fallback Business Plan Notice under the Lease (or New Lease, as applicable), such that Construction Lender or Successor Tenant, as applicable, shall have ninety (90) days from the Takeover Date to deliver a Fallback Business Plan to Landlord for its review and approval in accordance with the Lease or New Lease, as applicable); and

(vi)    as a condition to Landlord entering into a New Lease with Construction Lender or Successor Tenant stepping into the obligations of Tenant under the Lease in accordance with the Lease, if Construction Lender has engaged a third-party developer, general contractor or construction manager to take over and complete the Project (a "**Project Developer**"), such Project Developer shall provide a guaranty from a Qualified Replacement Guarantor in substantially the same form as the Lease Completion Guaranty in respect of Completion of the Fallback Project (such requirement, the "**Fallback Completion Guaranty Requirement**").

(f)    Construction Lender will, from time to time following request from Landlord (but not more often than once in any calendar quarter), advise Landlord as to the amount, if any, of Net Recoveries (or remaining proceeds available for advances under the Construction Loan) for Total Project Costs of the Multifamily Project.

(g)    Landlord agrees that, so long as Construction Lender is proceeding with reasonable diligence to enforce the obligations of Guarantor under the Construction Loan Guaranties, Landlord will defer execution on any judgment against Guarantor that has become final by appeal or lapse of time for appeal on the Lease Guaranties, provided, however, Landlord's obligation to defer execution and collection on any such judgment (or payment) shall terminate at such time as both (i) Construction Lender's rights to cure under Section 12(e) of the Lease have terminated without cure of

5

the relevant Defaults and (ii) the New Lease Option Period has terminated without execution and delivery of the New Lease in accordance with Section 12(h) of the Lease; provided further, that, subject to Section 6(e) of this Agreement, Landlord may seek and obtain collection of such judgment (or payment in settlement of any claims for payment under the Lease Guaranties) if Guarantor is the subject of a Bankruptcy Action or if Landlord determines that failure to promptly collect upon such judgment or settlement will materially prejudice Landlord's ability to collect upon such judgment or settlement or exercise its rights and remedies under the Lease or otherwise at law or equity.

(h)    To the extent that Landlord receives payment of Completion Costs pursuant to the Lease Completion Guaranty or pursuant to a judgment against Guarantor for claims for such Completion Costs under the Lease Completion Guaranty, Landlord shall, to the extent not expended on the reasonable costs of collection of such Completion Costs, make such collections available to Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, or Construction Lender (if Construction Lender is mortgagee in possession), as the case may be, for payment of Total Project Costs if the Lease (or New Lease, if applicable) has not been terminated and such Person(s) have (i) agreed in writing to assume the obligations of Tenant to Complete the Project in accordance with the Lease and Work Letter, subject to reasonable requisition requirements of Landlord and (ii) if the CONH Requirement has not been satisfied and the CONH Requirement Outside Date has then occurred or a Fallback Business Plan Notice has been (or was deemed to have been) delivered, satisfied the Fallback Completion Guaranty Requirement. In no event shall any such collections under the Lease Completion Guaranty be made available to Tenant or any Affiliate of Tenant. Construction Lender hereby acknowledges and agrees that if it becomes a Successor Tenant or new tenant under the Lease in accordance with the terms thereof, it shall assume the obligations of Tenant to Complete the Project in accordance with the terms of the Lease and Work Letter.

(i)    If Net Recoveries are to be made available by Landlord for payment of Total Project Costs, Landlord may condition such availability upon the Successor Tenant providing assurances, reasonably satisfactory to Landlord, that such Net Recoveries will be applied to payment of Total Project Costs. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, to the extent Total Project Costs include interest on the Construction Loan (or any other Leasehold Mortgage), payment of such interest, from Net Recoveries will be deferred until Completion of the Project has occurred.

(j)    Additionally, Landlord agrees that if it receives payment of any Lease Carry Obligations, it shall either (x) apply the receipts (less the actual, reasonable costs of obtaining such collections) to the expenses for which they were collected, in which event Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, Construction Lender (if Construction Lender is mortgagee in possession or is undertaking obligations to Complete the Project in accordance with the Lease) or New Tenant, as the case may be, shall not be liable for such expenses or (y) make such receipts (less the actual, reasonable costs of obtaining such collections) available to Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, Construction Lender (if Construction Lender is mortgagee in possession or is undertaking obligations to Complete the Project in accordance with the Lease) or New Tenant, as the case may be to pay for such expenses, in which event such Person shall be liable for the failure to pay such expenses.

6

(k)        Notwithstanding Section 6(f) of this Agreement, in no event shall Construction Lender accept a Tender of the Leased Premises under the CL Payment and Carry Guaranty unless (x) Construction Lender has complied with or intends thereafter to comply with the obligations of a Leasehold Mortgagee under Section 12(h) of the Lease to obtain a New Lease or (y) Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, or Construction Lender (if Construction Lender is mortgagee in possession) cures all applicable Defaults under the Lease in accordance with Section 12 thereof. Subject to Section 5 of this Agreement, if Guarantor exercises (or seeks to exercise) its rights to Tender the Leased Premises to Construction Lender and, at such time, the Takeover Date has occurred, Construction Lender shall pay to Landlord any and all amounts received from Guarantor following exercise of a Lender Guaranty Claim under the CL Payment and Carry Guaranty which are Lease Carry Obligations (including, without limitation, any proceeds of the Construction Loan available for such costs and any amounts held by Construction Lender in any applicable reserves for such costs), which shall be applied to Guarantor's obligations under the Lease Carry Guaranty.

(l)        Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, except as set forth in this Section 6, Landlord shall not (i) be prohibited from enforcing or otherwise collecting under any Lease Guaranty or (ii) be deemed to have subordinated and shall not be obligated to subordinate any of its rights and remedies under the Lease Guaranties or any other guaranties issued by Guarantor to or for the benefit of Construction Lender pursuant to or in connection with the Lease. Notwithstanding the foregoing or anything else to the contrary set forth in this Agreement, except as set forth in this Section 6, Construction Lender shall not (i) be prohibited from enforcing or otherwise collecting under any Construction Loan Guaranty or (ii) be deemed to have subordinated and shall not be obligated to subordinate any of its rights and remedies under the Construction Loan Guaranties or any other guaranties issued by Guarantor to or for the benefit of Landlord pursuant to or in connection with the Lease.

(m)        Nothing in this Section 6 shall be deemed to derogate from any rights inuring to Construction Lender as a Leasehold Mortgagee pursuant to the Lease.

(n)        Notwithstanding anything contained herein to the contrary, from and after the date that Construction Lender transfers its interest in the Construction Loan to a Qualified Institutional Lender, Construction Lender shall have no further obligations or liabilities hereunder for any obligations accruing following the date of such transfer, and the other parties hereto shall look only to such Qualified Institutional Lender with respect to such obligations or liabilities, provided that (x) such Qualified Institutional Lender assumes all of the obligations of the Construction Lender under this Agreement in writing, and (y) to the extent that Construction Lender has retrieved from Guarantor any Net Recoveries or Lease Carry Guaranty Obligations, such amounts are transferred to such Qualified Institutional Lender or Landlord, as applicable, in compliance with all of the obligations of Construction Lender under this Section 6.

7.        Hotel Union Pension Fund Obligations; Enhanced Severance Obligations; Parkview Indemnity.

(a)        As further set forth in the Lease, (i) Tenant is responsible for satisfying the Hotel Union Pension Fund Obligations by the Hotel Union Pension Fund Obligations Date in accordance with the Union MOA (which obligations are guaranteed

7

by Tenant and Guarantor, on a joint and several basis, pursuant to the Union MOA and Condo Indemnity), (ii) Landlord has the right to accelerate the Hotel Union Pension Fund Obligations Date and cause Tenant to pay all remaining Hotel Union Pension Fund Obligations within fifteen (15) Business Days following delivery of a Hotel Union Pension Fund Obligations Notice in accordance with the Lease (such right, the "**Acceleration Right**"), and (iii) as of the Lease Date, as required by the Union MOA, Landlord assumed the Union MOA and is, therefore, directly liable to the Hotel Union and the Hotel Union Pension Fund for satisfaction of such obligations if Tenant fails to satisfy such obligations or otherwise breach the Union MOA.

(b)    Landlord acknowledges that, pursuant to that certain Co-Lender Agreement, dated as of the Effective Date, by and between Parkview and Construction Lender (the "**Co-Lender Agreement**"), Parkview is providing an indemnity to Construction Lender for all Costs associated with the Hotel Union Pension Fund Obligations as further set forth in the Co-Lender Agreement (the "**Parkview Indemnity**"). As a condition to approving the Construction Loan Modifications, Landlord is requiring and Parkview has agreed to execute and deliver a joinder to this Agreement (the "**Joinder**"), which Joinder entitles Landlord and its Indemnified Parties to benefit from the Parkview Indemnity.

(c)    The parties acknowledge that (i) as of the Lease Date, the Project Budget included a line item in the amount of $13,021,368.00 for the then-estimated Hotel Union Pension Fund Obligations (the "**Withdrawal Liability Line Item**"), which amount was to be funded with proceeds of the Construction Loan and a line item in the amount of $34,228,632.15 (the "**Enhanced Severance Line Item**"), which amount was advanced on the Lease Date from proceeds of the Construction Loan into the Enhanced Severance Escrow pursuant to the Enhanced Severance Escrow Agreement and subsequently disbursed in full for payment of Enhanced Severance Obligations in accordance with the Lease, (ii) as further set forth in the First Amendment, Tenant received a Hotel Union Pension Fund Demand Letter dated September 29, 2022, which provided that the aggregate Hotel Union Pension Fund Obligations have increased to $17,285,224 and that such Hotel Union Pension Fund Obligations may be paid in quarterly payments (each, a "**Withdrawal Liability Installment Payment**"), rather than in a lump-sum as described in the Union MOA, (iii) prior to the Effective Date, Tenant caused the occurrence of certain defaults under the Lease described in clauses (1) and (2) on Schedule 2 attached hereto (the "**Indemnified Defaults**") and entered into a Consent Award with the Hotel Union, regarding the Leased Premises, as evidenced by that Arbitration Award Notice and Consent Award Tenant, attached hereto as Exhibit B (the "**Consent Award**"), which Consent Award resulted in increased Enhanced Severance Obligations in the amount of $9,903,572.90, (iv) in order to satisfy such increased Enhanced Severance Obligations, Parkview advanced Construction Loan proceeds allocated to the Withdrawal Liability Line Item to pay Enhanced Severance Obligations, and (v) as of the Effective Date, the aggregate amount of Construction Loan proceeds remaining available to be disbursed towards the Withdrawal Liability Line Item is $0.00. For the avoidance of doubt, pursuant to the Lease, Tenant is responsible for the payment of all Withdrawal Liability Installment Payments and the aggregate Hotel Union Pension Fund Obligations on the Hotel Union Pension Funds Obligations Date, which amounts are not available for advance from Construction Loan proceeds.

(d)    In the event that Construction Lender acquires all of the limited liability company interests in Tenant whether through the exercise of remedies under the

8

Construction Loan Documents or otherwise (any such event, a "**UCC Foreclosure**"), Construction Lender shall deliver written notice to Landlord, together with a copy of documentation evidencing such UCC Foreclosure (such notice, the "**Takeover Notice**"). The Tenant following a UCC Foreclosure and delivery of a Takeover Notice shall hereinafter be referred to as "**NW Tenant**". Following receipt of a Takeover Notice, Landlord shall, only until the Deferral Date (i) forbear from exercising its Acceleration Right with respect to the Hotel Union Pension Fund Obligations or, if such Acceleration Right has already been exercised and the Hotel Union Pension Fund Obligations have not then been satisfied in full, forbear from enforcing payment in full of the Hotel Union Pension Fund Obligations as to NW Tenant and (ii) forbear from commencing litigation against NW Tenant seeking payment of any Hotel Union Pension Fund Obligations under the Union MOA and Condo Indemnity.

(e)     As of the Effective Date, Landlord hereby waives any right to pursue remedies under Section 22 of the Lease as a result of the Defaults described on Schedule 2 attached hereto (it being agreed that such waiver shall not apply as to any subsequent Defaults of Tenant under the Lease). Notwithstanding the foregoing, Landlord has no direct or specific knowledge of the content of any of the notices, grievances or other communications between Tenant and any of the Hotel Union, any Hotel Employees or the Hotel Union Pension Fund referenced in the Indemnified Defaults and, as of the Effective Date, has no knowledge of any Losses or Costs incurred by or asserted against Landlord on account of such Indemnified Defaults. In the event that, after the Effective Date, Landlord incurs any Losses on account of, or discovers any Losses or Costs resulting from, such Indemnified Defaults (any such claims, "**Indemnified Default Claims**"), Landlord shall be entitled to seek indemnification from Tenant and Guarantor pursuant to and in accordance with the Lease and Union MOA and Condo Indemnity; provided, however, following receipt of a Takeover Notice and only until the Deferral Date, Landlord shall forbear from commencing litigation against NW Tenant for the payment of any such Indemnified Default Claims under the Union MOA and Condo Indemnity.

(f)     Landlord's compliance with the foregoing Sections 7(d) and (e) shall be conditioned on NW Tenant, Successor Tenant, a receiver appointed at the request of Construction Lender as part of a Foreclosure Event, or Construction Lender (if Construction Lender is mortgagee in possession) curing all applicable Defaults (excluding any Personal Defaults) then existing under the Lease in accordance with Section 12 thereof (including, without limitation, making all Withdrawal Liability Installment Payments then due, but specifically excluding any Default by Tenant for failure to pay the Hotel Union Pension Fund Obligations in full following exercise of Landlord's Acceleration Right) and remaining current on such Withdrawal Liability Installment Payments and all other Rent and Additional Rent obligations under the Lease during the Deferral Period.

(g)     For purposes of this Section 7, the term "**Deferral Date**" shall mean the later to occur of (i) the date that is twelve (12) months after the Takeover Notice has been given to Landlord, and (ii) the date that is ten (10) calendar days after Landlord has made a Bona Fide Pursuit Effort; provided, however, that the Deferral Date shall be deemed to have occurred if the automatic stay pursuant to Section 362 of the United States Bankruptcy Code applies in respect of the assets of Guarantor, Parkview or Tenant, or if a court of competent jurisdiction has issued any temporary or permanent injunction that restrains Landlord from making or continuing a Bona Fide Pursuit Effort.  The term "**Bona Fide Pursuit Effort**" shall mean either (i) Landlord's commencement of litigation against either Guarantor or Parkview seeking payment of the Hotel Union Pension Fund

9

Obligations or payment of the Indemnified Default Claims (as applicable) or (ii) Landlord's issuance to Guarantor or Parkview of at least three (3) written demands for payment of the Hotel Union Pension Fund Obligations or payment of the Indemnified Default Claims (as applicable). For greater clarity, the following shall apply in respect of the definition of "Bona Fide Pursuit Effort": (A) Landlord's written demands may be transmitted by e-mail, (B) Landlord's litigation or written demands, as applicable, need not be directed to both Guarantor and Parkview, (C) Landlord shall not be required to commence litigation against Guarantor or Parkview in order for Landlord to satisfy clause (ii) of such definition and to have engaged in a Bona Fide Pursuit Effort, and (D) any defense, counterclaim, inquiry or other response as may be asserted by Guarantor or Parkview shall be irrelevant to determine whether a Bona Fide Pursuit Effort has been effectuated.

(h) For the avoidance of doubt, Section 6 of this Agreement shall in no way apply to the Union MOA and Condo Indemnity, it being agreed that, except as expressly set forth in this Section 7, Landlord shall not (i) be prohibited from enforcing or otherwise collecting under the Union MOA and Condo Indemnity or (ii) be deemed to have subordinated and shall not be obligated to subordinate any of its rights and remedies under the Union MOA and Condo Indemnity.

(i) This Section 7 shall survive termination of this Agreement and the Lease.

8. Tenant Representations and Warranties. Tenant represents and warrants to Landlord and Construction Lender, as of the Effective Date, as follows:

(a) Tenant has delivered to Landlord true, correct and complete copies of all of the amendments, modifications, supplements, and extensions to the Construction Loan Documents, all of which are described on Schedule 1 attached hereto.

(b) To Tenant's knowledge, the Enhanced Severance Obligations (including as increased pursuant to the Consent Award) have been paid in full as required by the Hotel Union. Tenant agrees to request a written certification from the Hotel Union that all Enhanced Severance Obligations have been satisfied and shall deliver such certification to Landlord promptly upon receipt.

(c) Other than the Defaults listed on Schedule 2 attached hereto, Tenant has no actual knowledge of any Defaults or Events of Default on the part of Tenant. All of the representations and warranties made by Tenant in the Lease are true and correct in all material respects.

9. Construction Lender Representations and Warranties. Construction Lender represents and warrants to Landlord as of the Effective Date, as follows:

(a) The Construction Loan Documents are in full force and effect and, except as set forth on Schedule 1 have not been modified, amended, restated, assigned or otherwise supplemented.

(b) To Construction Lender's knowledge, there is no default under the Construction Loan Documents by Tenant, as borrower thereunder nor has Construction Lender given any notice of any default by Tenant, as borrower thereunder.

4892-4925-0135, v. 10

(c)     To Construction Lender's knowledge, except with respect to those Total Project Costs set forth in the Project Budget that are required to be funded by Tenant through cash equity or sources other than Construction Loan proceeds, the Construction Loan is properly capitalized and, with respect to all Draw Requests made by Tenant on or prior to the Effective Date, all conditions required to obtain advances of proceeds of the Construction Loan in accordance with the Construction Loan Documents have been satisfied or waived.

10.     Miscellaneous.

(a)     The foregoing recitals are incorporated by reference into this Section 10 as if set forth in the Section 10 in full.

(b)     Landlord has not received actual notice of any prior sale, transfer, assignment, hypothecation or pledge of Tenant's right, title or interest in, to or under the Lease or the Leased Premises.

(c)     All parties to this Agreement represent (i) they are authorized and empowered to execute, deliver and perform this Agreement, (ii) any consents necessary in connection with such execution, delivery and performance have been duly obtained, and (ii) neither the execution, delivery or performance of its obligations under this Agreement is or could result in a violation of any applicable law, rule, regulation, statute, court order or other governmental pronouncement, or a default under any agreement or organizational document, to which it is a signatory or by which its properties may be bound.

(d)     This Agreement may be executed in one or more counterparts, or by the parties executing separate counterpart signature pages, including facsimiles transmitted by telecopier or counterparts being sent by email or other electronic medium, all of which shall be deemed to be original counterparts of this Agreement and all of which taken together shall constitute one and the same agreement.

(e)     This Agreement may not be modified other than by an agreement in writing, signed by the parties hereto or by their respective successors in interest.

(f)     This Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and assigns, subject to the provisions set forth in the Lease, and all covenants, conditions and agreements herein contained shall be construed as running with the land.  Without limiting the generality of the foregoing, Construction Lender's rights under this Agreement shall inure to the benefit of Construction Lender's successors and/or assigns (including a purchaser at a foreclosure sale) which are not Tenant, an Affiliate of Tenant, or a Prohibited Person, subject to the terms and conditions of the Lease. In addition to the foregoing and notwithstanding anything to the contrary specified herein, Construction Lender shall have the right to (i) designate a Subsidiary of Construction Lender to prosecute and/or consummate a Foreclosure Event on behalf of Construction Lender, and (ii) assign its Leasehold Mortgage to one or more subsidiaries of Construction Lender, each of which is wholly owned and controlled by Construction Lender (each, a "**Foreclosure Subsidiary**"), and, in the case of each of the foregoing clauses (i) and (ii), such Foreclosure Subsidiary shall be deemed a "Leasehold Mortgagee" pursuant to the terms of the Lease and shall be entitled to all of the rights and benefits of a Leasehold Mortgagee under and pursuant to the terms of the Lease (but subject to the terms and conditions thereof).

11

(g)    Guarantor shall be a third party beneficiary of this Agreement, solely for purposes of Section 6 of this Agreement.

*[remainder of page intentionally left blank; signature pages follow]*

12

4892-4925-0135, v. 10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**CONSTRUCTION LENDER:**

**NW HUDSON LENDER LLC**, a Delaware limited liability company

By: _____

Name: Ran Eliasaf

Title:  Authorized Signatory

[Signature Page to Leasehold Financing Agreement]

**LANDLORD**:

**356W58 GROUND LESSOR LLC**,
a Delaware limited liability company

By: _____
    Name: Luke Pak
    Title: Authorized Signatory

*[Signature Page to Leasehold Financing Agreement – Hudson Hotel]*

**TENANT**:

**HUDSON 1701/1706, LLC**,
a Delaware limited liability company

By: _____

    Name:  Alberto Smeke Saba
    Title:    Authorized Signatory

By: _____

    Name:  Salomon Smeke Saba
    Title    Authorized Signatory


**HUDSON 1702, LLC**,
a Delaware limited liability company

By: _____

    Name:  Alberto Smeke Saba
    Title    Authorized Signatory

By: _____

    Name:  Salomon Smeke Saba
    Title:    Authorized Signatory

*[Signature Page to Leasehold Financing Agreement – Hudson Hotel]*

**JOINDER**

The undersigned, for good and valuable consideration, the receipt of which is hereby acknowledged, joins in the execution of this Agreement for purposes of guaranteeing Tenant's obligations to satisfy the Hotel Union Pension Fund Obligations by the Hotel Union Pension Fund Obligations Date in the event that Tenant fails to satisfy same in accordance with the Lease and Union MOA and Condo Indemnity.

In furtherance of the foregoing, Parkview hereby (i) covenants and agrees, at its sole cost and expense, to indemnify and hold harmless Landlord and its successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals, agents and affiliates (each, an "**Indemnified Party**"; and, collectively, the "**Indemnified Parties**"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Landlord shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses) (collectively, the "**Costs**"), that may be imposed on, incurred by, or asserted against any Indemnified Party on account of the Hotel Union Pension Fund Obligations (which Parkview acknowledges, as of the Effective Date, are in the aggregate amount of $17,285,224), (ii) waives diligence, presentment, demand, protest, or notice of any kind whatsoever, any defense based on suretyship principles, any defense based on statute of limitations; and (iii) consents to any supplement, amendment or other modification made to this Agreement in accordance with its terms without its consent or approval, as in effect on the Effective Date of this Agreement, except to the extent that any such supplement, amendment or other modification shall in any way increase the obligations of Parkview hereunder, except to a *de minimis* extent, which shall be subject to Parkview's approval in its sole and absolute discretion.

Parkview's obligations under this Joinder shall survive termination of the Lease and this Agreement; provided, however, upon satisfaction in full of the Hotel Union Pension Fund Obligations by Tenant in accordance with the Lease (and delivery of evidence reasonably satisfactory to Landlord that the Hotel Union Pension Fund has acknowledged same), such obligations shall terminate and be of no further force and effect.

*[Remainder of page intentionally left blank; signature pages follow]*

16

**PARKVIEW FINANCIAL REIT, LP,**
a Delaware limited partnership

By:    Parkview Financial Fund GP, Inc.,
       a California corporation,
       its general partner

       By _____
           Name: Ted Jung
           Title:   Chief Credit Officer

**SCHEDULE 1**

**List of Construction Loan Modification Documents**

(Each dated as of May 1, 2023, unless otherwise noted)

1.  Omnibus Amendment to Loan Documents by and among Tenant, Guarantor and Parkview.

2.  Amendment to Building Loan Agreement made by and among Tenant and Parkview.

3.  Replacement Building Loan Promissory Note A made by Borrower to the order of Parkview in the original amount of up to $39,508,467.15, together with that certain Allonge by Parkview in favor of Construction Lender.

4.  Replacement Building Loan Promissory Note B made by Borrower to the order of Initial Lender in the original principal amount of up to $42,274,059.85.

5.  Replacement Project Loan Promissory Note A made by Borrower to the order of Parkview in the original amount of up to $60,491,532.85, together with that certain Allonge by Parkview in favor of Northwind.

6.  Replacement Project Loan Promissory Note B made by Borrower to the order of Initial Lender in the original principal amount of up to $64,725,940.15.

7.  Assignment and Assumption Agreement by and between Parkview, as assignor, and Northwind, as assignee.

8.  Assignment of Mortgage by Original Agent to Northwind, as administrative agent for Lenders relating to the Building Loan Mortgage.

9.  Assignment of Mortgage by Original Agent to Northwind, as administrative agent for Lenders relating to the Project Loan Mortgage.

4892-4925-0135, v. 10

**SCHEDULE 2**

**Defaults**

1. Landlord was not provided with the opportunity to reasonably participate in and have a representative present for meetings, calls or communication between the Tenant and the Hotel Union involving the Enhanced Severance Obligations and the Union MOA, and Tenant had material communications with the Hotel Union regarding the Union MOA, the Union MOA Obligations and the Project without Landlord's approval, both of which are evidenced by communications Landlord has received from Tenant's labor counsel that stated Tenant and the Hotel Union had prior communications, which ultimately resulted in the execution and delivery by Tenant of the Consent Award.  These are a defaults under Section 57(b)(iii) of the Lease.

2. Tenant did not provide Landlord with copies of certain grievances, notices, knowledge, or material communications (whether written or verbal) received from any Hotel Employees or the Hotel Union with respect to the Union MOA and the Union MOA Obligations. Tenant's labor counsel has indicated that the Hotel Union notified Tenant of such grievances, but Landlord was not made aware of same until after Tenant entered into the Consent Award. This is a default under Section 57(b)(iv) of the Lease.

3. Without Landlord's prior written consent, Tenant or an affiliate thereof entered into a material agreement (i.e., the Consent Award) with the Hotel Union. This is a default under Section 57(b)(ii) of the Lease and an automatic Event of Default under Section 21(q) of the Lease.

4. Tenant failed to provide Landlord, within 10 Business Days at the end of each calendar month (so long as Enhanced Severance Obligations under the Union MOA have not yet been satisfied), a written report detailing the status of payment of the Enhanced Severance Obligations. This is a default under Section 32(a) of the Lease.

5. Without Landlord's prior written consent, Tenant materially modified the Construction Loan Documents by providing Parkview with that certain Certification signed on March 31, 2023. This is a default under Section 48(f) of the Lease.

6. Without Landlord's prior written approval, Tenant made changes to the Project Budget by reallocating funds in the amount of $9,903,572.90 to pay Enhanced Severance Obligations, that were budgeted for Hotel Union Pension Fund Obligations. Tenant also failed to cause Construction Loan proceeds to be applied in accordance with the approved Project Budget (which, as noted above, was modified without Landlord's approval). This is a default under Sections 3 and 9 of the Work Letter.

7. Tenant failed to provide Landlord, at least once per calendar month, a true and complete copy of Draw Requests (and all supporting materials required pursuant to the Construction Loan Documents) provided to Parkview to obtain the proceeds of the Construction Loan. This is a default under Section 9 of the Work Letter.

4892-4925-0135, v. 10

**EXHIBIT A**

**Description of Leased Premises**

4892-4925-0135, v. 10

Lots 1701 and 1702

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1 and 2** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration").  These Units are also designated as **Tax Lots 1701 and 1702 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701) and **46.94011 %** interest (as to Unit 2, Lot 1702) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

**ALL THAT CERTAIN** plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 57th Street, distant 20 feet easterly from the corner formed by the intersection of the easterly side of Ninth Avenue with the northerly side of West 57th Street;

RUNNING THENCE easterly along the said northerly side of West 57th Street, 155 feet;

THENCE northerly parallel with Ninth Avenue, 200 feet 10 inches to the southerly side of West 58th Street;

THENCE westerly along the said southerly side of West 58th Street, 135 feet to a point distant 40 feet easterly from the corner formed by the intersection of the southerly side of West 58th Street with the easterly side of Ninth Avenue;

THENCE southerly parallel with Ninth Avenue and part of the distance through a party wall, 100 feet 10 inches;

THENCE westerly parallel, more or less, with West 58th Street, 20 feet;

THENCE southerly and part of the way through a party wall, 100 feet to the northerly side of West 57th Street, the point or place of BEGINNING.

For Information Only:   Said premises are known as 353 West 57th Street Condominium, 353-361 West 57th Street a/k/a 356 West 58th Street, Units 1 and 2, New York, NY and designated as Block 1048 Lots 1701 and 1702 as shown on the Tax Map of the City of New York, County of New York

## EXHIBIT A

## TENTH FLOOR UNIT LEGAL DESCRIPTION

Lot 1706

**THE CONDOMINIUM UNIT** (hereinafter referred to as the "Unit") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 358-366 West 58th Street**, County of New York, State of New York, said Unit being designated and described as **Unit No. 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and Amendment to Amended and Restated Declaration dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). This Unit is also designated as **Tax Lot 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **3.89067 %** interest in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Unit are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

**EXHIBIT B**

**Consent Award**

21

4892-4925-0135, v. 10

OFFICE OF THE IMPARTIAL CHAIRPERSON
321 WEST 44ᵀᴴ STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2023-36
Hudson New York
April 3, 2023
Page 1 of 2

**EMPLOYER**: Hudson New York

HTC Case # #U23-151/Emergency Hearing filed by the Hotel and Gaming Trades Council, AFL-CIO against CSC Hudson LLC ("Employer") regarding the Employer's failure to provide proper tax documents to bargaining unit employees.

Hearing held at the Office of the Impartial Chairperson on April 3, 2023.

## APPEARANCES:

For the Employer:          Sal Smeke
                           General Manager

Counsel for the Employer:  Jackson Lewis, P.C.
              By:          Peter Moss, Esq.

For the Hotel and Gaming Trades Council, AFL-CIO:
Counsel:                   Pitta LLP
              By:          Joseph Farelli, Esq.

For the Union:             Hazel Hazzard, HTC

*       *       *

The undersigned, pursuant to the selection of the Hotel & Gaming Trades Council, AFL-CIO ("Union") and Hudson New York ("Employer" or "Company"), was duly designated to serve as arbitrator of a dispute concerning the Hotel's failure to provide proper tax documents to bargaining unit employees. A hearing was held on April 3, 2023. The parties appeared and were represented as noted. The parties engaged in settlement discussions both before and at the start of the hearing. Those efforts culminated in an agreement settling the dispute ("Settlement"). They asked the Arbitrator to incorporate the Settlement into a Consent Award. The Arbitrator was assured by the parties that the Settlement constituted their complete understanding and had been entered into voluntarily. In view of the foregoing, and because the Settlement appears to be reasonable and fair, the Arbitrator hereby renders the following:

**OFFICE OF THE IMPARTIAL CHAIRPERSON**
321 WEST 44TH STREET, SUITE 400
NEW YORK, NY 10036
TEL: (212) 541-7212  FAX: (646) 992-8103

#2023-36
Hudson New York
April 3, 2023
Page 2 of 2

## CONSENT AWARD

1. Hudson 1701/1706, LLC ("Hudson") will send the amounts specified on Attachment A to the Internal Revenue Service (the "FWH" column) and the New York State Department of Taxation and Finance (the "SWH" column) for each corresponding recipient of enhanced severance identified on Attachment A on or about March 31, 2023;

2. Hudson will provide copies of the proof of payment and vouchers to each recipient of enhanced severance identified on Attachment A.

3. The Office of the Impartial Chairperson shall retain jurisdiction to resolve any disputes between the parties or regarding this matter.

   It is so ordered.

Dated:      April 3, 2023
            New York, New York

            ALVIN BLYER, under the penalties of perjury, duly affirms that he is the arbitrator described herein and that he executed the foregoing instrument.

            _____
            IMPARTIAL CHAIRPERSON

Hudson 1701/1706 LLC
Union Settlement
2022 Payees

| First | Last | Pay Date | 100%<br>Gross | 21%<br>FWH | 6.5%<br>SWH | 72.50%<br>Net Pay |
|---|---|---|---|---|---|---|
| Albeny | Abreu | 12/22/22 | 8,590.71 | 1,804.05 | 558.40 | 6,228.26 |
| Albeny | Abreu | 12/22/22 | 218,924.84 | 45,974.22 | 14,230.11 | 158,720.51 |
| Mariama | Abubakar | 7/1/22 | 61,521.51 | 12,919.52 | 3,998.90 | 44,603.09 |
| Robert | Affel | 7/1/22 | 108,917.35 | 22,872.64 | 7,079.63 | 78,965.08 |
| Nadia | Ahmed | 6/10/22 | 134,028.63 | 28,146.01 | 8,711.86 | 97,170.76 |
| Hasan | Ahmed | 7/22/22 | 107,646.00 | 22,605.66 | 6,996.99 | 78,043.35 |
| Jahangir | Alam | 7/22/22 | 191,314.20 | 40,175.98 | 12,435.42 | 138,702.80 |
| Mohammed | Ali | 10/10/22 | 44,060.24 | 9,252.65 | 2,863.92 | 31,943.67 |
| Faustina | Amoako | 6/20/22 | 180,157.08 | 37,832.99 | 11,710.21 | 130,613.88 |
| Adriana | Aniceto | 11/18/22 | 47,010.60 | 9,872.23 | 3,055.69 | 34,082.68 |
| James | Antonellis | 7/1/22 | 100,167.20 | 21,035.11 | 6,510.87 | 72,621.22 |
| Gifty | Antwi | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yilmaz | Atmaca | 7/22/22 | 108,787.64 | 22,845.41 | 7,071.20 | 78,871.03 |
| Nidia | Augustin | 7/22/22 | 57,127.12 | 11,996.69 | 3,713.26 | 41,417.17 |
| Sophon | Aur | 6/10/22 | 164,789.76 | 34,605.85 | 10,711.33 | 119,472.58 |
| Taniqua | Avent | 6/10/22 | 57,127.12 | 11,996.69 | 3,713.26 | 41,417.17 |
| Safiatou | Ballo | 7/1/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Saidy | Batista | 7/1/22 | 175,752.99 | 36,908.13 | 11,423.94 | 127,420.92 |
| Jin | Bei | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Miraf | Belay | 7/22/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Millicent | Bogle | 7/1/22 | 160,395.36 | 33,683.03 | 10,425.70 | 116,286.63 |
| Christopher | Brescia | 7/1/22 | 102,357.27 | 21,495.03 | 6,653.22 | 74,209.02 |
| Li | Cai | 7/1/22 | 184,564.53 | 38,758.55 | 11,996.69 | 133,809.29 |
| Aroldo | Calderon | 6/20/22 | 59,324.31 | 12,458.11 | 3,856.08 | 43,010.12 |
| Liliang | Cao | 7/1/22 | 50,535.24 | 10,612.40 | 3,284.79 | 36,638.05 |
| John | Ceselka | 10/10/22 | 198,817.50 | 41,751.68 | 12,923.14 | 144,142.68 |
| Kam | Chan | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yan | Chan | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Ramesh | Chan | 11/18/22 | 309,252.61 | 64,943.05 | 20,101.42 | 224,208.14 |
| Chiu | Chau | 7/22/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Gustavo | Chavez | 7/22/22 | 228,997.30 | 48,089.43 | 14,884.82 | 166,023.05 |
| Amy | Chen | 6/20/22 | 194,212.73 | 40,784.67 | 12,623.83 | 140,804.23 |
| Feng | Chen | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Lap | Chen | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Xing | Chen | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yan | Chen | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Jet | Chin | 7/22/22 | 121,565.50 | 25,528.76 | 7,901.76 | 88,134.98 |
| Yu | Chiu | 7/22/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Ahmed | Choudhury | 7/22/22 | 124,152.00 | 26,071.92 | 8,069.88 | 90,010.20 |
| Omar | Choudri | 12/12/22 | 110,726.00 | 23,252.46 | 7,197.19 | 80,276.35 |
| Mahbubul | Chowdhury | 10/10/22 | 31,610.59 | 6,638.22 | 2,054.69 | 22,917.68 |
| Mohammad | Chowdhury | 7/22/22 | 214,503.80 | 45,045.80 | 13,942.75 | 155,515.25 |
| Louis | Christie | 6/20/22 | 52,732.43 | 11,073.81 | 3,427.61 | 38,231.01 |
| Leroy | Cofer | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Hermes | Collado | 7/1/22 | 52,841.60 | 11,096.74 | 3,434.70 | 38,310.16 |
| Yris | Collado | 7/1/22 | 173,578.54 | 36,451.49 | 11,282.61 | 125,844.44 |
| Alexander | Corless | 7/1/22 | 49,986.40 | 10,497.14 | 3,249.12 | 36,240.14 |
| Miguel | Cruz | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Josyn | Cuevas | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Chandrawattie | Dayal | 7/1/22 | 54,929.92 | 11,535.28 | 3,570.44 | 39,824.20 |

Hudson 1701/1706 LLC
Union Settlement
2022 Payees

| First | Last | Pay Date | 100% Gross | 21% FWH | 6.5% SWH | 72.50% Net Pay |
|-------|------|----------|-------|-----|-----|---------|
| Joanne | De Here | 6/10/22 | 158,198.17 | 33,221.61 | 10,282.88 | 114,693.68 |
| Michael | Delgado | 7/22/22 | 97,556.20 | 20,486.80 | 6,341.15 | 70,728.25 |
| Everton | Desouza | 7/1/22 | 50,531.86 | 10,611.69 | 3,284.57 | 36,635.60 |
| Eduardo | Diaz | 6/20/22 | 166,986.95 | 35,067.26 | 10,854.15 | 121,065.54 |
| Raphael | Diaz | 7/1/22 | 277,883.20 | 58,355.47 | 18,062.41 | 201,465.32 |
| Brandon | Dicrispino | 7/22/22 | 174,195.00 | 36,580.95 | 11,322.68 | 126,291.37 |
| Maria | Drejaj | 6/20/22 | 129,634.61 | 27,223.27 | 8,426.25 | 93,985.09 |
| Anganie | Dwarika | 6/20/22 | 67,748.63 | 14,227.21 | 4,403.66 | 49,117.76 |
| Edgar | Erickson | 7/1/22 | 75,959.80 | 15,951.56 | 4,937.39 | 55,070.85 |
| Tony | Espinosa | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Jose | Estela | 7/22/22 | 188,042.40 | 39,488.90 | 12,222.76 | 136,330.74 |
| Long | Fan | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Jian | Fang | 7/1/22 | 164,789.76 | 34,605.85 | 10,711.33 | 119,472.58 |
| Victoria | Fontanez | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Frederik | Frangaj | 11/18/22 | 268,442.15 | 56,372.85 | 17,448.74 | 194,620.56 |
| Sophia | Freeman | 6/20/22 | 68,113.10 | 14,303.75 | 4,427.35 | 49,382.00 |
| Brenda | Garcia | 6/20/22 | 153,803.77 | 32,298.79 | 9,997.25 | 111,507.73 |
| Angelina | Gjelaj | 7/1/22 | 184,564.53 | 38,758.55 | 11,996.69 | 133,809.29 |
| Carlos | Gonzalez | 7/1/22 | 42,907.46 | 9,010.57 | 2,788.99 | 31,107.90 |
| Guy | Gregoire | 7/1/22 | 15,623.93 | 3,281.02 | 1,015.56 | 11,327.35 |
| Jose | Guerrido | 6/20/22 | 60,292.05 | 12,661.33 | 3,918.98 | 43,711.74 |
| Jonan | Guzman | 7/1/22 | 31,079.23 | 6,526.64 | 2,020.15 | 22,532.44 |
| Mohammed | Hassan | 11/18/22 | 68,728.80 | 14,433.05 | 4,467.37 | 49,828.38 |
| Christina | Hernandez | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Jainarain | Hiralall | 7/1/22 | 187,131.00 | 39,297.51 | 12,163.52 | 135,669.97 |
| Qunyi | Ho | 7/1/22 | 194,212.73 | 40,784.67 | 12,623.83 | 140,804.23 |
| Hellen | Holmon | 7/1/22 | 200,484.11 | 42,101.66 | 13,031.47 | 145,350.98 |
| Kamrul | Hossceen | 10/10/22 | 265,356.00 | 55,724.76 | 17,248.14 | 192,383.10 |
| Li | Hu | 11/18/22 | 194,212.73 | 40,784.67 | 12,623.83 | 140,804.23 |
| Li | Huang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Benny | Huang | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Li-qin | Huang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Xiu | Huang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yun | Huang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Reynato | Ibasan | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Dragos | Ilinca | 10/10/22 | 164,777.81 | 34,603.34 | 10,710.56 | 119,463.91 |
| Mohammed | Islam | 7/22/22 | 207,809.00 | 43,639.89 | 13,507.59 | 150,661.52 |
| Toma | Ivezic | 7/22/22 | 108,787.64 | 22,845.41 | 7,071.20 | 78,871.03 |
| Vijai | Jadoo | 7/1/22 | 141,659.00 | 29,748.39 | 9,207.84 | 102,702.77 |
| Dewan | Jahangir | 7/22/22 | 214,503.80 | 45,045.80 | 13,942.75 | 155,515.25 |
| Miladys | James | 7/1/22 | 57,457.40 | 12,066.05 | 3,734.73 | 41,656.62 |
| Shana | Jeannot | 7/1/22 | 24,419.40 | 5,128.07 | 1,587.26 | 17,704.07 |
| Ryszard | Jedrzejewski | 7/1/22 | 136,816.58 | 28,731.48 | 8,893.08 | 99,192.02 |
| Yu | Jiang | 7/1/22 | 275,254.98 | 57,803.55 | 17,891.57 | 199,559.86 |
| Jaime | Josue | 11/18/22 | 366,496.00 | 76,964.16 | 23,822.24 | 265,709.60 |
| Ben | Kaon | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Marjana | Kepi | 7/1/22 | 136,226.20 | 28,607.50 | 8,854.70 | 98,764.00 |
| Rashed | Khan | 10/10/22 | 282,366.00 | 59,296.86 | 18,353.79 | 204,715.35 |
| Alam | Khan | 7/1/22 | 243,490.80 | 51,133.07 | 15,826.90 | 176,530.83 |
| Arian | Khayer | 7/1/22 | 216,777.49 | 45,523.27 | 14,090.54 | 157,163.68 |

Hudson 1701/1706 LLC
Union Settlement
2022 Payees

| First | Last | Pay Date | 100% Gross | 21% FWH | 6.5% SWH | 72.50% Net Pay |
|---|---|---|---|---|---|---|
| Karen | Knuckles | 7/1/22 | 207,616.41 | 43,599.45 | 13,495.07 | 150,521.89 |
| Antoni | Kolodziejczyk | 7/1/22 | 192,489.58 | 40,422.81 | 12,511.82 | 139,554.95 |
| Gui | Kong | 6/20/22 | 171,381.00 | 35,990.01 | 11,139.77 | 124,251.22 |
| Ismeta | Krasnici | 7/1/22 | 149,409.38 | 31,375.97 | 9,711.61 | 108,321.80 |
| Peng | Kuang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Chie | Kwok | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Chie | Kwok | 12/22/22 | 75,974.75 | 15,954.70 | 4,938.36 | 55,081.69 |
| Kim | Kwong | 7/1/22 | 284,023.60 | 59,644.96 | 18,461.53 | 205,917.11 |
| Lha | Lah | 7/1/22 | 160,338.41 | 33,671.07 | 10,422.00 | 116,245.34 |
| Kin | Lam | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Nagy | Latif | 7/1/22 | 185,671.33 | 38,990.98 | 12,068.64 | 134,611.71 |
| Bao Xiu | Lau | 7/1/22 | 56,457.19 | 11,856.01 | 3,669.72 | 40,931.46 |
| Li | Lau | 6/20/22 | 127,437.41 | 26,761.86 | 8,283.43 | 92,392.12 |
| Sindy | Lee-Chong | 7/1/22 | 162,592.56 | 34,144.44 | 10,568.52 | 117,879.60 |
| Xiao | Li | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yuhua | Li | 7/1/22 | 151,305.26 | 31,774.11 | 9,834.84 | 109,696.31 |
| Rui | Liang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Xue | Liang | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Nancy | Liang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Ai | Lin | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Ying | Lin | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yong Xin | Lin | 6/20/22 | 127,437.41 | 26,761.86 | 8,283.43 | 92,392.12 |
| Chun | Lin-zhu | 7/1/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Tim | Lo | 7/22/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Eduardito | Lopez | 7/1/22 | 29,880.20 | 6,274.84 | 1,942.21 | 21,663.15 |
| Kit | Louie | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Rosalyn | Love | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Guan | Lu | 7/5/22 | 221,441.22 | 46,502.66 | 14,393.68 | 160,544.88 |
| Guan | Lu | 12/22/22 | 8,701.32 | 1,827.28 | 565.59 | 6,308.45 |
| Gary | Lui | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Jin | Lum | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Abeba | Mahadi | 7/22/22 | 214,436.76 | 45,031.72 | 13,938.39 | 155,466.65 |
| Matt | Mailer | 7/22/22 | 209,804.74 | 44,059.00 | 13,637.31 | 152,108.43 |
| Appenteng | Mante | 7/1/22 | 138,709.20 | 29,128.93 | 9,016.10 | 100,564.17 |
| Sophath | Mao | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Mogibur | Master | 7/22/22 | 246,389.50 | 51,741.80 | 16,015.32 | 178,632.38 |
| Gloria | Mendez | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Valerie | Merzius | 7/1/22 | 50,531.86 | 10,611.69 | 3,284.57 | 36,635.60 |
| Sevda | Molic | 6/20/22 | 136,226.20 | 28,607.50 | 8,854.70 | 98,764.00 |
| Jayson | Mom | 7/1/22 | 160,395.36 | 33,683.03 | 10,425.70 | 116,286.63 |
| Jason | Montero | 7/1/22 | 197,103.20 | 41,391.67 | 12,811.71 | 142,899.82 |
| David | Morales | 7/1/22 | 57,351.53 | 12,043.82 | 3,727.85 | 41,579.86 |
| Ramiro | Munoz | 7/1/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Mark | Murphy | 7/1/22 | 56,144.20 | 11,790.28 | 3,649.37 | 40,704.55 |
| Hassan | Najah | 7/1/22 | 179,531.17 | 37,701.55 | 11,669.53 | 130,160.09 |
| Jie | Ng | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yu | Ng | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Ky | Nguyen | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Mohammed | Noman | 7/22/22 | 205,807.70 | 43,219.62 | 13,377.50 | 149,210.58 |
| Daniel | Nyame | 7/1/22 | 162,324.75 | 34,088.20 | 10,551.11 | 117,685.44 |

Hudson 1701/1706 LLC
Union Settlement
2022 Payees

| First | Last | Pay Date | 100% Gross | 21% FWH | 6.5% SWH | 72.50% Net Pay |
|---|---|---|---|---|---|---|
| Giovanni | Palumbo | 7/1/22 | 20,582.10 | 4,322.24 | 1,337.84 | 14,922.02 |
| Eden | Pantor | 7/1/22 | 154,423.50 | 32,428.94 | 10,037.53 | 111,957.03 |
| Jatwaun | Parrish | 6/20/22 | 21,546.53 | 4,524.77 | 1,400.52 | 15,621.24 |
| Nicholas | Pascarella | 7/1/22 | 104,537.14 | 21,952.80 | 6,794.91 | 75,789.43 |
| Nancy | Paulino | 7/22/22 | 207,200.00 | 43,512.00 | 13,468.00 | 150,220.00 |
| Freddy | Pena Jr. | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Cirilo | Perez | 6/20/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Ewa | Pfisterer | 7/1/22 | 68,113.10 | 14,303.75 | 4,427.35 | 49,382.00 |
| Bienvenida | Pichardo | 7/1/22 | 164,789.76 | 34,605.85 | 10,711.33 | 119,472.58 |
| Mayra | Piedrahita | 7/1/22 | 59,324.31 | 12,458.11 | 3,856.08 | 43,010.12 |
| Chuk kwan | Poon | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Manuel | Portillo | 7/22/22 | 49,992.25 | 10,498.37 | 3,249.50 | 36,244.38 |
| Sophea | Prum | 7/1/22 | 136,226.20 | 28,607.50 | 8,854.70 | 98,764.00 |
| Hui | Qiu | 6/20/22 | 188,956.81 | 39,680.93 | 12,282.19 | 136,993.69 |
| Mohammed | Rahman | 7/22/22 | 231,896.00 | 48,698.16 | 15,073.24 | 168,124.60 |
| Harun | Rashid | 7/22/22 | 212,394.92 | 44,602.93 | 13,805.67 | 153,986.32 |
| Mamunoor | Rasid | 7/22/22 | 237,693.40 | 49,915.61 | 15,450.07 | 172,327.72 |
| Bree | Roberson | 7/22/22 | 80,965.09 | 17,002.67 | 5,262.73 | 58,699.69 |
| Walter | Robinson | 7/1/22 | 193,080.75 | 40,546.96 | 12,550.25 | 139,983.54 |
| Jose | Rodriguez | 7/22/22 | 195,671.70 | 41,091.06 | 12,718.66 | 141,861.98 |
| Yan | Ruan | 7/22/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Daniela | Sanchez | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Juan | Santana | 7/5/22 | 78,351.00 | 16,453.71 | 5,092.82 | 56,804.47 |
| Richard | Seetoe | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Saranda | Selimaj | 7/1/22 | 59,324.31 | 12,458.11 | 3,856.08 | 43,010.12 |
| Avalon | Smith | 7/5/22 | 221,994.50 | 46,618.85 | 14,429.64 | 160,946.01 |
| Sopanie | Sous | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Karlton | Stallings | 6/10/22 | 204,714.54 | 42,990.05 | 13,306.45 | 148,418.04 |
| Joseph | Syta | 7/22/22 | 198,156.00 | 41,612.76 | 12,880.14 | 143,663.10 |
| Minh | Ta | 7/22/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Wai | Tam | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Li | Tam | 7/1/22 | 138,423.40 | 29,068.91 | 8,997.52 | 100,356.97 |
| Xiufen | Tan | 6/20/22 | 147,212.18 | 30,914.56 | 9,568.79 | 106,728.83 |
| Michael | Teyengua | 6/20/22 | 135,497.25 | 28,454.42 | 8,807.32 | 98,235.51 |
| Pharom | Thao | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Kevin | Thiem | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Dominique | Thomas-nunes | 6/20/22 | 184,564.53 | 38,758.55 | 11,996.69 | 133,809.29 |
| John | Tincani | 7/22/22 | 108,787.64 | 22,845.41 | 7,071.20 | 78,871.03 |
| My | Truong | 7/22/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Yim | Tse | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Kon | Tuy | 6/20/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| Mohammed | Uddin | 10/10/22 | 216,419.00 | 45,447.99 | 14,067.24 | 156,903.77 |
| Rayhan | Uddin | 7/1/22 | 211,366.40 | 44,386.94 | 13,738.82 | 153,240.64 |
| Sultan | Uddin | 7/22/22 | 59,374.00 | 12,468.54 | 3,859.31 | 43,046.15 |
| Md | Uddin | 7/22/22 | 285,768.00 | 60,011.28 | 18,574.92 | 207,181.80 |
| Martha | Ulerio | 7/1/22 | 142,817.79 | 29,991.74 | 9,283.16 | 103,542.89 |
| Jose | Vasquez | 11/18/22 | 367,113.63 | 77,093.86 | 23,862.39 | 266,157.38 |
| Sharmane | Vazquez | 7/1/22 | 178,228.39 | 37,427.96 | 11,584.85 | 129,215.58 |
| Ardiana | Vukaj | 7/1/22 | 149,409.38 | 31,375.97 | 9,711.61 | 108,321.80 |
| Fikreta | Vukelj | 7/1/22 | 184,564.53 | 38,758.55 | 11,996.69 | 133,809.29 |

Hudson 1701/1706 LLC
Union Settlement
2022 Payees

| First | Last | Pay Date | 100% Gross | 21% FWH | 6.5% SWH | 72.50% Net Pay |
|---|---|---|---|---|---|---|
| Austin | Walker | 7/22/22 | 108,633.00 | 22,812.93 | 7,061.15 | 78,758.92 |
| Lina | Wang | 6/20/22 | 180,170.13 | 37,835.73 | 11,711.06 | 130,623.34 |
| Qiong | Wang | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Charletta | Williams | 7/1/22 | 160,900.63 | 33,789.13 | 10,458.54 | 116,652.96 |
| Ching | Wong | 6/20/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Jian | Wong | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| John | Wong | 7/22/22 | 154,129.50 | 32,367.20 | 10,018.42 | 111,743.88 |
| Ben | Wood | 7/22/22 | 207,214.56 | 43,515.06 | 13,468.95 | 150,230.55 |
| Yan | Wu | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Hua | Wu | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Winnie | Wu | 7/1/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Hettie | Xing | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Mei | Yang | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Hong | Yao | 7/1/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Lai | Yip Wong | 7/1/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Pedro | Yordan | 7/1/22 | 122,717.51 | 25,770.68 | 7,976.64 | 88,970.19 |
| Christina | Yuan | 6/10/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Otto | Zapata | 7/1/22 | 164,777.81 | 34,603.34 | 10,710.56 | 119,463.91 |
| Annerys | Zarzuela | 7/1/22 | 186,761.72 | 39,219.96 | 12,139.51 | 135,402.25 |
| Mardalena | Zefi | 7/1/22 | 177,972.94 | 37,374.32 | 11,568.24 | 129,030.38 |
| Lemlem | Zerastion | 7/22/22 | 162,592.56 | 34,144.44 | 10,568.52 | 117,879.60 |
| Xiao-min | Zhang | 10/10/22 | 188,945.23 | 39,678.50 | 12,281.44 | 136,985.29 |
| William | Zhong | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| Ming | Zou | 6/20/22 | 188,958.92 | 39,681.37 | 12,282.33 | 136,995.22 |
| | | Totals | $ 36,012,992.15 | $ 7,562,728.23 | $ 2,340,844.57 | $ 26,109,419.35 |
| | | | | 21% | 6.5% | 72.5% |

Total Fed + NYS          $ 9,903,572.80