## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HUDSON 1701/1706, LLC, *et al.*,[1] | |
| Debtors. | Case Nos. 25-11853 (KBO) |
| | (Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company, | Adv. Proc. No. 25-52471 (KBO) |
| Plaintiffs, | |
| v. | |
| 356W58 GROUND LESSOR LLC, a Delaware limited liability company, | |
| Defendant. | |

## THE DEBTORS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

FACTS ................................................................................................................... 3

    I.      The Project ................................................................................... 3

    II.    The Purported Ground Lease Is Not A True Lease ................... 4

           A.     The Purported Ground Lease Has A 99-Year Term ................... 5

           B.     The Property Was Acquired in Order To Lease It To The Debtors ........... 5

           C.     The Debtors Made A Significant Down Payment ...................... 5

           D.     The Debtors Assumed Numerous Ownership Obligations ........ 5

           E.     The Annual Rent Is Not Market Based ..................................... 6

           F.     The Purported Ground Lease Contains Provisions That Are Meant To Ensure A Certain Investment Return To Defendant ............................ 8

    III.   Construction Delays And Bankruptcy ...................................... 9

ARGUMENT ....................................................................................................... 10

    I.      Rule 12(b)(6) Standards ........................................................... 10

    II.    The Debtors Have Alleged A Viable Claim For  Recharacterization Of The Purported Ground Lease .............................................................. 11

           A.     Under Applicable Law, The Purported Ground Lease Is A Financing And Not A True Lease ............................................. 13

           B.     That Defendant Seeks An "Inequitable Windfall" Further Supports Recharacterization ................................................................... 15

           C.     Defendant's "Quasi-Estoppel" Argument Is Baseless ............ 16

    III.   The Debtors Have Alleged Viable Claims to Avoid the Fourth Amendment as a Fraudulent Conveyance .............................................. 18

           A.     A Transaction Voluntarily Executed By The Debtors  Is Still Subject to Fraudulent Conveyance Analysis ............................ 18

           B.     The Debtors Have Satisfied the Statutory  Elements For Pleading A Fraudulent Conveyance Claim ............................................. 20

CONCLUSION.............................................................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*Amgen Inc. v. Sanofi*,
   2019 WL 259099 (D. Del. Jan. 18, 2019)..............................................................................17

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................................10

*Carino v. Stefan*,
   376 F.3d 156 (3d Cir. 2004) ...................................................................................................10

*Constr. Loan Servs. II LLC v. Silverrock Dev., Co., LLC (In re Silverrock Dev. Co., LLC)*,
   2025 WL 3492145 (D. Del. Dec. 5, 2025) ..................................................................12, 13, 15

*H.Y.C. v. Hyatt Hotels Corp.*,
   2016 WL 107924 (D. Del. Jan. 8, 2016).................................................................................10

*In re 48th St. Steakhouse, Inc.*,
   61 B.R. 182 (Bankr. S.D.N.Y. 1986).......................................................................................11

*In re Ahmadi*,
   467 B.R. 782 (Bankr. M.D. Pa. 2012) .....................................................................................10

*In re Berez*,
   646 F.2d 420 (9th Cir. 1981) ..................................................................................................16

*In re BYJU's Alpha, Inc.*,
   2025 WL 659092 (D. Del. Feb. 27, 2025)................................................................................20

*In re Charys Holding Co., Inc.*,
   2010 WL 2774852 (Bankr. D. Del. July 14, 2010) ...........................................................10, 21

*In re Chateaugay Corp.*,
   102 B.R. 335 (Bankr. S.D.N.Y. 1989).....................................................................................14

*In re DBSI, Inc.*,
   445 B.R. 344 (Bankr. D. Del. 2011) ........................................................................................20

*In re EBC I, Inc.*,
   356 B.R. 631 (D. Del. 2006)....................................................................................................19

*In re Green Field Energy Servs., Inc.*,
   2015 WL 5146161 (Bankr. D. Del. 2015) ................................................................................21

*In re Homeplace Stores, Inc.*,
   228 B.R. 88 (Bankr. D. Del. 1998) ..........................................................................................12

*In re Hotel Syracuse, Inc.*,
   155 B.R. 824 (Bankr. N.D.N.Y. 1993) .................................................................. 17

*In re Keydata Corp.*,
   18 B.R. 907 (Bankr. D. Mass. 1982) .................................................................. 13

*In re Midway Games Inc.*,
   428 B.R. 303 (Bankr. D. Del. 2010) .................................................................. 11

*In re Montgomery Ward, LLC*,
   469 B.R. 522 (Bankr. D. Del. 2012) .................................................................. *passim*

*In re PCH Assocs.*,
   804 F.2d 193 (2d Cir. 1986) .................................................................. *passim*

*In re PennySaver USA Publ'g, LLC*,
   602 B.R. 256 (Bankr. D. Del. 2019) .................................................................. 20

*In re Pinto*,
   89 B.R. 486 (Bankr. E.D. Pa. 1988) .................................................................. 20

*In re Pittsburgh Sports Assocs. Holding Co.*,
   239 B.R. 75 (Bankr. W.D. Pa. 1999) .................................................................. 11

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) .................................................................. 20, 21

*In re Winston Mills, Inc.*,
   6 B.R. 587 (Bankr. S.D.N.Y. 1980) .................................................................. 13

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*,
   936 F.2d 744 (2d Cir. 1991) .................................................................. 13, 14, 16

*J&R Passmore, LLC v. Rice Drilling D, LLC*,
   2024 WL 1347291 (S.D. Ohio Mar. 29, 2024) .................................................................. 18

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) .................................................................. 10

*MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*,
   2024 WL 5113165 (2d Cir. Dec. 16, 2024) .................................................................. 13, 14, 16

*North Hill Funding of New York, LLC v. Amincor Other Assets, Inc.*,
   2016 WL 7868718 (N.Y. Sup. Ct. Jan. 17, 2016) .................................................................. 11

*Phillips v. County of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) .................................................................. 10

*Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*,
  2022 WL 609213 (D. Del. Jan. 27, 2022) ................................................................. 18

*Sumitomo Mitsui Banking Corp. v Credit Suisse*,
  44 Misc 3d 1224[A] (Sup. Ct. N.Y. Cnty. 2014) ....................................................... 11

*Sun Oil Co. v. Commissioner*,
  562 F.2d 258 (3d Cir. 1977) ...................................................................................... 12

*Teleprompter of Erie, Inc. v. City of Erie*,
  567 F. Supp. 1277 (W.D. Pa. 1983) ........................................................................... 18

## **Statutes**

11 U.S.C. § 365 ................................................................................................................ 1

11 U.S.C. § 548 .......................................................................................................... 20, 21

## **Rules**

Fed. R. Civ. P. 12 ........................................................................................................... 10

The Debtors/Plaintiffs Hudson 1701/1706, LLC and Hudson 1702, LLC (together the "Plaintiffs" or the "Debtors") submit this memorandum of law in opposition to the motion (the "Motion" or "Def. Br.") of Defendant 356W58 Ground Lessor LLC (the "Defendant") to dismiss the Complaint ("Complaint" or "Cmplt.") in this adversary proceeding.

## PRELIMINARY STATEMENT

As a critical part of their plan to exit bankruptcy, the Debtors seek to restart and complete the "Hudson" construction project at the heart of the Debtors' enterprise, a project that has been stalled for almost three years. Recharacterizing the Defendant's "ground lease" at the Hudson (the "Purported Ground Lease") as what it really is – a financing transaction – is a critical first step in the Debtors' construction completion plan. To that end, the Complaint sets forth in detail the numerous provisions of the Purported Ground Lease that, under well-established bankruptcy law, make it clear that it is in fact a financing and not a true lease. The Debtors also cite Defendant's own marketing materials touting the "financial" solution that its ground lease concept provided to the real estate development marketplace.

In response, the Defendant does not discuss the various financing provisions identified in the Complaint and, instead, spends almost all of its briefing focusing on a completely inconsequential point: that, pre-bankruptcy, the parties called the Purported Ground Lease a lease. But recharacterization claims necessarily arise from transactions papered as "leases," and courts decide the question by economic substance – not labels, recorded nomenclature or boilerplate provisions. The crucial analysis here is not whether the Purported Ground Lease is or was called a lease, but whether it was a *true lease*. Numerous courts have recognized that the United States Congress intended the landlord protections of the Bankruptcy Code to apply only to true leases,

and not to apply to transactions dressed up as leases but that are, in substance, financing transactions.

Under this economic substance analysis, the Purported Ground Lease is not a true lease for all the reasons outlined in the Complaint.  Defendant's motion improperly asks the Court to shortcut a heavily fact-driven inquiry – economic substance – on the pleadings, despite detailed allegations regarding risk allocation, return structure, tax treatment, and lender-style protections. At this stage, the Court must accept the Debtors' allegations as true.  At the very least, this is a factually intensive case that cannot be resolved at this Rule 12(b)(6) juncture.

The Defendant is similarly wrong about the Debtors' causes of action for constructive fraudulent conveyance with respect to the "Fourth Amendment" to the Purported Ground Lease. The Defendant contends that because the Debtors agreed to this Amendment, they are precluded from attempting to avoid it now.  The Defendant is wrong: that the Debtors voluntarily executed the challenged transaction is inconsequential.  Instead, constructive fraudulent conveyance – which seeks to benefit all creditors in a bankruptcy proceeding – focuses on two discrete factual issues: the solvency of the debtor at the time of the transaction and the reasonableness of the value received for any asset transferred by the debtor in that transaction.  Transactions that run afoul of these considerations are then avoided *to allow for a more equitable distribution of the debtor's estate.*  That the Fourth Amendment was entered into voluntarily is irrelevant, and the issues that are relevant – solvency and reasonable value – require a trial and cannot be resolved on a Rule 12(b)(6) motion.

For these reasons, and as shown in more detail below, the Motion should be denied.

## FACTS

### I.      The Project

The Debtors were formed in March 2022 to redevelop and operate condominium units (the "Project") within the real property known as 353 West 57th Street Condominium (the "Real Property") in New York, New York.  The Debtors planned to redevelop the Hudson as a multifamily residential property originally anticipated to include 440 market-rate rental units complete with commercial space and a penthouse ("Hudson" or the "Property").  The Hudson comprises, and the Project was to be completed within Units 1701, 1702 and 1706 of the Real Property.  (Cmplt. ¶ 21)

As part of the Project, in February 2022, a Debtor affiliate, CSC Hudson LLC ("CSC Hudson"), entered into an agreement to purchase Units 1701 and 1702 and lease Unit 1706, with an option to later purchase Unit 1706 (the "Purchase Agreement").  However, the Debtors ultimately decided to pursue a financing option marketed by Montgomery Street Partners ("MSP") and its affiliate, The Ground Lease REIT, Inc. ("GLR").  According to MSP and GLR, this financing option was structured as a "ground lease" that would free up initial capital for construction purposes.  (Id. ¶¶ 25, 31-34)  Indeed, MSP and GLR market this ground lease concept on their internet website as a "financing product" beneficial to real estate developers.  (Id. ¶¶ 25, 34; https://glreit.com/wp-content/uploads/2023/04/GLR_Flyer.pdf)[2]

Having agreed to use MSP and GLR's financing product, CSC Hudson assigned the Purchase Agreement to Defendant, a special purpose entity formed by GLR in 2022.  Then, on May 4, 2022, two transactions occurred simultaneously:  (1) Defendant closed under the terms of

---

[2] Those marketing materials state that GLR's ground lease structure is "an interest only, 99-year *financing product* intended to maximize Sponsor returns and *address capital requirements* for core to opportunistic real estate investments." (Cmplt. ¶ 34 (emphasis added))

the Purchase Agreement and acquired Units 1701 and 1702 and a lease and purchase option for Unit 1706; and (2) Defendant transferred control of the Property to the Debtors by the terms of the Purported Ground Lease.  (Cmplt. ¶ 27)

The Purported Ground Lease gave the Debtors the right to commence and complete construction of and then operate the Hudson for 99 years.  (*Id.* ¶¶ 31 n.5, 34; Ex. A)  In a press release after the closing, MSP touted the Hudson transaction, stating that the Debtors had "utilized our ground lease capital and paired it with leasehold financing to gain control of the asset and reposition it," which provided the Debtors "with a compelling execution at a lower blended cost of capital."[3]  (Cmplt. ¶ 31)

The Debtors also received $207 million in Project development and construction financing (the "Construction Loan") from Parkview Financial REIT LP (the "Prepetition Lender").  As security for the Debtors' obligations under the Construction Loan, the Debtors pledged to the Prepetition Lender a security interest in, among other things, the Debtors' equity.  (Cmplt. ¶ 60)

## II.  **The Purported Ground Lease Is Not A True Lease**

In a true lease, the lessor maintains the rights and obligations of ownership while transferring temporary use of the property to the lessee.  The Purported Ground Lease violates this fundamental concept in numerous ways:

---

[3] Press Release, "Montgomery Street Partners Utilizes 99-Year Ground Lease Structure to Acquire, Facilitate Planned Residential Conversion of the Hudson Hotel in Columbus Circle, Manhattan," MSP (July 22, 2025), publicly available at https://montgomerystreetpartners.com/news/montgomery-street-partners-utilizes-99-year-ground-lease-structure-to-acquire-facilitate-planned-residential-conversion-of-the-hudson-hotel-in-columbus-circle-manhattan) (last accessed December 17, 2025).

A.    **The Purported Ground Lease Has A 99-Year Term**

The term of the Purported Ground Lease is 99 years.  (Cmplt. ¶¶ 31 n.5, 34)  A lease of this duration encompasses the reasonable useful life of a property and is routinely used as a substitute for an outright conveyance, allocating to the tenant substantially all of the property's economic value and risks of ownership, with the landlord retaining nothing more than nominal title.

B.    **The Property Was Acquired in Order To Lease It To The Debtors**

The Defendant closed on the Purchase Agreement and purchased the Property on the same day that it executed the 99-year Purported Ground Lease with the Debtors.  (Def. Br. at 3; Cmplt. ¶ 27)  Defendant had no independent interest in acquiring the Property as a long-term owner; the purchase was undertaken solely to enable the Debtors to access the Defendant's purported "financing product" to fund acquisition costs.

C.    **The Debtors Made A Significant Down Payment**

The Purported Ground Lease required an up-front payment of $36.85 million, almost 20 percent of the cost of the underlying real property itself.  This payment was "in connection with . . . [Defendant's] *acquisition* of the Leased Premises;" it was not a security deposit or some kind of prepaid rent to be credited in the future.  (Cmplt. Ex. A, § 4(i) (emphasis added))  In substance and effect, the payment constituted purchase-price consideration (or a "down payment") for Defendant's acquisition of the Property – an equity-like contribution fundamentally inconsistent with a true lease and consistent with a financing transaction.

D.    **The Debtors Assumed Numerous Ownership Obligations**

The Purported Ground Lease is "triple net" (Cmplt. ¶ 43), meaning that it obligated the Debtors or their affiliates to:  (1) pay all real estate taxes (*see* Ex. A, § 7(a)), (2) obtain insurance at levels demanded by Defendant and naming Defendant as an additional insured (*see* § 15)  and

(3) keep and maintain the Hudson in good condition, repair, and appearance (*see* § 9(a)).  The Purported Ground Lease also obligates the Debtors to obtain all permits and licenses (*see* § 7(c)), keep the Hudson free and clear of liens (*see* § 10), pay all utilities (*see* § 9(f)), and assume the risk of loss and indemnify Defendant (§ 38).

Furthermore, pursuant to a closing agreement among CSC Hudson, the Defendant, and the Debtors, CSC Hudson was required to pay other costs ancillary to the Defendant's purchase of the Hudson, including escrow fees; recording fees; and costs or expenses incurred by the Defendant in connection with the closing ("including, without limitation third party due diligence costs and construction consultant fees incurred by [the Defendant]") up to $350,000, as well as $595,000 "in consideration for advisory and management services" to GLR.  (Cmplt. ¶ 79)

In economic substance, the Purported Ground Lease allocates to the Debtors all meaningful incidents of ownership *and* even requires them to fund costs tied to Defendant's acquisition, underscoring that the "lease" is a form-over-substance financing device, with title serving as security rather than as a retained ownership interest.  Again, these obligations to pay closing costs are not obligations typical of a lessee; they are, however, obligations that a borrower under a financing transaction might bear.

### E.    The Annual Rent Is Not Market Based

The annual Base Rent for the first five years of the Purported Ground Lease term was $6,000,000 (approximately 3% of the purchase price) payable in $500,000 monthly installments. (Cmplt. Ex. A, § 4(a)) The Base Rent is set to increase by 10% in the sixth and eleventh lease years and by at least 2% for the following 88 lease years. (*See id*., § 4(b)-(d))  The Base Rent increased to $6,400,000 upon Defendant's purchase of the Tenth Floor Unit (*i.e.*, Unit 1706) on January 3, 2023.  A conservative estimate of the Defendant's return on investment over the full term of the Purported Ground Lease exceeds 63%.  (Cmplt. ¶ 39)

The "rent" payments themselves are unmoored from the market value of the use of the Hudson, ballooning 10% in the sixth and eleventh years of the Purported Ground Lease and at least 2% thereafter with no adjustment based on the fair market value of the use of the Hudson anytime during the 99-year term.  Instead, the "rent" payments ensure that the Defendant receives a fixed return on its investment.

The "rent" increases in the Fourth Amendment underscore this point.  On March 29, 2024, the parties executed a Fourth Amendment to the Purported Ground Lease.  (Cmplt. ¶ 56 and Ex. E)  Pursuant to this Amendment, the going-forward annual base rent for the Real Property was increased from $6.4 million to $8.75 million, an increase of approximately 36 percent.  The Defendant admitted that it required the Debtors to execute the Fourth Amendment because the Defendant was worried about the returns it had promised to its investors with respect to the Purported Ground  Lease: "our investors require that ground lease proceeds advanced and ground rent rates and increases be tied to specific thresholds, yields, and coverage ratios based on the asset's as-stabilized market value and project net operating income" and that those "investors are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics."  (*Id.* ¶ 55; Def. Br. at 9-10)

In economic substance, the so-called rent is structured – and was later repriced – not by reference to the market value of the Property's use, but to protect the Defendant's promised investor yields, demonstrating that the payment stream operates as loan repayment designed to ensure a fixed return on capital.  That is the hallmark of a financing transaction: *i.e.,* "rent" calibrated to deliver an investment return, not to compensate a landlord for use and occupancy.

**F.     The Purported Ground Lease Contains Provisions That Are
Meant To Ensure A Certain Investment Return To Defendant**

The Purported Ground Lease recognizes that the Debtors might decide to pursue a different plan for completion of the Project, what is referred to as a plan for a Fallback Project, and the Debtors submitted two such Fallback Project proposals to Defendant in 2023 and 2024.  (*See infra* p. 8)  Such Fallback Projects entitled Defendant to a "Right-Size Payment" to maintain a satisfactory loan-to-value ratio ("LTV") for Defendant.  (Cmplt. ¶ 40 and Ex. A, § 60(a))

The Right-Size Payment is similar to a typical "equity cure" provision in financing transactions.  Equity cure provisions allow a borrower to avoid breach of a financial covenant by injecting additional capital into the venture so that the relevant LTV decreases below a contractual threshold.  In fact, the amount of the Right-Size Payment in the Purported Ground Lease is a function of the 12-month trailing net operating income earned by the Debtors from the Project. (Cmplt. ¶ 41; Ex. A at 26)  Notably, the Right-Size Payment is *inversely* related to Plaintiffs' net operating income: as income goes down, the Right-Size Payment goes up – thereby insulating Defendant from operating risk – a hallmark of financing, not leasing.  (*Id.*)  True landlords do not require tenants to inject tens of millions of dollars to preserve the landlord's investment yield.

Highly telling of the nature of this transaction, in connection with the Purported Ground Lease, Alberto Smeke Saba and Salomon Smeke Saba (the "Smekes"), the principals of CSC Hudson and former principals of the Debtors, entered into a "Carry Guaranty" with Defendant guaranteeing the payment of "rent" owed to Defendant, plus interest, taxes, insurance premiums and all operating expenses.  (Cmplt. ¶ 44; *see also id.* Ex. B)  Carry guarantees are not a feature of true commercial leases; rather the inclusion of one here reflects a lender-style credit enhancement designed to backstop the Defendant's expected return.

III.    **Construction Delays And Bankruptcy**

The Debtors began construction in 2022, but in late 2023, the New York City Department of Housing and Preservation Development ("HPD") issued a stop work order after finding reasonable cause that existing single room occupancy tenants ("SRO Tenants") at the Property had been harassed.  That stop work order is still in place.  (Cmplt. ¶ 61)

In an effort to cure the stop work order, the Debtors agreed to change the Project and add affordable housing units.  The Debtors also provided two alternative "Fallback Business Plans" to Defendant on December 22, 2023 and January 11, 2024.  As noted above, Defendant conditioned its preliminary acceptance of the Fallback Business Plans on the Debtors' consent to the Fourth Amendment.  (*Id.* ¶ 55)

The Construction Loan matured on November 1, 2024.  Although the Prepetition Lender agreed to two forbearances, a notice of default was ultimately issued and a sale of the Lender's collateral – the equity interest in the Debtors – was conducted on July 25, 2025.  At that sale, the Prepetition Lender credit bid $80 million of its debt and obtained the equity interests in the Debtors.  The Prepetition Lender then assigned the equity interests it acquired to its wholly owned subsidiary, PV Hudson.  (*Id.* ¶¶ 62-65)

On October 22, 2025, the Debtors filed for bankruptcy protection in this Court, after the Defendant refused to negotiate with the Debtors.

In its Motion, the Defendant spends significant space deriding the involvement of the Prepetition Lender, the current indirect owner of the Debtors, in this bankruptcy case.  It is worth noting that any foreclosing lender is, in general, a reluctant equity participant.  The Prepetition Lender was not a voluntary or strategic equity participant in the Project and became the owner of the Debtors only after material defaults under the Construction Loan.  Since foreclosing on the pledged equity interests in the Debtors, the Prepetition Lender has supported Debtors' construction

completion plan and has provided financial and other support both prior to and during this bankruptcy proceeding.  In any event, the facts regarding the Prepetition Lender's foreclosure are not material to the interpretation of the Purported Ground Lease's economic substance or consideration of the Fourth Amendment under fraudulent conveyance law and thus are irrelevant in this adversary proceeding.

## ARGUMENT

## I.   Rule 12(b)(6) Standards

The Defendant's Fed. R. Civ. P. 12(b)(6) motion should be denied.[4]  A Rule 12(b)(6) motion tests only the sufficiency of the Complaint, and Defendant is not allowed, as it does here, to argue points beyond what the Complaint says.  *See In re Charys Holding Co., Inc.*, 2010 WL 2774852, at *2 (Bankr. D. Del. July 14, 2010); *see also  Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, a court must "accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff."  *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Given the fact intensive nature of recharacterization proceedings, they are typically not appropriate for summary resolution.  *See, e.g.*, *In re Montgomery Ward, LLC*, 469 B.R. 522, 535 (Bankr. D. Del. 2012) (denying cross-motions for summary judgment in recharacterization action

---

[4] Defendant submits numerous documents with the Motion.  Some are cited or referenced in the Complaint, but several are not (*see e.g.*, Def. Br. Exs. K, R, S, and V).  Debtors object to any consideration of these extraneous documents on the Motion.  *See H.Y.C. v. Hyatt Hotels Corp.*, 2016 WL 107924, at *1 (D. Del. Jan. 8, 2016) (holding that supplementary documents could not be considered on a 12(b)(6) motion because as "a general rule, the court may not consider on a motion to dismiss matters extraneous to the pleadings" and the defendant's proffered documents did "not fall within any exception"); *In re Ahmadi*, 467 B.R. 782, 786-87 (Bankr. M.D. Pa. 2012) (holding that extraneous documents related to the property in question could not be considered on a 12(b)(6) motion to dismiss because the documents are not "relied on in the complaint," "attached to the complaint," or "matters of public record").

and directing parties to prepare for trial).  *See also In re Midway Games Inc.*, 428 B.R. 303, 322

(Bankr. D. Del. 2010) (in debt-to-equity recharacterization proceeding, Court held:

"Recharacterization is, by its nature, a fact intensive inquiry. The Court is satisfied that the

Committee has sufficiently pleaded facts which make dismissal at this stage inappropriate").

## II.    The Debtors Have Alleged A Viable Claim For
## Recharacterization Of The Purported Ground Lease

In adopting the Bankruptcy Code, the U.S. Congress expressly recognized its lease

protections should apply only to "true leases":

> Congress was not blind to the economic realities which have led to the use of a
> lease as a financing device or as collateral security. The legislative history
> to section 502 of the Code . . . makes clear the Congressional intention that the
> [Section 365] limitation be applied to only true leases, with the determination that
> a lease is a true one to turn on the circumstances of each case and the economic
> substance of the transaction, not on the locus of title, form of transaction or the
> mere labelling as a lease. *See* 124 Cong. Rec. H. 11, 093–94 (Sept. 28, 1978); S 17,
> 410 (Oct. 6, 1978).

*In re 48th St. Steakhouse, Inc.*, 61 B.R. 182, 190 (Bankr. S.D.N.Y. 1986), *aff'd*, 77 B.R. 409

(S.D.N.Y. 1987), *aff'd*, 835 F.2d 427 (2d Cir. 1987).  Whether the Purported Ground Lease is a

true lease is, like any other process of contract construction, a question of law.  *See, e.g.*, *In re

Pittsburgh Sports Assocs. Holding Co.*, 239 B.R. 75, 81 (Bankr. W.D. Pa. 1999) ("[T]he

proposition that the agreement between PHA and SMG is (or is not) a 'true' lease is a conclusion

of law no less than the proposition that, say, an individual was negligent or committed perjury. In

the present context it does not constitute a statement of fact").

Under New York law, which applies to the construction of the Purported Ground Lease

(Cmplt. Ex. A § 45), "it is the 'economic substance' of a transaction which governs its

construction, and 'not the form or labels used in the transaction." *North Hill Funding of New York,

LLC v. Amincor Other Assets, Inc.*, 2016 WL 7868718, at *7 (N.Y. Sup. Ct. Jan. 17, 2016) (citing

*Sumitomo Mitsui Banking Corp. v Credit Suisse*, 44 Misc 3d 1224[A] (Sup. Ct. N.Y. Cnty. 2014)

("It is clear that a court must first look to the substance of the entire transaction, rather than its form, and it is the essential character of the transaction that governs.") (internal quotation omitted).

This New York law is consistent with federal bankruptcy law regarding the interpretation of leases. *See In re PCH Assocs.*, 804 F.2d 193, 198 (2d Cir. 1986) (to "determine whether a 'true lease' exists for purposes of the [Bankruptcy] Code . . . 'we look to the economic realities of the lease and not to the labels applied by the parties' to determine the true nature of a transaction") (quoting *Sun Oil Co. v. Commissioner*, 562 F.2d 258, 263 (3d Cir. 1977)); *Constr. Loan Servs. II LLC v. Silverrock Dev., Co., LLC (In re Silverrock Dev. Co., LLC)*, 2025 WL 3492145, at *3 (D. Del. Dec. 5, 2025) ("To determine whether it's a financing instrument or a true lease [the] court must look at the circumstances and economic substance of the agreement to discern the true nature of the instrument regardless of what it is called") (quotation omitted); *In re Montgomery Ward, LLC*, 469 B.R. at 529 ("[T]he bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of the title, the form of the transaction or the fact that the transaction is denominated as a 'lease,' to determine whether the transaction embodies a 'true lease' or a financing transaction'") (*quoting In re PCH Assocs.*, 804 F.2d at 199).

Pursuant to these authorities, the economic substance of the Purported Ground Lease is that of a financing transaction and not a true lease. Defendant's contrary position rests largely on labels and boilerplate (Def. Br. at 16-20),[5] not economic substance, and is contrary to both New York law and the law governing lease recharacterization.

---

[5] Although the Purported Ground Lease contains a provision referring to it as a "true lease" (Cmplt. Ex. A § 5(b)), such provisions, like all other labels, do not control a recharacterization analysis. *See, e.g.*, *In re Homeplace Stores, Inc.*, 228 B.R. 88, 94 (Bankr. D. Del. 1998) (noting that lease

A.    **Under Applicable Law, The Purported**
      **Ground Lease Is A Financing And Not A True Lease**

The Debtors' First Count, (Cmplt. ¶¶ 92-97), seeks a recharacterization of the Purported

Ground Lease based on its various provisions, including those discussed above.  (*See supra* pp.

4-5)  Notably, federal courts have routinely found that provisions similar to those in the Purported

Ground Lease are sufficient to demonstrate that a lease is not a "true lease" but, instead, a financing

transaction:

(a)   **99-Year Lease**:  *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears*
      *Holdings Corp.) ("MOAC")*, 2024 WL 5113165, at *3-4 (2d Cir. Dec. 16, 2024)
      (recharacterization of 100-year lease as a financing affirmed); *Int'l Trade Admin. v.*
      *Rensselaer Polytechnic Inst.* ("*RPI*"), 936 F.2d 744, 749 (2d Cir. 1991) (99-year lease with
      prepaid rent recharacterized as a financing); *In re PCH Assocs.*, 804 F.2d 193, 196 n.3, 200
      (2d Cir. 1986) (renewable 33-year ground lease recharacterized as a financing); *Constr.*
      *Loan Servs.*, 2025 WL 3492145 at *3-4 (99-year ground lease recharacterized as a
      financing).

(b)   **Property purchased for purpose of leasing to debtor**:  *In re PCH Assocs.*, 804 F.2d at
      200-201 ("[T]he fact that property is 'purchased by the lessor specifically for the lessee's
      use' tends to prove that no true lease exists") (quoting *In re Winston Mills, Inc.*, 6 B.R. 587,
      598 (Bankr. S.D.N.Y. 1980)); *In re Keydata Corp.*, 18 B.R. 907, 909 (Bankr. D. Mass.
      1982) (true lease did not exist where lessee "selected, inspected, contracted for, and
      received" the property before purchase); *In re Montgomery Ward, LLC*, 469 B.R. at 530

---

agreement's "unequivocal statement of true lease intent was not a conclusive factor" and denying
lessors' motion for summary judgment that agreement was true lease).

(recharacterization considers whether "the property was purchased by the lessor specifically for the lessee's use").

(c) **Lease incorporates significant upfront payment**:  *MOAC*, 2024 WL 5113165, at *3 (affirming recharacterization where "Sears prepaid its rent for the first thirty years" of 100-year lease); *RPI*, 936 F.2d at 749 ("There are two unusual aspects of the lease: the 99 year term and the pre-paid rent (over a period of the initial three years) of $97,830").

(d) **Lessee assumes typical owner obligations**:  *MOAC*, 2024 WL 5113165, at *3 (affirming recharacterization where "Sears paid taxes and other costs associated with the property"); *RPI*, 936 F.2d at 751 ("[T]he indicia of ownership in the lessee are a factor in our decision" affirming recharacterization of lease); *In re PCH Assocs.*, 804 F.2d at 201 ("PCH assumed many of the obligations associated with outright ownership of the property, including responsibility for paying property taxes and insurance.  As noted in the *Senate Report* on section 502(b)(6) of the Bankruptcy Code:  The fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease"); *In re Montgomery Ward, LLC*, 469 B.R. at 530 (recharacterization considers whether "the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance"); *In re Chateaugay Corp.*, 102 B.R. 335, 344 (Bankr. S.D.N.Y. 1989) (lessor "neither assume[d] nor [wa]s burdened by any of the traditional obligations or indicia associated with ownership or lessor status" where lessee paid for all taxes, insurance and repairs and maintenance, and assumed risk of loss and indemnity obligations).

(e) **Rent payments are not market based**: *In re PCH Assocs.*, 804 F.2d at 200 (recharacterization affirmed where "rent was not calculated to compensate Liona for the use of the property; rather the parties structured the 'rent' solely to ensure Liona's return on its investment"); *Constr. Loan Servs.*, 2025 WL 3492145, at *3 ("The rent is not market by any means"); *In re Montgomery Ward, LLC*, 469 B.R. at 530 (recharacterization considers whether "rental payments" were "structured for some other purpose, such as to ensure a particular return on an investment").

(f) **Lease provisions ensuring lessor a particular return on investment**: *In re PCH Assocs.*, 804 F.2d at 195 (lease recharacterization affirmed where "the minimum net annual rent [wa]s based upon a fixed return on [lessor's] investment"); *In re Montgomery Ward, LLC*, 469 B.R. at 530 (recharacterization considers whether "the 'rental' payments were . . . structure[d] . . . to ensure a particular return on an investment").

That the Purported Ground Lease contains versions of each of these six financing-like provisions (*see supra* pp. 4-5) precludes summary dismissal and necessitates a trial of this action.

### B. That Defendant Seeks An "Inequitable Windfall" Further Supports Recharacterization

Although Defendant addresses none of the relevant provisions of the Purported Ground Lease in its Motion, it does argue that since the Hudson reverts to Defendant after 99 years, recharacterization is inappropriate. (*See, e.g.*, Def. Br. at 5 n.4)

However, the exact opposite is true in this bankruptcy proceeding. Evidence at trial will demonstrate that the Defendant has, in less than four years, received over $62 million in payments under the Purported Ground Lease, and that significant improvements have been made to the Hudson in that period. And yet, Defendant wants to recapture the Hudson – and keep for itself the value of all improvements – even though approximately 95 years remain on the lease term.

Such a result is inconsistent with the very fundamentals of bankruptcy and reorganization. As the Second Circuit Court of Appeals recently recognized, allowing a purported lessor to "recapture" a leased premises decades before the termination of the lease would be a "grossly inequitable" windfall and supports a recharacterization of the lease. *MOAC*, 2024 WL 5113165, at *3 (to permit MOAC "to recapture the leased premises over sixty years before the expiration of the MOAC Lease would amount to a windfall to MOAC . . . That a present reversion to [MOAC] would be grossly inequitable bolsters our conclusion that § 365(d)(4) does not apply to this unusual transaction") (quotations omitted). *See also RPI*, 936 F.2d at 749 (99 year term and prepaid rent "transformed the agreement from a traditional lease into a pre-paid right of possession for a substantial future term"); *In re Berez*, 646 F.2d 420, 421 (9th Cir. 1981) ("The absence of a purchase option in a lease does not preclude a finding that the lease was actually a disguised secured loan").

A remote, century-delayed reversion, like the one in the Purported Ground Lease, does not convert a yield-protected financing into a true lease – particularly where, as alleged here, the capital is effectively repaid through prepaid rent, fixed returns, equity-cure mechanisms, and guaranteed carry long before any reversion could matter.

### C.    Defendant's "Quasi-Estoppel" Argument Is Baseless

Finally, ignoring the ample case law that focuses on economic substance, and not labels, Defendant contends that the Debtors are "estopped" from bringing a recharacterization claim because they have referred to the Purported Ground Lease as a "lease" in the past. (Def. Br. at 16-20) This contention is meritless for several reasons.

First, as noted, the issue here is whether the Purported Ground Lease is a "true lease," not whether it is called a lease. As courts have repeatedly recognized, this "true lease" analysis requires focus on the economic substance of the Purported Ground Lease and not how it is labeled.

*See In re PCH Assocs.*, 804 F.2d at 199 ("Furthermore, the bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of title, the form of the transaction or the fact that the transaction is denominated as a 'lease'" to determine whether the transaction embodies a 'true lease' or a financing transaction") (citing S. Rep. No. 989, 95th Cong., 2d Sess. 64); *In re Montgomery Ward*, 469 B.R. at 528 ("Simply labeling an agreement a 'lease' does not necessarily create a true lease"); *In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993) ("In making this determination a court is not constrained by the labels placed upon the transaction by the parties. Rather, the court must look to the economic substance of the transaction to determine whether it is in fact a 'true' lease"). *See also In re Anadrill Directional Servs. Inc.,* 2026 WL 234908, at *4 (Bankr. S.D. Tex. Jan. 28, 2026) (noting that when applying New York law in a recharacterization analysis "courts look to the substance, not merely the form, of an agreement"). The Defendant's brief simply ignores this case law.

Second, the doctrine of "quasi-estoppel" cannot possibly apply here. As the Defendant's own case law states, "[t]he doctrine [of quasi-estoppel] 'only applies when the earlier position amounts to a misstatement of fact, not of law." *Amgen Inc. v. Sanofi*, 2019 WL 259099, at *4 (D. Del. Jan. 18, 2019) (citations omitted). As noted above, whether the Purported Ground Lease is a true lease or rather – as the Debtors contend – a financing transaction is a matter of contract construction and thus a legal, not factual, issue. (*See* Section II. at 11-12) Tellingly, *none* of the authority that the Defendant cites in its brief addresses quasi-estoppel in the context of a recharacterization claim.

Third, the Defendant's entire quasi-estoppel argument rests on the circular contention that since the Debtors called the Purported Ground Lease a lease, the Debtors "benefit[ed]" from a

lease, and cannot now challenge that lease.  (*See, e.g.*, Def. Br. at 23 ("[G]iven that [Prepetition

Lender] and the Debtors accepted the benefits of the Lease, they are estopped from now taking an

inconsistent position with the Lease")  However, to the extent the Debtors benefited from anything,

they benefited from the economic substance of the Purported Ground Lease, not from its labelling

as a lease.  Once again, the critical issue here is economic substance, and the consideration of

economic substance requires a trial on the Debtors' claims.[6]

### III.   The Debtors Have Alleged Viable Claims to Avoid the Fourth Amendment as a Fraudulent Conveyance

#### A.   A Transaction Voluntarily Executed By The Debtors Is Still Subject to Fraudulent Conveyance Analysis

The Debtors' fraudulent conveyance causes of action,  (Cmplt. ¶¶ 98-121 (Counts II

through V)), seek to avoid the Fourth Amendment as a constructive fraudulent conveyance.

Section 548(a)(1) of the Bankruptcy Code, which pertains to fraudulent conveyance, provides that:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or
> any obligation . . . incurred by the debtor, that was made or incurred on or within 2
> years before the date of the filing of the petition, if the debtor voluntarily or
> involuntarily . . . (i) received less than a reasonably equivalent value in exchange
> for such transfer or obligation; and (ii) . . . was insolvent on the date that such
> transfer was made or such obligation was incurred, or became insolvent as a result
> of such transfer or obligation.

---

[6] In any event, quasi-estoppel is an equitable doctrine turning on factual issues of context and fairness. *See, e.g.*, *Teleprompter of Erie, Inc. v. City of Erie*, 567 F. Supp. 1277, 1282 (W.D. Pa. 1983) ("[Q]uasi-estoppel … is regarded as a species of equitable estoppel").  The Defendant's theory here depends on disputed inferences about "benefits" "inconsistencies," and "unconscionability" (Def. Br. at 17-18) that cannot be resolved against Debtors on a motion to dismiss. *See J&R Passmore, LLC v. Rice Drilling D, LLC*, 2024 WL 1347291, at *15 (S.D. Ohio Mar. 29, 2024) (denying summary disposition where quasi-estoppel required "too fact-intensive of an inquiry"); *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, 2022 WL 609213, at *2 (D. Del. Jan. 27, 2022) ("Equitable estoppel is a fact-intensive inquiry").

11 U.S.C. § 548(a)(1) & (B).  To recover under Section 548, therefore, the Debtors must show that there was a transfer of an interest in their property for less than reasonably equivalent value while they were insolvent or that such transfer rendered them insolvent.

Despite this law, the Defendant argues that because the Debtors "proposed negotiating and entering into the Fourth Amendment" (Def. Br. at 20-21), the fraudulent conveyance claims should be dismissed.  Defendant is wrong.  Fraudulent transfer statutes are designed to avoid the debtor's own prepetition transfers/obligations.  Indeed, Section 548 expressly contemplates that a transfer subject to avoidance as a fraudulent conveyance may have been "voluntarily" made by the debtor. 11 U.S.C. § 548(a)(1).  Thus, Defendant's focus on who proposed the amendment or whether the Prepetition Lender consented is not the statutory inquiry, and constructive fraudulent transfer claims routinely address transactions executed under financial distress and creditor pressure. Accordingly, the critical issues are whether Debtors were insolvent (or rendered insolvent) and whether they received reasonably equivalent value—fact-bound issues not resolved on the pleadings here.

Further, fraudulent conveyance law focuses on restoring value to the estate for creditor distributions and not the debtor's subjective bargaining history.  For example, in the *eToys/AOL* litigation, this Court explained that "fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise available for the payment of creditors," and that "[a] transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties."  *In re EBC I, Inc*., 356 B.R. 631, 640, 641 (Bankr. D. Del. 2006) (citations omitted); *see also id*. at 641 ("There is nothing in the language of section 548 to suggest that contract rights are property that is not recoverable under that section"); *In re R.M.L., Inc*., 92 F.3d 139, 148 (3d Cir. 1996)

(concluding that non-refundable fees paid pursuant to commitment letter were nonetheless avoidable as fraudulent conveyances because they did not convey reasonably equivalent value to the debtor); *In re BYJU's Alpha, Inc.*, 2025 WL 659092, at *14 (Bankr. D. Del. Feb. 27, 2025) ("Any otherwise legal transfer may be avoided under § 548 if the requirements of that section are otherwise met") (citation omitted).

      **B.**      **The Debtors Have Satisfied the Statutory**
              **Elements For Pleading A Fraudulent Conveyance Claim**

Finally, the Debtors have adequately pled the necessary statutory requirements for fraudulent conveyance, and the Defendant does not argue otherwise.

First, insolvency is adequate pled: the Debtors allege that the Fourth Amendment was executed at a time when they were insolvent or that the execution of that Agreement rendered them insolvent.  (Cmplt. ¶¶ 5, 102, 105)  "[I]nsolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss."  *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019). "This is because the determination of insolvency is highly fact-specific and should be based on reasonable appraisals or expert testimony." *Id.* (citation omitted); *see also In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) ("[I]nsolvency is generally a factual determination not appropriate for a motion to dismiss").  A motion to dismiss is not the proper place to bring in experts to determine insolvency.

Second, the Debtors have pleaded a lack of reasonably equivalent value (Cmplt. ¶¶ 5, 101-105), and the Defendant fails to argue otherwise.  Like insolvency, reasonably equivalent value is also not properly determined on a motion to dismiss.  *See PennySaver*, 602 B.R. at 267 ("Reasonably equivalent value and insolvency are generally factual determinations that should be reserved for discovery"); *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at 8 (Bankr. D. Del. 2015) ("Given the wide number of variables to consider, and the less stringent pleading

requirements of Rule 8(a)(2) to constructive fraud claims, '[t]he issue of 'reasonably equivalent value' requires a factual determination that cannot be made on a motion to dismiss'") (citation omitted); *In re Charys Holding Co., Inc*., 443 B.R. 628, 638 (Bankr. D. Del. 2010) (same).

Finally, even if a value analysis was attempted at this early juncture, it is clear that the Fourth Amendment increased the Debtors' obligations with minimal to no benefit.  On a fraudulent conveyance claim, "[t]he touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred."  *In re R.M.L., Inc.*, 92 F.3d at 151 (citation omitted).  As the *R.M.L.* court explained, even where a debtor pays for an opportunity to obtain future economic benefit, that opportunity constitutes "value" only if there is a meaningful or realistic chance that the benefit will materialize; where the probability of success is merely theoretical or "minimal," the debtor has not received reasonably equivalent value.  *Id.* at 153-54.  The Complaint's allegations demonstrate that the Debtors entered the Fourth Amendment with a "minimal" chance to receive a reasonably equivalent value in the future.  *Id*. at 148.

## **CONCLUSION**

For all the reasons set forth above, the Motion should be denied in its entirety.


DATED:  Wilmington, Delaware                    CHIPMAN BROWN CICERO & COLE, LLP
          February 11, 2026

                                         */s/ William E. Chipman, Jr.*
                                         William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone:    (302) 295-0191
Email:          chipman@chipmanbrown.com
                    olivere@chipmanbrown.com
                    bach@chipmanbrown.com
                    maser@chipmanbrown.com
-and-

BOIES SCHILLER FLEXNER LLP
Robert Gordon (admitted *pro hac vice*)
Michael M. Fay (admitted pro hac vice)
Jenny H. Kim (admitted pro hac vice)
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 446-2300
Email:          rgordon@bsfllp.com
                    mfay@bsfllp.com
                    jkim@bsfllp.com

*Counsel for Debtors and Debtors in Possession*