**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br>Hudson 1701/1706 LLC,<br>Debtors.[1] | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br>Plaintiffs,<br>v.<br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br>Defendant. | Adv. Proc. No. 25-52471 (KBO) |

**356W58 GROUND LESSOR LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

Dated: July 9, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mcguire@lrclaw.com
dute@lrclaw.com
venkateswaran@lrclaw.com

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
poconnor@adstach.com

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' headquarters and the mailing address for the Debtors is 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, CA 90045.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 3

A. Origin of the Lease........ 3

B. The Lease ........ 4

C. The Construction Loan ........ 7

D. First Amendment to Ground Lease........ 9

E. Parkview Assigns a Controlling Position of the Construction Loan to Northwind ........ 9

F. Northwind Assigns the Construction Loan Back to Parkview ........ 10

G. Parkview, Landlord, and Debtors Execute the Fourth Amendment........ 10

H. Debtors Default on Construction Loan........ 13

I. Parkview and Debtors Enter into a Settlement Agreement, but Debtors Defaulted, and Parkview Foreclosed ........ 13

J. Bankruptcy Case Procedural History........ 15

K. The Court Grants Landlord's Motion to Dismiss........15

L. The Amended Complaint........16

STANDARD OF REVIEW ........ 18

ARGUMENT........ 21

I. Debtors' Claim that the Lease is not a True Lease is Implausible, and this Court Should thus Dismiss Count I........21

II. Findings in the Dismissal Order Relevant to Debtors' Recharacterization Claim are Law of the Case ........ 26

III. Debtors' Claims to Avoid the Fourth Amendment are Implausible, and this Court Should Dismiss Counts II, III, IV, and V........28

IV. Debtors' Have Not Alleged Particular Facts to Support Counts II, III, IV and V, and Those Claims Should Thus be Dismissed........29

CONCLUSION........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*631 N. Broad St., LP v. Commonwealth Land Title Ins. Co.*
2018 WL 4051798 (E.D. Pa. Aug. 23, 2018) ....................22, 25

*Amgen Inc. v. Sanofi*
2019 WL 259099 (D. Del. Jan. 18, 2019)....................22, 25

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)....................18, 19

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007)....................18

*Burtch v. Milberg Factors, Inc.*
662 F.3d 212 (3d Cir. 2011)....................18

*Christianson v. Colt Indus. Operating Corp.*
486 U.S. 800 (1988)....................20, 27

*Davis v. Wells Fargo*
824 F.3d 333 (3d Cir. 2016)....................19

*Hamilton v. Leavy*
322 F.3d 776 (3d Cir. 2003)....................20, 27

*In re Baker Hughes Inc.*
215 F.3d 1297 (Fed. Cir. 2000)....................22

*In re Barney's, Inc.*
206 B.R. 328 (Bankr. S.D.N.Y. 1997)....................21

*In re Burlington Coat Factory Sec. Litig.*
114 F.3d 1410 (3d Cir. 1997)....................19, 20

*In re City of Philadelphia Litig.*
158 F.3d 711 (3d Cir. 1998)....................20, 27

*In re Continental Airlines, Inc.*
279 F.3d 226 (3d Cir. 2002)....................20, 27

*In re Livent, Inc. Noteholders Sec. Litig.*
151 F. Supp. 2d 371 (S.D.N.Y. 2001)....................19

*In re Montgomery Ward, L.L.C.*
469 B.R. 522 (Bankr. D. Del. 2012) ....................6, 21

*In re Robb*
23 F.3d 895 (4th Cir. 1994) ....................22

*In re WorldCom, Inc.*
339 B.R. 56 (Bankr. S.D.N.Y. 2006)....................21

*In re Zohar III, Corp.*
639 B.R. 73 (Bankr. D. Del. 2022) ....................19, 26, 29

*Kost v. Kozakiewicz*
1 F.3d 176 (3d Cir. 1993)....................19

*L A Apparel, Inc. v. Straight A Co., LP*
2022 WL 17417173 (M.D. Pa. Dec. 5, 2022)....................22

*Matter of Davidson*
947 F.2d 1294 (5th Cir. 1991) ....................................................................................23
*Network Apps, LLC v. AT&T Mobility LLC*
778 F. Supp. 3d 610 (S.D.N.Y. 2025)...........................................................................20
*Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*
123 F.3d 111 (3d Cir. 1997)....................................................................................20, 27
*Schmidt v. Skolas*
770 F.3d 241 (3d Cir. 2014)...........................................................................................19
*Tanksley v. Daniels*
902 F.3d 165 (3d Cir. 2018)...........................................................................................19
*Union Carbide Corp. v. United States*
612 F.2d 558 (Ct. Cl. 1979) ...........................................................................................22
*Watterson v. Page*
987 F.2d 1 (3d Cir. 1993)...............................................................................................19
*Weslowski v. Zugibe*
96 F. Supp. 3d 308 (S.D.N.Y. 2015)...............................................................................20

**Rules**

Fed. R. Bankr. P. 7012(b) .............................................................................................. 1
Fed. R. Civ. P. 12(b)(6).................................................................................................. 1

356W58 Ground Lessor LLC ("Landlord"), through its undersigned counsel, respectfully submits this memorandum of law, together with the Declaration of Matthew B. McGuire (the "McGuire Declaration"), dated July 9, 2026, with exhibits annexed thereto,[2] in support of its motion to dismiss the Amended Complaint [D.I. 91][3] filed by Debtors Hudson 1701/1706, LLC and Hudson 1702, LLC (together, the "Debtors" with prejudice pursuant to Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

The Amended Complaint retreads territory already investigated by this Court leading up to its order dismissing the original Complaint. The allegations and claims in the Amended Complaint are consistent with the Complaint. Thus, there is nothing to change the Court's view of the Parkview-controlled Debtors' recharacterization effort (Parkview has again been omitted as a necessary party), and the Amended Complaint should be dismissed with prejudice.

This Court previously acknowledged that the recharacterization effort is nothing more than an endeavor to gain leverage to renegotiate the terms of the Ground Lease (the "Lease"). Debtors offer nothing in the Amended Complaint to dispel that concern. In fact, the Amended Complaint doubles down on Parkview and Debtors' naked motivation to pursue recharacterization. *See* Amended Complaint at ¶ 5 ("even if the Project proceeds according to current plans – [Debtors] will not have the revenue to pay, or the ability to finance, a $65 million payment. . . . ***Accordingly, without recharacterization, the Debtors will be compelled to reject the Ground Lease*** . . ..") (emphasis added). And Debtors have ignored the Court's directive to explain what the Lease is.

---

[2] Unless otherwise stated, all citations to exhibits are to those included in the McGuire Declaration.

[3] Unless otherwise stated, all docket references are to the Adversary Proceeding number 25-52471.

The claim seeking recharacterization (Count I) is belied by the plain terms of the Lease itself, which confirm that the Lease is what it purports to be: a true lease. For instance, the Lease does not provide Debtors any opportunity to acquire the property during or at the conclusion of the lease term. All of Debtors' right, title and interest in and to the Premises automatically reverts to Landlord at that time.

Moreover, Debtors' use of the property is restricted to that prescribed in the Lease, and Debtors may not use the property for any other purpose without Landlord's express consent. Landlord maintains the unconditional right to sell its fee interest in the leased property without Debtors' consent, and Landlord has the right to encumber the fee estate without Debtors' consent.

And Landlord's remedies following Debtors' Event of Default include termination of the Lease and Debtors' duty to surrender possession.

In other words, the Lease is entirely inconsistent with Debtors' theory of ownership (whatever it is).

Furthermore, both privately and publicly, Debtors and Parkview have repeatedly confirmed that Debtors hold only a leasehold interest, including in the Lease and leasehold financing documents themselves, as well as in the recorded documents evidencing the property sale to Landlord, the recorded memorandum of the Lease, the recorded leasehold mortgage, and in the public advertisements of the UCC foreclosure sale.

The Court is aware of this reality as it has already dismissed as implausible the very claims raised again here. The Court directed Debtors to clearly indicate the facts that support their recharacterization claim in an amended complaint (if they could). But Debtors' Amended Complaint fails to follow that instruction because Debtors are simply unable to overcome the plain meaning of the Lease and the conduct of Parkview and Debtors throughout the life of the Lease.

No amount of briefing, debate, discovery, or litigation can alter the documentary evidence. Parkview and Debtors' Amended Complaint amounts to nothing other than a second-bite-of-the-apple rehash of things already considered.

To be sure, a further examination of the recharacterization factors would amply demonstrate that the Lease is a true lease in substance (not just form). Yet a searching analysis of factors is unnecessary here because the operative documents and public statements by Debtors and Parkview so clearly evidence the parties' intentions so as to render the recharacterization claim wholly implausible.

Debtors' claims to avoid the Fourth Amendment to the Lease (Counts II through V) should be dismissed for at least two reasons: they are implausible, and Debtors' failure to allege new facts (rather than merely repeat the same allegations contained in the original Complaint) means that law of the case applies. Debtors have not alleged anything new to overturn the Court's dismissal of the avoidance claims.

Because the substance of the Amended Complaint is wholly contradicted by the documentary evidence and the actions of both Debtors and Parkview, it fails to meet the plausibility standard required in this Court and should be dismissed with prejudice forthwith.

## BACKGROUND

### A. Origin of the Lease

On February 3, 2022, CSC Hudson, LLC entered into a Purchase and Sale Agreement (the "PSA") to acquire certain condominium units (Units 1701, 1702, and 1706) comprising the majority of the building that formerly housed the Hudson Hotel, located at 353-361 West 57th Street, New York, New York (the "Premises") from an entity affiliated with Cain International US

Services, LP ("Cain"). CSC Hudson, LLC and other entities bearing the CSC name are controlled by Alberto Smeke Saba and Salomon Smeke Saba.

On May 3, 2022, Landlord assumed all of the rights, title and interest of CSC Hudson, LLC in the PSA pursuant to an Assignment, Assumption and Modification of Purchase and Sale Agreement.The next day, Cain sold the Premises to Landlord for a purchase price of $207,500,000, and deeds evidencing the transfer of ownership were recorded. *See* Exs. A and B.

**B. The Lease**

Simultaneous with the purchase and sale of the Premises on May 4, 2022, Debtors, as tenants, and Landlord, as landlord, entered into a ground lease for the Premises for a period of 99 years. *See* Ex. C. Under the Lease, Debtors were obligated to construct and complete an agreed upon project at the premises (the "Construction Project"). The Construction Project as initially conceived was the conversion of the Premises from a hotel into approximately 400 residential units to be rented at market rates. *See id*. at 18 (definition of "Multifamily Project"). Debtors were required to substantially complete the initial project by May 4, 2024. *See id*. at 86 (§ 21(d)), 149 (definition of "Required Substantial Completion Date"), 152 (§ 6(b)), 153 (§ 10(a)).

The Lease obligates Debtors to pay Base Rent in monthly installments at a fixed amount beginning on May 4, 2022 through the fifth Lease Year. *See id*. at 34 (§ 4(a)). The parties agreed that Base Rent would increase at a particular rate between the sixth and eleventh Lease years (*id*. at § 4(b)), and at another rate beginning with the twelfth Lease Year. *See id*. at § 4(c). Commencing in the twenty-first Lease Year and every ten years thereafter, the Lease requires payment of Base Rent according to a calculation outlined in Section 4. *See id*. at § 4(d).

The Lease also obligates Debtors to pay Additional Rent, including property taxes, insurance, and maintenance costs, as is typical in "triple net leases." *See id*. at 35-36 (§ 4(h)). And

Debtors agreed to "pay the amount of $36,850,000 to [Cain] and Landlord, in connection with Tenant's acquisition of the Personal Property and Landlord's acquisition of the Leased Premises." *See id*. at 36 (§ 4(i)). The portion of this amount allocated to the Premises was treated as "Prepaid Rent," which is Additional Rent under the Lease. *See id*.

The Lease prepared for the possibility that Debtors would not be able to complete the Construction Project by the May 4, 2024 deadline. In that event, the Lease obligated Debtors to formulate and submit a Fallback Business Plan and pursue a Fallback Project. *See id*. at 121-123 (§ 48). Landlord could approve or deny any Fallback Business Plan in its sole and absolute discretion. *See id*. at 9 (definition of "Fallback Business Plan").

Debtors' delivery of a Fallback Business Plan would trigger Debtors' obligation to pay a Right-Size Payment pursuant to Section 60 of the Lease. *See id*. at 142-143. The purpose of the Right-Size Payment was to provide Debtors with the opportunity to maintain possession of the property and pursue a Fallback Business Plan rather than surrender the property following a failure to execute the original business plan. In other words, the Right-Size Payment was meant to avoid a forfeiture of Debtors' investment and efforts. The parties agreed to "treat the Right-Size Payment as a prepayment of rent that is treated as a loan pursuant to Section 467 of the [Internal Revenue] Code." *See id*. at 143 (§ 60(d)). Debtors' failure to complete the original project, or a Fallback Project, could lead to the termination of the Lease. *See id*. at § 22.

Landlord's remedies upon Debtors' Event of Default are entirely consistent with those of a typical landlord. For instance, Landlord may terminate the Lease and compel Debtors to surrender possession (*id.* at 89 (§ 22(a)), terminate Debtors' right to possession without terminating the Lease (*id.* at 89 (§ 22(b)), or maintain Debtors' right to possession and seek recovery of rent (*id.* at 90 (§ 22(c), (e)).

At the end of the Lease term, Debtors are required to surrender the Premises to Landlord free and clear of all encumbrances, and all of Debtors' right, title and interest in and to the Premises shall automatically revert to and become the sole property of Landlord. *See id.* at 95-96 (§ 25(a)); *see also id.* at 34 (§ 3). Debtors do not have any right or ability to acquire the Premises, even for a *de minimis* amount. They must surrender the Premises at the end of the term.[4]

Any holding over by Debtors after the expiration of the lease term shall not constitute a renewal of the Lease. *See id.* at 96 (§ 25(a)). If Debtors hold over, at Landlord's option and within Landlord's sole discretion, Debtors may be deemed a tenant on a month-to-month basis and must comply with all Lease terms, except that Base Rent shall automatically be 200% of Base Rent then applicable. *See id.* at 96 (§ 25(c)).

The Lease makes repeated and consistent statements reflecting the parties' agreement that the Lease is what it purports to be: a true lease. For example, Section 5(b) states: "Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement, including for U.S. federal, state and local tax purposes. Landlord holds fee title in and to the Fee Estate, and such title was not acquired or intended to be held as any type of mortgage or security interest. Tenant shall be deemed the owner of the Leasehold Estate." *Id*. at 37 (§ 5(b)).

Use of the Premises is restricted to that which is permitted under the Lease and for no other purpose without Landlord's written consent. *Id*. at 42-43 (§ 8). Landlord is permitted to encumber the fee estate without Debtors' consent. *Id*. at 42-43 (§ 8(a)). And Landlord has the absolute and

[4] The ***primary indicator*** concerning whether a lease is a true lease is how ownership is allocated at the end of the lease term. *In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 530 (Bankr. D. Del. 2012). In true leases, the property reverts back to the lessor. *See id.*; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 64 (1978) ("The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration [or] for nominal consideration indicated that the transaction is a financing lease or lease intended as security.").

unconditional right, without Debtors' consent, to sell, assign, or transfer its fee title in the land subject to the Lease, and to sell, assign, or transfer its rights, titles, and interests in the Lease without Debtors' consent. *Id*. at 47 (§ 11(a)).Conversely, Debtors are restricted from transferring the leasehold interest. *See id.* at 78 (§ 19(b)).

Landlord's interest in the Premises is not subordinate to any encumbrances (*id.* at 77 (§ 18(a))), and is superior to the lien of any Fee Mortgagee. *Id.* at 77 (§ 18(b)).

Debtors must maintain the property in good condition, repair, and appearance, evidencing that the parties expected that the property would be valuable at the end of the lease term. *See id*. at 44-46 (§ 9).

Landlord has the right to enter the Premises upon reasonable notice to Debtors for inspection purposes and to show the space to prospective investors, purchasers, and mortgagees. *See id.* at 106 (§ 31).

The Memorandum of Lease was recorded so that third parties would have notice of the existence of the Lease. *See* Ex. D at 3. ("Landlord and Tenant have executed a certain Lease, dated as of the date hereof (the 'Lease'), under which Landlord leases to Tenant that certain real property described in Exhibit A attached hereto (the 'Leased Premises')").

Hallmarks of lending, such as a recourse carveout guaranty, amortization or principal repayment obligation, or of a joint venture, such as an investor partner's power to remove and replace the venture's manager, are entirely absent from the Lease.

**C. The Construction Loan**

Concurrently with the execution of the Lease, Debtors obtained a Construction Loan from Parkview Financial REIT, LP ("Parkview") pursuant to that certain Building Loan Agreement dated May 4, 2022 (*see* Ex. E), and that certain Project Loan Agreement dated May 4, 2022 (*see*

Ex. F), in an aggregate amount of up to $207,000,000. The purpose of the Construction Loan was to finance the Construction Project. Both the Building Loan Agreement and the Project Loan Agreement[5] make repeated references to the Lease, including that Debtors are the owners of leasehold estates pursuant to the Lease, and that Debtors have "good, marketable and indefeasible title to its leasehold and/or subleasehold interests in the Property[.]" *See* Ex. E at 23 (§ 6.12); Ex. F at 17 (§ 6.12).

Parkview secured its Construction Loan by executing that certain Building Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 4, 2022 ("Building Leasehold Mortgage") (*see* Ex. G), and that certain Project Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing dated May 4, 2022 ("Project Leasehold Mortgage") (*see* Ex. H), through which Debtors mortgaged their interests in the Premises, Improvements, the Lease, and the leasehold estate created pursuant to the Lease. These agreements each specifically reference and rely upon the Lease. *See* Exs. G at 2 and H at 2 ("Mortgagor is the owner of the leasehold estate in that certain piece or parcel of land located at and known as Units 1, 2 and 6… which leasehold estate was demised pursuant to the Ground Lease described in Exhibit B attached hereto"). The Building Leasehold Mortgage and the Project Leasehold Mortgage specifically require Debtors to obtain Parkview's prior written consent before amending the Lease. *See* Ex. G at 16-17 (§ 2.17); Ex. H at 16-17 (§ 2.17).

Parkview, Landlord, and Debtors executed that certain Leasehold Financing Agreement dated May 4, 2022 that—in accord with its title—specifically referenced and relied upon the existence of the Lease and recognized Parkview as the "Leasehold Mortgagee." *See* Ex. I at 2 (§

[5] The Building Loan Agreement and Project Loan Agreement may be referred to collectively as the "Loan Agreement."

1). That document further states in part, "Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease . . .." *See id*. at 1.

**D. First Amendment to Ground Lease**

Pursuant to Section 47 of the Lease, Landlord held an option to purchase a space on the tenth floor of the building known as the "Tenth Floor Unit" from an unaffiliated third party. Landlord exercised that option effective on January 3, 2023, and Debtors and Landlord executed that certain First Amendment to Ground Lease dated January 3, 2023 (*see* Ex. J) in connection with the purchase. Debtors were required to obtain, and did obtain, Parkview's prior written consent before executing this amendment. *See* Ex. G at 16-17 (§ 2.17); Ex. H at 16-17 (§ 2.17).

**E. Parkview Assigns a Controlling Position of the Construction Loan to Northwind**

By March 2023, Parkview had failed to make certain advances of the Construction Loan as a result of liquidity problems across its debt platform, which Parkview itself acknowledged. *See* Ex. K. Without an ability to replace Parkview, Debtors struggled for months to pay various expenses and contractors, which allowed liens to accrue, many of which remain outstanding today.

Thus, on May 1, 2023, the Construction Loan was modified and a portion of it was assigned to NW Hudson Lender LLC, an entity affiliated with Northwind Group. Modifications to the Construction Loan required Landlord's approval. As such, NW Hudson Lender LLC, Landlord, and Debtors entered into that certain Leasehold Financing Agreement dated May 1, 2023 (*see* Ex. L), which contained repeated references to the Lease, including that Debtors are the owners of leasehold estates pursuant to the Lease.

This Leasehold Financing Agreement, like the initial Leasehold Financing Agreement that Parkview executed in 2022, specifically referenced and relied upon the existence of the Lease and recognized NW Hudson Lender LLC as the "Leasehold Mortgagee." *See* Ex. L at 2 (§ 1). It further

states in part, "Construction Lender acknowledges receipt of a true, correct and complete copy of (i) the Lease . . .." *Id*. at 1.

Landlord granted its approval of the Construction Loan modification by executing that certain Second Amendment to Ground Lease on May 1, 2023. *See* Ex. M. Debtors were required to obtain and did obtain Parkview's prior written consent before executing this amendment. *See* Ex. G at 16-17 (§ 2.17); Ex. H at 16-17 (§ 2.17).

**F. Northwind Assigns the Construction Loan Back to Parkview**

Parkview re-acquired a controlling position of the Construction Loan on December 1, 2023. That same day, Landlord and Debtors executed that certain Third Amendment to Ground Lease (*see* Ex. N) which, among other things, made repeated references to the Lease and recognized Parkview as a Leasehold Mortgagee under the Lease. *See* Ex. N at 1.

Critically, Parkview (along with Landlord and Debtors) executed the Third Amendment, and specifically confirmed that "Parkview is hereby an assignee of Northwind under the [May 1, 2023] Leasehold Financing Agreement and, as assigned, such Leasehold Financing Agreement is in full force and effect[.]" *See id*. at 2 (§ 3). Parkview also confirmed that it "executed and delivered the Parkview Estoppel." *See id*. at 2 (§ 3). The Parkview Estoppel (that certain document labeled "Certificate" executed by Parkview on December 1, 2023) (*see* Ex. O) repeatedly references and relies upon the Lease, including Parkview's request "to be recognized under the Lease as a Leasehold Mortgagee." *See* Ex. O at 1.

**G. Parkview, Landlord, and Debtors Execute the Fourth Amendment**

Before commencing certain work comprising the Construction Project, Debtors were required by law to obtain a Certificate of No Harassment from the New York City Department of Housing Preservation and Development ("HPD") verifying that no tenant harassment occurred at

the subject property during a prescribed look-back period—or an exemption therefrom (the "CONH Requirement").[6] Following receipt of HPD notices dated July 1, 2022 and September 25, 2023, it became apparent that Debtors could not satisfy the CONH Requirement, effectively nullifying their ability to legally pursue the initial Construction Project. *See* Ex. C (Lease) at 86 (§ 21(d)). The parties thus understood that Debtors could not cause Substantial Completion to occur by the Required Substantial Completion Date, which is an Event of Default under the Lease. *See id*. As a result, Debtors proposed two Fallback Business Plans on January 11, 2024, which Landlord could approve or deny in its sole and absolute discretion. Each proposed Fallback Business Plan was significantly deficient and thus rejected by Landlord in that certain Response Letter, dated January 26, 2024 (*see* Ex. P). The Response Letter laid out certain "Required Conditions," including detailed changes to the Lease as a condition to approving either Fallback Business Plan. *See* Ex. P at 10-12 (§ D).

After further negotiations among Landlord, Debtors, and Parkview, the parties (including Parkview) executed that certain Fourth Amendment to Ground Lease dated March 29, 2024, which gave effect to some (but not all) of Landlord's Required Conditions. *See* Ex. Q (the "Fourth Amendment").

For instance, Debtors received numerous concessions in order to obtain certainty and time to (i) pursue a cure of HPD's adverse findings (*id*. at 2 (§ 2(c))), (ii) fix the deficiencies identified by Landlord in Debtors' Fallback Business Plan proposals (*id*.), (iii) determine in more detail any potential requirements of the Hotel Union (*id*. at 2-3 (§ 2(g))), should Debtor elect and receive Landlord's approval to pursue the Fallback Business Plan that proposed to use a portion of the

---

[6] "[I]n order for Tenant to achieve Substantial Completion of the [initial Construction Project] in accordance with Legal Requirements, Tenant must (i) satisfy the CONH Requirement with respect to the entire Leased Premises[.]" *See* Ex. C (Lease) at § 49.

Premises as an extended-stay hotel, (iv) pursue a renegotiation of the Construction Loan with Parkview (the Construction Loan was due to mature on November 1, 2024) to ensure that any Fallback Business Plan was adequately capitalized (*id*. at 2 (§ 2(c))), (v) give Debtors more time to cure the existing liens (*id*. at 3 (§ 2(h))), and (vi) provide more certainty to Debtors of their long-term financial obligations under the Lease, which would make a potential sale or future financings of its leasehold interest more attractive to future tenants and leasehold lenders. In addition, the method of calculating the Right-Size Payment was adjusted to enable Debtors to buy down more rent per each dollar they paid. *Id*. at § 6(c). Landlord agreed to extend Debtors' time to pay the Right-Size Payment, extending from the last day of the fifth Lease Year to the last day of the tenth Lease Year in order to further relieve pressure on the construction budget and Parkview. *Id*. at § 6(b). And Landlord granted Debtors a twelve-month partial abatement of Base Rent (*i.e.*, until March 29, 2025) in order to ease pressure on the construction budget and push out Base Rent increases until after the date Debtors proposed they would complete the Fallback Project and repay the Construction Loan. *Id*. at 15 (Ex. A to the Fourth Amendment).[7]

In exchange, Debtors agreed to pay increased Base Rent to be more reflective of the newly-imposed risks of the Project given that any Fallback Project would necessarily alter the use of the Premises and reduce its marketability. *Id*. at 3 (§ 3).

Like the Third Amendment, Parkview "acknowledged and agreed" to the Fourth Amendment and executed it on March 29, 2024. *Id*. at 13. The Fourth Amendment again made repeated references to and relied upon the Lease and Debtors' leasehold interest. *Id*.

---

[7] Landlord agreed to this concession even though the Base Rent in the Required Conditions of Landlord's January 26, 2024 Response Letter called for a significantly higher amount of Base Rent with no abatement. *See* Ex. P. at 11.

**H. Debtors Default on Construction Loan**

On October 11, 2024, Parkview sent the Notice of Events of Default Under Loan Agreement to Debtors to advise that Events of Default had occurred as a result of Debtors' (i) failure to share communications from the New York City Department of Buildings with Landlord, (ii) failure to maintain adequate insurance coverage, and (iii) apparent inability to pay the outstanding Construction Loan balance by the maturity date (November 1, 2024). *See* Ex. R.

That Notice of Events of Default Under Loan Agreement made numerous and repeated references to the Lease and to Parkview's Leasehold Mortgage. *See id*. at 3. In addition, one of the Events of Default noticed by Parkview was the product of an Event of Default under the Lease, underscoring not only Parkview's recognition and acceptance of the Lease, but Parkview's reliance upon and confidence in the Lease. *See id*. at 4 ("Ground Lease Default").Debtors responded to this Notice with their own letter dated October 18, 2024 in which they, too, made repeated references to the Lease. *See* Ex. S.

In February 2025, Parkview published Uniform Commercial Code notices in various periodicals (a sample of which is attached as Ex. T) advertising the public auction of collateral as part of its foreclosure proceedings. The notices stated that Debtors "own a leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium[.]" *See* Ex. T. The notices further state: "The sale of the Collateral involves the sale of the equity interests of the Company and does not involve the direct sale of the leasehold estate described above." *Id*.

**I. Parkview and Debtors Enter into a Settlement Agreement, but Debtors Defaulted, and Parkview Foreclosed**

Parkview and Debtors entered into that certain Agreement dated April 10, 2025 (the "<u>Settlement Agreement</u>") (*see* Ex. U) in order to, among other things, incentivize Debtors to meet certain construction and regulatory approval milestones (including a May 30, 2025 deadline by

which Debtors agreed to submit materials to HPD to cure the CONH) and memorialize Parkview's forbearance of its remedies under the Construction Loan Agreement and related Guaranties.

That Agreement made repeated references to the Lease, including:

- "Borrower is the owner of a ground leasehold estate in the premises described in Exhibit 'A' attached hereto (the 'Property') demised pursuant to the ground lease described in Exhibit 'B' attached hereto (the 'Ground Lease')." Ex. U at 1 (§ A).

- "It is the intention of the Borrower, as mortgagor, and the Guarantor, as guarantor, and Administrative Agent, on behalf of the Lenders, as mortgagee, that there not be a merger of the leasehold estate in the Property demised pursuant to the Ground Lease with Administrative Agent's existing rights and lien rights under the Loan Documents and this Agreement. . .." *Id*. at 3 (§ R).

Debtors failed to meet its May 30, 2025 deadline to submit materials to HPD, and Parkview subsequently issued that certain Notice of Default Under Financial Agreement dated June 5, 2025 (*see* Ex. V) in which it demanded that Debtors "provide Administrative Agent and Ground Lessor drafts of the Applicable HPD Materials for its review and approval pursuant to Section 3.3(e) no later than June 9, 2025." *See* Ex. V at 2. That Parkview notice also made other references to the Lease. *Id*. at 1, n.2.

Parkview then pursued a foreclosure of its collateral and published Uniform Commercial Code notices in June 2025 in various periodicals advertising the public auction (a sample of which is attached as Ex. W). These notices contained language identical to the February notices, including that Debtors "own a leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium" and "The sale of the Collateral involves the sale of the equity interests of the Company and does not involve the direct sale of the leasehold estate described above." *See* Ex. W.

**J. Bankruptcy Case Procedural History**

On October 22, 2025 (the "Petition Date"), Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors are authorized to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On December 22, 2025—two months after filing the bankruptcy petition—Debtors filed the Complaint [D.I. 1] seeking to recharacterize the Lease and avoid obligations under the Fourth Amendment.

**K. The Court Grants Landlord's Motion to Dismiss**

Landlord moved to dismiss the Complaint because the substance of the Complaint is wholly contradicted by documentary evidence and the actions of both Debtors and Parkview, and thus fails to meet the plausibility standard required of litigants in this Court. The Court granted Landlord's motion to dismiss the Complaint on May 15, 2026 [D.I. 86] ("Dismissal Order").

In the hearing at which the Court announced its decision granting Landlord's motion to dismiss the Complaint, the Court made several observations and findings, including:

- True leases are forms of financing (Ex. X, 4:8-9)
- "[T]he facts alleged by the debtors support nothing other than the conclusion that the debtors entered into a commercial ground lease arrangement that has become economically unattractive . . ." (*Id*. at 5:1-5)
- Debtors' failure to recalibrate the Lease in negotiations with Landlord "left [Debtors] with little choice, but to seek recharacterization" (*Id*. at 5:5-12), implying that the adversary proceeding is a negotiation tactic. (*Id*. at 5:13-18)
- Landlord's acquisition of the property from a third-party seller and subsequent leasing of the property to Debtors for a defined period is unlike other recharacterization cases in which debtors purported to sell the property to a lessor and then lease it back (*Id*. at 5:19-25)

- The Lease requires the reversion of the property and improvements back to Landlord at termination or expiration (*Id*. at 6:8-11)
- There is no option for Debtors to buy the property at any time, including at the end of the lease for a *de minimis* amount (*Id*. at 6:12-14)
- The triple-net feature and 99-year term are typical of true leases (*Id*. at 6:17-19)
- Section 8(a) of the Lease restricts Debtors' use of the property and requires Landlord's consent to any deviation from the prescribed use (*Id*. at 7:4-5)
- Section 11 of the Lease allows Landlord to sell its fee interest subject to the Lease without Debtors' consent (*Id*. at 7:6-8)
- The Lease enables Landlord to encumber the fee estate without Debtors' consent (*Id*. at 7:8-10)
- "The terms of the lease suggest, when viewed with all other existing facts, that the payments compensate the lessor for its agreement to allow the debtors to develop the property and sublease it to residential tenants over the next 99 years." (*Id*. at 8:1-5)
- Documents incorporated into the Complaint, including Landlord's marketing materials, indicate that the Lease is a financing tool to be utilized by developers (such as Debtors) to avoid having to purchase the property in fee-simple. (*Id*. at 6:19-24)

The Court also advised that, if Debtors wished to file an amended complaint, it should "include all forms of relief that you seek and require with respect to the ground lease, in order to move the Chapter 11 cases forward, including any counts to determine the validity, priority, or extent of any purported liens of the ground lessor under Rule 7001(b), and whether Parkview should be added as a necessary party . . .." (*Id*. at 9:8-13).

**L. The Amended Complaint**

Debtors filed the Amended Complaint [D.I. 91] on June 10, 2026. The Amended Complaint re-treads some of the same territory already dispensed with in conjunction with the Dismissal Order. Relying upon the same evidence presented in the original Complaint, the Amended Complaint states that Landlord "marketed their ground lease structure to investors as an 'interest

only, 99-year financing product intended to maximize Sponsor returns and address capital requirements for core to opportunistic real estate investments[.]'" *See* Amended Complaint at ¶ 3 (emphasis omitted). This Court expressly found that this marketing piece, which was incorporated into the Complaint, evidenced that the Lease is a financing tool to be utilized by developers (such as Debtors) to avoid having to purchase the property in fee-simple. *See* Ex. X, 6:19-24; *see also* Ex. Y, 141:7-142:10 (noting that Debtors chose not to buy the property in fee-simple).

Debtors further argue that the 99-year lease term weighs against recharacterization (Amended Complaint at ¶ 77) even though this Court already recognized that such a term is typical of ground leases. *See* Ex. X, 6:17-19. Debtors similarly complain that the Lease's triple-net features mean that it is not a true lease. Amended Complaint at ¶ 78. The Court already disagreed. *See* Ex. X, 6:17-19.

Debtors are undeterred in their relitigation pursuit even when the Court observed and relied upon express provisions of the Lease itself, including (i) that the property and improvements revert back to Landlord at termination or expiration (*Id*. at 6:8-11); (ii) Landlord may sell its fee interest subject to the Lease without Debtors' consent (*Id*. at 7:6-8); and (iii) Debtors' use of the property is restricted to that prescribed in the Lease, and Landlord must consent to any deviation therefrom (*Id*. at 7:4-5).

The Court previously expressed its concern in Debtors' confession in the original Complaint that they "tried to recalibrate the purported ground lease to reflect the true value of the use of the Hudson directly with the defendant" and following their failure to achieve a resolution, "they have been left with little choice, but to seek recharacterization." *See Id*. at 5:5-18. The revelation that the recharacterization efforts are a "tactic for unsuccessful lease renegotiations is troubling." *See Id*. at 5:13-18.

The Amended Complaint contains the same admission disguised in different language. *See* Amended Complaint at ¶ 5 ("the Debtors forecast that in 2032 – even if the Project proceeds according to current plans – they will not have the revenue to pay, or the ability to finance, a $65 million payment. . . ***Accordingly, without recharacterization, the Debtors will be compelled to reject the Ground Lease*** . . ..") (emphasis added).

Critically, the Amended Complaint did not follow the Court's instruction to assert what the Lease is if not a true lease, or name Parkview as a necessary party.

**STANDARD OF REVIEW**

The Supreme Court requires that claimants plead facts sufficient to make out a plausible claim for relief. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotations and citations omitted).

In *In re Zohar III, Corp.*, this Court further delineated this standard of review on a motion to dismiss, holding that a plaintiff must allege facts that are plausible, and that courts may use judicial experience and common sense to discount pleadings that are contradicted by documents relied upon in a complaint:

> [T]he alleged facts must nudge the claims "across the line from conceivable to plausible." [citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))]. The United States Court of Appeals for the Third Circuit has prescribed a three-step process for courts to determine the sufficiency of a complaint - note the elements of the claim; identify the allegations that are conclusory and not entitled to an assumption of truth; assume the veracity of well-pleaded factual allegations and determine the plausibility of the plaintiff's entitlement to relief. [citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)]. Instead of being a mini trial for parties to put forth their whole case and competing viewpoints of

> what the ultimate outcome should be, a dismissal motion focuses on the narrow and fundamental question of whether, if everything the plaintiff alleges is true, the plaintiff can prevail. [citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)]. In answering that question, a court may draw from "judicial experience and common sense" [*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)], but it must only consider alleged facts that are within the scope of the court's review. [citing *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014)]. The scope of what is reviewable includes the complaint, public record, and documents that are "integral to or explicitly relied upon" by a plaintiff, such as documents attached to a complaint and any undisputedly authentic documents upon which the claims are based. [citing *Tanksley v. Daniels*, 902 F.3d 165, 172 (3d Cir. 2018)]. "[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." [citing *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)].

*In re Zohar III, Corp.*, 639 B.R. 73, 89–90 (Bankr. D. Del. 2022) (Owens, J.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022).

Courts are not limited to claimants' version of evidence as presented in a complaint when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Courts may review documents not attached to a plaintiff's complaint "[w]here plaintiff has actual notice ... and has relied upon these documents in framing the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citing *Watterson v. Page,* 987 F.2d 1, 3–4 (3d Cir. 1993). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

This rule seeks to prevent a plaintiff from maintaining a cause of action when a review of the underlying documentary evidence would reveal that the claim is implausible. *See id.* ("What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent."); *see also In re Zohar III, Corp.*, 639 B.R. at 107 ("Like the

challenged actions of the other Defendants, the plausibility of most of the supposed inequities committed by MBIA is undermined by governing documents and past litigation results.”).

“[W]hat is critical is whether the claims in the complaint are ‘based’ on an extrinsic document and not merely whether the extrinsic document was explicitly cited.” *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

The law of the case doctrine “limits relitigation of an issue once it has been decided” in an earlier stage of the same litigation. *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002); *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). The doctrine is applied with the intent that it will promote finality, consistency, and judicial economy. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *In re City of Philadelphia Litig.*, 158 F.3d 711, 717–18 (3d Cir. 1998). Courts are loathe to revisit their own prior decisions in the absence of extraordinary circumstances, such as where the initial decision was clearly erroneous and would work a manifest injustice, a supervening new law has been announced, or when new evidence is presented. *See Christianson*, 486 U.S. at 817; *Pub. Int. Rsch. Grp. of New Jersey, Inc.*, 123 F.3d at 116-117; *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003). “[I]f the evidence at the two stages of litigation is ‘substantially similar,’ or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply.” *Hamilton*, 322 F.3d at 787.

“[F]ollowing the resolution of a motion to dismiss, ‘[t]he mere filing of an [a]mended [c]omplaint does not entitle [a p]laintiff to relitigate his claims absent new factual allegations.’” *Network Apps, LLC v. AT&T Mobility LLC*, 778 F. Supp. 3d 610, 619 (S.D.N.Y. 2025) (citing *Weslowski v. Zugibe*, 96 F. Supp. 3d 308, 316 (S.D.N.Y. 2015), *aff’d*, 626 F. App’x 20 (2d Cir. 2015). “Accordingly, courts must ‘examine’ an amended complaint following the resolution of a

motion to dismiss and 'apply the law of the case doctrine to recurring issues that do not involve new factual allegations.'" *Id*. at 620.

## ARGUMENT

### I. Debtors' Claim that the Lease is not a True Lease is Implausible, and this Court Should thus Dismiss Count I

Each party involved in this litigation and in the underlying transaction—including Parkview—has not only recognized the validity of the Lease, but has relied upon its very legitimacy in entering into and amending the various and several agreements in the Lease's orbit. Indeed, the Lease's status as a true lease is central to every agreement executed in conjunction with it, including Parkview's Loan Agreement, each agreement and amendment that followed, and all public filings. If any party ever sincerely suspected that the Lease was not a true lease in the three years following its execution, it would have raised such an objection—especially when negotiating and executing the numerous agreements that rely upon the Lease.

An agreement labeled a "lease" creates a rebuttable presumption that the agreement is what is purports to be (a true lease) and the burden of demonstrating that it is a disguised financing rests with the party challenging it. *See In re Montgomery Ward, L.L.C.*, 469 B.R. 522, 528-29 (Bankr. D. Del. 2012); *accord In re WorldCom, Inc.*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006) (the burden of proof rests with the party seeking to characterize an agreement as something "other than what it purports to be."). "The quantum of evidence necessary to satisfy that burden is 'substantial.'" *In re Barney's, Inc.*, 206 B.R. 328, 332 (Bankr. S.D.N.Y. 1997).

This rule exists for good reason. Without it, landlords would exist under constant threat that unhappy or cash-strapped tenants could simply seek to undo contracts that were always treated as valid by all involved.[8]

Courts in this circuit refuse to countenance that type of contradictory behavior under the doctrine of quasi-estoppel, which "operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *631 N. Broad St., LP v. Commonwealth Land Title Ins. Co.*, No. CV 17-02805, 2018 WL 4051798, at *8 (E.D. Pa. Aug. 23, 2018), *aff'd*, 778 F. App'x 164 (3d Cir. 2019); *see also Amgen Inc. v. Sanofi*, No. CV 14-1317-RGA, 2019 WL 259099, at *4 (D. Del. Jan. 18, 2019) ("Quasi-estoppel is a similar doctrine recognizing the 'duty of consistency.' *In re Baker Hughes Inc.*, 215 F.3d 1297, 1301-02 (Fed. Cir. 2000). Similar to judicial estoppel, it prevents a litigant 'from shifting to a contrary position touching on the same facts or transaction' and 'the earlier position was then to the advantage of the [litigant] but that it is now to the [litigant's] advantage to shift his position.' *Id.* at 1301 (quoting *Union Carbide Corp. v. United States*, 612 F.2d 558, 566 (Ct. Cl. 1979))."); *L A Apparel, Inc. v. Straight A Co., LP*, No. MC 3:21-285, 2022 WL 17417173, at *7 (M.D. Pa. Dec. 5, 2022) ("Under Delaware law, the doctrine of quasi-estoppel applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.").

Courts in other circuits are similarly intolerant. *See In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994) ("[Q]uasi-estoppel forbids a party from accepting the benefits of a transaction or statute and

[8] The Amended Complaint repeatedly warns of an inequitable result or a windfall if Debtors are unable to assume the Lease. Of course, Debtors fail to mention that Landlord would be dealt an exceptionally unfair misfortune if its property were taken away as part of a litigation that this court has already recognized as a "tactic."

then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."); *Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) (same).

Here, Debtors' plausibility burden is insurmountable. The Lease contains the features characteristic of a landlord-tenant relationship.

Debtors are required to surrender the Premises to Landlord free and clear of all encumbrances, and all of Debtors' right, title and interest in and to the Premises shall automatically revert to and become the sole property of Landlord at the end of the Lease term. *See* Lease at 95-96 (§ 25(a)); *see also id.* at 34 (§ 3). Debtors' holdover would not create a new lease term, and any holdover would subject Debtors to a 200% rent increase. *See id.* at 96 (§ 25(c)). Following an Event of Default, Landlord may terminate the Lease and compel Debtors to surrender possession (*id.* at 89 (§ 22(a)). Use of the Premises is restricted to that which is permitted under the Lease and for no other purpose without Landlord's written consent. *Id*. at 42-43 (§ 8). Landlord is permitted to encumber its fee estate without Debtors' consent. *Id*. at 42-43 (§ 8(a)). Landlord has the absolute and unconditional right, without Debtors' consent, to sell, assign, or transfer its fee title in the land subject to the Lease, and to sell, assign, or transfer its rights, titles, and interests in the Lease without Debtors' consent. *Id*. at 47 (§ 11(a)). Debtors are restricted from transferring the leasehold interest. *See id.* at 78 (§ 19(b)). Landlord's interest in the Premises is not subordinate to any encumbrances (*id.* at 77 (§ 18(a))), and is superior to the lien of any Fee Mortgagee. *Id.* at 77 (§ 18(b)). Debtors must maintain the property in good condition, repair, and appearance. *See id*. at 44-46 (§9). Landlord has the right to enter the Premises upon reasonable notice to Debtors for inspection purposes and to show the space to prospective investors, purchasers, and mortgagees. *See id.* at 106 (§ 31).

Conversely, hallmarks of lending, such as a recourse carveout guaranty, amortization or principal repayment obligation, or of a joint venture, such as investor partner's power to remove and replace the venture's manager, are entirely absent from the Lease. And Debtors' method of maintaining possession of the property following its failure to execute a business plan (the Right-Size Payment) is a Lease feature wholly unlike anything present in a lender-borrower relationship.

Debtors and Parkview acknowledged and relied upon the Lease in countless communications, and in at least the following agreements and notices:

a. Lease (Ex. C) (executed by Debtors)

b. Memorandum of Lease (Ex. D) (executed by Debtors and recorded)

c. Building Loan Agreement (Ex. E) (executed by Debtors and Parkview)

d. Building Leasehold Mortgage (Ex. G) (executed by Debtors and Parkview and recorded)

e. Project Loan Agreement (Ex. F) (executed by Debtors and Parkview)

f. Project Leasehold Mortgage (Ex. H) (executed by Debtors and Parkview and recorded)

g. Leasehold Financing Agreement (Ex. I) (executed by Debtors and Parkview)

h. First Amendment (Ex. J) (executed by Debtors and approved by Parkview)

i. Leasehold Financing Agreement (Ex. L) (executed by Debtors)

j. Second Amendment (Ex. M) (executed by Debtors and approved by Parkview)

k. Third Amendment (Ex. N) (executed by Debtors and Parkview)

l. Parkview Estoppel (Ex. O) (executed by Parkview)

m. Fourth Amendment (Ex. Q) (executed by Debtors and Parkview)

n. Notice of Events of Default Under Loan Agreement dated October 11, 2024 (Ex. R) (executed by Parkview)

o. Debtors' Letter in response to Notice of Events of Default Under Loan Agreement dated October 18, 2024 (Ex. S)

p. February 2025 UCC Notice of Public Sale (Ex. T) (published by Parkview)

q. Settlement Agreement (Ex. U) (executed by Debtors and Parkview)

r. Notice of Default Under Financial Agreement dated June 5, 2025 (Ex. V) (executed by Parkview)

s. June 2025 UCC Notice of Public Sale (Ex. W) (published by Parkview)

Alone, the sheer *number* of documents executed by Parkview and Debtors is enough to demonstrate that the Amended Complaint is implausible. But the *significance* of these documents is even more compelling because these documents are not mere communications between the parties or non-binding statements of intent (though countless such communications that are not attached here exist). Rather, these documents formed the bases of the parties' obligations to one another. In addition, every document that was recorded, and the February 2025 and June 2025 UCC Notices of Public Sale, conveyed to the world that Parkview understood that the Lease is exactly what it purports to be. *See* Exs. T and W (Debtors "own a leasehold estate in certain condominium units in the building known as 353 West 57th Street Condominium.").[9] In short, all relevant parties at all times treated the Lease as a true lease because that is what it is.

And given that Parkview and Debtors accepted the benefits of the Lease, they are estopped from now taking an inconsistent position with the Lease and the numerous agreements based upon the Lease's validity to avoid the obligations or effects under the Lease. *See 631 N. Broad St.,* 2018 WL 4051798, at *8; *Amgen Inc.*, 2019 WL 259099, at *4.

This Court need not abandon its "judicial experience and common sense" in the face of a claim that is so overwhelmingly contrary to integral and undisputedly authentic documents. *In re*

[9] Debtors' claim is further undermined by the fact that Parkview's collateral (*i.e.*, Debtors' leasehold interest) would not exist if not for the Lease.

*Zohar III, Corp.*, 639 B.R. 73, 89–90 (Bankr. D. Del. 2022) (Owens, J.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022). It "make[s] no sense . . . [and is] contradicted . . . by documents upon which [Debtors'] pleadings rely, or by facts of which the court may take judicial notice." *Id*. at 90.

Accordingly, Debtors' claim that the Lease is not a true lease is not plausible, and this Court should dismiss Count I in the Complaint.

## II. Findings in the Dismissal Order Relevant to Debtors' Recharacterization Claim are Law of the Case

As stated above, the Amended Complaint asks the Court to revisit many of the determinations it made in conjunction with the Dismissal Order, including those reached upon a review of nothing other than a plain reading of the documentary evidence – the Lease itself. *See* Ex. X, 6:8-11; 7:4-8 (finding that (i) the property and improvements revert back to Landlord at termination or expiration, (ii) Landlord may sell its fee interest subject to the Lease without Debtors' consent, and (iii) Debtors' use of the property is restricted to that prescribed in the Lease, and Landlord must consent to any deviation therefrom). The Court further found in reliance upon the Lease and its review of relevant caselaw that the 99-year lease term and triple-net feature is not uncommon for ground leases. *See Id*. at 6:17-19. And the Court already concluded that, pursuant to the terms of the Lease, Debtors' "payments compensate the lessor for its agreement to allow the debtors to develop the property and sublease it to residential tenants over the next 99 years." *See id*. at 7:11-8:10.

Other documentary evidence already considered by the Court (the marketing piece referenced in paragraph 25 of the Complaint) led to the conclusion that Debtors opted to source capital through the Lease rather than acquire the Property in fee-simple. *See* Ex. X, 6:19-24; *see also* Ex. Y, 141:7-142:10 (noting that Debtors chose not to buy the property in fee-simple). Debtors

now argue that this *same* marketing piece evidences something other than a landlord-tenant relationship. *See* Amended Complaint at ¶ 3.

The Amended Complaint asks the Court to revisit and overturn these findings. But Debtors do not offer any new evidence, point to a supervening new law, or suggest that the Court's determinations are clearly erroneous and would work a manifest injustice to justify relitigation. *See Christianson*, 486 U.S. at 817; *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116-117 (3d Cir. 1997); *Hamilton v. Leavy*, 322 F.3d 776, 787 (3d Cir. 2003). In fact, the only factual evidence cited by Debtors in the Amended Complaint concerning these findings is the documentary evidence already reviewed by the Court, including the Lease. *See* Amended Complaint at ¶¶ 3, 77-82. The law of the case doctrine thus forecloses Debtors' relitigation of these facts. *In re Continental Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002); *Magnesium Elektron, Inc.*, 123 F.3d at 116. The Court need not waste its time rethinking things it has already considered. *Christianson*, 486 U.S. at 816 ("This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'"); *In re City of Philadelphia Litig.*, 158 F.3d 711, 717–18 (3d Cir. 1998) ("The doctrine is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity.").

Debtors have made no effort to distance themselves from their statement in paragraph 2 of the original Complaint that their recharacterization efforts stem from their inability to renegotiate a lease that has become economically unattractive – a confession that this Court found "troubling." *See* Ex. X, 5:13-18. Debtors nonetheless double-down on their motivation in the Amended Complaint. *See* Amended Complaint at ¶ 5 ("even if the Project proceeds according to current plans – [Debtors] will not have the revenue to pay, or the ability to finance, a $65 million payment…. *Accordingly, without recharacterization, the Debtors will be compelled to reject the*

*Ground Lease…*") (emphasis added). This wolf-in-wolf's-clothing approach is almost commendable for its irreverence. But the Court's prior findings are law of the case nonetheless.

Accordingly, this Court should dismiss Count I in the Amended Complaint.

## III. Debtors' Claims to Avoid the Fourth Amendment are Implausible, and this Court Should Dismiss Counts II, III, IV, and V

Parkview as Construction Lender executed the Fourth Amendment to the Lease. Now, Parkview (acting through Debtors) asks this Court to ignore that fact and find that Debtors did not receive reasonably equivalent value under the Fourth Amendment. These claims are implausible.

Debtors themselves proposed negotiating and entering into the Fourth Amendment following their failure to obtain the CONH Requirement. That failure effectively nullified their ability to legally pursue the initial Construction Project and remain current under the Loan Agreement. Debtors received numerous concessions under the Fourth Amendment in order to obtain certainty and time to (i) pursue a cure of HPD's adverse findings, (ii) fix the deficiencies identified by Landlord in Debtors' Fallback Business Plan proposals, (iii) determine in more detail any potential requirements of the Hotel Union, should Debtor elect and receive Landlord's approval to pursue the Fallback Business Plan that proposed to use a portion of the Premises as an extended-stay hotel, (iv) pursue a renegotiation of the Construction Loan with Parkview (the Construction Loan was due to mature on November 1, 2024) to ensure that any Fallback Business Plan was adequately capitalized, (v) give Debtors more time to cure the existing liens, and (vi) provide more certainty to Debtors of their long-term financial obligations under the Lease, which would make a potential sale of its interest more attractive to future tenants and leasehold lenders.

And Debtors were granted a twelve-month partial abatement of Base Rent (*i.e.*, until March 29, 2025) in order to ease pressure on the construction budget and push out Base Rent increases until after the anticipated repayment of the Construction Loan. Landlord agreed to this concession

even though the Base Rent in the Required Conditions of Landlord's January 26, 2024 Response Letter called for a significantly higher amount of Base Rent with no abatement.

Parkview "acknowledged and agreed" to the Fourth Amendment and executed it on March 29, 2024.

Setting aside the reasonably equivalent value actually received by Debtors under the Fourth Amendment, it is not plausible that an amendment requested by Debtors and approved by Parkview as Debtors' lender is sufficiently unfair to be avoided. Such an argument "make[s] no sense . . . [and is] contradicted . . . by documents upon which [Debtors'] pleadings rely, or by facts of which the court may take judicial notice." *Zohar III,* 639 B.R. at 90.

Accordingly, Debtors' claims seeking to avoid the Fourth Amendment are not plausible, and this Court should dismiss Counts II, III, IV and V in the Amended Complaint.

## IV. Debtors' Have Not Alleged Particular Facts to Support Counts II, III, IV and V, and Those Claims Should Thus be Dismissed

In the hearing in which the Court dismissed the Complaint, the Court directed Debtors to support their claims seeking avoidance of the Fourth Amendment with particularized facts if it opted to amend the Complaint:

> Counsel for the debtors told me a few hearings ago that this was a clear case for recharacterization and if that is the case, I would like the debtors to make it clearer when they amend their claim. Similarly, the debtors have not stated the remainder of the complaint's counts, which seek avoidance of the fourth amendment to the ground lease, recovery of increased rent payments they made thereunder, and the disallowance of any defendant claims until the recovery of those transfers. Debtors allege that they did not obtain a reasonable equivalent value for the obligations they incurred under the lease amendment, but they do not support that conclusion with any particularized facts.

Ex. X, 8:11-22.

Yet, the Amended Complaint merely repeats the same allegations contained in the original Complaint. *Compare* Complaint at ¶¶ 56-59 *with* Amended Complaint ¶¶ 83-87. Thus, the Court's

order dismissing the Fourth Amendment avoidance claims in the Complaint is law of the case. *See Hamilton*, 322 F.3d at 787 ("[I]f the evidence at the two stages of litigation is 'substantially similar,' or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply.") (citation omitted).

Accordingly, Debtors' claims seeking to avoid the Fourth Amendment should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Landlord respectfully requests that this Court dismiss each of Debtors' claims with prejudice, and for such other and further relief that the Court deems just and proper.

Dated: July 9, 2026
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*<u>/s/ Matthew B. McGuire</u>*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Katherine S. Dute (No. 6788)
Soumya P. Venkateswaran (No. 7278)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mcguire@lrclaw.com
dute@lrclaw.com
venkateswaran@lrclaw.com

– and –

**ADLER & STACHENFELD LLP**
Kirk L. Brett (admitted *pro hac vice*)
Patrick O'Connor (admitted *pro hac vice*)
555 Madison Avenue, 6th floor
New York, New York 10022
Telephone: (212)883-1700
Facsimile: (212)883-8883
Email: kbrett@adstach.com
poconnor@adstach.com

*Counsel to 356W58 Ground Lessor LLC*