# EXHIBIT P

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

January 26, 2024

VIA FEDEX OVERNIGHT AND EMAIL

HUDSON 1701/1706, LLC and
HUDSON 1702, LLC
c/o CSC Co-Living
6 St. Johns Lane
New York, New York 10013
Attention: Salomon Smeke Saba and Alberto Smeke Saba
Email: ss@csc-coliving.com; as@csc-coliving.com

Re: Fallback Business Plan dated December 22, 2023 (the "Multifamily Fallback Business Plan") and Fallback Business Plan dated January 11, 2024 (the "Hotel Fallback Business Plan")

Dear Sal and Alberto:

Reference is hereby made to (i) that certain Ground Lease, dated May 4, 2022 (the "Original Lease"), as amended by that certain First Amendment to Ground Lease, dated January 3, 2023 (the "First Amendment"), as further amended by that certain Second Amendment to Ground Lease, dated May 1, 2023 (the "Second Amendment"), as amended by that certain Third Amendment to Ground Lease, dated December 1, 2023 (the "Third Amendment"; and together with the Original Lease, First Amendment, and Second Amendment, collectively, as the same may be further amended, restated, and/or supplemented from time to time, the "Ground Lease"), by and among 356W58 GROUND LESSOR LLC, a Delaware limited liability company, as landlord ("Landlord"), and HUDSON 1701/1706, LLC, a Delaware limited liability company ("Tenant 1"), and HUDSON 1702, LLC, a Delaware limited liability company ("Tenant 2"; and together with Tenant 1, individually and collectively, as the context may require, "Tenant"), as tenant, covering the premises located at 353-361 West 57th Street a/k/a 356 West 58th Street, New York, New York as further described in the Ground Lease (the "Leased Premises"), (ii) the Multifamily Fallback Business Plan, (iii) the Hotel Fallback Business Plan and (iv) that certain Stipulation of Settlement, Index No 24/1138, proposed by HPD to be signed by Alberto Smeke Saba in the form attached to each of the Multifamily Fallback Business Plan and the Hotel Fallback Business Plan (the "Stipulation"). Capitalized terms not defined herein shall have the meanings ascribed to such terms set forth in the Ground Lease.

We are in receipt of each of your Multifamily Fallback Business Plan and Hotel Fallback Business Plan and have reviewed your proposals. Due to the Project having received both a CONH Exemption Denial and a preliminary determination from HPD of a Finding of Harassment, it is unlikely that Tenant will be able to satisfy the CONH Requirement by the CONH Requirement

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

Outside Date. As such, Tenant has elected to pursue a Fallback Project in accordance with a proposed Fallback Business Plan.

Pursuant to the Ground Lease, Landlord's right to approve or disapprove any Fallback Business Plan is subject to its sole and absolute discretion – regardless of whether the proposed Fallback Project includes a Hotel Use or any other use (*see* Definitions of "Fallback Business Plan" and "Fallback Project", Section 1). Further, in order for a Leasehold Mortgagee to be bound by any modification or amendment to the Ground Lease, such modification or amendment requires such Leasehold Mortgagee's consent (*see* Section 12(c)(i) of the Ground Lease).

We acknowledge that Tenant is facing significant pressure from HPD, the Hotel Union, its contractors and the SRO Tenants to conclude construction at the Project as quickly as possible – and we are eager for the Project to get back on track. However, for the reasons outlined in this letter (this "Response Letter"), we believe that there are significant deficiencies in each proposed Fallback Business Plan, and due to these deficiencies and the uncertainties in implementation of the Cure Election (defined below), additional discretion on the part of Landlord will be required in connection with certain aspects of the Fallback Project that have not yet been finalized. Therefore, our approval of Tenant's signing the Stipulation and exercising the Cure Election are subject to Tenant electing to pursue either the Hotel Fallback Business Plan or the Multifamily Fallback Business Plan and Landlord's receipt of written approval from Tenant and Construction Lender of the applicable Required Conditions (defined below) in the form of an interim amendment to the Ground Lease (the "Interim Ground Lease Amendment"), which Interim Ground Lease Amendment shall be acceptable to Landlord in its sole and absolute discretion.

Following execution of the Interim Ground Lease Amendment, Landlord will cooperate with Tenant to obtain and review all remaining information and deliverables identified in this Response Letter to fully evaluate Tenant's chosen Fallback Business Plan and work with HPD to finalize the details of the Cure Documents. Landlord's final approval of the applicable Fallback Business Plan and the Cure Documents are conditioned on (i) Tenant executing any and all further amendments to the Ground Lease required by Landlord to memorialize the final approved Fallback Business Plan (including the updated Project Budget, Construction Schedule and related matters) and final HPD-approved Rent Regulation Program (the "Final Ground Lease Amendment") and (ii) Construction Lender and Tenant amending the Construction Loan Documents to reflect the approved Fallback Business Plan, the Final Ground Lease Amendment, any modifications to the terms of the Construction Loan necessary to fully capitalize the Fallback Project, and such other matters as Landlord may request (the "Construction Loan Amendments"; together with the Final Ground Lease Amendment, collectively, the "Required Amendments"), which Required Amendments shall be acceptable to Landlord in its sole and absolute discretion. Tenant and Construction Lender shall execute and deliver the Required Amendments no later than the date that the final, approved Cure Documents are executed and delivered by Tenant to HPD.

Please be advised that, if Tenant does not elect to pursue either the Hotel Fallback Business Plan or Multifamily Fallback Business Plan, modify the applicable Fallback Business Plan to remedy the identified deficiencies in accordance with this Response Letter, and agree in writing to

the applicable Required Conditions by **February 15th, 2024** (the "Response Deadline"), Landlord intends to review the existence of any defaults and, if not appropriately cured by Tenant or Construction Lender in accordance with the Ground Lease, pursue all available remedies at law or in equity.

*A. Cure Election*

Tenant proposes that, in order to move forward with any Fallback Project pursuant to either the Multifamily Fallback Business Plan or the Hotel Fallback Business Plan, Alberto Smeke Saba ("Alberto") sign the Stipulation with HPD and, in so doing, elect to submit the Project to a Rent Regulation Program (the "Cure Election") that would cure the public record of any Finding of Harassment and require that 28% of the residential or hotel floor area of the Project be rented to individuals earning at or below 80% of the Area Median Income (the "Affordability Requirement") in perpetuity. Pursuant to Section 7(d) of the Ground Lease, submitting any portion of the Leased Premises to a Rent Regulation Program, including through a Cure Election, requires Landlord's consent (to be given or withheld in its sole and absolute discretion).

Based on extensive discussions with Tenant, Tenant's counsel (Rosenberg & Estis) and Landlord's counsel (Belkin Burden and Adler & Stachenfeld LLP), we understand that the Cure Election is a multi-step process that can take anywhere between two and nine months to finalize and is subject to some discretion on the part of HPD's Inclusionary Housing Unit (the "IH Unit"). We understand the process requires the following steps: (i) signing and submitting the Stipulation to HPD, which HPD will, in turn, submit to the Office of Administrative Trials and Hearings ("OATH") to resolve HPD's petition for an initial determination of a Finding of Harassment and vacate any scheduled hearings, (ii) preparation and submission of a full application to the IH Unit for implementing the Affordability Requirement, based on the forms attached hereto as Exhibit A (the "Cure Application"), and (iii) negotiation with the IH Unit over details of a final agreement with HPD (the "Cure Agreement") that stipulates satisfaction of the Affordability Requirement, together with a regulatory agreement, subordination non-disturbance and attornment agreement and such other deliverables as HPD may require as conditions to issuing a Cure Certificate for the Project (together with the Cure Agreement, collectively, the "Cure Documents"). Once issued, the Cure Certificate will allow Tenant to obtain all remaining permits required from DOB to Complete the Fallback Project.

Through this process, the IH Unit maintains some discretion over the number, location, size, and income restrictions of the units designated as permanent Low Income Housing (collectively, the "Regulated Units") to satisfy the Affordability Requirement in a manner generally consistent with Inclusionary Housing benefits, as well as final approval over how such Regulated Units are financed and operated. For Inclusionary Housing benefits, the IH Unit typically requires (i) a minimum unit size, (ii) specified unit mix, and (iii) horizontal mix requirements (*i.e.*, a mixture of Regulated Units and market rate units on the same floors of the building) (collectively, the "IH Unit Requirements"). We understand that Tenant and its counsel have requested a waiver of these requirements from the IH Unit; however, such waiver has not yet been formally approved. As such, although Tenant has proposed satisfying the Affordability

Requirement by designating all the SRO Units and planned studio and one-bedroom units as Regulated Units, we are concerned that HPD may not ultimately approve the waiver and instead require Tenant to implement IH Unit Requirements at the Project.

Further, the Hotel Fallback Business Plan proposes that any residential units that are not Regulated Units be rented on a nightly or weekly basis as an extended-stay hotel, to be operated by a third party Hotel Operator. Although the IH Unit typically does not dictate pricing or configuration of the market rate units at any project where Inclusionary Housing benefits are issued, given the IH Unit's policy goals, it is unclear whether it may have concerns about the Hotel Use of the Project and, therefore, whether this use has the potential to impact its willingness to grant the waiver of IH Unit Requirements or might trigger requests for other requirements that might impact cost, timing and feasibility of the Hotel Fallback Business Plan.

We note that in order to have the SRO Units counted as Regulated Units to satisfy the Affordability Requirement, it is likely that each SRO Tenant will need to submit its financial information to HPD in order to confirm that the applicable SRO Tenant meets the income restrictions imposed. Obtaining this information will require voluntary cooperation by each SRO Tenant and it is possible that several may be unwilling to do so, in which case, HPD may not permit the applicable SRO Unit to be counted towards satisfying the Affordability Requirement.

As such, in order for us to make an informed evaluation of each Fallback Business Plan, we must receive from Tenant an alternative, "worst-case-scenario" designation of Regulated Units that follows IH Unit Requirements (assuming no waiver is ultimately granted) and a limited participation rate (e.g., 50%) from the SRO tenants is achieved. Please provide further detail on how this alternative designation of Regulated Units would affect the proposed Project Budget, Construction Schedule, and projected net operating income for the Leased Premises with respect to both the Hotel Fallback Business Plan and the Multifamily Fallback Business Plan. Such alternative unit mix, together with the alternative Project Budget, Construction Schedule and related projections shall hereafter be referred to as the "Alternative Regulated Unit Plan".

In addition, the Cure Application is a critical next step in moving forward with negotiations with the IH Unit after execution of the Stipulation; however, neither the Multifamily Fallback Business Plan nor the Hotel Fallback Business Plan included a completed Cure Application for our review and approval. As such, Tenant must provide a complete and accurate Cure Application, inclusive of all backup materials required to be provided to the IH Unit for consideration.

Once submitted, Landlord intends to review the Alternative Regulated Unit Plan and complete Cure Application promptly. Assuming such materials are acceptable to Landlord, Landlord intends to approve Alberto's execution of the Stipulation (so long as Landlord's counsel's comments to the Stipulation are included per the attached Exhibit B) and Tenant's pursuit of the Cure Election, subject to Landlord's approval (to be given or withheld in its sole and absolute discretion) of the final form of the Cure Documents that will be ultimately negotiated with the IH Unit and Tenant's execution of the Interim Ground Lease Amendment.

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

*B. Deficiencies of each Fallback Business Plan and Additional Discretion Required*

The Ground Lease requires that any Fallback Business Plan include, among other things: (i) an updated Project Budget and an updated sources and uses, including any additional financing sources needed to Complete the Fallback Project, (ii) an updated memorandum or legal opinion reasonably acceptable to Landlord, prepared by Tenant's Architect or zoning counsel reasonably approved by Landlord, which memorandum or opinion shall set forth updated zoning calculations, relevant authority from Legal Requirements and such other information as is reasonably necessary to determine that the Fallback Business Plan can be achieved by the Required Substantial Completion Date under Legal Requirements (the "Zoning Memo"), (iii) any proposed revisions to the applicable Tenant Protection Plan needed to complete the work for the Fallback Project, (iv) a memorandum or legal opinion reasonably acceptable to Landlord, prepared by Tenant's labor and employment counsel providing a summary and analysis of any obligations of Tenant (and potential liability to Landlord) under the IWA, 32BJ Agreement, L94 Agreement and Union MOA, together with an estimate of labor costs that may be incurred by Tenant during the construction of the Fallback Project and following Substantial Completion of the Fallback Project (the "Labor Analysis"), and (v) if the proposed Fallback Project is a Hotel Project, a proposed Hotel Flag and Hotel Operator, together with a draft Hotel Management Agreement, proposed room rates (and such other details pertaining to the proposed management and branding of the Hotel as Landlord may reasonably request). The foregoing deliverables were not included in either the Multifamily Fallback Business Plan or the Hotel Fallback Business Plan. Tenant is also required to provide any other information or deliverables reasonably requested by Landlord for its evaluation of any Fallback Business Plan.

In addition, it is our understanding that the Construction Lender has received, but not yet approved either proposed Fallback Business Plan and, as such, certain assumptions made by Tenant with respect to the capital sources available to complete each Fallback Project have not been fully confirmed. For example, the Multifamily Fallback Business Plan assumes that Construction Lender will agree to pay-in-kind a portion of its interest, freeing up capital for Tenant to use towards Total Project Costs. It is not clear that Construction Lender has agreed to this concept. In addition, under the current Construction Loan Documents, the Construction Lender did not pre-approve any change in use to an extended stay hotel and, as such, any such change in use would require express written approval of the Construction Lender (together with appropriate modifications to the Construction Loan Documents). Accordingly, Landlord's approval of either Fallback Business Plan is contingent upon (i) receiving Construction Lender's express written approval of an updated Project Budget, Construction Schedule and sources and uses, (ii) our satisfactory review and approval (in our sole and absolute discretion) of the applicable Construction Loan Amendments, and (iii) if remaining proceeds from the Construction Loan are not sufficient (together with Tenant's equity sources) to capitalize 100% of the remaining Total Project Costs for the applicable Fallback Project, written commitments from any and all additional proposed equity and debt sources.

*(i) Deficiencies of Hotel Fallback Business Plan*

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

Given the risk imposed by the Union MOA (including the Snap Back Provision) and past practice of the Hotel Union, it is critical that Landlord have a complete understanding of the potential additional liability and obligations that will arise if a portion of the Leased Premises remains as a Hotel Use. For example, the Hotel Fallback Business Plan assumes that all remaining Hotel Union Pension Fund Obligations will terminate if the Leased Premises is partially utilized for a Hotel Use – but this has not been confirmed in writing with the Hotel Union. As such, our approval of the Hotel Fallback Business Plan is conditioned on Tenant entering into a written agreement (or amendment to the Union MOA) with the Hotel Union, 32BJ and L94 that details all required staffing, labor expenses and related requirements for the Hotel Fallback Business Plan (the "Updated Union Agreement"), which Updated Union Agreement shall be subject to Landlord's approval (to be given or withheld in its sole and absolute discretion). Pursuant to the terms of the Ground Lease, Tenant shall ensure that Landlord and its counsel (including David Rothfeld at Ellenoff, Grossman & Schole) are given the opportunity to participate in all discussions and negotiations with the Hotel Union, promptly provide copies of all communications received from the Hotel Union and obtain Landlord's approval prior to responding to any such communications.

Further, as required by the Ground Lease, the proposed Hotel Flag, Hotel Operator, Hotel Franchisor, Hotel Management Agreement and Hotel Franchise Agreement (as applicable) require Landlord's prior written approval. It is not clear from the Hotel Fallback Business Plan provided whether Kasa is Tenant's selected Hotel Operator or what the proposed management structure would be if Kasa were selected. Please clarify the intent here. In order to fully evaluate the Hotel Fallback Business Plan, Landlord requires further review of the selected Hotel Operator and approval of all relevant Hotel related agreements to be executed in connection with the Fallback Business Plan, including any required subordination and non-disturbance agreements that any such Hotel Operator may require, as further set forth in Section 59 of the Ground Lease.

In order to fully evaluate the Hotel Fallback Business Plan, Landlord also requires review of the following information and documentation:

1. A fully revised Project Budget, including all hard and soft costs, loan interest, Base Rent, property taxes, insurance, quarterly obligations to pay the Withdrawal Liability Installment Payments, and additional reserves (*see* Required Conditions, below), together with a list of all change orders and incremental costs over and above the existing Project Budget for the Multifamily Project;
2. A written commitment from all capital sources (including Construction Lender) to capitalize 100% of the costs required by the proposed Project Budget;
3. A detailed sources and uses table, showing all sources of capital required to Complete the Fallback Project in accordance with the updated Project Budget;
4. An updated Zoning Memo indicating that the proposed partial Hotel Use is permitted by Legal Requirements;
5. A complete Labor Analysis from Tenant's labor counsel;
6. Further documentation, including resume, balance sheet and example deal sheets, evidencing Kasa's (or such other selected Hotel Operator's) financial capacity and

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

experience as a Hotel Operator and detailing applicable building/design requirements;

7. A draft Hotel Management Agreement with the proposed Hotel Operator, which shall include the Hotel Operators required fee structure;
8. Identify the proposed managing agent and management agreement for the Regulated Units; and
9. An updated Tenant Protection Plan to address all remaining work required to Complete the Fallback Project.

*(ii) Deficiencies of Multifamily Fallback Business Plan*

In order to fully evaluate the Multifamily Fallback Business Plan, we request the following information and documentation:

1. A fully revised Project Budget, including all hard and soft costs, loan interest, Base Rent, property taxes, insurance, quarterly obligations to pay the Withdrawal Liability Installment Payments, and additional reserves (*see* Required Conditions, below), together with a list of all change orders and incremental costs over and above the existing Project Budget;
2. A detailed sources and uses table, showing all sources of capital required to Complete the Fallback Project in accordance with the updated Project Budget;
3. A written commitment from all capital sources (including Construction Lender) to capitalize 100% of the costs required by the proposed Project Budget;
4. Identify the proposed managing agent and management agreement for the Regulated Units; and
5. An updated Tenant Protection Plan to address all remaining work required to Complete the Fallback Project.

*C. Chronicle and Status of the Project*

Although the Project always had some inherent risks, we believe many of those risks have been exacerbated by the Tenant's actions throughout the term of the Ground Lease.

Tenant initially proposed phasing construction such that, prior to satisfying the CONH Requirement, demolition and construction would be limited primarily to portions of the Building that did not contain SRO Units, like the lobby, common areas and amenity spaces. During the first few months, however, Tenant chose to expand the scope of demolition to include portions of residential floors, including where SRO Units were located. By doing so, the Tenant exposed the SRO Tenants to daily inconveniences and frequent service interruptions, which resulted in noise complaints, stop work orders, and a need for the Tenant to have a lot of face-to-face contact with the SRO Tenants. Tenant's choice to do so clearly impacted the SRO Tenants' experiences on site and likely contributed to HPD's initial determination of a Finding of Harassment. Landlord, its counsel (Belkin Burden) and Landlord's Construction Consultant warned Tenant that doing such work and having so much direct contact with the SRO Tenants could impact the CONH

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

Requirement – and, ultimately, HPD's initial determination of a Finding of Harassment was based, in part, on new building violations incurred as a result of the work performed by Tenant on floors 4 through 20 of the Building, the testimony of the SRO Tenants who claimed essential service interruptions during demolition (including access to elevators and hot water) and exposure to dust, debris and noise, and meetings that Tenant had with SRO Tenants that was interpreted by such SRO Tenants as pressure to sell their units and to cooperate with HPD investigators (*see* Notice of Hearing, OATH Index No. 24/1138, issued October 18, 2023). Had Tenant either waited to commence work until after a determination on the CONH or implemented its original plan to limit demolition prior to satisfaction of the CONH Requirement, or otherwise heeded warnings from counsel that such contact with SRO Tenants should be approached with extreme caution and with proper statutory procedure, it is possible that HPD might not have issued an initial determination of a Finding of Harassment and the original Multifamily Project might still be viable.

In addition, Tenant's early negotiations with the Hotel Union prior to acquisition and the negotiated terms of the Union MOA exposed the Project to major financial uncertainties with respect the timing of payment of the Hotel Union Pension Fund Obligations and the scope of Enhanced Severance Obligations. Tenant's Affiliate had already executed the Union MOA by the time Landlord became involved in the transaction and, as a result, at the time of acquisition, Landlord had little choice but to accept the Union MOA as negotiated, as by that point, the Hotel Union was unwilling to entertain further clarifications or supplemental agreements.

The Union MOA specifically required payment of the Hotel Union Pension Fund Obligations in one lump sum within 60 days following receipt of the Hotel Union Pension Fund's Demand Letter, notwithstanding that ERISA expressly permits payment of such liability in 51 quarterly installments. Rather than negotiating for a reduced sum payment or an alternate payment schedule during initial negotiations of the Union MOA, when Tenant received the Hotel Union Pension Fund Demand Letter (which confirmed Tenant's right to pay such sum in quarterly installments), instead of complying with the terms of the Union MOA and making the payment in full, Tenant proceeded to pay only the quarterly installments, hoping that the Hotel Union would not ultimately enforce the Union MOA by its terms. Ultimately, the Hotel Union did enforce the terms of the Union MOA nearly a year after delivery of the Hotel Union Pension Fund Demand Letter, putting extreme pressure on Landlord, Tenant and Construction Lender to negotiate an alternative payment plan to avoid a lengthy arbitration with the Hotel Union – a process that has cost Landlord significant time, effort and legal expense to address.

Further, the Union MOA did not provide an actual exhibit detailing the total amount of Enhanced Severance Obligations, but rather relied on a vague formula for calculation. Based merely on an estimate of such obligations provided by the Hotel Union, Construction Lender set aside a reserve of $34,228,632.15 to be used to satisfy the Enhanced Severance Obligations. Sometime between May 4, 2022 and April 3, 2023, Tenant received grievances or other notices from the Hotel Union and/or certain Hotel Employees claiming additional Enhanced Severance Obligations over and above the amounts the Hotel Union had previously calculated. Rather than keeping Landlord informed of these developments and giving Landlord the opportunity to participate in discussions with the Hotel Union, the Tenant negotiated independently with the

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

Hotel Union and ultimately entered into a Consent Award that resulted in an additional $9,903,572.90 of Enhanced Severance Obligations. Such additional cost was ultimately paid for through an unauthorized reallocation of the Project Budget that neither Tenant nor Construction Lender disclosed to Landlord until weeks after it had been signed. Such reallocation not only resulted in a major cost overrun, but also depleted all remaining funds that had been reserved by the Construction Lender to satisfy the remaining Hotel Union Pension Fund Obligations in the amount of approximately $17,285,224. Such actions resulted in numerous Defaults and Events of Default under the Ground Lease, as enumerated on Schedule 2 of the Leasehold Financing Agreement executed by Tenant, Landlord and Construction Lender on May 1, 2023. Such actions had the effect of gutting the Project Budget of much needed funds to satisfy the Tenant's ongoing obligations (including obligations for which Landlord would be directly liable upon termination of the Ground Lease) – and, again, resulted in Landlord having to spend significant additional time, effort and legal expense to address.

Further, the initial Construction Loan Documents that Tenant negotiated with Parkview did not include any ability for Tenant, as borrower thereunder, to seek additional or replacement financing or replace the defaulting lender, following a funding default by the lender. Such rights are common in the marketplace and would have likely facilitated a faster resolution after Parkview failed to fund in early 2023. Instead, the Construction Loan remained in default for months until Northwind's acquisition of a controlling piece of the Construction Loan from Parkview finally closed on May 1, 2023. The protracted process resulted in Landlord spending significant additional time, effort and legal expense and ultimately required the Landlord to defer pursuit of remedies for various Defaults under the Ground Lease and accept additional risk of the unsatisfied Hotel Union Pension Fund Obligations, which, as of the date hereof, remain completely uncapitalized.

Each of these missteps has significantly increased the risk profile of the Project – risks that continue to compound as construction delays drag on and the Hotel Union Pension Fund Obligations remain unsatisfied. Construction work has been stalled for months, resulting in several mechanic's liens being filed against the Leased Premises, all while insurance and other costs have ballooned. Once a Fallback Business Plan has been approved in accordance with this Response Letter, it will take time to remobilize contractors and get back on track. Such delays will significantly push back the anticipated stabilization timeline for the Project. All of this exposes the Project to continued capitalization risk, as remaining proceeds from the Construction Loan alone will likely be insufficient to cover all remaining Total Project Costs for the Fallback Project.

Throughout this tumultuous period, Landlord has been cooperative and accommodating in an effort to give Tenant the best chance to realize its vision for the Project. We have deferred pursuit of remedies on various Defaults under the Ground Lease, facilitated time consuming and expensive negotiations with Construction Lender, the Hotel Union, and HPD, agreed to favorable modifications of the Ground Lease to allow Tenant the ability to push out its payment of the Hotel Union Pension Fund Obligations, and even offered to provide separate financing to the Tenant in order to facilitate its purchase of the Penthouse Unit. At this point, our confidence in Tenant's ability to complete a successful Project has significantly diminished and our investors are wary of offering additional concessions to aid the Tenant's efforts.

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

*D. Required Conditions*

Ground lease investing relies heavily on highly conservative credit metrics to justify the exceptionally low cost of capital provided to the tenant – a cost of capital that affords the tenant the opportunity to achieve enhanced returns upon successful completion of a pre-approved business plan. Market standards dictate and our investors require that ground lease proceeds advanced and ground rent rates and increases be tied to specific thresholds, yields and coverage ratios based on the asset's as-stabilized market value and projected net operating income. Each proposed Fallback Business Plan poses additional and unanticipated risks that inherently change the value of the asset and its return profile – and our investors are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics to the Ground Lease. Therefore, Landlord will not agree to either Fallback Business Plan without receipt of both Tenant's and Construction Lender's written approval of each of the following conditions (as applicable to each proposed Fallback Business Plan, collectively, the "Required Conditions") pursuant to an Interim Ground Lease Amendment. Please note that such Required Conditions are in addition to and not in lieu of Tenant's obligations to provide the additional information and deliverables outlined earlier in this Response Letter.

*(i) Required Conditions for Landlord's Approval of the Multifamily Fallback Business Plan*

The Multifamily Fallback Business Plan anticipates a significantly reduced net operating income at stabilization, which will ultimately impair the value of the Fee Estate and Landlord's ability to finance or sell its position. As such, the following Required Conditions must be approved in writing by Tenant and Construction Lender in order for Landlord to provide its approval to the Multifamily Fallback Business Plan:

1. Payment of $50,000,000 (the "Multifamily Upfront Payment") to Landlord upon the earlier to occur of (x) 6 months after Tenant's execution of the Stipulation or (y) Tenant's execution of the final Cure Documents, as approved by Landlord (such earlier date, the "Repricing Deadline"), to be structured in a tax efficient manner. Tenant's failure to timely pay the Multifamily Upfront Payment shall be an immediate Event of Default under the Ground Lease.

2. The following amendments to the Ground Lease being incorporated into the Interim Ground Lease Amendment:
    a. Acceleration of the CPI Adjustment Year to the 6th Lease Year and every 5 Lease Years thereafter (*i.e.*, the 11th Lease Year, 16th Lease Year…etc.);
    b. Adjustment of CPI Increase Percentage to assume a 4% annual cap;
    c. Modification of the definitions of Minimum Payment, Right-Size Base Rent, Right-Size Yield and Right-Size Payment to adjust the calculations to take into account a 3.0x Coverage Ratio and 4.0% yield to Landlord; and

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

d. Landlord's deemed earning of the Right-Size Payment as of execution of the Required Amendments and extension of the Right-Size Event Date to the earlier of the last day of the 10th Lease Year.

3. Modification of the Project Budget to include the following additional line items, together with evidence reasonably satisfactory to Landlord that such additional costs (and the entirety of the remaining Project Budget) is fully capitalized:
   a. Multifamily Upfront Payment
   b. Remaining Hotel Union Pension Fund Obligations, including the next 8 quarterly Withdrawal Liability Installment Payments through November 1, 2025, in the aggregate amount of $3,927,106.00 and the remaining unpaid balance in the amount of $14,148,125.08, payable by December 15, 2025
   c. Reserve for attorney's fees and other reimbursable expenses anticipated to be incurred by Landlord through Completion of the Project in the amount of $350,000, to be replenished in $50,000 increments upon Landlord's request
   d. Reserve for 18 months of Base Rent, as reasonably determined by Landlord

4. *Required Conditions for Landlord's Approval of the Hotel Fallback Business Plan*

Although the projected cash flow anticipated by the Hotel Fallback Business Plan is greater, the risks inherent in managing and maintaining hospitality assets and the fact that this use will invariably require ongoing cooperation with the Hotel Union, necessitate revised economics that reflect how those risks will impact the Landlord's ability to finance or sell its position. As such, the following Required Conditions must be approved in writing by Tenant and Construction Lender in order for Landlord to provide its approval to the Hotel Fallback Business Plan:

1. The following amendments to the Ground Lease being incorporated into the Interim Ground Lease Amendment:
   a. The annual Base Rent for the entirety of the Leased Premises through the 5th Lease Year shall be increased from $6,400,000 to $9,250,000, commencing as of the Repricing Deadline;
   b. Acceleration of the CPI Adjustment Year to the 6th Lease Year and every 5 Lease Years thereafter (*i.e.*, the 11th Lease Year, 16th Lease Year…etc.);
   c. Adjustment of CPI Increase Percentage to assume a 4% annual cap;
   d. Modification of the definitions of Minimum Payment, Right-Size Base Rent, Right-Size Yield and Right-Size Payment to adjust the calculations to take into account a 3.50x Coverage Ratio; and
   e. Landlord's deemed earning of the Right-Size Payment as of execution of the Interim Ground Lease Amendment.

**356W58 GROUND LESSOR LLC**
c/o GLR Capital Investments, L.L.C.
2801 North Harwood Street, Suite 1200
Dallas, Texas 75201

2. Modification of the Project Budget to include the following additional line items, together with evidence reasonably satisfactory to Landlord that such additional costs (and the entirety of the remaining Project Budget) is fully capitalized:
    a. Remaining Hotel Union Pension Fund Obligations, including the next 8 quarterly Withdrawal Liability Installment Payments through November 1, 2025, in the aggregate amount of $3,927,106.00 and the remaining unpaid balance in the amount of $14,148,125.08, payable by December 15, 2025 (or, in lieu thereof, confirmation in writing from the Hotel Union that all remaining Hotel Union Pension Fund Obligations will terminate)
    b. Reserve for attorney's fees and other reimbursable expenses anticipated to be incurred by Landlord through Completion of the Project in the amount of $350,000, to be replenished in $50,000 increments upon Landlord's request
    c. Reserve for 18 months of Base Rent, as reasonably determined by Landlord

Please reach out if you have any questions or concerns. Please be aware that a copy of this Response Letter has been provided to the Construction Lender for its review.

For the avoidance of doubt, nothing contained in this Response Letter should be construed as any kind of waiver or agreement by Landlord to forbear from exercising its rights and remedies. Nor should this Response Letter be construed as binding Landlord to any course of action or any form of advance approval of any proposal by Tenant. This Response Letter is without prejudice to Landlord's rights and remedies, all of which are expressly reserved.

[*Remainder of Page Intentionally Left Blank; Signature Page Follows*]

**LANDLORD**:

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: ____________________
Name: Luke Pak
Title: Authorized Signatory

Enclosures

cc: Cole Schotz P.C.
1325 Avenue of the Americas, 19th Floor
New York, New York 10019
Attn: Jordan J. Metzger, Esq.
E-mail: jmetzger@coleschotz.com

Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, NY 10017
Attn: Stephen B. Meister
E-mail: sbm@msf-law.com

Parkview Financial REIT, LP
11601 Wilshire Boulevard, Suite 2100
Los Angeles, California 90025
Attn: Paul Rahimian

Farrell Fritz, P.C.
622 Third Avenue, 37th Floor
New York, New York 10017
Attn: Jeffrey K. Levin
E-mail: jlevin@farrellfritz.com

# EXHIBIT A

Form of Cure Application

**THE CITY OF NEW YORK**
**DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**
OFFICE OF DEVELOPMENT
100 GOLD STREET, ROOM 5G, NEW YORK, NEW YORK 10038
Inclusionary@hpd.nyc.gov

## AFFORDABLE HOUSING PLAN APPLICATION PURSUANT TO THE CURE PROGRAM

*Please indicate "Not Applicable" or "NA" where appropriate. Do not leave any lines blank.*

1. **Applicant:** ______________________________
   Address: ______________________________
   Fax: ______________________________
   Email: ______________________________
   Primary Contact (Name, Phone, Email):
   ______________________________

2. **Owner (if different):** ______________________________
   Address: ______________________________
   Fax: ______________________________
   Email: ______________________________
   Primary Contact (Name, Phone, Email):
   ______________________________

3. **Administering Agent:** ______________________________
   Address: ______________________________
   Fax: ______________________________
   Email: ______________________________
   Primary Contact (Name, Phone, Email):
   ______________________________

4. **General Contractor:** ______________________________
   Address: ______________________________
   Fax: ______________________________
   Email: ______________________________
   Primary Contact (Name, Phone, Email):
   ______________________________

5. **Architect:** ______________________________
   Address: ______________________________
   Fax: ______________________________
   Email: ______________________________
   Primary Contact (Name, Phone, Email):
   ______________________________

**6. Attorney and Firm:** ______________________________

Address: ______________________________

Fax: ______________________________

Email: ______________________________

Primary Contact (Name, Phone, Email):

______________________________

**7. Location of Low Income Housing Units**

Street Address: ______________________________

Borough: ______________________________

Block(s)/Lot(s): ______________________________

Community Board: ______________________________

**8. Cure Requirement Floor Area (in both square feet and percentage of floor area) pursuant to:**

☐ CONH Pilot Program, Local Law 1 2018

Square Feet: ____________ Percentage: ____________

☐Special District: ______________ ZR Section: ____________ ☐SRO

Square Feet: ____________Percentage: ____________

**9. Unit Count**

Total units in project: ________Total Cure units in project: ________Super's units: ___

For projects with more than one building:

1. Address for first building: ______________________________

   Total units in first building: _____ Total Cure units in first building: _____ Super's units: ___
2. Address for second building: ______________________________

   Total units in second building: ____ Total Cure units in second building: _____ Super's units: __

*For additional buildings, please add additional pages as needed.*

Income Distribution of Low Income Housing Units:

Number of low-income units (equal to or less than 40% AMI):______

Number of low-income units (equal to or less than 50% AMI): ______

Number of low-income units (equal to or less than 60% AMI):______

Number of low-income units (equal to or less than 80% AMI): ______

**10.** Tax Exemption to be requested: ______________________________

*No portion of the low income housing required shall qualify to satisfy an eligibility requirement for any tax exemptions.*

**11. Type of Project (check all that apply)**

Construction type:

☐New Construction
☐Preservation
☐Substantial Rehabilitation

Location of Floor Area Compensation:

☐On-site
☐Off-site
☐On-site and Off-site

Cure Units:

☐Rental
☐Homeownership

Non-Cure Units:

☐Rental
☐Homeownership
☐Not Applicable

Electric Utility Systems:

☐N/A – Not Used
☐ Individual unit heating systems utilizing electric resistance heated PTACs or heat pumps
☐ Individual unit hot water systems heated by electrically powered boilers
☐Electric stoves

**12.** If the project will contain a condominium or cooperative structure, please describe the structure and the use of each unit. If not, please indicate N/A:

______________________________________________________________________

______________________________________________________________________

______________________________________________________________________

**Authorized Signature of Applicant:**_____________________________________________

**Print name:** __________________________________________________________

**Date:**____________

Block:

Lot(s):

ARCHITECT'S OR ENGINEER'S LETTERHEAD

ARCHITECT/ENGINEER AFFIDAVIT

Address(es)____________________________________________________

Borough ____________Block ________Lot(s)________________________________________

Total Number of Buildings ____________________________________________________

In connection with the above pending request for the issuance of a Cure Agreement ("Agreement") with the New York City Department of Housing Preservation and Development ("HPD"), I, ____________________________, certify, under penalty of perjury, that the following statements are true and correct to the best of my knowledge:

1. I am a Choose one _________licensed to practice and in good standing with the State of New York Department of Education.

2. I am the Choose One for the project described above ("Project").

3. All capitalized terms not defined herein have the respective meanings set forth in the New York City Zoning Resolution ("Zoning Resolution"). All amounts of floor area stated herein are measured in accordance with the definition of "Floor Area" set forth in Zoning Resolution § 12-10 and the definition of "Cure Requirement" set forth in Zoning Resolution § Choose and are based on the building drawings ("Plans") submitted to the New York City Department of Buildings and HPD for the Project.

4. Pursuant to NYC Zoning Resolution §________________________________________, I certify the Project meets the Cure Requirements. The building(s) are on a Cure compliance lot where ______ percent of Residential Floor Area of the zoning lot contains permantly affordable Cure units.

All floor area figures below should be measured as **net** square footage per the definition set forth in Zoning Resolution § 23-91:

- Such measurement includes the square footage within the inside face of the walls enclosing such dwelling unit (i.e., all floor surfaces within the dwelling unit, including closets, and the partitions that separate rooms that are within the same dwelling unit).
- Such measurement excludes (a) the thickness of exterior walls, (b) the thickness of partitions separating such dwelling unit from any other dwelling units or other spaces, and (c) portions of such dwelling unit that do not qualify as Floor Area.

Block:
Lot(s):

5. The Project contains ______________ square feet of total Residential Floor Area.

6. The Project contains ______________ square feet of Floor Area attributed to dwelling units designated as the Cure Requirement to be occupied by Qualifying Households.

7. The Project Choose contain the required ________ % of Floor Area to meet the Cure Requirement.

8. If the Project is constructed in accordance with the Plans, the completed building(s) in the Project will be in compliance with the requirements contained in the following laws and regulations:

(a) Chapter 11 of the New York City Building Code; and

(b) Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 part CFR 8. Units designated for mobility impairments (5% of the total units) and sensory impairments (2% of the total units) must include both Affordable Units and non-Affordable Units. Units designated for mobility impairment may not be designated for sensory impairments. In calculating the number of designated units, decimals must be rounded up to the next whole number.

Block:
Lot(s):

I make these statements as of this ____day of _______, 20______, in order to induce HPD to enter into the Agreement to permit one or more dwellings to comply with the Cure Requirement pursant to the New York City Zoning Resolution Choose , if other please specify ________________________________________.
I understand that HPD will rely on the veracity of these statements in entering into the Agreement.

I understand that if HPD finds noncompliance with the Zoning Resolution and/or that any of the statements made herein are not accurate, HPD, in its sole discretion, may prevent me from certifying any future projects with HPD. Furthermore, I understand that submission of a false certification may be deemed to be professional misconduct pursuant to Section 6509 of the Education Law.

I also understand that if, on completion, an HPD review and/or Department of Building approval of the Project finds that total Floor Area devoted to Cure Units to be occupied by Qualified Households, is different from the statements made herein, HPD will modify all relevant documents relating to this Project to reflect the correct total require Cure Floor Area.

______________________
Architect/Engineer Signature

______________________
Architect/Engineer Name

______________________
License Number

______________________
Business Name

______________________
Business Address

______________________
Phone Number

Seal of [Registered Architect:]
[Professional Engineer:]

Sworn to me this ___day of _______, 20__

Notary Public

________________________________

Block:
Lot(s):

**EXHIBIT A**

**PROJECT NAME:**
**ADDRESS:**
**DATE:**

## Cure Unit Summary

To be completed by developer's team - Please Indicate CURE Units

**Bdrm Summary**

| # Bdrms | Units |
|---|---|
| 0 Bdrm | |
| 1 Bdrm | |
| 2 Bdrm | |
| 3 Bdrm | |
| Total | 0 |

| Construction Floor # | Marketing Floor # | Apt # | # Bdrms | Net Sq. Ft. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| Total Residential Sq Ft | |
| Total Cure Square Ft | 0 |
| Cure Percentage | #DIV/0! |

| Cure 504 Designated Units | |
|---|---|
| Unit Numbers | Designation |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Super / Resident Manager Unit(s)**

| Construction Floor # | Marketing Floor # | Apt # | # Bdrms | Net Sq. Ft. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

Form 2019-09-16

NYC
Department of Housing Preservation & Development

LOUISE CARROLL
Commissioner
ELIZABETH OAKLEY
Deputy Commissioner
PATRICIA ZAFIRIADIS
Associate Commissioner

Office of Development
Inclusionary Housing
100 Gold Street, 5G
New York, N.Y. 10038
nyc.gov/hpd

# AFFORDABLE HOUSING PLAN CHECKLIST PURSUANT TO THE CURE PROGRAM

| PROJECT NAME: | | AS OF: | | TARGETED CLOSING DATE: | |
|---|---|---|---|---|---|

| ✓ | Requirement | | Responsible Party | Notes |
|---|---|---|---|---|
| | **A. Application** | | | |
| | Cure Application (Original required) | | Development Team | |
| | Project description/narrative | | Development Team | |
| | Cure Application Submission Fee ($100)<br>*Made payable to NYC Dept. of Finance* | | Development Team | |
| | HPD Construction Sign Fee ($100)<br>*Made payable to NYC HPD* | | Development Team | |
| | **B. BLDS Processing and Review** | | | |
| | BLDS eSubmit invitation initiated | | IH Project Manager | |
| | Drawings & documents submitted to BLDS eSubmit | LINK | Project Architect | |
| | BLDS final acceptance received | | HPD BLDS | |
| | **C. Architectural Submissions** | | | |
| | Cure Architect Affidavit (Original required) | | Project Architect | |
| | Cure Unit Chart (Excel format) | | Development Team | |
| | Utility verification letter (Original required) | | Engineer of Record | |
| | **D. Campaign Finance Forms** | | | |
| | Doing Business Data form | LINK | Development Team | |
| | **E. Community Board Notification** | | | |
| | Notification delivered<br>*(at least 45 days prior to closing)* | LINK | Development Team | |
| | **F. Integrity Review** | | | |
| | Disclosure forms for Entity and Individuals | LINK | Administering Agent | |
| | Integrity Review final report issued | | HPD Integrity Review | |
| | Pre-Transaction Affidavit<br>*(at least two weeks prior to closing)* | LINK | Administering Agent | |
| | **G. Tax Memo** | | | |
| | Property list submitted (Excel format)<br>*Administering Agent only* | | Development Team | |
| | Arrears and Violations report run | | IH Project Manager | |
| | Report responses submitted (if applicable) | | Development Team | |
| | **H. Supporting Organizational Documents** | | | |
| | Organizational charts<br>*Applicant, Administering Agent and General Contractor required* | | Development Team | |
| | Employer Identification Numbers (EINs)<br>*Applicant, Owner (if applicable), Administering Agent, Managing Agent, General Contractor, Architect, Developer, and Attorney required* | | Development Team | |
| | **I. Financing** | | | |
| | Fully executed term sheet | | Development Team | |
| | Underwriting (Excel format) | | Development Team | |
| | Fully executed commitment letter | | Development Team | |
| | **J. Legal** | | | |
| | Draft Cure Agreement and SNDA circulated | | HPD Legal | |
| | Draft Cure Agreement exhibits circulated | | IH Project Manager | |
| | Cure Agreement opinion letter (Original required) | | Applicant's Counsel | |
| | Tax exemption opinion letter submitted (Original required) | | Applicant's Counsel | |
| | **K. Closing** | | | |
| | Closing date assigned | | HPD Team | |
| | Cure Application Fee ($1,100 per Cure unit)<br>*Made payable to NYC Dept. of Finance.* | | Development Team | |

NYC
Department of Housing Preservation & Development

LOUISE CARROLL
Commissioner
ELIZABETH OAKLEY
Deputy Commissioner
PATRICIA ZAFIRIADIS
Associate Commissioner

Office of Development
Inclusionary Housing
100 Gold Street, 5G
New York, N.Y. 10038
nyc.gov/hpd

# AFFORDABLE HOUSING PLAN PROVISIONS PURSUANT TO THE CURE PROGRAM

## A. Application

Information on the Cure Program can be found here: https://zr.planning.nyc.gov/article-ix/chapter-6/96-110

**Fees**

All fees must be paid in the form of a certified check, bank check, or money order as follows:

- **$100 Cure Application Submission Fee**: *due at application submission, made payable to the NYC Department of Finance (DOF).*
- **$100 Construction Sign Fee**: *due at application submission, made payable to the NYC Department of Housing Preservation and Development (HPD).*
- **Cure Application Fee**: $1,100 per Cure unit; *due at closing, made payable to DOF.*

## B. BLDS Processing and Review

Once a complete Application package is submitted to the Inclusionary Housing Program, your Project Manager will initiate the intake of the project through the BLDS eSubmit system. A notification will be sent to the development team which will permit the architect to upload the Drawings and Documents.

Submit DOB submission-quality drawings that substantiate or verify the Architect's Affidavit for new construction, substantial rehabilitation, and preservations projects as follows:

Each design submission must comprise two multi-page PDFs, one of which must contain all design drawings ("Drawings"), and the other of which must contain all supporting documents ("Documents"). All files must be submitted through the BLDS eSubmit process, and each file must be less than 50 MB in size.

**New Construction Drawings**

*Note: New construction building plans filed with DOB must be reviewed by a DOB plan examiner. Responses to DOB objections must not be self-certified.*

BLDS Design Review Submission Checklist and Guidelines:

- New Construction Design Review Submission Checklist
- Supportive Housing Guidelines

**Conversions and Enlargements**

Submit existing DOB-approved building plans, including

(1) the site plan of the building to contain Affordable Housing,

(2) zoning sheets that reflect the total size of the building,

(3) the size and configuration of the dwelling units to be contained in the building.

If no existing building plans are on record, please submit newly drawn building plans.

- Indicate landmark status of proposed conversion or enlargement building.
- Provide a scope of work indicating the extent of conversion or enlargement work proposed.

## C. Architectural Submissions

**Architect Affidavit**

Submit certification from an architect that states:

(1) the amount of affordable floor area in the project,

(2) that the affordable housing units comply with §93-90 or 93-110 of the New York City Zoning Resolution ("Zoning Resolution")

(3) that the project complies with §504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) and implementing regulations at 24 part CFR 8.

Access the Cure Architect Affidavit and Exhibit A Cure Unit Summary & Size Chart here:

- Architect Affidavit
- Exhibit A of the Architect Affidavit
  - *Cure Unit Summary & Size Chart*

NYC Department of Housing Preservation & Development

LOUISE CARROLL
Commissioner
ELIZABETH OAKLEY
Deputy Commissioner
PATRICIA ZAFIRIADIS
Associate Commissioner

Office of Development
Inclusionary Housing
100 Gold Street, 5G
New York, N.Y. 10038
nyc.gov/hpd

**Utility Verification Letter**

Engineer of record must submit a letter to Inclusionary Housing Project Manager stating the proposed heating, hot water, and cooking systems for the project.

Units with the following two heating and hot water systems receive the highest utility allowances:

- Individual unit electric resistance heated PTACs or heat pumps
- Individual unit hot water systems heated by electrically powered boilers
- Electric stoves

Utility Allowance Chart: 2019 LIHTC Rent & Income Limits for NYC

## D. Campaign Finance Forms

Entities participating in affordable housing transactions with the City must complete and submit Campaign Finance forms with submission of the Application and again before closing. Please submit a hard copy original and PDF electronic version each time.

## E. Community Board Notification

A copy of the full Cure Application along with the required notification documents must be submitted to the Community Board at least 45 days prior to execution of a restrictive declaration. Submit an email as proof that the proposed Application was submitted to and received by the Community Board in which the project is located (cc: inclusionary@hpd.nyc.gov).

## F. Integrity Review

Submit disclosure forms for Administering Agent. Provide a hard copy original and an electronic copy (PDF) for the entities and their principals. Entities or individuals may submit only electronic copies after submitting an Application for Electronic Integrity Review Submission and receiving a personal identification number ("PIN").

**Pre-Transaction Affidavits**

Submit affidavits two to four weeks before signing a regulatory agreement for Administering Agent.

## G. Tax Memo

Submit a list of all NYC properties currently owned, managed, or controlled by the project's Administering Agent all principals. Provide proof of payment for DOF and DEP arrears and Dismissal Requests or Certificate(s) of Correction for outstanding C-violations, as applicable, for the properties listed.

## H. Supporting Organizational Documents

Submit organizational charts for Applicant, Administering Agent, and General Contractor.
Submit Employer Identification Numbers (EINs) for Applicant, Owner (if different than Applicant), Administering Agent, Managing Agent, General Contractor, Architect, Developer, and Attorney.

## I. Financing

**Underwriting**

Submit the following in Microsoft Excel format with all cells fully linked. Calculations must be shown.

1. **Development budget** - HPD IH reserves and fees must be capitalized in the development budget.
2. **Sources and uses of financing**
3. **Number and bedroom size of units**
4. **Rents and income level of tenants:** Indicate year and AMI level of affordable rents and whether tenants are responsible for gas and/or electric payments.
5. **Maintenance and Operations:** At a minimum, the following should be included as separate line items:
   - Administrative: legal, accounting, management fee, fire & liability insurance
   - Utilities: heating, electricity, water & sewer
   - Maintenance: supplies, cleaning, exterminating, repairs/replacement, super & maintenance salaries, elevator maintenance/repairs, building reserve.
6. **30 year cash flow analysis:** Provide a Cash Flow Analysis sheet.
7. **Sales Prices:** for homeownership projects only.

Department of Housing Preservation & Development

LOUISE CARROLL
Commissioner
ELIZABETH OAKLEY
Deputy Commissioner
PATRICIA ZAFIRIADIS
Associate Commissioner

Office of Development
Inclusionary Housing
100 Gold Street, 5G
New York, N.Y. 10038
nyc.gov/hpd

## J. Legal

HPD Legal will assign an attorney to review closing documents and draft the Cure Agreement and Subordination and Non-Disturbance Agreement(s).

## K. Closing

**Permit Notice Availability**

Upon execution and recordation of the Cure Agreement (or proof that the document was submitted to the Office of the City Register for recordation), HPD will generate a Permit Notice, for delivery to DOB. The Permit Notice will state the amount of permanantly affordable floor area in the project and will allow DOB to issue a New Building permit.

# EXHIBIT B

Modifications to Stipulation

THE CITY OF NEW YORK OFFICE OF
ADMINISTRATIVE TRIALS AND HEARINGS

---------------------------------------------------------------------X

THE DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT OF THE CITY OF NEW YORK,

Petitioner,

-against-

ALBERTO SMEKE SABA applicant for a Certification of No Harassment for the premises located at 353 West 57 Street, New York, New York, 10019,

Respondent.

---------------------------------------------------------------------X

STIPULATION OF SETTLEMENT

Index No. 24/1138

**Block 1048, Lot 7502**

This stipulation of settlement ("Stipulation") is entered into by and between Petitioner, the Department of Housing Preservation and Development of the City of New York ("HPD") and Respondent, ALBERTO SMEKE SABA, stating as follows:

**WHEREAS**, the Respondent, ALBERTO SMEKE SABA, applied to the Department of Housing Preservation and Development of the City of New York for a Certificate of No Harassment ("CONH") pursuant to Administrative Code of the City of New York Title 28, §28-107.1 et seq., §27-2093, and the City of New York Zoning Resolution §96-110, for the premises located at 353 West 57 Street, New York, New York, 10019 (the "Premises"); premises being a Single Room Occupancy (SRO) building located within the Special Clinton District - Anti-Harassment area.

The Premises, including all blocks and lots must be explicitly stated here.

**WHEREAS,** Respondent, ALBERTO SMEKE SABA, is represented by legal counsel, Luise Barrack, Esq. and Elizabeth Brown, Esq. of the law firm Rosenberg and Estis P.C.

**WHEREAS**, on September 25, 2023, the Assistant Commissioner for the Office of Enforcement and Neighborhood Services of HPD issued an Initial Determination finding that there was reasonable cause to believe that harassment occurred at the Premises during the inquiry period.

**WHEREAS**, on September 26, 2023, a copy of the Initial Determination of Reasonable Cause was served on the respondent, ALBERTO SMEKE SABA, and another copy was annexed to the Notice of Hearing and Petition as "Exhibit A"

**WHEREAS**, HPD commenced a Hearing pursuant to Administrative Code of the City of New York Title 28, §28-107.1 et seq., §27-2093, and the City of New York Zoning Resolution §96-110, by serving a Notice of Hearing and Petition on the Respondent to be heard before the Office of Administrative Trials and Hearings ("OATH") on January 16, 2024;

**WHEREAS**, contained in HPD's Petition is a request for a Report and Recommendation, from OATH to the Commissioner of HPD, finding that harassment occurred at the subject building during the relevant inquiry period and recommending a denial of the Respondent's application for a CONH;

**WHEREAS**, the parties agree to avoid litigation and settle this matter and, although Respondent ALBERTO SMEKE SABA does not concede the allegations set forth in the Petition, Respondent nevertheless consents to the issuance of a Final Determination denying the Application for a CONH for the subject premises and waives his right to any further proceedings in connection with the Application, including a hearing before OATH ("OATH Hearing") subject to the terms set forth herein, and

**WHEREAS,** OATH has not issued a Report and Recommendation or made any finding of facts concerning harassment in this matter, and

**WHEREAS**, ALBERTO SMEKE SABA and HPD agree that the Respondent may elect to execute a CURE Agreement with the Division of Inclusionary Housing of HPD and the

contact information to facilitate the execution of a CURE Agreement will be provided to the Respondent.

**WHEREAS**, ALBERTO SMEKE SABA and HPD agree that this Stipulation represents the whole agreement between the parties to be executed in order to resolve Respondent's CONH application and any amendments to the Stipulation shall be void unless in writing and executed by the parties to this Stipulation, and

**WHEREAS,** Respondent acknowledges and agrees that he has been advised and had the opportunity to obtain independent legal counsel, Luise Barrack, Esq., and Elizabeth Brown, Esq. of Rosenberg and Estis P.C., to review this Stipulation and that this Stipulation is the product of an arm's length negotiation between all parties and shall not be construed against any party due to authorship. The Respondent acknowledges and agrees that he understands all of the terms and conditions contained herein.

**NOW, THEREFORE**, it is hereby stipulated and agreed:

1. The "WHEREAS" clauses stated hereinabove are material components of this Stipulation of Settlement and are incorporated into this Stipulation as if set forth fully hereunder.
2. ALBERTO SMEKE SABA waives his right to a Hearing, pursuant to Administrative Code of the City of New York Title 28, §28-107.1 et seq., §27-2093, and the City of New York Zoning Resolution §96-110, regarding his application for a Certification of No Harassment for the property located at 353 West 57 Street, New York, New York 10019, Block: 1048 Lot: 7502.

3. The Assistant Commissioner of HPD shall issue a Final Determination pursuant to Administrative Code of the City of New York Title 28, §28-107.1 et seq., §27-2093, and the City of New York Zoning Resolution §96-110, denying ALBERTO SMEKE SABA's application for a Certification of No Harassment without a finding of harassment for the premises located at 353 West 57 Street, New York, New York, 10019.
4. ALBERTO SMEKE SABA waives all rights to a challenge HPD's Final Determination pursuant to article seventy-eight (78) of the New York Civil Practice Laws and Rules or in any other way.
5. The Final Determination accompanied by a copy of this Stipulation shall be filed at the Office of the City Register and mailed to the applicant.
6. ALBERTO SMEKE SABA, through his attorneys, agrees to return a fully signed original copy of this Stipulation to HPD so that HPD can vacate the Conference scheduled for January 16, 2024 and resolve the Petition for a Hearing scheduled before OATH.
7. This Stipulation may be executed in one or more counterparts, each of which originally signed copy shall be deemed an original, but all of which together shall constitute one and the same instrument.

____________________________ Dated: ________________

ALBERTO SMEKE SABA Respondent
6 Street Johns Lane
New York, New York 10013

______________________________ Dated: ____________________

Luise Barrack, Esq.
Rosenberg & Estis, P.C.
733 Third Avenue
New York, New York 10017

______________________________ Dated: ____________________

Ronit Joseph, of Counsel
Martha Ann Weithman, Esq.
Attorney for Petitioner
Department of Housing Preservation and Development
Of the City of New York
100 Gold Street
New York, New York 10038