# EXHIBIT Q

# FOURTH AMENDMENT TO GROUND LEASE

THIS FOURTH AMENDMENT TO GROUND LEASE (this "Fourth Amendment") is effective as of the 29th day of March, 2024 (the "Fourth Amendment Effective Date"), by and among **356W58 GROUND LESSOR LLC**, a Delaware limited liability company (together with its successors and assigns, "Landlord"), **HUDSON 1701/1706, LLC** ("Tenant 1"), and **HUDSON 1702, LLC** ("Tenant 2"; and together with Tenant 1, individually and collectively, as the context may require, joint and severally, and together with their respective successors or assigns permitted by the Lease, "Tenant"), each a Delaware limited liability company, as acknowledged and agreed to by **PARKVIEW FINANCIAL REIT, LP**, a Delaware limited partnership ("Construction Lender").

W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into that certain Ground Lease, dated as of May 4, 2022 (the "Original Lease Agreement"), as amended by that certain First Amendment to Ground Lease, dated as of January 3, 2023 (the "First Amendment"), as amended by that certain Second Amendment to Ground Lease, dated as of May 1, 2023 (the "Second Amendment"), as amended by that certain Third Amendment to Ground Lease, dated as of December 1, 2023 (the "Third Amendment"; and together with the Original Lease Agreement, the First Amendment, and the Second Amendment, collectively, the "Original Lease"; as the same is amended by this Fourth Amendment and as may be further amended, restated, assigned and/or modified from time to time, the "Lease"), pursuant to which Landlord ground leased to Tenant the Leased Premises described therein;

WHEREAS, Tenant delivered a Fallback Business Plan Notice on January 11, 2024 (the "Hotel Fallback Business Plan"), requesting that Landlord approve (i) Tenant's execution of the Stipulation (as defined in the Response Letter) and pursuit of the Cure Election (as defined in the Response Letter) and (ii) the Hotel Fallback Business Plan and proposed Fallback Project for the Leased Premises set forth therein (collectively, the "Tenant Proposals");

WHEREAS, reference is hereby made to that certain letter re: Fallback Business Plan dated January 26, 2024 (the "Response Letter"), delivered by Landlord to Tenant and Construction Lender; and

WHEREAS, pursuant to the Response Letter, as a condition to Landlord's approval of the Tenant Proposals, Tenant is required to execute and deliver this Fourth Amendment, reflecting certain required conditions outlined herein.

NOW, THEREFORE, in consideration of these presents, and for other good and valuable consideration, the mutual delivery of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1. Recitals Incorporated; Defined Terms. The foregoing recitals are hereby incorporated into this Fourth Amendment as if fully set forth herein. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Original Lease and, if not in the Original Lease, as defined in the Response Letter.

2. Acknowledgments. Landlord and Tenant hereby acknowledge and agree as follows:

(a) Prior to the Fourth Amendment Effective Date, Tenant received both a CONH Exemption Denial and a preliminary determination from HPD of a Finding of Harassment. As a result, Tenant is unlikely to be able to satisfy the CONH Requirement by the CONH Requirement Outside Date

and, in lieu thereof, has delivered a Fallback Business Plan Notice to Landlord and requested Landlord's approval of the Hotel Fallback Business Plan.

(b) For the reasons further outlined in the Response Letter, Landlord has not yet approved (and hereafter shall continue to retain the right to approve in its sole and absolute discretion) each of (i) the Cure Application, Cure Documents, and Rent Regulation Program that will be imposed on the Leased Premises following execution of the Cure Documents, (ii) the Hotel Fallback Business Plan (and the Fallback Project contemplated thereby), including, without limitation, any modifications to the Project Plans and Specifications, Project Budget, GMP, Contracts or Construction Schedule proposed in connection therewith, and (iii) any Construction Loan Amendments.

(c) This Fourth Amendment shall constitute an Interim Ground Lease Amendment as required by the Response Letter; however, Landlord and Tenant have mutually approved modifications to the Required Conditions set forth in the Response Letter applicable to the proposed Hotel Fallback Business Plan, which modifications are attached hereto as Exhibit A. Simultaneously with Landlord's approval of Tenant's Fallback Business Plan and Tenant's execution and delivery of the Cure Documents and Construction Loan Amendments (in each case, in forms subject to Landlord's approval in its sole and absolute discretion), the parties shall enter into a Final Ground Lease Amendment further outlining all approved modifications to the Project and any other relevant modifications to the Lease, which Final Ground Lease Amendment shall be subject to Landlord's approval in its sole and absolute discretion. In the event that the ultimate Fallback Business Plan approved by Landlord (in its sole and absolute discretion) contemplates that the Leased Premises will be used entirely for multifamily use, rather than partially for extended-stay hotel use, as contemplated by the proposed Hotel Fallback Business Plan, Landlord shall consider, in good faith, any reasonable proposed modifications to the economic terms of the Lease, including, without limitation, Base Rent step-ups and timing or calculation of the Right-Size Payment or Buyback Option (any such proposed modifications to be subject to Landlord's approval in its sole and absolute discretion).

(d) Upon Landlord's receipt of fully executed counterpart signature pages to this Fourth Amendment from each of Tenant and Construction Lender, Tenant shall be authorized to execute and deliver the Stipulation provided that the modifications to the Stipulation set forth in the Response Letter are incorporated therein. Tenant shall deliver to Landlord a true, correct and complete copy of the final, executed Stipulation within one (1) Business Day of Tenant's receipt of same from HPD.

(e) Immediately following Tenant's execution and delivery of the Stipulation to HPD, Tenant shall commence pursuit of the Cure Election and initial negotiations with HPD's IH Unit regarding the Cure Documents. Tenant shall ensure that Landlord's counsel, YuhTyng Patka (Email: Ypatka@adstach.com; Phone: (212) 692-5532) is afforded a reasonable opportunity to participate in all meetings, calls and videoconferences with HPD and copied on all email and other written correspondence with HPD regarding the Cure Election and Cure Documents.

(f) Tenant shall deliver true, correct and complete copies of any and all draft Cure Documents to Landlord and Landlord's counsel as soon as reasonably practicable following receipt of same and shall accommodate any and all reasonable comments from Landlord and Landlord's counsel to same. Tenant shall simultaneously deliver to Landlord and Landlord's counsel all documentation and other information the Tenant delivers to HPD in connection with its Cure Application and the negotiation of the Cure Documents.

(g) Pursuant to and as further set forth in the Lease, Tenant shall ensure that Landlord and its counsel (including David Rothfeld at Ellenoff, Grossman & Schole; Email: drothfeld@egsllp.com; Phone: (646) 895-7222) are given the opportunity to participate in all discussions and negotiations with the

Hotel Union, promptly provide copies of all communications received from the Hotel Union and obtain Landlord's approval prior to responding to any such communications.

(h) As of the Fourth Amendment Effective Date, the Leased Premises is subject to certain mechanic's and/or materialmen's liens described on Schedule 1 attached hereto and made a part hereof (the "Existing Liens"), which have not been timely paid, or otherwise bonded and discharged by Tenant in accordance with Section 10 of the Original Lease and, therefore, have resulted in a Default under the Lease. Tenant's failure to fully pay and discharge such Existing Liens in accordance with Section 10(a) of the Lease within thirty (30) days after the Fourth Amendment Effective Date shall be an immediate Event of Default under the Lease.

3. Basic Ground Lease Information. The paragraph under the heading Fixed Rent on page (i) of the Original Lease, entitled "Basic Ground Lease Information" is hereby deleted and replaced with the following:

> Subject to Section 60 and Section 7 of the Fourth Amendment, the annual Base Rent for the Leased Premises shall be $6,400,000 (payable in accordance with Section 4(f) below at a rate of $533,333.33 per month). Commencing on the Fourth Amendment Effective Date, the aggregate annual Base Rent for the Leased Premises shall be increased to $8,750,000 (payable in accordance with Section 4(f) below at a rate of $729,166.67 per month). Notwithstanding the foregoing, Tenant shall receive a rent credit in the aggregate amount of $2,350,000 to be applied in twelve (12) equal monthly installments of $195,833.33 per month, commencing on the Fourth Amendment Effective Date and terminating upon March 29, 2025.
>
> On the first day of each of the sixth (6th) Lease Year and the eleventh (11th) Lease Year, the Base Rent shall increase to an amount equal to one hundred ten percent (110%) of the Base Rent that was in effect for the respective prior Lease Year.
>
> Commencing on the first day of the eleventh (11th) Lease Year and on every subsequent CPI Adjustment Year, Base Rent shall increase to the greater of (x) the Base Rent in effect during the immediately preceding Lease Year, increased by the Rent Escalation (if then applicable) or (y) (A) in the case of the first CPI Adjustment Year (i.e., the eleventh (11th) Lease Year), $8,750,000, or, for all other CPI Adjustment Years, the Base Rent for the Lease Year occurring five (5) years prior to such Lease Year, *multiplied by* (B) the then-applicable CPI Increase Percentage (examples of which are further illustrated on Exhibit H attached hereto).
>
> On the first day of every Lease Year, starting with the twelfth (12th) Lease Year, the Base Rent shall increase to an amount equal to one hundred two percent (102%) of the Base Rent that was in effect for the prior Lease Year (each such increase, a "Rent Escalation"), subject to Section 4(d) below.

4. Definitions.

(a) The definitions of "Adjustment Date" and "Non-Triggering Transfer" are hereby deleted from Section 1 of the Original Lease.

(b) The definitions of "30 Year Treasury", "CPI Increase Percentage", "Operating Expenses", "Right-Size Base Rent", "Right-Size Payment", "Right-Size Yield" and "Trailing 12-Month NOI" are hereby deleted and replaced in their entirety with the following:

"30 Year Treasury" means the annual yield to maturity of the actively traded non-callable non-inflation-indexed United States Treasury fixed interest rate security at a 30-year constant maturity (other than any such security which can be surrendered at the option of the holder at face value in payment of federal estate tax or which was issued at a substantial discount), as reported in *The Wall Street Journal* or other authoritative publication or news retrieval service on the fifth (5th) Business Day preceding the Right-Size Event Date or Buyback Option Payment Date, as applicable. If *The Wall Street Journal* ceases to publish the "U.S. 30 Year Treasury Bond Yield," Landlord shall select an equivalent publication that publishes such "U.S. 30 Year Treasury Bond Yield," and if such "U.S. 30 Year Treasury Bond Yield" is no longer generally published or is limited, regulated or administered by a Governmental Authority, then Landlord shall select a comparable interest rate index in its sole discretion.

"CPI Increase Percentage" shall mean the increase in (A) the Index for the last full calendar month preceding the applicable CPI Adjustment Year, *over and above* (B) in the case of the first CPI Adjustment Year (i.e., the eleventh (11th) Lease Year), the corresponding index for the calendar month proceeding the Effective Date of the Lease and, for all other CPI Adjustment Years, the corresponding Index for the calendar month in which the preceding CPI Adjustment Year occurred, expressed as a percentage rounded to two (2) decimals. Notwithstanding the foregoing, the CPI Increase Percentage shall in no event exceed (i) for the first CPI Adjustment Year, 134.39% (3.00% annual cap) or (ii) for any subsequent CPI Adjustment Year, 118.77% (3.50% annual cap).

"Operating Expenses" means, for any period, without duplication, all expenses actually paid or payable by Tenant during such period in connection with the operation, management, maintenance, repair and use of the Leased Premises, determined on an accrual basis, and, except to the extent otherwise provided in this definition, in accordance with GAAP. Operating Expenses specifically shall include (i) all expenses incurred in the immediately preceding twelve (12) month period, (ii) all payments required to be made pursuant to any covenants, restrictions, easements, declarations or agreements of record relating to the construction, maintenance, operations or use of the Leased Premises, (iii) property management and franchise fees in an amount equal to the management and franchise fees actually paid, (iv) administrative, payroll, security and general expenses for the Leased Premises, (v) the cost of utilities, inventories and fixed asset supplies consumed in the operation of the Leased Premises, including any actual furniture, fixtures and equipment used in connection with any Hotel Use, (vi) a reasonable reserve for uncollectible accounts, (vii) costs and fees of independent, third-party professionals (including, without limitation, legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services required or permitted hereunder, (viii) cost of attendance by employees at training and manpower development programs, (ix) association dues (if any), (x) computer processing charges, (xi) advertising expenses, (xii) operational equipment and other equipment lease payments, (xiii) Taxes and insurance premiums and (xiv) customary capital and/or maintenance reserves, which, if the Project includes a Hotel Use, shall include customary operating and maintenance reserves consistent with the standard typically maintained by the Hotel Operator or Hotel Franchisor for similar hotels located in New York City, as applicable. Notwithstanding the foregoing, Operating Expenses shall not include (1) depreciation or amortization, (2) income taxes due from Tenant or any Affiliate of Tenant, (3) capital expenditures, and (4) debt service with respect to any Leasehold Mortgage or other financing of Tenant or any Affiliate of Tenant with respect to the Leased Premises.

"Right-Size Base Rent" means, as of the Right-Size Event Date, the quotient obtained by *dividing* (x) the quotient obtained by dividing the Trailing 12-Month NOI by 3.00 by (y) the Right-Size Base Rent Escalation.

"Right-Size Payment" shall mean, as of the Right-Size Event Date, (A) if the Trailing 12-Month NOI *divided by* the then-scheduled unabated annual installment of Base Rent due in the eleventh (11th ) Lease Year is less than 3.00, an amount equal to the lesser of (x) the Minimum Payment and (y) the quotient obtained by dividing $2,500,000 by the Right-Size Yield; or (B) if the Trailing 12-Month NOI divided by the then-scheduled unabated annual installment of Base Rent due in the eleventh (11th) Lease Year is equal to or greater than 3.00, an amount equal to $0. Notwithstanding the foregoing, in the event that clause (A) of this definition applies, and the Minimum Payment exceeds $65,000,000, the Right-Size Payment shall be equal to $65,000,000. For the avoidance of doubt, Exhibit M shall include example calculations of each of the amounts described in clauses (A) and (B) of this definition, in addition to the calculation of the Minimum Payment.

"Right-Size Yield" shall mean the lesser of (A) 30 Year Treasury plus twenty-five (25) basis points and (B) 4.50%, to be determined by Landlord ten (10) days prior the Right-Size Event Date.

"Trailing 12-Month NOI" means, for the twelve (12) months immediately prior to the month in which either the Right-Size Event Date or the Buyback Option Payment Date occurs, as applicable, the amount equal to (a) all gross income derived from Subleases and other operating income earned from the Leased Premises (determined in accordance with GAAP, but specifically excluding (i) any extraordinary or non-recurring revenues and (ii) any Sublease under which the applicable subtenant thereunder is (A) not paying rent or otherwise in default beyond all notice and cure periods, (B) in bankruptcy and has not affirmed its sublease in the applicable bankruptcy proceeding, or (C) has expressed its intention (directly, constructively or otherwise) to not renew, terminate, cancel and/or reject its applicable Sublease) during such period, as determined by Landlord in good faith based on reporting provided by Tenant pursuant to this Lease; *minus* (b) all expenditures for Operating Expenses for the Leased Premises over such period, other than Base Rent under this Lease.

(c) The following definitions shall be added to Section 1 of the Original Lease:

"Buyback Option Payment" shall mean an amount equal to the quotient obtained by dividing (x) the Buyback Option Reduction by (y) the Buyback Option Yield determined on the Buyback Option Yield Lock Date.

"Buyback Option Yield" shall mean the lesser of (A) 30 Year Treasury plus twenty-five (25) basis points and (B) 4.50%, to be determined by Landlord on the Buyback Option Yield Lock Date.

"Right-Size Base Rent Escalation" shall mean greater of (x) 110% and (y) the increase in (A) the Index for the last full calendar month preceding the first CPI Adjustment Year (i.e., the eleventh (11th) Lease Year), *over and above* (B) the corresponding Index for the last full calendar month in the fifth (5th) Lease Year.

"Fourth Amendment" shall mean the Fourth Amendment to Ground Lease by and among Landlord and Tenant, dated as of the Fourth Amendment Effective Date, as acknowledged and agreed to by Parkview Financial REIT, LP, a Delaware limited partnership.

"Fourth Amendment Effective Date" has the meaning set forth in the Fourth Amendment.

5. Rent.

(a) Each of Landlord and Tenant hereby acknowledge and agree that, prior to the Fourth Amendment Effective Date, pursuant to Section 4(a) of the Original Lease, the annual Base Rent

for the Leased Premises was $6,400,000 (payable in accordance with Section 4(f) of the Original Lease at a rate of $533,333.33 per month).

(b) Section 4(a) of the Original Lease is hereby deleted in its entirety and replaced with the following:

> Subject to Section 60 and Section 7 of the Fourth Amendment, the annual Base Rent for the Leased Premises shall be $6,400,000 (payable in accordance with Section 4(f) below at a rate of $533,333.33 per month). Commencing on the Fourth Amendment Effective Date, the aggregate annual Base Rent for the Leased Premises shall be increased to $8,750,000 (payable in accordance with Section 4(f) below at a rate of $729,166.67 per month). Notwithstanding the foregoing, Tenant shall receive a rent credit in the aggregate amount of $2,350,000 to be applied in twelve (12) equal monthly installments of $195,833.33 per month, commencing on the Fourth Amendment Effective Date and terminating upon March 29, 2025.

(c) Section 4(c) of the Original Lease is hereby deleted in its entirety and replaced with the following:

> On the first day of every Lease Year, starting with the twelfth (12th) Lease Year, the Base Rent shall increase to an amount equal to one hundred two percent (102%) of the Base Rent that was in effect for the prior Lease Year (each such increase, a "Rent Escalation"), subject to Section 4(d) below.

(d) The first sentence of Section 4(d) of the Original Lease is hereby deleted in its entirety and replaced with the following:

> Commencing on the first day of the eleventh (11th) Lease Year and continuing every five (5) Lease Years thereafter (i.e., on the sixteenth (16th) Lease Year, the twenty-first (21st) Lease Year, the twenty-sixth (26th) Lease Year, and so on) (each such Lease Year, a "CPI Adjustment Year"), Base Rent shall increase to the greater of (x) the Base Rent in effect during the immediately preceding Lease Year, increased by the Rent Escalation (if then applicable, and in the eleventh (11th) Lease Year, by 110%) or (y) (A) (i) solely with respect to the first CPI Adjustment Year, $8,750,000 or (ii) for any subsequent CPI Adjustment Year, the Base Rent for the Lease Year occurring five (5) years prior to such CPI Adjustment Year, *multiplied by* (B) the then-applicable CPI Increase Percentage (any such increase, the "CPI Escalation"). Notwithstanding the foregoing, in the event the relevant Index figure for the month referred to in clause (A) of the definition of the CPI Increase Percentage is not available on the applicable CPI Adjustment Year, Tenant shall continue to pay, monthly in advance, the same amount of annual Base Rent as was applicable for the month immediately preceding such CPI Adjustment Year; however, within thirty (30) days after Landlord gives Tenant Notice of any deficiency in Tenant's payments of annual Base Rent for the current period due to unavailability of such relevant Index figures (which Notice shall be accompanied by the relevant Index figure and the calculation supporting Landlord's statement of deficiency), Tenant shall pay Landlord the amount of such deficiency and shall thereafter pay Landlord, monthly in advance, the new annual Base Rent amount resulting from the calculation stated above. By way of illustration only, attached as Exhibit H are example calculations of the Base Rent for certain CPI Adjustment Years, each based on a hypothetical Index in effect for such Lease Year. Landlord shall provide Tenant with notice of Landlord's calculation of the Base Rent for each CPI Adjustment Year (accompanied by the relevant information on which such calculation is

based); provided, however, any failure to provide such notice and information shall not relieve Tenant's obligation to pay Base Rent hereunder.

(e) Section 4(e) of the Original Lease is hereby deleted in its entirety and replaced with the following:

The foregoing adjustments to the annual Base Rent shall never operate to reduce the annual Base Rent below the amount being paid prior to the most recent CPI Adjustment Year (subject, however, to adjustments made with respect to the Right-Size Reduction in accordance with Section 60 or the Buyback Option Reduction in accordance with Section 7 of the Fourth Amendment).

(f) Exhibit H of the Original Lease is hereby deleted in its entirety and replaced with the Exhibit B attached hereto and made a part hereof.

6. Right-Size Event.

(a) Landlord and Tenant hereby agree that, as of the Fourth Amendment Effective Date, Tenant has delivered or been deemed to have delivered a Fallback Business Plan Notice and, therefore, Landlord is now entitled to the Right-Size Payment in accordance with Section 60 of the Original Lease.

(b) Section 60(a) of the Original Lease is hereby deleted in its entirety and replaced with the following:

Landlord is hereby entitled to the Right-Size Payment in accordance with this Section 60, which Right-Size Payment shall be due and payable upon the last day of the tenth (10th) Lease Year (such date, the "Right-Size Event Date"; and such event, the "Right-Size Event"). Tenant shall pay the Right-Size Payment to Landlord as Additional Rent on the Right-Size Event Date.

(c) Section 60(b) of the Original Lease is hereby deleted in its entirety and replaced with the following:

If Tenant timely pays the Right-Size Payment, then commencing with the first calendar month following the Right-Size Event Date and payment of the Right-Size Payment, the amount of Base Rent payable shall be reduced by an amount equal to the product of (x) the Right-Size Payment, *multiplied by* (y) the Right-Size Yield (the "Right-Size Reduction"); provided that, with respect to Base Rent for the Lease Year in which the Right-Size Event occurs, only the portion of Base Rent payments due for the calendar months following the month during which the Right-Size Event occurs shall be reduced by the Right-Size Reduction, as prorated for such period. Notwithstanding the foregoing, in no event shall the Right-Size Reduction exceed $2,500,000 (i.e., the resulting Base Rent following application of the Right-Size Reduction shall not have the effect of reducing the annual Base Rent due under this Lease by more than $2,500,000 per annum). Following the reduction in Base Rent pursuant to a Right-Size Reduction, solely for purposes of calculating the subsequent Rent Escalations or CPI Escalations pursuant to Section 4, Base Rent for the Lease Year in which the Right-Size Payment occurs and all preceding Lease Years shall be deemed to have been reduced by the Right-Size Reduction (without duplication). For the avoidance of doubt, any Rent Escalation or CPI Escalation described in Section 4 of this Lease shall otherwise continue to apply in the same manner as set forth

in Section 4 at all times following the Right-Size Event Date (it being agreed that the Base Rent applied thereunder will be adjusted by the Right-Size Reduction). By way of illustration only, Exhibit M sets forth an example application of the Right-Size Reduction to Base Rent hereunder.

(d) Exhibit M of the Original Lease is hereby deleted in its entirety and replaced with Exhibit C attached hereto and made a part hereof.

7. Base Rent Buyback Option.

(a) From and after this Fourth Amendment Effective Date until the sooner of (A) the date that is twelve (12) months following Substantial Completion of the Project (including issuance of a temporary certificate of occupancy for the Improvements by DOB) and (B) May 4, 2027 (such period, the "Buyback Option Period"), Tenant shall have a one-time right (the "Buyback Option") to make the Buyback Option Payment to Landlord by delivering Notice to Landlord of its intention to exercise the Buyback Option (the "Buyback Option Notice"), together with a Tenant's desired reduction of annual Base Rent payable during the remainder of the Term of the Lease (such amount, the "Buyback Option Reduction"), which Buyback Option Reduction shall not exceed $2,500,000. Tenant shall be required to make the Buyback Option Payment to Landlord no later than ninety (90) days from the date of the Buyback Option Notice (such date, the "Buyback Option Payment Date"). Tenant's failure to pay the Buyback Option Payment on the Buyback Option Payment Date shall be an immediate Event of Default under the Lease.

(b) Landlord shall deliver Notice to Tenant of its calculation of the Buyback Option Payment at least ten (10) Business Days prior to the Buyback Option Payment Date, which Buyback Option Payment shall be calculated twenty (20) days prior to the Buyback Option Payment Date (hereinafter defined) (such date, the "Buyback Option Yield Lock Date").

(c) If Tenant timely exercises the Buyback Option during the Buyback Option Period and pays the Buyback Option Payment on the Buyback Option Payment Date, then commencing with the first calendar month following the Buyback Option Payment Date, the amount of Base Rent payable shall be reduced by the Buyback Option Reduction; provided that, with respect to Base Rent for the Lease Year in which the Buyback Option Payment Date occurs, only the portion of Base Rent payments due for the calendar months following the month during which the Buyback Option Payment was made shall be reduced by the Buyback Option Reduction, as prorated for such period. Following the reduction in Base Rent pursuant to a Buyback Option Reduction, solely for purposes of calculating the subsequent Rent Escalations or CPI Escalations pursuant to Section 4 of the Lease, Base Rent for the Lease Year in which the Buyback Option is exercised and all preceding Lease Years shall be deemed to have been reduced by the Buyback Option Reduction (without duplication). For the avoidance of doubt, any Rent Escalation or CPI Escalation described in Section 4 of the Lease shall otherwise continue to apply in the same manner as set forth in such Section 4 at all times following Tenant's exercise of the Buyback Option (it being agreed that the Base Rent applied thereunder will be adjusted by the Buyback Option Reduction).

(d) Notwithstanding anything to the contrary set forth in the Original Lease or this Fourth Amendment, in the event that Tenant exercises the Buyback Option prior to the Right-Size Event Date and, following the adjustment of the Base Rent by the Buyback Option Reduction in accordance with this Section 7, the Trailing 12-Month NOI *divided by* the then-scheduled unabated annual installment of Base Rent due in the Lease Year in which the Buyback Option Payment Date occurred is greater than or equal to 3.00 (the "Coverage Ratio Threshold"), Landlord shall no longer be entitled to the Right-Size Payment. Tenant's achievement of the Coverage Ratio Threshold following exercise of the Buyback Option shall be deemed complete and total satisfaction of its obligations to pay the Right-Size Payment in accordance with Section 60 of the Original Lease (as modified by this Fourth Amendment). Thereafter, the

entirety of Section 60 of the Original Lease (as modified by this Fourth Amendment) shall be of no further force and effect and Tenant's failure to pay the Right-Size Payment on the Right-Size Event Date shall not be a Default or Event of Default under the Lease.

(e) For all U.S. federal, state and local tax purposes, Landlord and Tenant shall treat the Buyback Option Payment as a prepayment of rent that is treated as a loan pursuant to Section 467 of the Code. The Buyback Option Payment shall be the initial principal balance of the loan. The principal amount of the loan shall be deemed to amortize through equal monthly payments, beginning with the first payment of Base Rent due after the Buyback Option Payment and ending with the last payment of Base Rent due on or prior to the expiration of the Term. The amount of each such monthly principal amortization amounts shall be equal to the Buyback Option Payment divided by the number of months over which it is deemed to be repaid. Interest shall accrue on the unpaid balance of the loan at a rate equal to one hundred percent (100%) of the applicable federal rate in effect on the Buyback Option Payment Date, based on monthly compounding, and reflecting the term of the loan. For each month during the remaining balance of the Term, additional rent shall accrue as Additional Rent in an amount equal to the interest accruing on the loan plus the principal amortization for that month. Promptly after the Buyback Option Payment Date, Landlord shall furnish to Tenant a schedule setting forth the monthly amounts of principal, interest and rent, determined in accordance with the foregoing, and the parties shall report interest and rental income and expense for all U.S. federal, state and local tax purposes in a manner that is consistent with that schedule.

8. Notices. Section 23 of the Original Lease is hereby amended to replace the Landlord's notice information with the following:

| | |
|---|---|
| If to Landlord: | 356W58 GROUND LESSOR LLC<br>c/o GLR Capital Investments, L.L.C.<br>2801 North Harwood Street, Suite 1200<br>Dallas, Texas 75201<br>Attn: Luke Pak<br>Telephone: 214-545-5576<br>E-mail: pak@mspcm.com |
| With a copy to: | 356W58 GROUND LESSOR LLC<br>c/o GLR Capital Investments, L.L.C.<br>2801 North Harwood Street, Suite 1200<br>Dallas, Texas 75201<br>Attn: Max Lamont<br>Telephone: 214-545-5577<br>E-mail: lamont@mspcm.com |
| And with a copy to: | Adler & Stachenfeld LLP<br>555 Madison Avenue, 6th Floor<br>New York, NY 10022<br>Attention: Danielle Ash, Esq. & File Manager<br>File No. 4308.0014<br>Email: Dash@adstach.com |

9. No Claims Against Landlord. Tenant represents and warrants that it has no actual knowledge of any default by Landlord of any of its obligations under the Lease or any claims against Landlord relating to the negotiation of this Fourth Amendment. If and to the extent that Tenant holds any claims against Landlord or any of its Affiliates or representatives arising from or relating to any default of

Landlord’s obligations under the Lease or the negotiation of this Fourth Amendment, whether known or unknown, Tenant hereby waives and releases each such claim.

10. Governing Law; Ratification. This Fourth Amendment shall be governed by the laws of the State of New York without regard to conflicts of laws principles. Except as otherwise specifically amended by this Fourth Amendment, all of the terms of the Original Lease shall remain in full force and effect and are hereby ratified and confirmed by the parties hereto. From and after the Fourth Amendment Effective Date, all references in the Original Lease to the “Lease" shall be deemed references to the Original Lease, as amended by this Fourth Amendment.

11. Counterparts; Facsimile Signatures. This Fourth Amendment may be executed in more than one counterpart, which, when taken together, shall constitute one instrument. This Fourth Amendment may be executed and delivered by facsimile transmission, electronic mail (e-mail) transmission, or Portable Document Format ("PDF") transmission. Signature pages to this Fourth Amendment delivered by facsimile transmission, electronic mail (e-mail) transmission, or PDF transmission shall be given the same legal force and effect as original signatures.

12. Incorporation. Sections 41, 42, 43, 44, 45, 46, 52, 53, 55 and 61 of the Original Lease are hereby incorporated by reference as if set forth in full in this Fourth Amendment.

[The remainder of this page is intentionally left blank; signature pages follow]

**IN WITNESS WHEREOF**, Landlord and Tenant have caused this Fourth Amendment to be executed as of the Fourth Amendment Effective Date.

**LANDLORD**:

**356W58 GROUND LESSOR LLC,**
a Delaware limited liability company

By: ______________________
Name: Luke Pell
Title: Authorized Signatory

**TENANT**:

**HUDSON 1701/1706, LLC**,
a Delaware limited liability company

By: ____________________________
Name: Alberto Smeke Saba
Title: Authorized Signatory

By: ____________________________
Name: Salomon Smeke Saba
Title: Authorized Signatory

**HUDSON 1702, LLC**,
a Delaware limited liability company

By: ____________________________
Name: Alberto Smeke Saba
Title: Authorized Signatory

By: ____________________________
Name: Salomon Smeke Saba
Title: Authorized Signatory

Acknowledged and agreed to this 29
day of March, 2024:

**CONSTRUCTION LENDER**:

**PARKVIEW FINANCIAL REIT, LP**,
a Delaware limited partnership

By: Parkview Financial GP, Inc.,
a Delaware corporation,
its general partner

By: ______________________
Name: Paul Rahimian
Title: CEO

SCHEDULE 1

Existing Liens

1. Notice of lien filed on November 20, 2023 by Elysium Construction Inc., a Delaware corporation, for $467,003.81.

2. Notice of lien filed on December 13, 2023 by Elysium Construction Inc., a Delaware corporation, for $3,200,000.00.

3. Notice of lien filed on October 26, 2023 by B&H Restoration, Inc., a corporation, for $180,400.00.

4. Notice of lien filed on November 21, 2023 by J & N Dolcinium Inc., a corporation, for $343,910.00.

5. Notice of lien filed on February 28, 2024 by MRNY Consulting Solutions LLC DBA Narrow Security, a New York corporation, for $34,074.00.

EXHIBIT A

Modifications to the Required Conditions

a. The annual Base Rent for the entirety of the Leased Premises through the 5th Lease Year shall be increased from $6,400,000 to ~~$9,250,000~~ **$8,750,000**, commencing as of the ~~Repricing Deadline~~ **execution of the Interim Ground Lease Amendment, but subject to a 12-month partial abatement (such that the full Base Rent increase will not be due until 12 months after execution of the Interim Ground Lease Amendment)**;
b. Acceleration of the CPI Adjustment Year to the ~~6~~**11**th Lease Year and every 5 Lease Years thereafter (*i.e.*, the 11th Lease Year, 16th Lease Year…etc.);
c. Adjustment of CPI Increase Percentage to assume a ~~4~~**3.0**% annual cap **for the first CPI Adjustment Year and 3.50% thereafter**;
d. Modification of the definitions of Minimum Payment, Right-Size Base Rent, Right-Size Yield and Right-Size Payment to adjust the calculations to take into account a ~~3.50x~~**3.00x** Coverage Ratio**, Right-Size Yield equal to the lesser of (i) 4.50% and (ii) the then-30Y UST + 25bps and cap of $2,500,000 Right-Size Reduction**; ~~and~~
e. **Extension of Right-Size Event Date until Year 10;**
f. Landlord's deemed earning of the Right-Size Payment as of execution of the Interim Ground Lease Amendment**; and**
g. **One-time option of Tenant, exercisable no later than 12 months following obtaining temporary certificate of occupancy for the Fallback Project, to repurchase a portion of the Base Rent subject to a repurchase yield equal to the lesser of (i) 4.50% and (ii) the then-30Y UST + 25bps and a rent reduction cap of $2,500,000. If following the repurchase, the Coverage Ratio equals or exceeds 3.00x, Tenant shall no longer be required to pay the Right-Size Payment on the Right-Size Event Date**.

EXHIBIT B

Example Calculations of Base Rent

(See Attached)

## GROUND RENT CALCULATION - BASE RENT & CPI ADJUSTMENT EXAMPLE

| Calculation | | Notes |
|---|---|---|
| Original Base Rent | $6,400,000.00 | Subject to Section 60 and Section 7 of the Fourth Amendment, the annual Base Rent for the Leased Premises shall be $6,400,000 (payable in accordance with Section 4(f) below at a rate of $533,333.33 per month). Commencing on the Fourth Amendment Effective Date, the aggregate annual Base Rent for the Leased Premises shall be increased to $8,750,000 (payable in accordance with Section 4(f) below at a rate of $729,166.67 per month). Notwithstanding the foregoing, Tenant shall receive a rent credit in the aggregate amount of $2,350,000 to be applied in twelve (12) equal monthly installments of $195,833.33 per month, commencing on the Fourth Amendment Effective Date and terminating upon March [__], 2025 [**12 MONTHS FOLLOWING FOURTH AMENDMENT EFFECTIVE DATE**]. |
| Revised Base Rent[1] | $8,750,000.00 | |
| Rent Escalation: | | |
| Year 6 and 11 | 10.00% | |
| Thereafter per annum | 2.00% | |
| CPI Adjustment Year(s): | | |
| Initial CPI Adjustment Year | Year 11 | |
| Subsequent CPI Adjustment Years | Every five (5) Years | |
| CPI Increase Percentage: | | On the first day of each of the sixth (6th) Lease Year and the eleventh (11th) Lease Year, the Base Rent shall increase to an amount equal to one hundred ten percent (110%) of the Base Rent that was in effect for the respective prior Lease Year. |
| Initial CPI Cap (Year 11) | 134.39% | |
| Subsequent CPI Cap (Year 16, 21,…etc. | 118.77% | |
| CPI Assumptions (for illustration only) | | Commencing on the first day of the eleventh (11th) Lease Year and on every subsequent CPI Adjustment Year, Base Rent shall increase to the greater of (x) the Base Rent in effect during the immediately preceding Lease Year, increased by the Rent Escalation (if then applicable) or (y) (A) in the case of the first CPI Adjustment Year (i.e., the eleventh (11th) Lease Year), $8,750,000, or, for all other CPI Adjustment Years, the Base Rent for the Lease Year occurring five (5) years prior to such Lease Year, *multiplied by* (B) the then-applicable CPI Increase Percentage (examples of which are further illustrated on Exhibit H attached hereto). |
| Initial CPI Adjustment Year | 11 | |
| CPI Period 0 | 100 | |
| CPI First Adjustment (Year 10) | 129 | |
| Actual CPI Increase Percentage | 129.00% | |
| Year 11 CPI CAP (CAGR) | 3.00% | On the first day of every Lease Year, starting with the twelfth (12th) Lease Year, the Base Rent shall increase to an amount equal to one hundred two percent (102%) of the Base Rent that was in effect for the prior Lease Year (each such increase, a "Rent Escalation"), |
| CPI Cap (First Adjustment) | 134.39% | |
| **Applied CPI Increase Percentage** | **129.00%** | |
| Future CPI Assumption (beginning in Year 11) | 2.25% | "CPI Increase Percentage" shall mean the increase in (A) the Index for the last full calendar month preceding the applicable CPI Adjustment Year, over and above (B) in the case of the first CPI Adjustment Year (i.e., the eleventh (11th) Lease Year), the corresponding index for the calendar month proceeding the Effective Date of the Lease and, for all other CPI Adjustment Years, the corresponding Index for the calendar month in which the preceding CPI Adjustment Year occurred, expressed as a percentage rounded to two (2) decimals. Notwithstanding the foregoing, the CPI Increase Percentage shall in no event exceed (i) for the first CPI Adjustment Year, 134.39% (3.00% annual cap) or (ii) for any subsequent CPI Adjustment Year, 118.77% (3.50% annual cap). |
| **Future CPI Increase Percentage** | **111.77%** | |

*[1] Commencing upon the date that is 12 months following the 4th Amendment Effective Date, the aggregate annual Base Rent for the Leased Premises shall be increased to $8,750,000 .*

*For purposes of this example, Base Rent is assumed to change to $8,750,000 at the start of Lease Year 3. Actual timing of the change in Base Rent will be subject to the terms of the Lease.*

## GROUND RENT SCHEDULE - EXAMPLE

| Lease Year | Base Rent | Y-O-Y % Change | Description |
|---|---|---|---|
| 1 | $6,400,000.00 | | Original Base Rent |
| 2 | $6,400,000.00 | | |
| 3 | $8,750,000.00 | | Revised Base Rent per Fourth Amendment to Ground Lease |
| 4 | $8,750,000.00 | | |
| 5 | $8,750,000.00 | | |
| 6 | $9,625,000.00 | 10.00% | First Fixed Rent Escalation (110%) |
| 7 | $9,625,000.00 | | |
| 8 | $9,625,000.00 | | |
| 9 | $9,625,000.00 | | |
| 10 | $9,625,000.00 | | |
| 11 | $11,287,500.00 | 17.27% | Greater of (i) 110% and (ii) CPI Increase Percentage (example illustrates a 129.00% applied CPI Increase Percentage) |
| 12 | $11,513,250.00 | 2.00% | Fixed Escalations change to 2.0% per annum for the life of the Ground Lease |
| 13 | $11,743,515.00 | 2.00% | |
| 14 | $11,978,385.30 | 2.00% | |
| 15 | $12,217,953.01 | 2.00% | |
| 16 | $12,615,786.96 | 3.26% | Greater of (i) 2.0% escalation and (ii) CPI Increase Percentage (example illustrates a 111.77% applied CPI Increase Percentage) |
| 17 | $12,868,102.70 | 2.00% | |
| 18 | $13,125,464.76 | 2.00% | |
| 19 | $13,387,974.05 | 2.00% | |
| 20 | $13,655,733.53 | 2.00% | |
| 21 | $14,100,383.68 | 3.26% | Greater of (i) 2.0% escalation and (ii) CPI Increase Percentage (example illustrates a 111.77% applied CPI Increase Percentage) |

EXHIBIT C

Example Calculations of Minimum Payment

(See Attached)

| Right-Size Example Calculations #1 | | | |
|---|---|---|---|
| **Trailing 12-Month NOI** | | | **Notes** |
| Gross Income | | $70,000,000 | Hotel, Residential, Retail, Commercial and Misc. Revenue |
| Operating Expenses | | ($39,000,000) | Per Lease Defiinition |
| **Trailing 12-Month NOI** | | **$31,000,000** | Per Lease Defiinition |
| | | | |
| **Right-Size Base Rent Calculation** | | | **Notes** |
| Trailing 12-Month NOI | | $31,000,000 | |
| | *divided by* | 3.00x | |
| | | $10,333,333 | Trailing 12-Month NOI / 3.00 |
| | *divided by* | 110% | **Right Size Base Rent Escalation** |
| **Right-Size Base Rent (Lease Year 10)** | | **$9,393,939** | Trailing 12-Month NOI / Right-Size Coverage / Right Size Base Rent Escalation |
| | | | |
| **Minimum Payment Calculation** | | | **Notes** |
| (i) Then Applicable Annual Base Rent | | $9,625,000 | Year 10 Base Rent |
| | *less* | | |
| (ii) Right-Size Base Rent | | $9,393,939 | Calcuated Above |
| **Right Size Reduction** | | **$231,061** | If less than 0, no Right Size Payment |
| 30 Year Treasury | | 4.50% | |
| Spread | | 0.25% | |
| Index Yield | | 4.75% | 30 Year Treasury + Spread |
| Maximum Right Size Yield | | 4.50% | |
| **(y) Right-Size Yield** | | **4.50%** | Minimum of Maximum Right Size Yield and Index Yield |
| **Minimum Payment** | | **$5,134,680** | [(i) - (ii)] / (y) Cannot Exceed $65,000,000 |
| **Maximum (payment cap)** | | **$65,000,000** | |
| | | | |
| **Right-Size Payment** | | | **Notes** |
| (a) Year 10 Base Rent - Right Size Base Rent | | $231,061 | If less than 0, no Right Size Payment |
| (b) cap | | $2,500,000 | Maximum reduction of Base Rent per Lease. |
| **Right Size Reduction** | | $231,061 | Minimum of (a) and (b), but not less than 0 |
| Right Size Yield | | 4.50% | |
| **Right-Size Payment** | | **$5,134,680** | |

| Right-Size Example Calculation #2 \| $0 Right Size Payment | | | |
|---|---|---|---|
| **Trailing 12-Month NOI** | | | **Notes** |
| Gross Income | | $75,000,000 | Hotel, Residential, Retail, Commercial and Misc. Revenue |
| Operating Expenses | | ($39,000,000) | Per Lease Defiinition |
| **Trailing 12-Month NOI** | | **$36,000,000** | Per Lease Defiinition |
| | | | |
| **Right-Size Base Rent Calculation** | | | **Notes** |
| Trailing 12-Month NOI | | $36,000,000 | |
| | *divided by* | 3.00x | |
| | | $12,000,000 | Trailing 12-Month NOI / 3.00 |
| | *divided by* | 110% | **Right Size Base Rent Escalation** |
| **Right-Size Base Rent (Lease Year 10)** | | **$10,909,091** | Trailing 12-Month NOI / Right-Size Coverage / Right Size Base Rent Escalation |
| | | | |
| **Minimum Payment Calculation** | | | **Notes** |
| (i) Then Applicable Annual Base Rent | | $9,625,000 | Year 10 Base Rent |
| | *less* | | |
| (ii) Right-Size Base Rent | | $10,909,091 | Calcuated Above |
| **Right Size Reduction** | | **($1,284,091)** | If less than 0, no Right Size Payment |
| 30 Year Treasury | | 4.50% | |
| Spread | | 0.25% | |
| Index Yield | | 4.75% | 30 Year Treasury + Spread |
| Maximum Right Size Yield | | 4.50% | |
| **(y) Right-Size Yield** | | **4.50%** | Minimum of Maximum Right Size Yield and Index Yield |
| **Minimum Payment** | | **$0** | [(i) - (ii)] / (y) Cannot Exceed $65,000,000 |
| **Maximum (payment cap)** | | **$65,000,000** | |
| | | | |
| **Right-Size Payment** | | | **Notes** |
| (a) Year 10 Base Rent - Right Size Base Rent | | ($1,284,091) | If less than 0, no Right Size Payment |
| (b) cap | | $2,500,000 | Maximum reduction of Base Rent per Lease. |
| **Right Size Reduction** | | $0 | Minimum of (a) and (b), but not less than 0 |
| Right Size Yield | | 4.50% | |
| **Right-Size Payment** | | **$0** | |

| Right-Size Example Calculations #3 \| $65,000,000 Cap | | | |
|---|---|---|---|
| **Trailing 12-Month NOI** | | | **Notes** |
| Gross Income | | $60,000,000 | Hotel, Residential, Retail, Commercial and Misc. Revenue |
| Operating Expenses | | ($39,000,000) | Per Lease Defiinition |
| **Trailing 12-Month NOI** | | **$21,000,000** | Per Lease Defiinition |
| **Right-Size Base Rent Calculation** | | | **Notes** |
| Trailing 12-Month NOI | | $21,000,000 | |
| | *divided by* | 3.00x | |
| | | $7,000,000 | Trailing 12-Month NOI / 3.00 |
| | *divided by* | 110% | **Right Size Base Rent Escalation** |
| **Right-Size Base Rent (Lease Year 10)** | | **$6,363,636** | Trailing 12-Month NOI / Right-Size Coverage / Right Size Base Rent Escalation |
| **Minimum Payment Calculation** | | | **Notes** |
| (i) Then Applicable Annual Base Rent | | $9,625,000 | Year 10 Base Rent |
| | *less* | | |
| (ii) Right-Size Base Rent | | $6,363,636 | Calcuated Above |
| **Right Size Reduction** | | **$3,261,364** | If less than 0, no Right Size Payment |
| 30 Year Treasury | | 3.50% | |
| Spread | | 0.25% | |
| Index Yield | | 3.75% | 30 Year Treasury + Spread |
| Maximum Right Size Yield | | 4.50% | |
| **(y) Right-Size Yield** | | **3.75%** | Minimum of Maximum Right Size Yield and Index Yield |
| **Minimum Payment** | | **$86,969,697** | [(i) - (ii)] / (y) Cannot Exceed $65,000,000 |
| **Maximum (payment cap)** | | **$65,000,000** | |
| **Right-Size Payment** | | | **Notes** |
| **Right-Size Payment** | | **$65,000,000** | per the Cap |
| Right Size Yield | | 3.75% | |
| **Right Size Reduction** | | $2,437,500 | |
| **Right Size Base Rent** | | | **Notes** |
| Contractual Year 10 Base Rent | | $9,625,000 | |
| | *less* | | |
| Right Size Reduction | | $2,437,500 | As adjusted based on $65,000,000 cap |
| **Base Rent after application of Right Size Reduction** | | **$7,187,500** | Year 10 Base Rent |