# EXHIBIT U

## AGREEMENT

This Agreement (the "**Agreement**"), dated as of April 10, 2025 (the "**Effective Date**"), is made and entered by and among (I) PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership having an office at 11440 San Vicente Boulevard, 2nd Floor, Los Angeles, California 90045, as administrative agent (in such capacity, together with its successors and assigns, "**Administrative Agent**") for itself and the other lenders from time to time a party to the Loan Documents (collectively, together with their successors and assigns, "**Lender**" or "**Lenders**"), (II) HUDSON 1702, LLC and HUDSON 1701/1706, LLC, each a Delaware limited liability company, having an office at c/o CSC RE, 459 Columbus Avenue, Unit #1082, New York, New York 10024 (collectively, "**Borrower**"), (III) CSC HUDSON LLC, a Delaware limited liability company having an office at c/o CSC RE, 459 Columbus Avenue, Unit #1082, New York, New York 10024 ("**Holdings**"), (IV) ALBERTO SMEKE SABA and SALOMON SMEKE SABA, each a natural person (individually and collectively, as the context may require, and jointly and severally, "**Guarantor**" and Borrower, Holdings and Guarantor, collectively, the "**Borrower Parties**"; and the Borrower Parties, together with the Administrative Agent, the "**Parties**"), and 356W58 Ground Lessor LLC, a Delaware limited liability company ("**Ground Lessor**") solely with respect to Sections 3 and 6 below.

## RECITALS

A. Borrower is the owner of a ground leasehold estate in the premises described in Exhibit "A" attached hereto (the "**Property**") demised pursuant to the ground lease described in Exhibit "B" attached hereto (the "**Ground Lease**").

B. Pursuant to that certain Building Loan Agreement, dated as of May 4, 2022 (the "**Closing Date**"), by and among Borrower, Administrative Agent and Initial Lender, as amended by Amendment to Building Loan Agreement dated as of May 1, 2023, and as further amended by the hereafter defined First Omnibus Amendment, the hereafter defined Second Omnibus Amendment, and the hereafter defined Third Omnibus Amendment, by and between Borrower and Administrative Agent (collectively, as so amended, the "**Building Loan Agreement**"), Lender made a loan (the "**Building Loan**") to Borrower in the maximum principal amount of Eighty-One Million Seven Hundred Eighty-Two Thousand Five Hundred Twenty-Seven and No/100 Dollars ($81,782,527.00), which Building Loan was evidenced by that certain Building Loan Mortgage Note, dated as of the Closing Date, as amended, made by Borrower in favor of Parkview Financial REIT, LP, as a Lender ("**Initial Lender**") and secured by that certain Building Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the Closing Date and recorded on June 15, 2022 in the Office of the City Register of the City of New York under CRFN 2022000240500, as amended, by Borrower in favor of Administrative Agent for the benefit of Lenders (as so amended, the "**Building Loan Mortgage**").

C. Pursuant to that certain Project Loan Agreement, dated as of the Closing Date, as amended, by and among Borrower, Administrative Agent and Initial Lender, as amended by the hereinafter defined First Omnibus Amendment, and as further amended by the hereafter defined Second Omnibus Amendment, and the hereafter defined Third Omnibus Amendment (collectively, as so amended, the "**Project Loan Agreement**" and, together with the Building Loan Agreement, each individually a "**Loan Agreement**" and collectively, the "**Loan**

**Agreements**")), Lender made a loan (the "**Project Loan"** and, together with the Building Loan, the "**Loan")** to Borrower in the maximum principal amount of One Hundred Twenty-Five Million Two Hundred Seventeen Thousand Four Hundred Seventy-Three and No/100 Dollars ($125,217,473.00), which Project Loan is evidenced by that certain Project Loan Mortgage Note, dated as of Closing Date, as amended, made by Borrower in favor of Initial Lender and secured by that certain Project Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated as of the Closing Date and recorded on June 15, 2022, in the Office of the City Register of the City of New York under CRFN 2022000240501, as amended, by Borrower in favor of Administrative Agent for the benefit of Lenders (the "**Project Loan Mortgage**" and, together with the Building Loan Mortgage, the "**Mortgages**").

D. In connection with the Building Loan and Project Loan, Guarantor executed in favor of Administrative Agent for the benefit of Lenders a certain Guaranty, a certain Completion Guaranty and, together with Borrower, a certain Environmental Indemnity Agreement, each dated as of the Closing Date (each, a "**Guaranty**", and collectively, the "**Guaranties**").

E. Pursuant to that certain Omnibus Amendment to Loan Documents dated as of May 1, 2023 among Administrative Agent, Lender, Borrower and Guarantor (the "**First Omnibus Amendment**"), the original Building Loan Mortgage Note was replaced by the Building Loan Note A and the Building Loan Note B (collectively, the "**Building Loan Note**"), as more particularly provided in the First Omnibus Amendment.

F. Pursuant to the First Omnibus Amendment, the original Project Loan Mortgage Note was replaced by the Project Loan Note A and the Project Loan Note B (collectively, the "**Project Loan Note**" and, together with the Building Loan Note, the "**Not**es" and each, a "**Note**"), as more particularly provided in the First Omnibus Amendment.

G. On or about May 1, 2023, contemporaneously with the First Omnibus Amendment, Building Loan Note A and Project Loan Note A were assigned to NW Hudson Lender LLC, as a lender, and the Building Loan Mortgage and the Project Loan Mortgage, as each were modified by the First Omnibus Amendment, were assigned to NW Hudson Lender LLC, as Administrative Agent. On or about December 1, 2023, Building Loan Note A and Project Loan Note A were re-assigned to Initial Lender, and the original Building Loan Mortgage and the original Project Loan Mortgage, as each were modified by the First Omnibus Amendment, were re-assigned to Parkview Financial REIT, LP, as Administrative Agent.

H. The parties further amended the Loan Documents pursuant to the terms and conditions of that certain Second Omnibus Amendment to Loan Documents dated as of May 10, 2024 (the "**Second Omnibus Amendment**").

I. The parties further amended the Loan Documents pursuant to the terms and conditions of that certain Third Omnibus Amendment to Loan Documents dated as of June 5, 2024 (the "**Third Omnibus Amendment**").

J. The Loan Agreements, the Notes, the Mortgages and the Guaranties, together with the documents included within the definition of Loan Documents (as such term is defined in the Loan Agreement) are collectively referred to as the "**Loan Documents**".

K. All property of Borrower and Guarantor in which Borrower or Guarantor has granted to Administrative Agent a security interest, mortgage or lien, or which Borrower or Guarantor has assigned or pledged to Administrative Agent as collateral, including, without limitation, the Property, is hereinafter referred to as the "**Collateral**."

L. On October 11, 2024, the Lender delivered to the Borrower that certain Notice of Default and Reservation of Rights dated October 11, 2024 (the "**October 2024 Default Notice**") outlining certain specified events of default described in such October 2024 Default Notice;

M. On October 12, 2024, the Borrower delivered a copy of a draft verified complaint dated October 1, 2024 that included various claims by Borrower against Lender;

N. On November 23, 2024, Lender delivered to Borrower that certain Notice of Default and Reservation of Rights dated November 23, 2024 (the "**Maturity Default Notice**") after the failure of Borrower to pay all sums due and owing under the Project Loan Agreement, the Building Loan Agreement and the other Loan Documents on November 1, 2024 (the "**Maturity Date").**

O. The Guarantor is willing to participate in this Agreement for the consideration and on the terms set forth herein.

P. All Parties are represented by counsel.

Q. Each of Lender, Borrower and the Guarantor are receiving valuable consideration through this Agreement separate from the Loan Documents.

R. It is the intention of the Borrower, as mortgagor, and the Guarantor, as guarantor, and Administrative Agent, on behalf of the Lenders, as mortgagee, that there not be a merger of the leasehold estate in the Property demised pursuant to the Ground Lease with Administrative Agent's existing rights and lien rights under the Loan Documents and this Agreement, which lien rights as against the leasehold estate in the Property are specifically intended by the parties to survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

S. FOR GOOD AND VALUABLE CONSIDERATION RECEIVED, THE BORROWER AND THE GUARANTOR INTEND TO WAIVE AND HEREBY DO WAIVE THEIR RIGHTS, IF ANY, UNDER THE AUTOMATIC STAY PROVISIONS OF SECTION 362 OF THE BANKRUPTCY CODE, AND IF THE BORROWER AND/OR THE GUARANTOR FILE FOR BANKRUPTCY, EACH INTENDS THAT PRESENTATION OF THIS AGREEMENT TO THE COURT SHALL BE CONCLUSIVE PROOF OF THE VOLUNTARILY AND EXPLICIT WAIVER OF SUCH AUTOMATIC STAY RIGHTS.

**NOW, THEREFORE,** in consideration of the terms herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower Parties, Administrative Agent and Lender (collectively, the "Parties" and individually a "Party"), intending to be legally bound, hereby covenant and agree as follows:

1. No Modification to Loan Documents or Waiver of any Claims. This Agreement is not intended to constitute a novation, or in any way adversely affect the lien and security interest, of the Loan Documents. Except as expressly set forth herein, the execution of this Agreement shall not operate as a waiver of any right, power, claim or remedy of any party to the Loan Documents, nor constitute an amendment or modification of any provision of any of the Loan Documents.

2. Additional Acknowledgments and Agreements of the Borrower Parties. Borrower Parties acknowledge and agree that:

2.1 Recitals. The above recitals are true and correct in all respects and are incorporated herein by reference.

2.2 No Waiver of Defaults. Neither this Agreement, nor any actions taken in accordance with this Agreement or the Loan Documents, shall be or be construed as Administrative Agent's or Lender's waiver of or consent to the defaults specified in the October 2024 Default Notice or the Maturity Default Notice or any other existing or future defaults or events of default under the Loan Documents, at law or in equity, and Administrative Agent and Lenders hereby reserve all of their respective rights and remedies under the Loan Documents with respect thereto. Except as expressly set forth herein, the execution, delivery, and effectiveness of this Agreement shall not directly or indirectly: (i) create any obligation to defer any enforcement action after the occurrence and continuance of any default or event of default; (ii) constitute a consent or waiver of any past, present, or future violations of any provisions of the Loan Documents; or (iii) amend, modify, or operate as a waiver of any provision of the Loan Documents or any right, power, or remedy of Administrative Agent and/or Lender; (iv) constitute a consent to any merger or other transaction or to any transfer, sale, restructuring, or refinancing transaction. Except as expressly set forth herein, each party to the Loan Documents reserves all of its respective rights, powers, and remedies under this Agreement, the Loan Documents, and applicable law.

2.3 Time is of the Essence. Time is of the essence with respect to each and every term and condition set forth in this Agreement.

2.4 Acceptance of Payments or Performance. No Party's acceptance of any payment hereunder or other performance by another party shall constitute a waiver of any Event of Default (as defined in the Loan Agreement) or of any of their rights and remedies.

3. Escrow and Bonus Incentive Payments.

3.1 Escrow. To the extent applicable, if the Guarantor earns, pursuant to the terms hereof and within the time periods specified herein, TIME BEING OF THE ESSENCE, the Cure Incentive Approval Payment, the SRO Affordability Incentive Payment, J-1 Incentive Payment, and/or CUNY Lease Incentive Payment (as such terms are defined herein, each an "**Incentive Payment**", and collectively, the "**Incentive Payments**"), the Administrative Agent shall, and no later than five (5) business days' following the Administrative Agent's agreeing that such Incentive Payment has been earned (or if there is a dispute as to whether such Incentive Payment has been earned, within five (5) Business Days after the Arbitrator determines that such Incentive Payment has been earned), by federal wire transfer, deposit the applicable payment amount(s) that have been so earned (such amounts, individually and collectively, the "**Escrowed**



1618879912.14

**Amounts**") into the escrow account of First American Title Insurance Company (the "**Escrow Agent**") in accordance with the wire instructions attached hereto as Exhibit "D". Such Escrowed Amounts shall be held pursuant to an escrow agreement in the form attached hereto as Exhibit "E" (the "**Escrow Agreement**"). Deposit of the full amount of one or more Incentive Payments into the account of the Escrow Agent shall satisfy in full all of the Administrative Agent's and Lenders' payment and other obligations with respect to each such Incentive Payment, and from and after such deposit the Administrative Agent and Lenders shall have no further obligation or responsibility with respect to any such Incentive Payment.

3.2 Release of Escrow.

(a) The Escrowed Amounts earned by the Guarantor shall be released to Guarantors (in equal parts), upon the Project achieving Substantial Completion (as such term is defined in the Ground Lease) in accordance with the terms and conditions of the Ground Lease, including, without limitation, receipt by the Borrower of a temporary certificate of occupancy (a "**TCO**") from the New York City Department of Buildings for the Project, which TCO shall permit occupancy of the Improvements (as such term is defined in the Ground Lease) for their intended use and shall permit leasing and occupancy by the intended subtenants thereof.

(b) Upon the Project achieving Substantial Completion and receiving a TCO, either (x) Ground Lessor and Administrative Agent may deliver joint written instruction to Escrow Agent authorizing release of the Escrowed Amounts to Guarantors or (y) the Guarantors may deliver to the Escrow Agent and, contemporaneously therewith, to the Administrative Agent and Ground Lessor, a written notice (each such notice, a "**Claim Notice**") requesting release of the Escrowed Amounts. The Escrow Agent shall be permitted to treat any notice claiming to constitute a Claim Notice as a Claim Notice within the meaning of this Agreement.

(c) Upon receipt of a Claim Notice, either the Administrative Agent or the Ground Lessor may within the time period specified in the Escrow Agreement deliver a Dispute Notice (as such term is defined in the Escrow Agreement) to the Escrow Agent with a copy to the Guarantors and the Ground Lessor or the Administrative Agent, as applicable.

(d) If a Dispute Notice is given by the Administrative Agent or the Ground Lessor then the Escrowed Amounts shall be held by the Escrow Agent and released as provided in Section 4 of the Escrow Agreement.

3.3 Incentives. If the Borrower achieves the events described below within the specified time periods, TIME BEING OF THE ESSENCE, the Guarantor shall be deemed to have earned the fees specified below (it being understood and agreed that, except as expressly set forth in the Escrow Agreement, such fees shall be payable to the Guarantor upon, but not before, the Project achieving Substantial Completion and receipt of the TCO, but upon the Guarantor earning any such Incentive Payment in accordance with the terms hereof, Administrative Agent or Lenders will deposit an amount equal to the earned Incentive Payment with the Escrow Agent as Escrowed Funds to be held and released as provide in Sections 3.1 and 3.2 and the Escrow Agreement):

(a) As used herein the term "**J-1 Unit Zoning Conversion**" means, if so obtained, confirmation from the New York City Department of Buildings (the "**Department of**

**Buildings**") and each other applicable agency, pursuant to applicable required documentation, that all of the non-SRO Units in the Property classified as "J-1" for purposes of Title 27 of the New York City Building Code (the "**J-1 Zoned Units**") are converted to residential apartment units classified as "R2" units for purposes of Title 27 of the New York City Building Code. The Guarantor agrees to cause the Borrower to submit to the New York City Department of Buildings (the "**Department of Buildings**") and each other applicable agency, no later than April 25, 2025 (the "**J-1 Submission Date**"), all materials necessary to achieve confirmation from the Department of Buildings and each other applicable agency pursuant to applicable required documentation that the J-1 Zoning Conversion is approved (the "**Applicable J-1 Materials**") and thereafter to use its commercially reasonable efforts to obtain the J-1 Unit Zoning Conversion as soon after such date as possible. If such efforts include the purchase of a light and air easement (the "**Easement**") from the owner of a neighboring property to the Property, or the purchase of such neighboring property itself, the purchase price for such Easement, or the property itself, shall not exceed Five Million and no/100 Dollars ($5,000,000.00) and the Borrower shall enter into a definitive agreement for such purchase on or before April 25, 2025. For the avoidance of doubt, any draft Easement shall be submitted to and approved by Ground Lessor in accordance with the terms of the Ground Lease and shall be submitted to and approved by the Administrative Agent, in each case such approval not to be unreasonably withheld, conditioned or delayed. If the Borrower shall so submit such materials to the Department of Buildings and each other applicable agency on or prior to April 25, 2025 and thereafter diligently use such commercially reasonable efforts to achieve the J-1 Unit Zoning Conversion and if the Department of Buildings and each other applicable agency enter into applicable required documentation confirming the granting and effectiveness of the J-1 Unit Zoning conversion on or before May 30, 2025 (the "**Outside J-1 Hurdle Date**"), then the Guarantor, collectively, shall be deemed to have earned a fee in an amount equal to Twelve Million Five Hundred Thousand and no/100 Dollars ($12,500,000.00) (the "**J-1 Incentive Payment**") (it being understood and agreed that such fee shall not be payable if any of the non-SRO Units currently classified as "J-1 Units" is not subject to, or does not have the benefit of, the J-1 Unit Zoning Conversion). Notwithstanding the foregoing, provided the Borrower submitted the Applicable J-1 Materials to the Department of Building prior to the J-1 Submission Date and has thereafter used commercially reasonable efforts to achieve the J-1 Unit Zoning Conversion as soon after the J-1 Submission Date as possible, but, despite such submission and efforts, the J-1 Unit Zoning Conversion is not obtained by the Outside J-1 Hurdle Date for reasons beyond the reasonable control of the Borrower, (i) the Outside J-1 Hurdle Date may, in the reasonable discretion of the Administrative Agent, be extended (the "**First J-1 Extension**") by an additional fifteen (15) days and (ii) the Outside J-1 Hurdle Date may, if so determined by Administrative Agent in its sole and absolute discretion, be further extended (a "**Second J-1 Extension**"), beyond the First J-1 Extension for an amount of days determined by Administrative Agent in its sole and absolute discretion (it being understood and agreed that the Administrative Agent may decline to grant such Second J-1 Extension for any reason or for no reason).

(b) As used herein the term "**Cure Approval and Lifting of the Stop Work Order"** means, if so obtained, an agreement from the New York City Department of Housing Preservation and Development ("**HPD**"), duly executed by HPD and all other parties party thereto in substantially the form of Exhibit "F" hereto, that (i) cures the public record of any Finding of Harassments (as such term is defined in the Ground Lease) and requires that 28% of the residential or hotel floor area of the Project be rented to individuals earning at or below 80% of the Area Median Income (the "**Affordability Requirement**") in perpetuity, including, without limitation,

making an election to submit the Property to a Rent Regulation Program that would result in such cure and determination (together with a final Cure Agreement (the "**Cure Agreement**") with HPD's Inclusionary Housing Unit (the "**IH Unit**") that stipulates satisfaction of the Affordability Requirement, together with a regulatory agreement, subordination non-disturbance and attornment agreement and such other deliverables as HPD may require as conditions to issuing a Cure Certificate for the Project (together with the Cure Agreement, collectively, the "**Cure Documents**")) and (ii) results in all work stop orders issued by the New York City Department of Buildings or other applicable agency being lifted and the New York City Department of Buildings and each applicable agency, including the New York City Department of Buildings, granting all approvals, permits and licenses required to complete the construction and development of the Project. The Guarantor agrees to cause the Borrower to submit to HPD, the IH Unit and each other applicable agency, on or before May 30, 2025 (the "**HPD Submission Date**"), all materials necessary to achieve the Cure Approval and Lifting of Stop Work Order (the "**Applicable HPD Materials**") and thereafter to use its best efforts to obtain the Cure Approval and Lifting of Stop Work Order and all approvals, permits and licenses required to complete the construction and development of the Project as soon thereafter as possible. If (i) the Borrower submits all documentation necessary to obtain the Cure Approval and Lifting of the Stop Work Order on or before May 30, 2025, (ii) diligently uses such best efforts to achieve the Cure Approval and Lifting of the Stop Work Order, (iii) the HPD, IH Unit and each other applicable agency enters into the Cure Agreement and issues the Cure Approval and Lifting of the Stop Work Order and (iv) the Department of Buildings, HPD, IH Unit and each other applicable agency issue all approvals, permits and licenses required to complete the construction and development of the Project on or before June 30, 2025 (the "**Outside HPD Hurdle Date**"), then the Guarantors, collectively, shall have deemed to have earned a fee in an amount equal to One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) (the "**Cure Approval Incentive Payment**"). Notwithstanding the foregoing, provided the Borrower submitted the Applicable HPD Materials to the HPD prior to the HPD Submission Date and has thereafter used commercially reasonable efforts to achieve the Cure Approval and Lifting of the Stop Work Order as soon after the HPD Submission Date as possible, but, despite such submission and efforts, the Cure Approval and Lifting of the Stop Work Order is not obtained by the Outside HPD Hurdle Date for reasons beyond the reasonable control of the Borrower, (i) the Outside HPD Hurdle Date may, in the reasonable discretion of the Administrative Agent, be extended (the "**First HPD Extension**"), by an additional fifteen (15) days and (ii) the Outside HPD Hurdle Date may, in the sole and absolute discretion of the Administrative Agent, be further extended (the "**Second HPD Extension**") beyond the First HPD Extension for an amount of days determined by Administrative Agent in its sole and absolute discretion (it being understood and agreed that the Administrative Agent may decline to grant such Second J-1 Extension for any reason or for no reason).

(c) If the Borrower obtains the SRO Affordability Revision (as defined herein) by September 30, 2025 (the "**SRO Date**"), then the Guarantor, collectively, shall have earned a fee in an amount per SRO Unit that is subject to the SRO Affordability Revision and has been vacated or relocated equal to $78,125.00 (the "**SRO Affordability Incentive Payment**"). As used herein, the term "**SRO Affordability Revision**" means, if so obtained, confirmation from the IH Unit, pursuant to applicable required documentation that units in the Property occupied by tenants occupying a Single Room Occupancy multiple dwelling (as such term is defined in the New York Multiple Dwelling Law) (such units, the "**SRO Units**") and planned studio and one-bedroom units shall be designated as permanent "Low Income Housing" and are vacated or

relocated, such that the applicable unit may be deemed a “free market unit” and be counted as such for purposes of determining satisfaction of the Affordability Requirement. Any such SRO Affordability Revision shall be subject to the prior written approval by the Ground Lessor and the Administrative Agent, such approvals not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, if the Borrower has used commercially reasonable efforts to obtain the SRO Affordability Revision but, despite such efforts, the SRO Affordability Revision is not obtained by the SRO Date for reasons beyond the control of the Borrower, (i) the SRO Date may, in the reasonable discretion of the Administrative Agent, be extended (the “**First SRO Extension**”), by an additional fifteen (15) days and (ii) the SRO Date may, in the sole and absolute discretion of the Administrative Agent, be further extended (the “**Second SRO Extension**”) beyond the First SRO Extension for an amount of days determined by Administrative Agent in its sole and absolute discretion (it being understood and agreed that the Administrative Agent may decline to grant such Second J-1 Extension for any reason or for no reason); provided that in no event may the SRO Date be extended to a date that is later than the date on which the Building obtains a TCO.

(d) If the Borrower enters into the CUNY Lease (which CUNY Lease is subject to the prior written approval of Administrative Agent in accordance with the terms of the Loan Documents and to the prior written approval of Ground Lessor in accordance with the terms of the Ground Lease), duly executed by all parties thereto, satisfying the requirements of the definition of the CUNY Lease by June 30, 2025, then the Guarantor, collectively, shall be deemed to have earned a fee in an amount equal to Sixteen Million Five Hundred Thousand and no/100 Dollars ($16,500,000.00) the “**CUNY Lease Incentive Payment**”), less the sum or any amounts previously paid by the Borrower pursuant to this Section 3.3 (it being understood and agreed that upon the Guarantor earning such payment pursuant to this clause (d), the Guarantor shall not be entitled to any further payments pursuant to clause (a), (b) or (c) of this Section 3.3. As used herein, the term “**CUNY Lease**” means a lease, if so obtained, for a portion of the Property between the Property Owning Entities and The City University of New York (“**CUNY**”) providing for a so-called “triple-net” lease pursuant to which the tenant will pay all expenses of the Property and the operation thereof, including all real estate taxes, insurance premiums and other costs and maintenance costs and expenses and annual rental payments of at least Twenty-five Million and no/100 Dollars ($25,000,000.00), which annual rent payments shall escalate in subsequent years by amounts acceptable to the Administrative Agent and Ground Lessor.

(e) The Guarantor shall submit to the Administrative Agent and Ground Lessor for its review and approval drafts of all submissions proposed to be made to, and drafts of all agreements proposed to be entered into with, HPD, the IH Unit, the New York City Department of Buildings or any other applicable agency, the owner of the neighboring property or CUNY in connection with any of the matters described in this Section 3.3. If the Administrative Agent or Ground Lessor provides comments on any such proposed submissions or drafts, the Guarantor shall reasonably consider such comments and reasonably revise such proposed submissions or drafts in accordance with such comments and submit the submissions and agreements in the forms approved by the Administrative Agent and Ground Lessor, which approval shall not be unreasonably withheld, conditioned or delayed. The Guarantor will keep the Administrative Agent and Ground Lessor informed as to the status of discussions and negotiations regarding the contemplated purchase of the light and air easement from the owner of the neighboring property, or of the neighboring property itself, the Cure Documents, the Cure Approval and Lifting of the

Stop Work Order, the J-1 Unit Zoning Conversion, the SRO Affordability Revision and the CUNY Lease. The Guarantor shall, within two (2) Business Days of delivery or receipt thereof, notify the Administrative Agent and Ground Lessor of all communications (via e-mail, phone, fax or written notice) to or from HPD, the IH Unit, the New York City Department of Buildings or any other applicable agency, the owner of the neighboring property or CUNY and, if applicable, deliver a copy of such communication to the Administrative Agent. The Guarantor shall deliver true, correct and complete copies of any and all draft or definitive Cure Documents and any and all draft or definitive documents relating to the J-1 Unit Zoning Conversion, the acquisition of an easement from the owner of the neighboring property, the Cure Approval and Lifting of the Stop Work Order, the SRO Affordability Revision, or a CUNY Lease to Administrative Agent, Ground Lessor and Administrative Agent's and Ground Lessor's counsel and shall use commercially reasonable efforts to include Administrative Agent's and Ground Lessor's counsels in all material meetings, calls and video conferences that are scheduled in advance with HPD or any other applicable agency, the owner of the neighboring property, or CUNY and copied on all email and other written correspondence with HPD or any other applicable agency, CUNY or any other party regarding the Cure Documents, the Cure Approval and Lifting of the Stop Work Order, the J-1 Unit Zoning Conversion, the SRO Affordability Revision, or the CUNY Lease.

4. <u>Fee Disputes</u>.

4.1 Any dispute among the Parties under this Agreement as to whether the Guarantor has earned an Incentive Payment hereunder (or the amount of an Incentive Payment that has been earned) shall be resolved and finally determined by arbitration pursuant to an Expedited Arbitration Proceeding. The Expedited Arbitration Proceeding shall be the sole and exclusive mechanism for resolving disputes as to the existence of such dispute. If the arbitrator in the Expedited Arbitration Proceeding (the "**Arbitrator")** determines that the Guarantor has not earned a disputed Incentive Payment, then neither the Administrative Agent nor the Lenders shall be required to deposit any funds with the Escrow Agent on account of such disputed Incentive Payment. If the Arbitrator in the Expedited Arbitration Proceeding determines that the Guarantor has earned and is entitled to receive the disputed Incentive Payment, then the Administrative Agent shall deposit with the Escrow Agent the amount of such disputed Incentive Payment pursuant to Section 3.1, and such funds shall constitute Escrowed Funds for purposes hereof.

4.2 As used herein, an "**Expedited Arbitration Proceeding**" means a binding arbitration proceeding conducted in The City of New York under the Commercial Arbitration Rules of the American Arbitration Association (or its successor) (the "**Arbitration Rules**") and administered pursuant to the expedited procedures provisions thereof; provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Section E-4(B) of the Arbitration Rules shall be returned within five (5) Business Days from the date of mailing; (ii) the parties shall notify the American Arbitration Association (or its successor) by telephone, within four (4) Business Days of receipt of notice of the appointed arbitrator, of any objections to the arbitrator appointed and, subject to clause (vii) below, shall have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration Association (or its successor) and was not objected to in accordance with Section E-4(B) of the Arbitration Rules as modified by clause (i) above; (iii) the notification of the hearing referred to in Section E-7 of the Rules shall be four (4) Business Days in advance of the hearing; (iv) the hearing shall be held within seven (7) Business Days after the appointment of the arbitrator; (v) the arbitrator shall have no right to award

damages or vary, modify or waive any provision of this Agreement; (vi) the decision of the arbitrator shall be final and binding on the parties, and any party may seek to have the decision confirmed by way of a court order and (vii) the arbitrator shall not have been employed by either party (or any of their respective Affiliates) during the seven (7) year period prior to the date of the Expedited Arbitration Proceeding. All fees and expenses of the arbitrator and all other expenses of the arbitration shall be borne initially by the Company; provided that after the final determination such fees and expenses shall be borne by the Saba Members, if the Saba Members are not the prevailing party in such Expedited Arbitration Proceeding.

5. Failure to Pay Incentives.

5.1 Priority. The Administrative Agent hereby agrees with the Borrower Parties that in the event the Administrative Agent and Lenders fail to deposit with the Escrow Agent (or otherwise pay) an amount equal to an Incentive Payment actually earned by the Guarantor and required to be deposited with the Escrow Agent pursuant to this Agreement, then upon receipt by Administrative Agent or any Lender of payments in respect of principal or interest on the Loan, Guarantors shall be entitled to receive, and Administrative Agent shall deposit with the Escrow Agent, an amount equal to the amount of such unpaid fee or fees prior to making any other payments or distributions, whether to a third-party, Lender (whether in repayment of the Loan or otherwise) or other party.

6. Negotiation Period; Limited Temporary Forbearance.

6.1 Each of the Borrower Parties, Ground Lessor and Administrative Agent agrees that if (i) the J-1 Unit Zoning Conversion is obtained on or prior to the Outside J-1 Hurdle Date (as may be extended pursuant to the terms hereof) and the Guarantor has earned the J-1 Incentive Payment pursuant to all of the applicable terms of this Agreement within the time period specified herein, (ii) the Cure Approval and Lifting of the Stop Work Order is obtained on or prior to the Outside HPD Hurdle Date (as may be extended pursuant to the terms hereof) and the Guarantor has earned the Cure Approval Incentive Payment pursuant to all of the applicable terms of this Agreement within the time period specified herein, and (iii) provided no Event of Default (as defined in the Ground Lease) after the Effective Date resulting from the failure to pay Base Rent or Additional Rent (as defined in the Ground Lease) is then continuing (collectively, the "**Standstill Conditions**"), then during the period (the "**Negotiation Period**") beginning on the date on which such Standstill Conditions are satisfied (the "**Negotiation Period Commencement Date**") and ending on the earlier to occur of the date that is (x) thirty (30) days after the Negotiation Period Commencement Date and (y) the date, if any, on which any Borrower Party shall breach, or be in default under this Agreement, then, during such Negotiation Period, Borrower Parties, Ground Lessor and Administrative Agent shall work, in good faith, towards reaching a mutually acceptable settlement arrangement relating to matters arising under the Loan Documents and the Ground Lease and an agreement relating thereto (including, without limitation, a termination of the Guaranties or release of Guarantors therefrom, releases of claims of the parties thereto and the assumption by Administrative Agent or an affiliate thereof of management of the Borrower and control of the Project and its development, in each case on terms acceptable to the parties thereto and Ground Lessor); provided, however, that no party shall be obligated to enter into any such settlement agreement and the entry into any such settlement agreement shall be in each party's sole and absolute discretion.

6.2 Administrative Agent further agrees with Guarantor that if all of the Standstill Conditions have been satisfied, then, during the period prior to termination or expiration of the Negotiation Period, Administrative Agent will forbear from (x) from instituting any suit or proceeding in any court, or taking any other formal legal action (including non-judicial foreclosure), seeking to enforce the Guaranties or realizing upon any collateral security (including under the Guaranty and the Pledge and Security Agreement (LLC Interests), dated as of May 4, 2022 (the "**Pledge Agreement**"), by Holdings in favor of Administrative Agent) therefor and (y) carrying out any sale of any collateral security pursuant to the Uniform Commercial Code. Upon termination or expiration of the Negotiation Period, each of Administrative Agent, Lenders and Borrower Parties shall be entitled to pursue its rights and remedies under and in connection with the Loan Documents and under applicable law, in equity or otherwise, without delay, and shall immediately be fully restored to the position such party would have held if this Agreement had never been executed subject to any contrary provisions in this Agreement. Furthermore, nothing contained herein shall be construed as requiring Lender or Administrative Agent to extend the Negotiation Period.

6.3. Ground Lessor agrees with Guarantor and Administrative Agent that all of the Standstill Conditions have been satisfied, then, during the Negotiation Period, Ground Lessor will forbear from instituting any suit or proceeding in any court, or taking any other formal legal action, seeking to exercise Ground Lessor's remedies under Sections 22(a) or 22(b) of the Ground Lease (it being agreed that Ground Lessor shall be entitled to seek and pursue any and all other rights and remedies set forth in the Ground Lease). Upon termination or expiration of the Negotiation Period, Ground Lessor shall be entitled to pursue its rights and remedies under the Ground Lease to the fullest extent available under applicable law, in equity or otherwise, without delay (including the right to terminate the Ground Lease). Furthermore, nothing contained herein shall be construed as requiring Ground Lessor to extend the Negotiation Period.

6.4 Without limiting the foregoing, each of the Administrative Agent, Lenders, and Borrower Parties shall have the right, upon ten (10) business days' prior written notice, to terminate the Negotiation Period, in the event such party reasonably determines that: (i) one or more of the other parties hereto are not negotiating in good faith respect to a settlement agreement, or (ii) one or more of the other parties hereto are in breach of, or in default under, this Agreement.

6.5 Concurrently with the execution and delivery of this Agreement, Administrative Agent will adjourn, until further notice, the sale pursuant to the Uniform Commercial Code of the Collateral pledged to Administrative Agent pursuant to the Pledge Agreement that has been scheduled for April 10, 2025. Administrative Agent agrees that during the Negotiation Period, neither it nor any successor thereof, will reschedule such Uniform Commercial Code sale to be held prior to the tenth (10th) business day following the earliest to occur of: (i) the expiration or termination of the Negotiation Period, (ii) the Outside J-1 Hurdle Date as the same may be extended pursuant to the terms hereof (if Guarantor shall fail to earn the J-1 Incentive Payment pursuant to all of the applicable terms of this Agreement) or (iii) the Outside HPD Hurdle Date as the same may be extended pursuant to the terms hereof (if Guarantor shall fail to earn the Cure Approval Incentive Payment pursuant to all of the applicable terms of this Agreement). In consideration for such agreement, each Borrower Party agrees that it waives, and will not assert, any claim that, subject to the terms hereof, any rescheduled date for such Uniform Commercial

Code sale is not commercially reasonable or the application of any statutory timeframe for the scheduling, notice or holding of such Uniform Commercial Code sale.

6.6. Nothing set forth in this Agreement shall be deemed to modify, amend, vitiate or otherwise reduce any of Borrower's or Guarantor's obligations or liabilities under the Ground Lease, the Project Guaranties (as defined in the Ground Lease) or any other documents, instruments or agreements executed or delivered by Borrower or Guarantor in connection with the Ground Lease.

7. Representations and Warranties of Borrower, Guarantor, and Administrative Agent. Each of Parties represents and warrants to each other as of the date hereof as follows:

7.1 Authorization. The execution, delivery, and performance of this Agreement are within their power and, with respect to Borrower, have been duly authorized by all necessary limited liability company action.

7.2 Enforceability. This Agreement constitutes a valid and legally binding Agreement enforceable against Borrower and Guarantor in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, and similar laws affecting creditors' rights generally and to general principles of equity.

7.3 No Violation. The execution, delivery, and performance of this Agreement do not and will not: (a) violate any law, regulation, or court order to which Borrower or Guarantor is subject; or (b) conflict with Borrower's organizational documents.

7.4 No Duress. The Borrower and the Guarantor represent and warrant that they are represented by legal counsel of their choice, are fully aware of the terms contained in this Agreement and have voluntarily and without coercion or duress of any kind entered into this Agreement and the documents executed in connection with this Agreement.

7.5 No Defaults. The execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not conflict with, violate or constitute a default under any contract, agreement or other instrument, any laws, regulations or any order or decree to which the Borrower or any Guarantor is a party or by which the Borrower, the Guarantor or the Property is bound or governed.

7.6 Consents. No consent of any federal, state, municipal or other governmental authority, or any third party is required for the execution, delivery or performance of this Agreement by the Borrower.

7.7 Review and Understanding. Each of Borrower and Guarantor has reviewed this entire Agreement (including the accuracy of the recitals) and understands the significance and consequences of this Agreement (including that the provisions hereof are contractual in nature).

8. Survival of Representations and Warranties. Regardless of any investigation at any time made by, or on behalf of, any party hereto or of any information any party may have in respect thereof, all covenants, agreements, representations and warranties made hereunder as set forth in Section 4 above shall survive for one (1) year after the Effective Date.

9. No Partnership. Nothing in this Agreement is intended to create any partnership, joint venture or association between the Borrower Parties, on one hand, and Administrative Agent or Lenders on the other hand, and any inferences to the contrary are expressly negated.

10. Intentionally Omitted.

11. Notices. Except as otherwise provided for herein, all notices, approvals, consents and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given or sent (a) when received, if delivered by hand or (b) when received, if delivered by electronic mail with a copy thereof sent by reputable overnight courier which requires delivery confirmation, or (c) on the following business day, if dispatched by a reputable overnight courier which requires delivery confirmation, in each case to the party intended at its address as follows (or at such other address as may hereafter be specified by such party from time to time by like notice):

If to Administrative Agent or Lender:

Parkview Financial REIT, LP
11440 San Vicente Boulevard, 2nd Floor
Los Angeles, CA 90049
Attention: Paul Rahimian and Ted Jung
Email: paul@parkviewfinancial.com
ted@parkviewfinancial.com

With a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Attention: Neal F. Kronley, Esq.
E-mail: Neal.Kronley@us.dlapiper.com

If to Borrower:

Hudson 1702, LLC
Hudson 17801/1706, LLC
c/o CSC RE
459 Columbus Avenue, Unit #1802
New York, New York 10024
Attention: Alberto Smeke Saba and Salomon Smeke Saba
Email: as@cscre.us and ss@cscre.us

With a copy to:

K&L Gates LLP
599 Lexington Avenue, 32nd Floor
New York, New York 10022
Attention: Robert Salame. Esq.
Email: Robert.Salame@klgates.com

If to Guarantor:

Alberto Smeke Saba

Salomon Smeke Saba
59 Columbus Avenue, Unit #1082
New York, New York 10024
Email: as@cscre.us
ss@cscre.us

With a copy to: K&L Gates LLP
599 Lexington Avenue, 32nd Floor
New York, New York 10022
Attention: Robert Salame. Esq.
Email: Robert.Salame@klgates.com

If to Ground Lessor:

356W58 GROUND LESSOR, LLC
c/o GLR Capital Investments, L.L.C.
2801 N Harwood Street, Suite 1200
Dallas, Texas 75201
Attn: Luke Pak
E-mail: pak@mspcm.com

356W58 GROUND LESSOR, LLC
c/o GLR Capital Investments, L.L.C.
2801 N Harwood Street, Suite 1200
Dallas, Texas 75201
Attn: Max Lamont
E-mail: lamont@mspcm.com

With a copy to: Adler & Stachenfeld LLP
555 Madison Avenue
New York, New York 10022
Attention: Danielle Ash. Esq.
Email: dash@adstach.com

The giving of any notice required hereunder may be waived in writing by the Party entitled to receive such notice. No failure or delay in the routing of any such notice, demand, request, consent, approval, declaration or other communication within any organization to the individual designated to receive the same or a copy thereof shall in any way qualify the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

12. Further Assurances. The Parties agree to execute and deliver such other instruments, and take such other action, as the parties may reasonably request in connection with the transactions contemplated by this Agreement.

13. Headings. Headings are for reference only and are not to be given consideration in interpreting this Agreement.

14. Governing Law and Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to principles of conflicts of law. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in The City of New York, and each Party irrevocably submits to the jurisdiction of such courts in any such suit, action or proceeding.

15. Counterparts. This Agreement may be executed in counterparts, and all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or PDF transmission shall be as effective as delivery of a manually executed counterpart.

16. Amendment or Modification. This Agreement may not be modified or amended except upon execution of a written document signed by each of the parties hereto.

17. Successors and Assigns. This Agreement and all its provisions shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns, and shall not benefit any person or entity other than those enumerated above.

18. Entire Agreement. This Agreement constitutes the entire agreement between the parties, integrates all the terms and conditions mentioned herein or incidental hereto, and supersedes all oral negotiations and prior writings with respect to the subject matter hereof, including, without limitation, any summary of terms and conditions, information memorandum, presentation or any other communications.

19. Severability. The provisions of this Agreement are intended to be severable. If any provision of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or enforceability without in any manner affecting the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction.

20. **WAIVER OF TRIAL BY JURY. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

21. Assignment. No assignment of this Agreement or of any rights or obligations hereunder may be made by any of the Parties (by operation of law or otherwise) without the prior express written consent of all other Parties, and any attempted assignment without the required consent shall be null and void.

22. Acknowledgement. The parties acknowledge that this Agreement (and all parts hereof) is not, and may not be construed as, an admission of liability or wrongdoing or breach by any party and is not to be construed as an admission that any party engaged in any wrongful or breach of any of the Loan Agreement.

23. Interpretation Against Drafter. The parties acknowledge that they have read this Agreement, have had the opportunity to review it with an attorney of their respective choice, and have agreed to all of its terms. Under these circumstances, the parties agree that the rule of construction that a contract be construed against the drafter will not be applied in interpreting this Agreement and that in the event of any ambiguity in any of the terms or conditions of this Agreement, such ambiguity will not be construed for or against any party on the basis that such party did or did not author same.

24. Confidentiality. Each party acknowledges and confirms that any information received from the other party orally or in writing for the purpose of this Agreement is confidential information. Each party shall keep such information confidential and cannot disclose any related information without the other party's prior written consent, but the following information shall not subject to such confidentiality: (a) information that is or will be generally known to the public (provided that such information does not result from the receiving party's unauthorized disclosure to the public); (b) disclosure of such information is required by applicable laws or security exchange rules; or (c) information to be disclosed to the directors or the legal or financial advisors of any party for the transactions contemplated under this Agreement, if such directors or legal or financial advisors are subject to confidentiality obligations similar to those in this confidentiality clause. Any disclosure of confidential information made by the employee or counsel of one party shall be deemed as a disclosure made by that party, and that party shall be liable for the breach in accordance with this Agreement.

25. Expenses. Each Party shall it or his own costs and expenses incurred in negotiating, closing and carrying out the transactions contemplated by this Agreement.

[NO FURTHER TEXT ON THIS PAGE]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

HUDSON 1702, LLC,
a Delaware limited liability company

By________________________________
Name:
Title:

HUDSON 1701/1706, LLC,
a Delaware limited liability company

By________________________________
Name:
Title:

HOLDINGS:

CSC HUDSON LLC,
a Delaware limited liability company

By________________________________
Name:
Title:

ADMINISTRATIVE AGENT:

PARKVIEW FINANCIAL REIT, LP,
a Delaware limited partnership

By: Parkview Financial Fund GP, Inc.,
a California corporation,
its general partner

By____________________
Name: Ted Jung
Title: Chief Credit Officer

LENDER:

PARKVIEW FINANCIAL REIT, LP,
a Delaware limited partnership

By: Parkview Financial Fund GP, Inc.
a California corporation,
its general partner

By____________________
Name: Ted Jung
Title: Chief Credit Officer

GUARANTORS:

ALBERTO SMEKE SABA

_______________________

SALOMON SMEKE SABA

_______________________

GROUND LESSOR:

356W58 GROUND LESSOR LLC

By: ______________________
Name: LUKE PAUL
Title: AUTHORIZED SIGNATORY

## EXHIBIT A

Property Description

**THE CONDOMINIUM UNITS** (hereinafter referred to as the "Units") in the building (hereinafter referred to as the "Building") known as **353 West 57th Street Condominium** and by the street number **353-361 West 57th Street a/k/a 356 West 58th Street**, County of New York, State of New York, said Units being designated and described as **Units Nos. 1, 2 and 6** in a Declaration **dated 4/11/1985** made by **Irving Schatz**, pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act") establishing a Plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit A annexed hereto and by this reference made a part hereof), which Declaration was recorded in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 in Reel 902 Page 1** as amended by **First Amendment to Declaration** dated 1/29/1993 and recorded 5/11/1993 in Reel 1969 Page 2286, as amended by **Amended and Restated Declaration** made by Henry Hudson Holdings LLC, Irving Schatz, Adrienne Wechsler and Cheryl Hirsch dated as of 2/12/1999 and recorded 7/16/1999 in Reel 2913 Page 1753 and **Amendment to Amended and Restated Declaration** dated as of 9/30/1999 and recorded 10/27/1999 in Reel 2979 Page 2159 (which Declaration and Amendments thereto are hereinafter collectively referred to as the "Declaration"). These Units are also designated as **Tax Lots 1701, 1702, and 1706 in Block 1048** of the County of New York on the Tax Map of the Real Property Assessment Department and on the Floor Plans of the Building, certified by **Butler Rogers Baskett Architects**, and filed with the Real Property Assessment Department **as Condominium Plan No. 208** and also filed in the Office of the City Register of the City of New York, County of New York, on **4/24/1985 as Condominium Map No. 4326** and recorded 4/24/1985 as Reel 8500 Page 4326, as amended by **Amended Condominium Plan No. 208-A** filed 5/11/1993 as **Amended Condominium Map No. 5192** and recorded 5/11/1993 as Reel 9300 Page 5192.

**TOGETHER** with an undivided **44.05105 %** interest (as to Unit 1, Lot 1701), **46.94011 %** interest (as to Unit 2, Lot 1702), and **3.89067 %** interest (as to Unit 6, Lot 1706) in the Common Elements (as such term is defined in the Declaration).

**The Land** on which the Building and Units are located is situated in the County of New York and State of New York and is more fully described in the Declaration.

# **EXHIBIT B**

[Description of Ground Lease]

Ground Lease dated as of May 4, 2022 between Hudson 1701/1706, LLC and Hudson 1702, LLC, collectively, as Tenant, and 356W58 Ground Lessor LLC, as Landlord, (the "**Original Lease Agreement**"), as amended by that certain First Amendment to Ground Lease, dated as of January 3, 2023 (the "**First Amendment**"), as amended by that certain Second Amendment to Ground Lease, dated as of May 1, 2023 (the "**Second Amendment**"), as amended by that certain Third Amendment to Ground Lease, dated as of December 1, 2023 (the "**Third Amendment**"), and as amended by that certain Fourth Amendment to Ground Lease, dated as of March 29, 2024 (the "**Fourth Amendment**").

# **EXHIBIT C**

[Reserved]

# EXHIBIT D

Form of Cure Agreement

**THIS CURE AGREEMENT** ("Agreement") is made as of this ___ day of November, 2024, among **HUDSON 1701/1706, LLC**, a Delaware limited liability company, and **HUDSON 1702, LLC**, a Delaware limited liability company (jointly, severally and collectively, "Applicant"), having an address at c/o CSC Co-living, 6 St. Johns Lane, New York, New York 10013, **356W58 GROUND LESSOR LLC**, a Delaware limited liability company ("Owner"), having an address at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201, and **THE CITY OF NEW YORK** ("City"), a municipal corporation acting by and through its **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**, having its principal office at 100 Gold Street, New York, New York 10038 ("HPD").

**WHEREAS**, on April 24, 1985, a declaration of condominium dated April 11, 1985 was recorded in the Office of the City Register, New York County ("Register's Office"), at Reel 902, Page 1, establishing certain property in Block 1048 in the County, City and State of New York as a condominium, which declaration of condominium was amended by that certain First Amendment to Declaration dated January 29, 1993 and recorded in the Register's Office on May 11, 1993 at Reel 1969, Page 2286 (collectively, the "Condominium Declaration"); and

**WHEREAS**, the Condominium Declaration established a condominium consisting of six condominium units, designated as Block 1048, Lots 1701-1706 on the Tax Map of the City of New York, more particularly described on Exhibit A-1 annexed hereto and made a part hereof (collectively, the "Property")

**WHEREAS,** Owner is the owner in fee simple of the premises identified as Block 1048, Lots 1701, 1702, and 1706 on the Tax Map of the City of New York, more particularly described on Exhibit A-2 annexed hereto and made a part hereof (the "Cure Condo Units"); and

**WHEREAS,** Applicant holds title to the leasehold estate in the Cure Condo Units pursuant to that certain ground lease dated May 4, 2022 between Applicant, as tenant, and Owner, as landlord, as amended by that certain first amendment to ground lease dated January 3, 2023, that certain second amendment to ground lease dated May 1, 2023, that certain third amendment to ground lease dated December 1, 2023, and that certain fourth amendment to ground lease dated March 29, 2024 (as the same may be amended from time to time, the "Ground Lease")

**WHEREAS,** the Property constitutes a single zoning lot ("Zoning Lot") and is located in the Special Clinton District established pursuant to Chapter 6 of Article IX ("Special Clinton District Provisions") of the New York City Zoning Resolution, as the same may be amended from time to time ("Zoning Resolution") and subject to the requirements thereof; and

**WHEREAS**, pursuant to a stipulation of settlement after conference, HPD has denied a Certification of No Harassment with respect to all or a portion of the Zoning Lot and Applicant seeks compliance with the cure provisions of Zoning Resolution §96-109(d) ("Clinton Cure") by entering into this Agreement; and

**WHEREAS,** pursuant to the requirements of Zoning Resolution §96-109, Applicant and Owner have entered into this Agreement and agreed to subject the Zoning Lot to the restrictions and provisions hereof, and all other parties in interest to the Zoning Lot, as shown on the Certification of Parties in Interest prepared by Royal Abstract of New York LLC dated [__________] and attached hereto as Exhibit G-1, have consented to the execution and recording of this Agreement and subordinated their respective interests in the Property to this Agreement by written instrument annexed hereto as Exhibit G-2, which instruments are intended to be recorded in the Register's Office simultaneously with the recordation of this Agreement; and

**WHEREAS**, Applicant has filed with HPD an affordable housing plan ("Plan"), a copy of which is annexed hereto as Exhibit B and made a part hereof, in accordance with the requirements of Zoning Resolution §23-90 for rental Affordable Housing provided without Public Funding as amended by Zoning Resolution §96-109(a)(11)(ii) ("Section 23-90") and agreed to enter into this Agreement; and

**WHEREAS,** HPD has reviewed and approved the Plan; and

**WHEREAS**, Applicant intends to undertake substantial rehabilitation on the Property ("Project"); and

**WHEREAS**, the Project will provide Low Income Housing as defined in Zoning Resolution §96-109(a)(9), in accordance with Section 23-90, the Inclusionary Housing Program Guidelines and any addenda and amendments thereto from time to time ("Guidelines"), and the Special Clinton District Provisions; and

**WHEREAS**, HPD has been duly authorized to administer Section 23-90, the Guidelines, and the Special Clinton District Provisions (collectively, "Program") and enter into this Agreement; and

**WHEREAS**, the Floor Area of the Low Income Housing to be provided under the Project will satisfy the Cure Requirement set forth in Zoning Resolution §96-109(a)(3); and

**WHEREAS**, in accordance with Zoning Resolution §96-109(b), after (i) Applicant and Owner have entered into this Agreement and caused this Agreement to be recorded in the Register's Office and indexed against each tax lot within the Zoning Lot, and (ii) all other parties in interest to the Zoning Lot have consented to the execution and recording of this Agreement and subordinated their respective interests in the Property to this Agreement by written instrument recorded in the Register's Office, HPD will certify compliance with Zoning Resolution §96-109(d).

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein and other good consideration, the receipt and sufficiency whereof is hereby acknowledged, and in compliance with the Clinton Cure, the parties hereto hereby covenant and agree as follows:

1. Definitions. All capitalized terms used in this Agreement and not expressly defined herein shall have the meanings ascribed to such terms in the Zoning Resolution. As used herein:

"Administering Agent" shall mean Settlement Housing Fund, Inc., a New York not-for-profit corporation, having an office at 247 West 37th Street, 4th Floor, New York, New York 10018.

"Administering Agent Agreement" shall have the meaning set forth in Section 13.

"Agreement" shall have the meaning first set forth above.

"Annual Income" shall mean, in accordance with 24 C.F.R. 5.609 or any successor regulations, the anticipated total income from all sources to be received by the household head and spouse and by each additional member of the household, including all net income derived from assets, for the twelve (12) month period following the initial determination of income. The Administering Agent also shall retain all records and

documents relating to income determination for a minimum of three (3) years after the date a tenant commences occupancy in a Low Income Unit.

“Applicant" shall have the meaning first set forth above. All references to "Applicant" in this Agreement shall include Applicant's successors, assigns, grantees and lessees.

“Building” shall mean a building containing Low Income Units that will be altered or constructed, as applicable, on the Zoning Lot.

"Certification Of No Harassment" shall have the meaning set forth in Zoning Resolution §96-01.

"City" shall have the meaning first set forth above.

“Clinton Cure" shall have the meaning first set forth above.

"Cure Compliance Lot" shall have the meaning set forth in Zoning Resolution §96-109(a)(2).

"Cure Requirement" shall have the meaning set forth in Zoning Resolution §96-109(a)(3). For the purpose of such definition, the total Residential Floor Area and Hotel Floor Area of the Multiple Dwelling(s) to be altered or demolished in which Harassment has occurred shall be deemed to be [367,255] square feet.

"Cure Requirement Lot" shall have the meaning set forth in Zoning Resolution §96-109(a)(4).

“DHCR” shall mean the Division of Housing and Community Renewal of the State of New York, or any successor agency.

"DOB" shall mean the Department of Buildings of the City of New York, or any successor agency.

“Floor Area" shall have the meaning set forth in the Zoning Resolution.

“Floor Area Ratio" shall have the meaning set forth in the Zoning Resolution.

“Guidelines" shall have the meaning first set forth above.

"Harassment" shall have the meaning set forth in Zoning Resolution §96-01.

“Hotel Floor Area” shall have the meaning set forth in the Zoning Resolution.

"HPD" shall have the meaning first set forth above.

“Initial Occupancy" shall have the meaning set forth in the Zoning Resolution.

“Low Income Floor Area" shall have the meaning set forth in the Zoning Resolution.

"Low Income Housing" shall have the meaning set forth in Zoning Resolution §96-109(a)(9).

"Low Income Units" shall mean dwelling units in the Building to be used as Low Income Housing, which units are identified on Exhibit C attached hereto and made a part hereof.

“Monthly Rent" shall have the meaning set forth in the Zoning Resolution.

"Multiple Dwelling" shall have the meaning set forth in Zoning Resolution §96-01.

“Operating Accounts” shall mean all bank accounts established with respect to the management and operation of the Low Income Units by Applicant and/or the Administering Agent, as applicable.

“Owner" shall have the meaning first set forth above. All references to "Owner" in this Agreement shall include Owner’s successors, assigns, grantees and lessees.

“Plan" shall have the meaning first set forth above.

“Program" shall have the meaning first set forth above.

"Project" shall have the meaning first set forth above.

"Property" shall have the meaning first set forth above.

“Rent Stabilization” shall have the meaning set forth in the Zoning Resolution.

“Rent-up" shall have the meaning set forth in the Zoning Resolution.

“Rent-up Date" shall have the meaning set forth in the Zoning Resolution.

“Residential Floor Area" shall have the meaning set forth in the Zoning Resolution.

"Restrictive Declaration" shall have the meaning set forth in Zoning Resolution §96-109(a)(11).

"Section 23-90" shall have the meaning first set forth above.

"SMSA Limits" shall mean the rent limits established from time to time by U.S. Department of Housing and Urban Development for the New York Standard Metropolitan Statistical Area.

"Special Clinton District Provisions" shall have the meaning first set forth above.

"Zoning Lot" shall have the meaning first set forth above.

"Zoning Resolution" shall have the meaning first set forth above.

2. Restrictive Declaration. This Agreement is a Restrictive Declaration.

3. Cure Requirement Lot; Cure Compliance Lot. The Zoning Lot is both the Cure Requirement Lot and the Cure Compliance Lot.

4. Low Income Housing. Low Income Housing in an amount not less than the Cure Requirement shall be provided in a Multiple Dwelling on the Cure Compliance Lot. Such Low Income Housing shall comply with the requirements of Section 23-90.

5. Permits and Certificates of Occupancy.

a. Neither Applicant nor Owner shall seek or obtain any permit from DOB for any construction, alteration, or demolition work on the Zoning Lot, except a permit for an alteration which is not a Material Alteration and does not require a Certification Of No Harassment, unless this Agreement has been recorded in the Register's Office and indexed against each tax lot within the Zoning Lot.

b. Neither Applicant nor Owner shall apply for or accept any temporary or permanent certificate of occupancy for any new or existing structure or portion thereof on the Zoning Lot, other than any Low Income Housing located on the Zoning Lot, until (i) HPD certifies that the Low Income Housing required by this Agreement has been completed in compliance with this Agreement; and (ii) DOB has issued a temporary or permanent certificate of occupancy for each unit of Low Income Housing required by this Agreement.

c. Applicant and/or Owner shall request that DOB include the occupancy restrictions of this Agreement in any temporary or permanent certificate of occupancy for any new or existing structure or portion thereof on the Zoning Lot. Applicant and/or Owner shall not accept any temporary or permanent certificate of occupancy which does not contain such restrictions. Failure to comply with the terms and conditions set forth in this Agreement shall constitute a violation, and a basis for revocation, of any certificate of occupancy containing such restriction.

d. The Applicant shall construct and operate the improvements described herein in accordance with the terms hereof. After completing such improvements, neither the Applicant nor the Owner shall either obtain permits from the City's DOB for any construction, alteration, or demolition work on the Zoning Lot that would result in a change in the Floor Area located on the Zoning Lot, nor actually commence any such work, without first entering into an amendment to this Agreement with HPD.

e. Neither Applicant nor Owner shall at any time, without the prior written consent of HPD, cause or permit any action which would result in a change to (i) the size or boundaries of the Zoning Lot, whether by a zoning lot merger, tax lot merger, zoning lot subdivision, tax lot subdivision, or any other method, or (ii) the aggregate Floor Area constructed on the Zoning Lot.

1. Any such action without the prior written consent of HPD shall be deemed null and void, shall constitute an event of default under this Agreement, and shall subject the Applicant and/or Owner, as applicable, the Project, and the Property to the remedies set forth in Section 20.

2. Before consenting to any such action, HPD shall recalculate the Cure Requirement to account for any proposed change in the aggregate Floor Area constructed on the existing or expanded Zoning Lot. If such action would result in an increase in the Cure Requirement under the provisions of the Zoning Resolution in effect on the date of this Agreement, HPD shall

require the provision of additional Low Income Housing to satisfy such recalculated Cure Requirement. If such action would result in a decrease in the Cure Requirement under the provisions of the Zoning Resolution in effect on either the date of this Agreement or the date of such action, the Cure Requirement shall not be reduced and shall remain as specified in Section 1.

f. Applicant shall ensure that its construction plans for the Project are in full compliance with the design requirements of all applicable laws, and with all requirements to obtain approvals and/or waivers from DOB as set forth in the building plans submitted to and approved by HPD and DOB ("Building Plans"). Failure to complete construction in accordance with the Building Plans within thirty-six (36) months from the date of this Agreement shall constitute a default under this Agreement and in addition to the remedies set forth in Section 20 hereof shall constitute a basis for revocation of any permit, temporary or permanent certificate of occupancy for any new or existing structure or portion thereof on the Zoning Lot (other than the Low Income Housing) and the Cure Completion Certificate described in Section 11 hereof. Any design changes made subsequent to the date of this Agreement as a result of determinations by DOB shall be submitted to HPD's Division of Building & Land Development Services ("BLDS") with a written explanation, for further HPD review and approval.

6. No Bonus or Tax Benefit. No portion of the Low Income Housing developed on the Zoning Lot shall qualify to (i) increase the Floor Area Ratio pursuant to Zoning Resolution §96-21, Zoning Resolution §96-22, or Zoning Resolution §23-90; or (ii) satisfy an eligibility requirement of any real property tax abatement or exemption program with respect to any Multiple Dwelling that does not contain such Low Income Housing.

7. The Project. The Project to be undertaken by Applicant is described in the Plan submitted to and approved by HPD and the building plans submitted to and approved by HPD and DOB. The Project will provide [one hundred forty-eight (148)] Low Income Units in the Building.

8. Cure Requirement. Upon completion, the Low Income Units will comprise a Floor Area in the amount of [54,432] square feet in conformance with the Cure Requirement.

9. Representations. Applicant hereby represents that:

(a) the site of the Low Income Units is eligible for the substantial rehabilitation, as applicable, of Low Income Housing pursuant to the Program;

(b) the proposed substantial rehabilitation, as applicable, of the Low Income Units, as described in the Plan, conforms to the Guidelines, HPD's design guidelines, and any construction guidelines issued in conjunction with such design guidelines, and upon completion the Low Income Units shall conform to the Building Plans submitted to and approved by HPD and DOB;

(c) the substantial rehabilitation, as applicable, of the Low Income Units shall be completed within three (3) years of the date of this Agreement; and

(d) the Project shall at all times and in all respects comply with the Program.

(e) it shall not at any time, without the prior written consent of HPD, cause or permit any action which would result in a change to (i) the size or boundaries of the Zoning Lot, whether by a zoning lot merger, tax lot merger, zoning lot subdivision, tax lot subdivision, or any other method, or (ii) the aggregate Floor Area constructed on the Zoning Lot.

10. Rents.

(a) The initial rents charged by Applicant for the Low Income Units upon Rent-up of such units shall: (a) not exceed the rents set forth in the schedule annexed hereto as Exhibit D, (b) be registered with DHCR or any successor agency, and (c) thereafter be subject to Rent Stabilization without regard to whether such Low Income Units are statutorily subject to Rent Stabilization.

(b) Rents for existing tenants of Low Income Units upon renewal of leases for such units or at any time during the term of the lease shall be the lesser of (a) the rent allowed by Rent Stabilization, or (b) 30% of 80% of the SMSA Limits.

(c) Upon rental of a Low Income Unit that becomes vacant after Initial Occupancy, to a new tenant, the rent shall be the lesser of (a) the rent allowed by Rent Stabilization, or (b) 30% of 80% of SMSA Limits.

(d) Notwithstanding anything to the contrary contained herein, Applicant shall not utilize any exemption or exclusion from any requirement of Rent Stabilization to which Applicant might otherwise be or become entitled with respect to one or more Low Income Units, including, but not limited to, any exemption or exclusion from the rent limits, renewal lease requirements, registration requirements, or other provisions of Rent Stabilization due to (i) the vacancy of a unit where the rent exceeds a prescribed maximum amount, (ii) the fact that tenant income and/or unit rent exceed prescribed maximum amounts, (iii) the nature of the tenant, or (iv) any other factor.

(e) Applicant shall grant all tenants the same rights that they would be entitled pursuant to Rent Stabilization. In addition, Applicant shall register the Low Income Units with DHCR pursuant to Rent Stabilization, and such units shall be subject to Rent Stabilization without regard to whether such Low Income Units are otherwise statutorily subject to Rent Stabilization. Applicant shall ensure that these rights are stated in each lease for a Low Income Unit. If any court declares that Rent Stabilization is statutorily inapplicable to a Low Income Unit, such unit shall remain subject to all requirements of Rent Stabilization in accordance with this Agreement and the lease for such Low Income Unit for so long as this Agreement shall remain in effect.

In the event that any of the foregoing laws and regulations expire or are no longer enforced in substantially the same manner as on the date hereof, HPD may designate or establish an alternate regulatory mechanism in substitution thereof.

11. Certifications.

Upon the request of Applicant following recordation of this Agreement against the Property, and provided that the Applicant is in compliance with this Agreement, the Plan, and the Program, and solely for the purpose of allowing DOB or City Planning Commission to issue the permit(s) or special permit(s) required for the Project, HPD will certify to DOB or City Planning Commission, as applicable, compliance with the cure provisions of Zoning Resolution §96-109(d) ("Cure Certificate"), and in particular that the Plan has been submitted and approved in compliance with the Program and that the square footage of the Floor Area of the Low Income Units, when completed in accordance with the Plan and this Agreement, will satisfy the Cure Requirement.

Following recordation of this Agreement against the Property and completion of the Low Income Units in accordance with the Plan and this Agreement, and for the purpose of allowing DOB to issue the permanent certificate of occupancy required in connection with the Project for any new or existing structure, or portion thereof, on the Cure Requirement Lot, other than for the Low Income Housing on the Cure Requirement Lot, HPD shall issue a certificate of completion ("Cure Completion Certificate") certifying the Project's compliance with the cure provisions of Zoning Resolution §96-109(d) only after the following has occurred:

(a) (i) HPD's receipt of a temporary certificate of occupancy for each Low Income Unit containing the occupancy restrictions contained in this Agreement in accordance with Zoning Resolution §96-109(d)(2), or (ii) certification from DOB that each Low Income Unit that is subject to the occupancy restrictions contained in this Agreement in accordance with Zoning Resolution §96-109(d)(2) is eligible to receive its temporary certificate of occupancy or permanent certificate of occupancy upon HPD's issuance of the Cure Completion Certificate; and

(b) a site inspection which establishes to HPD's satisfaction that the Low Income Units have been completed in accordance with this Agreement, the Building Plans, the Plan, the Program, HPD's design guidelines and construction guidelines issued in conjunction with such design guidelines, and the building plans previously submitted to and approved by HPD; and

(c) funding of the Special Reserve Fund, where applicable, in accordance with Section 17; and

(d) submission of proof, satisfactory to HPD, that the Low Income Units are being rented in accordance with Sections 10, 22 and 23 of this Agreement and that Applicant has entered into leases with tenants for at least ten percent (10%) of the Low Income Units in accordance with the Program, pursuant to which the tenants may begin occupancy upon the issuance of a TCO or CO; and

(e) HPD's receipt of certificates of insurance required by Section 14, together with satisfactory evidence that all premiums for the current year are fully paid; and

(f) HPD's receipt of (i) a policy of leasehold title insurance dated as of the date the Applicant acquired title to the Premises, or a title policy insuring the lien of mortgage of the primary lender for the Premises or such lender's credit enhancer, dated as of the date of the closing of the financing of such mortgage, will satisfy the foregoing, where such policy (a) has been issued by a title company in good standing licensed to issue title insurance in New York State and contains the

Standard New York Endorsement (Owner's Policy) in substantially the form that appears as Exhibit E hereto, (b) such policy evidences leasehold ownership in the Applicant and the absence of liens and other encumbrances on the Premises other than those approved by HPD, (ii) proof of payment of premiums therefor, and (iii) title continuations run by the title company from the date of the title policy to the date of submission of such title policy together with a letter from the title company confirming the absence of liens and encumbrances on the Premises other than those previously approved by HPD and mechanics liens which have been bonded; and

(g) HPD's receipt of an executed contract between the Applicant and Administering Agent in accordance with Section 13 hereof; and

(h) submission of proof of multiple dwelling registration of the Building that contains the Low Income Units, in accordance with the New York City Housing Maintenance Code and of registration of all such occupied Low Income Units with the DHCR, and with written HPD approval, if the Low Income Units are not fully occupied, an affidavit stating that Applicant shall register all remaining units as they become occupied and shall submit proof of such registration of all remaining units in a form approved by HPD upon the earlier to occur of: (A) the occupancy of the last remaining unit, or (B) one (1) year from receipt of a permanent certificate of occupancy for all the Low Income Units; and

(i) Applicant's certification that the representations, covenants, warranties and statements made by Applicant that are contained in this Agreement and all other documents executed in connection with this Agreement remain true and correct as of the date on which the foregoing conditions have been satisfied; and

(j) submission of zoning calculations that show the Cure Requirement as approved by the DOB provided, however, that if such approved zoning calculations differ from those set forth in the Building Plans, HPD's issuance of the Cure Completion Certificate shall be based upon such approved calculations; and

(k) HPD's receipt of evidence that the Ground Lease remains in full force and effect.

12. Warranties. Applicant shall obtain and retain commercially reasonable warranties of the work on the Low Income Units from the general contractor and all subcontractors performing such work.

13. Renting Low Income Units. Applicant has contracted with Administering Agent, a not-for profit organization qualified by HPD to participate in the Program, to act as administering agent for the Low Income Units. The Administering Agent shall ensure that the Low Income Units are rented at Rent-up and each subsequent vacancy, in compliance with the Plan and all of the requirements of the Program. Within sixty (60) days of the Rent-up Date, the Administering Agent shall submit an affidavit to HPD attesting that the Monthly Rent registered and charged for each Low Income Unit complied with the Monthly Rent requirements for such unit at Initial Occupancy. Each year after Rent-up, in the month of March, the Administering Agent shall submit an affidavit to HPD attesting that each lease or sublease of a Low Income Unit or renewal thereof during the preceding year complied with the applicable Monthly Rent requirements of the Program. A contract between the Administering Agent and HPD ("Administering Agent Agreement") is annexed hereto as

Exhibit F and made a part hereof. HPD reserves the right to replace the Administering Agent in the event that the Low Income Units are not managed and operated in compliance with the Program. Applicant may not terminate its agreement with the Administering Agent without simultaneously entering into a new Administering Agent Agreement approved in writing by HPD.

14. Insurance.

(a) Applicant shall obtain and maintain in force all-risk casualty insurance and property insurance, including broad form extended coverage that, in the event of a casualty to the Building, will pay an amount of insurance equal to full replacement value of the Low Income Units (without depreciation or obsolescence clause) and include, without limitation, coverage for loss or damage by acts of terrorism, water (other than flood-related), wind, subsidence, and earthquake. Such insurance shall be "occurrence" instead of "claims-made." In the event of a casualty, (i) Applicant or Administering Agent shall promptly notify HPD thereof, and (ii) the proceeds of the insurance and the Special Reserve Fund, if applicable, established pursuant to Section 17 of this Agreement or Applicant's cash shall be utilized for the reconstruction of the Low Income Units.

(b) Applicant shall obtain and maintain in force commercial general liability insurance and other insurance of commercially reasonable types and amounts with respect to the Building.

15. Construction Monitoring. HPD may monitor the construction of the Low Income Units in any reasonable manner, including inspection of the Property. Upon request of HPD (a) Applicant shall give HPD notice of planning and construction meetings by telephone or in writing and (b) HPD may (i) participate in planning and construction progress meetings, (ii) review construction contracts, plans, specifications and materials samples and (iii) review proposed changes to the foregoing. After HPD's request for any such documents or materials, Applicant shall give to HPD (x) notice of any and all proposed changes to such documents or materials, and (y) notice of any casualty to or other material event concerning the work on the Low Income Units. In no event shall the approved building plans for the Low Income Units be altered, modified or revised in any respect without the prior written approval of HPD.

16. Disclosure of Financial Arrangements. Upon the request of HPD, Applicant shall fully disclose the financial terms and arrangements relating to the Low Income Units and use by Applicant of the Cure Certificate. In the event that HPD obtains information pursuant hereto, HPD shall thereafter disclose such information to third parties only as required by law, except that such data may be used and disclosed with attribution to Applicant as part of an analysis of the Program.

17. Special Reserve Fund. Simultaneous with or prior to the issuance of the Cure Completion Certificate, Applicant will fund a special operating reserve fund (the "Special Reserve Fund") in the amount of either: (1) $[122,472.00], which represents $2.25 per square foot of Low Income Floor Area as stated in the architect's affidavit ("Cure Architect Affidavit") submitted to HPD on [____________________] or (2) if, in accordance with Section 11(j), the DOB approves zoning calculations that differ from the Cure Architect Affidavit, then $2.25 per square foot of Low Income Floor Area as stated on DOB approved zoning calculations, which shall be placed in a blocked reserve account to be administered by HPD or its

designee. The Special Reserve Fund and the interest accrued thereon shall belong to the Low Income Units and the owner of such Low Income Units and shall be used solely for the benefit of the Low Income Units. The Special Reserve Fund is separate from the Building reserve fund built into the rent roll that will accumulate over time. The proceeds of the Special Reserve Fund shall be available to pay for unanticipated increases in the cost of operating and maintaining the Low Income Housing (including, but not limited to, escalating real estate taxes), or for capital repairs or improvements, the cost of which cannot be covered by the Building's capital reserve fund. Expenditures from the Special Reserve Fund shall be made solely at the discretion of HPD and may be made by HPD on behalf of Applicant.

If HPD authorizes any expenditures to be made from the Special Reserve Fund, Applicant shall replenish the Special Reserve Fund in the amount of the total sum of all such authorized expenditures by applying the excess of collected rents over actual operating expenses until all such repayments have been made. Such repayments into the Special Reserve Fund shall be made prior to the payment of any unpaid developer, syndication or partnership fees. In addition, such repayments shall be supported by the most recent financial statements, an independent auditor's report and a rent roll for the Property. Applicant may choose to replenish such Special Reserve Fund on a calendar year basis or on a fiscal year basis. In addition, upon sale, transfer other disposition the Low Income Units or any interest therein, Applicant shall repay, in full, all amounts withdrawn from and owed to the Special Reserve Fund.

18. Inspection.

(a) HPD shall have full authority to inspect the Property without prior notice during business hours and Applicant and the Administering Agent shall cooperate fully with HPD in any such inspection. HPD shall have authority to inspect the Property other than during business hours on three (3) days prior notice.

(b) HPD shall have full authority to inspect the books and records of Applicant and Administering Agent without prior notice during business hours and Applicant and the Administering Agent shall cooperate fully with HPD in any such inspection. Applicant and the Administering Agent shall furnish copies of all books and records to HPD, without cost to HPD, upon five (5) days prior written request.

19. Operating Accounts. Applicant and Administering Agent shall provide HPD with the names and locations of all Operating Accounts. All such accounts shall confer plenary authority on HPD to freeze such accounts, which authority HPD shall exercise subject to Section 20. Furthermore, Applicant shall provide HPD with annual operating statements for the Low Income Units.

20. Remedies of HPD.

(a) If Applicant or Owner violates any term, covenant or provision of this Agreement, or if any of the representations and warranties made by Applicant or Owner herein is determined by HPD to be false or misleading, then HPD may declare a default under this Agreement.

(b) Upon declaration of a default under this Agreement, HPD shall give Owner, Applicant and the Administering Agent, as applicable, notice thereof by hand

delivery or reputable overnight courier and a reasonable opportunity to cure (if HPD determines that such default can be cured). If at the end of the cure period (if any) the default has not been cured, then HPD shall provide Owner, Applicant and the Administering Agent, as applicable, notice thereof and shall provide Owner, Applicant and the Administering Agent, as applicable, an opportunity to be heard on not less than three (3) days prior written notice. Following such hearing, upon the existence of an uncured default under this Agreement, HPD may (i) assume responsibility for management of the Property directly or through a third party designated by it, (ii) freeze the Operating Accounts, (iii) seek specific performance of this Agreement or an injunction against its violation, (iv) have a receiver of its choice appointed during the pendency of any litigation, (v) seek monetary damages against Owner and/or Applicant, and/or (vi) terminate this Agreement. In the event that HPD exercises its rights under clause (ii) of this Section 20(b) and provided that there are sufficient funds in the Operating Accounts then HPD may use the funds in such Operating Accounts to make payments due under the loan documents for previously approved mortgage loans of the Applicant and/or Owner, and to pay for reasonable and customary operating expenses for the Low Income Units.

(c) The remedies set forth in Section 20(b) shall be cumulative with any other remedies available to HPD at law or in equity and exercise of one or more remedies set forth in Section 20(b) shall not limit HPD in the exercise of one or more other remedies set forth therein or otherwise available to HPD at law or in equity.

(d) HPD may exercise the remedies set forth in Section 20(b) without the notice, opportunity to cure or hearing provided therein if HPD determines that exigent circumstances require immediate action to protect the Property or the tenants thereof. HPD will provide notice and a hearing as provided in Section 20(b) hereof promptly following exercise of its remedies as set forth therein.

(e) If HPD elects to assume responsibility for management of the Low Income Units pursuant to this Section 20, Applicant shall (and shall cause the Administering Agent to) immediately deliver possession of the Low Income Units and all books and records kept in connection therewith to HPD or the person or entity designated by HPD and shall cooperate fully in effectuating the smooth transfer of management and control of the Low Income Units, including execution of written instruments and provision of notice to third parties.

(f) Applicant and Owner hereby grant HPD and its designees an irrevocable license to enter and remain on the Property for the purpose of managing the Low Income Units as provided in this Agreement. Applicant and Owner hereby agree that HPD or its designees shall not be liable in any event except for gross negligence or willful misconduct.

Whether or not HPD declares a default hereunder, a violation of this Agreement shall constitute a violation, and a basis for the revocation, of any permit, temporary certificate of occupancy or permanent certificate of occupancy for the Project in accordance with Zoning Resolution §96-109(d)(2)(iii) or (iv).

21. Debt Restrictions.

(a) Debt of the Applicant. In accordance with Zoning Resolution §23-96(f), Applicant shall not mortgage or otherwise encumber the Low Income Units or this Agreement without the prior written consent of HPD. Furthermore, if HPD consents to a mortgage loan, the lender must enter into a subordination and non-disturbance agreement with HPD in form and substance satisfactory to HPD substantially in the form annexed hereto as Exhibit H that subordinates the loan to all of the terms and conditions of this Agreement. Applicant shall cause such subordination agreement to be recorded against the Property in the Register's Office, and shall pay all required fees and taxes in connection therewith.

(b) Debt of the Owner**.** Owner shall be permitted to mortgage or otherwise encumber its fee interest in the Property or this Agreement without HPD's prior consent, if (1) Owner has notified HPD of such debt; (2) the lender is a local, state, or federal agency, savings bank, commercial bank, life insurance company, public real estate investment company, pension fund, Federal National Mortgage Association (Fannie Mae), Federal Home Loan Mortgage Corporation (Freddie Mac), or other lender approved by HPD; (3) the debt service coverage ratio is greater than 1.1; and (4) if such debt is a new indebtedness and/or a new mortgage, the lender enters into a subordination and non-disturbance agreement with HPD substantially in the form annexed hereto as Exhibit H that subordinates the loan to all of the terms and conditions of this Agreement. If all of the conditions of the preceding sentence are not met, then Owner must obtain the prior written consent of HPD to any such debt or encumbrance, and, if HPD consents to such debt or encumbrance, lender shall enter into a subordination and non-disturbance agreement with HPD substantially in the form annexed hereto as Exhibit H that subordinates the loan to all of the terms and conditions of this Agreement. Owner shall cause such subordination and non-disturbance agreement to be recorded against the Property in the Register's Office, and shall pay all required fees and taxes in connection therewith. Notwithstanding the foregoing, in the event of the termination of the Ground Lease or any subsequent ground lease on the Property where Owner is required to undertake the responsibilities of the Applicant hereunder, then the debt provisions applicable to the Applicant set forth in Section 21(a) above shall apply to such Owner and its respective successors and assigns for so long as no New Ground Lease is in existence.

22. Marketing of Low Income Units. The Administering Agent shall be required to market the Low Income Units in accordance with the Program. Furthermore, each lease for an Low Income Unit shall provide that such lease may be terminated and such tenant may be evicted if such tenant falsely or fraudulently certifies income or household composition to the Administering Agent.

23. Initial Occupancy Certification. The Low Income Units shall be occupied by persons or families having an Annual Income at the time of Initial Occupancy equal to or less than eighty percent (80%) of the median income for the New York primary metropolitan statistical area, as determined by the United States Department of Housing and Urban Development or its successors from time to time for a family of four, as adjusted for family size. Within sixty (60) days following the Rent-up Date, the Administering Agent shall submit to HPD an affidavit attesting that each household occupying a Low Income Unit complied, at Initial Occupancy, with the annual income eligibility requirements of the Program and that the Monthly Rent registered and charged for each Low Income Unit, complied with the Monthly Rent requirements for such unit, at Initial Occupancy.

24. Covenants Running With The Land. The restrictions, covenants and provisions set forth in this Agreement shall run with the land, bind Applicant, Owner, and all other parties in interest to the Cure Requirement Lot and the Cure Compliance Lot and their respective successors and assigns, and be perpetual in duration.

25. Recordation. Applicant, at the sole expense of Applicant, shall promptly after execution of this Agreement submit this Agreement for recordation against all tax lot(s) of the Zoning Lot in the Register's Office, and deliver satisfactory evidence of such recordation to HPD.

26. Subordination. All parties in interest to the Zoning Lot other than the Applicant and Owner have entered into this Agreement for the purpose of subordinating their respective interests in the Zoning Lot to this Agreement.

27. Incorporation By Reference.

a. The terms of Zoning Resolution §96-109(d) and the relevant definitions contained in Zoning Resolution §96-109(a), Zoning Resolution §12-10, and Zoning Resolution §23-91 are incorporated herein by reference. If any requirement of the Clinton Cure contained in such provisions is not expressly included in this Agreement, such requirement shall be deemed to be included herein.

b. Each exhibit to this Agreement is hereby made a part of this Agreement and all of its terms are incorporated herein by reference.

28. No Third Party Beneficiaries. The provisions of this Agreement are solely and exclusively for the benefit of the City, Applicant, and Owner, and no other person shall be a beneficiary thereof.

29. No Waiver. No failure or delay on the part of the City to exercise any right, power or remedy under this Agreement or available at law or in equity shall operate as a waiver thereof, or limit or impair the City's right to take any action or to exercise any such right, power or remedy, or prejudice its rights against Owner or Applicant in any respect.

30. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assignees. Neither Applicant nor Owner shall, without HPD's prior written consent, sell, transfer, or otherwise convey the Low Income Units or any part thereof or interest therein, directly or indirectly, whether beneficial or legal, voluntarily or involuntarily, or agree to do any of the foregoing. HPD shall not unreasonably withhold its consent to any such sale, transfer, or other conveyance, provided the transferee thereof delivers to HPD a duly executed assumption agreement in recordable form and in all respects satisfactory to HPD under which the transferee assumes and agrees to be subject to and comply with the obligations, covenants, restrictions, and provisions of this Agreement. The transferee at its sole expense shall promptly record such agreement against the Property in the aforesaid Register's Office, and promptly deliver satisfactory evidence of such recordation to HPD. HPD's consent to any one such occurrence shall not be deemed consent to any other occurrence.

31. Investigation Clause. Applicant, Owner, and Administering Agent shall be bound by and comply with the provisions of the Investigation Clause annexed hereto as Exhibit I and made a part hereof.

32. Modifications.

(a) No provision of this Agreement may be extended, modified, waived, or terminated orally, but only by an instrument in writing signed by the party against whom enforcement is sought.

(b) In the event of modification to the Program, any subsequent modification in reporting requirements may be imposed retroactively. Applicant, Owner, and/or the Administering Agent, as applicable, shall comply with all modifications to Program reporting requirements as set forth in the Guidelines, of which the Applicant and/or Administering Agent, as applicable, shall be deemed to have constructive notice, concerning: (i) the type of documents to be retained; (ii) the length of time for which such documents must be retained; and (iii) the form and method of submitting such documents to HPD.

33. Change in Floor Area. After completing the Low Income Units, the Applicant shall neither obtain permits from DOB or special permits from the City Planning Commission for any construction, alteration, or demolition work on the Zoning Lot that would result in a change in the Floor Area located on the Zoning Lot, nor actually commence any such work, without first entering into an amendment to this Agreement with HPD, which amendment, among other things, shall ensure the continued satisfaction of the Cure Requirement with respect to the Zoning Lot.

34. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall be deemed one and the same instrument.

35. Notices. All notices, approvals, requests, waivers, consents or other communications given or required to be given under this Agreement shall be in writing and sent or transmitted as follows:

If to the Applicant:

With a copy to:

If to Administering Agent:

| | |
|---|---|
| If to Owner: | 356W58 Ground Lessor LLC<br>c/o MSP Capital Investments, L.L.C.<br>2801 N. Harwood Street, Suite 1200<br>Dallas, TX 75201 |
| With a copy to: | Adler & Stachenfeld LLP<br>Attn: YuhTyng Patka, Esq.<br>555 Madison Avenue, 6th Floor<br>New York, NY 10022 |

| | |
|---|---|
| If to HPD: | NYC Department of Housing Preservation and Development<br>100 Gold Street<br>New York, NY 10038<br>Attn: Assistant Commissioner, Housing Incentives |
| with a copy to: | NYC Department of Housing Preservation and Development<br>100 Gold Street<br>New York, NY 10038<br>Attn: General Counsel |

Notices must be hand delivered or sent by certified or registered U.S. mail, return receipt requested or overnight delivery by a reputable national carrier. Notice shall be deemed to have been given upon delivery. Each party named above may designate a change of address by written notice to all of the other parties.

36. Owner's Consent and Agreement.

(a) Owner's interest in the Property, Owner's interest in the Ground Lease and any and all fee mortgages, whether now or in the future encumbering either Owner's fee interest in the Property or the Ground Lease, shall be subject and subordinate to the terms of this Agreement during the term of this Agreement. Nothing in this Section 36 shall provide HPD with any remedies that it may not otherwise have under this Agreement or result in the forfeiture of Owner's interests in the Property.

(b) Owner, as fee owner and landlord under the Ground Lease, consents to the execution and delivery of this Agreement by Applicant and to all of the terms and conditions of this Agreement.

(c) If the Ground Lease is terminated prior to the expiration of this Agreement and Owner then leases the Premises to a third party (the "New Ground Lease"), the New Ground Lease and any amendments thereto shall also be subject and subordinate to this Agreement and any tenant under the New Ground Lease shall be required to assume the ongoing obligations of the Applicant pursuant to this Agreement for the balance of the term of this Agreement.

(d) If the Ground Lease or any New Ground Lease is terminated and Owner does not enter into a New Ground Lease, Owner shall assume all of the ongoing obligations of Applicant pursuant to this Agreement for the balance of the term of this Agreement.

(e) In the event of any conflict between the terms of the Agreement and the Ground Lease, the terms of this Agreement shall govern.

(f) Notwithstanding any provision of this Agreement to the contrary and notwithstanding the Owner's execution of this Agreement, HPD agrees to look only to Applicant for satisfaction of all obligations of Applicant under this Agreement arising or accruing up to the date of any termination of the Ground Lease (including, without limitation, any indemnification provisions relating thereto or to

such period), and Owner and its successors and assigns shall in no event be liable for any thereof.

(g) Owner agrees that it will promptly execute and deliver to HPD such documents as HPD may reasonably request to effectuate the terms of this Agreement, including but not limited to, a subordination, non-disturbance and attornment agreement(s) subordinating the Owner's interest under the Ground Lease to this Agreement.

37. Primary Residence. Low Income Units may only be occupied as a primary residence, as defined in Rent Stabilization, by natural persons or families pursuant to a one- or two-year lease who have met the applicable income requirements for Low Income Households at the time of such tenant's initial occupancy of such unit. Applicant shall only offer a vacant dwelling unit for occupancy by persons or families intending to occupy such unit as their primary residence pursuant to a one- or two-year lease and shall not cause or permit the sublease or assignment of any dwelling unit for transient occupancy, for occupancy by any household that is not income eligible, or to any corporation or other entity.

38. The annexed Exhibits A, B, C, D, E, F, G, H, and I are hereby made part hereof.

[No further text; signature page follows]

IN WITNESS WHEREOF, the parties hereto and all parties in interest to the Zoning Lot have executed this Agreement as of the date first set forth above.

**THE CITY OF NEW YORK**

By: **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

By: ____________________
Tricia Dietz
Assistant Commissioner, Housing Incentives

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the ___ day of __________, 2024 before me, the undersigned, a notary public in and for said state, personally appeared **Tricia Dietz**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________
Notary Public

APPROVED AS TO FORM BY
STANDARD TYPE OF CLASS
UNTIL: ___________

By: ____________________
Acting Corporation Counsel

**HUDSON 1701/1706, LLC**

By: ________________________
Name:
Title:

**HUDSON 1702, LLC**

By: ________________________
Name:
Title:

STATE OF NEW YORK )
) ss.:
COUNTY OF __________ )

On the ___ day of __________________, 202__, before me, the undersigned, a notary public in and for said state, personally appeared ____________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

________________________
Notary Public

STATE OF NEW YORK )
) ss.:
COUNTY OF __________ )

On the ___ day of __________________, 202__, before me, the undersigned, a notary public in and for said state, personally appeared ____________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

________________________
Notary Public

**356W58 GROUND LESSOR LLC**

By: ________________________
Name:
Title:

STATE OF NEW YORK )
) ss.:
COUNTY OF __________ )

On the ___ day of __________________, 202__, before me, the undersigned, a notary public in and for said state, personally appeared ____________________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

________________________
Notary Public

# EXHIBIT A-1

# PROPERTY DESCRIPTION

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as:

| Block | Lot(s) | Address |
|---|---|---|
| 1048 | 1701-1706 | 353 West 57th Street |

County: New York

## EXHIBIT A-2

## CURE CONDO UNITS DESCRIPTION

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as:

| Block | Lot(s) | Address |
|---|---|---|
| 1048 | 1701, 1702, 1706 | 353 West 57th Street |

County: New York

**EXHIBIT B**

**AFFORDABLE HOUSING PLAN**

(following pages)

# EXHIBIT C

# LIST OF LOW INCOME UNITS

(following pages)

**EXHIBIT D**

**SCHEDULE OF RENTS**

(following pages)

# EXHIBIT E

## STANDARD NEW YORK ENDORSEMENT
## TITLE INSURANCE POLICY
## (OWNER'S POLICY)

1. The following is added to the insuring provisions on the face page of this policy:

"__. Any statutory lien for services, labor or materials furnished prior to the date hereof, and which has now gained or which may hereafter gain priority over the estate or interest of the insured as shown in Schedule A of this policy."

2. Exclusion Number 5 is deleted, and the following is substituted:

5. Any lien on the Title for real estate taxes, assessments, water charges or sewer rents imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as Shown in Schedule A.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

IN WITNESS WHEREOF, ___________________Insurance Company of New York has caused this Endorsement to be signed and sealed on its date of issue set forth herein.

DATED:

COUNTERSIGNED___________________
Authorized Signatory

____________Insurance Company

BY:_ ____________________

# EXHIBIT F

# ADMINISTERING AGENT AGREEMENT

(following pages)

**Administering Agent Agreement**
**Cure Program**

**AGREEMENT** (this "Agreement") made this ___ day of November, 2024, between the Settlement Housing Fund, Inc. ("Administering Agent"), a New York not-for-profit corporation, having an office at 247 West 37th Street, 4th Floor, New York, New York 10018, and the Department of Housing Preservation and Development ("HPD"), having an office at 100 Gold Street, New York, New York 10038.

**WHEREAS**, HUDSON 1701/1706, LLC, HUDSON 1702, LLC (jointly, severally and collectively, "Applicant"), and 356W58 GROUND LESSOR LLC ("Owner") have executed and recorded a Cure Agreement with HPD (as may be amended from time to time, the "Cure Agreement"), pursuant to which Applicant has agreed to provide Low Income Units (as defined in the Cure Agreement) at the property ("Property") described in Exhibit A attached to the Cure Agreement, in accordance with the Program (as defined in the Cure Agreement); and

**WHEREAS**, Administering Agent has agreed to ensure that the Low Income Units are rented in compliance with the Cure Agreement at Rent-up and each subsequent vacancy and has signed an agreement with the Applicant to that effect; and

**WHEREAS**, Administering Agent has been qualified to act as an Administering Agent by HPD;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, it is hereby agreed that Administering Agent will assume the ongoing responsibility for ensuring that each Low Income Unit is rented, and upon vacancy re-rented, in compliance with the Cure Agreement. In addition, Administering Agent shall (1) maintain records setting forth the facts that form the basis of any affidavit submitted to HPD; (2) maintain such records as HPD may require at the Administering Agent's office or other location approved by HPD; and (3) make all records and facts of the operation of Administering Agent available for HPD's inspection.

Notwithstanding any other remedy contained herein, HPD may commence an action against Administering Agent to require specific performance of Administering Agent's obligations herein. HPD reserves the right to replace Administering Agent in the event that the Low Income Units are not rented and Rent-up and each subsequent vacancy thereafter in compliance with the Program. If the agreement between Applicant and Administering Agent is terminated or expires, Administering Agent shall provide HPD with written notice of such termination or expiration and this Agreement shall be terminated.

This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together shall be deemed one and the same instrument.

*[Signatures follow]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first set forth above.

**THE CITY OF NEW YORK**

By: **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

By: ________________________
Tricia Dietz
Assistant Commissioner, Housing Incentives

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On this _____ day of ___________, 2024, before me, the undersigned, a notary public in and for said state, personally appeared **Tricia Dietz**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person on behalf of which the individual acted, executed the instrument.

____________________
Notary Public

**SETTLEMENT HOUSING FUND, INC.**

By: ______________________________
Name:
Title:

STATE OF NEW YORK )
) ss.:
COUNTY OF ___________ )

On the ___ day of _________, 2024 before me, the undersigned, a notary public in and for said state, personally appeared ____________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

____________________
Notary Public

# EXHIBIT G-1

# PARTIES IN INTEREST CERTIFICATION

(following pages)

# EXHIBIT G-2

# WAIVER AND SUBORDINATION

(following pages)

# WAIVER OF EXECUTION AND SUBORDINATION TO CURE AGREEMENT

**THIS WAIVER OF EXECUTION AND SUBORDINATION TO CURE AGREEMENT** ("Waiver and Subordination"), made this ___ day of November, 2024 by [INSERT NAME], having an address at [_______________] ("[Unit Owner/Lessee/Mortgagee]").

**WHEREAS**, [Unit Owner/Lessee/Mortgagee] is a "party in interest" as defined in Section 12-10(d) of the Zoning Resolution of the City of New York (the "Zoning Resolution") with respect to the zoning lot (the "Zoning Lot") consisting of Block 1048, Lots 1701-1706 on the Tax Map of the City of New York (the "Property"); and

**WHEREAS**, the City of New York (the "City"), acting by and through its Department of Housing Preservation and Development ("HPD") has denied a Certification of No Harassment with respect to all or a portion of the Property; and

**WHEREAS**, in order to comply with the cure provisions of Zoning Resolution §96-109, Low Income Housing (as defined in the Zoning Resolution) must be provided pursuant to a cure agreement (the "Agreement"), which will be entered into among HPD, HUDSON 1701/1706, LLC and HUDSON 1702, LLC (collectively, "Applicant"), and 356W58 GROUND LESSOR LLC ("Owner"); and

**WHEREAS**, the Agreement, which is intended to be recorded in the Office of the City Register for New York County ("Register's Office") simultaneously with the recording hereof, will subject the Property to certain restrictions, covenants, obligations, and agreements as contained in the Agreement; and

**WHEREAS**, Zoning Resolution §96-109 requires that the Agreement run with the land and bind all parties in interest to the Property and their successors; and

**WHEREAS**, [Unit Owner/Lessee/Mortgagee] has agreed to waive its right to execute the Agreement, consented to the execution of the Agreement, and subordinated its interest in the Property to the Agreement.

**NOW, THEREFORE**, [Unit Owner/Lessee/Mortgagee] has agreed to execute and record this Waiver and Subordination against the Premises.

1. [Unit Owner/Lessee/Mortgagee] hereby waives any rights it has to execute, and consents to the execution by Applicant and Owner of the Agreement.

2. [Unit Owner/Lessee/Mortgagee] hereby agrees that its interest in the Premises shall in all respects be subject and subordinate to the terms, restrictions, and provisions of the Agreement.

3. [Unit Owner/Lessee/Mortgagee] hereby agrees that it shall not do any of the following:

    (a) Apply for or accept any temporary or permanent certificate of occupancy for any new or existing structure or portion thereof on the Zoning Lot until (i) HPD certifies that the Low Income Housing required by the Agreement has been completed in compliance with the Agreement and (ii) the City's Department of Buildings ("DOB") has issued a temporary or permanent certificate of occupancy for each unit of Low Income Housing required by the Agreement.

(b) Obtain permits from DOB for any construction, alteration, or demolition work on the Zoning Lot that would result in a change in the Floor Area (as defined in the Zoning Resolution) located on the Zoning Lot, nor actually commence any such work, without first entering into an amendment to the Agreement with HPD.

(c) Without the prior written consent of HPD, cause or permit any action which would result in a change to (i) the size or boundaries of the Zoning Lot, whether by a zoning lot merger, tax lot merger, zoning lot subdivision, tax lot subdivision, or any other method, or (ii) the aggregate Floor Area (as defined in the Zoning Resolution) constructed on the Zoning Lot.

This Waiver and Subordination shall run with the land and be binding upon [Unit Owner/Lessee/Mortgagee] and its heirs, legal representatives, successors and assigns.

[No further text; signature page follows]

**IN WITNESS WHEREOF**, [Unit Owner/Lessee/Mortgagee] has duly executed this Waiver and Subordination as of the date and year first above written.

**[UNIT OWNER/LESSEE/MORTGAGEE]**

By: ________________________________
Name:
Title:

STATE OF NEW YORK )
) ss.:
COUNTY OF ___________ )

On the ___ day of _________, 2024 before me, the undersigned, a notary public in and for said state, personally appeared _____________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

____________________
Notary Public

# EXHIBIT H

## SUBORDINATION AND NON-DISTURBANCE AGREEMENT

(following pages)

**THIS SUBORDINATION AND NON-DISTURBANCE AGREEMENT** ("Agreement"), made as of this ____ day of __________, 2023, by __________________, a ______________________, having an address at ________________________ ("Mortgagee"), in favor of **THE CITY OF NEW YORK**, (the "City") a municipal corporation acting by and through its **DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**, having an office at 100 Gold Street, New York, New York 10038 ("HPD").

**WHEREAS**, Mortgagee holds a certain mortgage or mortgages dated of even date herewith, as follows: ____________________________________________________ made by **[Applicant]**, a _______________________ ("Applicant") in favor of Mortgagee to secure, among other things, the aggregate principal sum of ____________________________________ DOLLARS ($______________) or so much thereof as may be advanced pursuant thereto, and interest, (the "Mortgage(s)") covering the premises described in **Schedule A** annexed hereto and incorporated herein (the "Premises");

**WHEREAS**, HPD, Applicant and Owner have entered into a certain Cure Agreement dated as of the date hereof (the "Regulatory Agreement"), which Regulatory Agreement is intended to be recorded against the Premises immediately following execution and delivery thereof;

**WHEREAS**, the Cure Agreement was entered into under the New York City Zoning Resolution (the "Resolution") and the Inclusionary Housing Program Guidelines (the "Guidelines") (the Guidelines and the Resolution are collectively referred to as the "Program");

**WHEREAS**, the Regulatory Agreement provides that Applicant shall not mortgage or otherwise encumber the Low Income Units (as defined in the Regulatory Agreement) or the Regulatory Agreement without the prior written consent of HPD and that, if HPD consents to a mortgage loan, the lender must subordinate the loan to all of the terms and conditions of the Regulatory Agreement;

**WHEREAS**, Applicant has entered into the Mortgage and other instruments evidencing or securing obligations of the Premises to Mortgagee (collectively, "Other Loan Documents"; the Mortgage and the Other Loan Documents are referred to collectively as the "Loan Documents"); and

**WHEREAS**, HPD has consented to the Loan Documents on the condition that Mortgagee subordinate the Loan Documents to all the terms and conditions of the Regulatory Agreement in the manner hereinafter described.

**NOW THEREFORE**, for good and valuable consideration, the receipt whereof is hereby acknowledged, Mortgagee hereby represents to and agrees with HPD, notwithstanding any contrary term, provision, agreement, covenant, warranty, and/or representation contained or

implied in any Loan Documents or any other document executed in connection with the Premises, that:

1. The Loan Documents are and shall continue to be subject and subordinate to the terms, covenants, agreements, and conditions of the Regulatory Agreement.

2. As used in this Agreement (a) the term "Mortgage" shall refer to the Mortgage and any amendments, replacements, substitutions, extensions, modifications, or renewals thereof, and (b) the term "Mortgagee" shall include the Mortgagee's successors and assigns.

3. As used in this Agreement, the phrase "subject and subordinate" means that:

   (a) to the extent there are any inconsistencies between the provisions of the Regulatory Agreement and any provisions of the Loan Documents, the provisions of the Regulatory Agreement shall take priority over the inconsistent provisions of the Loan Documents, except as provided herein; and

   (b) if Mortgagee or if any person or entity becomes the owner of the Premises (including, if the Premises is defined as a leasehold interest as well as a fee interest, the owner of such leasehold interest) by foreclosure, conveyance in lieu of foreclosure, or otherwise ("New Owner"), (i) the Regulatory Agreement shall continue in full force and effect and the Mortgagee and New Owner shall have no right to disturb the rights of HPD under the Regulatory Agreement, (ii) HPD shall not be named as a defendant in any action or proceeding to foreclose the Mortgage or otherwise enforce the Mortgagee's or New Owner's rights thereunder, except as set forth below, and (iii) the Premises shall be subject to the Regulatory Agreement in accordance with the provisions thereof; provided, however, that Mortgagee and New Owner shall not be liable for any act or omission of Applicant or bound by any subsequent amendment of or modification to the Regulatory Agreement without its written consent. Subject to the foregoing, nothing contained herein shall prevent the Mortgagee or New Owner from naming HPD in any foreclosure or other action or proceeding initiated by the Mortgagee or New Owner pursuant to the Mortgage to the extent necessary under applicable law in order for the Mortgagee or New Owner to avail itself of and complete the foreclosure or other remedy.

4. Upon a declaration of default under the Regulatory Agreement, HPD shall give Mortgagee notice thereof by hand delivery or reputable overnight courier and a reasonable opportunity to cure (if such default can be cured), provided, however, that Mortgagee shall have no obligation to cure any such default. If Mortgagee cures the default during such cure period (if any) or has commenced to cure the specified default within such period and is diligently pursuing completion of such cure, or has commenced the exercise of remedies under the Loan Documents within such period, HPD shall not exercise any of the remedies under

Section 20(b) of the Regulatory Agreement by reason of such default. Nothing herein shall limit HPD's right to consent to a replacement manager pursuant to Paragraph 6 herein.

5. If HPD freezes the Operating Account(s) (as defined in the Regulatory Agreement) pursuant to Paragraph 20(b) of the Regulatory Agreement, HPD will allow Mortgagee to use funds therein to make payments due under the Loan Documents, provided that there are sufficient funds in the Operating Account(s) to pay for reasonable and customary operating expenses for the Premises. Mortgagee hereby acknowledges that it has no interest in or rights to any funds held in the Special Reserve Fund pursuant to the Regulatory Agreement.

6. Notwithstanding anything contained in the Regulatory Agreement or the Loan Documents, neither HPD nor Mortgagee may assume responsibility for management of the Low Income Units (as defined in the Regulatory Agreement) or designate a third party to manage the Low Income Units without the consent of the other. If, in the exercise of its remedies under the Regulatory Agreement, HPD notifies Mortgagee of its intention to install a replacement manager of the Low Income Units, then Mortgagee's consent to such manager shall not be unreasonably withheld or delayed. If, in the exercise of its remedies under the Loan Documents, Mortgagee notifies HPD of its intention to install a replacement manager of the Low Income Units, then HPD's consent to such manager shall not be unreasonably withheld or delayed. The aforesaid provisions shall apply to management of the Premises (and not only management of the Low Income Units) if it is not feasible or practical for the Low Income Units to be managed separately from the rest of the Premises.

7. Intentionally omitted.

8. No failure to exercise and no delay in exercising, on the part of HPD, of any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege operate as a waiver of any other right, power or privilege under this Agreement.

9. The covenants, provisions and terms of this Agreement and the rights and obligations of the parties hereunder shall be governed by and construed and interpreted in accordance with the laws of the State of New York, and shall be binding upon and inure to the benefit of Mortgagee, HPD, and their respective successors, transferees, and assigns.

10. Neither this Agreement nor any provision hereof (including this paragraph) may be changed, modified, amended, waived, supplemented, discharged, abandoned, or terminated orally except by an instrument in writing signed by the party against whom enforcement of the change, modification, amendment, waiver, supplement, discharge, abandonment, or termination is sought.

11. All notices, approvals, requests, waivers, consents or other communications given or required to be given under this Agreement shall be in writing and sent as follows:

If to HPD: Department of Housing Preservation and Development
100 Gold Street
New York, NY 10038
Attn: Assistant Commissioner, Housing Incentives

with a copy to: Department of Housing Preservation and Development
100 Gold Street
New York, NY 10038
Attn: General Counsel

If to Mortgagee: ____________________
____________________
____________________
Attn: ________________

with a copy to: ____________________
____________________
____________________
Attn: ________________

Notices must be hand delivered, sent by overnight delivery (e.g., FedEx) or sent by certified or registered U.S. mail, return receipt requested. Notice shall be deemed to have been given upon delivery if sent by hand delivery, U.S. mail or overnight delivery. Each party named above may designate a change of address by written notice to all of the other parties.

12. This Agreement shall be recorded against the Premises immediately after the execution hereof, in the Office of the City Register for the County in which the Premises are located and the Applicant shall pay all required fees and taxes in connection therewith.

13. This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which shall constitute one agreement.

**[No further text - signatures on the next page]**

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the day and year first above written.

**THE CITY OF NEW YORK**

**BY: DEPARTMENT OF HOUSING PRESERVATION AND DEVELOPMENT**

By: ____________________
Name:
Title

APPROVED AS TO FORM
BY STANDARD TYPE OF CLASS
FOR USE UNTIL ____________

By: /s/____________________
Acting Corporation Counsel

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

On the ___ day of ______ in the year 202__, before me, the undersigned, a notary public in and for said state, personally appeared _____________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

____________________
Notary Public

**[MORTGAGEE]**

By: ______________________
Name:
Title:

STATE OF NEW YORK )
) ss.:
COUNTY OF )

On the ___ day of _____________ in the year 202__, before me, the undersigned, a notary public in and for said state, personally appeared ________________________, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

______________________
Notary Public

## SCHEDULE A

## PROPERTY DESCRIPTION

All those certain plots, pieces and parcels of land, with the buildings and improvements thereon erected, situate, lying and being in the City and State of New York, designated on the Tax Map of the City of New York as:

| Block | Lot(s) | Address |
|---|---|---|

County:

# EXHIBIT I

## INVESTIGATION CLAUSE

(a) The parties to this Agreement agree to cooperate fully and faithfully with any investigation, audit or inquiry conducted by a State of New York (State) or City of New York (City) governmental agency or authority that is empowered directly or by designation to compel the attendance of witnesses and to examine witnesses under oath, or conducted by the Inspector General of a governmental agency that is a party in interest to the transaction, submitted bid, submitted proposal, contracts, lease, permit, or license that is the subject of the investigation, audit or inquiry.

(b) If any person who has been advised that his or her statement, and any information from such statement, will not be used against him or her in any subsequent criminal proceeding refuses to testify before a grand jury or other governmental agency or authority empowered directly or by designation to compel the attendance of witness and to examine witnesses under oath concerning the award of or performance under any transaction, agreement, lease, permit, contract, or license entered into with the City, the State or any political subdivision or public authority thereof, or the Port Authority of New York and New Jersey, or any local development corporation within the City, or any public benefit corporation organized under the laws of the State of New York, or;

(c) If any person refuses to testify for a reason other than the assertion of his or her privilege against self-incrimination in an investigation, audit or inquiry conducted by a City or State governmental agency or authority empowered directly or by designation to compel the attendance of witness and to take testimony under oath, or by the Inspector General of the governmental agency that is a party in interest in, and is seeking testimony concerning the award of, or performance under, any transaction, agreement, lease, permit, contract, or license entered into with the City, the State, or any political subdivision thereof or any local development corporation within the City, then;

(d) The commissioner or agency head whose agency is a party in interest to the transaction, submitted bid, submitted proposal, contract, lease, permit, or license shall convene a hearing upon not less than five (5) days written notice to the parties involved to determine if any penalties should attach for the failure of a person to testify.

(e) If any non-governmental party to the hearing requests an adjournment, the commissioner or agency head who convened the hearing may, upon granting the adjournment, suspend any contract, lease, permit, or license pending the final determination pursuant to paragraph (g) below without the City incurring any penalty or damages for delay or otherwise.

(f) The penalties which may attach after a final determination by the commissioner or agency head may include but shall not exceed:

(1) The disqualification for a period not to exceed five (5) years from the date of an adverse determination for any person, or any entity of which such person was a member at the time the testimony was sought, from submitting bids for, or transacting business with, or entering into or obtaining any contract, lease, permit or license with or from the City; and /or

(2) The cancellation or termination of any and all such existing City contracts, leases, permit, or licenses that the refusal to testify concerns and that have not been assigned as permitted under this agreement, nor the proceeds of which pledged, to an unaffiliated and unrelated institutional lender for fair value prior to the issuance of the notice scheduling the hearing, without the City incurring any penalty or damages on account of such cancellation or termination; moneys lawfully due for goods delivered, work done, rentals, or fees accrued prior to the cancellation or termination shall be paid by the City.

(g) The commissioner or agency head shall consider and address in reaching his or her determination and in assessing an appropriate penalty the factors in paragraphs (1) and (2) below. He or she may also consider, if relevant and appropriate, the criteria established in paragraphs (3) and (4) below in addition to any other information which may be relevant and appropriate:

(1) The party's good faith endeavors or lack thereof to cooperate fully and faithfully with any governmental investigation or audit, including but not limited to the discipline, discharge, or disassociation of any person failing to testify, the production of accurate and complete books and records, and the forthcoming testimony of all other members, agents, assignees or fiduciaries whose testimony is sought.

(2) The relationship of the person who refuses to testify to any entity that is a party to the hearing, including, but not limited to, whether the person whose testimony is sought has an ownership interest in the entity and/or the degree of authority and responsibility the person has within the entity.

(3) The nexus of the testimony sought to the subject entity and its contracts, leases, permits or licenses with the City.

(4) The effect a penalty may have on an unaffiliated and unrelated party or entity that has a significant interest in an entity subject to penalties under (f) above, provided that the party or entity has given actual notice to the commissioner or agency head upon the acquisition of the interest, or at the hearing called for in (d) above gives notice and proves that such interest was previously acquired. Under either circumstance the party or entity must present evidence at the hearing demonstrating the potential adverse impact a penalty will have on such person or entity.

(h)

(1) The term "license" or "permit" as used herein shall be defined as a license, permit, franchise or concession not granted as a matter of right.

(2) The term “person” as used herein shall be defined as any natural person doing business alone or associated with another person or entity as a partner, director, officer, principal or employee.

(3) The term “entity” as used herein shall be defined as any firm, partnership, corporation, association, or person that receives moneys, benefits, licenses, leases, or permits from or through the city or otherwise transacts business with the City.

(4) The term “member” as used herein shall be defined as any person in association with another person or entity as a partner, officer, principal or employee.

(i) In addition to and notwithstanding any other provisions of this Agreement the Commissioner or agency head may in his or her sole discretion terminate this Agreement upon not less than three (3) days written notice in the event the contractor fails to promptly report in writing to the Commissioner of Investigation of the City of New York any solicitation of money, goods, requests for future employment or other benefit or thing of value, by or on behalf of any employee of the City or other person, firm, corporation or entity for any purpose which may be related to the procurement or obtaining of this Agreement by the Contractor, or affecting the performance of this Agreement.

**REGULATORY AGREEMENT**

**AMONG**

**THE CITY OF NEW YORK,**

**HUDSON 1701/1706, LLC,**

**HUDSON 1702, LLC,**

**AND**

**356W58 GROUND LESSOR LLC**

| Block | Lot(s) | Address |
|---|---|---|
| 1048 | 1701-1706 | 353 West 57th Street |

County: New York

**RECORD AND RETURN TO:**

NYC Department of Housing Preservation
and Development
Office of Legal Affairs
100 Gold Street, Room 5-S6 (MS)
New York, New York 10038

**EXHIBIT E**

Form of Escrow Agreement

# INCENTIVE PAYMENT ESCROW AGREEMENT

THIS INCENTIVE PAYMENT ESCROW AGREEMENT (this "Agreement") is made and entered into as of this ____ day of ___________, 2025 (the "Effective Date"), by and among PARKVIEW FINANCIAL REIT, LP, a Delaware limited partnership, as administrative agent (in such capacity, together with its successors and assigns, "Administrative Agent") for itself and the other lenders from time to time party to the Loan Documents (as such term is defined in that certain Building Loan Agreement, dated as of May 4, 2022, as amended, by and among Borrower, Administrative Agent and the Lenders) (collectively, together with their successors and assigns, "Lenders"), Hudson 1702, LLC and Hudson 1701/1706, LLC, each a Delaware limited liability company (collectively, "Borrower"), CSC HUDSON LLC, a Delaware limited liability company having an office at c/o CSC RE, 459 Columbus Avenue, Unit #1082, New York, New York 10024 ("Holdings"), Alberto Smeke Saba and Salomon Smeke Saba, each a natural person (individually and collectively, as the context may require, and jointly and severally, "Guarantor"; and together with Borrower and Holdings, individually and collectively as the context may require, "Tenant Parties"), 356W58 GROUND LESSOR LLC, a Delaware limited liability company (together with its successors and assigns, "Ground Lessor") and FIRST AMERICAN TITLE INSURANCE COMPANY, as escrow agent (the "Escrow Agent"; and, together with each of Administrative Agent, the Tenant Parties, and Ground Lessor, each, a "Party").

## RECITALS

WHEREAS, Administrative Agent, Tenant Parties and Ground Lessor are parties to that certain Agreement, dated as of the Effective Date (the "Fee Agreement") (All initial capitalized terms used, but not defined, in this Agreement shall have the meanings set forth in the Fee Agreement);

WHEREAS, the Fee Agreement provides, *inter alia*, that the Guarantor shall be entitled to receive certain fees (each, an "Incentive Payment"; and collectively, the "Incentive Payments") upon the satisfaction of certain conditions specified therein within the time periods specified therein (each such condition, a "Incentive Payment Condition");

WHEREAS, pursuant to Section 3 of the Fee Agreement, following Guarantor's satisfaction of any applicable Incentive Payment Condition set forth in the Fee Agreement, Administrative Agent shall cause the applicable Incentive Payment to be deposited into escrow with Escrow Agent (any such funds, the "Escrow Funds"); and

WHEREAS, Escrow Agent is willing to hold and disburse such Escrow Funds pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1. Deposit of Escrow Funds; Appointment of Escrow Agent; Escrow Account.

(a) By its execution and delivery of this Agreement to the other Parties, Administrative Agent hereby agrees that, within five (5) business days after Guarantor's satisfaction of all applicable Incentive Payment Conditions with respect to any Incentive Payment (or if there is a dispute as to whether such Incentive Payment has been earned, within five (5) business days after the Arbitrator (as such term is defined in the Fee Agreement) determines that all such Incentive Payment Conditions have been satisfied and such Incentive Payment has been earned), Administrative Agent shall (i) notify the Parties via email only which Incentive Payment has been earned and (ii) wire the applicable Incentive

Payment amount to Escrow Agent (the "Escrow") pursuant to wire instructions set forth on Exhibit A attached hereto and (iii) notify Escrow Agent via email only when the wire is sent and provide via email only a federal reference number if requested by Escrow Agent. Upon (x) receipt of an Incentive Payment or (y) written request by a Party at any time not more than once per month, Escrow Agent shall confirm via email only to all Parties the amount of Escrow Funds then on deposit with Escrow Agent pursuant to this Agreement. Administrative Agent, Tenant Parties and Ground Lessor each hereby appoint Escrow Agent as the escrow agent pursuant to the terms of this Agreement and Escrow Agent hereby accepts said appointment pursuant to the express terms, conditions and provisions of this Agreement and agrees to act in accordance with such terms, conditions and provisions of this Agreement with respect to the Escrow.

(b) Upon the receipt by Escrow Agent of Borrower's W9, Escrow Agent shall hold the Escrow Funds in a separate escrow account at Bank of America, N.A. (the "Escrow Account"), and shall not commingle the Escrow Funds with any other third-party deposits or its own funds. The Party providing the W9 shall receive a 1099 for the interest regardless of which Party actually receives the interest.

2. Investment of Escrow Funds. All interest and other amounts earned on the Escrow Funds, or portion thereof, shall be paid to Guarantor.

3. Term.

(a) The obligations of Escrow Agent under this Agreement shall terminate on the earliest to occur of: (i) each of Ground Lessor's and Administrative Agent's delivery of written notice to Escrow Agent that the Project has achieved Substantial Completion, including, without limitation, receipt of a TCO in accordance with the Fee Agreement (such notice, the "Substantial Completion Notice"), (ii) complete disbursement of the Escrow Funds in accordance with the terms of this Agreement, or (iii) April 8, 2026 (such earliest date, the "Termination Date"), in which case all funds remaining in the Escrow shall be distributed to Guarantor or Ground Lessor in accordance with Section 3(b).

(b) If, as of the Termination Date, any Escrow Funds have not been disbursed in accordance with Section 4 and, therefore, remain in Escrow Agent's possession, such remaining Escrow Funds (the "Remaining Funds") shall be disbursed to (i) if the Termination Date occurred as a result of delivery of a Substantial Completion Notice, to Guarantor, in accordance with the instructions provided by Guarantor or (ii) if the Termination Date occurred as a result of clause (iii) of the definition thereof, to Ground Lessor, in accordance with the instructions provided by Ground Lessor; provided, however, in the event that Ground Lessor has notified Escrow Agent in writing that an Event of Default (as defined in the Ground Lease) has occurred and is continuing under the Ground Lease on or prior to the Termination Date, such Remaining Funds shall be disbursed to Ground Lessor in accordance with the instructions provided by Ground Lessor to be utilized subject to the sole and absolute discretion of Ground Lessor.

(c) Upon the termination of this Agreement, in accordance with this Section 3, Escrow Agent shall be relieved from all duties, obligations, liabilities and responsibilities hereunder other than those that accrued prior to such termination.

4. Disbursement of Escrow Funds.

(a) Disbursement of Excess Easement Funds. If (i) Borrower enters into a definitive agreement to acquire the Easement (the "Easement PSA") in accordance with the terms of the Fee Agreement on or prior to April 25, 2025, (ii) such Easement PSA requires payment of a purchase price for the Easement in excess of $5,000,000.00 (and such Easement PSA has been reviewed and approved by Ground Lessor and Administrative Agent), and (iii) Borrower acquires the Easement pursuant to the

Easement PSA and, as a result of such purchase, earns the J-1 Incentive Payment and such J-1 Incentive Payment is deposited in escrow with Escrow Agent pursuant to the terms hereof, then, provided that Ground Lessor has not then delivered an Event of Default Notice, Ground Lessor shall deliver written notice to Escrow Agent (the "Excess Easement Funds Release Notice") directing disbursement of a portion of the Escrow Funds in an amount equal to the excess of the purchase price set forth in the Easement PSA in excess of $5,000,000.00 (but in no event exceeding $2,000,000.00 in the aggregate) (such amount, as set forth in the Excess Easement Funds Release Notice, the "Excess Easement Funds"). Upon Escrow Agent receiving an Excess Easement Funds Release Notice, Escrow Agent shall disburse the Excess Easement Funds as so directed within one (1) business day of receipt of such joint written direction.

(b) Disbursement Pursuant to Joint Instructions. If at any time Escrow Agent shall either receive (x) a joint written direction signed by Administrative Agent, Guarantor and Ground Lessor authorizing and directing disbursement of the Escrow Funds or any portion thereof or (y) a Substantial Completion Notice, Escrow Agent shall disburse the Escrow Funds (or such portion thereof) as so directed within one (1) business day of receipt of such joint written direction.

(c) Disbursement Pursuant to Notice of an Event of Default by Ground Lessor. If at any time Escrow Agent shall receive written notice from Ground Lessor that an Event of Default (as defined in the Ground Lease) has occurred and is continuing under the Ground Lease (an "Event of Default Notice"), Escrow Agent shall immediately disburse the Escrow Funds to Ground Lessor in accordance with the instructions provided by Ground Lessor to be utilized subject to the sole and absolute discretion of Ground Lessor.

(d) Disbursement Pursuant to a Claim Notice from Guarantor. If Guarantor is entitled to receive the Escrow Funds or a portion thereof pursuant to the Fee Agreement, Guarantor (in such capacity, the "Requesting Party") may provide written notice to Escrow Agent that Guarantor is entitled to receive the Escrow Funds or a portion thereof pursuant to the Fee Agreement (such notice the "Claim Notice") and that the Escrow Funds (or portions thereof) be distributed in accordance with the instructions given in such Claim Notice. Escrow Agent shall provide written notice (the "Receipt Notice") to the other Parties (each, a "Confirming Party") of its receipt of such Claim Notice (together with a copy of the Claim Notice) no later than one (1) business day after its receipt of such Claim Notice, provided such written notice may be delivered to the Parties via email in accordance with Section 9(b).

(i) If any Confirming Party disputes that the Requesting Party is entitled to receive the Escrow Funds or the portion thereof so requested, the Confirming Party shall provide written notice to Escrow Agent within ten (10) business days after its receipt of the Receipt Notice disputing that the Requesting Party is entitled to receive the Escrow Funds (a "Dispute Notice"). For the avoidance of doubt, any delivery of an Event of Default Notice shall be deemed delivery of a Dispute Notice in accordance with this Section 4(d)(i). If Escrow Agent has not received a Dispute Notice from any Confirming Party within such ten (10) business day period, Escrow Agent shall deliver a second Receipt Notice to the Parties (which second Receipt Notice shall state at the top thereof, in bold and capitalized letters, "EACH PARTY'S FAILURE TO RESPOND TO THIS NOTICE MAY RESULT IN A DEEMED APPROVAL OF DISBURSEMENT OF ESCROW FUNDS") and if each Confirming Party fails to respond to such second Receipt Notice within five (5) business days after receipt of such second Receipt Notice, each Confirming Party shall be deemed to have authorized the disbursement set forth in the Claim Notice, and Escrow Agent shall disburse the Escrow Funds (or the portion thereof so requested) pursuant to the instructions set forth in the Claim Notice. If Escrow Agent receives a Dispute Notice within such ten (10) business day period (or the additional five (5) business day period following delivery of a second Receipt Notice), Escrow Agent shall deliver a copy of such Dispute Notice to each of the other Parties and shall retain the Escrow Funds in the Escrow Account pending receipt of a joint written direction signed by each of Administrative Agent, Guarantor and Ground Lessor authorizing the disbursement of the Escrow Funds,

or a copy of a final decision of an arbitrator or final unappealable order of a court of competent jurisdiction with respect to distribution of the Escrow Funds. Notwithstanding the foregoing, if Escrow Agent receives contrary written directions from Administrative Agent, Guarantor or Ground Lessor or no written directions by the Termination Date, Escrow Agent shall have the right to deposit the Escrow Funds with any court of competent jurisdiction in New York and interplead Administrative Agent, Guarantor and Ground Lessor. Upon depositing the Escrow Funds and filing its complaint in interpleader, Escrow Agent shall be released from all liability under this Agreement regarding the Escrow Funds, except as otherwise expressly provided in this Agreement.

5. Escrow Fees. All fees, costs and expenses of the Escrow Agent with respect to the escrow established pursuant to this Agreement (if any, the "Escrow Fees") shall be shared equally between Administrative Agent and Guarantor. All such Escrow Fees shall be due and payable upon the initial deposit of any Escrow Funds with Escrow Agent pursuant to this Agreement. Escrow Agent's fee is $1,500.

6. Compliance with Court Orders. Each of the Parties hereby acknowledges that Escrow Agent may accept, obey and comply with any and all writs, orders, judgments or decrees issued or entered by any court with or without jurisdiction (a "Court Order"), in which case, notwithstanding anything to the contrary in this Agreement, Escrow Agent shall not be liable to any Party by reason of such acceptance, obedience or compliance, regardless of whether such Court Order is subsequently reversed, modified, annulled, set aside or vacated.

7. Release and Indemnification.

(a) The Parties hereby release Escrow Agent and its officers, managers, employees and agents (each, an "Escrow Agent Party"), for any liability, damage, loss, cost or expense incurred by such Escrow Agent Party to the extent resulting from (i) any action taken or not taken in good faith upon advice of Escrow Agent's counsel given with respect to any questions relating to its obligations under this Agreement, or (ii) any action taken or not taken in reliance upon any document, including any written notice provided to Escrow Agent pursuant to this Agreement, as to the due execution and the validity and effectiveness of such document, and the truth and accuracy of any information contained therein, which such Escrow Agent Party in good faith believes to be genuine, to have been signed or presented by a duly authorized person or persons and to comply with the terms of the Fee Agreement and this Agreement, except to the extent resulting from the gross negligence, willful default or intentional misconduct by any Escrow Agent Party. Administrative Agent, Borrower, Holdings and Guarantor, jointly and severally, shall indemnify and hold harmless any Escrow Agent Party against any liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and court costs, incurred by such Escrow Agent Party to the extent resulting from the performance by any Escrow Agent Party of Escrow Agent's obligations under this Agreement, except to the extent resulting from the gross negligence, willful default or intentional misconduct by such Escrow Agent Party.

(b) It is agreed by and among the Parties that:

(i) the duties of Escrow Agent are only as herein specifically provided and are purely ministerial in nature, and Escrow Agent shall incur no liability whatever except for willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) or gross negligence, as long as Escrow Agent has acted in good faith;

(ii) in the performance of its duties hereunder, Escrow Agent shall be entitled to rely upon any document, instrument or signature believed by it to be genuine and signed by Landlord, Tenant or their respective successors;

(iii) Escrow Agent may assume that any person on behalf of any Party purporting to give any notice of instructions in accordance with the provisions hereof has been duly authorized to do so;

(iv) Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless in writing and signed by it and the Parties;

(v) Escrow Agent is acting as a stake-holder only with respect to the Escrow. Upon making delivery of all of the Escrow in the manner provided in this Agreement, Escrow Agent shall have no further liability hereunder, except from any claims arising out of the gross negligence or willful misconduct (including, without limitation, willful disregard of the terms of this Agreement) by Escrow Agent in the performance of its duties hereunder.

(c) By execution of this Agreement, Escrow Agent hereby acknowledges and agrees that notwithstanding anything to the contrary contained in this Agreement, Escrow Agent shall not release any Escrow Funds except in accordance with the express provisions of this Agreement.

(d) In addition to any other indemnification of Escrow Agent contained herein, in the event that Escrow Agent incurs any actual, third-party out-of-pocket costs or expenses hereunder, including, without limitation, costs of Escrow Agent, then Escrow Agent shall be entitled to reimbursement for such costs from the Tenant Parties within thirty (30) days after receipt of demand from Escrow Agent (provided that Escrow Agent shall provide the Tenant Parties copies of bills, invoices, receipts or other documentation that evidences the reimbursement amount).

8. Relationship of Parties. Administrative Agent, Tenant Parties and Ground Lessor acknowledge and agree that Escrow Agent is acting solely as a stakeholder at their request, and that Escrow Agent shall not be deemed to be the agent of any of Administrative Agent, any Tenant Party or Ground Lessor.

9. Notices. Except as otherwise provided for herein, all notices, approvals, consents and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given or sent (a) upon the date delivered, if delivered by hand, or (b) upon the date of delivery, if delivered by electronic mail (provided that, within three (3) business days after delivery by electronic mail, the Party delivering the notice sends a copy of such notice by at least one other method of delivery set forth in this paragraph), or (c) one (1) business day after deposit with a nationally recognized overnight courier service with next business day delivery specified and requires delivery confirmation, in each case to the party intended at its address as follows (or at such other address as may hereafter be specified by such party from time to time by like notice):

If to Administrative Agent or Lender:

Parkview Financial REIT, LP
11440 San Vicente Boulevard, 2nd Floor
Los Angeles, CA 90049
Attention: Paul Rahimian and Ted Jung
Email: paul@parkviewfinancial.com
ted@ parkviewfinancial.com

With a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Attention: Neal E. Kronley, Esq.

E-mail: Neal.Kronley@us.dlapiper.com

If to Borrower: Hudson 1702, LLC
Hudson 1701/1706, LLC
459 Columbus Avenue, Unit #1082
New York, New York 10024
Attention: Alberto Smeke Saba and Salomon Smeke Saba
Email: as@cscre.us and ss@cscre.us

With a copy to: K&L Gates LLP
599 Lexington Avenue, 32nd Floor
New York, New York 10022
Attention: Robert Salame, Esq.
Email: Robert.Salame@klgates.com

If to Holdings: CSC Hudson LLC
459 Columbus Avenue, Unit #1082
New York, New York 10024
Attention: Alberto Smeke Saba and Salomon Smeke Saba
Email: as@cscre.us and ss@cscre.us

With a copy to: K&L Gates LLP
599 Lexington Avenue, 32nd Floor
New York, New York 10022
Attention: Robert Salame, Esq.
Email: Robert.Salame@klgates.com

If to Guarantor: Alberto Smeke Saba
Salomon Smeke Saba
459 Columbus Avenue, Unit #1082
New York, New York 10024
Attention: Alberto Smeke Saba and Salomon Smeke Saba
Email: as@cscre.us and ss@cscre.us

With a copy to: K&L Gates LLP
599 Lexington Avenue, 32nd Floor
New York, New York 10022
Attention: Robert Salame, Esq.
Email: Robert.Salame@klgates.com

If to Ground Lessor:

356W58 GROUND LESSOR, LLC
c/o GLR Capital Investments, L.L.C.
2801 N Harwood Street, Suite 1200
Dallas, Texas 75201
Attn: Luke Pak
Telephone: 214-545-5576
E-mail: pak@mspcm.com

356W58 GROUND LESSOR, LLC
c/o GLR Capital Investments, L.L.C.

2801 N Harwood Street, Suite 1200
Dallas, Texas 75201
Attn: Max Lamont
Telephone: 214-545-5577
E-mail: lamont@mspcm.com

With a copy to:

Adler & Stachenfeld LLP
555 Madison Avenue
New York, New York 10022
Attention: Danielle Ash. Esq.
Email: dash@adstach.com

If to Escrow Agent:

First American Title Insurance Company
666 Third Avenue
New York, NY 10017
Attention: Andrew Jaeger
Email: ajaeger@firstam.com
Tel: 212-551-9433
Reference Number: _____________

The giving of any notice required hereunder may be waived in writing by the Party entitled to receive such notice. No failure or delay in the routing of any such notice, demand, request, consent, approval, declaration or other communication within any organization to the individual designated to receive the same or a copy thereof shall in any way qualify the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

10. Assignment. None of Administrative Agent, Borrower, Holdings or Guarantor shall assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of the other Party. Escrow Agent shall not, directly or indirectly, assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of each other Party hereto.

11. Successors and Assigns; Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns pursuant to this Section 11. This Agreement shall not confer any rights or remedies upon any Person other than the Parties any their respective successors and permitted assigns pursuant to Section 11.

12. Conflict with Fee Agreement. If any of the terms or provisions of this Agreement conflict with, or are inconsistent with, any terms or provisions of the Fee Agreement, the terms and provisions of this Agreement shall control.

13. Governing Law; Severability. This Agreement shall be governed by the laws of the State of New York. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

14. Jurisdiction; Venue. Any litigation or other court action regarding this Agreement shall be conducted in the New York State Supreme Court in New York County or the United States District Court for the Southern District of New York, in the State of New York, and each Party hereby submits to jurisdiction and consents to venue in such courts.

15. Waiver of Trial by Jury. Each Party hereby waives its right to a trial by jury in any action or proceeding by any Party against any other Party with respect to any matter arising from or in connection with this Agreement.

16. Prevailing Party. If any litigation or other court action, arbitration or similar adjudicatory proceeding is undertaken by any Party to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, of the prevailing Party in such action, suit or proceeding shall be reimbursed or paid by the Party against whose interest the judgment or decision is rendered. This Section 16 shall survive the termination of this Agreement. This Section 16 shall not apply to Escrow Agent.

17. Recitals. The recitals to this Agreement are incorporated herein by such reference and made a part of this Agreement.

18. Entire Agreement; Amendments to Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between or among the Parties on or prior to the date of this Agreement with respect to the transaction contemplated in this Agreement. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

19. PDF; Counterparts. A Party may deliver executed signature pages to this Agreement by e-mail transmission of a PDF file containing such pages to any other Parties, which PDF copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

*[Remainder of page intentionally left blank;*
*signatures on following pages.]*

IN WITNESS WHEREOF, Administrative Agent, Borrower, Holdings. Guarantor and Escrow Agent have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

ADMINISTRATIVE AGENT:
PARKVIEW FINANCIAL REIT, LP,
a Delaware limited partnership

By: Parkview Financial Fund GP, Inc.,
a California corporation,
its general partner

By: ______________________________
Name: Ted Jung
Title: Chief Credit Officer

BORROWER:

HUDSON 1702, LLC,
a Delaware limited liability company

By:______________________________
Name:
Title:

HUDSON 1701/1706, LLC,
a Delaware limited liability company

By:______________________________
Name:
Title:

HOLDINGS:

CSC HUDSON LLC,
a Delaware limited liability company

By________________________________________
Name:
Title:

GUARANTORS:

__________________________
ALBERTO SMEKE SABA

__________________________
SALOMON SMEKE SABA

GROUND LESSOR:

356W58 GROUND LESSOR, LLC,
a Delaware limited liability company

By: ______________________________
Name:
Title:

ESCROW AGENT:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: ______________________________
Name:
Title:

Exhibit A

Wire Instructions