**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case Nos. 25-11853(KBO)<br><br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br><br>Defendant. | Adv. Proc. No. 25-52471 (KBO) |

**THE DEBTORS' OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 4

I. Procedural History ........ 4

II. The Amended Complaint ........ 5

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. The Amended Complaint Sufficiently Alleges A Claim For Recharacterization Of The Ground Lease ........ 5

A. The Ground Lease Exhibits Almost All Of The Factors That Courts Have Relied On In Recharacterizing Leases ........ 6

B. The Ground Lease Contains Other Terms That Also Favor Recharacterization ........ 9

C. The Original Complaint's Dismissal Does Not Implicate The Law Of The Case Doctrine ........ 12

D. Defendant's Renewed "Quasi-Estoppel" Argument Is Baseless ........ 14

E. The Amended Complaint Complies With The Court's May 15 Requests ........ 16

F. MSP's Analysis Of The Ground Lease's Terms Is Fundamentally Flawed ........ 17

II. The Debtors Have Alleged Viable Claims to Avoid the Fourth Amendment as a Fraudulent Conveyance ........ 18

CONCLUSION ........ 21

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Sanofi*,
2019 WL 259099 (D. Del. Jan. 18, 2019) ........ 15

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ........ 5

*Comer v. Am. Transmission Sys., Inc.,*
2025 WL 1530750 (W.D. Pa. May 29, 2025) ........ 13

*Constr. Loan Servs. II LLC v. Silverrock Dev., Co., LLC (In re Silverrock Dev. Co., LLC)*,
2025 WL 3492145 (D. Del. Dec. 5, 2025) ........ 6

*Farmer v. Lanigan*,
2016 WL 4107693 (D.N.J. Aug. 1, 2016) ........ 14

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) ........ 5

*Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency*,
155 B.R. 824 (Bankr. N.D.N.Y. 1993) ........ 7, 14

*In re 48th St. Steakhouse, Inc.*,
61 B.R. 182 (Bankr. S.D.N.Y. 1986) ........ 6

*In re Anadrill Directional Servs. Inc.,*
676 B.R. 860 (Bankr. S.D. Tex. 2026) ........ 14

*In re BYJU's Alpha, Inc.*,
2025 WL 659092 (D. Del. Feb. 27, 2025) ........ 19

*In re Charys Holding Co., Inc.*,
443 B.R. 628 (Bankr. D. Del. 2010) ........ 20

*In re DBSI, Inc.*,
445 B.R. 344 (Bankr. D. Del. 2011) ........ 20

*In re EBC I, Inc.*,
356 B.R. 631 (Bankr. D. Del. 2006) ........ 19

*In re Green Field Energy Servs., Inc.*,
2015 WL 5146161 (Bankr. D. Del. 2015) ........ 20

*In re Integrated Health Servs., Inc.*,
260 B.R. 71 (Bankr. D. Del. 2001) ........ 7

*In re Modell's Sporting Goods, Inc.*,
2023 WL 2961856 (Bankr. D.N.J. Apr. 14, 2023) ............ 19

*In re Montgomery Ward, LLC*,
469 B.R. 522 (Bankr. D. Del. 2012) ............ 6, 7

*In re Olick,*
*565 B.R. 767* (Bankr. E.D. Pa. 2017) ............ 13

*In re PCH Assocs.*,
804 F.2d 193 (2d Cir. 1986) ............ *passim*

*In re PennySaver USA Publ'g, LLC*,
602 B.R. 256 (Bankr. D. Del. 2019) ............ 20

*In re R.M.L., Inc.*,
92 F.3d 139 (3d Cir. 1996) ............ 18

*In re Wingspread Corp.,*
116 B.R. 915 (Bankr. S.D.N.Y. 1990) ............ 8

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
620 F. Supp. 3d 167 (D.N.J. 2022) ............ 14

*Ingrao v. AddShoppers, Inc.,*
2024 WL 4892514 (E.D. Pa. Nov. 25, 2024) ............ 5

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*,
936 F.2d 744 (2d Cir. 1991) ............ *passim*

*J&R Passmore, LLC v. Rice Drilling D, LLC,*
2024 WL 1347291 (S.D. Ohio Mar. 29, 2024) ............ 15

*Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.)*,
949 F.2d 585 (2d Cir. 1991) ............ 17

*MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*,
2024 WL 5113165 (2d Cir. Dec. 16, 2024) ............ 9, 10, 17

*NCA Inv'rs Liquidating Trust v. Berkowitz, Trager & Trager, LLC (In re Seaboard Hotel Mbr. Assocs., LLC)*,
2021 Bankr. LEXIS 1564 (Bankr. D. Del. June 10, 2021) ............ 19

*Network Apps, LLC v. AT&T Mobility LLC,*
778 F. Supp. 3d 610 (S.D.N.Y. 2025) ............ 14

*Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*,
2022 WL 609213 (D. Del. Jan. 27, 2022) ............ 15

*Tatis v. Allied Interstate, LLC*,
882 F.3d 422 (3d Cir. 2018) ........ 5

*Teleprompter of Erie, Inc. v. City of Erie*,
567 F. Supp. 1277 (W.D. Pa. 1983) ........ 15

*United States ex. rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ........ 13

**Statutes**

11 U.S.C. § 548 ........ 19

**Rules**

Fed.R.Civ.P. 15 ........ 12

Fed.R.Civ.P. 9 ........ 19

Federal Rule of Bankruptcy Procedure 7008 ........ 9

Federal Rule of Bankruptcy Procedure 7012 ........ 9

Federal Rule of Bankruptcy Procedure 7015 ........ 12

The Debtors/Plaintiffs Hudson 1701/1706, LLC and Hudson 1702, LLC (together, the "**Plaintiffs**" or the "**Debtors**") submit this memorandum of law in opposition to the motion (the "**Motion**") (Adv. Pro. Dkt. Nos. 93-95) of Defendant 356W58 Ground Lessor LLC (the "**Defendant**"), an affiliate of MSP Capital Management, L.L.C., d/b/a Montgomery Street Partners (together with Defendant, "**MSP**") to dismiss the Amended Complaint (the "**Amended Complaint**" or "**Am. Cmplt.**") (Adv. Pro. Dkt. No. 91) in the above-captioned adversary proceeding (the "**Adversary Proceeding**").

## PRELIMINARY STATEMENT

The core issue in the Adversary Proceeding and in the Debtors' above-captioned chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") is how to treat the Debtors' contract with MSP, an agreement entitled "Ground Lease" and dated May 4, 2022 ("**Ground Lease**") (Am. Cmplt., Ex. A). If, as the Debtors contend, the Ground Lease is not a true lease and should therefore be recharacterized under established bankruptcy law, there is a compelling path to reorganization and completion of the Debtors' redevelopment project (the "**Project**") at the former Hudson Hotel in New York City (the "**Property**"). If, as MSP contends, the Ground Lease is a true lease, the Debtors will be compelled to reject it, the Debtors will forfeit the Property, and MSP will take possession of it, inclusive of hundreds of millions of dollars of investment and improvements, and there will be no reorganization for the benefit of the Debtors and their creditors.

On May 15, 2026, this Court dismissed the Debtors' original complaint ("**Original Complaint**") for recharacterization and other relief, without prejudice to repleading with additional facts demonstrating that the Ground Lease is not a true lease. The Debtors responded by adding and clarifying numerous facts demonstrating that the transaction of which the Ground Lease was a part – involving the acquisition of the Property for the Debtors' Project (the

"**Acquisition Transaction**") – reflects a relationship that is vastly different from an ordinary ground lessor-ground lessee relationship. For example, unlike in a traditional ground lease:

(1) the Ground Lease was executed as part of the Acquisition Transaction, which required the Debtors to pay almost $39 million (or almost 20%) of the Property's purchase price *directly to the seller* (Am. Cmplt. ¶ 56);

(2) the Ground Lease affirms, through an attached "Project Budget," that its purpose was to provide financing for the Debtors' acquisition of the Property in connection with their Project to convert the Property into a multi-family apartment complex (*id*. ¶¶ 32-40, 58);

(3) the Property – in conformance with MSP's own investment guidelines – was purchased specifically for the Debtors' use in connection with the Project (*id*. ¶¶ 59-60);

(4) the Ground Lease contains a "Right-Size Payment" provision which operates just like a common financial covenant in loan agreements that requires the maintenance of a defined ratio of income to debt service (a "**Loan Debt Service Covenant**"). Under this Right-Size Payment obligation, the Debtors owe an extraordinary $65 million payment in the tenth year of the Lease if net operating income for the Project does not meet unreasonably high thresholds, *even if rents are timely paid* (*id*. ¶¶ 66-67);

(5) the Ground Lease expressly recognizes that this $65 million payment, and the $39 million in purchase price contributions, among other payments, cannot be treated as rent under the Internal Revenue Code (the "**IRC**"), and thus characterizes these amounts as *loans from the Debtors to MSP* (*id*. ¶¶ 71-75); and

(6) the Right-Size Payment was designed to arise at a time when the Property would almost certainly not have the income to pay it, forcing a forfeiture of the Property and the $220 million of improvements on that Property, after only $1/10^{th}$ of the 99-year term of the Ground Lease.

(Am. Cmplt. ¶¶ 2-5, 54-75).

Put another way, even though MSP contributed only 43 percent of the total financing for the acquisition of the Property and development of the Project, through rejection or termination of the Ground Lease, MSP would receive 100 percent of the value in the tenth year of a 99-year lease. MSP would take both the Property, with the Debtors' original $39 million purchase price

contribution, and the Project, in which approximately $220 million has been invested to date. For MSP, this would be an enormous and unprecedented windfall of at least $259 million. For all other creditors in the Chapter 11 Cases, it would result in effectively no recovery whatsoever.

In response to the Amended Complaint's expansion of details, MSP's opening memorandum ("**Def. Br.**") (Adv. Pro. Dkt. No. 94) all but ignores them and baselessly contends that the Debtors have alleged nothing new. MSP does not directly address the newly articulated allegations in the Amended Complaint and, ultimately, merely contends (once again) that because the parties called the Ground Lease a "lease," it must be a true lease under the Bankruptcy Code (*see e.g.*, Def. Br. at 7, 21, 25).

That, of course, is not the standard here – if it were, recharacterization would never be granted in *any* case where an agreement is titled a "lease." As the Second Circuit Court of Appeals has recognized, in recharacterization analyses, "[t]he proper inquiry for a court . . . is whether 'the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship.'" *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.* ("***RPI***"), 936 F.2d 744, 748 (2d Cir. 1991) (quoting *In re PCH Assocs.,* 804 F.2d 193, 200 (2d Cir. 1986) ("***PCH I***")). Thus, the issue here is whether the following relationship can accurately be characterized as an "ordinary landlord/tenant relationship:"

> The Debtors: (a) contributed almost $39 million toward the purchase price of the underlying Property, which was simultaneously leased by MSP to the Debtors for 99 years; (b) invested over $220 million in a redevelopment Project on that Property for the agreed-upon purpose of constructing and operating a multi-family residential building; but (c) now must forfeit the entire, improved Property back to MSP after less than 1/20 of the lease term, not because the Debtors have failed to pay rent but because construction delays impacted the Project's future cash flows and MSP is demanding, only three years after the anticipated Project completion date, a $65 million "pay down" of its investment in the Property – a demand that (i) acts just like enforcement of a loan debt service coverage ratio, (ii) the tenant cannot possibly pay or raise so soon after completion, and (iii) the Internal Revenue Code forbids the parties from treating as rent.

It is plausible, and in fact quite probable, that this relationship is not an "ordinary landlord/tenant relationship." The Debtors' recharacterization claim is clearly plausible, the Motion should be denied, and the parties should move forward to a trial for which they have already prepared.[2]

## BACKGROUND

### I. Procedural History

On December 22, 2025, the Debtors filed the Original Complaint. (Adv. Pro. Dkt. No. 1). MSP moved to dismiss the Original Complaint on February 4, 2026. (Adv. Pro. Dkt. No. 15).

Because of the importance of the characterization of the Ground Lease to the resolution of these Chapter 11 cases, the Debtors and MSP agreed to an expedited schedule for the adjudication of the Original Complaint. From February to May 2026, the parties engaged in discovery, which included the exchange of tens of thousands of pages of documents, the depositions of several fact witnesses, and expert reports and related depositions. In light of these efforts, the parties are ready to proceed expeditiously to trial on the Amended Complaint.

On May 15, 2026, in open court, the Court granted MSP's motion to dismiss the Original Complaint but provided the Debtors leave to amend their complaint to add and/or clarify the factual allegations in the complaint and the relief sought. The Debtors promptly filed their Amended Complaint on June 10, 2026. (Adv. Pro. Dkt. No. 91).

[2] The Defendant is similarly wrong about the Debtors' repleaded causes of action for constructive fraudulent transfer with respect to the March 2024 Fourth Amendment to the Ground Lease (the "**Fourth Amendment**"). The Debtors' new allegations supporting those claims sufficiently state plausible claims under both federal and state fraudulent transfer law. (Am. Cmplt.¶¶ 83-87).

## II. <u>The Amended Complaint</u>

The facts related to this Adversary Proceeding, and the Debtors' repleaded recharacterization and fraudulent transfer claims, are set forth in robust detail in the Amended Complaint.[3]

## LEGAL STANDARD

"To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the plausibility of a claim, the court must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Ingrao v. AddShoppers, Inc.,* 2024 WL 4892514, at *5 (E.D. Pa. Nov. 25, 2024) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)).

## ARGUMENT

### I. The Amended Complaint Sufficiently <u>Alleges A Claim For Recharacterization Of The Ground Lease</u>

In adopting the relevant provisions of the Bankruptcy Code, Congress expressly recognized that the Code's treatment of leases should apply only to "true leases":

> Congress was not blind to the economic realities which have led to the use of a lease as a financing device or as collateral security. The legislative history to section 502 of the Code . . . makes clear the Congressional intention that the [section 365] limitation be applied to only true leases, with the determination that a lease is a true one to turn on the circumstances of each case and the economic substance of the transaction, not on the locus of title, form of transaction or the mere labelling as a lease. *See* 124 Cong. Rec. H. 11, 093–94 (Sept. 28, 1978); S 17, 410 (Oct. 6, 1978).

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in the Amended Complaint.

*In re 48th St. Steakhouse, Inc.*, 61 B.R. 182, 190 (Bankr. S.D.N.Y. 1986), *aff'd*, 77 B.R. 409 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 427 (2d Cir. 1987).

The touchstone for determining whether a lease is a "true lease" is the substance of the terms of the purported lease, rather than the label that the parties have affixed to the agreement in the past. *Constr. Loan Servs. II LLC v. Silverrock Dev., Co.*, *LLC (In re Silverrock Dev. Co., LLC)*, 2025 WL 3492145, at *3 (D. Del. Dec. 5, 2025) ("To determine whether it's a financing instrument or a true lease [the] court must look at the circumstances and economic substance of the agreement to discern the true nature of the instrument regardless of what [it] is called" (citation omitted)); *In re Montgomery Ward, LLC*, 469 B.R. 522, 529 (Bankr. D. Del. 2012) ("[T]he bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of the title, the form of the transaction or the fact that the transaction is denominated as a 'lease,' to determine whether the transaction embodies a 'true lease' or a financing transaction'") (quoting *PCH I*, 804 F.2d at 199)).

MSP correctly notes that the Ground Lease is presumed to be a true lease, but that presumption is rebuttable, and courts have provided significant guidance on the factors relevant to the rebuttal analysis. Here, the Ground Lease should be recharacterized because it both exhibits the majority of factors that courts have identified as relevant to a recharacterization analysis and, as part of the Acquisition Transaction, reflects other unique aspects that demonstrate it established something other than an "ordinary landlord/tenant relationship." *RPI*, 936 F.2d at 748.

### A. The Ground Lease Exhibits Almost All Of The Factors That Courts Have Relied On In Recharacterizing Leases

Of the several considerations that courts have looked to in determining whether to recharacterize a lease, the Ground Lease exhibits almost all of them. These factors were discussed forty years ago by the Second Circuit in *PCH I*, where the court affirmed the foundational principle

that bankruptcy courts must "look to the circumstances of the case and consider the economic substance of the transaction rather than the locus of the title, the form of the transaction or the fact that the transaction is denominated as a lease, to determine whether the transaction embodies a true lease or a financing transaction." 804 F.2d at 199 (citation modified). The court then discussed several different recharacterization considerations that later courts have synthesized into a non-exclusive list of factors in determining whether a lease is a "true lease," including:

> (1) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment;
>
> (2) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction;
>
> (3) whether the property was purchased by the lessor specifically for the lessee's use;
>
> (4) whether the transaction was structured as a lease to secure certain tax advantages;
>
> (5) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance;
>
> (6) whether the lease contains provisions which permit or require the lessee to purchase the premises for a nominal sum at the end of the lease term; and
>
> (7) an "unusually long term" for the lease.

*See PCH I,* 804 F.2d 200-01; *In re Montgomery Ward, LLC*, 469 B.R. 522, 530 (citing *In re Dena Corp.*, 312 B.R. 162, 170 (Bankr. N.D. Ill. 2004)); *In re Dena Corp.*, 312 B.R. at 170 (quoting *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency* (*In re Hotel Syracuse, Inc.*) (Bankr. N.D.N.Y. 1993) ("***Hotel Syracuse***")); *In re Integrated Health Servs., Inc.*, 260 B.R. 71, 76 (Bankr. D. Del. 2001) (citing *PCH I*, 804 F.2d at 200-01 and *Hotel Syracuse*, 155 B.R. at 838-839); *Hotel*

*Syracuse,* 155 at 838–839 (citing *PCH I,* 804 F.2d at 200-01); *In re Wingspread Corp.,* 116 B.R. 915, 923 (Bankr. S.D.N.Y. 1990) (citing *PCH I ,* 804 F.2d at 200-01).

The Amended Complaint sets forth in detail how the Ground Lease satisfies six out of these seven recharacterization factors:

(1) the rent payments under the Ground Lease were based not on market rates, but rather to ensure specific investor yield targets (Am. Cmplt. ¶¶ 61-62);

(2) the Ground Lease's "Project Budget" demonstrates that it was part of the acquisition and redevelopment financing for the Project (*id*. ¶¶ 32-40, 58);

(3) the Property was purchased for the sole purpose of leasing it to the Debtors for redevelopment and operation by the Debtors, not MSP (*id*. ¶¶ 59-60);

(4) MSP or its investors are advantageously allowed to avoid taxation on significant payments from the Debtors by characterizing them as "loans" from the Debtors, rather than as rent payments (*id.* ¶¶ 71-75);

(5) the Debtors assumed all the obligations of ownership of the Property, including paying of all real estate taxes, obtaining insurance at levels demanded by the Ground Lessor, keeping and maintain the Property in good condition, repair, and appearance (*id*. ¶ 78); and

(6) the Ground Lease has an unusually long, 99-year term (*id*. ¶ 77).

Importantly, courts have recognized that these factors are additive, and are not viewed in isolation. For example, in *RPI,* the Second Circuit was presented with a "triple net" lease, which obligated the lessee to pay property taxes, operating expenses, and similar costs associated with the operation of the leased property. 936 F.2d at 750-51. The Second Circuit cautioned that the "*indicia* of ownership" associated with a "triple net" lease "should not be viewed in isolation," due to "the increasingly common use of 'triple net' leases." *Id.* at 751. However, although that single factor was not dispositive, the Second Circuit noted that it was a "factor in our decision" combined with the other factors weighing in favor of recharacterization. *Id.* In that same case, the Second Circuit also noted that while "an unusually long term, standing alone, does not automatically signal

that an agreement is not a true lease", "in combination with other factors, it may lead to such a conclusion." *Id.* at 749.

Considering these well-established factors together, the allegations of the Amended Complaint weigh heavily in favor of a recharacterization of the Ground Lease and, at the very least, establish that a claim for recharacterization of the Ground Lease is "plausible," thus satisfying the pleading requirements of Rule 7008 of Federal Rule of Bankruptcy Procedure ("**Bankruptcy Rule**") and prohibiting dismissal of the Amended Complaint pursuant to Bankruptcy Rule 7012(b). The only missing factor – a provision for the Debtors to purchase the underlying Property – is not dispositive, as the Second Circuit has made clear in the cases discussed below.

### B. The Ground Lease Contains <u>Other Terms That Also Favor Recharacterization</u>

Recharacterization is even more plausible here because of the other extraordinary non-lease terms in the Ground Lease. As this Court has recognized (Bankr. Dkt. No. 447 (4/21/2026 Tr.) at 146:19-147:5; Adv. Pro. Dkt. No. 90 (5/15/26 Tr.) at 4:18-25), cases recharacterizing leases often involve considerations beyond the factors discussed in *PCH I* and its progeny. For example, in *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*, 2024 WL 5113165, at *3 (2d Cir. Dec. 16, 2024), the Second Circuit focused on the fact that the debtor-tenant had prepaid 30 years of rent on a 100-year lease for a shopping mall. And, although that rent amounted to only $300 ($10 a year for 30 years), the Court held that allowing a lessor to "recapture" a leased premises decades before the termination of the lease would be a "grossly inequitable" windfall that supported recharacterization. 2024 WL 5113165, at *3 (to permit MOAC "to recapture the leased premises over sixty years before the expiration of the MOAC Lease would amount to a windfall to MOAC . . . . That a present reversion to [MOAC] would be grossly

inequitable bolsters our conclusion that § 365(d)(4) does not apply to this unusual transaction" (citation modified)). Similarly, in *RPI,* the Second Circuit found that $97,830 in prepaid rent, when considered with a 99-year lease term and significant improvements, was not "the kind of agreement Congress envisioned as being subject to § 365(d)(4)." 936 F.2d at 750.

Both of these Second Circuit decisions affirmed lease recharacterizations even where, as here, there was no provision permitting the tenant to purchase the leased property at any point in time.[4] The underlying focus of both *MOAC* and *RPI* was not some future opportunity to purchase the property by the tenant-debtor, but rather the life span of the intended use of the property, the grossly premature forfeiture of that property, and any improvements made to the property by the tenant-debtor.

Such concerns exist here as well and in greater magnitude: as noted, the Debtors paid almost $39 million toward the purchase of the Property (or almost 20% of the purchase price) and have spent approximately $220 million on construction and other costs related to the completion of the Project. Yet, all of this Debtor-created value would be lost by the tenth year (or, pursuant to the Chapter 11 Cases, by as little as the fifth year) of a 99-year lease if the Ground Lease is determined to be a true lease. (Am. Cmplt. ¶¶ 4-7) The Second Circuit faced a very similar issue in *RPI*:

> To permit [RPI] to recapture the leased premises with the manufacturing facility improvements would amount to a "windfall" to RPI. RPI might argue that there is no "windfall" since the property, including the manufacturing facility, reverts to it in 2082 at the end of the 99 year term. However, the windfall is the current value today of the premises improved by a relatively new manufacturing facility, less the "present value" in economic terms of a reverter of the premises in an unknown state of improvement in 91 years. That a present reversion to RPI would be grossly inequitable bolsters our conclusion that § 365(d)(4) does not apply to this unusual transaction.

[4] Although the existence of such a term is not discussed in *MOAC*, it is highly unlikely that a shopping mall tenant would ever have a right to purchase the fee underlying its leased store space.

936 F.2d at 751. As in *RPI,* MSP should not be allowed a windfall, which in this case would be at least $259 million.

The Amended Complaint also details the loan-like requirements of the Right Size Payment. (Am. Cmplt. ¶¶ 63-70). Traditional leases involve the payment of agreed-upon rents and costs associated with the maintenance and upkeep of the underlying property. The Right-Size Payment is something very different and operates like a loan debt service coverage ratio. Such a covenant requires a paydown of a loan when income drops as a ratio to required debt service. The Right-Size Payment arises in the exact same circumstances: where, as here, the Debtors experience difficulty in completing construction and timely generating a benchmarked net operating income from the Property, the Debtors are compelled to transfer to MSP tens of millions of dollars to "pay down" MSP's investment in the property. This Right Size Payment punishes the Debtors *even if the Debtors are timely paying rent in full.* (Am. Cmplt. ¶ 66). Because of the draconian terms that MSP demanded from the Debtors in the Fourth Amendment, that penalty payment now stands at $65 million in 2032 (Am. Cmplt. ¶¶ 4-5, 46-50, 67-70), a sum the Debtors cannot possibly pay or finance.

Proof that the Right-Size Payment is not a traditional lease term can be found in the express terms of the Ground Lease. Four times in the Ground Lease and its amendments, extraordinary tenant payment obligations are referred to as "prepaid" or "additional" rent, but MSP ultimately treats them as loans because the IRC precludes rent treatment:

(1) the Debtors' $36.85 million contribution to the purchase of Units 1701 and 1702 (Ground Lease, § 5(d));

(2) the Debtors' $2 million contribution to the purchase of Unit 1706 (Ground Lease, § 47(e));

(3) the Right-Size Payment (Ground Lease, § 60(d)); and

(4) any buy back of rent under the Fourth Amendment (Fourth Amendment, §7(e)).

(Am. Cmplt. ¶¶ 71-75).

As MSP concedes, IRC § 467 forbids the treatment of these payments as rent and, therefore, the Ground Lease contains language identical or similar to the following for all four of these extraordinary payments: "[f]or all U.S. federal, state and local tax purposes, Landlord and Tenant shall treat the Prepaid Rent as a prepayment of Additional Rent that is treated as a loan pursuant to Section 467 of the Code." (Am. Cmplt. ¶ 73). Two of the extraordinary payments have already been paid: the Debtors' contribution to the purchase of Units 1701 and 1702 and the Debtors' contribution to the purchase of Unit 1706. MSP concedes that it has not repaid any of these "loans" to the Debtors or credited any of these payments against rent. (*Id.* ¶ 74).

### C. The Original Complaint's Dismissal Does Not Implicate The Law Of The Case Doctrine

MSP also argues that the Court should dismiss the Amended Complaint because its order dismissing the Original Complaint is now law of the case and cannot be revisited. (Def. Br. at 26-28). Of course, this contention – which identifies no specific legal ruling by the Court other than the dismissal itself – ignores the fact that the dismissal was without prejudice to the Debtors amending with additional allegations. (*See* Adv. Pro. Dkt. No. 90 (5/15/26 Tr.) at 8:11-14). If MSP were right – and law of the case applied even where leave to amend is granted – Bankruptcy Rule 7015's provision permitting parties to amend with leave of Court would be effectively written out of the Bankruptcy Rules.

Tellingly, none of MSP's cases involve the procedural posture of this current case, *i.e.,* a motion to dismiss an amended complaint following dismissal of the original complaint with leave

to amend.[5] (Def. Br. at 27). Instead, courts routinely find that a prior ruling on a motion to dismiss does not implicate law of the case when the issue is whether an amended complaint has plausibly stated a claim. *See, e.g., Comer v. Am. Transmission Sys., Inc.,* 2025 WL 1530750, at *10 n.14 (W.D. Pa. May 29, 2025) ("In this matter, in which the Court previously dismissed all claims, including the claim against [defendant] *without prejudice* to amendment, the law of the case does not bar the Court's consideration of whether Plaintiff has, in his FAC, stated a plausible claim against [defendant]" (emphasis in original)); *United States ex. rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 493 (3d Cir. 2017) ("Therefore, interlocutory orders . . . remain open to trial court reconsideration, and do not constitute the law of the case. And the grant of a leave to amend is an interlocutory order" (citation modified)); *In re Olick,* 565 B.R. 767, 792 n.38 (Bankr. E.D. Pa. 2017) (noting law of the case doctrine "is not employed when the earlier decision was in the context of a motion to dismiss"), *aff'd*, 829 F. App'x 586 (3d Cir. 2020).

This rule is especially true where, as here, a plaintiff has pled additional facts not previously considered:

> [I]t does not follow that the law of the case doctrine controls this motion to dismiss. The reason for this conclusion is clear – the "law of the case" on which Plaintiff seeks to rely is this Court's screening of Plaintiff's *original* complaint. Plaintiff's filing of an amended complaint, in which he pled facts which are not identical to those in his original complaint, changed the factual allegations which are before this Court. Thus, this case fits the exception to the law of the case doctrine where that doctrine is inapplicable – where the facts of the case have essentially changed and the law as it applies to the facts as they now stand must be re-evaluated.

[5] The cases cited by MSP, *Christianson v. Colt Indus. Operating Corp.* 486 U.S. 800 (1988); *Hamilton v. Leavy*, 322 F.3d 776 (3d Cir. 2003); *In re Cont'l Airlines, Inc.,* 279 F.3d 226, 228 (3d Cir. 2002); *In re City of Philadelphia Litig.* 158 F.3d 711 (3d Cir. 1998); and *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111 (3d Cir. 1997), all considered whether prior appellate court decisions in those same litigations were law of the case in subsequent proceedings. Procedurally, all of these cases were either post-transfer, post-plan confirmation, post-summary judgment or post-trial.

*Farmer v. Lanigan*, 2016 WL 4107693, at *3 (D.N.J. Aug. 1, 2016); *see also Network Apps, LLC v. AT&T Mobility LLC,* 778 F. Supp. 3d 610, 619–20 (S.D.N.Y. 2025) ("By contrast, to the extent that a plaintiff has offered new claims or factual allegations that arguably address the deficiencies the Court previously identified, the Court will consider those claims anew." (citation modified)); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 185 n.14 (D.N.J. 2022) ("In the case of a motion to dismiss, the law of the case doctrine does not apply where, as here, new allegations have been made which change the nature of the record and place it in an altogether different state than it was in at the time the Court decided the issue at hand").

### D. Defendant's Renewed "Quasi-Estoppel" Argument Is Baseless

In addition, MSP once again contends that the Debtors are "estopped" from bringing a recharacterization claim because they have referred to the Ground Lease as a "lease" in the past. (Def. Br. at 22-23). This contention is still meritless for several reasons.

First, the issue here is whether the Ground Lease is a "true lease," not whether it is called a lease. As this Court recognized during argument on MSP's original motion (Bankr. Dkt. No. 447 (4/21/2026 Tr.) at 122:22-123:7, 128:9-15), recharacterization analysis focuses on the economic substance of the Ground Lease and not how it is labeled. *See also PCH I*, 804 F.2d at 199 ("Furthermore, the bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than 'the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease"' to determine whether the transaction embodies a 'true lease' or a financing transaction." (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 64)); *In re Anadrill Directional Servs. Inc.,* 676 B.R. 860, 869 (Bankr. S.D. Tex. 2026) (noting that when applying New York law in a recharacterization analysis "courts look to the substance, not merely the form of an agreement."); *Montgomery Ward*, 469 B.R. at 528 ("Simply labeling an agreement a 'lease' does not necessarily create a true lease."); *Hotel Syracuse*, 155 B.R. at 838

("In making this determination a court is not constrained by the labels placed upon the transaction by the parties. Rather, the court must look to the economic substance of the transaction to determine whether it is in fact a 'true' lease"). Accordingly, the fact that a lease was called a lease does not, as MSP would have, resolve the issue of whether it is a "true lease."

Second, as the Defendant's own case law states, "[t]he doctrine [of quasi-estoppel] only applies when the earlier position amounts to a misstatement of fact, not of law . . . ." *Amgen Inc. v. Sanofi*, 2019 WL 259099, at *4 (D. Del. Jan. 18, 2019) (citations omitted). Whether the Ground Lease is a true lease is a matter of contract construction and thus a legal, not factual, issue. (*See supra* pp. 5-9). Tellingly, *none* of the authority that the Defendant cites in its brief addresses quasi-estoppel in the context of a recharacterization claim.

Third, the Defendant's entire quasi-estoppel argument rests on the circular contention that since the Debtors called the Ground Lease a lease, the Debtors "benefit[ed]" from a lease, and cannot now challenge that lease. (*See, e.g.*, Def. Br. at 25 ("[G]iven that Parkview and Debtors accepted the benefits of the Lease, they are estopped from now taking an inconsistent position with the Lease and the numerous agreements based upon the Lease's validity to avoid the obligations or effects under the Lease.")). However, the Debtors dealt with the Ground Lease based on its economic substance, which is not that of a true lease. Once again, the critical issue here is economic substance, and the consideration of economic substance requires a trial on the Debtors' claims.[6]

---

[6] In any event, quasi-estoppel is an equitable doctrine turning on factual issues of context and fairness. *See, e.g., Teleprompter of Erie, Inc. v. City of Erie*, 567 F. Supp. 1277, 1282 (W.D. Pa. 1983) ("[Q]uasi-estoppel . . . is regarded as a species of equitable estoppel."). The Defendant's theory here depends on disputed inferences about "benefits" "inconsistencies," and "unconscionability" (Def. Br. at 22) that cannot be resolved against Debtors on a motion to dismiss. *See J&R Passmore, LLC v. Rice Drilling D, LLC,* 2024 WL 1347291, at *15 (S.D. Ohio Mar. 29, 2024) (denying summary disposition where quasi-estoppel required "too fact-intensive of an inquiry"); *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, 2022 WL 609213, at *2 (D. Del. Jan. 27, 2022) ("Equitable estoppel is a fact-intensive inquiry.").

**E. <u>The Amended Complaint Complies With The Court's May 15 Requests</u>**

During the May 15, 2026 hearing, the Court requested that, if the Debtors chose to amend their complaint, they include additional recharacterization allegations and "all forms of relief that you seek and require with respect to the ground lease, in order to move the Chapter 11 cases forward, including any counts to determine the validity, priority, or extent of any purported liens of the ground lessor under Rule 7001(b), and whether Parkview should be added as a necessary party is also an issues [*sic*] that needs to be considered" (Adv. Pro. Dkt. No. 95 (5/15/26 Tr.) at 9:8-14). The Debtors have done just that with the extensive allegations set forth in the Amended Complaint.

Nonetheless, MSP contends that the Debtors "did not follow the Court's instruction to assert what the Lease is if not a true lease, or name Parkview as a necessary party." (Def. Br. at 18). This statement is demonstrably false: the vast majority of the Amended Complaint's paragraphs address the fact that the Ground Lease is not a true lease (*see, e.g.,* Am. Cmplt. ¶¶ 1-10, 21-82), and no less than ten paragraphs address the relief that the Debtors seek (*id.,* ¶¶ 88-97).

Furthermore, the Court did not expressly direct the Debtors to add Parkview as a party to this adversary proceeding, and the existing case law on recharacterization demonstrates that such a joinder is unnecessary. As the Second Circuit recognized in *PCH I*, in a recharacterization action like this one, the initial issue under section 365 of the Bankruptcy Code is whether the lease is a "true" or "bona fide" lease:

> We interpret section 365(d)(3), (4) of the Bankruptcy Code to apply solely to a "true" or "bona fide" lease. The Ground Lease is not, in our opinion, a true lease as contemplated therein, and we find that determination dispositive of the case. It is unnecessary, therefore, to identify the transaction as a joint venture, security agreement, subordinated financing, or other investment scheme. Suffice it to say that it is not a bona fide lease for purposes of the Bankruptcy Code.

804 F.2d at 198-99. In *PCH I,* the court determined that the disputed lease was not subject to section 365 of the Bankruptcy Code, and then determined, in later proceedings, how the lease would be treated. *See Liona Corp., N.V. v. PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991). The Amended Complaint requests that exact process. (Am. Cmplt. ¶¶ 88-97).

**F. <u>MSP's Analysis Of The Ground Lease's Terms Is Fundamentally Flawed</u>**

Finally, MSP contends that the Ground Lease reflects an ordinary landlord–tenant relationship by citing only a few of its terms and ignoring the factors discussed above. (Def. Br. at 23). However, even when the terms that MSP relies upon are considered, they do not support its contention that the Ground Lease is just an ordinary lease transaction.

First, MSP relies on the fact that there is no provision for the Debtors to purchase the Property at the end of the lease term, but both *MOAC* and *RPI* make clear that the absence of such a contract term is insignificant where, like here, the application of section 365 would result in an inequitable forfeiture of debtor assets. (*See supra* pp. 8-11). Next, MSP relies on its "absolute and unconditional right" to sell its interest in the Property (Def. Br. at 23), but as the Amended Complaint explains, no such absolute right exists in Section 11 of the Ground Lease. (Am. Cmplt. ¶ 81). Moreover, even assuming Section 11 permits MSP to sell the Condominium Units subject to the Ground Lease, a change in ownership does not transform a disguised financing arrangement into a true lease. Also, if MSP's interest is as a lender, the right to sell or assign that interest is a very common right of a lender. MSP also relies on the fact that the Debtors are restricted in their right to use or transfer their leasehold interest, and that MSP has a priority interest with respect to the Property, but similar provisions are common in loan agreements, as evidenced by the Parkview loan agreements accompanying MSP's Motion. (*See, e.g.,* Adv. Pro. Dkt. No. 95 (McGuire 5/5/26 Decl.) Exh. E (Building Loan Agreement, dated May 4, 2022), §§ 8.2-8.7 (required construction

activities), 8.13 (requirements for changes to project costs), 8.21 (limitations on transfers), 8.23 (limitations on assignments); Exh. G (Building Loan Leasehold Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated May 4, 2022)). Finally, MSP relies on the fact that the Debtors must maintain the Property, and that MSP can, with reasonable notice, visit the Property (Def. Br. at 23), but once again, such terms are common in real estate loan transactions (*see, e.g.,* Adv. Pro. Dkt. No. 95 (McGuire 5/15/26 Decl.) Exh. E, §§ 8.6 (compliance with laws, permitting requirements), 8.10(a) (right of lender to enter and inspect property), 8.22 (payment of taxes and other liabilities)).

Of course, MSP makes no mention of the decidedly non-lease aspects of the Ground Lease that do not fit within their self-serving presentation, including the Debtors' significant contribution to the purchase price of the Property, the fact that rent is based on investor-expected yields and not market rental rates, the simultaneous purchase and leasing of the Property, the Project Budget that reflects MSP's participation in the Project's capital stack, the original Right Size Payment, the amended Right-Size Payment in the Fourth Amendment, and the fact that the Right Size Payments provisions act much like a paydown of debt under a loan debt service coverage covenant.

Recharacterization is a plausible outcome here (indeed, much more than plausible) based on the well-pled allegations of the Amended Complaint, and MSP's motion to dismiss the Debtors' recharacterization claims in this Adversary Proceeding should be denied.

## II. The Debtors Have Alleged Viable Claims to Avoid the Fourth Amendment as a Fraudulent Conveyance

Finally, MSP also contends that the Debtors' fraudulent transfer claims (Cmplt. ¶¶ 102-118 (Counts II through V)) should be dismissed but relies almost exclusively on its contention that the Fourth Amendment was agreed to and thus must be enforced. (Def. Br. at 28-29). The Bankruptcy Code provides to the contrary: section 548 expressly contemplates that a transaction subject to

fraudulent transfer may have been "voluntarily" made by the debtor. 11 U.S.C. § 548 (a)(1). *See also In re R.M.L., Inc*., 92 F.3d 139, 148 (3d Cir. 1996) (concluding that non-refundable fees paid pursuant to commitment letter were nonetheless avoidable as fraudulent conveyances because they did not convey reasonably equivalent value to the debtor); *In re BYJU's Alpha, Inc*., 2025 WL 659092, at *14 (Bankr. D. Del. Feb. 27, 2025) ("Any otherwise legal transfer may be avoided under § 548 if the requirements of that section are otherwise met") (citation omitted); *In re EBC I, Inc*., 356 B.R. 631, 640-641 (Bankr. D. Del. 2006) ("[F]raudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors," and that "[a] transfer may be fraudulent even if it is made in accordance with the terms of a contract between the parties" (citation omitted)).

Although MSP raises the specter of "particularity" with respect to these fraudulent transfer claims (Def. Br. at 29-30), the more recent case law in this Circuit holds that the particularity requirements of Federal Rule of Civil Procedure 9(b), made applicable in the Adversary Proceeding by Bankruptcy Rule 7009, do not apply to constructive fraudulent transfer claims like those asserted here. *See, e.g., In re Modell's Sporting Goods, Inc.*, 2023WL 2961856, at *23 (Bankr. D.N.J. Apr. 14, 2023) ("Rule 9(b) may apply to certain claims brought under § 548 of the Bankruptcy Code. However, . . . when the claim is constructive fraud, the great majority of cases hold that since a cause of action based on constructive fraud does not require proof of fraud, the heightened pleading requirements of Rule 9(b) are not applicable.") (quotation omitted); *NCA Inv'rs Liquidating Trust v. Berkowitz, Trager & Trager, LLC (In re Seaboard Hotel Mbr. Assocs., LLC)*, 2021 Bankr. LEXIS 1564, at *48 (Bankr. D. Del. June 10, 2021) ("A plaintiff pleading constructive fraud, as opposed to actual fraud, does not need to meet the heightened standard of

Rule 9(b). Constructive fraud is just that—a statutory construct—which in no way depends upon any fraudulent conduct by a defendant."). And, even if the particularity standard did apply here, MSP fails to identify what particulars are missing from the Amended Complaint.

The Debtors have adequately pled the necessary statutory requirements for fraudulent conveyance. Insolvency is adequately pled: the Debtors allege that the Fourth Amendment was executed at a time when they were insolvent and provide specific numbers demonstrating that the Debtors' liabilities exceeded their assets. (Am. Cmplt. ¶¶ 51-53). In any event, "insolvency is best left to discovery to determine and should not generally be decided on a motion to dismiss." *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 270 (Bankr. D. Del. 2019). "This is because the determination of insolvency is highly fact-specific and should be based on reasonable appraisals or expert testimony." *Id*. (citation omitted); *see also In re DBSI, Inc*., 445 B.R. 344, 349 (Bankr. D. Del. 2011) ("[I]nsolvency is generally a factual determination not appropriate for resolution in a motion to dismiss.").

The Debtors have also pleaded specific provisions of the Fourth Amendment that transferred value to MSP without the Debtors receiving reasonably equivalent value in return (Cmplt. ¶¶ 46-50), and MSP fails to demonstrate otherwise. Further, like insolvency, reasonably equivalent value is not properly determined on a motion to dismiss. *See PennySaver*, 602 B.R. at 267 ("Reasonably equivalent value and insolvency are generally factual determinations that should be reserved for discovery."); *In re Green Field Energy Servs., Inc*., 2015 WL 5146161, at *8 (Bankr. D. Del. 2015) ("Given the wide number of variables to consider, and the less stringent pleading requirements of Rule 8(a)(2) to constructive fraud claims, '[t]he issue of "reasonably equivalent value" requires a factual determination that cannot be made on a motion to dismiss.'"

(citation omitted)); *In re Charys Holding Co., Inc.*, 443 B.R. 628, 638 (Bankr. D. Del. 2010) (same).

The Debtors' fraudulent transfer claims are viable and plausible, and the Motion should be denied as to these claims as well.

**CONCLUSION**

For all the reasons set forth above, the Motion should be denied in its entirety.

DATED: Wilmington, Delaware
July 30, 2026

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ William E. Chipman*

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
olivere@chipmanbrown.com
bach@chipmanbrown.com
maser@chipmanbrown.com

*Counsel for Debtors and Debtors in Possession*

BOIES SCHILLER FLEXNER LLP
Robert D. Gordon
Michael M. Fay
Jenny H. Kim
Sabina Mariella
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Email: rgordon@bsfllp.com
mfay@bsfllp.com
jkim@bsfllp.com
smariella@bsfllp.com

*Counsel for Debtors and Debtors in Possession*