# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case Nos. 25-11853(KBO)<br><br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br><br>Defendant. | Adv. Proc. No. ~~25-~~ 25-52471(KBO) |

~~**COMPLAINT**~~

**AMENDED COMPLAINT**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

# TABLE OF CONTENTS

INTRODUCTION ........ 1

PARTIES ........ 6

JURISDICTION AND VENUE ........ 7

FACTUAL ALLEGATIONS ........ 7

A. History of the Hudson Hotel Building ........ 7

B. Financing The Project ........ 9

C. Initial Construction Efforts ........ 14

D. The Fourth Amendment ........ 16

E. The Debtors Were Insolvent At All Relevant Times ........ 17

FACTS SUPPORTING RECHARACTERIZATION ........ 18

A. The Debtors Paid Almost $39 Million Directly To The Seller For The Purchase Of The Condominium Units ........ 19

B. The Ground Lease Expressly Recognizes That MSP Was Providing Financing To The Capital Stack For The Debtors' Acquisition Of The Property And Development of the Project ........ 19

C. The Property Was Purchased Solely In Connection With The Debtors' Conversion Project ........ 20

D. The Ground Lease's "Rents" Are Based On Targeted Investor Yields And Not Market Rental Rates ........ 20

E. The Ground Lease Required An Extraordinary Non-Rent Payment With 94 Years Left On Its Term ........ 21

F. The Fourth Amendment Requires An Even Larger Non-Rent Payment With 89 Years Left On The Ground Lease's Term ........ 22

G. The Extraordinary Payments Cannot Be, And Are Not, Treated As Rent In The Ground Lease Or Fourth Amendment ........ 23

H. The Ground Lease Is Not A Ground Lease: Neither MSP Nor The Debtors Ever Owned The Land Under The Condominium Units ........ 25

I. So-Called Modern Institutional Ground Leases, Like The Ground Lease Here, Are Admitted In The Industry To Be At Risk Of Recharacterization ........ 25

J. Other Considerations ... 26

FACTS SUPPORTING FRAUDULENT TRANSFER ... 28

DEBTORS' REQUESTED RELIEF ... 29

CAUSES OF ACTION ... 32

COUNT I: Declaratory Judgment That The Ground Lease Is Not a True Lease Under 11 U.S.C. § 365 ... 32

COUNT II: Avoidance of Fraudulent Transfer (Fourth Amendment) Pursuant to 11 U.S.C. § 548(a)(1)(B) – Constructive Fraud ... 33

COUNT III: Avoidance of Fraudulent Transfer (Fourth Amendment) Pursuant to 11 U.S.C. § 544(b)(1) – New York Uniform Voidable Transactions Act ... 34

COUNT IV: Recovery of Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B) and 550(a) ... 35

COUNT V: Disallowance of Defendant's Claims Pursuant to 11 U.S.C. § 502(d) ... 35

PRAYER FOR RELIEF ... 36

[Different first page link-to-previous setting changed from off in original to on in modified.].

Debtors and plaintiffs Hudson 1701/1706, LLC and Hudson 1702, LLC (together, the **"Debtors"** or **"Plaintiffs"**), the debtors and debtors in possession in the above-captioned jointly administered chapter 11 bankruptcy cases (the "**Chapter 11 Cases**"), as and for their Amended Complaint in the above-captioned adversary proceeding (the "**Adversary Proceeding**") against Defendant 356W58 Ground Lessor LLC (the **"Defendant"**), an affiliate of MSP Capital Management, L.L.C., d/b/a Montgomery Street Partners (together with the Defendant, "**MSP**"), allege as follows:

**INTRODUCTION**

1. This action involves a Purported Ground Lease, as defined and described below, entered into between Plaintiffs and Defendant on May 4, 2022, together with the amendments thereto in connection with the financing of Plaintiffs' planned redevelopment of the former Hudson Hotel in New York, New York (the "Hudson")[2] within the real property known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street, New York, New York (the "Property"). Adversary Proceeding is commenced pursuant to: (a) the equitable doctrine of lease recharacterization, and (b) the law of fraudulent transfer, as provided for in sections 544, 548, and 550 of title 11 of the United States Code (the "**Bankruptcy Code**"), and under relevant state law. Each of these bodies of law – recharacterization and fraudulent transfer – exists in bankruptcy proceedings for one primary purpose: to avoid and unwind transactions that would result in inequitable forfeitures of estate assets that benefit one creditor to the detriment of other creditors.

---

[2] As used herein, the term "Hudson" refers, collectively, to Condominium Units 1701, 1702, and 1706 in the Property as further detailed below and the Unit numbers for the Condominium Units refer to the Lot numbers on the tax maps of The City of New York..

[Different first page link-to-previous setting changed from off in original to on in modified.].

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

2. With respect to recharacterization, the lease at issue here is a ground lease executed by the Debtors and Defendant on May 4, 2022 (the "**Ground Lease**;" a copy of the Ground Lease is attached hereto as **Exhibit A**). The terms of the Ground Lease, both in its initial form and as amended, make clear that it is not an ordinary agreement between a lessor and lessee. *First*, unlike a traditional lease agreement:

(a) the Ground Lease was executed as part of a transaction (the "**Acquisition Transaction**") which required the Debtors to pay almost $39 million to a subsidiary of Cain International, Inc. ("**Cain**"), the seller, as part of the purchase price for the acquisition of the three condominium units in the former Hudson Hotel in New York City that are the subject of the Ground Lease (the "**Property**");

(b) the Ground Lease affirms, through an attached "Project Budget," that MSP's role in the Acquisition Transaction, and thus the purpose of the Ground Lease, was to provide acquisition financing as part of the capital stack for the Debtors' acquisition and conversion of the Property into a multifamily apartment complex (the "**Project**");

(c) the Property – in conformance with MSP's own investment guidelines – was purchased specifically for the Debtors' use in completing the Project;

(d) the Ground Lease required an extraordinary payment – called a "Right-Size Payment" – in the fifth year of the lease if short-term income projections were not met (akin to a loan's coverage ratio), *even if rent was being timely paid*;

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

[Link to previous setting changed from off in original to on in modified.].

(e) MSP's representatives have conceded that "rents" under the Ground Lease were calculated to provide its investors with a particular rate of return, not by reference to market rental rates;

(f) the Defendant, as the ground lessor, does not even own – and thus cannot possibly lease – the "ground" (*i.e.,* the land on which the Property sits); and

(g) the Ground Lease contains additional provisions often found in leases that courts have determined are not "true leases".

3. These financing characteristics were structural features of the Acquisition Transaction and the Ground Lease from its inception in May 2022. MSP and its affiliate GLR (defined below) marketed their ground lease structure to investors as an "*interest only*, 99-year financing product intended to maximize Sponsor returns and *address capital requirements* for core to opportunistic real estate investments" (emphasis added)—the language of lending, not leasing. MSP's own correspondence to the Debtors described the Ground Lease as providing an "exceptionally low cost of capital"—again, the language of lending, not leasing.

4. *Second*, the Ground Lease contains unique non-rent terms that are also not found in traditional ground leases. For example, the Ground Lease, as amended, necessitates an extraordinary, non-rent $65 million Right-Size Payment by the Debtors in 2032 – *i.e.,* only three years after the Project is scheduled to be completed. The Ground Lease expressly recognizes that this sum cannot be treated as rent under the Internal Revenue Code (the "**IRC**"), and thus calls this amount *a loan from the Debtors to MSP*. In fact, the Ground Lease contains four different extraordinary, non-rent payments that are ultimately treated as "loans" from the Debtors to MSP (and *not* as pre-paid rent). Under a true ground lease, a lessor collects agreed-upon rent and has a

[Link to previous setting changed from off in original to on in modified.].

~~[Link-to-previous setting changed from off in original to on in modified.].~~

reversionary interest when the lease term expires; the lessor does not collect tens of millions of dollars in payments that defy the IRC's treatment of rent and are called loans.

5. Further, the $65 million non-rent, Right-Size Payment was designed to arise at a time when the Property would almost certainly not have the income to pay it. Indeed, the Debtors forecast that in 2032 – even if the Project proceeds according to current plans – they will not have the revenue to pay, or the ability to finance, a $65 million payment. (Once again, this payment is in addition to annual rent of $8.75 million.) Accordingly, without recharacterization, the Debtors will be compelled to reject the Ground Lease, resulting in a complete forfeiture to MSP of the Debtors' only asset, the Project, with a current value of well over $200 million. Put another way, through rejection or termination of the Ground Lease, even though MSP contributed only 43 percent of the total financing for the acquisition and development of the Property, MSP would receive 100 percent of the value: both the Property and the Project, in which approximately $216 million has been invested to date. For MSP, it would be an enormous and unprecedented windfall just four years into a 99-year purported lease. For all other creditors in the Chapter 11 Cases, it would result in effectively no recovery whatsoever.

6. The well-established bankruptcy law governing lease recharacterization precludes such a lopsided result. As the Second Circuit Court of Appeals recognized in *Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 200 (2d. Cir. 1986) (*"**PCH I**"*):

> If security transactions, loans and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the 'lessor' gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate. This is especially apparent in the case at bar. If successful, Liona would enjoy the benefit of its contract with PCH to the detriment of others having valid claims against the bankrupt's estate. However, if there is no true lease, Liona should not

~~[Link-to-previous setting changed from off in original to on in modified.].~~

*[Link-to-previous setting changed from off in original to on in modified.].*

be permitted to escape the consequences of investor/creditor status by invoking the labels of 'landlord' and 'lease.'

2. This Complaint seeks recharacterization of the Purported Ground Lease, which, while disguised as a "lease," does not resemble a ground lease, and certainly not the economic realities of a true lease by any definition of that term. Rather, the sum and substance of the Purported Ground Lease is that of a financing arrangement. This action follows the Plaintiffs' review of the Purported Ground Lease, as well as the facts and circumstances that led to the execution of the Purported Ground Lease, all of which overwhelmingly indicate that the Purported Ground Lease is a disguised financial product. Plaintiffs initially sought to recalibrate the Purported Ground Lease to reflect the true value of the use of the Hudson directly with the Defendant. This effort took place through reasonable, good-faith discussions, but Defendant rejected every single attempt. Plaintiffs have been left with little choice but to seek to redefine the Purported Ground Lease to reflect its actual substance and purpose and avoid Defendant's attempt to take advantage of the favorable treatment of "leases" under the Bankruptcy Code to the detriment of the Plaintiffs' and their other creditors.

3. As detailed herein, the Purported Ground Lease embodies many of the hallmarks of a disguised financing agreement, including, *inter alia*, that; (a) the "rent" payments were calculated to ensure Defendant saw a return on its investment and were not related to the market value of the tenancy; (b) it required an upfront payment (so-called "prepaid rent") in excess of $36 million, essentially equivalent to an 18% down payment or an equity contribution; (c) it requires a "Right-Size Payment" equivalent to an equity cure provision in a loan; (d) Defendant purchased the Hudson specifically as part of an arrangement to finance Plaintiffs' acquisition and redevelopment of the Hudson; and (e) it burdens Plaintiffs with all of the obligations typically associated with outright ownership. Taken together, it is clear that the Parties did not intend to enter a true lease and that Defendant was instead financing the purchase of the Hudson as part of Plaintiffs' redevelopment plan. Indeed, Defendants themselves touted their purported ground leases as a "financing product" in their contemporaneous communications and advertisements concerning the Purported Ground Lease.

7. These considerations are particularly significant in these Chapter 11 Cases, where the absence of lease recharacterization will result in the forfeiture of everything the Debtors own

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

and the massive investments the Debtors have made. As the United States Supreme Court has held, a "bankruptcy court does not look with favor upon forfeiture clauses in leases. They are liberally construed in favor of the bankrupt lessee so as not to deprive the estate of property which may turn out to be a valuable asset." *Finn v. Meighan*, 325 U.S. 300, 301 (1945). *See also Jones v. N.Y. Guaranty and Indemnity Co.*, 101 U.S. 622, 628 (1879) ("A court of equity abhors forfeitures, and will not lend its aid to enforce them"). MSP should not be allowed to walk away with both the Property and an additional $216 million "prize" where the lease in question is not a true lease.

4.8. Accordingly, Plaintiffs seek a declaratory judgment that the Purportedin this Amended Complaint the Debtors seek an order declaring that the Ground Lease is not a "true lease," but rather is a disguised financing arrangement. Thus, the interests created by the Purported Ground Lease are properly excluded from application of Bankruptcy Code sections 365 and 1123. Rather, the Purported Ground Lease transaction is subject to Section 506 under section 365 of the Bankruptcy Code. As the *PCH I* court recognized, in a recharacterization action like this one, the initial issue under section 365 of the Bankruptcy Code is whether the lease is a "true" or "bona fide" lease; if it is not, then section 365 does not govern the instrument:

5. In addition, Plaintiffs assert that the Fourth Amendment to the Purported Ground Lease was entered at a time when Plaintiffs were insolvent or rendered Plaintiffs insolvent and for less than reasonably equivalent consideration received by Plaintiffs in exchange and is avoidable under Bankruptcy Code sections 548 and 544 and applicable non-bankruptcy law and recoverable under section 550 of the Bankruptcy Code.

> We interpret section 365(d)(3), (4) of the Bankruptcy Code to apply solely to a "true" or "bona fide" lease. The Ground Lease is not, in our opinion, a true lease as contemplated therein, and we find that determination dispositive of the case. It is unnecessary, therefore, to identify the

*[Link-to-previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

> transaction as a joint venture, security agreement, subordinated financing, or other investment scheme. Suffice it to say that it is not a bona fide lease for purposes of the Bankruptcy Code.

**PARTIES**

804 F.2d at 198-99.

9. The Debtors also seek a further declaration, in a supplemental proceeding, that the relationship between the Debtors and the Defendant is more properly characterized as one of two relationships: a lender/borrower financing or a tenancy in common. Such a supplemental proceeding would also address the nature, priority, and extent of the Defendant's claim or equity interest arising out of that relationship, pursuant to Bankruptcy Code sections 502 and 506, among others, and Rules 3012 and 7001(b) and (i) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), among others. Because such a determination may also directly affect the interests of third-party creditors who may assert an interest in the Property – including Parkview Financial REIT, LP ("**Parkview Financial**"), mechanic's lienors, and perhaps other creditors – those creditors should be allowed to intervene and assert their interests.[2]

## PARTIES

6.10. Plaintiff/Debtor Hudson 1701/1706, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with offices at 1166 Avenue of the Americas, 15th Floor, New York, NY 10036. Plaintiff/Debtor Hudson 1701/1706, LLC is a debtor in the above-captioned casesand debtor in possession in the Chapter 11 Cases, having filed a voluntary petition for relief under chapter 11 of title 11 of the United StatesBankruptcy Code on October 22, 2025 (the "**Petition Date**").

---

[2] The Debtors also seek a declaratory judgment that the Fourth Amendment (defined below) is avoidable and avoided as a fraudulent transfer because it was executed at a time when the Debtors were insolvent and inadequately capitalized and the Debtors received no reasonably equivalent consideration for the additional payments required by that Amendment.

[Link to previous setting changed from off in original to on in modified.].

~~[Link-to-previous setting changed from off in original to on in modified.].~~

~~7.~~11. Plaintiff/Debtor Hudson 1702, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with offices at 1166 Avenue of the Americas, 15th Floor, New York, NY 10036. Plaintiff/Debtor Hudson 1702, LLC is a debtor ~~in the above-captioned cases~~and debtor in possession in the Chapter 11 Cases, having filed a voluntary petition for relief under chapter 11 of ~~title 11 of~~ the ~~United States~~Bankruptcy Code on the Petition Date.

~~8. Nonparty PV Hudson, LLC ("PV Hudson") is a limited liability company organized and existing under the laws of the State of Delaware and is the current holder of 100% of the limited liability company membership interests in each of the Plaintiffs.~~

~~9.~~12. Nonparty CSC Hudson, LLC ("**CSC Hudson**") is a limited liability company organized and existing under the laws of the State of Delaware and is the former holder of 100% of the limited liability company membership interests in each of the ~~Plaintiffs~~Debtors.

~~10.~~13. Upon information and belief, nonparty MSP Capital Management, L.L.C., d/b/a Montgomery Street Partners ~~("MSP")~~, is a limited liability company organized and existing under the laws of the State of Texas with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201.

~~11.~~14. Upon information and belief, nonparty The Ground Lease REIT, Inc. ("**GLR**") is a real estate investment trust with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201. Upon information and belief, GLR was formed by and is ~~a subsidiary~~an affiliate of MSP.

~~12.~~15. Upon information and belief, Defendant 356W58 Ground Lessor LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal offices at 2801 N. Harwood Street, Suite 1200, Dallas, Texas 75201. Upon information and belief,

~~[Link-to-previous setting changed from off in original to on in modified.].~~

*[Link-to-previous setting changed from off in original to on in modified.].*

the Defendant 356W58 Ground Lessor LLC was formed by GLR as a special purpose entity for the purposes of entering into the Purported Ground Lease with Plaintiffsthe Debtors.

**JURISDICTION AND VENUEJURISDICTION AND VENUE**

13.16. This actionAdversary Proceeding is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, sections 105, 363, 364 and 365, 502, 506, 544, 548, and 550, and 502(d) of title 11 of the United States Code (the " of the Bankruptcy Code"), and Bankruptcy Rules 3012, 7001(a), 7001(2) and 7001(9) of the Federal Rules of Bankruptcy Procedureb) and (i), in order to determine the respective rights of the Plaintiffs and the Defendant concerning the Purported Ground Lease described herein, which in turn relates to real property of Plaintiffsand the Property.

14.17. This Court has jurisdiction over the above-captioned bankruptcy cases,Chapter 11 Cases, the Debtors, property of the Debtors' estates, and Defendants and this adversary proceedingthe Defendant and the Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a).

15.18. This is a core proceeding under 28 U.S.C. § 157(b)(2).

16.19. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

17.20. Pursuant to Fed. R. Bankr. P.Bankruptcy Rule 7008(a) and Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (, the "Local Rules"), PlaintiffsDebtors consent to the Court's entry of a final judgment or order with respect to this adversary proceeding if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**FACTUAL ALLEGATIONS**

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link to previous setting changed from off in original to on in modified.].*

**A. Background of Transaction**

**A. History of the Hudson Hotel Building**

18.21. Plaintiffs were formed in March 2022 to redevelop and operate certain The Chapter 11 Cases and this Adversary Proceeding involve three commercial condominium units within the real propertybuilding known as 353 West 57th Street Condominium and by the street number 353-361 West 57th Street a/k/a 358-366 West 58th Street, New York, New York (the "**Hudson Hotel Building**" or "**Building**").

19.22. The buildingHudson Hotel Building was first constructed in 1929 as the American Women's Association clubhouse and a residence for young women. It contained 1,250 rooms, along with a swimming pool, restaurant, and gymnasium. Following the American Women's Association's bankruptcy in 1941, the buildingBuilding was converted into the Henry Hudson Hotel.

20.23. On or aroundabout April 11, 1985, and pursuant to a declaration under Article 9-B of the Real Property Law of the State of New York, the real property located at 353 West 361 West 57th StreetHudson Hotel Building was declared a commercial condominium building known as the 353 West 57th Street Condominium (the "**Condominium**"). The plan for the Condominium was subsequently amended on several occasions (as amended, the "**Condominium Declaration**"). The Condominium Declaration, among other things, establishes a condominium association (the "**Condominium Association**") and identifies certain common elements (the "**Common Elements**,") owned by the Condominium Association -- *including the land*, and each of the Condominium Unit owners has a specified undivided interest in such Common Elements. *upon which the Building is located.* In 1997, certain of the condominium units were purchased by the

*[Link to previous setting changed from off in original to on in modified.].*

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

Morgans Hotel Group, converted to a hotel by renowned hotelier Ian Schrager, and renamed "The Hudson."

~~21.~~24. The Hudson Hotel Building, pursuant to the Condominium Declaration, consists of six units numbered Unit 1701 through Unit 1706; ~~however,~~ only Units 1701, 1702 and 1706 are subject to the ~~Purported~~ Ground Lease ~~(as defined herein)~~. Unit 1701 ~~(the "EBC Unit")~~ comprises 203,585 square feet of the ~~Property~~Hudson Building, including portions of the cellar, sub-cellar first floor and floor 26, the entire first mezzanine and floors numbered 2 through 9, and 25, as well as certain elevators, entranceways, windows and other mechanical areas as more particularly described in the Condominium Declaration. Unit 1702 ~~(the "Hotel Unit")~~ comprises 216,937 square feet of the ~~Property~~Hudson Building, including portions of the cellar, sub-cellar, first floor and floors 23, 24 and 26, and the entire floors 11 through 22, as well as certain elevators, entranceways and windows and other mechanical areas as more particularly described in the Condominium Declaration. Unit 1706 comprises 17,981 square feet ~~in~~of the ~~Condominium~~Hudson Building and consists of the 10th floor of ~~the Property.[3]The "Hudson" refers, collectively, to Condominium~~ that Building.[3] Units 1701, 1702 and 1706 ~~in the~~ are collectively referred to herein as the "**Condominium Units**" or the "**Property**".

~~[3] For completeness, Unit 1703 is a supermarket unit on the first floor of the Property that comprises 18,236 square feet, Unit 1704 is a store unit on the first floor of the Property that comprises 1,598 square feet, and Unit 1705 comprises 3,821 square feet in the Property; it is the penthouse unit on portions of the 23rd and 24th floors of the Property, including the 24th floor roof.~~

[3] For completeness, Unit 1703 is a supermarket unit on the first floor of the Building and comprises 18,236 square feet. Unit 1704 is a store unit on the first floor of the Building and comprises 1,598 square feet. And Unit 1705 comprises 3,821 square feet in the Building; it is the penthouse unit on portions of the 23rd and 24th floors of the Building, including the 24th floor roof.

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

[Link to previous setting changed from off in original to on in modified.].

22. In 1997, the building was purchased by the Morgans Hotel Group. Following a three-year, $125 million renovation, certain condominium units were converted to hotel use by renowned hotelier Ian Schrager and renamed "The Hudson."

23. Plaintiffs planned to redevelop the Hudson as a multifamily residential property originally anticipated to include 440 market-rate rental units complete with commercial space and a penthouse.

24. CSC originally entered into a Purchase and Sale Agreement dated February 3, 2022 to purchase Unit 1701 and Unit 1702 and lease Unit 1706, with an option to later purchase Unit 1706 from a subsidiary of Cain International, a real estate investment management company, for $207.5 million.

25. Upon information and belief, CSC sought out alternative, additional financing for its redevelopment plans and entered into discussions with GLR, a real estate investment trust formed by MSP, a commercial real estate investment firm. Upon information and belief, CSC was attracted to GLR and MSP's "ground lease" scheme, which was explicitly advertised as a "financing product" as described by MSP and GLR directly below.[4]

(Del)


THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION

| Transaction Size | Property Types | NOI Coverage | Rate | Geography | Risk Profile |
| --- | --- | --- | --- | --- | --- |
| $10M - $500M+ | Mixed Use, Multifamily, Student & Senior Housing, Office, Industrial, Hospitality | 4.0x – 7.0x | 3.5% - 5.0%+ | Top 50 MSA's | Core, Value Add, Ground Up Development |

The **GLR Ground Lease** is an interest only, 99-year financing product intended to maximize sponsor's returns and seeks to address funding gaps due to cost overruns, vacancy, or lack of lender liquidity.

[4] *See THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION* (publicly available at https://glreit.com/wp-content/uploads/2023/04/GLR_Flyer.pdf) (last accessed December 17, 2025).
*[Link to previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

**B. Financing The Project**

25. In or about 2022, CSC Hudson initiated the Project, a plan to convert the Property's over 800 hotel rooms into a multifamily residential apartment complex. As part of the Project, the Debtors were formed in March 2022 to purchase, redevelop, and operate the Condominium Units.

26. CSC then assigned the Purchase and Sale Agreement to Defendant, a special purpose entity formed by GLR.

27.26. On May 4February 3, 2022, Defendant acquired Unit 1701 and Unit 1702, along with a lease and purchase option for Unit 1706, and simultaneously entered into the purported "Ground Lease" dated May 4, 2022 with Plaintiffs (as amended, the "Purported Ground Lease"), pursuant to which Plaintiffs occupy the Hudson. A true and correct copy of the Purported Ground Lease is attached hereto as **Exhibit A**. On or around January 3, 2023, Defendant acquired Unit 1706. CSC Hudson, by and through its principals, Salomon and Alberto Smeke (together, the "**Smekes**"), entered into an agreement with Cain to purchase Units 1701 and 1702, and sub-lease Unit 1706, with an option to later purchase Unit 1706 (the "**Purchase Agreement**"). The total purchase price under the Purchase Agreement related to the Condominium Units was $206,850,000.

27. At the time that CSC Hudson entered into the Purchase Agreement with Cain, the Smekes knew that they would need to obtain financing for the Project. To identify possible partners for acquisition and project financing, CSC Hudson engaged Meridian Capital Group ("**Meridian**"), an investment broker that CSC Hudson had retained for past projects.

28. Meridian first contacted MSP on January 31, 2022, regarding the opportunity to finance the acquisition of the Condominium Units. MSP and its affiliate, GLR, marketed a financing option which they characterized as a "ground lease," but that was touted as freeing up

[Link to previous setting changed from off in original to on in modified.].

~~[Link-to-previous setting changed from off in original to on in modified.].~~

initial capital for construction purposes. In a recent podcast interview,[4] Max Nipon ("**Nipon**"), an MSP principal, has described MSP's ground lease product as "effectively an alternative form of financing to the market," explaining that MSP's value proposition is that "[w]e can, in combination with a leasehold loan, provide a lower blended cost of capital through the debt stack. We can oftentimes engineer incremental leverage through the alchemy of the ground lease plus that leasehold loan." Nipon also described MSP's position in the capital structure as that of a lender, not a landlord, noting that leasehold lenders "look at us as effectively a type of A-note" and that MSP is "improving the debt stack for [the] borrower." Throughout the interview, Nipon compared the ground lease not to other lease products, but to preferred equity and mezzanine debt, stating that "everyone is jumping at the pref mez solution to fill gaps. I think the ground lease is a great option for that."

29. Consistent with this marketing, MSP led the Smekes to believe that a ground lease would offer less expensive acquisition financing for the Project, and that the monthly "rent" payments would likely be lower than monthly debt service payments on a traditional acquisition financing loan. As Alberto Smeke said, he viewed the Ground Lease as an "interest-only loan."

30. Representatives of MSP were first introduced to the Smekes via email on February 5, 2022 (*i.e.*, two days *after* CSC Hudson entered into the Purchase Agreement), and proceeded to negotiate a term sheet over the following weeks, which term sheet was executed on February 24, 2022. Simultaneously, CSC Hudson was negotiating with Parkview Financial to provide construction and development loans for the Project in the amount of $207 million.

[4] See https://podcasts.apple.com/us/podcast/ep-5-ground-lease-financing-max-nipon-montgomery-street/id1729873750?i=1000652163453

~~[Link-to-previous setting changed from off in original to on in modified.].~~

*[Link-to-previous setting changed from off in original to on in modified.].*

31. Tellingly, the requirement of a Right-Size Payment was not mentioned in MSP's term sheet with the Debtors. MSP first raised it in April 2022, with Luk Pak ("**Pak**"), an MSP partner, recognizing that MSP needed to be "very careful when and how we deliver this message." MSP's Nipon agreed:

> It will have to be a delicate conversation, but I think we can couch it as a necessary protection and one that, if they hit their business plan, shouldn't be an issue. But if they don't, we have accommodated them in not defining what they must do, just that they must have a business plan and it must include preserving our asset's value, which is materially impacted by virtue of a changed use or reduced property cash flow.

28. Furthermore, and pursuant to a Closing Agreement between CSC, Defendant, and Plaintiffs, CSC not Defendant was required to pay all the costs ancillary to Defendant's purchase of the property, including (i) all taxes; (ii) title insurance premiums; (iii) escrow fees; (iv) recording fees; (v) other costs or expenses incurred by Defendant in connection with the closing ("including, without limitation third party due diligence costs and construction consultant fees incurred by [Defendant]") up to $350,000; and (vi) $595,000 "in consideration for advisory and management services" to GLR.

29. Pursuant to the Purported Ground Lease, Plaintiffs were required to make an upfront payment to Defendant of $36,850,000 "in connection with [Plaintiffs'] acquisition of the Personal Property and [Defendant's] acquisition of the Leased Premises." *See* Ex. A, § 4 (i). It is not clear what "Personal Property" was actually acquired in this transaction given the Hudson's status as an abandoned hotel property.

30. Plaintiffs also received an aggregate $207 million in development and construction financing (the "Loan") from nonparty Parkview Financial REIT LP ("Prepetition Lender") to fund the redevelopment of the project.

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

31. MSP touted the transaction in a press release stating that Plaintiffs "utilized our ground lease capital and paired it with leasehold financing to gain control of the asset and reposition it" and that Defendant's "ground lease paired with leasehold financing provides our tenant [Plaintiffs] with a compelling execution at a lower blended cost of capital."[5]

32. The Purported Ground Lease bears the words "Ground Lease" but it lacks the indicia of a ground lease. The term "ground lease" typically describes a lease of unimproved land on which improvements are to be built by the tenant or a lease of improved real estate that covers the land but not the improvements, which are owned by the tenant. The Purported Ground Lease, however, refers to leases for two Condominium units – Units 1701 and 1702 – and a sublease for a third unit, Unit 1706, which was subsequently acquired by Defendant and made part of the Purported Ground Lease.

33. As MSP celebrates in its press release, the true essence of the Purported Ground Lease structure was a disguised financing to fund Plaintiffs' acquisition and construction.

34. Likewise, GLR touts its ground lease schemes to its investors and potential borrowers as "A COMPELLING **FINANCING** SOLUTION" that is a "return-enhancing alternative to conventional financing" offering "a highly competitive cost of capital."[6]It further explains that the ground lease structure is "an interest only, 99 year financing product intended to maximize Sponsor returns and address capital requirements for core to opportunistic real estate

[5] MSP July 31, 2022 Press Release, *Montgomery Street Partners Utilizes 99-Year Ground Lease Structure to Acquire, Facilitate Planned Residential Conversion of the Hudson Hotel in Columbus Circle, Manhattan* (publicly available at https://montgomerystreetpartners.com/news/montgomery-street-partners-utilizes-99-year-ground-lease-structure-to-acquire-facilitate-planned-residential-conversion-of-the-hudson-hotel-in-columbus-circle-manhattan/) (last accessed December 17, 2025).

[6] *See THE GLR GROUND LEASE: A COMPELLING FINANCING SOLUTION* (publicly available at https://glreit.com/wp-content/uploads/2023/04/GLR_Flyer.pdf) (last accessed December 17, 2025).

*[Link-to-previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

investments."[7] In short, GLR's marketing makes clear that its ground lease product is nothing more than an alternative financing solution for real estate developers.

**B. The Purported Ground Lease**

Neither Pak nor Nipon explained how a short-term change in business plan "impacts" anything under the 99-year ground lease or justifies triggering a massive non-rent payment from the lessee and thereby manufacturing a liquidity crisis where, as here, the rent was still being paid. The Right-Size Payment was not about "preserving value," but rather about adding a lender-like trigger for calling a default under the Ground Lease long before the end of its term.

32. On May 3, 2022, CSC Hudson entered into a Closing Agreement (the "**Closing Agreement**"; see copy attached as **Exhibit B** hereto) with Defendant. The Closing Agreement provides the mechanics of the Acquisition Transaction, including, among other things, that (a) CSC Hudson would assign its Purchase Agreement with Cain to Defendant; (b) the Debtors would contribute $36.85 million to purchasing Units 1701 and 1702, and leasing Unit 1706, by transferring that amount directly to Cain; and (c) the Debtors would execute the Ground Lease with the Defendant. (Closing Agreement §§ 2(a), 3, 7(a)(i)) Under the Closing Agreement, *the Debtors also paid all the closing costs* in purchasing Units 1701 and 1702, including taxes, title insurance premiums, escrow fees, recording fees, and due diligence costs.

33. In substance, the Acquisition Transaction is somewhat analogous to a sale-leaseback transaction: CSC Hudson held the contractual right to purchase the Property, transferred that right to MSP, and then the Debtors leased the Property back from MSP under the Ground Lease. Courts have found sale-leaseback transactions to be loan financings rather than true leases.

[7] *See id. supra* fn. 6.
[Link to previous setting changed from off in original to on in modified.].

*[Link to previous setting changed from off in original to on in modified.].*

*See Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.),* 949 F.2d 585 (2d Cir. 1991) ("***PCH II***").

35. Under the Purported Ground Lease, Plaintiffs hold an undivided interest in the Hudson, which includes Units 1701, 1702, and 1706 of the Condominium. As noted, the Purported Ground Lease does not cover Condominium Unit 1703, Unit 1704, and Unit 1705 on the Property.

36. Upon execution of the Purported Ground Lease, Plaintiffs were required to make an upfront payment to Defendant of $36,850,000 or 18% of the purchase price "in connection with [Plaintiffs'] acquisition of the Personal Property and [Defendant's] acquisition of the Leased Premises." *See* Ex. A, § 4 (i). This upfront payment was identified as "Prepaid Rent." However, Plaintiffs did not receive any credit for future rent payments owed by Plaintiffs. *See id.*

37. Furthermore, and upon information and belief, the $36.85M purchase price for this "Personal Property" was an inflated amount that bore no relationship to the value of the "Personal Property" acquired from the Hudson, a former hotel occupied by, among others, SRO tenants. Accordingly, the $36.85M in consideration for "Personal Property" or "Prepaid Rent" is more accurately viewed as a financial down payment or equity contribution from Plaintiffs to Defendant for the Hudson.[8]

38. Upon information and belief, Defendant denoted the transaction as a "ground lease" to, in part, secure certain state and federal tax advantages for Defendant.

39. The annual Base Rent for the first five years of the Purported Ground Lease term was $6,000,000 (approximately 3% of the purchase price) payable in $500,000 monthly installments. *See* Ex. A, § 4(a). The Base Rent is set to increase by 10% in the sixth and eleventh

[8] Under Section 5(b), the upfront payment of "Prepaid Rent" is treated as a loan from Plaintiffs to Defendant for tax purposes – a tax advantage benefitting Defendant.
*[Link to previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

lease years and by at least 2% for the proceeding 88 lease years. *See id.*, § 4(b)-(d). The Base Rent increased to $6,400,000 upon Defendant's purchase of the Tenth Floor Unit (i.e., Condominium Unit 1706) on January 3, 2023.[9] A conservative estimate of Defendant's return on investment over the full term of the Purported Ground Lease exceeds approximately 63%.

40. If Plaintiffs elect to pursue a Fallback Project (as that term is defined in the Purported Ground Lease)[10] to amend the original redevelopment plans, Defendant is entitled to a "Right-Size Payment," or equity cure, to maintain a satisfactory loan-to-value ratio ("LTV") and ensure it recoups its investment by no later than the end of the fifth lease year, May 3, 2027. *See* Ex. A, § 60(a).[11]

41. The amount of the Right-Size Payment is a function of the 12-month trailing net operating income earned by Plaintiffs from the Hudson. *See id.*, at 26. Notably, the Right-Size Payment is *inversely* related to Plaintiffs' net operating income. *See id.* As income goes down, the Right-Size Payment goes up.[12]

42. The Right-Size Payment is similar to the industry-typical equity cure provision in financing agreements which allows a borrower to inject additional capital by way of equity or subordinated debt when the LTV increases beyond a certain threshold to avoid breach of an LTV covenant. The Right-Size Payment is nothing more than a disguised equity cure payment that would be found in a typical real estate financing arrangement. Instead of the threat of an LTV

---

[9] As discussed below, the Base Rent was increased in connection with the Fourth Amendment to the Purported Ground Lease.

[10] Under the Purported Ground Lease, the "Fallback Project" is an alternative plan for a "fallback use of the Improvements approved by [Defendant]" in connection with the submission of a proposed "Fallback Business Plan" to Defendant outlining proposed modifications to the project, schedule, financing, etc. *See* Ex. A at 9-10. The triggering event requiring the submission of the Fallback Business Plan is discussed *infra* at Section C.

[11] As discussed below, these dates were adjusted in connection with the Fourth Amendment to the Purported Ground Lease.

[12] As discussed below, the potential Right-Size Payment amount was increased as part of the Fourth Amendment to the Purported Ground Lease.

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

covenant breach, the Purported Ground Lease simply *requires* Plaintiffs to pay the Right-Size Payment to keep the Purported Ground Lease at an LTV acceptable to Defendant.

43. The Purported Ground Lease is also "triple net," meaning that the Purported Ground Lease also obligates Plaintiffs to (1) pay all real estate taxes (*see* Ex. A, § 7(a)), (2) obtain insurance at levels demanded by Defendant and naming Defendant as an additional insured (*see* § 15 and (3) keep and maintain the Hudson in good condition, repair, and appearance (*see* § 9(a)). The Purported Ground Lease also obligates Plaintiffs to obtain all permits and licenses (*see* § 7(c)), keep the Hudson free and clear of liens (*see* § 10), and pay all utilities (*see* § 9(f)).

44. In connection with the Purported Ground Lease, Alberto Smeke Saba and Salomon Smeke Saba (the "Smekes"), the principals of CSC and former principals of Plaintiffs, entered into a "Carry Guaranty" with Defendant guaranteeing the payment of "rent" owed to Defendant, plus interest, taxes, insurance premiums and all operating expenses. The Carry Guaranty is attached hereto as **Exhibit B**. The Smekes also entered into Completion Guarantees with both Defendant and Prepetition Lender guaranteeing the completion of construction. The Completion Guarantees are attached hereto as **Exhibits C and D**. Notably, these guarantees provide additional security typical of what a lender would require.

45.34. The Purported Ground Lease and purported rent payments are unsubordinated to the Loan and other debts. *See* Ex. A., § 18(a). This has made it more difficult for Plaintiffs to obtain additional financing because any such lender would need to be subordinated to Defendant's interest in the Purported Ground Lease and rental payments. was executed the next day, on May 4, 2022. Also on May 4, 2022, the Debtors executed two loan agreements with Parkview Financial which provided the combined $207 million in development and construction financing for the Project (the "**Parkview Financial Agreements**"; and with the Closing Agreement and Ground

*[Link-to-previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

Lease, the "**Project Agreements**"). Together, the Project Agreements contemplated a redevelopment of the Property by the Debtors that would involve a conversion of the Condominium Units to a multi-family apartment complex with approximately 444 one-, two-, and three-bedroom units for residential occupancy.

**C. Construction Delays and Amendment to Purported Ground Lease**

46. Plaintiffs began construction on or around June 2022 to convert the Hudson to a multifamily residential property originally anticipated to include approximately 440 market-rate rental units together with commercial and amenity space and a penthouse.

47. The Purported Ground Lease required substantial completion of the construction project by May 4, 2024.

35. Attached to the Ground Lease as Exhibit C, Schedule I, was an initial budget (the "**Project Budget**") for the Project. That Project Budget showed the following uses and sources of funds for completion of the Project:

(Added)

PROJECT BUDGET

| Uses | Total | Per Unit | PGSF | PRSF | % of Costs |
|---|---|---|---|---|---|
| Purchase Price | $207,500,000 | $473,744 | $444 | $677 | 50.3% |
| Hard Costs | $52,301,277 | $119,409 | $112 | $171 | 12.7% |
| Hard Cost Contingency | $4,300,000 | $9,817 | $9 | $14 | 1.0% |
| Soft Costs | $21,521,250 | $49,135 | $46 | $70 | 5.2% |
| Soft Cost Contingency | $1,500,000 | $3,425 | $3 | $5 | 0.4% |
| Closing & Financing Costs | $19,657,985 | $44,881 | $42 | $64 | 4.8% |
| Ground Rent Reserve | $12,800,000 | $29,224 | $27 | $42 | 3.1% |
| Parkview Interest Reserve | $29,593,125 | $67,564 | $63 | $97 | 7.2% |
| 10th Floor Buyout | $13,000,000 | $29,680 | $28 | $42 | 3.2% |
| Union Severance, Pension and Healthcare | $47,250,000 | $107,877 | $101 | $154 | 11.5% |
| Developer Fee | $2,724,460 | $6,220 | $6 | $9 | 0.7% |
| **Total Uses** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

| Sources | Total | Per Unit | PGSF | PRSF | % of Costs |
|---|---|---|---|---|---|
| GLR Ground Lease - Funds at Close | $170,000,000 | $388,128 | $364 | $555 | 41.2% |
| GLR Ground Lease - 10th Floor | $8,000,000 | $18,265 | $17 | $26 | 1.9% |
| Parkview Leasehold Financing | $207,000,000 | $472,603 | $443 | $676 | 50.2% |
| Developer Equity | **$27,148,097** | $61,982 | $58 | $89 | 6.6% |
| **Total Sources** | **$412,148,097** | **$940,977** | **$881** | **$1,345** | **100.0%** |

[Link to previous setting changed from off in original to on in modified.].

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

36. The Project Budget demonstrates that MSP/GLR contributed $178 million to the total capital stack for the Project and calculates that contribution as 43.1% of the stack. If the Defendant truly owned the Property in fee simple as it claims, the contribution from MSP/GLR to acquire the Property would not be shown as part of the capital stack for the Project; it would simply be equity in the Property. The Project Budget also shows that Parkview Financial contributed $207 million, or 50.2%, of the capital stack, and that CSC Hudson pledged $27 million in "Developer Equity", or 6.6% of the capital stack. Again, if the Defendant truly owned the Property in fee simple, CSC, as the Developer, would have no equity to contribute.

37. Of the $207.5 million "Purchase Price" referenced in the Project Budget, $206.85 million was for the purchase of Units 1701 and 1702, and the leasing of Unit 1706. That Purchase Price was funded with a $170 million payment from MSP to Cain and a $36.85 million payment from the Debtors to Cain. CSC Hudson's "Developer Equity" pledge was in addition to the $36.85 million that the Debtors contributed to the Acquisition Transaction purchase price.

38. The $47.25 million "Union Severance, Pension and Healthcare" use referenced in the Project Budget is an obligation that the Hudson Hotel owed to the hotel employee labor union (the "**Union**") that had represented the former Hudson Hotel's workers. The Debtors' payment of this obligation was necessary in order to convert the Building from a hotel to a multi-family apartment complex. Those monies were paid to the Union pursuant to a settlement agreement.

39. The "10th Floor Buyout" referenced the exercise of the option to purchase Unit 1706, which occurred in January 2023. That buyout was budgeted at $13 million, but the actual price was $10 million and paid for with $8 million from MSP to Cain and a $2 million contribution from the Debtors to Cain, completing the Acquisition Transaction.

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

[Link-to-previous setting changed from off in original to on in modified.].

40. The hard and soft costs listed in the Project Budget were related to the construction of the Project's 444 apartment units.

## C. Initial Construction Efforts

41. Between May 2022 and late 2023, approximately $24 million of the hard costs listed in the Project Budget were spent by the Debtors on the Project. As a result, approximately 90 percent of the necessary demolition of the former hotel is complete. Among other things, that demolition removed the ground floor escalators which had originally provided hotel guests egress to the ground floor from reception, check-in and hotel amenity areas on the second floor. Escalator removal created ground floor egress for the occupancy of the Project's one commercial tenant, LA Fitness ("**LAF**"), and the build-out of LAF's space effectively eliminated practical redesign of egress for a hotel use.

42. In addition, between May 2022 and late 2023, approximately 40 percent of the room-to-apartment conversion work was completed.

48.43. When Plaintiffsthe Debtors commenced development and then construction, the Hudson Hotel Building contained 39 single room occupancy ("**SRO**") units and now contains 32 SRO units, many of which continue to beapartments occupied by long-term tenants (the "**SRO Tenants**, who"). These SRO Tenants are beneficiaries of rent-stabilization under New York City lawrent-stabilization laws. Because the Hudson Hotel Building is also located within the Clinton Special District, of New York City, zoning regulations require that the New York City Department of Housing and Preservation DevelopmentHealth and Human Services ("**HPD**") issue a Certificate of No Harassment ("**CONH**") following an investigation and survey of tenants residing at the Hudson. Plaintiffs therefore required a CONH from the Department of Buildings before making alterations to the Hudsonthat Building. The CONH certifies that a building owner is not harassing

[Link-to-previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

tenants by, among other things, offering money, threatening the use of force, disrupting essential services such as heat and water, or negligently creating an unsafe living environment.

49. The Purported Ground Lease required Plaintiffs to obtain the CONH by July 8, 2024 (the "CONH Requirement Outside Date"). *See* Ex. A, at 5.

50. On December 2, 2022, HPD sent a letter to the SRO Tenants seeking information in connection with Hudson's CONH application. On September 7, 2023, the SRO Tenants presented to Manhattan Community Board Four alleged incidents of harassment including: (i) inadequate notice of water and electricity shutdowns, (ii) inadequate pest control, (iii) positive testing for lead, and (iv) exposed wiring and cables.

51. The HPD made an initial determination finding that there was reasonable cause to believe that harassment occurred and on September 25, 2023, issued a notice of hearing and petition for Debtors to be heard before the Office of Administrative Trials and Hearings ("OATH"). The HPD also recommended that OATH deny the Plaintiffs' application for a CONH.

52. When the HPD issued the initial determination, Plaintiffs were still controlled by the Smekes and, rather than contesting the HPD's determination of harassment, the Smekes caused Plaintiffs to opt to pursue an application for a cure agreement with HPD to clear the record and allow redevelopment and construction to continue. To qualify for a cure agreement, an applicant must provide permanent affordable housing amounting to 28% of the total residential floor area of the building overseen by the HPD Inclusionary Housing Unit. Accordingly, the decision to seek a cure agreement affected the earning potential of the Plaintiffs—if a cure agreement is obtained, the Plaintiffs may only obtain market rate rentals for approximately 300 of the approximately 440 units anticipated in the Hudson following redevelopment.

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link to previous setting changed from off in original to on in modified.].*

53. It quickly became clear that Plaintiffs were not going to meet the CONH Requirement Outside Date. In the event that Plaintiffs did not meet the CONH Requirement Outside Date, the Purported Ground Lease provided for delivery to Defendant of an alternative "Fallback Business Plan" for a "Fallback Project," subject to Defendant's approval. *See* Ex. A, § 48(e).

54. Plaintiffs originally delivered two alternative Fallback Business Plans to Defendant on December 22, 2023 and January 11, 2024.

55. In response, Defendant conditioned their *preliminary* acceptance of either Fallback Business Plan on Plaintiffs entering into an "interim amendment" to the Purported Ground Lease. The purpose of this interim amendment was simple: raise the rent to make sure Defendant has its loan repaid in a timely manner, notwithstanding that the economics of the development materially changed to the detriment of Plaintiffs. Indeed, in Defendant's response to the submitted Fallback Business Plan, it refers to the "exceptionally low cost of capital provided to" Plaintiffs and explains that Defendant's "investors are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics" to the Purported Ground Lease.

44. In late 2023, the Project was the subject of two stop work orders (the "**Stop Work Orders**"), one of which was related to a failure to obtain a CONH based on complaints made by a number of SRO Tenants. Those Stop Work Orders remain in place, and no significant construction work towards completing the Project has been undertaken since the Stop Work Orders were issued. Instead, since issuance of the Stop Work Orders, basic systems have been maintained, tenant- and safety-related work has been completed, and construction has continued on the space that LAF intends to lease.

*[Link to previous setting changed from off in original to on in modified.].*

*[Link to previous setting changed from off in original to on in modified.].*

45. To date, the Debtors have spent approximately $216 million toward the completion of the Project. These expenditures include the original $36.85 million acquisition cost, the $2 million 10th floor acquisition cost, the Union settlement, LAF construction costs, property taxes, demolition costs, development planning, subcontractor settlements, insurance, utilities and property maintenance. The Debtors estimate that the Project will be complete and substantially rented by 2029. The Debtors also estimate that the annual net operating income ("**NOI**") of the completed Project, before the payment of rent under the Ground Lease, will be between $13 and $17 million.

**D. The Fourth Amendment**

46. In an effort to convince HPD to lift the Stop Work Orders, the Debtors' prior owners, the Smekes, agreed to alter the business plan for the Project by making 138 of the Project's 444 apartment units HPD-approved, below-market rental units. The Stop Work Orders, and this proposed alteration to the Project, led to the Debtors' defaults under both the Ground Lease and Parkview Financial Agreements. It also required the Debtors to submit "Fallback Business Plans" to MSP under the terms of the Ground Lease.

56.47. Plaintiffs agreed to enter intoMSP, in light of the defaults, demanded that CSC Hudson and the Debtors agree to modified terms in the Ground Lease in order to avoid an immediate forfeiture of the Condominium Units to MSP. These changes were ultimately memorialized in March 2024 in a fourth amendment to the Purported Ground Lease on March 29, 2024 (the "**Fourth Amendment**"). A true and correct, a copy of the Fourth Amendmentwhich is attached hereto as **Exhibit E** Pursuant to**C**). Alberto Smeke testified that CSC Hudson viewed signing the Fourth Amendment, the going-forward annual Base Rent was increased to $8,750,000 – an increase of approximately 36% – payable in $729,166.67 monthly installments.

*[Link to previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

The as its only option if it wanted to continue with the Project and not lose the Property — *i.e.*, it understood that MSP would not approve any Fallback Business Plan if the Debtors did not sign the Fourth Amendment allowed for a credit of $2,350,000 to be applied to the monthly rent payments in twelve monthly installments ending on March 29, 2025. *See* Ex. E, § 5(b). As of the Petition Date, the contractual purported monthly rental obligation was still $729,166.67, assuming section 365 of the Bankruptcy Code applies..

48. Alberto Smeke also testified that after the Debtors executed the Fourth Amendment, the value of the Project substantially decreased due to the Fourth Amendment's significant rent increase from $6.4 million to $8.75 million a year. Although a "rent buyback" provision was included in the Fourth Amendment, the Debtors determined that buyback option was not economically rational for them—the Debtors would have been required to pay down the rent at a 4.5% capitalization rate (*i.e.*, at a high price per dollar of rent reduction), but the market would value the rent reduction at a lower price per dollar of rent reduction. The Debtors would therefore be overpaying for the rental rate reduction.

49. In addition, the cost of "buying back" the annual rent rate to the original $6.4 million was approximately $52 million – an amount the insolvent Debtors did not have and could not feasibly obtain in the finance markets.

50. Finally, the Fourth Amendment contained the $65 million penalty discussed above, a sum that was apparently designed to create a liquidity crisis and force a default and forfeiture of the Property once the altered Project was complete. MSP's own expert has stated that such a forfeiture would result in MSP receiving a completed Project worth over $300 million.

[Link to previous setting changed from off in original to on in modified.].

~~[Link-to-previous setting changed from off in original to on in modified.].~~

## E. The Debtors Were Insolvent At All Relevant Times

51. The Debtors' insolvency is demonstrated by a balance sheet test, which demonstrates that at critical points—including at the execution of the Fourth Amendment and the Petition Date—the Debtors' debts exceeded their assets.

52. On March 29, 2024, the day the Fourth Amendment was executed, the Debtors had approximately $225 million in assets and $372 million in debts, for a negative equity value of over $145 million. And, on the Petition Date, the Debtors had approximately $220 million in assets and $458 million in debts, for a negative equity value of approximately $238 million.

53. Moreover, at all relevant times, the Debtors' only asset—the Project—was not generating income other than the nominal amounts received from the SRO Tenants. These amounts were inadequate and unreasonably small capital to meet the Debtors' anticipated obligations under the Ground Lease and the Fourth Amendment. The Debtors were thus also insolvent on these dates under alternative solvency tests, including the cash flow test and capital adequacy test.

## FACTS SUPPORTING RECHARACTERIZATION

54. The Ground Lease is what MSP's expert calls a "modern institutional ground lease." As such, it is not a true lease; instead, it is a finance product marketed to real estate developers and sponsors as a way to lower the initial capital demands of real estate construction projects. Notably, what is not marketed are the significant risks that this finance product brings to any construction venture, particularly ones that experience any delays or difficulties.

55. The Ground Lease includes a number of provisions identified by courts as indicative of a lease that should be recharacterized. In addition, the Acquisition Transaction and the Ground Lease include unique elements that do not exist in the published case law and that

~~[Link-to-previous setting changed from off in original to on in modified.].~~

[Link-to-previous setting changed from off in original to on in modified.].

further demonstrate the Ground Lease is not a true lease, including, as described in more detail below: (a) direct purchase price contributions by the Debtors for the acquisition of the Property, and (b) the requirement of extraordinary payments – what MSP calls "loans" – by the Debtors to MSP. Once again, a primary problem here is the uniquely draconian feature of one of these extraordinary payments/loans, the $65 million Right-Size Payment. With that Payment requirement, the Ground Lease is designed to manufacture a liquidity crisis that will result in the Debtors turning over to MSP the entirety of the Debtors' assets, *i.e.,* a Project currently worth over $200 million. This turnover would occur many decades before the Ground Lease's term ends, even though rent has been regularly paid in accordance with the terms of the Ground Lease and applicable bankruptcy law, and MSP has not contributed any of the $216 million invested in the development and construction of the Project. The Debtors, on behalf of their estates and all creditors, seek to prevent this forfeiture.

**A. The Debtors Paid Almost $39 Million Directly To The Seller For The Purchase Of The Condominium Units**

56. Unlike any other recharacterization case known to the Debtors, the Acquisition Transaction and the underlying Project Agreements required the Debtors to pay $38.85 million directly to the seller (Cain) for the purchase of the underlying fee simple (the Condominium Units) that was then leased to the Debtors. Specifically, the Acquisition Transaction required the Debtors to pay Cain $36.85 million for the purchase of Units 1701 and 1702 and $2 million for the purchase of Unit 1706. This fact is a significant indicator that the Acquisition Transaction is more like a loan financing than a lease: in true leases, lessees do not make direct payments to the seller of the very property being acquired and contemporaneously leased to the lessee.

57. Although the Ground Lease suggests that these monies, at least in part, went toward the acquisition of "Personal Property", the facts demonstrate otherwise. Alberto Smeke confirmed

[Link-to-previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

that there was nowhere near $36.85 million worth of personal property at the Property (an abandoned hotel) at the time of the Property Acquisition. Further, MSP admitted that Cain conveyed whatever personal property at the Property to the Debtors pursuant to a "Bill of Sale" (*see* **Exhibit D** hereto). That Bill of Sale reveals that Cain sold all personal property to the Debtors for the *de minimis* sum of ten ($10) dollars. The Debtors' $38.85 million in payments to Cain were for the purpose of purchasing real estate (the Condominium Units), not personal property.

**B. The Ground Lease Expressly Recognizes That MSP Was Providing Financing To The Capital Stack For The Debtors' Acquisition Of The Property And Development of the Project**

58. As noted above, the Project Budget accompanying the Ground Lease specifically states that MSP contributed $178 million to the total capital stack for the Project and calculates that contribution as 43.1% of the stack. That amount was in addition to the $207 million (50.2%) contributed by Parkview Financial and the $27 million (6.6%) pledged by CSC Hudson in the form of "Developer Equity."

**C. The Property Was Purchased Solely In Connection With The Debtors' Conversion Project**

59. In *PCH I,* the Second Circuit stated that "the fact that property is 'purchased by the lessor specifically for the lessee's use' tends to prove that no true lease exists." 804 F.2d at 200-201 (citation omitted). Here, MSP purchased/leased the Condominium Units contemporaneous with the Debtors and MSP executing the Ground Lease. In fact, the Closing Agreement between MSP and the Debtors specifically required execution of the Ground Lease (Closing Agreement, § 3), and MSP's investment guidelines do as well. There is no evidence that, prior to the Acquisition Transaction, MSP ever considered purchasing and leasing, or even had the opportunity to purchase and lease, the Condominium Units to anyone other than the Debtors, or that MSP itself ever contemplated owning and implementing the Project itself. Indeed, as mentioned above, MSP

*[Link-to-previous setting changed from off in original to on in modified.].*

~~[Link-to-previous setting changed from off in original to on in modified.].~~

was introduced to the Debtors two days *after* the Debtors had entered into the Purchase Agreement with Cain to purchase the Property.

60. Further, the Debtors always understood that they—not MSP or any other sponsor—would be developing the Project.

**D. The Ground Lease's "Rents" Are Based On Targeted Investor Yields And Not Market Rental Rates**

61. *PCH I* also considered whether supposed "rents" under a ground lease are based on market rental rates or calculated to ensure a return to investors. 804 F.2d at 200 (recharacterization affirmed where "rent was not calculated to compensate Liona for the use of the property; rather the parties structured the 'rent' solely to ensure Liona's return on its investment"). MSP's Nipon conceded that the rents MSP required from the Debtors were linked to a particular return for its investors—what MSP called the "yield" (calculated as the ground rent divided by MSP's contributions toward the purchase of the Condominium Units). In the original Ground Lease, MSP's target yield was 3.5 percent, and by the time of the March 2024 execution of the Fourth Amendment—because of rising interest rates generally—it was 4.5 percent.

62. In his podcast interview, MSP's Nipon confirmed that MSP prices its ground lease "rent" exactly as a lender prices debt—as a spread to a benchmark interest rate—rather than by reference to fair market rental values. Nipon stated: "we price everything as a spread to the 30-year treasury, that appears to be the appropriate benchmark for a 99-year duration. . . . [B]est cost to capital, which would be existing cash flowing multifamily is probably the 30-year plus 65 basis points today." Nipon also confirmed that MSP sizes its "rent" using coverage ratios—a tool used by lenders to ensure cash flow adequately services debt—stating that MSP typically wants "ground rent to be between 25 and 30% of NOI. In other words, somewhere between three and a half and

~~[Link-to-previous setting changed from off in original to on in modified.].~~

[Link-to-previous setting changed from off in original to on in modified.].

four turns of coverage." Coverage ratios are a hallmark of lending; they have no place in a true ground lease.

**E. The Ground Lease Required An Extraordinary Non-Rent Payment With 94 Years Left On Its Term**

63. MSP's Nipon has also conceded that ground lessors have two principal financial interests: collecting rent and the ultimate reversion of the leased property in 99 years. However, he also insisted that MSP had a "vested interest" in the near-term progress of the Project. When pushed to explain how such a vested interest could possibly exist (since MSP had no ownership interest in the leasehold), he pointed to the risk of default under the Ground Lease.

64. Nipon was likely referring to a decidedly non-lease component of the Ground Lease. This component, which was inserted by MSP pursuant to a "delicate conversation" late in the process of negotiating the Ground Lease, is set forth in Section 60 of the Ground Lease, entitled "Right-Size Payment":

> At any time . . . Tenant elects to pursue a Fallback Project and submits a Fallback Business Plan to Landlord, the receipt (or deemed receipt) of such . . . Fallback Business Plan, as applicable, shall entitle Landlord to the Right-Size Payment in accordance with this Section 60, which Right-Size Payment shall be due and payable upon the date (the "Right-Size Event Date") that is the earlier to occur of . . . (y) the date that is eighteen (18) months following Completion of the Fallback Project, and (z) the last day of the fifth (5th) Lease Year (such earliest occurrence, the "Right-Size Event").

65. As such, the original Ground Lease incorporated terms that would likely create a commercially infeasible and thus incurable default should the Project not proceed according to the original business plan. A lessor is typically concerned about receiving rent and, when such rent is not received, evicting the tenant. But the Ground Lease incorporates provisions that require extraordinary non-rent payments if the Project is compelled to change and does not meet short-term projections – *even if, as here, rent is being timely paid*.

[Link-to-previous setting changed from off in original to on in modified.].

~~*[Link to previous setting changed from off in original to on in modified.].*~~

66. Just five years after commencement of the Ground Lease (*i.e.,* after approximately 1/20 of the Ground Lease term), the Ground Lease required a $56 million payment if the Project's business plan had changed and was still not generating any NOI. Once again, *such payment was due even if rent was being paid*. Further, even if the current estimates at $13-17 million for the Project's annual NOI were to have materialized by 2027, the Debtors would still have owed MSP an extraordinary payment of over $50 million. Such a provision is not found in a true lease. Indeed, to the best of the Debtors' knowledge, no reported recharacterization decision has involved a trigger provision this overtly "loan-like"—underscoring just how far the Ground Lease departs from any *bona fide* lease arrangement.

**F. The Fourth Amendment Requires An Even Larger Non-Rent Payment With 89 Years Left On The Ground Lease's Term**

67. MSP claims that it did the Debtors a favor by pushing out the Right-Size Payment to the tenth year (from the fifth year) in the Fourth Amendment. However, no benefit was received, and the likelihood of a debilitating payment only increased. Whereas MSP calculated the Right-Size Payment due at five years at $28 million if NOI was $18 million, in the Fourth Amendment, the right-size payment at ten years is $65 million even if NOI could somehow reach $21 million. (Fourth Amend. § 6 and Ex. C).

68. Specifically, Section 6 of the Fourth Amendment amended the Ground Lease to state the following:

> Landlord is hereby entitled to the Right-Size Payment in accordance with this Section 60 [of the Ground Lease], which Right-Size Payment shall be due and payable upon the last day of the tenth (10th) Lease Year (such date, the "Right-Size Event Date"; and such event, the "Right-Size Event").

~~*[Link to previous setting changed from off in original to on in modified.].*~~

~~[Link to previous setting changed from off in original to on in modified.].~~

Exhibit C to the Fourth Amendment then provides sample Right-Size Payment calculations for 2032. Once again, at an annual NOI of $21 million, the Debtors will owe the maximum: $65 million.

69. MSP knew and knows that NOI of $21 million or more is unrealistic for the current Project. But because, in 2024 – two years into a 99-year lease – it had the ability under the terms of the lease to take the Project away from the insolvent Debtors, it demanded this unpayable $65 million penalty, forcing the Debtors to enter into the completely unreasonable and extortionary Fourth Amendment.

70. True leases do not demand $65 million payments when difficulties arise and values of the leased property decline. Loans, not leases, contain these types of coverage-ratio provisions.

**G. The Extraordinary Payments Cannot Be, And Are Not, Treated As Rent In The Ground Lease Or Fourth Amendment**

71. Referring to the extraordinary payments demanded by MSP as "non-rent" is not hyperbole: the Ground Lease itself recognized that they are not rent and thus treats them as "loans" from the Debtors to MSP.

72. Four times in the Ground Lease and its amendments, extraordinary payments outside of the annual rent are referred to as "prepaid" or "additional" rent, but MSP ultimately

[Link to previous setting changed from off in original to on in modified.].

treats these as loans because the IRC precludes rent treatment. These four extraordinary payments are:

(1) the Debtors' $36.85 million contribution to the purchase of Units 1701 and 1702 (Ground Lease, § 5(d));

(2) the Debtors' $2 million contribution to the purchase of Unit 1706 (Ground Lease, § 47(e));

(3) any Right-Size Payment (Ground Lease, § 60(d)); and

(4) any buy back of rent under the Fourth Amendment (Fourth Amendment, §7(e)).

73. As MSP concedes in the terms of the Ground Lease, IRC § 467 forbids the treatment of these payments as rent. Therefore, for all four of these extraordinary payments, the Ground Lease contains language identical or similar to the following: "[f]or all U.S. federal, state and local tax purposes, Landlord and Tenant shall treat the Prepaid Rent as a prepayment of Additional Rent that is treated as a loan pursuant to Section 467 of the Code." (*See* Ground Lease, §§ 5(d), 47(e), 60(d) and Fourth Amendment, § 7(e).) These supposed loans are from the tenant, the Debtors, to or on behalf of the landlord, MSP.

74. Two of the extraordinary payments have already been paid: the Debtors' contribution to the purchase of Units 1701 and 1702 and the Debtors' contribution to the purchase of Unit 1706. MSP concedes that it has made no provisions for the repayment of these "loans" to the Debtors or crediting of these payments against rent.

75. Lessors under true leases collect true rent that can, under all applicable laws, be treated as rent. The Ground Lease enables the Defendant to collect from the Debtors (or, in the case of the purchase price payments, cause the Debtors to pay to third party Cain) extraordinary payments that are not rent. Accordingly, it is not a true lease.

[Link to previous setting changed from off in original to on in modified.].

~~[Link-to-previous setting changed from off in original to on in modified.].~~

**H. The Ground Lease Is Not A Ground Lease: Neither MSP Nor The Debtors Ever Owned The Land Under The Condominium Units**

76. The Ground Lease does not lease an interest in any "ground" whatsoever. The land upon which the Building is located is owned by the Condominium Association as a Common Element and not by any owner of a condominium unit within the Condominium. As such, the Ground Lease, on its face, is disingenuously titled.

**I. So-Called Modern Institutional Ground Leases, Like The Ground Lease Here, Are Admitted In The Industry To Be At Risk Of Recharacterization**

75. MSP's leasing expert calls the Ground Lease a "modern institutional ground lease" and compares it to other similar financial products in the marketplace, including ground leases marketed by Safehold Inc. ("**Safehold**"), a publicly traded real estate investment company. Tellingly, Safehold has expressly warned its investors:

> We are subject to the risk of bankruptcy of our Tenants. . . .
>
> It is also possible that a bankruptcy court could re-characterize our Ground Leases as secured lending transactions depending on its interpretation of the terms of the lease. If a lease were judicially recharacterized as a secured lending transaction, we would not be treated as the owner of the property subject to the lease and could lose the legal as well as economic attributes of the owners of the property, which could have a material adverse effect on us.[5]

76. Nipon, in his podcast interview, credited "folks at ISTAR and Safehold for kind of trailblazing" the space of "institutional or modern ground lease[s]," thereby confirming that MSP's

[5] Safehold Inc., Form 10-K for the Fiscal Year Ended December 31, 2024, p. 16 (emphasis in original).

~~[Link to previous setting changed from off in original to on in modified.].~~

~~[Link-to-previous setting changed from off in original to on in modified.].~~

ground lease product belongs to the very category of products that Safehold has warned its investors may be recharacterized as lending transactions.

**J. Other Considerations**

77. Other considerations support recharacterization of the Ground Lease. As noted, the term of the Lease is 99 years (Ground Lease, § 3), if the likely triggering of a default in year 5 (originally) or year 10 (under the Fourth Amendment) is ignored. In *PCH I* and *MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*, 2024 WL 5113165 (2d Cir. Dec. 16, 2024) ("***MOAC***"), the Second Circuit looked to the unusually long term of the leases at issue—33 years with the option to extend to 165 years in *PCH I* and 100 years in *MOAC* —as a feature weighing in favor of recharacterization.

78. In addition, "[t]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease." *PCH I,* 804 F.2d at 201. The Ground Lease is "triple net," meaning that it obligates the Debtors or their affiliates to: (a) pay all real estate taxes (Ground Lease, § 7(a)), (b) obtain insurance at levels demanded by the Defendant and naming the Defendant as an additional insured (*id.* § 15) and (c) keep and maintain the Hudson in good condition, repair, and appearance (*id.* § 9(a)). The Ground Lease also obligates the Debtors to obtain all permits and licenses (*id.* § 7(c)), keep the Property free and clear of liens (*id.* § 10), pay all utilities (*id.* § 9(f)), and assume the risk of loss and indemnify the Defendant (*id.* § 38). MSP, by contrast, has no financial obligations typically associated with ownership under any of the operative agreements, for a period of 99 years.

79. The Court has identified certain Ground Lease provisions that it states weigh against recharacterization. The Debtors respectfully suggest that these provisions do not militate

~~[Link-to-previous setting changed from off in original to on in modified.].~~

~~[Link-to-previous setting changed from off in original to on in modified.].~~

in favor of a true lease and, in any event, are decidedly outweighed by the numerous aspects of the Acquisition Transaction and the unique provisions of the Ground Lease discussed above that support recharacterization.

80. *First*, the Court has noted that the Ground Lease has no provision for the Debtors to obtain title to the Condominium Units, even at the end of the Lease. In *MOAC,* a case involving an anchor store in a mall (and thus no apparent lessee right to purchase real estate at any point in time), the Second Circuit noted that a paramount consideration was precluding a windfall to the putative lessor. In *MOAC,* the lessee had pre-paid the first 30 years of rent. Notwithstanding the reversionary interest held by the putative lessor, the Second Circuit found that the lessor had received the benefit of its bargain with the lessee and refused to find that the putative lease was governed by section 365 of the Bankruptcy Code, which would have resulted in a windfall to the lessor. In *MOAC*, the prepaid rent was just $300. Here, the Debtors have "prepaid" tens of millions of dollars (plus contributed hundreds of millions of dollars in development-related costs). Indeed, the Second Circuit faced a similar situation in *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.* ("***RPI***"), 936 F.2d 744 (2d Cir. 1991)

:

> To permit [RPI] to recapture the leased premises with the manufacturing facility improvements would amount to a "windfall" to RPI. RPI might argue that there is no "windfall" since the property, including the manufacturing facility, reverts to it in 2082 at the end of the 99 year term. However, the windfall is the current value today of the premises improved by a relatively new manufacturing facility, less the "present value" in economic terms of a reverter of the premises in an unknown state of improvement in 91 years. That a present reversion to RPI would be grossly inequitable bolsters our conclusion that § 365(d)(4) does not apply to this unusual transaction.

~~[Link-to-previous setting changed from off in original to on in modified.].~~

~~[Link-to-previous setting changed from off in original to on in modified.].~~

936 F.2d at 751. *See also In re Berez*, 646 F.2d 420, 421 (9th Cir. 1981) ("The absence of a purchase option in a lease does not preclude a finding that the lease was actually a disguised secured loan").

81. *Second*, the Court has also stated that under Section 11 of the Ground Lease, MSP could sell "its fee title in the leased property, subject to the lease." However, Section 11 uses the term "Land," which is defined in the Ground Lease as consisting of elements of the Hudson Hotel Building other than the Condominium Units and comprising Common Elements. As noted above, the Common Elements are owned by the Condominium Association, not owners of Condominium Units. Therefore, the foregoing provision appears to be a nullity, as MSP has no ability to sell the "Land." Moreover, even if it is assumed that Section 11 allows MSP to sell the actual Condominium Units, subject to the Ground Lease, a change in ownership does not change the Ground Lease. The fact that the Ground Lease was not a true lease with MSP as lessor does not change with a successor lessor: it is still not a true lease.

82. *Third*, the Court also noted that under Section 8(a) of the Ground Lease, the Debtors' use of the Property is subject to MSP's approval. That term, however, is common in any financing of a real estate construction project through affirmative and negative loan covenants. In fact, Section 8(a) reinforces that MSP was simply adding to the capital stack of the Project; the Parkview Financial Agreements contain similar provisions.

**FACTS SUPPORTING FRAUDULENT TRANSFER**

83. As noted above, the Debtors were insolvent at all times relevant to this proceeding, including at the time the Fourth Amendment was signed. And, the Fourth Amendment caused the

~~[Link-to-previous setting changed from off in original to on in modified.].~~

~~*[Link to previous setting changed from off in original to on in modified.]*.~~

transfer of significant property from the Debtors to MSP for no reasonably equivalent value, rendering it even more insolvent.

84. *First*, the Fourth Amendment, with no justification whatsoever, raised the annual rent under the Ground Lease from $6.4 million to $8.75 million. (Fourth Amendment, § 3) The Ground Lease contains no provision for such an increase in rent, and MSP demanded it simply because it had significant bargaining leverage over the insolvent Debtors and interest rates had risen between 2022 and 2024.

85. *Second*, the Fourth Amendment, with no justification whatsoever, rewrote the Right-Size Payment to ensure that in 2032 an extraordinary payment of $65 million will be due from the Debtors to MSP. (*Id.* § 6)

~~57.~~86. ~~The~~*Third*, the Fourth Amendment ~~also allowed for~~added, with no justification whatsoever, more frequent adjustments to the ~~Base Rent to account for inflation, from~~$8.75 million rent, changing the frequency of the Ground Lease rent adjustments from every 10 years to ~~adjustments~~ every 5 years. ~~*See id.*,~~*Id.* § 5(d). ~~It also ensures that the increase is no less than 2% regardless of inflation. *See id.*~~

87. The Debtors received nothing of value for any of these transfers, much less reasonably equivalent value. MSP claims that the Fourth Amendment's buy-back provision is somehow a benefit. However, under Section 7 of the Fourth Amendment, in order to buy down the Ground Lease rent from $8.75 million to the original $6.4 million, the Debtors would be

~~*[Link to previous setting changed from off in original to on in modified.]*.~~

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

required to pay MSP $52 million. Nothing in the Fourth Amendment provides the Debtors with anything even close to $52 million in value.

## DEBTORS' REQUESTED RELIEF

~~58. The Fourth Amendment *further* changes the inputs for the calculation of the Right-Size Payment to be more favorable to Defendant, ballooning the potential payment up to a cap of $65,000,000. *See id.* at 5.~~

~~59. In exchange for incurring these increased payment obligations to Defendant, Plaintiffs received (1) a change in the date of the Right-Size Payment, which was pushed back from the end of the fifth lease year to the end of the tenth lease year; and (2) the ability to make a Buyback Option payment to Defendant to decrease going forward "rent" payments upon completion of construction in accordance with a not-yet-agreed-to Fallback Business Plan, but no later than May 4, 2027. *See id.*, § 7(a). In effect, the Debtors received an option to repay the loan early in exchange for the Fourth Amendment, which materially increased the Debtors' costs under the Ground Lease.~~

~~**D. UCC Foreclosure Sale of Equity Interests**~~

88. Consistent with the procedure in *PCH I* and *PCH II*, the Debtors submit that the Ground Lease should first be declared not a true lease under, and not subject to the assumption/rejection requirements of, section 365 of the Bankruptcy Code.

89. The Debtors further submit that, upon the Court making the foregoing declarations, the Court should conduct supplemental hearings pursuant to sections 105, 502, 506 of the Bankruptcy Code and Bankruptcy Rules 3012 and 7001(b) and (i), to determine the nature, priority, and extent of the Defendant's claim under the Ground Lease. With respect to the nature of the claim, the Debtors proffer, without limitation, two possible outcomes to that proceeding

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

[Link-to-previous setting changed from off in original to on in modified.].

based upon how the Court characterizes the Acquisition Transaction and the Ground Lease as a part of that transaction.

90. In the first instance, the Debtors request that the Court characterize the Acquisition Transaction and MSP's contribution of capital as a loan to finance the Debtors' acquisition of the Condominium Units, which would either be unsecured financing or, if the Court determines appropriate, secured by the imposition of an equitable lien. Under this scenario, the Debtors would be characterized as the purchasers of the Condominium Units, having already made a considerable down payment, and the monies owed under the Ground Lease would be characterized as the balance owing to MSP under its acquisition financing loan.

91. If MSP's loan is deemed secured by an equitable lien, the extent and priority of that lien should be determined by the Court in a supplemental proceeding in accordance with Bankruptcy Rule 7001(b), to allow other creditors who assert a secured position to intervene and be heard.

92. Alternatively, the Debtors request that the Court characterize the Acquisition Transaction as a joint purchase, with the Debtors and the Defendant owning the Condominium Units as tenants in common, and with each entity's ownership being commensurate with its net contributions to the acquisition of the Condominium Units. This characterization would recognize both MSP's and the Debtors' investment in the transaction to acquire the Condominium Units. It would also avoid the Debtors' forfeiture of their investment capital: $38.65 million.

60. As security for Plaintiffs' Loan Obligations to Prepetition Lender in addition to collateral granted by Plaintiffs to Prepetition Lender, CSC, as pledgor and the then-sole member of the Plaintiffs, entered into a pledge and security agreement (the "Pledge Agreement") with Prepetition Lender. Under the Pledge Agreement, as collateral CSC pledged 100% of the equity

[Link-to-previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

interests in the Plaintiffs along with certain other rights and interest, and as specifically defined in the Pledge Agreement (the "Pledged Collateral") for the Loan Obligations to Prepetition Lender. Upon an event of default, the Prepetition Lender had the right to conduct a UCC sale of the Pledged Collateral.

61. As noted, the Fourth Amendment increased the payments from $6,400,000 to $8,750,000 million per annum. These increased payments remained owing during construction and did not fluctuate with the stop work order in place as a result of the HPD's determination of harassment and further aggravated already-present liquidity constraints resulting from continued rent payments during the delays in construction.

62. The Loan from the Prepetition Lender matured on November 1, 2024. Plaintiffs were unable to make payment by that time, and the Prepetition Lender subsequently agreed to forebear from exercising any remedies on two occasions through November 22, 2024. Ultimately, on November 23, 2024, the Prepetition Lender sent Plaintiffs a notice of default under the Loan and forbearance agreements.

63. On or around November 25, 2024, the Prepetition Lender served upon CSC, Plaintiffs, and the Smekes a notice of public disposition of collateral, scheduling a UCC foreclosure sale of the Pledged Collateral scheduled for March 24, 2025 (the "UCC Sale"). On February 11, 2025, the Prepetition Lender served a second notice of disposition and publicized the adjusted date of the UCC Sale of April 10, 2025.

64. Prepetition Lender and the Smekes were involved in negotiations to resolve issues arising from the Smekes' management of the project in order to allow the redevelopment and construction to continue at the Hudson. Those efforts were at least partially successful, and, on April 10, 2025 – the date scheduled for the UCC Sale – the Prepetition Lender and the Smekes, as

*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

guarantors of the Loan, entered into an agreement which among other things, adjourned the UCC Sale.

65. Following intervening litigation and stalled negotiations, the UCC Sale of the Pledged Collateral was ultimately conducted on July 25, 2025. Prepetition Lender obtained the equity interests in Plaintiffs in exchange for a credit bid in the amount of $80,000,000 of existing indebtedness. The Prepetition Lender then assigned the interests it acquired to its wholly owned subsidiary, PV Hudson. PV Hudson is currently the sole member of the Plaintiffs.

66. Plaintiffs, now under PV Hudson's ownership, attempted to negotiate with Defendant reasonable stand-still agreements and a modification of the Purported Ground Lease to reflect changes in the economic realities of the project and the actual fair market value of Plaintiffs' use of the Hudson, but were rejected.

67. On November 20, 2025, Plaintiffs, as Debtors, sought authority in the Bankruptcy Case to extend the time to perform any obligations under the Purported Ground Lease for a period of 60 days from the Petition Date, through and including December 21, 2025 [D.I. 94]. The Bankruptcy Court entered an order granting this relief on December 12, 2025, and the Plaintiffs agreed to pay any rents that were then-due on December 22, 2025, while reserving "all rights with respect to any claims either party may assert against the other with respect to the Ground Lease" [D.I. 160].

**E. The Purported Ground Lease – Disguised Financing Arrangement**

68. The Purported Ground Lease embodies characteristics of a disguised financing agreement or joint venture agreement and is not a true lease.

*[Link-to-previous setting changed from off in original to on in modified.].*

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

### ~~1. Payments Under the Ground Lease Bore No Relation to Use of the Hudson, But Rather Were Calculated to Ensure Return on Investment.~~

~~69. Although the Purported Ground Lease recites that it is a lease and not a financing arrangement, courts look beyond such labels to the economic realities of the transaction. Here, the economic substance is that of a financing. The purported "rent" payments were not calculated to compensate Defendant for the use of the Hudson or by reference to the market value of the occupancy rights for the Condominium units (Units 1701, 1702 and 1706). Rather, the "rent" payments were designed and structured to ensure that Defendant would receive specific returns on its investment as one would expect with interest and fees on a loan.~~

~~70. For one, Plaintiffs paid a $36,850,000 upfront payment upon execution of the Purported Ground Lease. This payment was designated as for the acquisition of "Personal Property," for the prepayment of rent, or both. But Plaintiffs received no rent credit, and whatever "Personal Property" existing in the Hudson – a former hotel occupied by SRO Tenants – is, upon information and belief, worth considerably less than $36.85 million. The descriptions are not credible; rather, Plaintiffs effectively made an 18% down payment or an equity contribution to Defendant. Indeed, upon information and belief, the Hudson was largely gutted of any personal property (i.e., furniture) prior to Defendant's acquisition of the Property.~~

~~71. Similarly, the Right-Size Payment was calculated to ensure that Defendant saw a specific return on its investment in case of the need to switch to a Fallback Project – a reduction in potential cash flow, resulting in a reduction in value necessitating the need to "right-size" the LTV ratio. That is, the requirement that Plaintiffs make a Right-Size Payment was triggered by the change in redevelopment plans, and to compensate Defendant's investors as a consequence of these changes – again bearing no relation to the value of the occupancy rights for the Hudson.~~

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

*[Link-to-previous setting changed from off in original to on in modified.].*

72. The Right-Size Payment *increases* even when the income Plaintiffs generate from the Hudson *decreases*. The Right-Size Payment is *inversely* associated with the current market value of the use of the Hudson and capped at the sum of $65 million – approximately 38.2% of the original purchase price paid by Defendant – which, when added to the initial downpayment of $36.85 million represents 50% of the initial purchase price. The Right-Size Payment is nothing more than an equity cure provision to "right size" the extent of the LTV ratio.

73. The "rent" payments themselves are equally unmoored from the market value of the use of the Hudson, ballooning 10% in the sixth and eleventh years of the Purported Ground Lease and at least 2% thereafter with *no adjustment* based on the fair market value of the use of the Hudson anytime during the 99-year term.[13] The "rent" payments ensure that Defendant receives a fixed return that never gets adjusted for the fair market value. As noted earlier, a conservative estimate of Defendant's return on investment over the full term of the Purported Ground Lease exceeds approximately 63%. Defendant is acting as a lender ensuring a return based on the amount of capital Defendant extended to Plaintiffs.

74. The payment increases in the Fourth Amendment drive this point home. Indeed, Defendant admitted that it required Plaintiffs to execute the Fourth Amendment because Defendant was worried about the returns it had promised to its investors in reliance on Plaintiffs' completion of the redevelopment project. Defendant explained in response to Plaintiffs' Fallback Business Plan submitted in December 2023 that its "investors require that ground lease proceeds advanced and ground rent rates and increases be tied to specific thresholds, yields, and coverage ratios based on the asset's as-stabilized market value and project net operating income" and that its "investors

[13] The Parties demonstrated elsewhere in the Purported Ground Lease that they could calculate the fair market value of the purported "Leasehold Estate" for other non-"rent" purposes. *See, e.g.*, Ex. A, § 14.
*[Link-to-previous setting changed from off in original to on in modified.].*

*[Link-to-previous setting changed from off in original to on in modified.].*

are no longer willing to watch the value of their investment plummet without a corresponding adjustment of economics to the [Purported] Ground Lease."

75. Moreover, as a condition to entering the Purported Ground Lease, Defendant required not only a guaranty of rent payments, but also a guaranty that construction would be completed. The guaranty gives Defendant additional credit support beyond the value of the Hudson and external to the Purported Ground Lease and is consistent with support that a lender would receive in a conventional financing.

76.93. The Purported Ground Lease did not provide for a "pre-term" or "holding-period" rent period prior to receiving development permits or a "construction period" rent that would apply while improvements were in process. Here, the rent payments – in effect, interest – started in full force without abatement despite the construction delays. Indeed, Plaintiffs will have to pay *more* in connection with the Right Size Payment on account of construction delays than if the construction of the project was finished and Plaintiff were collecting rent. These provisions demonstrate that the payment obligations under the Purported Ground Lease were in no way related to the market value of the use of the Hudson.would then be characterized as a co-ownership agreement granting the Debtors exclusive use of the Condominium Units for 99 years in return for a defined share of the fee interest. Although the Second Circuit in *PCH II* rejected recharacterization of the subject lease as a "joint venture," that case involved considerations far beyond a simple tenancy in common. Even if a tenancy in common could be viewed as a joint venture, in this case, it is just a joint venture in the Condominium Units themselves, and not in the Project or any income derived from the Project.

94. This relief is supported by the case law. In *PCH II,* two sophisticated parties entered into a transaction to facilitate the acquisition, renovation, and operation of a Philadelphia

*[Link-to-previous setting changed from off in original to on in modified.].*

~~[Link-to-previous setting changed from off in original to on in modified.].~~

hotel. 949 F.2d at 589-90. The bankruptcy court recharacterized the ground lease as a joint venture. The Second Circuit affirmed that the purported ground lease was not a "true lease" but disagreed with the joint venture characterization because the transaction lacked a true profit-sharing element and the lessor had no right to control the operations or management of the hotel. Instead, the Court held that the transaction was a "sophisticated secured financing arrangement," with the lessor holding an equitable mortgage. 949 F.2d at 599-600.

95. The Court reached this conclusion because, as here, "[the debtor] was to get the money it needed to refurbish the Hotel and [the lessor] was to receive a fixed rate of return on the funds it advanced" and "[the lessor], to protect its funds, retained title to the land and in the event of a default had the right to retake not only possession of that land but also the Hotel and improvements." *Id.* at 600. The Second Circuit concluded that "the deed to the land underlying the Hotel while on its face conveying absolute ownership to [the lessor] was in reality nothing more than security for the funds that [the lessor] made available to [the debtor]. In short, [the lessor] held an equitable mortgage." *Id.*

96. Finally, the Debtors request that the Court also conduct supplemental proceedings pursuant to sections 502 and 506 of the Bankruptcy Code and Bankruptcy Rule 3012 to determine the amount of the claim or claims in the Chapter 11 Cases held by the Defendant, GLR, MSP, or any other affiliate or assignee (subject to disallowance of those claims pending payment to the Debtors' estates of any amounts determined to be owing to the estates, pursuant to section 502(d) of the Bankruptcy Code).

97. Either of these potential outcomes would recognize MSP's actual investment in the Project's capital stack while preventing MSP from inequitably appropriating $200 million in value and depriving all other creditors in the Chapter 11 Cases of any recovery whatsoever.

~~[Link-to-previous setting changed from off in original to on in modified.].~~

*[Link-to-previous setting changed from off in original to on in modified.].*

## CAUSES OF ACTION

77. In its own marketing materials, Defendant describes their "ground lease" scheme as an "interest only, 99-year financing product intended to maximize Sponsor returns and address capital requirements for core to opportunistic real estate investments."[14] Defendant is not in the business of collecting passive rental income like a typical landlord. In other words, Defendant earns "interest" on its investment capital. The Purported Ground Lease is simply an investment and financing vehicle.

**2. Hudson Was Acquired By Defendant Specifically For Plaintiffs' Use.**

78. Defendant received assignment of the Purchase and Sale Agreement from Plaintiffs, then paid for and acquired Hudson with the sole purpose of turning it around and "leasing" it to Plaintiffs. The purpose of this scheme is to have Defendant acquire the Condo Units by way of a disguised "interest only financing product," in order to allow Plaintiffs to obtain typical debt for the redevelopment portion of the project.

79. Defendant acquired Hudson after Plaintiffs had *already* contracted to purchase Hudson. After direct assignment of the Purchase and Sale Agreement, Defendant acquired Hudson and simultaneously entered into the Purported Ground Lease with Plaintiffs. Moreover, CSC – which owned all of the equity interests in Plaintiffs – was required to pay all of the costs ancillary to the transaction, including Defendant's diligence costs and a $595,000 payment to GLR for "advisory and consulting services." It is very unusual for a landlord to require its tenant to pay such a fee for leasing space; however, it is typical for a lender to require payments for such financing fees, as Defendant required the Plaintiffs to do here.

[14] *See GLR Ground Lease*, *supra* fn. 6.
*[Link-to-previous setting changed from off in original to on in modified.].*

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

~~80. In the Purported Ground Lease itself, Defendant notes that the up-front payment of $36.85 million was "in connection with . . . [Defendant's] *acquisition* of the Leased Premises" (resulting in an LTV ratio of approximately 82%), not some sort of security deposit or genuine prepaid rent that would be credited to future rent payments. *See* Ex. A, § 4(i) (emphasis added).~~

~~81. Defendant also announced to the world that the Purported Ground Lease was used to "acquire" the Hudson and "facilitate" the redevelopment by providing Plaintiffs "a lower blended cost of capital."~~

~~**3. The Transaction Was Denoted as a Purported Ground Lease for Tax Purposes.**~~

~~82. Upon information and belief, Defendant structured the Ground Lease to protect its investors from tax consequences and/or to secure certain tax advantages.~~

~~83. Upon information and belief, Defendant enjoys tax advantages by reclassifying payments under the Purported Ground Lease as "Prepaid Rent," including the upfront payment and the Right-Size Payment that can be treated as a loan for tax purposes permitting Defendant to spread out its realization of such income over time pursuant to 28 U.S.C. § 467. Such payments would be subject to less advantageous tax treatment in the typical financing context when classified as a financing fee or equity cure payment.~~

~~**4. Plaintiffs Assumed All of the Obligations Typical of Ownership.**~~

~~84. As noted above, Plaintiffs assumed virtually all of the obligations that would be expected by an owner of the fee interest in the real estate.~~

~~85. Plaintiffs are required under the Purported Ground Lease to, among other things, (i) obtain insurance at amounts set by Defendant and name Defendant as an additional insured, (ii) pay utilities, (iii) pay real estate taxes, (iv) obtain all necessary licenses and permits with government regulators, and (v) keep the Hudson clear of liens.~~

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

*[Link-to-previous setting changed from off in original to on in modified.].*

86. Moreover, the Purported Ground Lease provides for a waterfall of any award in the event of condemnation where a portion of such proceeds go to Plaintiffs in proportion with the fair market value of the purported "Leasehold Estate." *See* Ex. A, § 14.

87. While these terms may be understood to apply in commercial real estate ground leases, they should be viewed here in conjunction with the other indicia of a disguised financing arrangement, all meant to benefit Defendant. In other words, a true ground lease might contain these terms, but it would not *also* require tens of millions of dollars in upfront and balloon payments without any adjustment of the rent based on the fair market value of the Hudson.

**5. The Parties Intended To Enter Into a Financing Arrangement.**

88. By entering into the Purported Ground Lease, the Parties actually intended to enter into a financial arrangement.

89. This is made clear by MSP and GLR's own public statements describing their ground lease schemes as utilizing "ground lease capital," as a "financing product," and as a "compelling financing solution."

90. Moreover, the "Project Budget" agreed to by Defendant lists the Purported Ground Lease as a source of capital for financing the purchase and redevelopment of Hudson along with the Loan and Plaintiffs' equity. *See* Project Budget, Schedule 1 to Purported Ground Lease, Ex. A at 156.

91. Indeed, the unique nature of the Purported Ground Lease instructs that it is not a "ground lease" at all. The term "ground lease" typically describes a lease of unimproved land on which improvements are to be built by the tenant or a lease of improved real estate that covers the land but not the improvements, which are owned by the tenant. The Purported Ground Lease is neither of those things. Here, the Property is split into various Condominium units, of which only

*[Link-to-previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

three are encompassed by the Purported Ground Lease. The Condominium Declaration establishes the Common Elements, including the land, and each of the six Condominium Unit owners has a specified undivided interest in such Common Elements – not Defendant. Instead, the Purported Ground Lease is a financing arrangement.

## COUNT I

**Declaration that Purported Declaratory Judgment That The Ground Lease isIs Not a True Lease Under 11 U.S.C. § 365**

92.98. PlaintiffsThe Debtors restate and incorporate by reference the above paragraphs 1 through 9197 as if set forth fully herein.

93.99. Plaintiffs respectfully request that this Court invoke its equitable powers to look through the form of the Purported Ground Lease to its substance. Specifically, Plaintiffs request that the Court find and declare that the Purported As set forth in detail above, the Ground Lease isa disguised financing arrangement and not a true leas. Plaintiffse and, instead, is: (a) an instrument in connection with a loan from the Defendant to the Debtors to finance the Acquisition Transaction, with the Debtors owning the Condominium Units and owing the Defendant the balance of its loan; or (b) an instrument in connection with a joint-purchase transaction, creating a tenancy in common among the Debtors and the Defendant with respect to the purchased Property. Accordingly, the Debtors request that the Court order that the interests created by thePurported Ground Lease are properly excluded from application of any Bankruptcy Codesection is sections pertinent to leases, including but not limited to Bankruptcy Codesections section 36 and 11235.

94.100. Plaintiffs anticipate that Defendant will attempt to seek relief pursuant toThe Defendant has already asserted that the Ground Lease is governed by Bankruptcy Code sectionssection 365(d)(3) and (d)(4)4) and has appealed the Court's ruling dated April 22, 2026 in the Chapter 11 Cases that the Ground Lease, if a true lease, is governed instead by Bankruptcy

[Link to previous setting changed from off in original to on in modified.].

[Link to previous setting changed from off in original to on in modified.].

Code section 365(d)(2). The Debtors anticipate that the Defendant will also attempt to seek other relief pursuant to Bankruptcy Code section 365 in its ostensible role as "lessor" under the Purported Ground Lease or seek to terminate the Purported Ground Lease. Therefore, an actual case or controversy exists between Plaintiffs andthe Debtors and the Defendant.[15]

95.101. The controversy is genuine and definite. Whether the Purported Ground Lease is a true lease, or instead a disguised financing vehicle will materially impact Plaintiffsthe Debtors' rights in its chapterthe Chapter 11 proceedingsCases, including under any future chapter 11 plans.

96. Pursuant to Bankruptcy Code section 105 and 28 U.S.C. §§ 2201 & 2202, Plaintiffs seek a declaratory judgement that the Purported Ground Lease is not an enforceable true lease and is instead a disguised financing agreement.

97. In the event that this Court finds that Bankruptcy Code section 365 is applicable to the Purported Ground Lease as a true lease, Plaintiffs alternatively request leave to seek this Court's approval to assume the Purported Ground Lease pursuant to Bankruptcy Code section 365(a) and Rule 6006 of the Federal Rules of Bankruptcy Procedure.

## COUNT II

**Avoidance of Fraudulent Transfer —(Fourth Amendment)**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) – Constructive Fraud**

98.102. PlaintiffsThe Debtors restate and incorporate by reference the above paragraphs 1 through 97101 as if set forth fully herein.

103. As set forth in detail above, the Debtors (a) were insolvent at the time the Fourth Amendment was executed in March 2024, (b) had unreasonably small capital to permit entering

[15] Plaintiffs reserve all rights to argue in the alternative that Bankruptcy Code sections 365(d)(3) and (d)(4) do not apply to the Purported Ground Lease on any other grounds.
[Link to previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

into the Fourth Amendment, and (c) incurred debts pursuant to the Fourth Amendment beyond the Debtors' ability to pay.

104. Further, pursuant to the Fourth Amendment, the Debtors transferred significant value to the Defendant, receiving no reasonably equivalent value in exchange. Specifically, the Fourth Amendment: (a) increased annual rent by $2.35 million (from $6.4 million to $8.75 million), representing a substantial transfer of value over the remaining 95-year term of the Ground Lease; (b) imposed a $65 million Right-Size Payment due in 2032 that the insolvent Debtors could not conceivably fund; and (c) accelerated rent adjustment intervals from every 10 years to every 5 years. The only purported consideration, a buy-back option requiring approximately $52 million to restore the original rent level, was illusory because the insolvent Debtors did not have and could not obtain $52 million, and the buy-back was itself above market value as measured by capitalization rates.

99. Plaintiffs request that the Court find that that the Fourth Amendment, any transfer thereunder or in connection with, and any obligations incurred thereby are avoidable as a constructive fraudulent transfer or obligation under 11 U.S.C. § 548(a)(1)(B).

100. In connection with the Fourth Amendment, Plaintiffs incurred obligations to pay to Defendant approximately 36% in increased "rent" payments and an increased Right-Size Payment as compared to the original Purported Ground Lease.

101. In exchange, Plaintiffs received a Buyback Option and are not required to pay the (increased) Right-Size Payment until the tenth lease year as compared to the fifth lease year under the original Purported Ground Lease. This consideration received by Plaintiffs was far less than the reasonably equivalent value of the 36% increased "rent" payments and Right-Size Payment to be received by Defendant under the Fourth Amendment.

*[Link-to-previous setting changed from off in original to on in modified.].*

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

~~102. Plaintiffs were insolvent (or were rendered insolvent) at the time the Parties entered into the Fourth Amendment. At that time, Plaintiffs' monetary obligations, including monthly "rent" payments under the Purported Ground Lease, and obligations owing to the Prepetition Lender and construction of the redevelopment project was (and remains) stalled indefinitely due to the HPD's finding of harassment of the SRO Tenants.~~

~~103. At a minimum, Plaintiffs increased payment obligations to Defendant under the Fourth Amendment left them with an ever-shrinking unreasonably small amount of capital to adequately fund the construction of the redevelopment project.~~

~~104. Plaintiffs also incurred the increased payment obligations to Defendant under the Fourth Amendment despite the fact that construction was stalled and that Plaintiffs believed they would be unable to pay the increased "rent" payments and Right-Size Payment when those debts matured – let alone the outstanding balance of the Loan quickly approaching the maturity date.~~

~~105. Accordingly, Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers and obligations, and each of the Plaintiffs: (a) was insolvent on the date that each transfer and obligation was made; (b) became insolvent as a result of these transfers and obligations; (c) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (d) intended to incur, believed that they would incur, or reasonably should have believed that they would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due.~~

~~106.~~105. ~~Plaintiffs~~The Debtors entered into the Fourth Amendment under threat of termination of the ~~Purported~~ Ground Lease by the Defendant and thus were compelled to accept its terms.

~~*[Link-to-previous setting changed from off in original to on in modified.].*~~

~~[Link to previous setting changed from off in original to on in modified.].~~

~~107.~~106. Accordingly, the ~~transfer and obligations incurred under~~Debtors request that the Court find and declare that that the Fourth Amendment, any transfers thereunder or in connection therewith, and any obligations incurred thereby are avoidable and are avoided as constructive fraudulent transfers ~~under Section~~pursuant to 11 U.S.C. § 548(a)(1)(B)~~ of the Bankruptcy Code~~(i), (ii)(I), (ii)(II), and (ii)(III).

**COUNT III**

**Avoidance of Fraudulent Transfer ~~–~~(Fourth Amendment)**
**Pursuant to 11 U.S.C. § 544(b)(1) – New York Uniform Voidable Transactions Act**

~~108.~~107. ~~Plaintiffs~~The Debtors restate and incorporate by reference the above paragraphs 1 through ~~107~~106 as if set forth fully herein.

~~109.~~108. Section 544(b)(1) of the Bankruptcy Code provides that the trustee "may avoid any transfer of an interest in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor ~~by a creditor~~ holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1).

~~110.~~109. The Fourth Amendment, any ~~transfer~~transfers thereunder or in connection therewith, and any obligations incurred thereby are avoidable transfers under the New York Uniform Voidable Transactions Act, N.Y. Debt. and Cred. Law Art. § 270(a)(2).

~~111.~~110. Each of these transfers ~~and obligations~~ is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers were made ~~and obligations incurred~~.

~~112.~~111. ~~Plaintiffs~~The Debtors request that the Court find and declare that the Fourth Amendment, any ~~transfer~~transfers thereunder or in connection therewith, and any obligations incurred thereby are avoidable transfers and are avoided pursuant to 11 U.S.C. § 544(b)(1) and the New York Uniform Voidable Transactions Act, N.Y. Debt. and Cred. Law Art. § 270(a)(2).

~~[Link to previous setting changed from off in original to on in modified.].~~

*[Link-to-previous setting changed from off in original to on in modified.].*

113. Plaintiffs request that the Court find that that the Fourth Amendment, any transfer thereunder or in connection therewith, and any obligations incurred thereby are avoidable as a constructive fraudulent transfer or obligation under 11 U.S.C. § 544(b)(1).

**COUNT IV**

**Recovery of Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B) and 550(a)**

114.112. PlaintiffsThe Debtors restate and incorporate by reference the above paragraphs 1 through 113111 as if set forth fully herein.

115.113. Section 550(a) of the Bankruptcy Code provides that if a transfer is avoided under section 544 or 548 of the Bankruptcy Code, Plaintiffs maythe debtor or trustee may (subject to certain exceptions in other subparagraphs of section 550 that are inapplicable here) recover the property transferred from Plaintiff to Defendantthe initial transferee or any immediate or mediate transferee of such initial transferee.

116.114. Under the Fourth Amendment, the Defendant has received monthly "rent" payments and continues to receive monthly "rent" payments of $729,166.67—$195,833.34 per month above-and-beyond what it would have received under the original Purported Ground Lease.

117. Those payments were avoidable transfers under sections 544 and/or 548 of the Bankruptcy Code and are recoverable by the Plaintiffs' bankruptcy estates under section 550 of the Bankruptcy Code.

115. The Debtors request that the Court find and declare that, having declared that those "rent" payments are avoidable transfers and are avoided under section 544 and/or 548 of the Bankruptcy Code, they are recoverable by the Debtors' bankruptcy estates from the Defendant and any immediate or mediate transferee of the Defendant under section 550(a) of the Bankruptcy Code.

*[Link-to-previous setting changed from off in original to on in modified.].*

[Link to previous setting changed from off in original to on in modified.].

## COUNT V

### Disallowance of Defendant's Claims Pursuant to 11 U.S.C. § 502(d)

118.116. PlaintiffsThe Debtors restate and incorporate by reference the above paragraphs 1 through 117115 as if set forth fully herein.

119. The increased "rent" payments under the Fourth Amendment are recoverable transfers under Section 550 of the Bankruptcy Code and those transfers and/or obligations of the Fourth Amendment are avoidable under sections 544 and/or 548 of the Bankruptcy Code.

120.117. The Defendant has not paidrepaid to the Debtors' estates the amounts transferred for which Defendant is liable under Section 550 of the Bankruptcy Codeavoided pursuant to Counts II and III above.

121.118. Accordingly, under Section the Debtors request that the Court find and declare that, pursuant to section 502(d) of the Bankruptcy Code, any filed or scheduled claims in the Chapter 11 Cases held by the Defendant or any affiliate or assignee are disallowed until the Defendant pays in full to the Debtors' estates the amounts for which it is liable under section 550 of the Bankruptcy CodeCounts II-IV above.

## PRAYER FOR RELIEF

WHEREFORE, **Plaintiffs**the Debtors pray that the Court enter judgment in their favor and against the Defendant as follows:

A. Entering a Declaration that the Purported Ground Lease is not a true lease;

B. Entering a Declaration thethat any Bankruptcy Code sections 365 and, in particular, sections 365(d)(3) and (4) are section applicable to leases, including but not limited to Bankruptcy Code section 365, is not applicable to the Purported Ground Lease;

[Link to previous setting changed from off in original to on in modified.].

[Link to previous setting changed from off in original to on in modified.].

C. Determining, in this or a supplemental proceeding permitting the participation of other directly-affected putative secured creditors, that the Ground Lease is (a) an instrument in connection with a loan from the Defendant to the Debtors to finance the Acquisition Transaction, with the Debtors owning the Condominium Units and owing the Defendant the balance of its loan; or (b) an instrument in connection with a joint-purchase transaction, creating a tenancy in common among the Debtors and the Defendant with respect to the Property.

D. Determining, in this proceeding or a supplemental proceeding, the validity, priority, and extent of any equitable lien of the Defendant in the Property, pursuant to Bankruptcy Rule 7001(b);

C.E. DeterminingEntering a Declaration that the Fourth Amendment is avoidable and is avoided as a constructive fraudulent transfer under 11 U.S.C.sections 544(b)(1) and 548(a)(1)(B) of the Bankruptcy Code;

D.F. Ordering Defendantsthe Defendant to repay to the Debtors, pursuant to section 550(a) of the Bankruptcy Code, the additional "rent" amounts paid under the Fourth Amendment above-and-beyond what theyit would have received under the original Purported Ground Lease in an amount to be determined at trial, plus pre- and post-judgment interest;

E. Determining that the Purported Ground Lease is a disguised financing;

F. Determining that the value of the property securing the disguised financing at an amount to be determined at trial;

G. Declaring the terms of the financing based on a principal balance due as of the Petition Date in an amount to be determined at trial;

[Link to previous setting changed from off in original to on in modified.].

[Link to previous setting changed from off in original to on in modified.].

H.G. Disallowing any claims of the Defendant or any affiliate or assignee in the Chapter 11 Cases until the excess payments under the Fourth Amendment are repaid to Plaintiffs under 11 U.S.C. §the Debtors, pursuant to section 502(d) of the Bankruptcy Code; and

[*Remainder of Page Intentionally Left Blank*]

I.H. Granting such other relief as itthe Court deems necessaryjust and proper.

Dated: December 22, 2025
DATED: Wilmington, Delaware
June 10, 2026

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ William E. Chipman, Jr.*

[Link to previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.].*

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
olivere@chipmanbrown.com
bach@chipmanbrown.com
maser@chipmanbrown.com

-and-

**DLA Piper**BOIES SCHILLER FLEXNER LLP
**(US)**
*/s/ Stuart M. Brown*
Stuart M. Brown (DE No. 4050)
DLA Piper LLP (US)
1201 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@us.dlapiper.com
- and -

Neal Kronley (Robert Gordon (admitted *pro hac vice* application pending)
DavidMichael M. RileyFay (admitted *pro hac vice* application pending)
Caleb B. Roche (Jenny H. Kim (admitted *pro hac vice* application pending)
Sabina Mariella (admitted *pro hac vice*)
55 Hudson Yards
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 1002010001
Telephone: (212) 335-4500446-2300
Facsimile: (212) 335-4501
Email: neal.kronley@us.dlapiper
rgordon@bsfllp.com
mfay@bsfllp.com
david.riley@us.dlapiperjkim@bsfllp.com
caleb.roche@us.dlapipersmariella@bsfllp.com

*[Link-to-previous setting changed from off in original to on in modified.].*

*~~[Link-to-previous setting changed from off in original to on in modified.].~~*

*~~Proposed Special~~ Counsel ~~to the~~for Debtors and Debtors in Possession*

*~~[Link-to-previous setting changed from off in original to on in modified.].~~*

| | |
|---|---|
| **Summary report: Litera Compare for Word 11.9.1.1 Document comparison done on 8/11/2026 9:15:22 AM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Hudson - Lease Recharacterization Adversary Complaint (v. 2025.12.22).docx | |
| **Modified filename:** Hudson 1701 - Amended Recharacterization Complaint_260610_FINAL.docx | |
| **Changes:** | |
| Add | 566 |
| ~~Delete~~ | 479 |
| ~~Move From~~ | 33 |
| Move To | 33 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 2 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1113 |