**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>HUDSON 1701/1706, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-11853 (KBO)<br><br>(Jointly Administered) |
| HUDSON 1701/1706, LLC, a Delaware limited liability company; and HUDSON 1702, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>356W58 GROUND LESSOR LLC, a Delaware limited liability company,<br><br>Defendant. | Adv. Proc. No. 25-52471 (KBO) |

**<u>THE DEBTORS' PRETRIAL BRIEF</u>**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Hudson 1701/1706, LLC (0281) and Hudson 1702, LLC (0190). The Debtors' mailing address is c/o FTI Consulting, Inc. Attn: Alan Tantleff, 1166 Avenue of the Americas, 15th Floor, New York, NY 10036.

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 5

I. CSC Hudson Identifies the Property and Creates a Redevelopment Plan ........ 5

II. CSC Hudson Assigns its Right to Purchase the Property to MSP and the Parties Sign the Ground Lease ........ 7

III. The Ground Lease Reflects the Lessor's Capital as Part of the Capital Stack (Not Equity) and Requires Extraordinary Capital Contributions from the Debtors and a Draconian Non-Lease Right-Size Payment ........ 9

(a) The Debtors' DownPayment to Cain and Payment of Closing Costs ........ 9

(b) The Investor-Return Based Rent ........ 10

(c) The Right-Size Payment ........ 11

(d) The Debtors' Obligations Associated with Ownership ........ 12

IV. The Debtors Execute the Fourth Amendment to Avoid Forfeiture of their Investment ........ 12

LEGAL STANDARDS ........ 13

I. Recharacterization Standards ........ 13

(a) Recharacterization Case Law ........ 13

(b) Equitable Considerations ........ 15

II. Fraudulent Transfer Standards ........ 17

FACTS IN SUPPORT OF RECHARACTERIZATION ........ 18

(a) The Debtors, As Lessees, Contributed Over $40 Million to the Purchase of The Leased Property ........ 18

(b) The Property Was Purchased to Enable the Debtors' Project ........ 19

(c) MSP's Ground Lease "Rents" Are Based on Targeted Investor Yields and Not Market Rental Rates ........ 20

(d) The Ground Lease Required the Debtors to "Right-Size" the Lease, Just as Loans Are Often Right-Sized ........ 21

(e) The Ground Lease Incorporates Loan Terms Where Current "Rent" Characterizations Are Prohibited Under the Internal Revenue Code ....... 22

(f) The Ground Lease, As Amended, Incorporates a Punitive Term That Is Reasonably Likely to Cause a Default, and Reversion to the Lessor, in the 10th Year ....... 23

(g) MSP's Leasing Expert Compares the Ground Lease to Similar Products That Concededly Are at Risk of Recharacterization ....... 23

(h) The Ground Lease Has a 99-Year Term ....... 24

(i) The Debtors Assumed All Obligations Associated with Ownership ....... 24

FACTS IN SUPPORT OF FRAUDULENT TRANSFER ....... 26

THE DEBTORS' WITNESSES ....... 27

THE DEBTORS' EVIDENCE ....... 28

REQUESTED RELIEF ....... 29

I. Recharacterization of the Ground Lease and a Supplemental Proceeding to Determine the Nature, Priority, and Extent of the Defendant's Claim ....... 29

II. Fourth Amendment Relief ....... 31

CONCLUSION ....... 32

# TABLE OF AUTHORITIES

**Cases**

*Constr. Loan Servs. v. SilverRock Dev., Co., LLC (In re SilverRock Dev., Co.)*,
2025 WL 3492145 (D. Del. Dec. 5, 2025) .......... 20, 24

*Finn v. Meighan*,
325 U.S. 300 (1945) .......... 16

*Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency*,
155 B.R. 824 (Bankr. N.D.N.Y. 1993) .......... 14

*In re 48th St. Steakhouse, Inc.*,
61 B.R. 182 (Bankr. S.D.N.Y. 1986) .......... 14

In re Chateaugay Corp.,
102 B.R. 335 (Bankr. S.D.N.Y. 1989) .......... 25

*In re Keydata Corp.*,
18 B.R. 907 (Bankr. D. Mass. 1982) .......... 19

*In re Montgomery Ward, LLC*,
469 B.R. 522 (Bankr. D. Del. 2012) .......... passim

*In re PCH Assocs.*,
804 F.2d 193 (2d Cir. 1986) .......... 1

*In re PCH Assocs.*,
949 F.2d 585 (2d Cir. 1991) .......... 15, 20, 30

*In re Sears Holdings Corp.*,
661 B.R. 298 (S.D.N.Y. 2024) .......... 16

*In re Winston Mills, Inc.*,
6 B.R. 587 (Bankr. S.D.N.Y. 1980) .......... 19

*Intl. Trade Ad. v. Rensselaer Polytechnic Inst.*,
936 F.2d 744 (2d Cir. 1991) .......... 14, 16, 18, 24

*Liona Corp., N.V. v. PCH Assocs.*,
804 F.2d 193 (2d. Cir. 1986) .......... passim

*Marriott Family Restaurants v. Lunan Family Restaurants (In re Lunan Family Restaurants)*,
194 B.R. 429 (Bankr. N.D. Ill. 1996) .......... 1

*MOAC Mall Holdings LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*,
2024 WL 5113165 (2d Cir. Dec. 16, 2024) .......... 16, 18, 24, 25

**Statutes**

11 U.S.C. § 365 ........ passim

11 U.S.C. § 548 ........ 21

Debtors Hudson 1701/1706, LLC and Hudson 1702, LLC (collectively, the "**Debtors**") respectfully submit this pretrial brief in order to preview for the Court the Debtors' claims against 356W58 Ground Lessor LLC (the "**Ground Lessor**"), the applicable law, the contested issues of law and fact, the evidence the Debtors intend to proffer at trial in support of their claims, and the Debtors' requested relief.[2]

## PRELIMINARY STATEMENT

As this Court has recognized, in recharacterization analyses, "an agreement is not a true lease where the obligations under the lease significantly differ from those under ordinary landlord/tenant agreements." *In re Montgomery Ward, LLC*, 469 B.R. 522, 530 (Bankr. D. Del. 2012) (citing *Marriott Family Restaurants v. Lunan Family Restaurants (In re Lunan Family Restaurants*), 194 B.R. 429, 450 (Bankr. N.D. Ill. 1996) (quoting *In re PCH Assocs.*, 804 F.2d 193, 200 (2d Cir. 1986) ("***PCH I***"))). The Debtors will present witnesses at trial who will confirm that the ground lease (the "**Ground Lease**") between the Debtors and the Ground Lessor, an affiliate of Montgomery Street Partners, LP (collectively with the Ground Lessor, "**MSP**"), contains terms that, when viewed collectively, are significantly different from an ordinary landlord-tenant relationship. The Debtors' evidence will show that:

(i) the Debtors paid **$38.85 million** *directly to the seller of the Property* as part of MSP's purchase of condominium units at 353 West 57th Street in New York City (the "**Property**"), in addition to millions more in closing and financing costs;

[2] Submitted herewith is the Declaration of William E. Chipman, sworn to on November 20, 2026 ("**Chipman Decl.**"). Attached to the Chipman Declaration are: Exhibit A, excerpts from the April 24, 2026 deposition of Salomon Smeke ("**S. Smeke Dep.**"); Exhibit B, excerpts from the April 27, 2026 deposition of Alberto Smeke ("**A. Smeke Dep.**"); Exhibit C, excerpts from the April 28, 2026 deposition of Luke Pak ("**Pak Dep.**"); Exhibit D, excerpts from the April 30, 2026 deposition of Max Nipon ("**Nipon Dep.**"); and Exhibit E, excerpts from the November 12, 2026 deposition of Daniel Mizukovski ("**Mizukovski Dep**.").

(ii) MSP was not an existing property owner that leased the Property to the Debtors. Rather, the Debtors identified the opportunity to redevelop and operate the Property, created a redevelopment plan for the Property (the "**Project**"), negotiated and signed a purchase agreement for the Property, and sought construction and acquisition financing, all before MSP became involved;

(iii) MSP nominally acquired the Property simultaneously with the execution of the Ground Lease, solely to fund the Debtors' pre-existing purchase agreement;

(iv) the Ground Lease "rent" was not set by reference to market real estate rental rates, but rather was calculated as a yield on MSP's capital investment. The Debtors understood the rent payments as the equivalent of interest payments on an "interest-only" loan, while MSP marketed the "ground lease" product to its investors as a "financing product" offering a predictable yield stream;

(v) the Ground Lease contains a "right-size" mechanism (the "**Right-Size Payment**") that functions as a loan coverage ratio test—a tool used by lenders to monitor the adequacy of cash flow relative to debt service. This Right-Size Payment imposes a massive obligation (up to $65 million) on the Debtors, in effect serving as additional credit support, if specified NOI-to-rent thresholds are not met, *even when the Debtors are current on all rent*;

(vi) the Ground Lease itself treats the Debtors' payment to the seller and other extraordinary payments as loans to MSP because they cannot properly be characterized as current "rent" payments;

(vii) the Ground Lease has a term of 99 years; and

(viii) the Debtors bore all economic incidents of ownership, including, at inception, paying all closing costs normally borne by the buyer/owner and, during the pendency of the lease, all taxes, insurance, maintenance, utilities, and capital expenditures required for the development of the Property.

The following graph, prepared by Debtors' ground lease expert, Carolyn Pianin, drives home the significant difference between the Ground Lease and traditional ground leases.




As even MSP's leasing expert, Daniel Mizukovski ("**Mizukovski**"), agrees, market participants lease because they do not want to incur or finance the upfront costs of buying property. However, here, the Debtors were required to finance an extraordinary upfront payment of $36.85 million and will be required to finance (assuming it is even possible) another $65 million only ten years into a 99-year lease. In fact, when asked where the Debtors were supposed to find the $65 million owed in year ten, Mizukovski testified that it should have been accounted for in the

"development budget"—moving that obligation up to the very commencement of the Ground Lease and the Project. Mizukovski Dep. at 42:17–20, 43:5–44:5.[3]

As the Court is aware, since the May 2022 execution of the Ground Lease, the Project has been delayed and its scope has changed. In particular, the Debtors have committed to pricing 138 of the 440 apartment units at below-market prices in order to facilitate the lifting of two stop work orders issued while the Project was overseen by the Debtors' former managers. As a result, estimates of annual net operating income ("**NOI**") from the completed Project have declined from over $25 million to less than $15 million. Indeed, a December 2025 appraisal commissioned by MSP agreed, estimating the future NOI of the Property at $15 million. Complicating things, in 2024, the Debtors' former managers, facing default pressure from MSP and the possible premature forfeiture of the Project, agreed to a Fourth Amendment to the Ground Lease (the "**Fourth Amendment**") that increased the base rent by 36.7%—from $6.4 million to $8.75 million per year. At current NOI projections, the ground rent would consume approximately 58% of the Project's future NOI.

All of these financial issues are significantly compounded by the Fourth Amendment's requirement of the Right-Size Payment to MSP in 2032 (only 3 years after the projected completion of the Project) that will likely be $65 million—effectively requiring a large, non-lease-like balloon obligation in just the tenth year of a purported 99-year lease, a sum that will be impossible to finance. If the Ground Lease is treated as a true lease under section 365 of the Bankruptcy Code, the Debtors face a stark choice: assume the Ground Lease at unrealistic terms or reject it and forfeit

[3] Mizukovski also conceded that none of the ground lease engagements he worked on (as identified in his report) involved a simultaneous purchase and lease of the leased property, and none contained a provision similar to the Right-Size Payment. *Id.* at 6:20–7:10. And he conceded that he has seen no document showing that the Debtors' upfront payment was an actual negotiated prepayment of rent. *Id.* at 9:7–16.

to MSP—and to no other creditor—the substantial investments the Debtors have made in the Property, generating a windfall for MSP.

Forfeiture, however, is not the foregone outcome here. The facts demonstrate that the Ground Lease is a complex financial product and not an ordinary landlord/tenant lease agreement. Accordingly, under well-established bankruptcy law, the Debtors' investments in the Project can be preserved for the benefit of all creditors because the Ground Lease is not a true lease, and the assumption-or-rejection framework of section 365 does not apply. And the Debtors' investment here is significant: since May 2022, the Debtors have invested well over $200 million in the Project, including the over $40 million the Debtors contributed to MSP's initial acquisition of the Property.

The Property is the Debtors' only real asset and the only real source of value for the creditors in the Debtors' chapter 11 cases. As the Second Circuit Court of Appeals recognized in *Liona Corp., N.V. v. PCH Assocs.*, 804 F.2d 193, 200 (2d Cir. 1986) ("***PCH***"):

> If security transactions, loans and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the 'lessor' gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate. This is especially apparent in the case at bar. If successful, Liona would enjoy the benefit of its contract with PCH to the detriment of others having valid claims against the bankrupt's estate. However, if there is no true lease, Liona should not be permitted to escape the consequences of investor/creditor status by invoking the labels of 'landlord' and 'lease.'

As the evidence at trial will show, the same principles require recharacterization here.

## FACTUAL BACKGROUND

### I. CSC Hudson Identifies the Property and Creates a Redevelopment Plan

In the summer of 2021, the prior owner of the Debtors, CSC Hudson LLC ("**CSC Hudson**"), managed by its cofounders and principals Alberto Smeke and Salomon Smeke (together, the "**Smekes**"), identified the opportunity to redevelop and operate three commercial

condominium units (the "**Units**") at 353 West 57th Street Condominium in Manhattan, which was formerly a hotel called the Hudson Hotel. A. Smeke Dep. at 15:22-16:6. The Smekes created a detailed redevelopment plan for the Property, including key underwriting assumptions necessary to obtain traditional financing for the project (such as projected income and a redevelopment timeline). Hudson Ex. 4 (Jan. 31, 2022 Email from A. Bailkin attaching CSC Hudson transaction overview).

CSC Hudson planned to redevelop the Units as a multifamily residential property with approximately 400 market-rate rental units, commercial space, and a penthouse. Hudson Ex. 17 (Mar. 4, 2022 Parkview Letter of Intent) at 1. The real property was divided into six condominium units, and the Property that the Debtors planned to redevelop comprised Units 1701, 1702, and 1706. Hudson Ex. 1 (1993 First Amendment to Declaration) at 1; Joint Ex. 1 (Feb. 3, 2022 Purchase Agreement) at 1; Joint Ex. 5 (May 3, 2022 Closing Agreement) at 1.

On February 3, 2022, CSC Hudson entered into an agreement with the owner of the Property, EC 58th Street LLC ("**Cain**"), a subsidiary of Cain International, to purchase Units 1701 and 1702 and sub-lease Unit 1706, with an option to later purchase Unit 1706 (the "**Purchase Agreement**"). *See* Joint Ex. 1 (Feb. 3, 2022 Purchase Agreement) at 1-3; A. Smeke Dep. at 11:9-22, 13:18-14:5. The total purchase price for the Units was $207,850,000. *See* Joint Ex. 1 (Feb. 3, 2022 Purchase Agreement) at 4; Joint Ex. 5 (May 3, 2022 Closing Agreement) at 4; A. Smeke Dep. at 13:8-10.

At the time that CSC Hudson entered into the Purchase Agreement with Cain, the Smekes knew that they would need to obtain acquisition financing to purchase the Units. S. Smeke Dep. at 113:17–25 ("Q. You were looking for a funder for the project, right, to acquire the fee either through yourself or through MSP; is that correct? A. No. We were buying the property from Cain

International. Q. And you needed financing to do so, correct? A. That's right."). To identify possible partners, CSC Hudson engaged Meridian Capital Group ("**Meridian**"), an investment broker that the Smekes had retained for past projects. *Id*. at 40:13–23; A. Smeke Dep. at 17:8–18.

## II. CSC Hudson Assigns its Right to Purchase the Property to MSP and the Parties Sign the Ground Lease

MSP was not involved in the negotiation of the Purchase Agreement between CSC Hudson and Cain, including any negotiations regarding the total purchase price for the Units. In fact, Meridian first contacted MSP regarding the opportunity to finance the acquisition of the Units on January 31, 2022, just ***four days before*** CSC Hudson executed the Purchase Agreement with Cain. *See* Hudson Ex. 4 (Jan. 31, 2022 Email from A. Bailkin). Meridian then introduced representatives of MSP to the Smekes on February 5, 2022, ***after*** the Purchase Agreement between CSC Hudson and Cain was signed. Hudson Ex. 8 (Feb. 5, 2022 Email from M. Betesh of Meridian Capital introducing the Smekes to MSP). At that point, MSP had not even visited the Property. *Id*. (Feb. 5, 2022 Email from M. Bartmann of MSP requesting tour of the Property). MSP and CSC Hudson proceeded to negotiate a ground lease term sheet over the following weeks, which was executed on February 24, 2022. *See* Joint Ex. 2 (Feb. 24, 2022 MSP Term Sheet). Simultaneously, CSC Hudson was negotiating with Parkview to provide $207 million of development and construction financing. *See* Hudson Ex. 17 (Mar. 4, 2022 Parkview Letter of Intent) at 1.

MSP and its affiliated real estate investment trust, Ground Lease REIT, LP ("**GLR**"), marketed a financing option structured as a "ground lease" that would free up initial capital for construction purposes. MSP and GLR marketed this ground lease concept on their website as a "financing product" beneficial to real estate developers. *See* Hudson Ex. 109 (GLR Brochure). In a publicly available podcast interview, MSP principal Max Nipon described MSP's ground lease product as "effectively an alternative form of financing to the market," compared MSP's position

to a lender's "A-note," and compared the ground lease product to preferred equity and mezzanine debt. Hudson Ex. 85 (Transcript of *Recap with Brandon Roth*, Episode 5, "Ground Lease Financing," Apr. 11, 2024) at 6:8-21, 22:5-19, 29:17-30:10. Consistent with this marketing, the Smekes were led to believe that a ground lease would offer less expensive initial capital for the Project, and that the monthly "rent" payments would likely be lower than the debt service on other forms of financing. A. Smeke Dep. at 36:23-37:18, 38:18-39:5.

The Debtor entities were created in March 2022, with CSC Hudson as the sole member of each entity. A. Smeke Dep. at 7:14–22. On May 3, 2022, CSC Hudson entered into a Closing Agreement (the "**Closing Agreement**") with MSP, which provided that (i) CSC Hudson assigned its Purchase Agreement with Cain to MSP so that MSP could step into its shoes as the purchaser of Units 1701 and 1702, and the lessor of Unit 1706; and (ii) the Debtors would execute the Ground Lease with MSP. *See* Joint Ex. 5 (May 3, 2022 Closing Agreement) at 1. This simultaneous purchase of property and execution of a ground lease is not uncommon for MSP: MSP partner Luke Pak testified that every ground lease in GLR's portfolio was similarly created simultaneously with the purchase of the underlying property. In other words, MSP does not buy and hold real estate independently, but instead "creat[es] the ground lease when [it] invest[s] in the lease fee." Pak Dep. at 64:10–14.

The Debtors also entered into two separate loan agreements with Parkview on May 4, 2022, with the proceeds funding the Project. Joint Ex. 8 (May 4, 2022 Building Loan); Joint Ex. 11 (May 4, 2022 Project Loan).

## III. The Ground Lease Reflects the Lessor's Capital as Part of the Capital Stack (Not Equity) and Requires Extraordinary Capital Contributions from the Debtors and a Draconian Non-Lease Right-Size Payment

The Ground Lease gave the Debtors the right to commence and complete construction of the Project and then operate the Property for 99 years. *See* Joint Ex. 6 (May 4, 2022 Ground Lease) at i. The Ground Lease attached a Project Budget that laid out the redevelopment project's "capital stack" and reflected that MSP's role was to contribute $178 million in acquisition financing as part of the capital stack for the Debtors' acquisition and conversion of the Property into a multifamily apartment complex. *Id*. at Exhibit C, Schedule 1.

### (a) The Debtors' Downpayment to Cain and Payment of Closing Costs

Unlike traditional ground lease transactions, the Debtors paid significant funds towards the purchase of the Property. Under the terms of the Closing Agreement, the Debtors agreed to pay $37,500,000 towards the purchase price, $36,850,000 of which was allocated to the purchase of Units 1701 and 1702 and lease of Unit 1706. Joint Ex. 5 (May 3, 2022 Closing Agreement) § 2(a); Joint Ex. 6 (May 4, 2022 Ground Lease) § 4(i). Notably, that amount represented nearly 18% of the total $206,850,000 purchase price for Units 1701 and 1702—roughly the amount of a typical downpayment for a real estate purchase.

Further, *that amount was paid by CSC, on behalf of the Debtors, directly to Cain*, the seller of the Units under the Purchase Agreement—not to MSP. A. Smeke Dep. at 63:19–22, 64:2–7. Even though the Ground Lease purported to deem the capital contribution by the Debtors as "prepaid rent," the Debtors have not received any offset or credit against future rent. A. Smeke Dep. at 65:11–16. Meanwhile, MSP paid 18% less for the Property than the Purchase Agreement called for due to the Debtors' significant contribution.

Under the Closing Agreement, *the Debtors also paid all of the closing costs in purchasing the Property*, including taxes, title insurance premiums, escrow fees, recording fees, and due

diligence costs. Joint Ex. 5 (May 3, 2022 Closing Agreement) § 3(c); A. Smeke Dep. at 73:17-24. In total, the Debtors paid approximately **$40 million** towards MSP's purported acquisition of Units 1701 and 1702. *See* Joint Ex. 6 (May 4, 2022 Ground Lease) § 4(i); Hudson Ex. 37 (May 4, 2022 Settlement Statement).

Further, when MSP exercised its right to purchase Unit 1706—the 10th floor unit—in January 2023, the Debtors paid $2 million of the $10 million purchase price directly to Cain as seller (another typical downpayment amount for a real estate purchase) and again paid all the closing costs. Joint Ex. 15 (Jan. 3, 2023 Closing Agreement) §§ 2(a), 3; A. Smeke Dep. at 85:4-10. The Debtors therefore, again, paid a 20% downpayment towards MSP's purchase of the 10th floor of the Property.

**(b) The Investor-Return Based Rent**

In addition to making downpayments and paying all closing costs for the Units, the Debtors further agreed to pay the Ground Lessor $6,400,000 per year in rent (increased from $6 million after the purchase of Unit 1706). Joint Ex. 6 (May 4, 2022 Ground Lease) § 4(a). All parties understood that the annual rent payment was calculated to represent a targeted yield on MSP's $178,000,000 investment in the Project.[4] A. Smeke Dep. at 34:6-25, 53:15-22; Nipon Dep. at 26:20-27:3; *see also* Hudson Ex. 6 (Feb. 6, 2022 Email from M. Bartmann of MSP). The rent was set to increase by 10% in the sixth and eleventh lease years and by at least 2% for the following 88 lease years, with consumer price index (CPI) catchups starting in year 21 to ensure that MSP's

[4] In Nipon's podcast interview about MSP's ground lease project, he confirmed that MSP prices "rent" as a spread to the 30-year Treasury rate (exactly how a lender prices debt) and that MSP targets ground rent at 25–30% of NOI (3.5–4 "turns of coverage"), a lending coverage-ratio metric. *See* Hudson Ex. 85 (Transcript of *Recap with Brandon Roth*, Episode 5, "Ground Lease Financing," Apr. 11, 2024) at 7:7-9:11.

yield would grow commensurate with inflation. Joint Ex. 6 (May 4, 2022 Ground Lease) §§ 4(b)-(d); A. Smeke Dep. at 35:2-19, 89:9-90:3.

**(c) The Right-Size Payment**

The Ground Lease requires an extraordinary non-lease-like payment by the Debtors, called a "Right-Size Payment," in the fifth year of the lease if an alternative project or "Fallback Project" is pursued by the Debtors and short-term income projections are not met (akin to a loan's coverage ratio), even if rent is being timely paid. *See* Joint Ex. 6 (May 4, 2022 Ground Lease) §§ 1, 60(a). Although the Right-Size Payment would result in lower monthly rent to account for reduced cash flow, it also required an extraordinary one-time, lump-sum payment of more than $50 million just five years into the lease term to compensate MSP for that rent reduction upfront. *Id.* §60(a); *see also* Hudson Ex. 80 (Right-Size Example Calculations) at 3.

Tellingly, the requirement of a Right-Size Payment was not mentioned in MSP's February 24, 2022 term sheet with the Debtors—MSP first raised it on April 21, 2022, only two weeks before the transaction closed. *See* Joint Ex. 2 (Feb. 24, 2022 MSP Term Sheet); Hudson Ex. 24 (April 21, 2022 Email from D. Ash, MSP counsel, noting that the Right-Size Payment had been discussed for the first time that day).

MSP principal Max Nipon described the Right-Size Payment not as a tool to protect rental income, but as a device to preserve "market convention metrics," conceding that MSP "do[es]n't need the right-size mechanism to ensure just the payment of ground rent." Nipon Dep. at 94:12-17, 95:14-21. Further, MSP refused to remove the Right-Size Payment at CSC Hudson's request because it stated that it "need[s] assurances" that the Project's cash flow supports ground rent "at market-recognized standards"—expressly calling it a "coverage requirement," a loan covenant

type of provision, not a typical leasehold provision. *See* Hudson Ex. 76 (Feb. 5, 2024 email from M. Nipon of MSP to CSC Hudson).

**(d) The Debtors' Obligations Associated with Ownership**

Finally, given that the Ground Lease is a triple net lease, the Debtors are responsible for all ongoing costs associated with the Project and maintaining the property, including paying all real estate taxes, obtaining property insurance, keeping and maintaining the property in good condition, repair, and appearance, obtaining all permits and licenses required for the redevelopment of the property, paying all construction costs for the redevelopment, keeping the property free and clear of liens, and paying all utilities—all costs associated with ownership, many of which a landlord would pay under a true lease. Joint Ex. 6 (May 4, 2022 Ground Lease) §§ 5(e), 7(a), 7(c), 9(a), 9(f), 10, 15, 38; A. Smeke Dep. at 83:8–84:15.

## IV. The Debtors Execute the Fourth Amendment to Avoid Forfeiture of their Investment

By late 2023, the Debtors had invested approximately $24 million in hard costs into the Project (on top of the approximately $40 million downpayment and closing costs the Debtors had contributed to the acquisition of the Property). *See* Hudson Ex. 69 (Hudson 1702 Trial Balance as of Dec. 31, 2023). Nevertheless, the Project was the subject of two stop work orders in late 2023. *See* Hudson Ex. 74 (Jan. 26, 2024 MSP Response Letter) at 7. Those stop work orders required the Debtors to submit "Fallback Business Plans" to MSP under the terms of the Ground Lease. *See* Joint Ex. 6 (May 4, 2022 Ground Lease) § 48(c). In response to two detailed Fallback Business Plans that the Debtors submitted (through CSC Hudson), MSP informed the Debtors that it would not accept either Fallback Business Plan unless they also signed an amendment to the Ground Lease. A. Smeke Dep. at 113:7-12.

Left with two options—sign the amendment proposed by MSP or lose their investment of more than $60 million in the Project and Property—the Debtors signed the Fourth Amendment to

the Ground Lease. A. Smeke Dep. at 124:18-23 ("Q. At this time, what were the debtor entities' other options other than signing this -- to continue with the project? A. That was it. Q. This was the only option? A. Yeah.").

The Fourth Amendment increased ground rent by approximately 36% to $8.75 million and allowed for more frequent adjustments to the base rent, from every ten years to every five years. Joint Ex. 19 (Mar. 29, 2024 Fourth Amendment) §§ 5(b), 5(d). Further, the Fourth Amendment increased the Right-Size Payment to a maximum of approximately $65 million due in 2032—ten years into the Ground Lease. *Id.* §§ 4(b), 6(b).

Although a "rent buyback" provision was included in the Fourth Amendment, which on its face would allow the Debtors to buy down the rent to its pre-Fourth Amendment levels, the Debtors determined that the buyback option was not economically rational for them. The Debtors would have been required to pay down the rent at a 4.5% capitalization rate (i.e., at a high price per dollar of rent reduction), but the market would value the rent reduction at a lower price per dollar of rent reduction. A. Smeke Dep. at 140:8-142:11. The Debtors would therefore be overpaying for the rental rate reduction.

## LEGAL STANDARDS

### I. Recharacterization Standards

#### (a) Recharacterization Case Law

In adopting the Bankruptcy Code, the U.S. Congress expressly recognized its lease provisions should apply only to "true leases":

> Congress was not blind to the economic realities which have led to the use of a lease as a financing device or as collateral security. The legislative history to section 502 of the Code . . . makes clear the Congressional intention that the [section 365] limitation be applied to only true leases, with the determination that a lease is a true one to turn on the circumstances of each case and the economic substance of the

> transaction, not on the locus of title, form of transaction or the mere labelling as a lease.

*In re 48th St. Steakhouse, Inc.*, 61 B.R. 182, 190 (Bankr. S.D.N.Y. 1986) (citing 124 Cong. Rec. H. 11, 093–94 (Sept. 28, 1978); S 17, 410 (Oct. 6, 1978)), *aff'd*, 77 B.R. 409 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 427 (2d Cir. 1987). When considering whether a lease is a "true lease," the primary inquiry is "whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *Intl. Trade Ad. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir. 1991) ("***RPI***") (internal quotation marks omitted). "[T]he bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than the locus of the title, the form of the transaction or the fact that the transaction is denominated as a 'lease,' to determine whether the transaction embodies a 'true lease' or a financing transaction." *PCH*, 804 F.2d at 199.

To assist in this analysis, courts have identified a number of factors for consideration, including:

> (i) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment; (ii) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction; (iii) whether the property was purchased by the lessor specifically for the lessee's use; (iv) whether the transaction was structured as a lease to secure certain tax advantages; and (v) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance.

*Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993) (citing *PCH*, 804 F.2d at 200-01). This Court has cited *Hotel Syracuse* for these same recharacterization factors. *See, e.g.*, *Montgomery Ward*, 469 B.R. at 530.

The evidence presented by the Debtors at trial will show that the above factors, as well as certain unique features of the Ground Lease transaction, strongly militate in favor of a determination that the Ground Lease is not a true lease and should be recharacterized as a loan.

**(b) Equitable Considerations**

MSP argues that because the Ground Lease reverts to MSP in 95 years (99 years minus the four years since 2022), the lease must be a true lease under section 365. But recharacterization is an equitable principle that, like many bankruptcy concepts, is aimed at achieving the fair distribution of a debtor's assets to its creditors. *See In re PCH Assocs.*, 949 F.2d 585, 598 (2d Cir. 1991) ("***PCH II***") (explaining that in holding a lease was not a "true lease," "we sought to implement what is perhaps the predominant policy objective of a bankruptcy proceeding—equal treatment of similarly situated creditors"). Allowing one creditor to walk away with all the Debtors' assets, including the value of all the investments made in those assets by the Debtors, only four years into a 99-year lease is contrary to these equitable considerations.

The evidence at trial will demonstrate that the Ground Lessor has, in less than four years, received over $62 million in payments under the Ground Lease and that significant improvements have been made to the Property in that period. And yet, MSP wants to obtain the Project and the Property, cut off the Debtors' ability to continue the Project and realize the fruits of their significant investments, and keep for itself the value of all improvements—even though approximately 95 years remain on the lease term.

Such a result is inconsistent with the very fundamentals of bankruptcy and reorganization. As the Second Circuit Court of Appeals recognized in 2024, allowing a purported lessor to "recapture" a leased premises decades before the termination of the lease would be a "grossly inequitable" windfall and supports a recharacterization of the lease. *See MOAC Mall Holdings*

*LLC v. Transform Holdco LLC (In re Sears Holdings Corp.)*, 2024 WL 5113165, at *3 (2d Cir. Dec. 16, 2024) ("***MOAC***"). In that case involving the bankruptcy of Sears & Roebuck, Inc., the Second Circuit held that to permit a lessor (MOAC) "to recapture the leased premises over sixty years before the expiration of the MOAC Lease would amount to a windfall to MOAC" and "[t]hat a present reversion to [MOAC] would be grossly inequitable bolsters our conclusion that § 365 (d)(4) does not apply to this unusual transaction." *Id.* at *3 (citation modified); *see also RPI*, 936 F.2d at 749 (99-year term and prepaid rent "transformed the agreement from a traditional lease into a pre-paid right of possession for a substantial future term"); *Finn v. Meighan*, 325 U.S. 300, 301 (1945) ("The bankruptcy court does not look with favor upon forfeiture clauses in leases. They are liberally construed in favor of the bankrupt lessee so as not to deprive the estate of property which may turn out to be a valuable asset.").

In *MOAC*, Sears had prepaid 30 years of rent, but that amounted to only $300, *In re Sears Holdings Corp.*, 661 B.R. 298, 322 n.10 (S.D.N.Y. 2024), and Sears paid no funds toward the purchase of the mall in question.[5] Accordingly, the facts here are much more stark and prejudicial to the Debtors' interests than in *MOAC*: the Debtors have paid nearly $43 million of the purchase price and closing costs for the Units and over $160 million in additional costs related to the completion of the Project. Thus, the equitable considerations raised by the Second Circuit apply even more so here. If the Debtors are forced to reject the Ground Lease, the Debtors would lose substantially all of their investment, and all creditors other than MSP will receive nothing.

---

[5] The district court recognized in 2020 that the rent terms were "highly favorable" to Sears because "(1) Sears constructed the demised premises at its own expense, while (2) MOAC bent over backward to get Sears into the shopping center as an anchor tenant." *In re Sears Holdings Corp.*, 613 B.R. 51, 56 (S.D.N.Y. 2020), *vacated on other grounds,* 616 B.R. 615 (S.D.N.Y. 2020). The costs associated with Sears' buildout of the premises were not provided.

Nor can MSP avoid recharacterization by pointing to the parties' chosen labels. The substance-over-form inquiry required by *PCH* and its progeny exists precisely because parties may structure transactions as "leases" for tax, regulatory, or other purposes even when the economic substance is that of a loan. *See PCH*, 804 F.2d at 199 (the court must "consider the economic substance of the transaction rather than the locus of the title, the form of the transaction or the fact that the transaction is denominated as a 'lease'") (citation modified). In every recharacterization case under the Bankruptcy Code, the parties called the transaction a lease, but the relevant courts determined that it was in fact a financing.

Here, the evidence will show that MSP itself marketed its ground lease product as a "financing product" and described it as providing an "exceptionally low cost of capital"—the language of lending, not leasing. The parties' own conduct and communications undermine any argument that the "lease" label should be dispositive.[6]

## II. <u>Fraudulent Transfer Standards</u>

Section 548(a)(1) of the Bankruptcy Code, which pertains to fraudulent conveyance, provides that:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) . . . was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

To recover under section 548, the Debtors must show that there was a transfer of an interest in their property for less than reasonably equivalent value while they were insolvent or that such

[6] This is similar to what bankruptcy courts do routinely by ignoring the parties' self-serving recitations that each party is solvent or that consideration constitutes reasonably equivalent value when conducting a fraudulent conveyance analysis.

transfer rendered them insolvent.

## **FACTS IN SUPPORT OF RECHARACTERIZATION**

The purported Ground Lease contains many of the provisions that federal courts have looked to in deciding to recharacterize leases—as well as certain additional unique features—and nearly every one of the factors identified by the Second Circuit in *PCH* and *RPI* weighs in favor of recharacterization here.

### **(a) The Debtors, As Lessees, Contributed Over $40 Million to the Purchase of the Leased Property**

This fact is so unique that the Debtors were unable to locate any other recharacterization cases in which this fact was present.[7] What traditional ground lease compels the lessee to provide substantial funding (almost $39 million) for the purchase of the underlying leased property? The Debtors' leasing expert, Carolyn Pianin, will provide the answer: none that could be identified.

Furthermore, pursuant to the Closing Agreement, the Debtors were required to pay approximately $4 million in customary "owner" costs ancillary to MSP's purchase of the Property, including escrow fees; recording fees; owner's title insurance; and costs or expenses incurred by MSP in connection with the closing ("including, without limitation third party due diligence costs and construction consultant fees incurred by MSP") up to $350,000, as well as $595,000 to GLR in "consideration for advisory and management services" rendered. Joint Ex. 5 (May 3, 2022 Closing Agreement) § 3(c).

---

[7] Two cases address prepayments of rent, not contributions to the purchase price, and nonetheless determined that the prepayments were in substance payments of a *purchase of a right or fee interest* in the property and not just a leasehold interest. *See MOAC*, 2024 WL 5113165, at *3 (affirming recharacterization where "Sears prepaid its rent for the first thirty years" of 100-year lease); *RPI*, 936 F.2d at 749 ("There are two unusual aspects of the lease: the 99-year term and the pre-paid rent (over a period of the initial three years) of $97,830").

**(b) <u>The Property Was Purchased to Enable the Debtors' Project</u>**

The Second Circuit noted in *PCH* that "the fact that property is 'purchased by the lessor specifically for the lessee's use' tends to prove that no true lease exists." 804 F.2d at 200-01 (quoting *In re Winston Mills, Inc.*, 6 B.R. 587, 598 (Bankr. S.D.N.Y. 1980)). Here, MSP had no relationship to the Property or Project until *after* CSC Hudson had already identified the Property, formed a redevelopment plan, and negotiated a Purchase Agreement with Cain. CSC Hudson assigned its right to purchase the Property from Cain to MSP and executed the Ground Lease contemporaneously with MSP providing funding to purchase the Property from Cain.[8] *See* Joint Ex. 6 (May 4, 2022 Ground Lease) at 1; Joint Ex. 5 (May 3, 2022 Closing Agreement) § 2(a). In fact, the Closing Agreement between MSP and the Debtors specifically required execution of the Ground Lease, and MSP's investment guidelines do as well. *See* Joint Ex. 5 (May 3, 2022 Closing Agreement) at 1; Hudson Ex. 25 (Ex. B, Investment Guidelines) at -2085. There is no evidence that MSP ever considered leasing, or had the opportunity to lease, the Property to anyone other than the Debtors, or that MSP ever contemplated acquiring the Property and carrying out the Project itself. *See* A. Smeke Dep. at 48:19–23, 57:5–25.

This factor weighs heavily in favor of recharacterization. *See In re Keydata Corp.*, 18 B.R. 907, 909 (Bankr. D. Mass. 1982) (true lease did not exist where lessee "selected, inspected, contracted for, and received" the property before purchase); *Montgomery Ward*, 469 B.R. at 530 (recharacterization considers whether "the property was purchased by the lessor specifically for the lessee's use"). Further, because CSC Hudson originally negotiated the right to purchase the Property for purposes of completing the Project, assigned that right to MSP, and then leased the

---

[8] In the case of Unit 1706, MSP purchased the Unit concurrently with an amendment to the Ground Lease to include the Unit under the Lease. Joint Ex. 15 (Jan. 3, 2023 Closing Agreement); Joint Ex. 16 (Jan. 3, 2023 First Amendment to Ground Lease).

Property from MSP, the transaction is closely analogous to a sale-leaseback transaction, which courts have found to be loan financings rather than true leases. *See PCH II*, 949 F.2d at 590, 599-600.

**(c) MSP's Ground Lease "Rents" Are Based on Targeted Investor Yields and Not Market Rental Rates**

The Second Circuit in *PCH* also considered whether supposed "rents" under a ground lease are based on market rental rates or calculated to ensure a return to investors. *See* 804 F.2d at 200 (recharacterization affirmed where "rent was not calculated to compensate [the lessor] for the use of the property; rather the parties structured the 'rent' solely to ensure [the lessor's] return on its investment"). Instead of being based on comparable ground rents in New York or on the value of the Debtors' use of the property, MSP concedes that the rent in the Ground Lease was linked to a particular return for its investors—what MSP called the "yield" (calculated as the ground rent divided by MSP's investment toward the purchase of the Units). *See* Nipon Dep. at 26:20-27:3. In the original Ground Lease, MSP's target yield was 3.5%, and by the time of the March 2024 execution of the Fourth Amendment—because of rising interest rates generally—it was 4.5%. *See* Nipon Dep. at 100:5-101:2.

Again, this factor weighs clearly in favor of recharacterization and is consistent with case law in this district. *See, e.g.*, *Constr. Loan Servs. v. SilverRock Dev., Co., LLC (In re SilverRock Dev., Co.)*, 2025 WL 3492145, at *3 (D. Del. Dec. 5, 2025) ("The rent is not market by any means.") (citation omitted); *Montgomery Ward*, 469 B.R. at 530 (recharacterization considers

whether "rental payments" were "structured for some other purpose, such as to ensure a particular return on an investment").

**(d) The Ground Lease Requires the Debtors to "Right-Size" the Lease, Just as Loans Are Often Right-Sized**

Another unique feature of the Ground Lease is the Right-Size Payment. As the Debtors' ground lease expert, Ms. Pianin, will testify, traditional ground leases do not get "right-sized"; loans get "right-sized." Under a 99-year lease, a landlord receives 99 years of rent. If the tenant does not timely pay rent, the tenant may be evicted.

Despite these facts, Max Nipon of MSP contends that MSP had a "vested interest" in the Debtors' leasehold. Nipon Dep. at 75:15–25. But, of course, MSP does not, and Mr. Nipon admitted that MSP has two things: a right to rent and a reversionary interest in the property in 99 years. *Id.* at 21:12–21. Nonetheless, the Ground Lease requires the Debtors to pay huge sums of money if the Project did not proceed according to projections and current yields and if coverage ratios—measures used in loans, not leases—fell below benchmarks. For example, the Ground Lease's right-size provisions required a $28 million lump-sum payment in the fifth year of the Ground Lease if the Project's annual NOI was $18 million—an optimistic revenue stream today. *Id.* at 69:18–22. If the Project was not generating any NOI in year five, the payment was $65 million. *See* Nipon Dep. at 99:8–16. These payments are required under the Ground Lease even if the base rent is being timely paid.

What landlord requires an upfront payment of up to $65 million even though it is regularly receiving rent payments? The Debtors' lease expert, Ms. Pianin, will answer that question: none. MSP's own expert agrees that the Right-Size Payment is not optional: if the Property does not perform sufficiently when the payment comes due, it must be made. *See* Mizukovski Dep. at 7:21–8:7.

### (e) The Ground Lease Incorporates Loan Terms Where Current "Rent" Characterizations Are Prohibited Under the Internal Revenue Code

Another unique feature of this Ground Lease that militates in favor of recharacterization is that four times in the Ground Lease and its amendments, the transaction requires payments outside of the annual rent that are referred to as "prepaid" or "additional" rent: Debtors' contributions to the original Unit purchase prices (Joint Ex. 6 (May 4, 2022 Ground Lease) § 5(d)); Debtors' contribution to the 10th floor unit purchase (Joint Ex. 15 (Jan. 3, 2023 Closing Agreement) § 2(b)); any Right-Size Payment (Joint Ex. 6 (May 4, 2022 Ground Lease) § 60(d)); and, under the Fourth Amendment to the Ground Lease, any "buy back" prepayment of rent (Joint Ex. 19 (Mar. 29, 2024 Fourth Amendment) § 7(e)). Because these large lump sum payments by the Debtors do not correspond to the use of the Property in the period in which they are paid, the Ground Lease does not treat them as current rent at all; instead, to comply with section 467 of the Internal Revenue Code, it requires each to be accounted for under a deemed-loan schedule, as if the Debtors had lent the money to MSP. Joint Ex. 6 (May 4, 2022 Ground Lease) § 5(d), § 60(d); Joint Ex. 13 (Aug. 29, 2022 Side Letter); Joint Ex. 15 (Jan. 3, 2023 Closing Agreement) § 2(b); Joint Ex. 19 (Mar. 29, 2024 Fourth Amendment) § 7(e). The point is not that the tax code converts these payments into loans for "bankruptcy purposes"; it is that the parties themselves structured the Ground Lease's largest payment obligations on loan-amortization terms rather than as ordinary rent for current use, and the Ground Lease contains no provision for repayment of these pseudo-loans, ever.

What traditional ground lease includes terms that require extraordinary upfront payments to property sellers by the lessee that must be treated as loans under the Internal Revenue Code? Once again, the Debtors' real estate expert, Ms. Pianin, will answer: none.

**(f) The Ground Lease, As Amended, Incorporates a Punitive Term That Is Reasonably Likely to Cause a Default, and Reversion to the Lessor, in the 10th Year**

Although MSP claims that the Fourth Amendment provided reasonably equivalent value to the Debtors in exchange for a 36.7% increase in rent, the terms of the Fourth Amendment, and the evidence at trial, will show this claim is untrue. The Fourth Amendment increased ground rent and fundamentally changed the already-unaffordable Right-Size Payment to make it much more expensive. As examples attached to the Fourth Amendment demonstrate, *see* Joint Ex. 19 (Mar. 29, 2024 Fourth Amendment) at Exhibit C, even with an aspirational annual NOI of $21 million in the tenth year (2032), the Debtors would owe MSP a payment of $65 million. The most optimistic projection of annual NOI for the completed Project reflects $17 million in 2029, only three years before the new Right-Size Payment is due.

This punitive $65 million payment will almost certainly default the Debtors and result in a reversion of the Property to MSP, on a timeline shorter than even most commercial real estate loans, belying the concept of a true 99-year lease. It is likely that this reversion trap in year 10 is the "vested interest" that Mr. Nipon of MSP referred to in his deposition testimony, given that he tied the vested interest to a Debtor default. *See* Nipon Dep. at 75:15–25.

**(g) MSP's Leasing Expert Compares** the **Ground Lease** to **Similar Products That Concededly Are** at **Risk** of **Recharacterization**

MSP's leasing expert, Daniel Mizukovski, compares the Ground Lease to other similar financial products in the marketplace, including ground leases marketed by Safehold Inc., a publicly traded real estate investment company. Notably, as the Debtors' leasing expert will testify, modern institutional ground leases, like those marketed by Safehold, have only existed for approximately a decade and represent less than one percent of the ground lease market.

Even more tellingly, Safehold has expressly warned its investors:

> We are subject to the risk of bankruptcy of our Tenants . . . .
>
> ***It is also possible that a bankruptcy court could re-characterize our Ground Leases as secured lending transactions*** depending on its interpretation of the terms of the lease. If a lease were judicially recharacterized as a secured lending transaction, we would not be treated as the owner of the property subject to the lease and could lose the legal as well as economic attributes of the owners of the property, which could have a material adverse effect on us.[9]

**(h) The Ground Lease Has a 99-Year Term**

A 99-year lease term, by itself, is not a definitive indicator of a lease or a financing. But when considered in the context of other non-lease-like provisions in a purported lease, as discussed above, this aspect then weighs in favor of finding that the putative lessee purchased a right or fee interest in the land, rather than a mere leasehold interest, with a reversion of the fee in 99 years. For example, in *PCH*, the Second Circuit noted the bankruptcy court's finding that the unusually long term of the lease—33 years with the option to extend to 165 years—was a feature weighing in favor of recharacterization. *See* 804 F.2d at 195-96 & n.3. Here, the Ground Lease term is 99 years, reflecting in substance the Lessee's acquisition of the right to develop and occupy the Property for the life of the Project. Joint Ex. 6 (May 4, 2022 Ground Lease) at i; *see MOAC*, 2024 WL 5113165, at *3–4 (affirming holding that 100-year lease was not a true lease); *RPI*, 936 F.2d at 749, 751 (recharacterizing a 99-year lease with prepaid rent as a sale for a term of years); *SilverRock*, 2025 WL 3492145, at *3-4 (99-year ground lease recharacterized as a financing).

**(i) The Debtors Assumed All Obligations Associated with Ownership**

Another factor identified by the Second Circuit in *PCH* is "[t]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property," which "is more indicative of a financing transaction than of a true

[9] Safehold Inc., Form 10-K for the Fiscal Year Ended December 31, 2024, p. 16 (emphasis added).

lease." 804 F.2d at 201 (citation omitted). The Debtors paid the customary owner's closing costs for the acquisition of the Property. The substantive economic terms of MSP's Ground Lease also place the risks and obligations ordinarily attributed to ownership on the Debtors. The Ground Lease is "triple net," meaning that it obligated the Debtors or their affiliates to: (1) pay all real estate taxes (*see* Joint Ex. 6 (May 4, 2022 Ground Lease) § 7(a)); (2) obtain insurance at levels demanded by MSP and naming MSP as an additional insured (*id.* § 15); (3) keep and maintain the Property in good condition, repair, and appearance (*id.* § 9(a)); and (4) fund and complete the redevelopment plan (*id.* § 48). The Ground Lease also obligates the Debtors to obtain all permits and licenses (*id.* § 7(c)), keep the Property free and clear of liens (*id.* § 10), pay all utilities (*id.* § 5(e)), and assume the risk of loss and indemnify MSP (*id.* § 38). MSP, by contrast, has no financial obligations typically associated with ownership under any of the operative agreements, for a period of 99 years.

The fact that the Debtors were obligated to pay—and did in fact pay—all the financial obligations typically associated with ownership (as well as all closing costs to purchase the Units, including owner's title insurance) weighs strongly in favor of recharacterization. *See MOAC*, 2024 WL 5113165, at *3 (affirming recharacterization where "Sears paid taxes and other costs associated with the property"); *Montgomery Ward*, 469 B.R. at 530 (recharacterization considers whether "the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance"); *In re Chateaugay Corp.*, 102 B.R. 335, 344 (Bankr. S.D.N.Y. 1989) (holding the agreement in question is not a true lease where the lessor "neither assume[d] nor [wa]s burdened by any of the traditional obligations or indicia associated with ownership or lessor status" and lessee paid for all taxes, insurance, and repairs and maintenance, and assumed risk of loss and indemnity obligations).

* * *

All these lease terms and characteristics demonstrate that the Ground Lease is not a traditional lease and, instead, is a lending product. Accordingly, the Ground Lease is not a "true lease" for purposes of section 365 of the Bankruptcy Code, and it should be recharacterized.

## FACTS IN SUPPORT OF FRAUDULENT TRANSFER

The Debtors' expert regarding the Debtors' solvency, Craig Jacobson, will provide unrefuted testimony that the Debtors were insolvent under any applicable test at the time that they entered into the Fourth Amendment, and that the Fourth Amendment itself caused the Debtors to become significantly more insolvent. Specifically, on March 29, 2024, the day the Fourth Amendment was executed, Mr. Jacobson has determined that the Debtors had approximately $225 million in assets and $373 million in debts, for a negative equity value of over $147 million. On the Petition Date, the Debtors had approximately $220 million in assets and $459 million in debts, for a negative equity value of approximately $238 million. MSP has not disclosed any expert who will offer any contrary opinion.

Mr. Jacobson will also testify that the insolvent Debtors received no reasonably equivalent value in exchange for the astronomical increase in rent under the Fourth Amendment. Indeed, the other provisions of the Fourth Amendment significantly increased the Debtors' obligations—Mr. Jacobson will testify that the net impact of the Fourth Amendment on the Debtors' balance sheet solvency leaves the Debtors' already-negative net asset position $47.1 million lower than it was prior to the Fourth Amendment. And, as noted above, the Fourth Amendment merely increased the Debtors' likelihood of defaulting on the massive Right-Size Payment due in year 10.

Although MSP has proffered an expert, Matthew Dundon ("**Dundon**"), who contends that the Fourth Amendment conferred a net benefit of roughly $23.5 to $24 million on the Debtors, Mr. Jacobson will demonstrate that Dundon's conclusion rests on assumptions that do not survive

scrutiny: a highly inflated 11.94% discount rate that shrinks the present value of the $2.35 million annual rent increase to approximately $29.2 million (versus approximately $52 million at the appropriate 6.32% discount rate); a "development option" valued at $27 to $32 million that disappears (to roughly $28,000 to $80,000) once realistic construction costs, maturity dates, and strike prices are used; and a Right-Size deferral benefit that Dundon overstates several-fold by using unreasonably high NOI projections for the completed project. Corrected for those errors, the Fourth Amendment produced a net detriment, not a benefit. An option has value to an estate only if the estate could realistically exercise it; the trial evidence will show that, after the Fourth Amendment, the Project could not be financed or completed on the amended terms, and the Debtors never had the capital to exercise the buyback at a 4.5% capitalization rate.

**THE DEBTORS' WITNESSES**

The Debtors will call five principal witnesses in their case in chief at trial:

(a) **Alberto Smeke:** Mr. Smeke is a principal of CSC Hudson, the prior owner of the Debtors, and the sponsor of the Project at the time the Ground Lease was executed in May 2022. Mr. Smeke will provide testimony about the Debtors' identification of the Property for acquisition and their development of plans for the Project, their decision to enter into the Ground Lease and the Fourth Amendment, the amounts that the Debtors contributed to the acquisition of the Property and to the Project, the history of the Project from May 2022 until 2025, the Debtors' communications with MSP and other relevant parties, and how these transactions impacted the construction and the completion of the Project.

(b) **Paul Rahimian:** Mr. Rahimian is the founder of Parkview Financial. Mr. Rahimian will provide testimony about the involvement of Parkview in construction lending, Parkview's participation in the Project since May 2022, how the Project's capital stack was assembled and

how MSP's capital functioned within it, Parkview's present ownership of the Debtors, and the current efforts to complete construction of the Project.

(c) **Carolyn Pianin:** Ms. Pianin is the head of asset management for IZO Capital, a private debt fund that makes multifamily construction loans, and an expert on Manhattan commercial real estate. Ms. Pianin, as a designated expert, will provide testimony on the characteristics of traditional ground leases and loan financing in Manhattan real estate transactions and compare those characteristics to the Ground Lease. Ms. Pianin will also provide rebuttal testimony to MSP's expert, Mr. Mizukovski.

(d) **Craig Jacobson:** Mr. Jacobson is a Senior Managing Director at GlassRatner, LLP, a financial valuation firm focusing on real estate and real estate transactions. Mr. Jacobson, as a designated expert, will testify about the solvency of the Debtors at relevant times and on the lack of value received by the Debtors for the increased rent under the Fourth Amendment.

(e) **Glenn Brill:** Mr. Brill, who is overseeing the Project's current operations on behalf of the Debtors, will testify about the status of the Project, the Debtors' investments in and expenditures on the Project to date, and projections of the Property's annual net operating income.

## THE DEBTORS' EVIDENCE

The trial record summarized above provides overwhelming evidence rather than labels and assumptions; the economic substance of this ground lease transaction was a financing, not a true lease or typical landlord-tenant relationship. In summary, the Debtors' evidence will show among other factors that (i) CSC Hudson identified the Property and the development opportunity, negotiated the purchase price, and signed the Purchase Agreement, and that MSP's acquisition occurred only to finance the Debtors' pre-existing purchase agreement; (ii) the Debtors paid approximately $38.85 million directly to the seller and approximately $4 million in closing costs for MSP's acquisition, the equivalent of an owner's equity contribution or deposit; (iii) "rent" was

set as a target yield on MSP's $178 million investment, not by reference to the value of the tenancy or the value of the Property itself; (iv) MSP itself viewed the Right-Size Payment as a loan covenant type of provision, not a typical leasehold provision; and (v) the Project Budget attached to the Ground Lease lists MSP's $178 million as one source of funds alongside Parkview's $207 million financing and $27.1 million of developer equity, a three-party "capital stack" funding $412.1 million of total project costs.

These are precisely the types of factors that, when aggregated, have led courts to look past the parties' labeling of a transaction as a lease to determine that a transaction labeled a lease was in reality a financing.

## REQUESTED RELIEF

### I. Recharacterization of the Ground Lease and a Supplemental Proceeding to Determine the Nature, Priority, and Extent of the Defendant's Claim

Consistent with the procedure outlined by the Second Circuit in *PCH I*, the Debtors request relief in two steps. First, the Debtors respectfully request that the Court declare the Ground Lease is not a true lease and therefore that section 365 of the Bankruptcy Code, including its assumption and rejection requirements, and any other Bankruptcy Code section applicable to leases do not apply to the Ground Lease. Second, upon entry of that declaratory relief, the Debtors request that the Court schedule and conduct a supplemental proceeding with all interested parties to determine the nature, priority, and extent of MSP's claim arising from the Ground Lease pursuant to sections 105, 502, and 506 of the Bankruptcy Code and Bankruptcy Rules 3012 and 7001(b) and (i). The Debtors proffer, without limitation, that the Ground Lease should be recharacterized as either:

(i) debt financing (unsecured or secured by the imposition of an equitable lien if the Court deems appropriate) or (ii) a joint purchase.

This relief is supported by the case law. In *PCH II*, two sophisticated parties entered into a transaction to facilitate the acquisition, renovation, and operation of a Philadelphia hotel. 949 F.2d at 589-90. The Second Circuit affirmed that the purported ground lease was not a "true lease" and held that the transaction was a "sophisticated secured financing arrangement," with the lessor holding an equitable mortgage. *Id*. at 599-600. The court reached this conclusion because, as here, "[the debtor] was to get the money it needed to refurbish the Hotel and [the lessor] was to receive a fixed rate of return on the funds it advanced" and "[the lessor], to protect its funds, retained title to the land and in the event of a default had the right to retake not only possession of that land but also the Hotel and improvements." *Id.* Accordingly, the Second Circuit concluded that "the deed to the land underlying the Hotel while on its face conveying absolute ownership to [the lessor] was in reality nothing more than security for the funds that [the lessor] made available to [the debtor]. In short, [the lessor] held an equitable mortgage." *Id*. The court then remanded for the bankruptcy court to determine the value of the lessor's secured claim under section 506(a). *Id*. at 604.

In like manner, if the Court characterizes the transaction and MSP's contribution of capital as a loan to finance the Debtors' acquisition of the Units, and such loan is deemed secured by an equitable lien, the extent and priority of that lien should be determined by the Court in a

supplemental proceeding in accordance with Bankruptcy Rule 7001(b), to allow other creditors who assert a secured position to intervene and be heard.[10]

Furthermore, in the same supplemental proceeding, the Debtors request that the Court also determine, pursuant to sections 502 and 506 of the Bankruptcy Code and Bankruptcy Rule 3012, the amount of the claim or claims in the Chapter 11 Cases held by the Defendant, GLR, MSP, or any other affiliate or assignee (subject to disallowance of those claims pending payment to the Debtors' estates of any amounts determined to be owing to the estates, pursuant to section 502(d) of the Bankruptcy Code).

The Debtors submit that either a recharacterization of the Ground Lease as debt financing or a joint purchase would comport with the substance of the transaction, prevent the devastating harm to the Debtors' estates that would result from outright forfeiture of the Debtors' significant investment in the Project and the Units, and still recognize meaningful rights of MSP.

## II. Fourth Amendment Relief

The Debtors further request that, with respect to the Fourth Amendment, the Court find and declare that (i) the Fourth Amendment, any transfers thereunder or in connection therewith, and any obligations incurred thereby are avoidable and are avoided as constructive fraudulent transfers or avoidable transfers and (ii) all rent payments made pursuant to the Fourth Amendment in excess of the original base rent in the Ground Lease are recoverable by the Debtors' bankruptcy estates from the Defendant.

---

[10] To be clear, the only question the Court must decide at this trial is whether the Ground Lease is a true lease subject to section 365. The Court need not, and should not, decide at this trial whether MSP holds any lien, the validity, perfection, or extent of any such lien, or its priority relative to other secured creditors. Those questions require the participation of all creditors asserting secured positions in the Property. The Debtors therefore request that the Court reserve all lien, perfection, and priority issues, and the amount of any MSP claim, for the supplemental proceeding.

**CONCLUSION**

For the foregoing reasons, the Debtors respectfully submit that following trial in this action, the Court should determine that the Ground Lease is not a true lease, but rather a loan from MSP to the Debtors for the purchase of the Property or a joint purchase. Further, the Debtors submit that the Court should determine that the Fourth Amendment is voidable as a fraudulent conveyance.

DATED: Wilmington, Delaware
November 20, 2026

CHIPMAN BROWN CICERO & COLE, LLP

*/s/ William E. Chipman, Jr.*
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
Aaron J. Bach (No. 7364)
Alison R. Maser (No. 7430)
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, Delaware 19801
Telephone: (302) 295-0191
Email: chipman@chipmanbrown.com
olivere@chipmanbrown.com
bach@chipmanbrown.com
maser@chipmanbrown.com

BOIES SCHILLER FLEXNER LLP

Michael M. Fay (*admitted pro hac vice*)
Robert D. Gordon (*admitted pro hac vice*)
Sabina Mariella (*admitted pro hac vice*)
Jeffrey Waldron (*admitted pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Email: rgordon@bsfllp.com
mfay@bsfllp.com
smariella@bsfllp.com
jwaldron@bsfllp.com

*Counsel for Debtors and Debtors in Possession*